KASOWITZ, BENSON, TORRES
  & FRIEDMAN LLP
David M. Friedman (DF-4278)
Joseph A. Gershman (JG-8275)
1633 Broadway
New York, New York 10019
Tel:  (212) 506-1700
Fax:  (212) 506-1800

*Counsel to Plaintiff Adelphia Recovery Trust*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| ADELPHIA COMMUNICATIONS CORP., *et al.*, | ) | Chapter 11 Case |
| a Delaware corporation, | ) | Case No. 02-41729 (REG) |
| | ) | |
| Debtors. | ) | |
| | ) | |
| ADELPHIA RECOVERY TRUST, | ) | |
| | ) | |
| Plaintiff, | ) | Adv. Pro. No. 04-03293 |
| v. | ) | (CGM) |
| | ) | |
| PRESTIGE COMMUNICATIONS OF NC, INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| ADELPHIA RECOVERY TRUST, | ) | |
| | ) | |
| Plaintiff, | ) | Adv. Pro. No. 04-03295 |
| v. | ) | (REG) |
| | ) | |
| FPL GROUP, INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MOTION TO WITHDRAW THE REFERENCE**

## TABLE OF CONTENTS

<div align="right">**Page**</div>

PRELIMINARY STATEMENT .................................................................................................1

FACTUAL BACKGROUND..................................................................................................2

    The Bank Case.................................................................................................2

    The MDL Cases................................................................................................3

    The Prestige Case ............................................................................................4

    The FPL Case ..................................................................................................5

    There Are Substantial Overlapping Issues Among These Cases ........................................5

ARGUMENT...............................................................................................................7

I.    THE MOTION TO WITHDRAW THE REFERENCE SHOULD BE GRANTED
    BECAUSE OF THE SIGNIFICANT NUMBER OF OVERLAPPING ISSUES IN
    THESE CASES ........................................................................................................7

    A.    A Weighing of the Relevant Factors, Particularly Judicial  Economy, Militates
        Strongly in Favor of Withdrawal..........................................................................8

    B.    The Interests Of Efficiency And Uniformity Are Best Served By Consolidating
        The Adversary Proceedings With The Bank Case  Already Pending In The
        District Court, And There Are No  Significant Negative Consequences Of Doing
        So......................................................................................................9

    C.    This Motion Is Timely.......................................................................................14

CONCLUSION ..........................................................................................................16

<div align="center">i</div>

## TABLE OF AUTHORITIES

Page

**Cases**

*In re Adelphia Communs. Corp. Sec. & Derivative Litig,*
2006 U.S. Dist. LEXIS 8700 (S.D.N.Y. Feb. 19, 2006).........................................Passim

*Buechner v. Avery,*
2005 U.S. Dist. LEXIS 13735 (S.D.N.Y. Jul. 8, 2005)..................................................9

*Burger King Corp. v. B-K of Kansas, Inc.,*
64 B.R. 728, 1986 U.S. Dist. LEXIS 20986 (D. Kan. 1986).........................................15

*Enron Corp. v. Citigroup, Inc. (In re Enron Corp.),*
349 B.R. 108 (Bankr. S.D.N.Y. 2006) ..........................................................................9

*In re Complete Management, Inc.,*
2002 U.S. Dist. LEXIS 18344 (S.D.N.Y. Sep. 27, 2002) ...............................................9

*Houbigant, Inc. v. ACB Mercantile (In re Houbigant, Inc.),*
185 B.R. 680 (S.D.N.Y. 1995) ...................................................................................11

*Interconnect Telephone Services, Inc.,*
59 B.R. 397 (S.D.N.Y. 1986) .....................................................................................15

*Lone Star Indus. V. Rankin County Economic Dev. Dist. (In re New York Trap Rock Corp.),*
158 B.R. 574 (S.D.N.Y. 1993) ...................................................................................14

*LTV Steel Co., Inc. v. City of Buffalo (In re Chateaugay Corp.),*
2002 U.S. Dist. LEXIS 5318 (S.D.N.Y. Mar. 29, 2002).........................................9, 12

*Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.),*
4 F.3d 1095 (2d Cir. 1993) ..........................................................................................9

*Pan Am Corp. v. Delta Air Lines (In re Pan Am Corp.),*
163 B.R. 41 (S.D.N.Y. 1993) .................................................................................12, 13

*Pitts v. Comm'r,*
2005 U.S. Dist. LEXIS 10316, at *9 (S.D.N.Y. May 10, 2005)  ....................................9

*South St. Seaport Ltd. Pshp. v. Burger Boys (In re Burger Boys),*
94 F.3d 755 (2d Cir. 1996) ...........................................................................................9

*In re Texaco Inc.,*
84 B.R. 911 (Bankr. S.D.N.Y. 1988)............................................................................14

ii

*United States Lines, Inc. v. American S.S. Owners Mut. Protection & Indem. Ass'n
(In re United States Lines, Inc.),*
197 F.3d 631 (2d Cir. 1999) ....................................................................................................9

*Wedtech Corp v. London (In re Wedtech Corp.),*
81 B.R. 237 (S.D.N.Y. 1987) .................................................................................................13

## Statutes

28 U.S.C. § 157 .............................................................................................................7, 8, 14

28 U.S.C. § 1334 ......................................................................................................................7

## Rules

FED. R. BANKR. P. 5011 ..........................................................................................................7, 8

FED. R. BANKR. P. 9033(a) ..........................................................................................................8

LOCAL BANKR. R. 5011-1 ........................................................................................................7, 8

## Other

S.D.N.Y. Order of Reference, Administrative Order M-61, signed on July 10, 1984
    and entered on July 11, 1984. ............................................................................................7

## PRELIMINARY STATEMENT

Plaintiff Adelphia Recovery Trust (the "Trust") files this Motion to Withdraw the Reference for the two adversary proceedings entitled *Adelphia Recovery Trust v. Prestige Communications of NC, Inc. et al.*, Case No. 02-41729 (REG), Adv. Pro. No. 04-03293 (CGM) (Bankr. S.D.N.Y) (the "Prestige Case") and *Adelphia Recovery Trust v. FPL Group, Inc. et al.*, Case No. 02-41729 (REG), Adv. Pro. No. 04-03295 (REG) (Bankr. S.D.N.Y) (the "FPL Case") (collectively, the "Adversary Proceedings") currently pending before two different judges in the Bankruptcy Court. Each of the Bank Case (as defined below), the Prestige Case and the FPL Case was filed in the same court before the same judge. Through no action of the Trust, those three cases are now proceeding in three different courts. The Trust submits that because of the numerous overlapping factual and legal issues between the Adversary Proceedings and *Adelphia Recovery Trust v. Bank of America, N.A., et al.* No. 05 Civ. 9050 (LMM) (the "Bank Case") which the Trust is prosecuting in this Court, the interests of efficiency — particularly judicial efficiency — are best served by the Court exercising its discretion and withdrawing the reference of the Adversary Proceedings and consolidating those two cases with the Bank Case.

The Trust has great respect for the manner in which Judge Morris and Judge Gerber have administered the Adversary Proceedings. However, as the timetables and issues attendant to the three cases have come into sharper focus over the past month, it has become abundantly evident that the overlap of legal, factual and scheduling issues among these three cases continually increases, as does the inefficiency of proceeding in three separate courts. As discussed below, the grounds for withdrawal articulated by the Court in its Prior Withdrawal Decision (as defined below) with respect to the Bank Case apply to the Adversary Proceedings as well, perhaps with even greater force.

**FACTUAL BACKGROUND**

Adelphia Communications Corporation and its affiliated debtors (collectively, the "Debtors") filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the Southern District of New York on June 25, 2002 (the "Petition Date").

<u>The Bank Case</u>

In July 2003, the Official Creditors Committee of the Debtors filed a complaint and a motion seeking authorization to commence and prosecute the Bank Case. The Bank Case, which was commenced before Judge Robert Gerber, the judge presiding over the Adelphia bankruptcy proceedings, alleges, <u>inter alia,</u> that Adelphia's lenders aided and abetted the massive and unprecedented fraud perpetrated by members of the Rigas Family, who looted more than $3 billion primarily through three pre-petition credit "co-borrowing" facilities, and that such lenders received billions of dollars in fraudulent transfers. On February 6, 2006, upon defendants' motion, this Court withdrew the reference of the Bank Case in a decision which focused upon the common issues between the Bank Case and the MDL Case (as defined below) and the efficiencies of both cases proceeding in the same Court. *In re Adelphia Communications Corp. Securities and Derivative Litigation,* 2006 U.S. Dist. LEXIS 8700 (SDNY Feb. 19, 2006) (the "Prior Withdrawal Decision"). However, with the consent of the defendants, Judge Gerber retained jurisdiction to decide the pending motions to dismiss.

On June 11, 2007, the Bankruptcy Court issued an eighty-five page Decision on the motions to dismiss, sustaining the majority of the claims alleged in the Complaint. The Bankruptcy Court sustained claims for intentional and constructive fraudulent transfers, violations of the Bank Holding Company Act, equitable disallowance or subordination, and preferences under section 547 of the Bankruptcy Code. Claims for aiding and abetting fraud

<div align="center">2</div>

were dismissed, but leave to replead was granted.[1] The Amended Complaint in the Bank Case,

served on October 19, 2007, contains 57 claims asserted against numerous Defendants,[2]

including 33 fraudulent conveyance claims, and common law aiding and abetting claims.

On August 1, 2007, the Court issued an Order directing the parties to meet and confer on

a discovery schedule under which the trial could be completed in 2008. Subsequently, the

parties agreed to a two phase process. In phase one, the parties agreed to participate in mediation

before Judge Daniel Weinstein (retired), which is currently scheduled to take place in January

and February 2008. In phase two, which will commence in March 2008 if mediation is

unsuccessful, the parties will resume fact discovery, make good faith efforts to complete

depositions within six months of an agreed-upon date, and would thereafter agree on a schedule

for expert discovery, with a trial to take place no earlier than March 1, 2009. A copy of the

endorsed Scheduling Order is attached as Exhibit A.

<p align="center">The MDL Cases</p>

Beginning in 2002, numerous lawsuits were brought by purchasers and holders of

securities issued by Adelphia and affiliated entities (the "Securities Actions"), who were

allegedly harmed by the misconduct of the defendants in those cases.

By Order of the Judicial Panel on Multidistrict Litigation dated December 3, 2003,

pursuant to 28 U.S.C. § 407, actions pending the Central District of California, Western District

of New York, Eastern District of Pennsylvania, Western District of Pennsylvania and Northern

District of Texas were transferred to the United States District Court for the Southern District of

New York (Hon. Lawrence H. McKenna) for coordinated or consolidated pretrial proceedings.

The consolidated Securities Actions are styled are *In re Adelphia Communications Corp.,*

---

[1] By Order dated September 5, 2007, this Court granted the Bank Defendants leave to appeal from certain aspects of Judge Gerber's decision. That appeal is *sub judice.*

[2] The Claims are against: 48 Agent and Investment Bank defendants, 42 Syndicate Bank defendants, 28 Non Co-Borrowing Bank defendants and 633 Assignee Defendants (some defendants fall under more than one category).

<p align="center">3</p>

*Securities and Derivative Litigation*, Master File No. 1:03-md-01529-LMM (the "MDL Case").

In the MDL Case, the plaintiffs assert claims for alleged violations of federal securities laws, as well as numerous common law tort theories, relating to the alleged misuse of funds by senior management at Adelphia, and alleged disclosure violations concerning Adelphia's liability for off-balance-sheet debt.

Beginning on March 8, 2004, defendants in the MDL Case filed various motions to dismiss the Securities Complaints. By Orders dated May 27, 2005 and July 18, 2005, Judge McKenna dismissed numerous defendants from the securities claims on statute of limitations grounds and in some instances granted plaintiffs leave to replead. The MDL Case is ongoing before Judge McKenna.

<u>The Prestige Case</u>

The Prestige Case was filed on June 24, 2004, also before Judge Robert Gerber. That action asserts three claims against the former owners of the Prestige Cable Systems, who sold those systems to Adelphia and the Rigas Family on July 5, 2000: (1) aiding and abetting breach of fiduciary duty; (2) intentional fraudulent transfer; and (3) constructive fraudulent transfer. The source of funds for the challenged Prestige transaction included the CCH Co-Borrowing facility, one of the co-borrowing facilities at issue in the Bank Case. The Prestige Case alleges that the sellers of the Prestige cable systems conspired with the Rigas Family to devise a fraudulent transaction structure which provided substantial benefits to both families — at Adelphia's expense. It is alleged that the Rigas Family benefited from this fraudulent transaction by acquiring the Prestige Georgia cable system for substantially less than it was worth, by causing Adelphia to overpay for the cable systems it received in the transaction. The Defendants are alleged to have benefited by obtaining certain tax benefits — including potentially improper tax benefits to which one or more of the Defendants were not entitled under applicable law.

4

In January 2006, the Prestige Case was transferred to Bankruptcy Judge Cecilia Morris of the Southern District of New York, presumably for administrative reasons. No motion seeking such a transfer was filed by any party. On April 25, 2007, over Defendants' objection, Judge Morris granted Plaintiff's motion to amend the complaint, and ruled that all three causes of action stated valid claims. A substantial amount of fact discovery in the Prestige Case has yet to be conducted. Defendants recently served two new document requests, and there are 18 depositions that have been noticed but not yet taken — and there will almost certainly be more. The current scheduling order, a copy of which is attached hereto as Exhibit B, calls for fact discovery to be completed on March 15, 2008, with a trial to commence on January 20, 2009. A copy of the Amended Complaint in the Prestige Case is attached hereto as Exhibit C.

<div style="text-align:center">The FPL Case</div>

The FPL Case consists of a constructive fraudulent transfer claim pursuant to which the Trust seeks to recoup $149 million paid to repurchase certain Adelphia stock from FPL Group, Inc. in 1999. The complaint alleges that Adelphia was insolvent or had unreasonably small capital at the time of the stock buyback, and did not receive reasonably equivalent value for its cash payment. That action also was initially filed before Judge Gerber and it remains pending before him. There are two major issues in the case, both of which will also have to be addressed in the Bank Case: (i) whether Adelphia was insolvent as of January 1999; and (2) whether Adelphia had unreasonably small capital as of that date. This case is scheduled to go to trial on January 20, 2009 (although the parties have agreed informally to extend that date by approximately two months), and the taking of deposition discovery still remains. A copy of the complaint in the FPL case is attached hereto as Exhibit D, and a copy of the current scheduling order is attached hereto as Exhibit E.

<div style="text-align:center">There Are Substantial Overlapping Issues Among These Cases</div>

There are a significant number of overlapping factual, legal and scheduling issues among the Adversary Proceedings and the Bank Case:

The overlapping factual issues include:

- whether certain of the Debtors were insolvent during the time period 1999 – 2000 (which itself invokes numerous valuation issues);

- whether certain of the Debtors had unreasonably small capital during the time period 1999 – 2000;

- what the Prestige Defendants knew about the intended use of proceeds from the CCH Co-Borrowing Bank Facility;

- what the Bank Defendants knew about the Prestige transaction and the intended use of proceeds from the CCH Co-Borrowing Bank Facility;

- what the Independent Directors knew, if anything, about the fraudulent actions and breaches of fiduciary perpetrated by the Rigas Family in connection with the challenged transactions, and the state of Adelphia's finances;

- the factual (and legal) significance and interpretation of Adelphia's accounting restatement;

- what the banks were told about Adelphia's financial condition and its acquisitions during the 1999 – 2000 time period;

- what value, if any, the Debtors received in connection with the various challenged transactions;

- what damages, if any, were suffered by Adelphia in connection with the various challenged transactions.

The overlapping legal issues include:

- whether aiding and abetting breach of fiduciary duty is a valid claim under Pennsylvania law;

- the effect, if any, of the Debtors' settlement with the United States Government on the claims the Trust is asserting in the Bank and Prestige Cases;

- the effect of the Debtors' cash management system on the analysis of Adelphia's solvency or sufficiency of capital;

- in determining whether the Debtors were insolvent during the relevant time period, whether the Rigas Family's co-borrowing debt, various

intercompany obligations, alter ego or veil-piercing claims and other
contingent liabilities should be included as liabilities on Adelphia's
balance sheet;

- the effect, if any, of the settlement of Adelphia's lawsuit against Deloitte
& Touche on the Bank and Prestige Cases;

- the application, if at all, of various alleged equitable defenses, including
the *in pari delicto* doctrine.

As to scheduling issues, *all three cases are scheduled to go to trial in the first half of*
*2009*. The Prestige Case is scheduled to go to trial on January 20, 2009; the FPL case on the
very same day (or two months later if the Court approves the parties' agreement); and the Bank
Case between March 1 and June 30, 2009. In addition, the expert discovery schedules — which
for the Trust will include discovery of the same experts in all three cases — inevitably will
substantially overlap.

### ARGUMENT

**I.    THE MOTION TO WITHDRAW THE REFERENCE SHOULD BE GRANTED**
**BECAUSE OF THE SIGNIFICANT NUMBER OF OVERLAPPING ISSUES IN**
**THESE CASES**

1.    The District Court should exercise discretionary withdrawal of the reference of
the Adversary Proceeding pursuant to 28 U.S.C. § 157(d), Rule 5011 of the Federal Rules of
Bankruptcy Procedure and Local Bankruptcy Rule 5011-1.

2.    Section 1334 of title 28 vests bankruptcy jurisdiction in the federal district courts
in the first instance. Pursuant to 28 U.S.C. § 157(a), each district court may provide that all
matters directly and indirectly involving a case under the Bankruptcy Code be referred to the
district court's bankruptcy judges. 28 U.S.C. § 157(a). Although Congress has given the district
courts discretion to refer or not to refer, nearly every district court, including the Untied States
District Court for the Southern District of New York, has provided, by rule or order, for
automatic reference to the bankruptcy court. *See* S.D.N.Y. Order of Reference, Administrative
Order M-61, signed on July 10, 1984 and entered on July 11, 1984.

7

3.      Notwithstanding the automatic reference, the reference may be withdrawn upon

the filing of a motion by a party or by the Court on its own motion.  28 U.S.C. § 157(d).

Motions for withdrawal of the reference are filed with the Bankruptcy Court, but are heard by the

District Court.  FED. R. BANKR. P. 5011; LOCAL BANKR. R. 5011-1.

4.      Withdrawal of the reference may be either discretionary or mandatory.  28 U.S.C.

§ 157(d).  The statute provides:

> The district court *may* withdraw, in whole or in part, any case or
> proceeding referred under this section (28 U.S.C. § 157), on its
> own motion or on timely motion of any party, for cause shown.
> The district court *shall*, on timely motion of a party, so withdraw a
> proceeding if the court determines that resolution of the proceeding
> requires consideration of both title 11 and other laws of the United
> States regulating organizations or activities affecting interstate
> commerce.

28 U.S.C. § 157(d) (emphasis supplied).

5.      Because of the significant factual and legal overlap among the Bank Case and the

Adversary Proceedings, the Trust seeks to withdraw the reference for the Adversary Proceedings.

## A.      A Weighing of the Relevant Factors, Particularly Judicial Economy, Militates Strongly in Favor of Withdrawal

6.      A district court may withdraw the reference of any case or proceeding before the

bankruptcy court "for cause shown."  28 U.S.C. § 157(d).  Section 157(d) does not define the

term "cause," but the Second Circuit has identified the following factors as relevant to the

analysis: "(1) whether the claim is core or non-core,[3] (2) what is the most efficient use of judicial

---

[3] The Prestige Case is a non-core proceeding, which weighs in favor of withdrawal, because (i) it includes a non-core, aiding and abetting breach of fiduciary duty claim as to which the Bankruptcy Court may only make proposed findings that the District Court will have to review *de novo* (*see* 28 U.S.C. § 157(c)(1); Fed. R. Bankr. P. Rule 9033(a)); and (ii) its resolution will have no impact on the bankruptcy estate or any core bankruptcy functions since the bankruptcy reorganization process is already complete.  A common law aiding and abetting breach of fiduciary duty claim under state law is a non-core claim as to which the Bankruptcy Court may only make proposed findings. *See Buechner v. Avery*, 2005 U.S. Dist. LEXIS 13735, at *22 (S.D.N.Y. Jul. 8, 2005) (holding breach of fiduciary duty claim is non-core in nature); *In re Complete Management, Inc.*, 2002 U.S. Dist. LEXIS 18344, at *8-*12 (S.D.N.Y. Sep. 27, 2002) (holding state law claims for negligence and breach of fiduciary duty were non-core and were thus more commonly resolved by a district court rather than bankruptcy courts).  Moreover, because the reorganization has been completed, the Prestige Case will have no effect on the bankruptcy estate or any core

resources, (3) what is the delay and what are the costs to the parties, (4) what will promote

uniformity of bankruptcy administration, (5) what will prevent forum shopping, and (6) other

related factors." *South St. Seaport Ltd. Pshp. v. Burger Boys (In re Burger Boys)*, 94 F.3d 755,

762 (2d Cir. 1996); *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures*

*Corp.)*, 4 F.3d 1095, 1101 (2d Cir. 1993). Here, all of these factors weigh strongly in favor of

withdrawal of the reference — particularly the factors of efficiency and uniformity, which are

the most important factors in a permissive withdrawal analysis.[4]  Because of the substantial

overlap among the three cases, consolidating all three cases in the District Court will facilitate

the coordination of these overlapping cases, and is the only way to avoid the inefficiency of

multiple judges devoting time to the resolution of the same issues and eliminate the risk of

inconsistent rulings.

> **B.    The Interests Of Efficiency And Uniformity Are Best Served By
> Consolidating The Adversary Proceedings With The Bank Case
> Already Pending In The District Court, And There Are No
> Significant Negative Consequences Of Doing So**

7.    In the Prior Withdrawal Decision, this Court found that one of the most

significant factors to the analysis is "what is the most efficient use of judicial resources" *In re*

*Adelphia Communs. Corp. Sec. & Derivative Litig*, 2006 U.S. Dist. LEXIS 8700, at *19

(S.D.N.Y. Feb. 19, 2006) (*citing In re Burger Boys*, 94 F.3d at 762).

---

bankruptcy functions. *See United States Lines, Inc. v. American S.S. Owners Mut. Protection & Indem. Ass'n (In re United States Lines, Inc.)*, 197 F.3d 631, 636-37 (2d Cir. 1999) (discussing what kinds of proceedings are core and describing the core bankruptcy functions); *Enron Corp. v. Citigroup, Inc. (In re Enron Corp.)*, 349 B.R. 108, 111 (Bankr. S.D.N.Y. 2006) ("[T]he degree to which the proceeding is independent of the reorganization is one of the key considerations in determining whether a contract proceeding is core."). While the only claim in the FPL Case is a fraudulent conveyance claim, because the reorganization process has concluded and the other relevant factors all weigh in favor of withdrawal of the reference and consolidation of all of these cases before one court, the reference should be withdrawn.

[4] *See LTV Steel Co., Inc. v. City of Buffalo (In re Chateaugay Corp,* 2002 U.S. Dist. LEXIS 5318, at *18 (S.D.N.Y. Mar. 29, 2002) *(*holding that permissive withdrawal was appropriate even when action was core because core/non-core analysis was not dispositive, but rather **"in the final analysis, the critical question is efficiency and uniformity."***)* (emphasis added)*(quoting Mishkin v. Ageloff,* 220 B.R. 784, 800 (S.D.N.Y. 1998); *Pitts v. Comm'r*, 2005 U.S. Dist. LEXIS 10316, at *9 (S.D.N.Y. May 10, 2005) ("The reference to the Bankruptcy Court may be withdrawn even as to core matters where the interests of efficiency and uniformity so dictate.").

8.    When Plaintiff commenced these three cases, they were all filed and presided over by a single judge.  Subsequently, through no design or effort on the part of the Plaintiff, they are now before three different judges.  Because of the many overlapping issues among the three cases, the interest of judicial efficiency would best be served by consolidating all three cases with the District Court.  Consolidating all three cases in the District Court will not only allow a single judge to oversee, resolve and coordinate the significant number of overlapping issues among the three cases, but will also provide other benefits to the Court and the parties.  For example, the District Court can enlist the aid of a Magistrate Judge to supervise discovery and resolve discovery disputes, which will benefit the parties. *See id*. at *20.  Furthermore, the Court already has an experienced mediator in place who is familiar with the various Adelphia cases, which may further promote efficiency and reduce costs to both the parties and to the judicial system. *See id*. at *20-*21.

9.    Moreover, not only will the resolution of common issues avoid the waste of substantial judicial resources through duplication of effort, but because these cases are pending before three separate judges there is a substantial possibility that (i) inconsistent results will be reached by the three courts, or (ii) a decision in one case could preclude a central issue from even being reached in one of the other cases through collateral estoppel, even though the decision may have been different before the other court.  Withdrawal of the reference would therefore also best serve the interest of uniformity, as it would eliminate these risks.

10.    The costs and potential delay to the parties — another of the relevant factors — also weighs in favor of withdrawal, as consolidation of all three cases in one court is likely to result in costs savings to the Trust and no detrimental effect on the Defendants' costs.  If all three of these actions are consolidated before one judge, the Trust may only be required to brief and argue common issues once — such as the recently raised motion to compel the production of the

Deloitte expert reports. Moreover, it may be able to coordinate certain discovery among the three actions, such as depositions of certain Bank Defendants with respect to the CCH Facility (relevant to both the Prestige Case and the Bank Case), the depositions of other common fact witnesses such as former officers and directors of the Debtors, and expert discovery regarding solvency and sufficiency of capital (relevant to all three cases). Most of the 18 outstanding deposition notices in the Prestige case are of individuals who are likely to also be deposed in the Bank case, and possibly the FPL case, including former Adelphia directors, PwC and Standard and Poors employees involved in the auditing and restated financials, Adelphia accountants involved in the restatement of the financials, and Adelphia tax professionals. There is also outstanding document and deposition discovery of the Banks that needs to be taken in the Prestige Case, which will overlap with discovery in the Bank case. Withdrawal of the reference should not result in any increase in Defendants' costs, as all of the discovery taken in the Bankruptcy Court can be used in the District Court, and withdrawal would not result in transfer to a remote forum that would increase the Defendants' travel costs. Moreover, because the District Court is already familiar with many of the underlying facts relating to the Adversary Proceedings as a result of its substantial experience with the MDL Case and the Bank Case, there should be no significant delays or cost associated with educating the court about the Adversary Proceedings. *See, e.g., Houbigant v. ACB Mercantile*, 185 B.R. 680, 686 (S.D.N.Y. 1995) (refusing to restore reference to the bankruptcy court because the district court was already familiar with the relevant facts by virtue of prior related cases).

11.    The last relevant factor,[5] the desire to prevent forum shopping, is not an issue here because, if withdrawn, the Adversary Proceedings would remain in the same forum — the Southern District of New York. As this Court held in its Prior Withdrawal Decision, "[t]here is

---

[5] Uniformity of bankruptcy administration is not on issue here since Adelphia's bankruptcy reorganization has been completed.

no serious 'forum-shopping' issue here: the usual objectives of 'forum-shopping' — finding a

jurisdiction with more favorable law, and geographical convenience — do not apply, both the

bankruptcy court and the district court being bound to follow Second Circuit law, and both courts

being located in downtown Manhattan. Nor does the Court see any reason why withdrawal will

affect the uniformity of bankruptcy administration." *In re Adelphia Communs. Corp. Sec. &*

*Derivative Litig*, 2006 U.S. Dist. LEXIS 8700, at *21. Indeed, Plaintiff originally brought all

three cases in the <u>same</u> court and they were all pending before the <u>same</u> judge, and, through no

effort of the Plaintiffs, they became divided. Reconsolidating the three cases before a single

judge while they remain in the same forum will not implicate forum shopping concerns. *See Pan*

*Am Corp. v. Delta Air Lines (In re Pan Am Corp.)*, 163 B.R. 41, 44 (S.D.N.Y. 1993) (holding

consolidation of disputes with the same factual context before one forum promoted judicial

economy, reduced the risk of inconsistent findings and lessened duplicative efforts, therefore it

was not forum shopping).

      12.    Courts in this District routinely withdraw the reference in circumstances similar to

those here, where there are significant overlapping issues (and therefore substantial benefits in

efficiency and uniformity to withdrawing the reference) and no demonstrable prejudice to

withdrawing the reference. Indeed, courts have even withdrawn the reference as to even core

actions when doing so would serve the interests of efficiency and uniformity. For example, in

*LTV Steel*, 2002 U.S. Dist. LEXIS 5318, at *17, the court exercised its discretion to withdraw the

reference on the grounds that where there were many overlapping issues regarding alleged post-

petition environmental violations between an adversary proceeding and a district court case. The

court was concerned that if the bankruptcy court ruled on the plaintiff's claims in the case before

it, the plaintiffs could then apply the bankruptcy judgment to the district court action:

> [P]ossibly insulating themselves from responsibility for
> contamination at either site without a substantive evaluation of

<div align="center">12</div>

> defendants' claims of post-petition environmental violations.
> While plaintiffs' two-court strategy may minimize their potential
> liability, neither the interests of justice nor judicial economy favor
> the litigation of these two related matters in two separate fora.

*Id.* at \*22-\*23.

*See also, Wedtech Corp v. London (In re Wedtech Corp.)*, 81 B.R. 237 (S.D.N.Y. 1987)

(withdrawing the reference in a fraudulent conveyance action with no non-core claims that

shared common issues of law and fact with securities litigation before the district court because

decisions in fraudulent conveyance action could have ramifications for securities litigation

pending before the district court.); *Pan Am Corp. v. Delta Air Lines (In re Pan Am Corp.)*, 163

B.R. 41, 43-44 (S.D.N.Y. 1993) (withdrawing reference from core proceeding and consolidating

it with two related cases already pending in the District to serve interests of judicial efficiency

and to minimize the risk of inconsistent rulings).

13.    In the Prior Withdrawal Decision, the Court was persuaded that the common

factual platform of the Bank Case and the MDL Case -- that is, the fraudulent conduct of the

Rigas's and those alleged to be complicit with them -- provided a strong basis to consolidate the

two matters. Here, the overlap between the Bank Case and the Adversary Proceedings is even

stronger than the overlap between the Bank Case and the MDL Case that informed the Prior

Withdrawal Decision. In contrast to the facts underlying the Prior Withdrawal Decision, on the

instant motion, the plaintiff in all three relevant cases is *identical,* many of the factual issues are

*identical,* many of the legal issues are *identical*, and the trial schedules (which had not even been

set in connection with the cases subject to the Prior Withdrawal Decision) are virtually *identical*.

Withdrawal of the Adversary Proceedings is thus mandated with great force under the reasoning

of the Prior Withdrawal Decision.

**C.    This Motion Is Timely**

14.    This motion is timely, as it has been filed in the wake of developments that greatly amplify the substantial overlap among the Bank Case and the Adversary Proceedings. "There is no specific time limit for applications under 28 U.S.C. § 157(d) to withdraw a reference to the bankruptcy court." *See Lone Star Indus. V. Rankin County Economic Dev. Dist. (In re New York Trap Rock Corp.)*, 158 B.R. 574, 577 (S.D.N.Y. 1993). Southern District courts have recognized that "when determining whether something is timely, it must be evaluated in the context of the specific situation." *In re Texaco Inc.*, 84 B.R. 911, 919 (Bankr. S.D.N.Y. 1988). The appropriate measure of timeliness is not the filing of the lawsuits, but rather is determined from the context of each specific case. *See In re Adelphia Communs. Corp. Sec. & Derivative Litig*, 2006 U.S. Dist. LEXIS 8700, at *11 (measuring the timeliness of withdrawal motions from the date of the *Housecraft* decision rather than the filing dates). Here, this motion is timely for two reasons. First, only in the very recent past have scheduling orders been extant in all three cases — and the result is three practically simultaneous trials, nearly a physical impossibility. The Bank Case received its first scheduling order on October 24, the most recent Prestige scheduling order was entered on October 30, and the FPL's order was entered on August 9 (although it is likely to be amended shortly). Second, discovery has recently begun to overlap across the three cases in a way that it never did before. For example, during October and November, the Bank Defendants and the Trust conferred over whether the Trust would produce expert reports from Adelphia's litigation with Deloitte. Similarly, after serving five document requests in which no request for the Deloitte expert reports was made, suddenly on November 6, the Prestige Defendants served a document request seeking the very same Deloitte expert reports. The timing of the Prestige Defendants' request strongly suggests that a coordination of effort is occurring among the Defendants in these cases, and, in any event, common discovery disputes

14

now exist for the first time that should be coordinated and resolved in a consistent manner. With

the deposition of common fact witnesses about to increase substantially, and common expert

depositions shortly to begin in at least the Prestige Case, the overlap of issues plainly will

increase.

      15.    Courts have held that motions to withdraw the reference are timely even when not

filed immediately after the filing of the complaint — it all depends on the circumstances of the

case. *See*, e.g., *In re Adelphia Communs. Corp. Sec. & Derivative Litig.*, 2006 U.S. Dist. LEXIS

8700 (S.D.N.Y. Feb. 19, 2006)(holding that motion to withdraw reference filed over two years

after complaints had initially been filed were timely within the context of that case).  For

example, in *Interconnect Telephone Services, Inc.*, 59 B.R. 397 (S.D.N.Y. 1986), the court found

the motion to withdraw was timely even where the case had been filed a year before the motion

and the parties had been conducting discovery and the defendants' had unsuccessfully moved to

dismiss the action. *See id.* at 402.  The court noted that all of the discovery that had occurred in

the bankruptcy court could be used in the district court and therefore the plaintiff would not be

prejudiced — particularly as the defendants had represented to the court that they would not seek

to renew their motions to dismiss that had already been decided in the bankruptcy court. *See id.*

*See also Burger King Corp. v. B-K of Kansas, Inc.*, 64 B.R. 728, 730 (D. Kan. 1986)

(withdrawing the reference where motion was made almost a year after complaint was filed).

Here, the discovery that has occurred in the Adversary Proceedings will all be fully available if

the cases are transferred to the District Court, and there was no reason to move to withdraw the

reference at or about the time of filing of the actions, because all three of these actions initially

were pending before the same judge.  In sum, the motion is timely within the context of this case.

      16.    For the foregoing reasons, permissive withdrawal is appropriate with respect to

the Adversary Proceedings.

## CONCLUSION

17.    For the foregoing reasons, the Court should grant the Trust's motion and withdraw

the reference for the Adversary Proceedings, and grant such other and further relief in favor of

the Trust as the Court finds just and proper.

Dated:  New York, New York
        December 3, 2007

                                    Respectfully submitted,

                                    KASOWITZ, BENSON, TORRES
                                     & FRIEDMAN LLP

                                    By:    /s/ David M. Friedman
                                           David M. Friedman (DF-4278)
                                           Joseph A. Gershman (JG-8275)
                                    1633 Broadway
                                    New York, New York 10019
                                    Tel:  (212) 506-1700
                                    Fax:  (212) 506-1800

                                    *Counsel to Plaintiff Adelphia Recovery Trust*

16

KASOWITZ, BENSON, TORRES       **Hearing Date:**   **TBD**
& FRIEDMAN LLP                        **Objection Date:** **December 17, 2007**
David M. Friedman (DF-4278)
Joseph A. Gershman (JG-8275)
1633 Broadway
New York, NY 10019
Tel: (212) 506-1700
Fax: (212) 506-1800
*Counsel to Plaintiff Adelphia Recovery Trust*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | ) |
| | )     Chapter 11 Case |
| ADELPHIA COMMUNICATIONS CORP., et al., | ) |
| a Delaware corporation, | )     Case No. 02-41729 (REG) |
| | ) |
| Debtors. | ) |
| | ) |
| ADELPHIA RECOVERY TRUST, | )     Adv. Pro. No. 04-03293 |
| | )     (CGM) |
| Plaintiff, | ) |
| v. | ) |
| PRESTIGE COMMUNICATIONS OF NC, INC., et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |
| ADELPHIA RECOVERY TRUST, | )     Adv. Proc. No. 04-03295 |
| | )     (REG) |
| Plaintiff, | ) |
| v. | ) |
| FPL GROUP, INC, et al., | ) |
| | ) |
| Defendants. | ) |

**NOTICE OF MOTION OF THE PLAINTIFF ADELPHIA RECOVERY TRUST TO
WITHDRAW THE REFERENCE PURSUANT TO 28 U.S.C. § 157(D) AND LOCAL
BANKRUPTCY RULE 5011-1**

PLEASE TAKE NOTICE, upon the accompanying motion, Plaintiff Adelphia Recovery

Trust (the " Trust") will move this Court at the United States Courthouse, 500 Pearl Street, New

York, New York, at a date and time determined by the Court, to withdraw the reference of the

above-captioned Adversary Proceedings to the Bankruptcy Court under 28 U.S.C. §157(d),

Federal Rules of Bankruptcy Procedure 5011, and Rule 5011-1 of the Local Rules of the

Bankruptcy Procedure for the United States Bankruptcy Court for the Southern District of New

York.

PLEASE TAKE FURTHER NOTICE, that pursuant to Local Southern District Rule 6.1

(b) (2), any opposition to the Motion shall be filed with the District Court and served upon

counsel to the Plaintiff on December 17, 2007.

WHEREFORE, the Trust respectfully requests that this Court enter an order granting the

relief requested herein, and such other and further relief as this Court deems just and proper.


Dated: New York, New York
       December 3, 2007

                              KASOWITZ, BENSON, TORRES & FRIEDMAN
                              LLP

                              By:    /s/ David M. Friedman
                                     David M. Friedman (DF-4278)
                                     Joseph A. Gershman (JG-8275)
                              1633 Broadway
                              New York, New York 10019
                              Tel: (212) 506-1700
                              Fax: (212) 506-1800
                              *Counsel to Plaintiff Adelphia Recovery Trust*

# Exhibit A

SIMPSON THACHER & BARTLETT LLP

425 LEXINGTON AVENUE
NEW YORK, N.Y. 10017-3954
(212) 455-2000

FACSIMILE (212) 455-2502

DIRECT DIAL NUMBER

212-455-3979

# MEMO ENDORSED *(p.2)*

E-MAIL ADDRESS

wrussell@stblaw.com

BY HAND                                October 23, 2007

Re:    *Adelphia Recovery Trust v. Bank of America, N.A., et al.,*
       Case No. 05 Civ. 9050 (LMM)

The Honorable Lawrence M. McKenna
United States District Judge
United States District Court
Southern District of New York
Daniel Patrick Moynihan United States
Courthouse
500 Pearl Street, Room 1640
New York, New York 10007

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED: _10/24/07_ LAWRENCE

Dear Judge McKenna:

        We represent Wachovia Bank, National Association and Wachovia Capital Markets, LLC (f/k/a Wachovia Securities, Inc.), named defendants in the above-captioned action. We write this letter on behalf of the parties who have appeared in the above-captioned action.

        On September 21, 2007, we submitted to Your Honor a proposed discovery plan for Your Honor's consideration in accordance with the Court's Memorandum and Order dated August 1, 2007 (as amended by the Court's Memorandum and Order dated September 7, 2007). In our cover letter accompanying this proposed discovery plan, we indicated that there were a few defendants who had not yet decided whether they would participate in the Phase One process described in the proposed discovery plan.

        We write this letter to report to Your Honor that each of the defendants listed in footnote 1 of the proposed discovery plan, with the exception of one defendant, has confirmed its agreement to participate in the Phase One process. The parties expect that the remaining defendant, who only recently retained outside counsel, will likewise agree to participate in the Phase One process once its counsel has had the opportunity to familiarize itself with these proceedings and with the proposed discovery plan.

        Regardless of whether that defendant decides to sign on to the Phase One process, all other parties are prepared to declare effective the agreement concerning the Phase One process, and agree that the Court should approve the proposed discovery plan at this time. Several of the dates in the proposed discovery plan are triggered by this Court's

LOS ANGELES      PALO ALTO      WASHINGTON, D.C.      BEIJING      HONG KONG      LONDON      TOKYO



SIMPSON THACHER & BARTLETT LLP

The Honorable Lawrence M. McKenna     -2-     October 23, 2007

entry of an order embodying the schedule set forth in the proposed discovery plan, and the parties who have appeared in this action agree that there is no need to wait any longer for this one defendant. The parties hope to provide the Court with a status report as to this defendant as soon as possible.

We are available at Your Honor's convenience if the Court has any questions or wishes to discuss this matter.

Respectfully,

*William T. Russell*

William T. Russell, Jr.

cc:     The Honorable Daniel H. Weinstein (by email)
         Jed Melnick, Esq. (by email)
         All counsel of record (by email)

*The discovery plan annexed to Mr. Russell's letter to the Court of 9/21/07 is approved. (The one defendant who has not, as of this date, decided to agree to reception may, if necessary, write to the Court setting forth with specificity its objections.) So ordered.*

*(LMM) 10/24/07*

*1. Mr. Russell is requested to communicate a copy of this endorsement to all interested counsel.*

SIMPSON THACHER & BARTLETT LLP
425 LEXINGTON AVENUE
NEW YORK, N.Y. 10017-3954
(212) 455-2000

FACSIMILE (212) 455-2502

DIRECT DIAL NUMBER

(212) 455-3979

E-MAIL ADDRESS

wrussell@stblaw.com

BY HAND                                September 21, 2007

Re:    *Adelphia Communications Corp., et al. v. Bank of America,
       N.A., et al.*, Case No. 05 Civ. 9050 (LMM); 05 Civ. 9250
       (LMM); 05 Civ. 9285 (LMM)

The Honorable Lawrence M. McKenna
United States District Judge
United States District Court
Southern District of New York
Daniel Patrick Moynihan United States
Courthouse
500 Pearl Street, Room 1640
New York, NY 10007

Dear Judge McKenna:

       We represent Wachovia Bank, National Association and Wachovia Capital
Markets, LLC (f/k/a Wachovia Securities, Inc.), named defendants in the above-captioned
action. We write this letter on behalf of the parties who have appeared in the above-
captioned action.

       Pursuant to the Court's Memorandum and Order dated August 1, 2007 (as
amended by the Court's Memorandum and Order dated September 7, 2007), the parties have
met and conferred concerning a discovery plan. With the assistance of the Mediator, Hon.
Daniel Weinstein, and his colleague, Jed Melnick, the plaintiff and a majority of the
defendants have reached agreement and jointly submit the enclosed proposed discovery plan
for Your Honor's consideration. There are a few defendants who have not yet decided
whether they will participate in the Phase One process set forth in the enclosed proposed
plan, and the parties have not yet agreed how discovery will proceed as to those defendants
in the event they decline to participate in Phase One. The parties hope to provide the Court
with a status report as to those defendants by the end of next week.

SIMPSON THACHER & BARTLETT LLP

The Honorable Lawrence M. McKenna    -2-    September 21, 2007

We are available at Your Honor's convenience if the Court has any questions or wishes to discuss this matter.

Respectfully,

*William T. Russell, Jr.*

William T. Russell, Jr.

Enclosure

cc:    The Honorable Daniel H. Weinstein (by email)
       Jed Melnick, Esq. (by email)
       All counsel of record (by email)

"PHASE ONE" AND "PHASE TWO" DISCOVERY

WHEREAS, the parties have made substantial progress in agreeing to the scope and schedule for the consensual discovery to be implemented during "Phase One" of a discovery process, the parties suggest the following schedule to govern other aspects of a "Phase One" and a "Phase Two" schedule for this proceeding (although the parties reserve the right to seek a modification of the Phase Two schedule in the event that final agreement to the consensual Phase One process cannot be achieved).

PHASE ONE

1.     Notwithstanding anything to the contrary contained herein, there shall be no discovery among plaintiff and the Non-Agent Banks[1] during Phase One absent Order of the Court; provided that nothing shall preclude plaintiff and the Non-Agent Banks from making voluntary disclosures during Phase One for the purpose of facilitating settlement negotiations.

---

[1] "Non-Agent Bank" means any defendant that is not an Administrative Agent, Nominal Agent Bank or Investment Bank.

"Administrative Agents" means, collectively, Bank of America, N.A., Bank of Montreal, Citibank, N.A., JPMorgan Chase Bank, N.A., The Bank of Nova Scotia, and Wachovia Bank, National Association.

"Nominal Agent Banks" means, collectively, ABN AMRO Bank N.V., Bankers Trust Company (n/k/a Deutsche Bank AG), Barclays Bank PLC, Calyon New York Branch (f/k/a Credit Lyonnais New York Branch), CIBC, Inc., Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A. (Rabobank Nederland, NewYork Branch), Credit Suisse Capital Funding, Inc. (f/k/a DLJ Capital Funding, Inc.), Credit Suisse, New York Branch (f/k/a Credit Suisse First Boston, New York Branch), Merrill Lynch Capital Corp., Morgan Stanley Senior Funding, Inc., PNC Bank, National Association, Societe Generale, S.A., SunTrust Bank, The Bank of New York, The Fuji Bank, Limited, The Royal Bank of Scotland plc, and Toronto Dominion (Texas) LLC.

"Investment Banks" means, collectively, Banc of America Securities LLC, BMO Nesbitt Burns Corp., Wachovia Capital Markets LLC (f/ka/ Wachovia Securities, Inc.), Citigroup Global Markets Holdings, Inc. (f/k/a Salomon Smith Barney Holdings Inc.), ABN AMRO Securities LLC, BNY Capital Corp., Scotia Capital (USA), Inc., Barclays Capital, Inc., CIBC World Markets Corp., Chase Securities, Inc., Calyon Securities (USA) Inc. (f/k/a Credit Lyonnais Securities (USA), Inc.), Credit Suisse (USA), Inc. (f/k/a Credit Suisse First Boston (USA), Inc. and Donaldson, Lufkin & Jenrette, Inc.), Deutsche Banc Alex Brown, Inc. (f/k/a BT Alex Brown, Inc.), Fleet Securities, Inc., Merrill Lynch & Co., Inc., Morgan Stanley & Co., Inc., PNC Capital Markets, Inc., The Royal Bank of Scotland plc, SG Cowen Securities Corporation, SunTrust Securities, Inc., and TD Securities (USA) Inc.

2.    The parties may serve interrogatories in accordance with the Federal Rules of Civil Procedure and the Local Rules concerning the identity of potential witnesses and calculation of damages on or after October 1, 2007. Plaintiff's pending interrogatories shall be responded to within 30 days of the date of an Order approving this discovery schedule.

3.    On or after October 15, 2007 (i) plaintiff may serve document requests on any defendant, and (ii) any defendant may serve document requests on plaintiff. Plaintiff's pending document requests shall be answered within 30 days of the date of an Order approving this discovery schedule.

4.    On or after October 15, 2007, the parties may serve subpoenas seeking documents but not testimony on non-parties.

5.    The parties will work out a deposition protocol for Phase Two that will include reasonable deposition schedules, time limits on depositions and provisions to prevent duplication of effort.

6.    Any disputes concerning the scope of discovery that cannot be resolved consensually with the assistance of The Honorable Daniel Weinstein (the "Mediator") will be submitted to the Court so that remaining discovery can proceed expeditiously during Phase Two.

PHASE TWO

7.    The parties will commence Phase Two on the earlier of (i) March 15, 2008, and (ii) the date on which the Mediator declares that an impasse has been reached in settlement negotiations. Phase Two will include depositions, any further electronic discovery that may be agreed to by the parties or ordered by the Court, and any discovery commenced but not completed during

3

Phase One. Prior to the commencement of Phase Two, the parties shall take the steps necessary to preserve and make reasonably available the materials necessary to begin document production promptly after Phase Two commences. Nothing herein shall require the parties to commence the process of actually restoring any electronic storage media prior to the commencement of Phase Two.

8. Fact depositions shall commence 6 months after Merrill completes substantially all of the changes to the Merrill database set forth in the separate agreement between the parties concerning the Merrill database. Merrill estimates completion of those changes by late October. Plaintiff shall notify defendants and the Court when it believes that these changes have been substantially completed. To the extent defendants maintain that these changes have not been substantially completed, defendants shall immediately notify plaintiff and the Court. Any dispute regarding the substantial completion of the changes to the Merrill database shall be decided by the Mediator.

9. Status conference with Judge McKenna one month prior to commencement of fact depositions.

10. The parties will make good faith efforts to complete fact depositions within 6 months after commencement.

11. Status conference with Judge McKenna one month prior to the end of fact depositions.

12. A schedule for "Phase Three" expert discovery and summary judgment motions, if any, to be established at or before the status conference referred to in paragraph 11 above.

4

13.     Trial will commence no earlier than March 1, 2009.

Dated: September 21, 2007

# Exhibit B

TROUTMAN SANDERS LLP
Harris B. Winsberg (Ga. Bar No. 770892)
Douglas E. Ernst (Ga. Bar No. 249956)
600 Peachtree Street, N.E., Suite 5200
Atlanta, Georgia 30308-2216
(404) 885-3000

Counsel for the Defendants

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| ADELPHIA COMMUNICATIONS CORP., et al., a Delaware corporation | Case No. 02-4-1729 (REG) |
| | Jointly Administered |
| Debtors. | |
| ADELPHIA RECOVERY TRUST, | Adv. Pro. No. 04-03293 (CGM) |
| Plaintiff, | |
| v. | |
| PRESTIGE COMMUNICATIONS OF NC, INC., JONATHAN J. OSCHER, LORRAINE OSCHER McCLAIN, ROBERT F. BUCKFELDER, BUCKFELDER INVESTMENT TRUST, and ANVERSE, INC., | |
| Defendants. | |

### FIFTH AMENDED SCHEDULING ORDER

In an effort to coordinate discovery in this action, the parties jointly have agreed to, and propose to the Court, the following amended discovery plan:

1.    March 15, 2008—Fact Discovery Must Be Completed;

2.    April 30, 2008—The Party Bearing the Burden of Proof as to a Particular Issue Shall Serve Expert Reports;

3.    July 5 *3*, 2008—Responsive Expert Reports Shall be Served;

4.    August 10 *8*, 2008—All Expert Discovery, including expert depositions, to be completed;

5.    October 26 *24*, 2008—Deadline to File and Serve All Dispositive Motions;

6.    November 28 *21*, 2008—Final Pre-trial Order, provided that, in the event that dispositive motions are pending, this deadline shall be suspended until such time as the Court orders otherwise;

7.    December 12 *17*, 2008—Final Pre-trial Conference, provided that, in the event that dispositive motions are pending, this deadline shall be suspended until such time as the Court orders otherwise;

8.    April 2 *January 20,* 2009—Trial Date, provided that, in the event that dispositive motions are pending, this deadline shall be suspended until such time as the Court orders otherwise;

9.    Each Party reserves the right to file a motion to seek a stay of Expert Discovery in the event that a motion for summary judgment is filed. Each Party also recognizes that any motion for summary judgment filed in this action must comply with S.D.N.Y. Local Bankruptcy Rule 7056-1.

Dated: Poughkeepsie, New York
       October 30, 2007.


                                    /s/ Cecelia Morris
                                    _____
                                    Honorable Cecelia G. Morris
                                    United States Bankruptcy Judge


[SIGNATURES CONTINUED ON NEXT PAGE]

2

Respectfully submitted,

KASOWITZ, BENSON, TORRES &
FRIEDMAN LLP

By:    /s/ David M. Friedman
       David M. Friedman (DF-4278)
       Joseph A. Gershman (JG-8275)
       1633 Broadway
       New York, New York 10019
       Telephone No.:       (212) 506-1700
       *Counsel for Plaintiff*


TROUTMAN SANDERS LLP

By:    /s/ Harris B. Winsberg
       Harris B. Winsberg (Ga. Bar No. 770892)
       Douglas E. Ernst (Ga. Bar No. 249956)
       Bank of America Plaza, Suite 5200
       600 Peachtree Street, N.E.
       Atlanta, Georgia 30308
       Telephone No.:       (404) 885-3000
       *Counsel for Defendants*

3

# Exhibit C

KASOWITZ, BENSON, TORRES
& FRIEDMAN LLP
David M. Friedman (DF-4278)
Joseph A. Gershman (JG-8275)
1633 Broadway
New York, NY 10019
Tel: (212) 506-1700
Fax: (212) 506-1800

*Counsel to Official Committee*
*of Unsecured Creditors*

WILLKIE FARR & GALLAGHER
LLP
Terence McLaughlin (TM-0287)
787 Seventh Avenue
New York, New York 10019
Tel: (212) 728-8000
Fax: (212) 728-8111

*Counsel to the Debtors*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re<br>ADELPHIA COMMUNICATIONS CORP., *et al.,*<br>a Delaware corporation,<br><br>           Debtors.<br>_____<br>ADELPHIA COMMUNICATIONS CORP.,<br>ADELPHIA CABLEVISION, L.L.C., and the<br>OFFICIAL COMMITTEE OF UNSECURED<br>CREDITORS OF ADELPHIA<br>COMMUNICATIONS CORP., *et al.,*<br><br>           Plaintiffs,<br><br>        vs.<br><br>PRESTIGE COMMUNICATIONS OF NC, INC.,<br>JONATHAN J. OSCHER,<br>LORRAINE OSCHER McCLAIN,<br>ROBERT F. BUCKFELDER,<br>BUCKFELDER INVESTMENT TRUST, and<br>ANVERSE, INC.,<br><br>           Defendants. | Chapter 11 Case<br><br>Case No. 02-41729 (REG)<br><br><br><br><br><br>Adv. Pro. No. 04-03293<br>(CGM)<br><br><br><br><br>__AMENDED COMPLAINT__ |

Plaintiffs Adelphia Communications Corporation ("ACC"), Adelphia Cablevision, L.L.C.

("Cablevision," and together with ACC, "Adelphia"), and the Official Committee of Unsecured

Creditors of Adelphia Communications Corporation, *et al.* (the "Committee"), for their

complaint against Defendants, allege as follows:

## SUMMARY OF ACTION

      1.     This action seeks to recover a fraudulent conveyance arising out of Adelphia's

July 5, 2000 purchase of certain cable systems from Prestige Communications of NC, Inc.

("Prestige NC") in exchange for approximately $800 million in cash (the "Asset Purchase") --

which was far more than those assets were worth -- while Adelphia was insolvent.

      2.     Adelphia entered into and overpaid in the Asset Purchase as part of a transaction

in which members of the Rigas Family (defined *infra*), who were Adelphia directors and senior

officers, simultaneously bought Prestige NC's sister company, Prestige Communications, Inc.

("Prestige Georgia") for themselves at a significantly lower price. In addition, this action also

seeks to recover damages from the Defendants for aiding and abetting the Rigas Family's

breaches of fiduciary duty, as upon information and belief Defendants knew that the Rigas

Family was breaching its fiduciary duties by entering into and consummating the Asset Purchase,

and Defendants substantially assisted the Rigas Family in doing so by agreeing to, and then

consummating, the transaction.

## JURISDICTION AND VENUE

      3.     This Court's jurisdiction is founded upon sections 157 and 1334 of title 28 of the

United States Code, in that this proceeding arises under title 11 of the United States Code (the

"Bankruptcy Code"), or arises in or is related to the above-captioned chapter 11 case under the

Bankruptcy Code, which is pending in the United States Bankruptcy Court for the Southern

District of New York.

      4.     This civil proceeding is a core proceeding under sections 157(b)(2)(A), (B), (C),

(D), (H), (K) and (O) of title 28 of the United States Code.

5.    Venue in this Court is appropriate under section 1409(a) of title 28 of the United States Code.

6.    Adelphia and the Committee have filed this action jointly. Adelphia and the Committee filed a motion seeking court approval for the Committee to prosecute this action on behalf of the estates, and on July 14, 2004 that motion was granted by The Honorable Robert E. Gerber.

## THE PARTIES AND OTHER KEY PARTICIPANTS

7.    The Committee is the statutory committee of unsecured creditors duly appointed on July 11, 2002 in the chapter 11 cases of ACC and its affiliated debtors by the Office of the United States Trustee for the Southern District of New York.

8.    ACC and Cablevision are debtors in the jointly administered chapter 11 case, *In re Adelphia Communications Corporation, et al.*, Case No. 02-41729 (REG), which commenced on June 25, 2002 (the "Petition Date"). ACC, which at one time was one of the leading cable companies in the United States, is a corporation organized under the laws of the State of Delaware, and its principal place of business on the Petition Date was located in Coudersport, Pennsylvania. Cablevision, an indirect subsidiary of ACC, is a Pennsylvania corporation, and its principal place of business on the Petition Date was located in Coudersport, Pennsylvania. Cablevision paid Defendants $1.1 billion on behalf of ACC at the closing of the transaction.

9.    At all relevant times herein, members of the Rigas Family, principally John Rigas and his three sons, Timothy, Michael and James Rigas (collectively, the "Rigas Family), held all of the most senior positions at Adelphia. John Rigas was Adelphia's President and Chief Executive Officer; Timothy Rigas was Adelphia's Executive Vice President, Chief Financial Officer, Chief Accounting Officer and Treasurer; Michael Rigas was Adelphia's Executive Vice-President in Charge of Operations; and James Rigas was Adelphia's Executive Vice President in

3

Charge of Strategic Planning. In addition, the Rigas Family owned a substantial percentage of Adelphia stock with voting rights that enabled the Rigas Family to exercise voting control over the Debtors. In addition to their holdings in Adelphia, the Rigas Family also owned a number of cable systems themselves through corporations that were wholly-owned, directly or indirectly, by members of the Rigas Family.

10.    Highland Prestige Georgia, Inc. ("Highland Prestige") is a corporation organized under the laws of the State of Delaware, with its principal place of business located in the Commonwealth of Pennsylvania. At all relevant times herein Highland Prestige was owned and controlled by the Rigas Family, and was the entity that the Rigas Family used to purchase Prestige Georgia in July 2000.

11.    Upon information and belief, at all relevant times herein Prestige NC was a closely-held corporation with its principal place of business in Cartersville, Georgia that owned and operated cable systems in Virginia, Maryland, and North Carolina. In July 2000, Prestige NC sold these cable systems (the "Prestige Cable Systems") to Adelphia for approximately $800 million in cash. Prestige NC was dissolved in December 2000. Upon information and belief, defendants Jonathan J. Oscher, Lorraine Oscher McClain, Robert Buckfelder and the Buckfelder Investment Trust constituted the entirety of Prestige NC's shareholders, and, prior to its dissolution, the company was controlled by defendant Jonathan J. Oscher ("Oscher").

12.    Upon information and belief, at all relevant times herein, defendant Oscher served as President and Treasurer of Prestige NC, and was Prestige NC's primary shareholder, owning 940 shares of Prestige NC stock, or 94% of Prestige NC's outstanding stock at the time of the Asset Purchase.

4

13.     Upon information and belief, at all relevant times herein, defendant Lorraine Oscher McClain ("McClain") was Vice President of Prestige NC, and owned 30 shares of Prestige NC stock, which constituted 3% of Prestige NC's outstanding stock at the time of the Asset Purchase.

14.     Upon information and belief, at all relevant times herein, defendant Robert F. Buckfelder ("Buckfelder") was Prestige NC's Vice President of Finance and Chief Financial Officer, and owned 21 shares of Prestige NC stock, which constituted 2.1% of Prestige NC's stock at the time of the Asset Purchase.

15.     Upon information and belief, at all relevant times herein, defendant Buckfelder Investment Trust ("Buckfelder Trust") owned 9 shares of Prestige NC Stock, which constituted 0.9% of Prestige NC's outstanding stock at the time of the Asset Purchase.

16.     Upon information and belief, at all relevant times herein, Prestige Georgia was a closely-held corporation with its principal place of business in Cartersville, Georgia that provided cable service in the State of Georgia. In July 2000, Prestige Georgia ultimately was acquired by the Rigas Family through a series of transactions. At the time of the acquisition, Prestige Georgia's largest shareholder was Anverse, Inc. ("Anverse"), a non-profit corporation, which owned approximately 89% of Prestige Georgia's outstanding stock. Upon information and belief, the remaining 11% of Prestige Georgia's stock was split between defendant Oscher and three McClain family trusts, including a trust in the name of defendant McClain.

17.     Upon information and belief, defendant Anverse, whose principal place of business is in Cartersville, Georgia, is a non-profit charitable corporation organized under the laws of the State of Georgia. Upon information and belief, Anverse was one of the ultimate transferees of the cash Adelphia paid in the Asset Purchase. When Prestige Georgia was sold to

5

the Rigas Family, Anverse was Prestige Georgia's largest shareholder. Upon information and belief, at all relevant times herein Anverse was controlled by defendant Oscher, who served as Anverse's Chief Executive Officer. Upon information and belief, at all relevant times herein defendant McClain was Anverse's Secretary.

18.    Prior to the Asset Purchase, Defendants owned (directly or indirectly) and controlled two closely-held cable companies: Prestige NC, which provided cable service to approximately 118,250 subscribers in three states, Maryland, Virginia and North Carolina; and Prestige Georgia, which provided cable service to approximately 59,000 subscribers in Georgia.

## FACTS

19.    In the fall of 1999, Adelphia entered into negotiations with the Defendants and their representatives in hopes of acquiring the Prestige Cable Systems and Prestige Georgia's cable systems.

20.    These negotiations were ultimately successful, and on December 6, 1999, ACC entered into two agreements with the Defendants: (i) an Asset Purchase Agreement between ACC and Prestige NC that required Adelphia to purchase the Prestige Cable Systems; and (ii) a Stock Purchase Agreement between Adelphia and the shareholders of Prestige Georgia that required Adelphia to purchase all of the stock of Prestige Georgia. Collectively, these two agreements called for Adelphia to pay the Defendants $1.1 billion for both the Prestige Cable Systems and Prestige Georgia.

21.    In the course of the negotiations, the Defendants and the Rigas Family had to agree to an allocation of the total purchase price between the two purchase agreements. As directors and senior executives who had voting control over Adelphia's stock, the Rigas Family, subject to the proper exercise of its fiduciary duties to Adelphia and to approval by independent members of Adelphia's Board of Directors (the "Board"), had the power to determine what

6

percentage of the purchase price would be allocated to the Prestige Cable Systems (for which Adelphia would ultimately pay), and what percentage of the purchase price would be allocated to Prestige Georgia (for which the Rigas Family was ultimately supposed to pay). While the federal tax laws require that such a price allocation be done in a manner that reflects the fair market value of the underlying assets, upon information and belief the Defendants and the Rigas Family ultimately agreed to an allocation of the $1.1 billion purchase price that did not reflect the fair market value of the underlying assets. Rather, the Defendants and the Rigas Family ultimately agreed to allocate $800 million in cash in exchange for the Prestige Cable Systems under the Asset Purchase Agreement, and approximately $300 million in cash in exchange for the stock of Prestige Georgia under the Stock Purchase Agreement. In other words, at the behest of the Rigas Family and without the Rigas Family having made the appropriate disclosures to Adelphia's independent directors (the "Independent Directors"), Adelphia agreed to a price allocation that called for it to pay approximately $7,000 per subscriber for the Prestige Cable Systems in the Asset Purchase, an amount dramatically higher than comparable transactions. By contrast, the allocation for the Stock Purchase Agreement called for Adelphia to pay approximately $5,300 per subscriber for the cable systems owned by Prestige Georgia, approximately $1,700 less per subscriber than what Adelphia agreed to pay for the assets of Prestige Georgia's sister company.

22.    Upon information and belief, the large price disparity between the price per subscriber being paid in the Asset Purchase Agreement and the Stock Purchase Agreement was not a reflection of differences in the fair market value of these assets. Moreover, upon information and belief both the Rigas Family and the Defendants knew that the price allocation that they agreed to between the Asset Purchase Agreement and the Stock Purchase Agreement did not correspond to the fair market value of the assets and the stock being purchased.

7

However, the Rigas Family concealed this information from the Independent Directors who

would have prevented this injury to Adelphia had they been informed of its occurrence. Upon

information and belief, both the Rigas Family and the Prestige Defendants knew that the $800

million price allocated to the Asset Purchase Agreement was substantially more than the fair

market value of the assets being purchased, and the $300 million price allocated to the Stock

Purchase Agreement was substantially less than the fair market value of the Prestige Georgia

stock being purchased.

     23.     In addition to negotiating and agreeing to a skewed purchase price allocation

between the two purchase agreements that did not reflect the fair market value of the underlying

assets, the Defendants also agreed to a proposal from the Rigas Family that each purchase

agreement include an assignment clause that permitted Adelphia to assign all of its rights and

obligations under either agreement to a subsidiary or affiliate of Adelphia. An affiliate, in turn,

was defined to include, among other things, any entity owned or controlled by the Rigas Family.

In sum, the Rigas Family engineered a deal structure that allowed them to misappropriate assets

contracted for by Adelphia and to assign those assets to themselves. The Defendants, certain of

whom were long-time friends of the Rigas Family, knowingly agreed to a deal structure that

permitted the Rigas Family to cause Adelphia to pay substantially in excess of fair market value

for the assets that it would ultimately receive, so that the Rigas Family could assign to itself the

Prestige Georgia stock that was priced at substantially less than its fair market value. Upon

information and belief, the Defendants agreed to this deal structure because it purportedly

provided certain of the Defendants with certain tax benefits.

     24.     Either prior to or shortly after the Rigas Family and the Defendants agreed to an

allocation that did not reflect the fair market value of the underlying assets, the Rigas Family

decided to cause Adelphia to sell Prestige Georgia — the undervalued asset — to the Rigas

Family at Adelphia's cost. As directors and senior executives who had voting control over

Adelphia's stock, the Rigas Family, subject to approval of the Independent Directors, had the

power to determine how much it would pay Adelphia for the stock of Prestige Georgia. This

"agreement" between Adelphia and the Rigas Family was ultimately memorialized in a June

2000 letter agreement obligating Adelphia to transfer Prestige Georgia's common stock to

Highland Prestige, a company wholly-owned by the Rigas Family, in exchange for $300 million

in cash. Prior to the closing of the transaction, the Defendants were informed that Highland

Prestige Georgia, Inc. was to be purchasing the Prestige Georgia stock, and the "agreement"

between Adelphia and the Rigas Family that called for the Rigas Family to purchase this stock at

Adelphia's cost was shared with certain of the Defendants' agents. In spite of this knowledge,

Defendants did nothing to halt or amend the transaction, but instead took all steps necessary to

ensure that the transaction was consummated.

25.    Adelphia's purchase of the Prestige Cable Systems and Prestige Georgia was

consummated on July 5, 2000. Adelphia paid Prestige NC approximately $800 million for the

Prestige Cable Systems. Adelphia also paid  the shareholders of Prestige Georgia approximately

$300 million for their stock. The same day, Adelphia transferred Prestige Georgia's stock to

Highland Prestige in exchange for the assumption of $300 million in debt for which Highland

Prestige was already liable.

26.    Upon information and belief, the Prestige Cable Systems were not reasonably

equivalent in value to the cash that Adelphia paid for them. Indeed, the Rigas Family was

motivated to agree to an allocation that intentionally inflated their price -- with Defendants'

knowledge and consent -- so that the purchase price of the Prestige Georgia systems allocated to

9

the Rigas Family would be substantially discounted from the amount Adelphia paid. At the same time, the Individual Defendants were motivated to agree to an inflated allocation of the Prestige NC purchase because the Individual Defendants owned all of the stock in Prestige NC, but only a small percentage of the stock in Prestige Georgia, 89% of which was owned by defendant Anverse. Thus, money paid to acquire Prestige Georgia would provide little benefit to the Individual Defendants, as it would go primarily to Anverse, while money paid to acquire Prestige NC would go entirely to the Individual Defendants. In addition, upon information and belief the price allocation agreed to by the Defendants and the Rigas family purportedly provided certain of the Defendants with tax benefits.

27.    In the end, at the behest of the Rigas Family Adelphia agreed to and ultimately paid approximately $7,000 per subscriber for the Prestige Cable Systems in the Asset Purchase, an amount dramatically higher than comparable transactions. By contrast, the Rigas Family paid approximately $5,300 per subscriber for the cable system owned by Prestige Georgia, approximately $1,700 less per subscriber than what Adelphia paid for the assets of Prestige Georgia's sister company.

### FIRST CLAIM FOR RELIEF

**(Avoidance and Recovery of Constructively
Fraudulent Transfer Under 11 U.S.C. §§ 544(b) and 550)**

28.    Plaintiffs reallege paragraphs 1 through 27 as if fully set forth herein.

29.    The Asset Purchase was a transfer of interest in Adelphia's property.

30.    At the time of the Asset Purchase, Adelphia: (i) was insolvent or was rendered insolvent and/or (ii) was engaged or was about to engage in business or a transaction for which any property remaining with them was an unreasonably small capital. Adelphia did not receive reasonably equivalent value for the assets it acquired in the Asset Purchase.

31.    The Defendants and Prestige NC were initial and/or immediate or mediate transferees of the cash received in the Asset Purchase.

32.    At all times relevant hereto, there were actual creditors of Adelphia holding unsecured claims allowable against Adelphia's estates within the meaning of Sections 502(d) and 544(b) of the Bankruptcy Code with the right to void the Asset Purchase under applicable law, including, but not limited to, the laws of the Commonwealth of Pennsylvania and the State of Georgia.

33.    By virtue of the foregoing, pursuant to sections 544(b) and 550, of the Bankruptcy Code, Adelphia seeks to recover for the benefit of Adelphia's estate the difference in value between what it paid in cash in connection with the Asset Purchase Agreement, and the value of the cable systems that it received, together with all interest paid in respect of the obligations avoided hereunder.

## SECOND CLAIM FOR RELIEF

### (Avoidance and Recovery of Intentionally Fraudulent Transfer Under 11 U.S.C. §§ 544(b) and 550)

34.    Plaintiffs reallege paragraphs 1 through 33 as if fully set forth herein.

35.    The Asset Purchase constituted a transfer of interest in Adelphia's property.

36.    Adelphia -- through the actions of the Rigas Family described herein -- purchased the Prestige Cable Systems with the actual intent to delay, hinder and defraud any entity to which Adelphia was or became indebted to, on or after the date that such obligations were incurred. Upon information and belief, the Rigas Family knew that the cost Adelphia paid per subscriber for the Prestige Cable Systems was far in excess of fair market value.  The Rigas Family also caused Adelphia to pay a disproportionately higher amount of the total purchase price for the Prestige Cable Systems, which effectively subsidized the Rigas Family's cost of acquiring

Prestige Georgia. The Rigas Family caused Adelphia to conceal from the Independent Directors and creditors the true structure of the transactions relating to the Asset Purchase and the actual price that the Rigas Family intended to pay.

37.     The Defendants were initial and/or immediate or mediate transferees of the Asset Purchase.

38.     At all times relevant hereto, there were actual creditors of Adelphia holding unsecured claims allowable against Adelphia's estates within the meaning of Sections 502(d) and 544(b) of the Bankruptcy Code with the right to void the Asset Purchase under applicable law, including, but not limited to, the laws of the Commonwealth of Pennsylvania and the State of Georgia.

39.     By virtue of the foregoing, pursuant to sections 544(b) and 550 of the Bankruptcy Code, Adelphia seeks to recover for the benefit of Adelphia's estate the difference in value between what it paid in cash in connection with the Asset Purchase Agreement, and the value of the cable systems that it received, together with all interest paid in respect of the obligations avoided hereunder.

### THIRD CLAIM FOR RELIEF

#### (Aiding and Abetting Breach of Fiduciary Duty)

40.     Plaintiff ACC realleges paragraphs 1 through 39 as if fully set forth herein.

41.     Each member of the Rigas Family, as an officer and director of ACC, owed fiduciary duties to ACC. In addition, each member of the Rigas Family owed fiduciary duties to ACC's creditors by virtue of ACC's insolvency.

42.     Each member of the Rigas Family breached his fiduciary duties to ACC by causing ACC to overpay for the Prestige Cable Systems for the benefit of the Rigas Family. In

12

so doing, each of these members of the Rigas Family acted in a manner that was adverse to the interests of ACC.

43.    Defendants knew that the members of the Rigas Family, as officers and directors of ACC, owed fiduciary duties to ACC. In addition, Defendants knew that the Rigas Family's acquisition of Prestige Georgia was a self-interested transaction for the Rigas Family, and the usurpation of a corporate opportunity from Adelphia.

44.    Upon information and belief, Defendants knew or were willfully blind to the fact that by engineering and agreeing to a transaction structure that allowed the Rigas Family to shift some of the cost of Prestige Georgia onto Adelphia, the Rigas Family was breaching its fiduciary duties to ACC. Despite this knowledge, the Defendants substantially assisted the Rigas Family's breaches of fiduciary duties by agreeing to and consummating the sale of the Prestige Cable Systems and Prestige Georgia on the terms and conditions described in the Asset Purchase Agreement and Stock Purchase Agreement.

45.    The members of the Rigas Family were not the "sole actors" with respect to ACC. Rather, there were independent directors at ACC who would not have allowed ACC to enter into the Asset Purchase Agreement and the Stock Purchase Agreement had they been fully informed that: (i) the Rigas Family intended to saddle Adelphia with the bill for a disproportionately large amount of the total cost of the purchases from the Prestige NC and Prestige Georgia companies and (ii) the cost of acquiring the assets in the Asset Purchase was significantly in excess of their fair market value.

46.    By reason of the foregoing, ACC has been damaged in an amount to be determined at trial, including: (i) the amount that ACC's payment in acquiring assets in the Asset

13

Purchase Agreement exceeded their fair market value, and (ii) the amount of money that ACC

incurred in additional debt in connection with the purchase of Prestige Georgia.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in favor of Plaintiffs pursuant to Sections 544(b) and 550 of the Bankruptcy Code, avoiding, preserving and recovering for the benefit of Adelphia's estate the difference between what Adelphia paid for the Prestige Cable Systems and the value of what it received, together with all interest and in respect of the obligations avoided hereunder; (ii) awarding compensatory damages to ACC for Defendants' aiding and abetting of the Rigas Family's breaches of fiduciary duty, together with interest; and (iii) such other and further relief as the Court deems just and proper.

Dated: New York, New York
      March 26, 2007

<div style="margin-left: 40%;">

Respectfully submitted,

KASOWITZ, BENSON, TORRES
  & FRIEDMAN LLP

By:   /s/ David M. Friedman
        David M. Friedman (DF-4278)
        Joseph A. Gershman (JG-8275)
1633 Broadway
New York, New York 10019
Tel: (212) 506-1700
Fax: (212) 506-1800

*Counsel to the Official Committee of Unsecured Creditors*

WILLKIE FARR & GALLAGHER LLP

By:   /s/ Terence K. McLaughlin
        Terence K. McLaughlin (TM-0287)
787 Seventh Avenue
New York, New York 10019
Tel: (212) 728-8000
Fax: (212) 728-8111

*Counsel to the Debtors*

</div>

# Exhibit D

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
David M. Friedman (DF-4278)
Andrew K. Glenn (AG-9934)
Joseph A. Gershman (JG-8275)
1633 Broadway
New York, NY 10019
Tel: (212) 506-1700
Fax: (212) 506-1800

Counsel to the Official Committee of Unsecured Creditors

TRAUB, BONACQUIST & FOX LLP
Paul Traub (PT-3752)
Steven Fox (SF-5432)
Susan Balaschak (SB-1901)
655 Third Avenue, 21st Floor
New York, New York 10017-5617
Tel: (212) 476-4770
Fax: (212) 476-4787

Special Counsel to the Debtors

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re )<br>ADELPHIA COMMUNICATIONS CORP., et al., )<br>a Delaware corporation, )<br> )<br>Debtors. )<br> ) | Chapter 11 Case<br><br>Case No. 02-41729 (REG) |
| ADELPHIA COMMUNICATIONS CORP., )<br>ADELPHIA CABLEVISION, L.L.C., and )<br>OFFICIAL COMMITTEE OF UNSECURED )<br>CREDITORS OF ADELPHIA )<br>COMMUNICATIONS CORP., et al., )<br> )<br>Plaintiffs, )<br> )<br>vs. )<br> )<br>FPL GROUP, INC. and )<br>WEST BOCA SECURITY, INC., )<br> )<br>Defendants. )<br> ) | Adversary Proceeding<br>No. _____<br><br><br>**COMPLAINT** |

#1215943

Plaintiffs Adelphia Communications Corporation ("ACC") and Adelphia Cablevision, L.L.C. ("Cablevision," and together with ACC, "Adelphia") and the Official Committee of Unsecured Creditors of Adelphia Communications Corporation (the "Committee"), for their complaint against Defendants, allege upon information and belief as follows:

## SUMMARY OF ACTION

1.    This action seeks to recover a fraudulent conveyance arising out of Adelphia's January 28, 1999 repurchase of certain shares of its Class A Common Stock and Series C Cumulative Convertible Preferred Stock from Defendants in exchange for approximately $149 million in cash.  Upon information and belief, at the time it repurchased these securities, Adelphia was insolvent (or was rendered insolvent), and Adelphia did not receive any value -- let alone reasonably equivalent value -- in exchange for the cash it paid in this transaction.

## JURISDICTION AND VENUE

2.    This Court's jurisdiction is founded upon sections 157 and 1334 of title 28 of the United States Code, in that this proceeding arises under title 11 of the United States Code (the "Bankruptcy Code"), or arises in or is related to the above-captioned chapter 11 case under the Bankruptcy Code, which is pending in the United States Bankruptcy Court for the Southern District of New York.

3.    This civil proceeding is a core proceeding under sections 157(b)(2)(A), (B), (C), (D), (H), (K) and (O) of title 28 of the United States Code.

4.    Venue in this Court is appropriate under section 1409(a) of title 28 of the United States Code.

5.     Adelphia and the Committee have filed this action jointly.  Simultaneously herewith, Adelphia and the Committee have filed a motion with this Court seeking approval for the Committee to prosecute this action on behalf of the estates.

## THE PARTIES AND OTHER KEY PARTICIPANTS

6.     The Committee is the statutory committee of unsecured creditors duly appointed on July 11, 2002 in Adelphia's chapter 11 case by the Office of the United States Trustee for the Southern District of New York.

7.     ACC and Cablevision are debtors in the jointly administered chapter 11 case, In re Adelphia Communications Corporation, et al., Case No. 02-41729 (REG), which commenced on June 25, 2002 (the "Petition Date").  ACC, one of the leading cable companies in the United States, is a corporation organized under the laws of the State of Delaware, and its principal place of business on the Petition Date was located in Coudersport, Pennsylvania.  Cablevision, an indirect subsidiary of ACC, is a Pennsylvania corporation, and its principal place of business on the Petition Date was located in Coudersport, Pennsylvania.

8.     Defendant FPL Group, Inc. ("FPL Group"), whose principal place of business is located in Juno Beach, Florida, is one of the nation's largest providers of electricity-related services, with annual revenue of more than $9 billion.

9.     Defendant West Boca Security, Inc. ("West Boca Security"), whose principal place of business is located in Juno Beach, Florida, is a wholly-owned subsidiary of FPL Group. West Boca Security is the successor corporation to Mayberry Investments, Inc. ("Mayberry Investments").

10.     Mayberry Investments was a wholly-owned subsidiary of FPL Group which owned and then sold the Repurchased Securities to Adelphia in exchange for approximately

$149 million in cash in January 1999. In September 2000, Mayberry Investments was merged into defendant West Boca Security and dissolved.

11.    Certain of the Repurchased Securities that Mayberry Investments sold to Adelphia may have been owned by Telesat Cablevision, Inc. ("Telesat"), a wholly-owned subsidiary of FPL Group, whose principal place of business was located in Juno Beach, Florida. In September 2000, Telesat was merged into West Boca Security and dissolved. West Boca Security is the successor to Telesat.

12.    Certain of the Repurchased Securities that Mayberry Investments sold to Adelphia may have been owned by Cable LP I ("Cable LP"), a wholly-owned subsidiary of FPL Group, whose principal place of business was located in Juno Beach, Florida. In September 2000, Cable LP was merged into West Boca Security and dissolved. West Boca Security is the successor to Cable LP.

## FACTS

13.    In 1995, Adelphia entered into a business alliance with FPL Group, an electricity services provider based in Florida, pursuant to which FPL Group became an investor in Adelphia by acquiring 1,091,524 shares of Adelphia Class A Common Stock, and then later 20,000 shares of Adelphia's Series C Cumulative Preferred Stock (collectively, the "Repurchased Securities"). FPL Group also had a seat on Adelphia's board of directors, and entered into a joint venture with Adelphia to provide cable service in Florida.

14.    After several years, FPL Group made the strategic decision to terminate its business alliance with Adelphia. To that end, in the fall of 1998, FPL Group decided to divest itself of its equity investment in Adelphia. At that time, the Repurchased Securities were owned by Mayberry Investments, a wholly-owned subsidiary of the FPL Group. FPL informed Adelphia of its desire to sell the Adelphia stock owned by its subsidiary Mayberry Investments,

4

and Adelphia agreed to buy back the Repurchased Securities from Mayberry Investments in

exchange for $149,213,130.00 in cash. The purchase transaction was consummated on January

28, 1999. Upon information and belief, the funds Adelphia paid to Mayberry Investments for the

Repurchased Securities were subsequently transferred to FPL Group and/or West Boca Security.

15.     The Repurchased Securities were not reasonably equivalent in value to the cash

which Adelphia paid for them. Indeed, this transaction was a *de facto* dividend and provided

Adelphia with no value.

### CLAIM FOR RELIEF

**(Avoidance and Recovery of Constructively Fraudulent Transfer Under
11 U.S.C. §§ 544(b) and 550 Against Defendants FPL Group and West Boca Security)**

16.     Plaintiffs reallege paragraphs 1 through 15 as if fully set forth herein.

17.     On January 28, 1999 Adelphia bought the Repurchased Securities from Mayberry

Investments for $149,213,130.00.

18.     Adelphia's purchase of the Repurchased Securities in exchange for cash was a

transfer of interest in Adelphia's property.

19.     When Adelphia acquired the Repurchased Securities for cash, Adelphia (i) was

insolvent or was rendered insolvent, (ii) did not receive reasonably equivalent value in exchange

for the cash it paid Mayberry Investments, and (iii) was engaged or was about to engage in

business or a transaction for which any property remaining with Adelphia was an unreasonably

small capital.

20.     Upon information and belief, Mayberry Investments, Telesat, Cable LP, FPL

Group, and West Boca Security were initial and/or immediate or mediate transferees of the cash

paid by Adelphia for the Repurchased Securities.

21.     At all times relevant hereto, there were actual creditors of Adelphia holding unsecured claims allowable against Adelphia's estate within the meaning of Sections 502(d) and 544(b) of the Bankruptcy Code with the right to void the cash Adelphia paid to Mayberry Investments for the Adelphia Securities under applicable law, including, but not limited to, the laws of the Commonwealth of Pennsylvania and the State of Florida.

22.     By virtue of the foregoing, pursuant to sections 544(b) and 550 of the Bankruptcy Code, the cash Adelphia paid to Mayberry Investments for the Repurchased Securities should be avoided, recovered, and preserved for the benefit of Adelphia's estate together with all interest paid in respect of the obligations avoided hereunder.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff pursuant to Sections 544(b) and 550 of the Bankruptcy Code, avoiding, preserving and recovering for the benefit of Adelphia's estate the $149,213,130.00 paid by Adelphia for the Repurchased Securities, together with all interest and in respect of the obligations avoided hereunder, and such other and further relief as the Court deems just and proper.

Dated: New York, New York
      June 24, 2004

Respectfully submitted,

KASOWITZ, BENSON, TORRES
  & FRIEDMAN LLP

By:   /s/ David M. Friedman
        David M. Friedman (DF-4278)
        Andrew K. Glenn (AG-9934)
        Joseph A. Gershman (JG-8275)
1633 Broadway
New York, New York 10019
Tel: (212) 506-1700
Fax: (212) 506-1800

Counsel to the Official Committee
  of Unsecured Creditors

TRAUB, BONACQUIST & FOX LLP

By:   /s/ Paul Traub
        Paul Traub (PT-3752)
        Steven Fox (SF-5432)
        Susan Balaschak (SB-1901)
655 Third Avenue, 21st Floor
New York, New York 10017-5617
Tel: (212) 476-4770
Fax: (212) 476-4787

Special Counsel to the Debtors

# Exhibit E

GREENBERG TRAURIG, LLP
Adam D. Cole   (AC 1335)
Karen Y. Bitar (KB 8764)
Jennifer L. Smith (CH 6148)
The MetLife Building
200 Park Ave.
New York, New York 10166
Telephone: (212) 801-9200
Facsimile: (212) 801-6400
*Attorneys for Defendants FPL Group, Inc.*
*and West Boca Security, Inc.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re | ) | Chapter 11 Case |
| ADELPHIA COMMUNICATIONS CORP., et al., a Delaware corporation, | ) ) ) ) | Case No. 02-41729 (REG) |
| Debtors. | ) ) | |
| ADELPHIA COMMUNICATIONS CORP., et al., | ) ) ) | (Jointly Administered) |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| FPL GROUP, INC., et al., | ) ) ) | Adv. Pro. No. 04-03295 (REG) |
| Defendants. | ) ) | |

## FIFTH AMENDED SCHEDULING ORDER

In an effort to coordinate discovery in this action with certain scheduling

demands, including without limitation other adversary proceedings involving the Debtor,

the parties jointly have agreed to, and propose to the Court, the following fifth amended

discovery plan:

1.  January 28, 2008 — Fact Discovery Must Be Completed

2.  March 31, 2008 — The Party Bearing the Burden of Proof as to a Particular Issue Shall Serve Expert Reports

3.  May 5, 2008 — Responsive Expert Reports Shall be Served

4.  June 23, 2008 — All Expert Discovery, including expert depositions, to be completed

5.  August 4, 2008 — Deadline to File and Serve All Dispositive Motions

6.  August 18, 2008 — Final Pre-trial Order, provided that, in the event that dispositive motions are pending, this deadline shall be suspended until such time as the Court orders otherwise.

7.  September 8, 2008 — Final Pre-trial Conference, provided that, in the event that dispositive motions are pending, this deadline shall be suspended until such time as the Court orders otherwise.

8.  January 20, 2009 — Trial Date, provided that, in the event that dispositive motions are pending, this deadline shall be suspended until such time as the Court orders otherwise.

2

Dated:  New York, New York
August 10, 2007

                                    Respectfully submitted,


KASOWITZ, BENSON, TORRES &          GREENBERG TRAURIG LLP
FRIEDMAN LLP



By: /s/ Joseph A. Gershman          By: /s/ Jennifer L. Smith

David M. Friedman (DF 4278)         Adam D. Cole (AC 1335)
Joseph A. Gershman (JG 8275)        Karen Y. Bitar (KB 8764)
1633 Broadway                       Jennifer L. Smith (CH 6148)
New York, New York 10019            200 Park Avenue
(212) 506-1700                      New York, New York 10166
*Counsel for Plaintiff*             (212) 801-9200
*the Adelphia Recovery Trust*       *Counsel for Defendants*



***S/ Robert E. Gerber  8/13/2007***
SO ORDERED:

3