UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | Chapter 11 Case |
| ADELPHIA COMMUNICATIONS CORP., et al., a Delaware corporation, | Case No. 02-41729(REG) |
| Debtors. | |
| ADELPHIA RECOVERY TRUST, | CIVIL ACTION FILE |
| Plaintiff, | NO. 07 CIV. 11152(LMM) |
| v. | (Related to 03 MDL 1529(LMM) and 05 Civ. 9050(LMM) |
| PRESTIGE COMMUNICATIONS OF NC, INC., et al. | |
| Defendants. | |

## DECLARATION OF HARRIS B. WINSBERG
### *(PRO HAC VICE PENDING)*

HARRIS B. WINSBERG hereby declares as follows:

1.      I am a member of the firm of Troutman Sanders LLP, attorneys for Defendants Prestige Communications of NC, Inc., *et al.* in the above-captioned action.  I submit this Declaration in opposition to Plaintiff's motion to withdraw the reference.  I am fully familiar with the facts set forth in this Declaration, either from personal knowledge or on the basis of documents that have been provided to me.

2.      Attached as Exhibit A is a true and correct copy of Judge Morris' Order Granting Sanctions to Defendants for Plaintiff's Failure to Produce Documents.

3.      Attached as Exhibit B is a true and correct copy of the Notice of Hearing on Motion of the Official Committee of Unsecured Creditors for Order Approving Stipulation

Among the Debtors and the Creditors Committee, Authorizing the Creditors Committee to prosecute Claims Against the FPL Group and Prestige Group.

4.      Attached as Exhibit C is a true and correct copy of the Stipulation and Order Authorizing the Creditors Committee to Prosecute Claims Against the FPL Group and the Prestige Group.

5.      Attached as Exhibit D is a true and correct copy of an October 29, 2007 email from Defendants' counsel to Plaintiff's counsel regarding the fifth amended scheduling order.

6.      Attached as Exhibit E is a true and correct copy of an October 29, 2007 email from Plaintiff's counsel to Defendants' counsel regarding the fifth amended scheduling order.

7.      Attached as Exhibit F is a true and correct copy of the Joint Submission Regarding Defendants' Request for Permission to Move for Summary Judgment at the End of Fact discovery and a stay of Expert Discovery Pending Summary Judgment.

8.      Attached as Exhibit G is a true and correct copy of the February 3, 2006 Transcript of Motion Hearing Before Honorable Cecelia G. Morris.

9.      Attached as Exhibit H is a true and correct copy of the December 13, 2006 Transcript of Motion Before the Honorable Cecelia G. Morris.

10.     Attached as Exhibit I is a true and correct copy of the February 21, 2007 Transcript of Motion for Leave to Amend the Complaint filed by Official Committee of Unsecured Creditors.

11.      Attached as Exhibit J is a true and correct copy of the March 21, 2007 Transcript of Motion to Amend Complaint—Court Decision Before the Honorable Cecelia G. Morris.

12.      Attached as Exhibit K is a true and correct copy of the May 16, 2007 Transcript of Joint Submission Before the Honorable Cecelia G. Morris.

13.      Attached as Exhibit L is a true and correct copy of the October 17, 2007 Transcript of Defendants' Motion for Sanctions Before the Honorable Cecelia G. Morris.

14.      Attached as Exhibit M is a true and correct copy of the October 24, 2007 Transcript of Discovery Conference and Motions Before the Honorable Cecelia G. Morris.

15.      Attached as Exhibit N is a true and correct copy of the November 1, 2007 Transcript of Conference Before the Honorable Cecelia G. Morris.

Dated:  December 17, 2007.

    Atlanta, Georgia

    /s/ Harris B. Winsberg
    HARRIS B. WINSBERG (Pro Hac Vice Pending)
    (Ga. Bar No. 770892)
    TROUTMAN SANDERS LLP
    Bank of America Plaza, Suite 5200
    600 Peachtree Street, N.E.
    Atlanta, Georgia 30308-2216
    Telephone No.:    (404) 885-3000
    Facsimile No.:     (404) 885-3900

    *Counsel for Prestige Communications of N.C., Inc., et al.*

1883808_1.DOC

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this day served in the foregoing matter a copy of the

**Declaration of Harris B. Winsberg** by depositing a copy of same in the U.S. Mail in a properly

addressed envelope with adequate postage thereon as follows:

>David M. Friedman, Esq.
>Joseph A. Gershman, Esq.
>Kasowitz, Benson, Torres & Friedman LLP
>1633 Broadway
>New York, New York 10019

This 17th day of December 2007.


/s/ Harris B. Winsberg
Harris B. Winsberg (Pro Hac Vice Pending)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

In re:
ADELPHIA COMMUNICATIONS CORP., *et al.*,
a Delaware Corporation,
                                    Debtors.

Chapter 11 Case
Case No. 02-421729
(Jointly Administered)

------------------------------------------------------------------x


------------------------------------------------------------------x

ADELPHIA RECOVERY TRUST,
                                    Plaintiff,
v.
PRESTIGE COMMUNICATIONS OF NC, INC., *et al.,*
                                    Defendants.

Adversary Proceeding
No. 04-03293 (CGM)

------------------------------------------------------------------x


## ORDER GRANTING SANCTIONS TO DEFENDANTS FOR PLAINTIFF'S FAILURE TO PRODUCE DOCUMENTS

On September 24, 2007 defendants Prestige Communications of NC, Inc.,
Jonathan J. Oscher, Lorraine Oscher McClain, Robert F. Buckfelder Investment
Trust and Anverse, Inc. (collectively, "Defendants") filed a motion (the "Motion")
in accordance with Rule 7037 of the Federal Rules of Bankruptcy Procedure
("Bankruptcy Rule") and Rule 37(a) of the Federal Rules of Civil Procedure for an
order compelling Adelphia Recovery Trust ("Plaintiff") to produce (a) unredacted
transcripts of Adelphia's independent directors taken in *Adelphia Communications
Corp. v. Deloitte & Touche, LLP et al.*, Index No. 000598 (Phila.Ct. of Common
Pleas) with exhibits; (b) complete corporate minute books of Highland Prestige
Georgia, Inc. and Prestige Communications, Inc.; and (c) documents related to the
Adelphia's cable system acquisitions that closed in 1999 and 2000 (collectively,

"<u>Documents</u>") and awarding sanctions for failure to comply with the foregoing discovery requests.  A hearing was scheduled for October 17, 2007 ("<u>October 17, 2007 Hearing</u>").  On October 11, 2007 Plaintiff filed an objection to the Motion ("<u>Objection</u>").

**BACKGROUND**

This was not the first time Defendants have raised issues regarding the exchange of discovery in this proceeding.  Defendant's first motion seeking discovery was filed on September 14, 2006 wherein they requested all documents responsive to its pending demands ("<u>September 14, 2006 Motion</u>").  Defendants claimed that the parties had agreed to discovery production in October 2005[1] but Plaintiff had not complied ("<u>October 2005 Agreement</u>").  During arguments at the December 13, 2006 hearing, it came to light that although discovery had been pending for several years, Plaintiff had yet to produce a privilege log in this matter.  Defendants argued Plaintiff had waived its right to claim privilege because of its failure to deliver a privilege log to them. December 13, 2006 hearing transcript

---

[1] In an e-mail from Defendants' counsel to Plaintiff's counsel dated October 4, 2005, counsel for Defendants stated the following understanding:

> [Plaintiff] will produce the Covington Report and exhibits to [Defendants] once [Defendants] agree not to take issue with [Plaintiff's] position that, although the Report and exhibits are not themselves privileged, the documents created in connection with their preparation fall within the work-product doctrine. [Plaintiff] will send [Defendants] a proposed form of agreement to review, and upon [Defendants] signing the agreement, [Plaintiff] will promptly send [Defendants] the Covington Report and exhibits.  [Plaintiff] will provide [Defendants] with a log listing the materials relating to the Covington Report for which [Plaintiff] claim work-product protection.

Exhibit 5 of Affirmation of Robert K. Gordon in Support of Defendants' Motion to Compel the Production of Documents, ECF Docket Entry No. 34, Attachment 1, p. 20.

("Hr'g Tr.") 42:20-24, 43:10-22.[2] After hearing the parties' arguments, the Court directed them to submit a joint submission outlining their discovery issues ("Joint Submission").[3]

The Court, after reviewing their Joint Submission and hearing oral argument from the parties, granted Defendants' September 14, 2006 Motion on May 16, 2007 ("May 16, 2007 Ruling"). In its Ruling, the Court noted that Defendants expected Plaintiff to produce a privilege log pursuant to their October 2005 Agreement. May 16, 2007 Hr'g Tr. 19:4-21 and 20:14-17.[4] The Court also noted Plaintiff's pleadings in opposition to the September 14, 2006 Motion in which Plaintiff stated it would not assert either attorney-client or work-product privileges, except in very limited circumstances, and none of the circumstances were applicable to Defendants' current motion.[5] The Court noted that although Plaintiff later claimed the documents requested by Defendants fell within the work-product protection[6] it had yet to supply Defendants with a privilege log pursuant to

---

[2]  A copy of December 13, 2006 hearing transcript can be found on the docket as ECF Docket Entry No. 112.

[3]  Joint Submission Regarding Plaintiffs' Work Product Claim With Respect to Certain PriceWaterhouseCoopers Documents, ECF Docket Entry No. 66.

[4]  A copy of May 16, 2007 hearing transcript can be found on the docket as ECF Docket Entry No. 108.

[5]  Plaintiff's October 16, 2006 Objection to Defendants' Motion to Compel the Production of Documents ("October 16, 2007 Objection") states:

> Defendants complain that plaintiffs have refused to produce a privilege log, and argue that because they have not produced a privilege log, there's been a waiver of privilege. But to draft a privilege log, one must have privileged documents to enter on it. As [plaintiff has] told defendants numerous times, in open court and in chambers conferences, and made it clear in correspondence, … [plaintiff has] not withheld responsive documents based on privilege, with the exception of work product and privilege documents created in connection with this litigation.

October 16, 2007 Objection, p. 25, ECF Docket Entry No. 43.

[6]  Joint Submission at pp. 23-24.

Bankruptcy Rule 7026(b)(5)(A). The Court found Plaintiff had waived its right to assert work-product protection by not previously producing a privilege log and cited several cases[7] as precedent for its ruling. May 16, 2007 Hr'g Tr. 26-28.

---

[7] The Court referenced several opinions as authority for its ruling, which are set out fully below. In the matter *Strougo v. BEA Associates*, Judge Robert Sweet held:

> A privilege log must be received either within thirty days of a request for documents or by a date that is either agreed upon by the parties or set by the court. Fed.R.Civ.P. 34(b). The failure to provide a timely privilege log or to describe the documents in conformity with the Local Rules may result in a waiver of the privilege. *See, e.g.,* Fed.R.Civ.P. 26(b)(5), Advisory Committee Notes ("To withhold materials without such notice is contrary to the rule ... and may be viewed as a waiver of the privilege or protection."); *A.I.A. Holdings, S.A. v. Lehman Bros., Inc.,* No. 97 Civ. 4978, 2000 WL 1538003, *3 (S.D.N.Y. Oct. 17, 2000) (finding waiver of work-product privilege where defendants willfully failed to set forth either the parties or the subject matter of the documents in the privilege log such that "[t]he dearth of information in the index listing is so complete that the listing is the functional equivalent of no listing at all."); *Hurst v. F.W. Woolworth Co.,* 95 Civ. 6584(CSH), 1997 WL 61051, *6 (S.D.N.Y. Feb. 11, 1997) (finding of waiver may be appropriate where log is never or untimely provided); *Wilson v. New York City Housing Authority,* No. 96 Civ. 1765(SHS) (HBP), 1996 WL 524337, *2 (S.D.N.Y. Sept. 16, 1996) ("To the extent that defendants attempt to assert privilege, their failure to serve an index of privilege documents in conformity with [former] Local Civil Rule 46(e)(2) has resulted in waiver of any privilege they may have otherwise had."); *Carte Blanche (Singapore) PTE., Ltd. v. Diners Club Intern., Inc.,* 130 F.R.D. 28, 32 (S.D.N.Y.1990) (by claiming "privilege" rather than specifying particular privilege as required by the local rules, defendant waived work-product privilege).

*Strougo v. BEA Associates*, 199 F.R.D. 515, 521 (S.D.N.Y. 2001). In Judge Charles Haight's unpublished opinion, *Hurst v. F.W. Woolworth Co.,* 1997 WL 61051 (S.D.N.Y. Feb. 11, 1997) the Court ruled the defendant had waived any claim of privilege as a result of its unjustified failure to comply with the Federal Rules of Civil Procedure and the local District Court rules when it did not provide a privilege log. The court in *PKF Intern. Corp. v. IBJ Schroder Leasing Corp.,* 1996 WL 525862, *3 (S.D.N.Y. Sept. 17, 1996) held, "even if the privilege were recognized, [defendant] long ago waived the protection of the privilege by not producing the privilege log required by Local Civil Rule 46(e)(2)(ii)(A)." Lastly Chief Judge Bernstein's 1997 opinion *In re Schick* discusses issues which are very similar to the ones before this Court in the current matter:

> [But] for [Defendant's] persistence, these documents would have remained a secret. In this regard, [Defendant] suffered prejudice because he had to spend

At the October 17, 2007 Hearing, after entertaining arguments from both parties, the Court directed Plaintiff to turn over the Documents requested by Defendants in an unredacted form within the week ("October 17, 2007 Ruling").[8] The hearing was adjourned to October 24, 2007 ("October 24, 2007 Hearing").

At the October 24, 2007 Hearing, Defendants informed the Court that the October 17, 2007 Ruling had not been complied with by Plaintiff. Specifically, the Documents delivered by Plaintiff were redacted. The Court inquired of Plaintiff why it had not acted in accordance with the October 17, 2007 Ruling. Upon hearing Plaintiff's confirmation that it had not complied and because Plaintiff could offer no reasonable explanation for its noncompliance, the Court announced that Plaintiff would be sanctioned. The Court directed Plaintiff to pay Defendants' attorneys' fees for bringing of their Motion. The Court directed Defendants' counsel to submit an affirmation outlining the time associated with the bringing of its Motion ("Affirmation"). Defendants filed and served their Affirmation on November 7, 2007 indicating that the Defendants incurred fees totaling $15,432 for 53.8 hours of attorney time.

On October 29, 2007, Plaintiff filed a motion asking the Court to reconsider its October 17, 2007 Ruling and October 19, 2007 Order. Plaintiffs asserted the Court's Ruling and Order directed Plaintiff to turn over four memoranda written by the law firm of Willkie Farr & Gallagher LLP for Adelphia Communication

---

substantial time and money to compel the [Plaintiff] to perform her discovery obligations. Accordingly, I conclude that the [Plaintiff] has waived any privilege with respect to these five documents, and must produce copies that have been redacted to exclude matters beyond the scope of [Defendant's] discovery request.

*In re Schick,* 1997 WL 465217 at *6 (Bankr.S.D.N.Y. Aug. 12, 1997).

[8] The Court's direction was memorialized in written order dated October 19, 2007 and appears on the docket at ECF Docket Entry No. 92 ("October 19, 2007 Order").

Corp.'s Board of Directors ("Four Memoranda"). A hearing was held on November 1, 2007 and the Court heard arguments from both the Plaintiff and Defendants. Without deciding whether the Four Memoranda were privileged, the Court ruled that the Plaintiff did not need to produce the documents because they were irrelevant to this adversary proceeding ("November 1, 2007 Ruling"). November 1, 2007 Hr'g Tr. 4:24-25, 5.[9]

## RULING

The Court finds that it has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and the relief requested by the Defendants is authorized by Section 105 of Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq., as amended, and Rule 7037 of the Federal Rules of Bankruptcy Procedure, and that just cause exists for granting the relief Defendants seek.

Therefore, upon the facts stated above and upon the totality of the circumstances, it is hereby

ORDERED that the Plaintiff is sanctioned pursuant to Bankruptcy Rule Bankruptcy Rule 7037(a)(4) for the reasons set forth herein, and at the October 24, 2007 Hearing; and it is further

ORDERED that Plaintiff's November 7, 2007 motion requesting an opportunity to file responsive papers and for an opportunity to be heard in connection with Defendants' Affirmation is granted on a limited basis; the Court

---

[9] A copy of November 1, 2007 hearing transcript can be found on the docket as ECF Docket Entry No. 102.

will only consider Plaintiff's arguments concerning the amount of the sanction; and it is further

ORDERED that a hearing to decide the amount of Plaintiff's sanction will be heard on January 9, 2008 at 11:30 a.m. at the United States Bankruptcy Court located at One Bowling Green, New York, New York[10]; and it is further

ORDERED that this Court's May 16, 2007 Ruling is hereby confirmed.


Dated: Poughkeepsie, New York          /s/ Cecelia Morris
      December 14, 2007          _____
                               Judge Cecelia Morris
                               United States Bankruptcy Judge

---

[10] A courtroom will be assigned prior to the hearing and its location will be posted on the ECF Docket shortly thereafter.

Objection Deadline:  July 5, 2004 at 12:00 p.m.
Hearing Date:  July 8, 2004 at 9:45 a.m.

David M. Friedman (DF-4278)
Adam L. Shiff (AS-7571)
Andrew K. Glenn (AG-9934)
KASOWITZ, BENSON, TORRES
& FRIEDMAN LLP
1633 Broadway
New York, New York 10019
(212) 506-1700

COUNSEL TO THE OFFICIAL COMMITTEE
OF UNSECURED CREDITORS

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK·
------------------------------------------------------------X
In re                                                  :
                                                       :     Case No. 02-41729 (REG)
ADELPHIA COMMUNICATIONS CORP., et al.,  :     Jointly Administered
                                                       :
            Debtors.                                   :
                                                       :
------------------------------------------------------------X

**NOTICE OF HEARING ON MOTION OF THE OFFICIAL
COMMITTEE OF UNSECURED CREDITORS FOR ORDER
APPROVING STIPULATION AMONG THE DEBTORS AND
THE CREDITORS COMMITTEE, AUTHORIZING THE
CREDITORS COMMITTEE TO PROSECUTE CLAIMS
AGAINST THE FPL GROUP AND PRESTIGE GROUP**

PLEASE TAKE NOTICE that a hearing on the Motion of the Official Committee of

Unsecured Creditors of Adelphia Communications Corporation and its affiliated debtors (the

"Creditors Committee") for Order Approving Stipulation among the above-captioned debtors

and debtors in possession (the "Debtors") and the Creditors Committee Authorizing the Creditors

Committee to Prosecute Claims Against FPL Group and Prestige, dated June 24, 2004 (the

"Motion"), will be held before the Honorable Robert E. Gerber, United States Bankruptcy Judge,

in Room 621 of the United States Bankruptcy Court for the Southern District of New York, One

Bowling Green, New York, New York, 10004-1408, on **July 8, 2004 at 9:45 a.m.,** prevailing

Eastern Time, or as soon thereafter as counsel may be heard.

   PLEASE TAKE FURTHER NOTICE that objections, if any, to the relief

requested in the Motion shall (a) be in writing; (b) conform to the Federal Rules of Bankruptcy

Procedure and the Local Bankruptcy Rules for the Southern District of New York; (c) set forth

with specificity the name of the objector, the basis for the objection and the specific grounds

therefore; (d) be filed in accordance with General Order M-242 of the United States Bankruptcy

Court for the Southern District of New York, which order can be found at

www.nysb.uscourts.gov; and (e) be filed with the Court, One Bowling Green, New York, New

York 10004-1408, by no later than **July 5, 2004 at 12:00 p.m.,** prevailing Eastern Time (with a

copy delivered directly to Chambers) and served on: (i) the Office of the United States Trustee,

33 Whitehall Street, 21st Floor, New York, New York  10004 (Attn:  Tracy Hope Davis, Esq.);

(ii) Kasowitz, Benson, Torres & Friedman LLP, counsel for the Official Committee of

Unsecured Creditors, 1633 Broadway, New York, New York  10019 (Attn:  David M. Friedman,

Esq.); (iii) Willkie Farr & Gallagher, counsel for the debtors and debtors in possession, 787

Seventh Avenue, New York, New York  10019 (Attn:  Shelley Chapman, Esq.); (iv) Traub,

Bonacquist, & Fox LLP, counsel for the debtors and debtors in possession, 655 Third Avenue,

21st Floor, New York, New York 10017-5617 (Attn:  Paul Traub) so as to be actually received

no later than **July 5, 2004 at 12:00 p.m.,** prevailing Eastern Time.

Dated:  June 24, 2004
        New York, New York

                              KASOWITZ, BENSON, TORRES
                              & FRIEDMAN LLP


                              /s/ David M. Friedman
                              David M. Friedman (DF-4278)
                              Adam L. Shiff (AS-7571)
                              Andrew K. Glenn (AG-9934)
                              1633 Broadway
                              New York, New York 10019
                              (212) 506-1700

                              Counsel to the Official Committee
                              of Unsecured Creditors

Objection Deadline:  July 5, 2004 at 12:00 p.m.
Hearing Date:  July 8, 2004 at 9:45 a.m.

David M. Friedman (DF-4278)
Adam L. Shiff (AS-7571)
Andrew K. Glenn (AG-9934)
KASOWITZ, BENSON, TORRES
& FRIEDMAN LLP
1633 Broadway
New York, New York 10019
(212) 506-1700

COUNSEL TO THE OFFICIAL COMMITTEE
OF UNSECURED CREDITORS

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
In re                                                 :
                                                      :        Case No. 02-41729 (REG)
ADELPHIA COMMUNICATIONS CORP., et al.,  :        Jointly Administered
                                                      :
        Debtors.                                      :
                                                      :
-------------------------------------------------------------X

## MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR ORDER APPROVING STIPULATION AMONG THE DEBTORS AND THE CREDITORS COMMITTEE AUTHORIZING THE CREDITORS COMMITTEE TO PROSECUTE CLAIMS AGAINST THE FPL GROUP AND THE PRESTIGE GROUP

TO:    THE HONORABLE ROBERT E. GERBER,
       UNITED STATES BANKRUPTCY JUDGE:

The Official Committee of Unsecured Creditors of Adelphia Communications

Corporation and its affiliated debtors (the "Creditors Committee"), by its undersigned counsel,

Kasowitz, Benson, Torres & Friedman LLP ("KBT&F"), hereby moves this Court for entry of

the proposed stipulation and order (the "Stipulation") among the above-captioned debtors and

debtors in possession (the "Debtors") and the Creditors Committee, dated June 24, 2004, a copy

of which is attached hereto as Exhibit A, authorizing the Creditors Committee to prosecute

claims against: (1) FPL Group, Inc. and West Boca Security, Inc. (collectively, "FPL Group"),

and (2) Prestige Communications of NC, Inc., Jonathan J. Oscher, Lorraine Oscher McClain, Robert F. Buckfelder, Buckfelder Investment Trust and Anverse, Inc. (collectively "Prestige" and together with FPL Group, the "Defendants"), on behalf of the Debtors' estates (the "Motion"). In support of this Motion, the Creditors Committee respectfully represents as follows:

### Jurisdiction, Venue and Statutory Predicates

1.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for this Motion are Rule 9019(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and sections 105(a), 1003(c)(5) and 1009(b) of title 11 of the United States Code (the "Bankruptcy Code").

### Background

2.      On June 10, 2002, Century Communications Corporation filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. On June 25, 2002 (the "Petition Date"), each of the rest of the above-captioned debtors and debtors in possession filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Each of the Debtors continues to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      The Debtors' chapter 11 cases have been consolidated for procedural purposes and are being jointly administered pursuant to Bankruptcy Rule 1015(b).

4.      On July 11, 2002, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the Creditors Committee to represent all unsecured creditors of the Debtors pursuant to section 1102 of the Bankruptcy Code.

## The Creditors Committee's Investigation of the Claims

5.    The statutory deadline by which certain avoidance actions (the "Avoidance Actions") must be filed is approaching. Accordingly, in or about January, 2004, the Creditors Committee began an investigation into possible avoidance claims against the Defendants. In the course of that investigation, the Creditors Committee has, among other things: (i) reviewed transaction documents; and (ii) worked closely with the Debtors to determine the validity of potential claims against Defendants.

6.    As a result of the investigation, the Creditors Committee possesses a significant level of knowledge of the facts relevant to the transactions involving Defendants and the potential claims against them. The culmination of the Committee's investigation is the agreement with the Debtors embodied in the Stipulation and the drafting and contemporaneous filing of the Complaints with this Court.[1]

## The Complaints

7.    The allegations of the Complaints are incorporated into this Motion by reference. A brief summary of the Complaints is set forth below.

## Prestige.

8.    The Complaint against Prestige seeks to recover a fraudulent conveyance arising out of Adelphia's July 5, 2000 purchase of certain cable systems from Prestige Communications of NC, Inc. ("Prestige NC") in exchange for approximately $800 million in cash (the "Asset Purchase") -- which was far more than those assets were worth -- while Adelphia was insolvent.

9.    Adelphia entered into and overpaid in the Asset Purchase as part of a transaction in which members of the Rigas Family (John Rigas, Tim Rigas, and Michael Rigas), who were

---

[1]    Copies of these complaints against Prestige and FPL are annexed to the Stipulation as Exhibit A and B, respectively (the "Complaints"; the claims asserted therein are referred to herein as the "Claims").

Adelphia directors and senior officers, simultaneously bought Prestige NC's sister company, Prestige Communications, Inc. ("Prestige Georgia"), for themselves at a significantly lower price. In addition, this action also seeks to recover damages from the Defendants for aiding and abetting the Rigas Family's breaches of fiduciary duty as Defendants knew that the Rigas Family was breaching its fiduciary duties by entering into the Asset Purchase, and Defendants substantially assisted the Rigas Family in doing so by agreeing to, and then consummating, the transaction.

**The FPL Group.**

10.     The Complaint against FPL Group seeks to recover a fraudulent conveyance arising out of Adelphia's January 28, 1999 repurchase of certain shares of its Class A Common Stock and Series C Cumulative Convertible Preferred Stock from the FPL Group in exchange for approximately $149 million in cash (the "Repurchase"). At the time of the Repurchase, Adelphia was insolvent or it was rendered insolvent by its repurchase of the securities, and Adelphia did not receive reasonably equivalent value in exchange for the cash it paid in this transaction (indeed, it received no value whatsoever for this transaction). To compensate the Debtors' estates for the loss incurred as a result of the Repurchase, the Complaint against FPL Group seeks, among other things, to avoid, recover and preserve for the benefit of the estates the cash Adelphia paid pursuant to the Repurchase together with all interest paid in respect of the obligations avoided thereunder.

**The Stipulation**

11.     The Stipulation contains the following material provisions, but is qualified in its entirety by reference to the Stipulation itself:

  - Joint Filing of Complaint: The Debtors and the Creditors Committee shall jointly file the Complaint on behalf of the estates, with each of their

respective counsel signing the Complaint.

- **Debtors are Nominal Plaintiffs**: The Debtors will be nominal plaintiffs only and will not be bound by any of the factual allegations made in the Complaints by the Creditors Committee. Upon the Court's approval of the Stipulation, counsel for the Debtors' is authorized to withdraw from the action.

- **Leave to File Complaint**: The Creditors Committee shall be granted leave and have standing to file and to prosecute the Claims, including those set forth in the Complaint, on behalf of the Debtors' estates, in its own name and in the name of the Debtors in accordance with the Second Circuit's decision in Commodore Int'l Ltd. v. Gould (In re Commodore Int'l Ltd.), 262 F.3d 96 (2d Cir. 2001). Because the Debtors' counsel also has signed the Complaints, there can be no argument that the Complaints were not truly timely and properly commenced.

- **Debtors' Prosecution of Claim If Stipulation Is Not Approved**. If the Stipulation is not approved by the Court, the Debtors shall prosecute the Claims on behalf of the estates without prejudice to the Creditors Committees' right to intervene.

- **Settlement of Claims**: The Debtors shall retain the right to compromise and to settle the Claims. Parties in interest shall retain the right to oppose such settlement(s) as if this Stipulation never existed and the Debtors had retained exclusive control over the Claims.

- **Jurisdiction**: This Court shall retain jurisdiction to interpret, enforce and resolve any disputes under the Stipulation.

12.    The Stipulation proceeds from the shared belief of the Debtors and the Creditors Committee of the necessity of these estates' prosecution of the Claims against the Defendants. The Stipulation strikes an appropriate balance between the rights of the respective parties to prosecute, participate in, control and settle the litigation against the Defendants.

### The Stipulation Is Supported by Valid Business Judgment and Is in the Best Interests of the Estates

13.    The Stipulation is fair and equitable and falls well within the range of reasonable business judgment. The Complaints allege, at the very least, colorable claims that will yield significant recoveries to the estates. Thus, it is in the best interest of the estates to pursue the

Claims asserted in the Complaints.  Moreover, in the interest of judicial economy, to reduce costs and minimize the use of estate resources, it is in the best interest of the estate for the litigation of the Claims to be primarily handled by the Creditors Committee.

14.    The Creditors Committee submits that it is a logical party to bring the Complaints. The Creditors Committee represents the real parties in interest in the adversary proceeding as it is the unsecured creditors who will directly benefit from recoveries from the Claims.  In addition, counsel to the Creditors Committee has expertise in the area of avoidance actions.  Moreover, there is substantial overlap between the claims filed by the Creditors Committee against the Debtors' former lenders filed in this Court.  Indeed, both cases involve fraudulent conveyance claims for transactions occurring in 1999 and thereafter.

15.    Moreover, for the last five months, KBT&F has been undertaking an analysis of, and an investigation into, the Claims.  KBT&F has developed the intellectual capital necessary to pursue the claims set forth in the Complaints and it would be costly and wasteful for the Debtors' counsel to duplicate the work already performed.

16.    Moreover, the Stipulation protects the Debtors' ability to object to any amendment to the Complaints and to settle any of the Claims as if the Stipulation never existed and the Debtors had retained exclusive control over the Claims.  As such, the rights of the Debtors are protected and preserved.  The Stipulation thus evidences the collective judgment of the Debtors and the Creditors Committee that it is in the best interest of the estates for the Creditors Committee to bring the Complaints on behalf of the Debtors' estates.

**The Creditors Committee Should Be Granted
<u>Standing To Prosecute Claims Against Prestige and the FPL Group</u>**

17.    The Creditors Committee should be granted standing to bring the Complaints pursuant to the Stipulation, sections 1103(c)(5) and 1109(b) of the Bankruptcy Code and the

Second Circuit's decision in Commodore.[2]  In Commodore, the Second Circuit held that "[a]

creditors committee may acquire standing to pursue the debtors' claims if (1) the committee has

the consent of the debtor in possession or trustee, and (2) the Court finds that suit by the

committee is (a) in the best interest of the bankruptcy estate, and (b) is "necessary and

beneficial" to the fair and efficient resolution of the bankruptcy proceedings." In re Commodore

Int'l Ltd., 262 F.3d at 100; see also In re Housecraft Indus. USA, Inc., 310 F.3d 64, 70 (2d Cir.

2002) (reaffirming the ruling in Commodore, and expanding it to permit a secured creditor to

join with a chapter 7 trustee in joint prosecution of plenary litigation to set aside allegedly

fraudulent transfers).  In fact, "[t]he case for recognition of creditor standing is more compelling

than in Commodore because the [Debtors are also] named plaintiff[s]. . ." In re Housecraft

Indus. USA, Inc., 310 F.3d at 70-71.  The Debtors' participation as a party is significant because

the Creditors Committee is not replacing the Debtors as a claimant, but rather assisting with the

litigation.  Id.  Under the Stipulation, the Debtors will retain an appropriate level of control over

the litigation through their ability to enter into settlements and to object to amendments of the

Complaints.

18.    The Debtors, by virtue of the Stipulation, have consented to the Creditors

Committee pursuing the litigation of the Claims.  As such, the Court need only decide the second

prong of the Commodore test, that the litigation is in the best interest of the Debtors' estates and

---

[2]    As indicated in Commodore, a committee of unsecured creditors has implied authority under sections 1103
and 1109 to pursue claims of the estate.  Section 1103(c)(5) of the Bankruptcy Code states that a creditors
committee may "perform such other services as are in the interest of those represented."  11 U.S.C. §
1103(c)(5).  The Bankruptcy Code also treats the creditors as a party in interest.  Under section 1109(b),
"[a] party in interest, including a debtor, the trustee, a creditors committee, . . . may raise and appear and be
heard on any issue in a case under this chapter."  11 U.S.C. § 1109; see also In re V. Savino Oil & Heating
Co., Inc., 91 B.R. 655, 656-67 (Bankr. E.D.N.Y. 1988).

beneficial to the fair and efficient resolution of the bankruptcy proceeding. In re Housecraft
Indus. USA, Inc., 310 F.3d at 71.

19.    As discussed above, the adversary proceeding commenced by the filing of the
Complaints is in the best interest of the estates because it involves, at the very least, colorable
claims that could yield substantial recoveries to the estates. If successful, the Debtors and their
estates would recover in excess of $350 million. Because the suits would affect the distribution
and availability of property of the estate, the suits are thereby necessary to the ultimate resolution
of the bankruptcy proceedings. The Debtors and the Creditors Committee believe that
prosecuting the claims asserted in the Complaints are necessary to obtain this additional value.

20.    Allowing the Creditors Committee to bring the Complaints "permits a reasoned
and practicable division of labor between the creditors committee and the debtor in possession or
trustee, while also providing bankruptcy courts with significant authority both to manage the
litigation and to check any potential for abuse by the parties." In re Commodore Int'l Ltd., 262
F.3d at 100. It is further in the best interest of the estate for counsel to the Creditors Committee,
which is skilled in complex litigation, to prosecute these actions. As such, there is adequate
reason for this Court to grant the Creditors Committee standing to bring the Complaints.

21.    In fact, as this Court has noted, "at least in the Second Circuit, it is permissible,
not uncommon, and often desirable for official committees to seek and obtain the right to assert
the claim on behalf of the estate – either when there is doubt as to the debtor's ability or
inclination to prosecute the claim vigorously, or where the debtor consensually cedes control of
the litigation over to the committee." In re Adelphia Communications Corp., 285 B.R. 848, 855
(Bankr. S.D.N.Y. 2002) (citations omitted); See also Unsecured Creditors Committee of Debtor
STN Enters., Inc. v. Noyes (In re STN Enters.), 779 F.2d 901, 904 (2d Cir. 1985) (holding that

creditors committees may initiate adversary proceedings in the name of the debtor in possession, with the approval of the bankruptcy court, where, *inter alia*, the court finds that trustee or debtor in possession unjustifiably failed to bring suit or abused its discretion in failing to do so); In re Commodore Int'l Ltd., 262 F.3d at 100. The Court's statement is particularly apt here.

22.    Although not relevant to the current case because the Debtors have consented to the Creditors Committee's standing, even absent such consent, if the Debtors failed or refused to pursue the litigation of the Claims, the Creditors Committee would nevertheless be entitled to standing to bring the Complaints pursuant to the implied authority under sections 1103 and 1109 of the Bankruptcy Code and the Second Circuit's decision in STN. In determining whether to allow a creditors committee to commence an action pursuant to STN, courts consider (1) whether the creditors committee has presented a colorable claim; and (2) whether the action is likely to benefit the reorganization of the estate. In re STN Enters., 779 F.2d at 905. As discussed above, the Creditors Committee has presented colorable claims and, given the likelihood of significant recoveries to the estates, the actions will benefit the Debtors' estates.

### Notice

23.    Notice of this Motion has been provided to (i) the U.S. Trustee, (ii) counsel to the Debtors' prepetition and postpetition lenders; (iii) counsel to the Debtors, (iv) counsel to the Official Committee of Equity Security Holders; and (v) all parties on the Limited Service List, in accordance with this Court's Order entered on August 9, 2002 limiting service in these cases. The Creditors Committee submits that no other or further notice need be provided.

### Memorandum of Law

24.    As this Motion includes citations of legal authority, the requirements of Local Bankruptcy Rule 9013-1(b) for the submission of a memorandum of law herewith is satisfied pursuant to the Court's Case Management Order #1, entered in these cases on October 18, 2002.

## No Prior Request

25.    No previous request for the relief sought herein has been made by the Creditors

Committee to this or any other court.

## Conclusion

WHEREFORE, the Creditors Committee respectfully requests that the Court

grant the Motion approving the Stipulation between the Creditors Committee and the Debtors,

substantially in the form annexed hereto as Exhibit A, and grant such other and further relief as

may be just and proper.

Dated:  June 24, 2004
          New York, New York


                                        KASOWITZ, BENSON, TORRES
                                        & FRIEDMAN LLP


                                        /s/ David M. Friedman_____
                                        David M. Friedman (DF-4278)
                                        Adam L. Shiff (AS-7571)
                                        Andrew K. Glenn (AG-9934)
                                        1633 Broadway
                                        New York, New York 10019
                                        (212) 506-1700

                                        Counsel to the Official Committee
                                        of Unsecured Creditors

**Exhibit A**

**Stipulation**

David M. Friedman (DF-4278)
Adam L. Shiff (AS-7571)
Andrew K. Glenn (AG-9934)
KASOWITZ, BENSON, TORRES
& FRIEDMAN LLP
1633 Broadway
New York, New York 10019
(212) 506-1700

TRAUB, BONACQUISIT & FOX LLP
Paul Traub (PT-3752)
Steven Fox (SF-5432)
Susan Balaschak (SB-1901)
655 Third Avenue, 21st Floor
New York, New York 10017-5617
Tel: (212) 476-4770
Fax: (212) 476-4787

Counsel to the Debtors
and Debtors in Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
In re                                                   :
                                                        :     Case No. 02-41729 (REG)
ADELPHIA COMMUNICATIONS CORP., et al.,   :     Jointly Administered
                                                        :
            Debtors.                               :
                                                        :
-----------------------------------------------------------------X

## STIPULATION AND ORDER AUTHORIZING THE CREDITORS COMMITTEE TO PROSECUTE CLAIMS AGAINST THE FPL GROUP AND THE PRESTIGE GROUP

WHEREAS on June 25, 2002, the above-captioned debtors and debtors in possession (the

"Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States

Code (the "Bankruptcy Code") and since the Petition Date have been operating their businesses

and managing their properties as debtors in possession;

WHEREAS on July 11, 2002, the United States Trustee for the Southern District of New York (the "UST") appointed the Official Committee of Unsecured Creditors (as amended from time to time, the "Creditors Committee");

WHEREAS the statutory deadline by which the Debtors must bring certain avoidance actions (the "Avoidance Actions") is approaching;

WHEREAS , the Creditors Committee, with the cooperation of the Debtors, has undertaken an analysis of certain potential avoidance claims and other claims that may be asserted by the Debtors;

WHEREAS as a result of its investigation, the Creditors Committee has identified fraudulent conveyance claims and other claims (the "Claims") against (1) FPL Group, Inc. and West Boca Security, Inc. (collectively, "FPL Group"), and (2) Prestige Communications of NC, Inc., Jonathan J. Oscher, Lorraine Oscher McClain, Robert F. Buckfelder, Buckfelder Investment Trust and Anverse, Inc. (collectively "Prestige" and together with FPL Group, the "Defendants"), and, jointly with the Debtors, has prepared complaints containing such Claims in the form annexed hereto as Exhibits "A" and "B" respectively (collectively, the "Complaints");

WHEREAS the Debtors have consented to the Creditors Committee's standing to assert the Claims;

WHEREAS, the Creditors Committee and the Debtors believe that the litigation of the Claims by the Creditors Committee on behalf of the Debtors' estates is necessary and beneficial to the resolution of the bankruptcy proceeding and is in the best interests of the estates.

NOW FOR ALL OF THE FOREGOING, IT IS HEREBY STIPULATED AND

AGREED AS FOLLOWS:

1.    The Debtors and the Creditors Committee are authorized to jointly file the

Complaints on behalf of the estates.

2.    The Debtors will be nominal plaintiffs only and will not be bound by any of the

factual allegations made in the Complaints by the Creditors' Committee.  Upon the Court's

approval of the Stipulation, counsel for the Debtors is authorized to withdraw from the action.

3.    The Debtors' counsel shall sign the Complaints on behalf of the Debtors.

4.    The Creditors Committees' counsel shall sign the Complaints on behalf of the

Creditors Committee.

5.    If this stipulation is not approved by the Court, the Debtors shall prosecute the

Claims on behalf of the estates without prejudice to the Creditors Committee's right to intervene.

6.    The Creditors Committee shall be granted leave and have standing to file and to

prosecute the Claims, including those set forth in the Complaints, on behalf of the Debtors'

estates, in its own name and in the name of the Debtors in accordance with the Second Circuit's

decision in In re Commodore Int'l Ltd., 262 F.3d 96 (2d Cir. 2001).  Because the Debtors'

counsel also has signed the Complaints, there can be no argument that the Complaints were not

truly timely and properly commenced.

7.    Notwithstanding anything set forth herein; (i) the Debtors shall retain the right to

object to any amendment to the Complaints; (ii) the Debtors shall retain the right to compromise

and to settle the Claims; and (iii) parties in interest shall retain the right to oppose such

settlement(s) as if this Stipulation and Order never existed.

8.    This Court shall retain jurisdiction to interpret, enforce and resolve any disputes

under this Stipulation and Order.

Dated: June 24, 2004
        New York, New York

                                KASOWITZ, BENSON, TORRES
                                & FRIEDMAN LLP

                                By:    /s/ David M. Friedman
                                       David M. Friedman (DF-4278)
                                       Adam L. Shiff (AS-7571)
                                       Andrew K. Glenn (AG-9934)
                                1633 Broadway
                                New York, New York 10019
                                (212) 506-1700

                                COUNSEL TO THE OFFICIAL
                                COMMITTEE OF UNSECURED CREDITORS

                                TRAUB, BONACQUISIT & FOX LLP

                                By:    /s/ Paul Traub
                                       Paul Traub (PT-3752)
                                       Steven Fox (SF-5432)
                                       Susan Balaschak (SB-1901)
                                655 Third Avenue, 21st Floor
                                New York, New York 10017-5617
                                Tel: (212) 476-4770
                                Fax: (212) 476-4787

                                COUNSEL TO THE DEBTORS AND DEBTORS
                                IN POSSESSION

SO ORDERED this
__ day of June 2004

_____
United States Bankruptcy Judge

4

**EXHIBIT A**

**FPL GROUP COMPLAINT**

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
David M. Friedman (DF-4278)
Andrew K. Glenn (AG-9934)
Joseph A. Gershman (JG-8275)
1633 Broadway
New York, NY 10019
Tel: (212) 506-1700
Fax: (212) 506-1800
Counsel to the Official Committee
of Unsecured Creditors

TRAUB, BONACQUISIT & FOX LLP
Paul Traub (PT-3752)
Steven Fox (SF-5432)
Susan Balaschak (SB-1901)
655 Third Avenue, 21st Floor
New York, New York 10017-5617
Tel: (212) 476-4770
Fax: (212) 476-4787
Counsel to the Debtors
and Debtors in Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re | ) | Chapter 11 Case |
| ADELPHIA COMMUNICATIONS CORP., et al., | ) | |
| a Delaware corporation, | ) | Case No. 02-41729 (REG) |
| Debtors. | ) | |
| | ) | |
| ADELPHIA COMMUNICATIONS CORP., | ) | |
| ADELPHIA CABLEVISION, L.L.C., and | ) | |
| OFFICIAL COMMITTEE OF UNSECURED | ) | Adversary Proceeding |
| CREDITORS OF ADELPHIA | ) | No. _____ |
| COMMUNICATIONS CORP., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | **COMPLAINT** |
| vs. | ) | |
| | ) | |
| FPL GROUP, INC. and | ) | |
| WEST BOCA SECURITY, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

#1215943

Plaintiffs Adelphia Communications Corporation ("ACC") and Adelphia Cablevision, L.L.C. ("Cablevision," and together with ACC, "Adelphia") and the Official Committee of Unsecured Creditors of Adelphia Communications Corporation (the "Committee"), for their complaint against Defendants, allege upon information and belief as follows:

## SUMMARY OF ACTION

1.      This action seeks to recover a fraudulent conveyance arising out of Adelphia's January 28, 1999 repurchase of certain shares of its Class A Common Stock and Series C Cumulative Convertible Preferred Stock from Defendants in exchange for approximately $149 million in cash.  Upon information and belief, at the time it repurchased these securities, Adelphia was insolvent (or was rendered insolvent), and Adelphia did not receive any value -- let alone reasonably equivalent value -- in exchange for the cash it paid in this transaction.

## JURISDICTION AND VENUE

2.      This Court's jurisdiction is founded upon sections 157 and 1334 of title 28 of the United States Code, in that this proceeding arises under title 11 of the United States Code (the "Bankruptcy Code"), or arises in or is related to the above-captioned chapter 11 case under the Bankruptcy Code, which is pending in the United States Bankruptcy Court for the Southern District of New York.

3.      This civil proceeding is a core proceeding under sections 157(b)(2)(A), (B), (C), (D), (H), (K) and (O) of title 28 of the United States Code.

4.      Venue in this Court is appropriate under section 1409(a) of title 28 of the United States Code.

5.     Adelphia and the Committee have filed this action jointly.  Simultaneously herewith, Adelphia and the Committee have filed a motion with this Court seeking approval for the Committee to prosecute this action on behalf of the estates.

## THE PARTIES AND OTHER KEY PARTICIPANTS

6.     The Committee is the statutory committee of unsecured creditors duly appointed on July 11, 2002 in Adelphia's chapter 11 case by the Office of the United States Trustee for the Southern District of New York.

7.     ACC and Cablevision are debtors in the jointly administered chapter 11 case, In re Adelphia Communications Corporation, et al., Case No. 02-41729 (REG), which commenced on June 25, 2002 (the "Petition Date").  ACC, one of the leading cable companies in the United States, is a corporation organized under the laws of the State of Delaware, and its principal place of business on the Petition Date was located in Coudersport, Pennsylvania.  Cablevision, an indirect subsidiary of ACC, is a Pennsylvania corporation, and its principal place of business on the Petition Date was located in Coudersport, Pennsylvania.

8.     Defendant FPL Group, Inc. ("FPL Group"), whose principal place of business is located in Juno Beach, Florida, is one of the nation's largest providers of electricity-related services, with annual revenue of more than $9 billion.

9.     Defendant West Boca Security, Inc. ("West Boca Security"), whose principal place of business is located in Juno Beach, Florida, is a wholly-owned subsidiary of FPL Group. West Boca Security is the successor corporation to Mayberry Investments, Inc. ("Mayberry Investments").

10.     Mayberry Investments was a wholly-owned subsidiary of FPL Group which owned and then sold the Repurchased Securities to Adelphia in exchange for approximately

3

$149 million in cash in January 1999.  In September 2000, Mayberry Investments was merged into defendant West Boca Security and dissolved.

11.    Certain of the Repurchased Securities that Mayberry Investments sold to Adelphia may have been owned by Telesat Cablevision, Inc. ("Telesat"), a wholly-owned subsidiary of FPL Group, whose principal place of business was located in Juno Beach, Florida.  In September 2000, Telesat was merged into West Boca Security  and dissolved.  West Boca Security is the successor to Telesat.

12.    Certain of the Repurchased Securities that Mayberry Investments sold to Adelphia may have been owned by Cable LP I ("Cable LP"), a wholly-owned subsidiary of FPL Group, whose principal place of business was located in Juno Beach, Florida.  In September 2000, Cable LP was merged into West Boca Security and dissolved.  West Boca Security is the successor to Cable LP.

## FACTS

13.    In 1995, Adelphia entered into a business alliance with FPL Group, an electricity services provider based in Florida, pursuant to which FPL Group became an investor in Adelphia by acquiring 1,091,524 shares of Adelphia Class A Common Stock, and then later 20,000 shares of Adelphia's Series C Cumulative Preferred Stock (collectively, the "Repurchased Securities"). FPL Group also had a seat on Adelphia's board of directors, and entered into a joint venture with Adelphia to provide cable service in Florida.

14.    After several years, FPL Group made the strategic decision to terminate its business alliance with Adelphia.  To that end, in the fall of 1998, FPL Group decided to divest itself of its equity investment in Adelphia.  At that time, the Repurchased Securities were owned by Mayberry Investments, a wholly-owned subsidiary of the FPL Group.  FPL informed Adelphia of its desire to sell the Adelphia stock owned by its subsidiary Mayberry Investments,

4

and Adelphia agreed to buy back the Repurchased Securities from Mayberry Investments in exchange for $149,213,130.00 in cash. The purchase transaction was consummated on January 28, 1999. Upon information and belief, the funds Adelphia paid to Mayberry Investments for the Repurchased Securities were subsequently transferred to FPL Group and/or West Boca Security.

15.    The Repurchased Securities were not reasonably equivalent in value to the cash which Adelphia paid for them. Indeed, this transaction was a *de facto* dividend and provided Adelphia with no value.

## CLAIM FOR RELIEF

### (Avoidance and Recovery of Constructively Fraudulent Transfer Under 11 U.S.C. §§ 544(b) and 550 Against Defendants FPL Group and West Boca Security)

16.    Plaintiffs reallege paragraphs 1 through 15 as if fully set forth herein.

17.    On January 28, 1999 Adelphia bought the Repurchased Securities from Mayberry Investments for $149,213,130.00.

18.    Adelphia's purchase of the Repurchased Securities in exchange for cash was a transfer of interest in Adelphia's property.

19.    When Adelphia acquired the Repurchased Securities for cash, Adelphia (i) was insolvent or was rendered insolvent, (ii) did not receive reasonably equivalent value in exchange for the cash it paid Mayberry Investments, and (iii) was engaged or was about to engage in business or a transaction for which any property remaining with Adelphia was an unreasonably small capital.

20.    Upon information and belief, Mayberry Investments, Telesat, Cable LP, FPL Group, and West Boca Security were initial and/or immediate or mediate transferees of the cash paid by Adelphia for the Repurchased Securities.

5

21.     At all times relevant hereto, there were actual creditors of Adelphia holding unsecured claims allowable against Adelphia's estate within the meaning of Sections 502(d) and 544(b) of the Bankruptcy Code with the right to void the cash Adelphia paid to Mayberry Investments for the Adelphia Securities under applicable law, including, but not limited to, the laws of the Commonwealth of Pennsylvania and the State of Florida.

22.     By virtue of the foregoing, pursuant to sections 544(b) and 550 of the Bankruptcy Code, the cash Adelphia paid to Mayberry Investments for the Repurchased Securities should be avoided, recovered, and preserved for the benefit of Adelphia's estate together with all interest paid in respect of the obligations avoided hereunder.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff pursuant to Sections 544(b) and 550 of the Bankruptcy Code, avoiding, preserving and recovering for the benefit of Adelphia's estate the $149,213,130.00 paid by Adelphia for the Repurchased Securities, together with all interest and in respect of the obligations avoided hereunder, and such other and further relief as the Court deems just and proper.

Dated: New York, New York
      June 24, 2004

Respectfully submitted,

KASOWITZ, BENSON, TORRES
  & FRIEDMAN LLP

By:    /s/ David M. Friedman
        David M. Friedman (DF-4278)
        Andrew K. Glenn (AG-9934)
        Joseph A. Gershman (JG-8275)
1633 Broadway
New York, New York 10019
Tel: (212) 506-1700
Fax: (212) 506-1800

Counsel to the Official Committee
 of Unsecured Creditors

TRAUB, BONACQUISIT & FOX LLP

By:    /s/ Paul Traub
        Paul Traub (PT-3752)
        Steven Fox (SF-5432)
        Susan Balaschak (SB-1901)
655 Third Avenue, 21st Floor
New York, New York 10017-5617
Tel: (212) 476-4770
Fax: (212) 476-4787

Counsel to the Debtors and Debtors In Possession

**EXHIBIT B**

**PRESTIGE COMPLAINT**

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
David M. Friedman (DF-4278)
Andrew K. Glenn (AG-9934)
Joseph A. Gershman (JG-8275)
1633 Broadway
New York, NY 10019
Tel: (212) 506-1700
Fax: (212) 506-1800

Counsel to the Official Committee
of Unsecured Creditors

TRAUB, BONACQUISIT & FOX LLP
Paul Traub (PT-3752)
Steven Fox (SF-5432)
Susan Balaschak (SB-1901)
655 Third Avenue, 21st Floor
New York, New York 10017-5617
Tel: (212) 476-4770
Fax: (212) 476-4787

Counsel to the Debtors
and Debtors in Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re | ) |
| ADELPHIA COMMUNICATIONS CORP., et al., | )    Chapter 11 Case |
| a Delaware corporation, | ) |
|  | )    Case No. 02-41729 (REG) |
| Debtors. | ) |
|  | ) |
| ADELPHIA COMMUNICATIONS CORP., | ) |
| ADELPHIA CABLEVISION, L.L.C., and | ) |
| OFFICIAL COMMITTEE OF UNSECURED | )    Adversary Proceeding |
| CREDITORS OF ADELPHIA | )    No. _____ |
| COMMUNICATIONS CORP., ET AL., | ) |
|  | ) |
| Plaintiffs, | ) |
|  | )    **COMPLAINT** |
| vs. | ) |
|  | ) |
| PRESTIGE COMMUNICATIONS OF NC, INC. | ) |
| JONATHAN J. OSCHER, | ) |
| LORRAINE OSCHER McCLAIN, | ) |

#1217991

ROBERT F. BUCKFELDER,                                    )
BUCKFELDER INVESTMENT TRUST, and                         )
ANVERSE, INC.,                                           )
                                                         )
                  Defendants.                            )
_____             )

Plaintiffs Adelphia Communications Corporation ("ACC") and Adelphia Cablevision,

L.L.C. ("Cablevision," and together with ACC, "Adelphia") and the Official Committee of

Unsecured Creditors of Adelphia Communications Corporation, et al. (the "Committee"), for

their complaint against Defendants, allege as follows:

## SUMMARY OF ACTION

1.       This action seeks to recover a fraudulent conveyance arising out of Adelphia's

July 5, 2000 purchase of certain cable systems from Prestige Communications of NC, Inc.

("Prestige NC") in exchange for approximately $800 million in cash (the "Asset Purchase") --

which was far more than those assets were worth -- while Adelphia was insolvent.

2.       Adelphia entered into and overpaid in the Asset Purchase as part of a transaction

in which members of the Rigas Family (defined *infra*), who were Adelphia directors and senior

officers, simultaneously bought Prestige NC's sister company, Prestige Communications, Inc.

("Prestige Georgia"), for themselves at a significantly lower price.  In addition, this action also

seeks to recover damages from the Defendants for aiding and abetting the Rigas Family's

breaches of fiduciary duty, as upon information and belief, Defendants knew that the Rigas

Family was breaching its fiduciary duties by entering into the Asset Purchase, and Defendants

substantially assisted the Rigas Family in doing so by agreeing to, and then consummating, the

transaction.

3.       Not coincidentally, three members of the Rigas Family -- John Rigas, Tim Rigas,

and Michael Rigas -- are currently in the midst of a criminal trial in the Southern District of New

2

York for allegedly engaging in self-dealing, corporate malfeasance and securities fraud on a massive scale in an effort to utilize their positions as officers and directors of Adelphia to benefit themselves and the Rigas Family-owned cable systems at Adelphia's expense.

## JURISDICTION AND VENUE

4.      This Court's jurisdiction is founded upon sections 157 and 1334 of title 28 of the United States Code, in that this proceeding arises under title 11 of the United States Code (the "Bankruptcy Code"), or arises in or is related to the above-captioned chapter 11 case under the Bankruptcy Code, which are pending in the United States Bankruptcy Court for the Southern District of New York.

5.      This civil proceeding is a core proceeding under sections 157(b)(2)(A), (B), (C), (D), (H), (K) and (O) of title 28 of the United States Code.

6.      Venue in this Court is appropriate under section 1409(a) of title 28 of the United States Code.

7.      Adelphia and the Committee have filed this action jointly.  Simultaneously herewith, Adelphia and the Committee have filed a motion with this Court seeking approval for the Committee to prosecute this action on behalf of the estates.

## THE PARTIES AND OTHER KEY PARTICIPANTS

8.      The Committee is the statutory committee of unsecured creditors duly appointed on July 11, 2002 in the chapter 11 cases of ACC and its affiliated debtors by the Office of the United States Trustee for the Southern District of New York.

9.      ACC and Cablevision are debtors in the jointly administered chapter 11 case, In re Adelphia Communications Corporation, et al., Case No. 02-41729 (REG), which commenced on June 25, 2002 (the "Petition Date").  ACC, one of the leading cable companies in the United States, is a corporation organized under the laws of the State of Delaware, and its principal place

3

of business on the Petition Date was located in Coudersport, Pennsylvania. Cablevision, an

indirect subsidiary of ACC, is a Pennsylvania corporation, and its principal place of business on

the Petition Date located in Coudersport, Pennsylvania.

10.      At all relevant times herein, members of the Rigas Family, principally John

Rigas and his three sons, Timothy, Michael and James Rigas (collectively, the "Rigas Family),

held all of the most senior positions at Adelphia. John Rigas was Adelphia's President and Chief

Executive Officer; Timothy Rigas was Adelphia's Executive Vice President, Chief Financial

Officer, Chief Accounting Officer and Treasurer; Michael Rigas was Adelphia's Executive Vice-

President in Charge of Operations; and James Rigas was Adelphia's Executive Vice President in

Charge of Strategic Planning. In addition, the Rigas Family owned a substantial percentage of

Adelphia stock with voting rights that enabled the Rigas Family to exercise voting control over

the Debtors. In addition to their holdings in Adelphia, the Rigas Family also owned a number of

cable systems themselves through corporations that were wholly-owned, directly or indirectly,

by members of the Rigas Family.

11.      Highland Prestige Georgia, Inc. ("Highland Prestige") is a corporation organized

under the laws of the State of Delaware, with its principal place of business located in the

Commonwealth of Pennsylvania. Highland Prestige is owned and controlled by the Rigas

Family, and was the entity that the Rigas Family used to purchase Prestige Georgia in July 2000.

12.      Upon information and belief, at all relevant times herein, Prestige NC was a

closely-held corporation with its principal place of business in Cartersville, Georgia that owned

and operated cable systems in Virginia, Maryland, and North Carolina. In July 2000, Prestige

NC sold these cable systems (the "Prestige Cable Systems") to Adelphia for approximately $800

million in cash. Prestige NC was dissolved in December 2000. Defendants Jonathan J. Oscher,

Lorraine Oscher McClain, Robert Buckfelder and the Buckfelder Investment Trust constituted the entirety of Prestige NC's shareholders, and, prior to its dissolution, the company was controlled by defendant Jonathan J. Oscher ("Oscher").

13.     Upon information and belief, at all relevant times herein, defendant Oscher served as President and Treasurer of Prestige NC, and was Prestige NC's primary shareholder, owning 940 shares of Prestige NC stock, or 94% of Prestige NC's outstanding stock at the time of the Asset Purchase.

14.     Upon information and belief, at all relevant times herein, defendant Lorraine Oscher McClain ("McClain") was Vice President of Prestige NC, and owned 30 shares of Prestige NC stock, which constituted 3% of Prestige NC's outstanding stock at the time of the Asset Purchase.

15.     Upon information and belief, at all relevant times herein, defendant Robert F. Buckfelder ("Buckfelder") was Prestige NC's Vice President of Finance and Chief Financial Officer, and owned 21 shares of Prestige NC stock, which constituted 2.1% of Prestige NC's stock at the time of the Asset Purchase.

16.     Upon information and belief, at all relevant times herein, defendant Buckfelder Investment Trust ("Buckfelder Trust") owned 9 shares of Prestige NC Stock, which constituted 0.9% of Prestige NC's outstanding stock at the time of the Asset Purchase.

17.     Upon information and belief, at all relevant times herein Prestige Georgia was a closely-held corporation with its principal place of business in Cartersville, Georgia that provided cable service in the State of Georgia.  In July 2000, Prestige Georgia ultimately was acquired by the Rigas Family through a series of transactions.  At the time of the acquisition, Prestige Georgia's largest shareholder was Anverse, Inc. ("Anverse"), a non-profit corporation,

5

which owned approximately 89% of Prestige Georgia's outstanding stock. The remaining 11% of Prestige Georgia's stock was split between defendant Oscher and three McClain family trusts, including a trust in the name of defendant McClain.

18.    Upon information and belief, defendant Anverse, whose principal place of business is in Cartersville, Georgia, is a non-profit charitable corporation organized under the laws of the State of Georgia, which was essentially funded from the proceeds of the sale of the Prestige Cable Systems to Adelphia. Upon information and belief, Anverse was one of the ultimate transferees of the cash Adelphia paid in the Asset Purchase. When Prestige Georgia was sold to the Rigas Family, Anverse was Prestige Georgia's largest shareholder. Upon information and belief, at all relevant times herein, Anverse was controlled by defendant Oscher. Defendants Oscher and McClain are currently officers of defendant Anverse, with Oscher serving as President and McClain as Secretary.

19.    Prior to the Asset Purchase, Defendants owned (directly or indirectly) and controlled two closely-held cable companies: Prestige NC, which provided cable service to approximately 118,250 subscribers in three states, Maryland, Virginia and North Carolina; and Prestige Georgia, which provided cable service to approximately 59,000 subscribers in Georgia.

## FACTS

20.    In the fall of 1999, Adelphia entered into negotiations with the Defendants and their representatives in hopes of acquiring Prestige Cable Systems and Prestige Georgia cable systems in a package deal in which the Rigas Family would purchase Prestige Georgia's cable system for itself. Because the Rigas Family only sought to buy Prestige Georgia, the Rigas Family had a strong incentive to shift the largest possible portion of the purchase price to the Prestige Cable Systems, thereby reducing the cost of the cable system it would acquire from Prestige Georgia. As directors and senior executives who had voting control over Adelphia's

6

stock, the Rigas Family, subject to approval by independent members of the Adelphia's Board of Directors (the "Board"), had the power to determine what percentage of the purchase price would be allocated to the Prestige Cable Systems (for which Adelphia would pay), and what portion to Prestige Georgia (for which the Rigas Family was supposed to pay).

21.    These negotiations were ultimately successful, and on December 6, 1999, the Rigas Family caused Adelphia to enter into two agreements.  The first agreement was an Asset Purchase Agreement between Adelphia and Prestige NC, which called for Adelphia to purchase the Prestige Cable Systems in exchange for approximately $800 million in cash.  The second agreement was a Stock Purchase Agreement between Adelphia and the shareholders of Prestige Georgia, which called for Adelphia to purchase all of Prestige Georgia's stock for approximately $300 million in cash.  At the closing of these transactions, the Rigas Family planned to immediately purchase Prestige Georgia at Adelphia's cost.  This "agreement" between Adelphia and the Rigas Family was memorialized in a June 2000 letter agreement obligating Adelphia to transfer Prestige Georgia's common stock to Highland Prestige, a company wholly-owned by the Rigas Family, in exchange for $300 million in cash.

22.    Adelphia's purchase of the Prestige Cable Systems and Prestige Georgia was consummated on July 5, 2000.  Adelphia paid Prestige NC approximately $800 million for the Prestige Cable Systems, and the shareholders of Prestige Georgia approximately $300 million for their stock.  The same day, Adelphia transferred Prestige Georgia's stock to Highland Prestige in exchange for $300 million.

23.    Upon information and belief, the Prestige Cable Systems were not reasonably equivalent in value to the cash that Adelphia paid for them.  Indeed, the Rigas Family were motivated to intentionally inflate their price -- with Defendants' knowledge and consent -- so that

the purchase price of the Prestige Georgia systems allocated to the Rigas Family would be substantially discounted from the amount Adelphia paid. At the same time, the Individual Defendants were motivated to agree to an inflated allocation of the Prestige NC purchase. The Individual Defendants owned all of the stock in Prestige NC, but only a small percentage of the stock in Prestige Georgia, 89% of which was owned by defendant Anverse. Thus, money paid to acquire Prestige Georgia would provide little benefit to the Individual Defendants, as it would go primarily to Anverse, while money paid to acquire Prestige NC would go entirely to the Individual Defendants.

24.    In the end, Adelphia paid approximately $7,000 per subscriber for the Prestige Cable Systems and Prestige Georgia in the Asset Purchase, an amount dramatically higher than comparable transactions. By contrast, the Rigas Family paid approximately $5,300 per subscriber for the cable system owned by Prestige Georgia, approximately $1,700 less per subscriber than what Adelphia paid for the assets of Prestige Georgia's sister company.

## FIRST CLAIM FOR RELIEF

### (Avoidance and Recovery of Constructively
### Fraudulent Transfer Under 11 U.S.C. §§ 544(b) and 550)

25.    Plaintiffs reallege paragraphs 1 through 24 as if fully set forth herein.

26.    The Asset Purchase was a transfer of interest in Adelphia's property.

27.    At the time of the Asset Purchase, Adelphia: (i) was insolvent or was rendered insolvent and/or (ii) was engaged or was about to engage in business or a transaction for which any property remaining with Adelphia was an unreasonably small capital. Adelphia did not receive reasonably equivalent value for the assets it acquired in the Asset Purchase.

28.    The Defendants and Prestige NC were initial and/or immediate or mediate transferees of the cash received in the Asset Purchase.

8

29.    At all times relevant hereto, there were actual creditors of Adelphia holding unsecured claims allowable against Adelphia's estates within the meaning of Sections 502(d) and 544(b) of the Bankruptcy Code with the right to void the Asset Purchase under applicable law, including, but not limited to, the laws of the Commonwealth of Pennsylvania and the State of Georgia.

30.    By virtue of the foregoing, pursuant to sections 544(b) and 550, of the Bankruptcy Code, the Asset Purchase should be avoided, recovered, and preserved for the benefit of Adelphia's estate together with all interest paid in respect of the obligations avoided hereunder.

## SECOND CLAIM FOR RELIEF

### (Avoidance and Recovery of Intentionally Fraudulent Transfer Under 11 U.S.C. §§ 544(b) and 550)

31.    Plaintiff realleges paragraphs 1 through 30 as if fully set forth herein.

32.    The Asset Purchase constituted a transfer of interest in Adelphia's property.

33.    Adelphia -- through the actions of the Rigas Family described herein -- purchased the Prestige Cable Systems with the actual intent to delay, hinder and defraud any entity to which Adelphia was or became indebted to, on or after the date that such obligations were incurred. Upon information and belief, the Rigas Family knew that the cost Adelphia paid per subscriber of the Prestige Cable Systems was far in excess of fair market value. The Rigas Family also caused Adelphia to pay a disproportionately higher amount of the total purchase price for the Prestige NC and Prestige Georgia Companies, which effectively subsidized the Rigas Family's cost of acquiring Prestige Georgia. The Rigas Family caused Adelphia to conceal from the Board and creditors the true structure of the transactions relating to the Asset Purchase and the actual price that the Rigas Family intended to pay.

34.     The Defendants were initial and/or immediate or mediate transferees of the Asset Purchase.

35.     At all times relevant hereto, there were actual creditors of Adelphia holding unsecured claims allowable against Adelphia's estates within the meaning of Sections 502(d) and 544(b) of the Bankruptcy Code with the right to void the Asset Purchase under applicable law, including, but not limited to, the laws of the Commonwealth of Pennsylvania and the State of Georgia.

36.     By virtue of the foregoing, pursuant to sections 544(b) and 550 of the Bankruptcy Code, the Asset Purchase should be avoided, recovered, and preserved for the benefit of the Debtors' estates, together with all interest paid in respect of the obligations avoided hereunder.

## THIRD CLAIM FOR RELIEF

### (Aiding And Abetting Breach Of Fiduciary Duty)

37.     Plaintiff realleges paragraphs 1 through 36 as if fully set forth herein.

38.     Each member of the Rigas Family, as officers and director of Adelphia, owed fiduciary duties to Adelphia.  In addition, each member of the Rigas Family owed fiduciary duties to Adelphia's creditors by virtue of Adelphia's insolvency.

39.     Each member of the Rigas Family breached his fiduciary duties to Adelphia by causing Adelphia to overpay for the Prestige Cable Systems for benefit of the Rigas Family.  In so doing, each of these members of the Rigas Family acted in a manner that was adverse to the interest of Adelphia.

40.     Defendants also knew that the members of the Rigas Family, as officers and directors of Adelphia, owed fiduciary duties to Adelphia.  In addition, Defendants knew that the Rigas Family's acquisition of Prestige Georgia was a self-interested transaction for the Rigas Family, and the usurpation of a corporate opportunity from Adelphia.

10

41.    Upon information and belief, Defendants knew or were willfully blind to the fact that by shifting some of the cost of Prestige Georgia onto Adelphia, the Rigas Family was breaching its fiduciary duties. Despite this knowledge, the Defendants substantially assisted the Rigas Family's breaches of fiduciary duties by agreeing to and consummating the sale of the Prestige Cable Systems and Prestige Georgia on the terms and conditions described in the Asset Purchase Agreement and Stock Purchase Agreement.

42.    The members of the Rigas Family were not the "sole actors" with respect to Adelphia. Rather, there were independent directors at Adelphia who would not have allowed Adelphia to enter into the Asset Purchase had they been fully informed that: (i) the Rigas Family intended to saddle Adelphia with the bill for a disproportionately large amount of the total cost of the purchases from the Prestige NC and Prestige Georgia Companies and (ii) the cost of acquiring the assets in the Asset Purchase was significantly in excess of their fair market value.

43.    By reason of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff pursuant to Sections 544(b) and 550 of the Bankruptcy Code, avoiding, preserving and recovering for the benefit of Adelphia's estate the Asset Purchase, together with all interest and in respect of the obligations avoided hereunder; (ii) awarding compensatory damages for Defendants' aiding and abetting of the Rigas Family's breaches of fiduciary duty, together with interest; and (iii) such other and further relief as the Court deems just and proper.

Dated: New York, New York
      June 24, 2004

Respectfully submitted,

KASOWITZ, BENSON, TORRES
  & FRIEDMAN LLP

By:   /s/ David M. Friedman
     David M. Friedman (DF-4278)
     Andrew K. Glenn (AG-9934)
     Joseph A. Gershman (JG-8275)
1633 Broadway
New York, New York 10019
Tel: (212) 506-1700
Fax: (212) 506-1800

Counsel for the Official Committee of Unsecured Creditors

TRAUB, BONACQUISIT & FOX LLP

By:   /s/ Paul Traub
     Paul Traub (PT-3752)
     Steven Fox (SF-5432)
     Susan Balaschak (SB-1901)

655 Third Avenue, 21st Floor
New York, New York 10017-5617
Tel: (212) 476-4770
Fax: (212) 476-4787

Counsel for the Debtors and Debtors in Possession

12

David M. Friedman (DF-4278)
Adam L. Shiff (AS-7571)
Andrew K. Glenn (AG-9934)
KASOWITZ, BENSON, TORRES
& FRIEDMAN LLP
1633 Broadway
New York, New York 10019
(212) 506-1700

TRAUB, BONACQUISIT & FOX LLP
Paul Traub (PT-3752)
Steven Fox (SF-5432)
Susan Balaschak (SB-1901)
655 Third Avenue, 21st Floor
New York, New York 10017-5617
Tel: (212) 476-4770
Fax: (212) 476-4787

Counsel to the Debtors
and Debtors in Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

| | | |
|---|---|---|
| In re | : | |
| | : | Case No. 02-41729 (REG) |
| ADELPHIA COMMUNICATIONS CORP., et al., | : | Jointly Administered |
| | : | |
| Debtors. | : | |
| | : | |

-------------------------------------------------------------X

### STIPULATION AND ORDER AUTHORIZING THE
### CREDITORS COMMITTEE TO PROSECUTE
### CLAIMS AGAINST THE FPL GROUP AND THE PRESTIGE GROUP

WHEREAS on June 25, 2002, the above-captioned debtors and debtors in possession (the

"Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States

Code (the "Bankruptcy Code") and since the Petition Date have been operating their businesses

and managing their properties as debtors in possession;

WHEREAS on July 11, 2002, the United States Trustee for the Southern District of New York (the "UST") appointed the Official Committee of Unsecured Creditors (as amended from time to time, the "Creditors Committee");

WHEREAS the statutory deadline by which the Debtors must bring certain avoidance actions (the "Avoidance Actions") is approaching;

WHEREAS , the Creditors Committee, with the cooperation of the Debtors, has undertaken an analysis of certain potential avoidance claims and other claims that may be asserted by the Debtors;

WHEREAS as a result of its investigation, the Creditors Committee has identified fraudulent conveyance claims and other claims (the "Claims") against (1) FPL Group, Inc. and West Boca Security, Inc. (collectively, "FPL Group"), and (2) Prestige Communications of NC, Inc., Jonathan J. Oscher, Lorraine Oscher McClain, Robert F. Buckfelder, Buckfelder Investment Trust and Anverse, Inc. (collectively "Prestige" and together with FPL Group, the "Defendants"), and, jointly with the Debtors, has prepared complaints containing such Claims in the form annexed hereto as Exhibits "A" and "B" respectively (collectively, the "Complaints");

WHEREAS the Debtors have consented to the Creditors Committee's standing to assert the Claims;

WHEREAS, the Creditors Committee and the Debtors believe that the litigation of the Claims by the Creditors Committee on behalf of the Debtors' estates is necessary and beneficial to the resolution of the bankruptcy proceeding and is in the best interests of the estates.

NOW FOR ALL OF THE FOREGOING, IT IS HEREBY STIPULATED AND AGREED AS FOLLOWS:

1.    The Debtors and the Creditors Committee are authorized to jointly file the Complaints on behalf of the estates.

2.    The Debtors will be nominal plaintiffs only and will not be bound by any of the factual allegations made in the Complaints by the Creditors' Committee.  Upon the Court's approval of the Stipulation, counsel for the Debtors is authorized to withdraw from the action.

3.    The Debtors' counsel shall sign the Complaints on behalf of the Debtors.

4.    The Creditors Committees' counsel shall sign the Complaints on behalf of the Creditors Committee.

5.    If this stipulation is not approved by the Court, the Debtors shall prosecute the Claims on behalf of the estates without prejudice to the Creditors Committee's right to intervene.

6.    The Creditors Committee shall be granted leave and have standing to file and to prosecute the Claims, including those set forth in the Complaints, on behalf of the Debtors' estates, in its own name and in the name of the Debtors in accordance with the Second Circuit's decision in In re Commodore Int'l Ltd., 262 F.3d 96 (2d Cir. 2001).  Because the Debtors' counsel also has signed the Complaints, there can be no argument that the Complaints were not truly timely and properly commenced.

7.    Notwithstanding anything set forth herein; (i) the Debtors shall retain the right to object to any amendment to the Complaints; (ii) the Debtors shall retain the right to compromise

and to settle the Claims; and (iii) parties in interest shall retain the right to oppose such

settlement(s) as if this Stipulation and Order never existed.

       8.     This Court shall retain jurisdiction to interpret, enforce and resolve any disputes

under this Stipulation and Order.

Dated: June 24, 2004
      New York, New York

                           KASOWITZ, BENSON, TORRES
                           & FRIEDMAN LLP

                           By:    /s/ David M. Friedman
                                  David M. Friedman (DF-4278)
                                  Adam L. Shiff (AS-7571)
                                  Andrew K. Glenn (AG-9934)
                           1633 Broadway
                           New York, New York 10019
                           (212) 506-1700

                           COUNSEL TO THE OFFICIAL
                           COMMITTEE OF UNSECURED CREDITORS

                           TRAUB, BONACQUISIT & FOX LLP

                           By:    /s/ Paul Traub
                                  Paul Traub (PT-3752)
                                  Steven Fox (SF-5432)
                                  Susan Balaschak (SB-1901)
                         655 Third Avenue, 21st Floor
                         New York, New York 10017-5617
                         Tel: (212) 476-4770
                         Fax: (212) 476-4787

                         COUNSEL TO THE DEBTORS AND DEBTORS
                         IN POSSESSION

SO ORDERED this
*14th* day of July 2004

*s/ Robert E. Gerber*
United States Bankruptcy Judge

## Winsberg, Harris B.

| | |
|---|---|
| **From:** | Winsberg, Harris B. |
| **Sent:** | Monday, October 29, 2007 2:48 PM |
| **To:** | 'dfriedman@kasowitz.com' |
| **Cc:** | Ernst, Douglas E. |
| **Subject:** | FW: Scheduling Order |

David-

It appears that Joe is out of the office.  Please see my email below.  Thank you.

Harris

-----Original Message-----

| | |
|---|---|
| **From:** | Winsberg, Harris B. |
| **Sent:** | Monday, October 29, 2007 2:44 PM |
| **To:** | 'Joseph Gershman' |
| **Cc:** | Ernst, Douglas E. |
| **Subject:** | Scheduling Order |

Joe-

Here is the scheduling order, correcting the caption as you requested.  I need a signature page from you or an email from you saying I can sign your name with express permission before I tender to the Court.  Finally, David mentioned some case law on the conference call with the Court on Friday.  I have not seen any briefs or letters to the Court containing case law regarding the privilege issue.  If any such correspondence was provided to the Court, I ask that you immediately send me a copy.  Thank you.

Harris



scheduling
order.DOC (31 KB)

1

TROUTMAN SANDERS LLP
Harris B. Winsberg (Ga. Bar No. 770892)
Douglas E. Ernst (Ga. Bar No. 249956)
600 Peachtree Street, N.E., Suite 5200
Atlanta, Georgia 30308-2216
(404) 885-3000

Counsel for the Defendants

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| ADELPHIA COMMUNICATIONS CORP., et al., a Delaware corporation | Case No. 02-4-1729 (REG) |
| | Jointly Administered |
| Debtors. | |
| ADELPHIA RECOVERY TRUST, | Adv. Pro. No. 04-03293 (CGM) |
| Plaintiff, | |
| v. | |
| PRESTIGE COMMUNICATIONS OF NC, INC., JONATHAN J. OSCHER, LORRAINE OSCHER McCLAIN, ROBERT F. BUCKFELDER, BUCKFELDER INVESTMENT TRUST, and ANVERSE, INC., | |
| Defendants. | |

## <u>FIFTH AMENDED SCHEDULING ORDER</u>

In an effort to coordinate discovery in this action, the parties jointly have agreed to, and propose to the Court, the following amended discovery plan:

1.    March 15, 2008—Fact Discovery Must Be Completed;

2.    April 30, 2008—The Party Bearing the Burden of Proof as to a Particular Issue Shall Serve Expert Reports;

3.   July 5, 2008—Responsive Expert Reports Shall be Served;

4.   August 10, 2008—All Expert Discovery, including expert depositions, to be completed;

5.   October 26, 2008—Deadline to File and Serve All Dispositive Motions;

6.   November 28, 2008—Final Pre-trial Order, provided that, in the event that dispositive motions are pending, this deadline shall be suspended until such time as the Court orders otherwise;

7.   December 12, 2008—Final Pre-trial Conference, provided that, in the event that dispositive motions are pending, this deadline shall be suspended until such time as the Court orders otherwise;

8.   April 2, 2009—Trial Date, provided that, in the event that dispositive motions are pending, this deadline shall be suspended until such time as the Court orders otherwise;

9.   Each Party reserves the right to file a motion to seek a stay of Expert Discovery in the event that a motion for summary judgment is filed. Each Party also recognizes that any motion for summary judgment filed in this action must comply with S.D.N.Y. Local Bankruptcy Rule 7056-1.


Dated: Poughkeepsie, New York
       October __, 2007.




                                   _____
                                   Honorable Cecelia G. Morris
                                   United States Bankruptcy Judge




[SIGNATURES CONTINUED ON NEXT PAGE]



2

Respectfully submitted,


KASOWITZ,  BENSON, TORRES &
FRIEDMAN LLP

By: _____
    David M. Friedman (DF-4278)
    Joseph A. Gershman (JG-8275)
1633 Broadway
New York, New York 10019
Telephone No.:      (212) 506-1700
*Counsel for Plaintiff*


TROUTMAN SANDERS LLP

By: _____
    Harris B. Winsberg (Ga. Bar No. 770892)
    Douglas E. Ernst (Ga. Bar No. 249956)
Bank of America Plaza, Suite 5200
600 Peachtree Street, N.E.
Atlanta, Georgia 30308
Telephone No.:      (404) 885-3000
*Counsel for Defendants*

## Winsberg, Harris B.

**From:** David M. Friedman [DFriedman@kasowitz.com]
**Sent:** Monday, October 29, 2007 3:22 PM
**To:** Winsberg, Harris B.
**Cc:** Ernst, Douglas E.; Joseph Gershman
**Subject:** RE: Scheduling Order

Harris,

1. The Order is acceptable to us although my recollection is that the Court was looking for an earlier trial date. You may present this to the Court with our signature, but, just so there are no surprises, we will be prepared to agree to an earlier trial date if the Court insists upon one. Also, while this is still far off, I won't be able to do a trial during the Passover holdiay, which usually occurs in the month of April.

2. We understand that the November 1 session will relate to the Court's *in camera* review of the four Willkie memos -- presumably for relevance or privilege. If the Court directs production after that review, we will then seek reconsideration of her ruling (we filed a placeholder today) that the privilege was waived because a log had not been filed as of that ruling. In that motion, we will address the legal issue of when a log is required to be filed -- an issue that, to my knowledge, no party has yet briefed or argued. Obviously, you will then have a chance to respond.

While I hope the issue is academic after November 1, you might want to look at, for example, US v. Phillip Morris, 347 F.3d 951, 954 (D.C. Cir. 2003) where the Court stated "if a party's pending objections apply to allegedly privileged documents, the party need not log the document until the court rules on its objections."

Regards,

David

-----Original Message-----
**From:** Winsberg, Harris B. [mailto:harris.winsberg@troutmansanders.com]
**Sent:** Monday, October 29, 2007 2:48 PM
**To:** David M. Friedman
**Cc:** Ernst, Douglas E.
**Subject:** FW: Scheduling Order

David-

It appears that Joe is out of the office. Please see my email below. Thank you.

Harris

-----Original Message-----
**From:** Winsberg, Harris B.
**Sent:** Monday, October 29, 2007 2:44 PM
**To:** 'Joseph Gershman'
**Cc:** Ernst, Douglas E.
**Subject:** Scheduling Order

Joe-

Here is the scheduling order, correcting the caption as you requested. I need a signature page from you or an email from you saying I can sign your name with express permission before I tender to the Court. Finally, David mentioned some case law on the conference call with the Court on Friday. I have not seen any briefs or letters to the Court containing case law regarding the privilege issue. If any such correspondence was provided to the Court, I ask that you immediately send me a copy. Thank you.

Harris
<<scheduling order.DOC>>

---

IRS Circular 230 disclosure: To ensure compliance with requirements imposed by the IRS, we inform you that any tax advice that may be contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding any penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction(s) or tax-related matter(s) that may be addressed herein.

This e-mail communication (including any attachments) may contain legally privileged and confidential information intended solely for the use of the intended recipient. If you are not the intended recipient, you should immediately stop reading this message and delete it from your system. Any unauthorized reading, distribution, copying or other use of this communication (or its attachments) is strictly prohibited.

This e-mail and any files transmitted with it are confidential and may be subject to the attorney-client privilege. Use or disclosure of this e-mail or any such files by anyone other than a designated addressee is unauthorized. If you are not an intended recipient, please notify the sender by e-mail and delete this e-mail without making a copy.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>ADELPHIA COMMUNICATIONS CORP., et al., a<br>Delaware corporation,<br><br>     Debtors.<br><br>―――――――――――――――――――<br><br>ADELPHIA COMMUNICATIONS CORP., et al.,<br><br>     Plaintiffs,<br><br>v.<br><br>PRESTIGE COMMUNICATIONS OF NC, INC., et al.,<br><br>     Defendants. | Chapter 11 Case<br><br>Case No. 02-41729 (REG)<br><br>(Jointly Administered)<br><br><br><br>Adversary Proceeding<br>No. 04-03293 (CGM) |

**JOINT SUBMISSION REGARDING DEFENDANTS' REQUEST
FOR PERMISSION TO MOVE FOR SUMMARY JUDGMENT AT
THE END OF FACT DISCOVERY AND A STAY OF EXPERT
DISCOVERY PENDING SUMMARY JUDGMENT**

The Honorable Cecelia G. Morris
United States Bankruptcy Court
Southern District of New York
176 Church Street
Poughkeepsie, New York 12601-4165

Dear Judge Morris:

  **I.**  **Defendants' Statement of Position**

    This letter represents Defendants' request for a pre-motion conference with the Court on filing summary judgment, pursuant to Bankruptcy Court Local Rule 7056-1. This letter is also to inform the Court that Defendants will be seeking a stay of expert discovery while the motion for summary judgment (the "Motion") is under consideration. At the conclusion of this letter, Plaintiff offers its arguments in opposition to the requests which Defendants intend to make.

The Honorable Cecelia G. Morris
Page 2

Defendants intend to move for summary judgment on all of Plaintiff's claims against them by May 16, 2008 as discussed at the hearing held on October 24, 2007. At a minimum, regardless of whether the Court grants Defendants' Motion in full, Defendants will ask the Court to make Federal Rule of Civil Procedure 56(d) findings of fact, which will help guide the trial of this action, should it go forward. Thus, Defendants' Motion will either dispose of this case outright or significantly streamline it. Either way, expert discovery should be stayed pending the filing of Defendants' Motion and the Court's ruling on it—in the interest of judicial economy.

The Fifth Amended Scheduling Order ("Scheduling Order" [Docket No. 97]) directs, in pertinent part, the parties to finish fact discovery by March 15, 2008 and to finish expert discovery by August 8, 2008. Expert reports and responsive expert reports are due on April 30, 2008 and July 3, 2008, respectively. The deadline for filing and serving all dispositive motions is October 24, 2008, and trial is scheduled for January 20, 2009. The Scheduling Order also permits either party to seek a stay of expert discovery in the event a motion for summary judgment is filed. (Dkt. 97, ¶ 9.)

When submitting the Scheduling Order, the parties recognized the necessity for staying expert discovery in the event one or both parties moved for summary judgment. Expert discovery is expensive and time-consuming, and a stay of it will conserve judicial resources without prejudicing either party. If all of Plaintiff's claims are disposed of on summary judgment, then expert discovery would have been for not. Defendants respectfully submit that, on the undisputed factual record, Defendants are entitled to summary judgment on all of Plaintiff's claims. For example, Plaintiff does not have a single, direct fact that supports its aiding and abetting claim, as the tax allocation was developed by Defendants' counsel with no assistance or involvement by Adelphia or the Rigas Family (assuming such claim even exists under either Georgia or Pennsylvania law, which Defendants dispute). Moreover, the undisputed record shows that Defendants transferred the assets and stock to Adelphia, and that Adelphia never transferred the stock to Highland Prestige Georgia, Inc.

Even if all of Plaintiff's claims are not disposed of on summary judgment, engaging in expert discovery before the Court makes its Rule 56(d) findings of fact would be wasteful. In the Motion, Defendants will ask the Court to rule on, among other things, the applicable law governing Plaintiff's claims and the proper testing date for the alleged fraudulent transfer. For instance, currently, it is uncertain whether Georgia or Pennsylvania law applies to Plaintiff's claims and whether December 6, 1999 (*i.e.*, the execution date of the stock and asset purchase agreements) or July 5, 2000 (*i.e.*, the closing date of the transaction) is the "testing date" for fraudulent transfer analysis. These issues are important as the applicable Georgia fraudulent conveyance statute (O.C.G.A. § 18-2-22) is markedly different than Pennsylvania's version of the Uniform Fraudulent Transfer Act. *See Cheptow v. Hunt*, 381 F.3d 1077, 1087 (11th Cir. 2004) (noting that Georgia's version of the Uniform Fraudulent Transfer Act does not apply to transfers prior to July 1, 2002). Moreover, Adelphia's financial condition changed from December 1999 to July 2000. *See, e.g., Le Café Crème, Ltd. v. Le Roux (In re Le Café Crème, Ltd.)*, 244 B.R. 221 (Bankr. S.D.N.Y. 2000) (holding that the operative date was the date the purchase agreement was executed, not the respective dates of the cash payments under the purchase agreement). Findings by the Court on these issues, among others, will help tailor expert discovery if the case goes forward. On the other hand, if expert discovery is not stayed,

The Honorable Cecelia G. Morris
Page 3

then the parties' experts must expand their analysis to consider all possibilities. Such an inefficient exercise can and should be avoided.

Moreover, if the case goes forward, a stay of expert discovery should not affect the trial date set in the Scheduling Order: January 20, 2009. The only deadlines affected by a stay would be the filing of expert reports and responsive expert reports (April 30, 2008 and July 3, 2008, respectively) and the completion of expert discovery (August 10, 2008). Defendants will file their Motion by May 16, 2008, and the Court can set Plaintiff's time to respond as it sees fit. Once the Court rules on Defendants' Motion, the expert discovery deadlines can be adjusted to ensure completion without changing the trial date—particularly because less time for expert discovery will be required if the Court streamlines the case with Rule 56(d) findings.

A stay of expert discovery will also not prejudice Plaintiff. Plaintiff can similarly pursue summary judgment. More importantly, Plaintiff will likewise benefit from a focusing of issues and minimization of the scope of expert discovery in the case.

Finally, Plaintiff submits that this Court should hold off ruling on Defendants' proposal until after the District Court rules on Plaintiff's motion to withdraw the reference. Defendants, however, note that, at the hearing on October 24, 2007, while the parties and the Court were discussing summary judgment, the scheduling order and a trial date, Plaintiff made no mention of filing a motion to withdraw the reference. In fact, Plaintiff filed the motion to withdraw the reference without even mentioning it to Defendants in any of the prior conferrals. More important, Plaintiff's request for a stay pursuant to Federal Rule of Bankruptcy Procedure 5011 was denied by the District Court for the reasons set forth in its order entered on December 6, 2007. A copy of the parties' correspondence to the District Court and the District Court's order are attached hereto. For these reasons, Defendants respectfully submit that the Court should consider Defendants' proposal.

Defendants look forward to discussing the stay of expert discovery and the merits of moving for summary judgment at this stage in the case with the Court and Plaintiff at the Court's convenience.

## II.    Plaintiff Adelphia Recovery Trust's Statement in Opposition:

Plaintiff respectfully submits that consideration of this issue is premature for two reasons: First, there are still three months of fact discovery, including at least 15 depositions, remaining in the case. It is simply too early to assess the record to determine whether a reasonable case can be made for the absence of disputed facts. Second, Plaintiff's Motion to Withdraw the Reference will be fully submitted to the District Court within a few days of the Court's status conference. We respectfully submit that it makes the most sense to first hear from the District Court on Plaintiff's Motion to Withdraw the Reference before taking the time to address Defendants' summary judgment proposal. If the District Court denies the Motion, the Court has ample time to revisit Defendants' request.

Apart from Defendants' request being premature, it is highly unlikely that the case will benefit from a summary judgment motion, and Defendants have not provided any information in

The Honorable Cecelia G. Morris
Page 4

their submission that suggests otherwise. Defendants proposal should be rejected for at least three reasons: (i) Defendants cannot obtain summary judgment on the three issues they have identified as the intended bases for their motion, two of which have already been addressed and rejected by the Court; (ii) the gaiting issues upon which Defendants seek guidance are not significant enough to merit a summary judgment motion and an altered discovery schedule; and (iii) contrary to Defendants' submission, a stay of expert discovery will almost certainly result in a delay of the trial date.

The three issues Defendants have identified as the proposed bases for their motion cannot result in a successful summary judgment, as these issues have either already been addressed and rejected by this Court in its decision granting Plaintiff's motion to amend, or the issues they claim are undisputed are either (i) irrelevant to a resolution of any of the claims in the case, or (ii) are clearly in dispute.[1] As Local Bankruptcy Rule 7056-1 requires Defendants to "set[] forth the issues to be presented in the motion and the grounds for relief," Defendants are barred from raising any other issues as a basis for summary judgment other than what they have set forth in the submission. Indeed, Defendants appear to concede that their motion will not dispose of any of the claims in this case by seeking Rule 56(d) findings; however, the Court only reaches Rule 56(d) if a summary judgment motion otherwise is proper. Here it is not.

Two of the three issues that Defendants have identified are directed at Plaintiff's aiding and abetting claim and are simply a rehash of arguments Defendants made in opposing the motion to amend — both of which were rejected by this Court. First, Defendants argue that the aiding and abetting claim fails because "the tax allocation was developed by Defendants' counsel with no assistance or involvement by Adelphia or the Rigas Family."[2] However, Defendants already made this argument in their objection to the motion to amend, and it was rejected by the Court.[3] As Plaintiff explained in connection with the briefing on the motion to amend, it is irrelevant to the claims in this case who "developed" the allocation. Rather, what is significant (and undisputed) is that the Rigas Family agreed to it — and what is ultimately relevant to the claim is whether the $800-$300 million allocation represented the fair market value of the underlying assets, or, as we contend, a breach of duty to Adelphia. If the Rigas Family agreed to a skewed price allocation and assigned themselves the piece that was favorably and artificially priced for their personal benefit, they breached their fiduciary duties — and the Defendants aided and abetted that breach by knowingly agreeing to the fraudulent transaction structure, and then taking all steps necessary to consummate the transaction. Moreover, the evidence in the case thus far suggests that the Defendants proposed and agreed to this skewed price allocation to obtain certain tax benefits, including potentially improper tax benefits that they were not entitled to under the tax laws. The second argument Defendants intend to make against the aiding and

---

[1] In their initial proposed joint submission, Plaintiff pointed out that in violation of Local Bankruptcy Rule 7056-1, "Defendants have failed to identify any of the arguments on which that they intend to base their motion or to provide Plaintiff with some understanding of the issues they claim do not comprise genuine issues of material fact." In response, Defendants amended their submission to identify the three issues upon which they apparently plan to base their motion, two of which were rejected when they opposed the motion to amend.

[2] It is unclear how Defendants know that it will be "undisputed" that the allocation was developed solely by Defendants counsel when there at least 15 depositions that remain to be taken in the case.

[3] See Defendants Objection to Plaintiffs Motion for Leave to Amend the Complaint pp. 7-12; Defendants' Sur-reply to Plaintiffs' Reply Memorandum pp. 6-8; Court's decision granting the motion to amend, Transcript dated March 21, 2007, pp. 8-10.

The Honorable Cecelia G. Morris
Page 5

abetting claim is also to rehash an argument from the motion to amend — that aiding and abetting is not a valid claim under Pennsylvania and Georgia law. Defendants made the identical argument to the Court in their objection to the motion to amend the complaint, and the court rejected this argument, holding that the facts alleged in the Amended Complaint stated a valid claim for aiding and abetting breach of fiduciary duty, and the fact that the Supreme Courts of Georgia and Pennsylvania had yet to rule on the viability of such a claim did not mean that it did not exist.[4]  Indeed, as already briefed in the motion to amend the complaint, the aiding and abetting claim should be governed by Pennsylvania law, the site of the injury, and a number of Pennsylvania court have recognized aiding and abetting claims.  Moreover, in the Bank Litigation the court ruled that Pennsylvania law properly governs aiding and abetting breach of fiduciary duty claims brought by the Adelphia Recovery Trust against various financial institutions. *See* Adelphia Recovery Trust vs. Bank of America, 365 B.R. 24 (2007). As the Court has already addressed both of the arguments Defendants intend to make against the aiding and abetting claim, it makes no sense for the parties to rebrief, and the court to decide these same issues a second time in connection with a summary judgment motion.

The last issue identified by Defendants as the basis for their motion — that it is "undisputed" that the stock of Prestige Georgia was never conveyed to Highland Prestige Georgia, Inc., but instead was always retained by Adelphia, and therefore Adelphia suffered no injury — also fails because it is overwhelmingly contradicted by the evidence in the case, and therefore at a minimum is a disputed issue.[5]  Indeed, Defendants' contention that it is "undisputed" that the stock of Prestige Georgia was never transferred to Highland Prestige Georgia is contradicted by the testimony of Plaintiff's 30(b)(6) witness and numerous documents and financial records, and is contrary to the understanding of the Rigas Family, Adelphia's management, the United States Attorneys' Office, PriceWaterhouse Coopers, and the United States Bankruptcy Court for the Southern District of New York, which approved a settlement pursuant to which the Rigas Family's ownership of Prestige Georgia stock was transferred back to Adelphia in 2006. To further demonstrate that Defendants' "undisputed fact" is nothing of the sort, attached hereto as Exhibits A, B and C are: (i) a June 13, 2000 agreement in which Highland Prestige Georgia agrees to buy the Prestige Georgia stock from Adelphia for the same price Adelphia pays for it; (ii) a July 5 agreement in which Adelphia assigns all of its rights under the stock purchase agreement (including its ownership of the stock) to Highland Prestige Georgia, Inc.; and (iii) the stock certificate for 4,998 shares of Prestige Georgia stock issued to Highland Prestige Georgia, Inc., also dated July 5, 2000.

The second reason Defendants' summary judgment proposal should be rejected is because the "threshold" issues upon which they purportedly seek "guidance" do not rise to a level requiring premature intervention. The two supposedly gaiting issues of a legal nature identified by Defendants are: (i) whether Georgia or Pennsylvania law apply to Plaintiff's claims; and (ii) whether the "testing date" for fraudulent transfer analysis should be the date the agreements were initially signed or the actual closing date of the transaction. However, the

---

[4] *See* Defendants Objection to Plaintiffs Motion for Leave to Amend the Complaint pg. 10; Court's decision granting the motion to amend, Transcript dated March 21, 2007; Defendants' Sur-reply to Plaintiffs' Reply Memorandum pp. 6-8; pp. 8-10.

[5] It is notable that Defendants fail to identify any actual facts to support its contention that the undisputed record shows that Prestige Georgia's stock was never transferred to Highland Prestige Georgia, Inc.

The Honorable Cecelia G. Morris
Page 6

resolution of these issues is unlikely to provide much guidance to the parties, as they either have little significance to the case, or have already been decided by the courts—and are hardly the sort of issues that would justify staying the discovery schedule and briefing a premature summary judgment motion.    Indeed, contrary to Defendants' contention, the laws of Georgia and Pennsylvania relating to fraudulent transfers are not dissimilar, as both states have adopted the Uniform Fraudulent Transfer Act and therefore the laws governing these claims are almost identical in either state.    While Defendants apparently intend to argue that a predecessor to the current statute applies, they have failed to identify any conflicts between the predecessor statute and the Pennsylvania statute that would warrant a choice of law analysis.[6]  Moreover, it is well settled in the Southern District, as well as under the laws of Georgia and Pennsylvania that the measuring date for fraudulent transfer analysis is the date of the actual transfer—which in this case would be the July 5, 2000 closing date.  *See e.g., In re Best Prods. Co.,* 168 B.R. 35, 54 (Bankr. S.D.N.Y. 1994) ("Under traditional fraudulent conveyance rules, the solvency test is to be conducted at the time of the conveyance or incurrence of debt which is challenged."); *In re WorldCom, Inc.,* 2003 Bankr. LEXIS 1401, at *121 (Bankr. S.D.N.Y. Oct. 31, 2003) (holding the relevant date for measuring insolvency was the date of transfer); *see also Holmes v. Perry (In re Holmes),* 296 B.R. 567, 573-4 (Bankr. M.D. Ga. 2003) (holding the date for determining debtor's insolvency was the date of the alleged fraudulent transfers); *Fid. Bond & Mortg. v. Brand,* 371 B.R. 708, 716 (E.D. PA 2007) (holding insolvency is measured at the time of the alleged fraudulent transfer or was a result of the transfer).[7]  Thus, the bases Defendants put forth for Rule 56(d) findings are not issues that  merit a submission at this juncture, let alone a premature summary judgment motion at the close of fact discovery.

Finally, a stay of expert discovery will almost certainly result in a postponement of the scheduled trial date, despite Defendants' assertions to the contrary.    The schedule was aggressively calculated relying on the assumption that no stay of expert discovery would be granted, and the expert phase of discovery is slated to last approximately 5 months.  If the parties stay expert discovery in favor of briefing, arguing and deciding a summary judgment motion, there is no way that the parties will be able to both complete the expert phase of discovery and pre-trial filings by January of next year.  We also are compelled to point out that Defendants mischaracterize Judge McKenna's ruling in connection with Defendants' request from Judge McKenna that they be granted a 30-day extension to respond to the motion to withdraw the reference.  Judge McKenna granted the relief Plaintiff requested in its entirety — he directed that Defendants would be permitted a 30-day extension, but only if they agreed to stay discovery.

---

[6] In addition, Defendants' position that Georgia's old fraudulent conveyance statute applies is contradicted by Georgia's intermediate appellate court, which has ruled that the new UFTA-based statute properly applies.  *See Miller v. Lomax,* 266 Ga. App. 93, 96 (Ct. Appeals Ga. 2004).

[7] The one case Defendants cite to in support of the proposition that the date of the transfer was the date of execution of the purchase agreement, rather than the date of the closing when payment was made, is *Le Cafe Creme, Ltd.,* 244 B.R. 221 (Bankr. S.D.N.Y. 2000).  But that case is factually unique, and has no bearing on this case.  In *Le Cafe Creme,* the Court concluded that the date of transfer for a fraudulent conveyance analysis was the date a purchase agreement was executed because also on that same day (i) a security interest in property was conveyed; (ii) a security agreement was executed, (iii) a $150,000 promissory note was executed, and (iv) a covenant not to compete were executed.  Moreover, the purchase agreement did not call for the purchase price to be paid all at once, but rather to be paid in numerous installments.  Defendants have not identified any cases in which the purchase price is made in one lump sum payment on the closing date, as was done here, where a court concluded that the date of the transfer was when the purchase agreement was executed.

The Honorable Cecelia G. Morris
Page 7

Plaintiff only requested a stay from Judge McKenna in the event that he was inclined to grant Defendants such a long extension, and no stay was sought independently of Defendants' request. For these reasons, Plaintiff respectfully submits that it is highly unlikely that a premature motion for summary judgment will serve to eliminate any claims, streamline the issues in this case or provide any other benefit to the parties...

This 13th day of December 2007.

                                        Respectfully submitted,

| KASOWITZ, BENSON, TORRES & FRIEDMAN LLP | TROUTMAN SANDERS LLP |
|---|---|
| By: /s/ Joseph A. Gershman<br>     David M. Friedman (DF-4278)<br>     Joseph A. Gershman (JG-8275) | By: /s/ Harris B. Winsberg<br>     Harris B. Winsberg (Ga. Bar No. 770892)<br>     Douglas E. Ernst (Ga. Bar No. 249956) |
| 1633 Broadway<br>New York, New York 10019<br>Telephone No.:  (212) 506-1700<br>Facsimile No.:  (212) 506-1800 | Bank of America Plaza, Suite 5200<br>600 Peachtree Street, N.E.<br>Atlanta, Georgia 30308-2216<br>Telephone No.:  (404) 885-3000<br>Facsimile No.:  (404) 885-3900 |
| *Counsel for Adelphia Recovery Trust* | *Counsel for Prestige Communications of NC, Inc., et al.* |

# ATTACHMENTS

# TROUTMAN SANDERS LLP

### ATTORNEYS AT LAW
##### A LIMITED LIABILITY PARTNERSHIP

BANK OF AMERICA PLAZA
600 PEACHTREE STREET, N.E. - SUITE 5200
ATLANTA, GEORGIA  30308-2216
www.troutmansanders.com
TELEPHONE: 404-885-3000
FACSIMILE: 404-885-3900

Harris Winsberg
harris.winsberg@troutmansanders.com

Direct Dial:  404-885-3348
Direct Fax:  404-962-6719

December 4, 2007

The Honorable Lawrence M. McKenna
United States District Court
Southern District of New York
500 Pearl Street, Room 1640
New York, NY 10007

**In re Adelphia Recovery Trust v. Prestige Communications of NC, Inc., et al.**
**Adversary Proceeding No. 04-03293**

Dear Judge McKenna:

We represent the Defendants in the above-referenced case.  We are currently admitted *pro hac vice* in the Bankruptcy Court for the Southern District of New York, and we are in the process of applying for *pro hac vice* admission to the United States District Court for the Southern District of New York.

On December 3, 2007, Plaintiff filed a motion to withdraw the reference of the case from Bankruptcy Court to the District Court (the "Motion").  A hearing regarding the Motion has not yet been set.  However, Plaintiff set December 17, 2007 as the date by which Defendants must file a pleading responsive to the Motion, pursuant to Southern District of New York Local Rule 6.1(b)(2).  The purpose of this letter is to respectfully request an extension of time to file a responsive pleading until January 17, 2008.

Depositions in this case are currently scheduled for December 7, 11, 18 and 20, 2007, and the Bankruptcy Court has scheduled a status conference for December 19, 2007.  In light of the preparation required for these events and the long history of this case, Defendants respectfully submit that they are not able to prepare a proper response to the Motion within the timeframe set forth in Local Rule 6.1(b)(2).

By way of background, Plaintiff filed this lawsuit on June 24, 2004.  The case is operating under the Fifth Amended Scheduling Order, which was agreed to by the parties.  Fact discovery is set to conclude on March 15, 2008.  Moreover, the Bankruptcy Court has requested that the parties keep to the deadlines set forth in the Fifth Amended Scheduling Order.

ATLANTA · HONG KONG · LONDON · NEW YORK · NEWARK · NORFOLK · RALEIGH
RICHMOND · SHANGHAI · TYSONS CORNER · VIRGINIA BEACH · WASHINGTON, D.C.

TROUTMAN SANDERS LLP
ATTORNEYS AT LAW
A LIMITED LIABILITY PARTNERSHIP

The Honorable Lawrence M. McKenna
December 4, 2007
Page 2

We met and conferred with counsel for Plaintiff on December 4, 2007 regarding a mutually agreeable schedule for responding to the Motion. Plaintiff refused to grant Defendants any extension of time to respond to the Motion.

For these reasons, Defendants respectfully request the Court grant an extension of time to respond to Plaintiff's Motion until January 17, 2008.

Respectfully submitted,

*Harris Winsberg*

Harris B. Winsberg

cc:     David M. Friedman, Esq.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

1633 BROADWAY

NEW YORK, NEW YORK 10019-6799

212-506-1700

FACSIMILE: 212-506-1800

DAVID M. FRIEDMAN
212-506-1740
DFRIEDMAN@KASOWITZ.COM

ATLANTA
HOUSTON
NEWARK
SAN FRANCISCO

December 5, 2007

**Hand Delivery**

The Honorable Lawrence M. McKenna
United States District Court
Southern District of New York
500 Pearl Street, Room 1640
New York, NY 10007

>       Re: *Motion to Withdraw the Reference: Adelphia Recovery Trust vs. Prestige*
>       *Communications of NC, Inc., et al., Adversary Proceeding No. 04-03293 and*
>       *Adelphia Recovery Trust vs. FPL Group, Inc., et al., Adversary Proceeding No.*
>       *04-03295*

Dear Judge McKenna:

        I write on behalf of the plaintiff, Adelphia Recovery Trust (the "Trust"), in
response to Harris Winsberg's December 4 letter, which I received today, requesting an extension
of time from Your Honor in which to respond to Plaintiff's motion to withdraw the reference.

        Mr. Winsberg's request for a 30-day extension (thereby affording him 45 days to
respond), while perhaps innocuous in another context, will, if granted, substantially undermine
the very purpose of the motion to withdraw -- the avoidance of the costs, inconsistencies, and
prejudice associated with litigating overlapping, if not identical, issues. Mr. Winsberg concedes
in his letter that an extension is sought to afford him the opportunity to focus on the very same
tasks that we argue are duplicative and inefficient. This is thus one of those rare cases where an
extension will have a significant and undesirable substantive effect.

        As the Court is aware, in the Bank Case, the parties are proceeding pursuant to a
carefully negotiated "phased" discovery process which currently provides for a stay of offensive
discovery in favor of mediation scheduled to begin early next year. However, because the
Prestige Defendants have recently enlarged the scope of their discovery to encroach on many of
the issues in the Bank Case, the Trust finds that it is bearing many of the burdens of the
restrictions on discovery in the Bank Case and enjoying few of the benefits. That is, while the
Trust remains in a negotiated holding pattern on offensive discovery in the Bank Case, many of
the Trust's witnesses in the Bank Case are about to be deposed by Mr. Winsberg and document
discovery disputes that are either on hold or subject to mediation in the Bank Case are about to
be litigated by Mr. Winsberg. During the 30-day extension sought by Mr. Winsberg, this

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

unbalanced playing field will tip materially further against the Trust. This is one of the primary reasons that the motion to withdraw was filed at this juncture.

I should also point out that contrary to the implication in Mr. Winsberg's letter that he is making this request to facilitate his compliance with Judge Morris' scheduling order in the Prestige Case, Mr. Winsberg himself has informed us that he intends to seek a stay of the expert discovery scheduled under that order, which if granted would necessarily result in the modification of almost every date in the scheduling order.

The Trust believes that the two weeks provided for under the Local Rules should be more than adequate to respond to the 15-page brief on its motion to withdraw, as we do not believe that the motion invokes any facts that are in dispute or any novel or complex issues of law. Nonetheless, the Trust is prepared to consent to Mr. Winsberg's request so long as he is not able to exploit the extension and continue to create "facts on the ground" that place the Trust at a disadvantage in the Bank Case or further undermine the Trust's desire to avoid duplication and inefficiency. The Court may require the parties to maintain the status quo by invoking its power under Bankruptcy Rule 5011 to stay proceedings in the Prestige and FPL Cases pending its resolution of the motion to withdraw the reference, and the Trust urges the Court to do so if it is inclined to grant the extension sought by Mr. Winsberg.

I am available at the Court's convenience to discuss this matter further.

Respectfully yours,

David M. Friedman

cc:    Adam Cole, Esq.
        John Culver, Esq.
        Harris Winsberg, Esq.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------x
In re                            :    07 Civ.    (LMM)
                                 :
ADELPHIA COMMUNICATIONS CORP.,   :    Bankruptcy Case No.
et al., a Delaware corporation,  :      02-41729 (REG)
                                 :    **ORDER**
                    Debtors.     :(Related to 03 MDL 1529 (LMM)
                                 :    and 05 Civ. 9050 (LMM))
----------------------------------x

McKENNA, D.J.

        The Adelphia Recovery Trust ("ART") has filed a motion

seeking withdrawal of the reference to the Bankruptcy Court of two

adversary proceedings:  (i)  No. 04-03293 (CGM) (Prestige Communi-

cations of NC, Inc., et al.), and (ii) No. 04-03295 (REG) (FPL

Group, Inc., et al.).

        The defendants in the Prestige case seek an extension of

30 days -- from December 17, 2007 to January 17, 2008 -- to respond

to the motion.  ART opposes in view of the depositions reportedly

scheduled for December 7, 11, 18 and 20, 2007, arguing that ART

will be prejudiced by such discovery in the Prestige case which

will duplicate discovery being arranged in the larger ART case

against Bank of America, N.A. and others, pending in this Court,

by, for instance, inconsistent discovery rulings, or duplication of

depositions.

        The application of the defendants in the Prestige case

for an extension of time to respond to the motion to withdraw the

COPIES MAILED TO COUNSEL   DEC - 6 2007

reference is denied, provided, however, that it will be deemed granted if those defendants agree to a stay of proceedings (including the above mentioned depositions and any other discovery or discovery motions, but not any conference scheduled by Judge Morris) pending this Court's decision of the motion to withdraw the reference.

ART's motion for a stay pursuant to Fed. R. Bank. P. 5011 is denied because ART has not advised this Court that such motion has been presented to a bankruptcy judge or stated why it has not been so presented.

This Order is being made available to Mr. Friedman (whose office is located in this district) and Mr. Friedman is to fax a copy to Mr. Winsberg (whose office is not located in this district) forthwith upon receipt.

SO ORDERED.

Dated:  December 6 , 2007

Lawrence M. McKenna
U.S.D.J.

2

# Exhibit A

AUG 17 '01 11:47 FR BUHRMAN INGERSOLL    TO 18142746586    P.08/14

Highland Prestige Georgia, Inc.
One North Main Street
Coudersport, PA 16915

June 13, 2000

Adelphia Communications Corporation
One North Main Street
Coudersport, PA 16915

Ladies and Gentlemen:

Reference is hereby made to that certain Stock Purchase Agreement dated December 6, 1999 between Adelphia Communications Corporation ("Adelphia") and Anverse, Inc., Jonathan J. Oscher, The Connor Jay McClain Life Trust u/a 12/14/98, The Reilly Culver McClain Life Trust u/a 12/14/98, and The Lorraine Oscher McClain Life Trust u/a 12/14/98 (the "Purchase Agreement") whereby Adelphia agreed to purchase all the outstanding stock of Prestige Communications, Inc. ("Prestige Stock") for the Purchase Price as defined and determined under the Purchase Agreement (the "Purchase Price"). Highland Prestige Georgia, Inc. ("Highland Prestige") hereby agrees to acquire the Prestige Stock from Adelphia immediately after Adelphia purchases the Prestige Stock. Highland Prestige will pay to Adelphia an amount equal to the Purchase Price at the time of such acquisition and agrees to perform all obligations of Adelphia under the Purchase Agreement. This letter agreement shall not be legally binding upon Adelphia until it receives a reasonably satisfactory fairness opinion with respect to the transfer of the Prestige Stock to Highland Prestige.

Very truly yours,

Highland Prestige Georgia, Inc.

By: _____
Name: Timothy J. Rigas
Title: Executive Vice President

Accepted and Agreed to:

Adelphia Communications Corporation

By: _____
Name: Colin H. Higgin
Title: _____
VP/Deputy General Counsel

ADEL 0024806

SC-671

ADPR 001319

# Exhibit B

## ASSIGNMENT OF STOCK PURCHASE AGREEMENT
### (from Adelphia Communications Corporation to
### Highland Prestige Georgia, Inc.)

This Assignment is entered into as of this 5 th day of July, 2000 by and between ADELPHIA COMMUNICATIONS CORPORATION, a Delaware corporation ("ACC") and HIGHLAND PRESTIGE GEORGIA, INC., a Delaware corporation ("Highland Prestige").

### STATEMENT OF FACTS

1.      ACC is a party to that certain Stock Purchase Agreement by and among ACC, Anverse, Inc., a Georgia non-profit corporation, Jonathan J. Oscher, individually and Lorraine Oscher McClain, as trustee of each of the Connor Jay McClain Life Trust u/a 12/14/98, the Reilly Culver McClain Life Trust u/a 12/14/98 and the Lorraine Oscher McClain Life Trust u/a/ 12/14/98, dated as of December 6, 1999 (the "Purchase Agreement").

2.      ACC wishes to assign all of its rights and obligations under the Purchase Agreement to Highland Prestige.

3.      Highland Prestige desires to acquire and assume all of ACC's rights and obligations under the Purchase Agreement.

NOW, THEREFORE, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties, intending to be legally bound hereby, agree as follows:

1.      ACC assigns to Highland Prestige all of ACC's right, title and interest in, and obligations and duties under, the Purchase Agreement.

2.      Highland Prestige assumes all of ACC's right, title and interest in the Purchase Agreement and agrees to fully discharge and perform all of ACC's duties and obligations under the Purchase Agreement.

[Remainder of page intentionally left blank]

**BIPC 550172**

BIPC550172

ADPR 000783

IN WITNESS WHEREOF, the parties have caused this Assignment to be executed by a duly authorized officer as of the date first written above.

ADELPHIA COMMUNICATIONS
CORPORATION

By: *Michael J. Rigas*
Name: Michael J. Rigas
Title: Executive VP

HIGHLAND PRESTIGE GEORGIA, INC.

By: *Michael J. Rigas*
Name: Michael J. Rigas
Title: Executive VP

915220-1; PGSI1_General

-2-

**BIPC 550173**

──── BIPC550173 ──

ADPR 000784

# Exhibit C



TOTAL AUTHORIZED ISSUE
500,000 SHARES PAR VALUE $1.00 EACH
COMMON STOCK

CANCELLED

This is to Certify that ___ HIGHLAND PRESTIGE GEORGIA, INC. ___ is the owner of ___

FOUR THOUSAND NINE HUNDRED AND NINETY-EIGHT (4,998) ___ fully paid and
non-assessable shares of the above Corporation transferable only on the books of the
Corporation by the holder hereof in person or by duly authorized Attorney upon
surrender of this Certificate properly endorsed.
Witness, the seal of the Corporation and the signatures of its duly authorized officers.
Dated JULY 5, 2000

ADPR000081141

The following abbreviations, when used in the inscription on the face of this certificate, shall be construed as though they were written out in full according to applicable laws or regulations:

| | | | |
|---|---|---|---|
| TEN COM | - as tenants in common | UNIF GIFT MIN ACT - ...... Custodian ........ | |
| TEN ENT | - as tenants by the entireties | under Uniform Gifts to Minors | (Cust) (Minor) |
| JT TEN | - as joint tenants with right of survivorship and not as tenants in common | Act ................... (State) | |

Additional abbreviations may also be used though not in the above list

*For value received* _____ *hereby sell, assign and transfer unto*

PLEASE INSERT SOCIAL SECURITY OR OTHER
IDENTIFYING NUMBER OF ASSIGNEE

_____

(PLEASE PRINT OR TYPEWRITE NAME AND ADDRESS INCLUDING POSTAL ZIP CODE OF ASSIGNEE)

_____

_____

_____ *Shares*

*represented by the within Certificate, and do hereby irrevocably constitute and appoint*

_____ *Attorney*

*to transfer the said Shares on the books of the within named Corporation with full power of substitution in the premises.*

*Dated* _____ _____

*In presence of*

_____

NOTICE: THE SIGNATURE TO THIS ASSIGNMENT MUST CORRESPOND WITH THE NAME AS WRITTEN UPON THE FACE OF THE CERTIFICATE IN EVERY PARTICULAR WITHOUT ALTERATION OR ENLARGEMENT OR ANY CHANGE WHATEVER.

CANCELLED

THE SHARES OF STOCK REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR ANY STATE SECURITIES LAW ("THE ACTS"). SUCH SHARES OF STOCK MAY NOT BE TRANSFERRED EXCEPT (1) PURSUANT TO A REGISTRATION STATEMENT EFFECTIVE UNDER THE ACTS OR (2) PURSUANT TO AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE ACTS.

ADPR000081142

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: | . Case No.  02-41729 (REG) |
| | . |
| ADELPHIA COMMUNICATIONS, | . |
| CORP., et al., | . |
| | . One Bowling Green |
| | . New York, NY  10004-1408 |
| Debtors. | . |
| | . February 3, 2006 |
| . . . . . . . . . . . . . . . . | . 10:24 a.m. |
| ADELPHIA COMMUNICATIONS, | . |
| CORP., ADELPHIA CABLEVISION, | . |
| L.L.C., and OFFICIAL | . |
| COMMITTEE OF UNSECURED | . |
| CREDITORS OF ADELPHIA | . |
| COMMUNICATIONS CORP. et al., | . |
| | . |
| Plaintiffs, | . |
| | . |
| v. | . |
| | . |
| PRESTIGE COMMUNICATIONS OF NC, | . |
| INC., JONATHAN J. OSCHER, | . |
| LORRAINE OSCHER McCLAIN, | . |
| ROBERT F. BUCKFELDER, | . |
| BUCKFELDER INVESTMENT TRUST, | . |
| and ANVERSE, INC., | . |
| | . |
| Defendants. | . |
| . . . . . . . . . . . . . . . | . |

TRANSCRIPT OF MOTION HEARING
BEFORE HONORABLE CECELIA G. MORRIS
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Plaintiff, | Kasowitz, Benson, Torres & |
| Unsecured Creditors' | Friedman, LLP |
| Committee: | By:  JOSEPH A. GERSHMAN, ESQ. |
| | 1633 Broadway |
| | New York, NY  10019-6799 |

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311  Fax No.  (609) 587-3599**

APPEARANCES (Continued):

For the Debtor:                    Willkie Farr & Gallagher LLP
                                   By:  TERENCE McLAUGHLIN, ESQ.
                                   787 Seventh Avenue
                                   New York, NY  10019-6099

For the Defendants,                Troutman Sanders LLP
Prestige Communications:           By:  HARRIS B. WINSBERG, ESQ.
                                        ROBERT GORDON, ESQ.
                                   600 Peachtree Street, N.E.
                                   Suite 5200
                                   Atlanta, Georgia  30308-2216

1          THE COURT:  Thank you.  Good morning.  This is case

2   number 02-04-3294, In the Matter of Adelphia Communications

3   versus Prestige Communications, et als.  Yes, ma'am?

4          UNIDENTIFIED SPEAKER:  Your Honor, my colleague is

5   just in the men's room.

6          THE COURT:  Okay.  We'll wait a minute, then.

7          UNIDENTIFIED SPEAKER:  Oh.  Here he is.

8          THE COURT:  Good.  Come right in.

9          UNIDENTIFIED SPEAKER:  Sorry, Your Honor.

10          THE COURT:  State your name and affiliation.

11          MR. GERSHMAN:  Joseph Gershman from Kasowitz, Benson,

12   Torres & Friedman, representing the plaintiff, unsecured

13   creditors' committee.

14          THE COURT:  Very good.

15          MR. WINSBERG:  Good morning, Your Honor.  Harris

16   Winsberg and Robert Gordon on behalf of the Prestige

17   defendants, from Troutman Sanders in Atlanta, Georgia.

18          THE COURT:  Well, you'll note from the accent that I

19   happen to be a Georgia lawyer, so -- so I notice today that we

20   do have -- we're probably going to be under Georgia and

21   Pennsylvania law.  Is that correct, ultimately?

22          MR. GERSHMAN:  In the complaint that the committee

23   alleged that because this transaction occurred over a year

24   prior to the petition date that bookable fraudulent transfer

25   law under 544(b) they've alleged is either Pennsylvania or

**J&J COURT TRANSCRIBERS, INC.**

1 Georgia in their complaint.

2          THE COURT: And -- okay. Let me ask a few questions

3 before we start. Have you all had a chance to talk?

4          MR. WINSBERG: Yes, ma'am.

5          THE COURT: Because, you know, you really don't ever

6 want a crabby Judge in discovery disputes, so -- you sort of

7 want to talk about it. And I want to know what your

8 expectations of me are today. What do you expect of me? I

9 know this is a preliminary. We don't even necessarily have to

10 be on the record, but I wanted to be on the record. I wanted

11 to meet you, since I've been assigned this case.

12          MR. GERSHMAN: I guess it sort of depends on how Your

13 Honor wants to play it out. We're -- on behalf of the

14 plaintiffs we're happy to sort of present our position to you

15 that we think it makes sense to -- for there to be a protective

16 order entered which would quash the 30(b)(6) notices that the

17 defendants have served, with the exception of, the plaintiff's

18 think it is reasonable and they are willing to produce somebody

19 to testify about the collection and production of documents.

20 But as to the remaining topics, because of the circumstances in

21 this case, plaintiffs think it makes sense to quash that

22 notice, go ahead and allow discovery to proceed, and explore

23 these topics in depositions in contention and interrogatories,

24 and then if the defendants, after that, feel that there are

25 areas that they still have not gotten the information that they

**J&J COURT TRANSCRIBERS, INC.**

1  think they need, we can readdress the topic of a 30(b)(6)

2  deposition, and you know, we're happy for Your Honor to either

3  make a ruling on that today, or provide us with some guidance

4  as to how she thinks she would rule.  Or if Your Honor feels

5  that she wants more fulsome briefing than the letter briefs

6  that have been put in, we're happy to do that, as well.

7          THE COURT:  Okay.  I've read all of your letter

8  briefs.  Let me ask you a question.  I'll just say one thing

9  right off the bat, and just because -- the one thing that is

10  just disingenuous to me, and I'll make this very clear, if

11  you're going forward with the Chapter 11 reorganization, you

12  still have to produce and do all the other litigation.  That's

13  not an excuse not to produce.  So, that one I - I'll just let

14  you know my -- the hair on the back of my neck would stand up

15  if somebody starts arguing that, so --

16          MR. GERSHMAN:  Okay.

17          THE COURT:  -- that one we'll just leave there.  But

18  I have a -- the first question I have to ask is are there

19  business people?

20          MR. GERSHMAN:  Currently there are still -- Adelphia

21  is a functioning company.  There are business people, none of

22  whom are people who had anything -- there are no people who had

23  personal knowledge of any --

24          THE COURT:  But we've got Union Carbide, that case,

25  in front of us, so -- so, you do have business people?

**J&J COURT TRANSCRIBERS, INC.**

1          MR. GERSHMAN:  There are business people.  Yes,

2   ma'am.

3          THE COURT:  And there are business people working on

4   a Chapter 11 reorganization even though more than likely it's

5   lobbing off, and selling, and it's a liquidating 11, I would

6   assume?

7          MR. GERSHMAN:  That's correct.

8          THE COURT:  And there's one paragraph in the

9   defendant's letter that I would like you to address, and that

10  is on Page 5.  And I think this may be the crux of everything

11  for me.  I'm not sure.  The defendants have noticed a 30(b)(6)

12  deposition to date -- depositions, because to date discovery,

13  including substantial document discovery, has failed to reveal

14  any involvement by the Regises in establishing the 795-300

15  million price allocation and has shown no knowledge on the part

16  of any defendant that Adelphia intended to resell the Prestige

17  Georgia stock to Highland Prestige until well after the price

18  allocations for Prestige N.C. and Prestige Georgia were

19  established in the asset purchase and the stock purchase

20  agreement.

21         MR. GERSHMAN:  Your Honor, I guess two things.  One,

22  there have only been a few depositions in this case.  None of

23  the defendants have been deposed.  The only people who have

24  been deposed are certain brokers who represented the defendants

25  in the transaction.  I actually -- I believe that that sentence

1    is actually incorrect.  One of the employees who represented

2    the broker in the transaction, Mr. Tony Parisi, when asked at

3    what point in time did he and others become aware that the

4    Regises were participating in this transaction, he first

5    testified that it was known throughout the transaction that the

6    Regises were going to be buying Prestige Georgia.  After a

7    break in the deposition and after his counsel spoke with him,

8    he then came back and he said he now was not sure at what point

9    in time it was.  He wasn't sure whether it was throughout the

10   transaction or it was some time after the transaction got

11   signed up.  And so, I don't think, actually, that that

12   statement is factually correct.  And second, I would just say

13   that there really -- there hasn't really been anything in

14   discovery, other than the brokers who have testified, there

15   really hasn't been anything in the documents which shows

16   anything about who did the allocation and who knew what.  It's

17   just not a subject that has really been that explored given

18   that the documents really are not showing -- there isn't much

19   documentary evidence on it, and people haven't been deposed on

20   it.

21           THE COURT:  Tell me what you have to say.  We're just

22   going to have a little dialogue here.

23           MR. WINSBERG:  Thank you, Your Honor.  Mr. Gershman's

24   -- and we can debate the deposition of Tony Parisi, but my

25   recollection, when we came back on the record he was

**J&J COURT TRANSCRIBERS, INC.**

1  unequivocal in saying that it was after the knowledge -- if

2  there was any knowledge at all, and he wasn't sure because his

3  deposition testimony was he never spoke with anybody at

4  Prestige about the Regises' intent to sell the stock from

5  Adelphia to themselves, number one.  He never had any personal

6  knowledge.  And number two, he testified when he came back on

7  the record that he wasn't aware of it until after the documents

8  were signed in December of '99.  So, our view -- we've also

9  asked, in discovery, Your Honor, for them to identify -- their

10 letter brief is somewhat misleading in this regard.  They say

11 in the letter brief that we issued contention interrogatories.

12 What we asked them in the interrogatories, and I have them

13 here, Your Honor, is we asked them to identify people and

14 identify documents to support the allegations in the complaint.

15 And none of the documents or the people that I identified lend

16 any credence that the Regises had any involvement in fixing the

17 allocation of those two agreements.

18         We did cite to the Covington report, Your Honor.

19 Now, the Covington report is marked highly confidential under

20 protective order, but we are allowed -- permitted under our

21 agreement to talk to the Judge, Your Honor, about that.  And it

22 is in the letter brief.  And the Covington report, which is

23 done by the independent board of Adelphia, looked at it and

24 came up with the conclusion which is what our contention is, is

25 that the seller suggested it.  And the evidence is going to be,

1 I'll save Mr. Gershman the suspense, when our witnesses get

2 deposed they're going to testify that the seller suggested the

3 allocation and Adelphia accepted it.

4      THE COURT:  Okay.  Well, let's stop right there,

5 then, because you said when our witnesses get deposed.  So,

6 what's the deal today?  Why aren't we getting these witnesses

7 deposed?

8      MR. WINSBERG:  They have been noticed up, Judge.

9 Part of the issue here is why should we continue to have to go

10 on a wild goose chase?  We have noticed up the available

11 witnesses on the Adelphia side.  We have noticed up the

12 Buchanan Ingersoll lawyers, who was Adelphia's deal lawyers,

13 and those depositions are going to go forward in March.  The

14 other people in Adelphia's initial disclosures which they

15 listed, those people, for the most part, are unavailable due to

16 criminal issues.  The Regises, John, Tim, and Michael, are all,

17 I'm told by the Dillworth lawyers who represent them, are

18 likely unavailable because of Fifth Amendment concerns.  Collin

19 Higgins, who we've noticed his deposition, we've been informed

20 orally that he is going to take the Fifth when we ask him

21 questions.  So, they're unavailable.  And as to Mr. Gershman's

22 point about the lack of availability of witnesses, Your Honor,

23 that's only going to get worse as Adelphia's proposed

24 liquidating plan, where they propose to sell their assets at

25 Time Warner and Comcast, and that's supposed to close by July

10

1  of this year.  So, whatever concerns they have about making

2  people available is only going to get worse for them pretty

3  quickly, Your Honor.  So, because of the unavailability of

4  witnesses, and because frankly, Your Honor, if you read their

5  initial disclosures, they put Adelphia up as a witness with

6  knowledge on the very same topics that we would love to get

7  answers to, such as simple questions as who at Adelphia spoke

8  with our client about the allocation?  What did they talk

9  about?

10         THE COURT:  Yes.  That -- you can stand up, too.

11  That bothers me.  How are you going to prove your case?  That's

12  --

13         MR. GERSHMAN:  Well --

14         THE COURT:  I mean, let's just be serious right up

15  front.

16         MR. GERSHMAN:  Your Honor --

17         THE COURT:  Because I'm expecting a 12(b)(6) motion

18  and then I'm expecting a summary judgment motion, and I don't

19  want to go through all these exercises unless we've made sure

20  that everything is discovered that can be discovered.

21         MR. GERSHMAN:  As with most fraud cases, Your Honor,

22  I would probably be surprised if you had direct evidence of

23  somebody coming out and saying yes, we committed a fraud.  We

24  --

25         THE COURT:  I know, but it's got to be more than -- I

**J&J COURT TRANSCRIBERS, INC.**

1  would think I'm going to have to have more than this

2  constructive -- you know, that just say because the price was

3  not right we should get the money back.

4       MR. GERSHMAN:  Oh.  I think for the constructive

5  fraud claim, Your Honor, for that claim to prevail it's going

6  to require two things, Adelphia -- that will be entirely an

7  expert case.  It will have nothing to do with this 30(b)(6)

8  witness.  The two elements, I think, for us to prevail on that

9  case are that Adelphia was insolvent, or rendered insolvent by

10 that transaction, which will be, you know, a battle of the

11 experts on that issue, and there will be an argument over

12 reasonably equivalent value, whether the assets that Adelphia

13 bought in the Prestige transaction, whether they got reasonably

14 equivalent value.

15      THE COURT:  I can tell you my eyebrow would go up on

16 just the battle of the experts on that, so -- so, just so you

17 know.

18      MR. GERSHMAN:  Okay.

19      THE COURT:  We're sort of getting to know each other

20 here.  I need a little more than -- I think I need a little

21 more than that.  Now, I know there's going to be some case law,

22 but there's going to be some case law on both sides on this

23 one.  I'm pretty sure on that one, so -- yes, go ahead.

24      MR. WINSBERG:  May I respond briefly, Your Honor?

25      THE COURT:  Sure.  Sure.  You can stay where you are.


**J&J COURT TRANSCRIBERS, INC.**

12

1 Just stand there.  That microphone is good.

2           MR. WINSBERG:  Thank you, Your Honor.  As to the

3 expert issue, you have to have underlying facts of a complaint.

4 When they filed the complaint they had an obligation to take a

5 good faith belief that this case had merit.   I think it's

6 pretty clear now that they're struggling to come up with what

7 the basis was for why they filed to begin with.   And as far as

8 expert testimony, experts have to testify on facts, otherwise

9 expert testimony is not going to survive a <u>Daubert</u> ruling.

10 Experts can't make up the facts.  They make an opinion based

11 upon the facts that are presented to them.  And so, I don't

12 really think that that argument has any merit whatsoever.

13           THE COURT:  I'll let you respond to that.

14           MR. GERSHMAN:  Your Honor, the primary badge of fraud

15 plaintiffs believe here, is that there were -- the Prestige

16 acquisition was an acquisition in which the Prestige defendants

17 were paid collectively $1.1 billion for cable systems in four

18 states.  At the end of the day, at the end of the transaction,

19 Adelphia received the cable systems in three states, and

20 Adelphia paid $800 million for those assets.  The most common

21 metric of determining the price of a cable acquisition is

22 usually you divide the acquisition price by the number of

23 subscribers.

24           THE COURT:  But you're also going to have opposing

25 experts that's going to talk about the high flying days, and

1 how -- we were in the period of time that everybody was paying,

2 you know, the -- the tulip bulb era of --

3          MR. GERSHMAN:  That's --

4          THE COURT:  -- cable companies.

5          MR. GERSHMAN:  Absolutely, Your Honor.  But in this

6 transaction,  same transaction, similar quality assets, if

7 anything the assets that the Regises wound up with, the

8 testimony thus far has been that those may have been the most

9 high quality assets, they paid the lowest price for the piece.

10         THE COURT:  And how are your experts, you're going to

11 prove that the defendants in this case knew about that side

12 transactions where the Regises were actually buying one of them

13 and not the other one?  Adelphia was paying for both of them

14 but then there was a side transaction afterwards?

15         MR. GERSHMAN:  There was already testimony that prior

16 to the closing, there's no question that prior to the closing

17 there has been testimony that the brokers told the defendants

18 that the Regises were purchasing.  No question that before this

19 transaction closed they --

20         THE COURT:  But as the defendant -- so, what do I

21 care?  That's Adelphia doing what Adelphia's doing.  I mean --

22         MR. GERSHMAN:  Well, I'm not sure that's correct,

23 Your Honor.  If the defendants -- if the defendants were aware

24 that the Regises had decided to appropriate a portion of the

25 acquisition and to cause Adelphia to subsidize the purchase so

14

1 that they were not paying the fair market value, if they were

2 aware that that's what the Regises were doing and it is -- the

3 testimony thus far has shown that they knew that the Regises

4 were aware -- they were well aware that the Regises were

5 participating in this transaction --

6           THE COURT:  Well, you've already told me you've got

7 conflicting testimony from the same person, so I'm going to

8 have to --

9           MR. GERSHMAN:  No, that was just as to the timing --

10 at what point in time?  There's no question -- the testimony is

11 unequivocal that they knew before the closing.  The question is

12 did they know before the closing or did they know before the

13 deal even got signed up?  And, Your Honor, if the defendants

14 knew at any time before that transaction closed that the

15 Regises were acquiring assets and were paying less than they

16 were worth and were causing Adelphia to subsidize that

17 purchase, then that is going to be -- that would have been a

18 breach of fiduciary duty on the party of the Regises, and the

19 defendants would have been aiding and abetting that breach by

20 going along with that transaction.

21           THE COURT:  Okay.  I've heard you.  I've heard you,

22 but we've still got discovery because you've got to get there.

23 And so, this is informal, even though we're on the record, but

24 it's so we get to know each other.  It seems to me that the two

25 of you all, four of you all, six of you, whoever it is, you sit

**J&J COURT TRANSCRIBERS, INC.**

15

1  down and you go through everything, and you've got people

2  working at that company, and you need to look at that Union

3  Carbide case.  And you need to have them up for depositions.

4  Now, you've back down -- in your letter brief you've already

5  backed down on some of the number and who has to know what and

6  how many, but it seems to me reasonable minds can get to this

7  without draconian, you will not have any depositions, and not

8  draconian you will have everything you asked for.

9          MR. GERSHMAN:  Your Honor, again, I just want to make

10  sure that -- we're not saying that -- we're not saying that we

11  should -- that the debtor should not have to ever put up a

12  30(b)(6) witness.  We are just --

13          THE COURT:  I know.  You're saying that you want them

14  to do the work first instead of just talking to somebody and

15  then doing it.  And that's --

16          MR. GERSHMAN:  And particularly, Your Honor --

17          THE COURT:  It's your complaint.

18          MR. GERSHMAN:  That's right.  No question it is, Your

19  Honor.  And in a normal case we wouldn't be here asking for

20  this relief.  But in a situation where there really are no

21  witnesses -- there are no witnesses at all who had any

22  involvements or any personal knowledge of the topics that they

23  are seeking --

24          THE COURT:  You'd better read Union Carbide.

25          MR. GERSHMAN:  Well, I understand that there are some

**J&J COURT TRANSCRIBERS, INC.**

```
 1  cases -- there are certain cases where Courts rule you have to
 2  do it anyway.  There are other cases who say, you know, let's
 3  take a look at what they're asking for, and if what they're
 4  asking for is really the kind of stuff that is not suited for a
 5  30(b)(6) deposition such as let's put somebody up to testify as
 6  to all facts that support particular legal conclusion, which is
 7  basically a contention interrogatory, that is the sort of thing
 8  that it is better to answer in an contention interrogatory.
 9  And if for some reason there is insufficient information after
10  those contention interrogatories, then we'll come back and
11  address the issue.  And there are certainly cases that do that,
12  and, you know, I submit that this is a situation between the
13  fact that we don't have people, and so what we would basically
14  be doing is creating a witness.
15          THE COURT:  I've heard you on that.
16          THE COURT:  You'd better read Union Carbide.
17          THE COURT:  You'd better read Union Carbide.
18          MR. GERSHMAN:  Okay.  And secondly, in addition to
19  that, the substance of what these -- of what is being asked
20  here is stuff that is not conducive to a 30(b)(6) deposition.
21  It is not possible to educate somebody to give, in deposition
22  testimony, a summary of, you know, a four-year period of
23  acquisitions, every acquisition that Adelphia participated in.
24  That is something that --
25          THE COURT:  Well, that's why you're going to get
```

1 together and make them a little more reasonable about the

2 things you're talking about.  We've got one -- this is the

3 issue in this case.  You can't go through everything in

4 Adelphia.  You go through the issue in this case.  You might --

5 are you going to need to know that this is something they did

6 in other cases?

7          MR. WINSBERG:  Your Honor, to answer that question --

8          THE COURT:  Other -- yes, other acquisitions.

9          MR. WINSBERG:  One of their allegations is that the

10 price paid was unprecedented in the cable industry, so they've

11 put the issue, factually, into play in the allegation in the

12 complaint.  And so, they put it into play and we have a right

13 to discover facts on that.

14          THE COURT:  That's my problem with this.  I'm sitting

15 here listening to everything.  I've read the complaint.  I've

16 read both of your letter briefs.  It's your complaint.  You've

17 got to have the witnesses to bring in.  Where are those

18 witnesses going to be?  And I'm not talking about just the

19 experts, because I -- that's not going to be enough, because --

20 he's absolutely right.  You've got to have -- the expert can't

21 testify except on facts, and I'm going to have to hear those

22 facts somewhere.  So, where are your witnesses on those facts?

23 Do you think it's just going to be documents?

24          MR. GERSHMAN:  No, I mean, Your Honor, we suspect

25 that the facts are going to come -- will be from the various

1  third party witnesses.  Some of it may come from the documents.

2  And in addition to that, if it becomes necessary, you know, if

3  we have to educate a witness to testify on particular things

4  that have not come out in the third party depositions and in

5  responding to contention interrogatories, then the corporation

6  will educate somebody on those issues and have them testify.

7          THE COURT:  Well, let me ask you a question.  Between

8  depositions and contention interrogatories, what's your

9  downside?

10          MR. WINSBERG:  The downside, number one, Your Honor,

11  is that a lot of the witnesses that have been listed are

12  unavailable.  The other witnesses that we can depose are not

13  binding on Adelphia, so before we want to come back to Your

14  Honor and move for summary judgment, we have to go on a wild

15  goose chase to try to run down every fact to basically disprove

16  their complaint rather than them prove their complaint.

17  They're the plaintiff.  Even the cases they cite, Your Honor,

18  as to the non-contention interrogatory topics, the Courts say

19  go forward on that.  And most of our topics, Your Honor, as

20  they even admit in their letter brief, and I can go through

21  them, are not contention interrogatory topics.  And the ones

22  that are, Your Honor, that the Court does have the discretion

23  case by case to look at those issues and decide whether it's

24  fair to have it go forward or not, and on that point, Your

25  Honor, I -- in a lot of these cases they'll come forward and

1 say to Your Honor, Your Honor, if by doing this we're going to

2 have to put up the general counsel of the parent corporation.

3 They haven't even alleged that.  They haven't even come to Your

4 Honor and said through affidavits say who it is that's going to

5 be on these topics.

6　　　　THE COURT:  See, I think that you all need to be

7 talking, and you need to be going through every one of these,

8 or you want a crabby Judge sitting there as you go through

9 every one of them.  I mean, that's your choice.

10　　　　MR. WINSBERG:  And on that --

11　　　　THE COURT:  And I can get really crabby.

12　　　　MR. WINSBERG:  And on that point, Your Honor, we were

13 willing and are willing to meet with them, but we're here today

14 because they drew a line on the sand.  They got on the phone,

15 and as they said in the letter brief, nothing but document

16 authentication.  That's the only reason why we're here today.

17　　　　THE COURT:  Okay.  Well, I'll tell you one thing.

18 The line in the sand has now been washed away with a wave.

19 There is no line in the sand.  Now, you will talk, and you will

20 go through each one of them, and you will then, if you've got a

21 line in the sand you will come talk to me.  Somebody has

22 whispered in your ear, I'd like to know who is whispering in

23 your ear.

24　　　　MR. McLAUGHLIN:  Good morning, Your Honor.  I was

25 asking him if he would allow me to just be heard briefly.  My

1  name is Terence McLaughlin.  I'm with Willkie Farr & Gallagher.

2  We're counsel to the debtors.  We are not parties, per se, in

3  this action.  We have passed the baton to the creditors'

4  committee.

5           THE COURT:  Right.

6           MR. McLAUGHLIN:  I just wanted to make one thing -- I

7  don't have any views on how this all plays out.  I have no ax

8  to grind here.  I just want to make one point for the record

9  that is -- I'm thinking of down the road. The -- I want to be

10 sure that if 30(b)(6) witnesses proceed, I want to be sure

11 everybody understands the problem that we have so that there's

12 no argument for some kind of sanctions down the road if the

13 30(b)(6) depositions are not as informative as the parties had

14 hoped.  To educate a 30(b)(6) witness on some of these topics,

15 I believe the law probably says you do have an obligation, even

16 if you don't have current management who was involved, so --

17           THE COURT:  That's correct.  It does.

18           MR. McLAUGHLIN:  -- that's probably the statement of

19 law.  I haven't researched it, as I said.  But in order to

20 educate such a witness we have a practical problem.  The guys

21 -- that they're not there, aren't talking to them, aren't

22 talking to us either.  The Regises aren't talking to anybody.

23 So, it's hard for use to go and have a conversation to educate

24 such a witness --

25           THE COURT:  I understand that.

**J&J COURT TRANSCRIBERS, INC.**

1        MR. McLAUGHLIN:  Right.

2        THE COURT:  But you can go -- you call can go through

3   every single one of these piece -- you know, individual by

4   individual, by issue, by issue, by issue, and then come to me.

5        MR. McLAUGHLIN:  Understood.  And I just want to be

6   sure that the parties do not, down the road, say, well, you

7   said you would do a 30(b)(6) witness, the witness said I don't

8   know, I don't know, I don't know, I don't know, I don't know,

9   therefore I want sanctions against the debtors, because that

10  could very well happen here, Your Honor.  We'll do our very

11  best to educate them.

12       THE COURT:  Well, it's -- and it's according to your

13  30(b) witness.  I mean, you now, there are -- I'll just give

14  you a little war story.  I'm involved in the Enron mediations.

15  I'm heavily involved in the Enron mediations.  The business

16  people are third, fifth, 25th layer down that I'm dealing with

17  in these mediations.  But they are very much aware of what went

18  on in the company.  Now, do we have that in Adelphia?  More

19  than likely.  So, let's go find them.  Now --

20       MR. McLAUGHLIN:  We'll do our best.

21       THE COURT:  But then I also agree with you.  If it's

22  Regis, it's going to be not only do I not know, I take the

23  Fifth.  You're going to know that.

24       MR. McLAUGHLIN:  Right.  Well, we don't control them

25  at all.

**J&J COURT TRANSCRIBERS, INC.**

1            THE COURT:  I understand.  I understand.  But even if

2    you get a -- if you serve a subpoena on them that's what you're

3    going to get.  You know you're going to get that.  So, that's a

4    practicality that we have to deal with.  But I think you all

5    should sit down as ladies and gentlemen that we are, but

6    actually as more professional that we are, we are all part of

7    that unique club that calls us lawyers, and puts a little

8    ethical considerations on us so that you can sit down and go

9    through each one of them, and then if there's a real contention

10   you come see me.  You know?  Let's not do blankets.  Let's not

11   throw lines in the sand.  Let's figure it out.  It's as simple

12   as that.  I love trials, but I also love people talking to each

13   other and deciding what to do.  So -- and you might want to

14   look at a Rule 68 letter.  It's an interesting thing, offer,

15   that you might want to do, just in case.  But it's an

16   interesting cost shifting.  Most people don't take a look at

17   it.  I believe in negotiations.  I believe in mediations.  I

18   believe in things like Rule 68.  But I also love trials, so --

19            Anything else you want to hear from me?  I know this

20   is informal, but is there anything else you want to hear from

21   me?

22            MR. WINSBERG:  Your Honor, we do have a concern,

23   obviously.  We're more than happy to meet with Mr. Gershman and

24   the Willkie Farr lawyers to make witnesses available and make

25   ourselves available, but we do have a concern about timing.  We

1    do have a concern that with the Time Warner Comcast sale --

2          THE COURT:  I think I have a concern about timing,

3   too, so I expect you to be meeting -- I'm going to be back in

4   Manhattan the 15th and 16th of February.  If you have any other

5   matters that you need to get to me on one of those dates I'll

6   make sure I have time for you, because I'm concerned also about

7   timing.  Once something gets sold, and people really move

8   around, and -- it gets to be more and more of an issue.

9          MR. GERSHMAN:  On the 15th we'll actually be in

10   Atlanta at a deposition, but --

11          THE COURT:  Okay.  That's fine.

12          MR. GERSHMAN:  But the 16th we --

13          THE COURT:  Okay.  I will be in touch with chambers.

14   I will definitely -- I've made those two days to be in

15   Manhattan so I'll make time for anything that you might need to

16   talk to me about, or -- I wouldn't just say say hello, but you

17   could if you wanted to.  Anything else?

18          MR. GERSHMAN:  No, Your Honor.

19          MR. WINSBERG:  From our side, Your Honor, the only

20   thing I would add is just to correct the record that -- we'll

21   get to it when we get to it, but Mr. Gershman said on the

22   record that he thinks that one of the witnesses said that we

23   knew prior to the closing that it was going to be transferred

24   to the Highland parties --

25          THE COURT:  I --

1        MR. WINSBERG:  -- and that was not the case in the

2  deposition.

3        THE COURT:  This is informal, even though it's on the

4  record, and even though I heard it, I do know that this is

5  going to be what we're going to be what we're talking about,

6  and that's going to be the ultimate issue, so --

7        MR. WINSBERG:  I felt compelled, Your Honor.

8        THE COURT:  And I do love editorial comments, but I

9  -- and I understand that you always have to correct an

10  editorial comment, so -- great.  Good.  Good luck.

11        MR. WINSBERG:  Thank you, Your Honor.

12        THE COURT:  See you soon.  Court's in recess.

13                      *  *  *  *  *

### C E R T I F I C A T I O N

        I, TAMMY DeRISI, court approved transcriber, certify

that the foregoing is a correct transcript from the official

electronic sound recording of the proceedings in the above-

entitled matter.


/s/ Tammy DeRisi              Date:  February 14, 2006

TAMMY DeRISI

J&J COURT TRANSCRIBERS, INC.

```
 1                    UNITED STATES BANKRUPTCY COURT
                      SOUTHERN DISTRICT OF NEW YORK
 2                                        .
     IN RE:                               .  Case No. 02-41729-reg
 3                                        .
     ADELPHIA COMMUNICATIONS CORP.,       .  New York, New York
 4                                        .  Wednesday, December 13, 2006
                                Debtors.  .  11:19 a.m.
 5   . . . . . . . . . . . . . . .        .
     ADELPHIA COMMUNICATIONS CORP.,       .
 6   et al,                               .
                              Plaintiffs, .  Adv. Proc. 04-03293-cgm
 7                                        .
                   vs.                    .
 8                                        .
     PRESTIGE COMMUNICATIONS OF           .
 9   NC, INC., et al,                     .
                                          .
10                             Defendants..
     . . . . . . . . . . . . . . . .      .
11
                           TRANSCRIPT OF MOTION
12            BEFORE THE HONORABLE CECELIA G. MORRIS
                   UNITED STATES BANKRUPTCY JUDGE
13
     APPEARANCES:
14
     For the Plaintiffs/
15   Debtors:              Terence K. McLaughlin, Esq.
                           WILLKIE, FARR & GALLAGHER, LLP
16                         787 Seventh Avenue
                           New York, New York  10019
17

18   (Appearances continued)

19

20   Audio Operator:       Electronically Recorded
                           by Court Personnel
21
     Transcription Company:  Rand Transcript Service, Inc.
22                         311 Cheyenne Road
                           Lafayette, New Jersey  07848
23                         (973) 383-6977

24
     Proceedings recorded by electronic sound recording,
25   transcript produced by transcription service.
```

1    APPEARANCES:    (Continued)

2

      For Defendants Prestige:      Harris B. Winsberg, Esq.
3                                   Robert K. Gordon, Esq.
                                    TROUTMAN SANDERS, LLP
4                                   600 Peachtree Street, NE
                                    Suite 5200
5                                   Atlanta, Georgia 30308

6

      For the Official Committee
7    of Unsecured Creditors:       Joseph A. Gershman, Esq.
                                    Matthew R. DiBlasi, Esq.
8                                   KASOWITZ, BENSON, TORRES &
                                     FELD, LLP
9                                   1633 Broadway
                                    New York, New York 10019

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1

2

<u>INDEX</u>

3

<table>
<tr><td><u>MOTION TO COMPEL PRODUCTION OF DOCUMENTS</u></td><td><u>Page</u></td></tr>
</table>

| | |
|---|---|
| Electronic Discovery/Database | 4 |
|     <u>Court Decision</u> | 14 |
| | |
| Privilege Log, et cetera | 16 |
|     <u>Court Decision</u> | 33 |
| | |
| PriceWaterhouseCoopers Third-Party Discovery | 39 |
| | |
| | |
| <u>SCHEDULING</u> | 35,46 |

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Proceedings commence at 11:19 a.m.)

2        THE COURT:  Good morning.

3        COUNSEL:  Good morning, Your Honor.

4        THE COURT:  Good morning.  Are we on the record?

5    Thanks.  Sit down, please.

6        State your name and affiliation.

7        MR. WINSBERG:  Good morning, Your Honor.  Harris

8    Winsberg from Troutman Sanders.

9        MR. GORDON:  And Robert Gordon from Troutman

10   Sanders, also.

11       MR. MC LAUGHLIN:  Terence McLaughlin from Willkie,

12   Farr & Gallagher.

13       MR. GERSHMAN:  Joe Gershman and Matt DiBlasi from

14   Kasowitz, Benson, Torres & Friedman, on behalf of the

15   Unsecured Creditors.

16       THE COURT:  Very good.  You may be seated.

17       First things first.  Let's deal with the -- oh, I

18   didn't even bring it in -- the production issue.  So tell me

19   where we are on that.

20       I know December 1st slipped a bit, and in some ways

21   through no fault of anybody.  But where are we and what's

22   going on?

23       MR. MC LAUGHLIN:  Your Honor, maybe I'll start --

24       THE COURT:  Please, yeah.

25       MR. MC LAUGHLIN:  -- and I suspect that Mr. Gordon

1   may have additional things that he wanted to point out.

2        Your Honor, from the debtors' perspective we have

3   performed the search, both manual and search terms, that we

4   advised the Court and the defendants that we would do.  We

5   completed that search, with the exception of the two items

6   that I identified in my letter by December 1st, made

7   available a document production in the form of a new

8   database, what I've referred to as the "Prestige database;"

9   that database contains a voluminous amount of information.  I

10  don't have a page count for you, but I could certainly get it

11  if that was important for the Court.

12       The two items that were open as of December 1st

13  were:

14       One, I had mentioned to the defendants that I knew

15  that parties had exchanged hard copy productions previously;

16  some of them between the parties themselves and others from

17  third parties that had received subpoenas in this case, and I

18  thought it made sense as a courtesy to say, why don't I get

19  those hard copies, get them imaged and scanned, and get them

20  into the database, too.  But for obvious reasons, I afforded

21  that a slightly lower priority because I knew they'd be most

22  interested in getting the documents that they claimed they

23  hadn't gotten before.

24       I believe, although I obviously would need to

25  confirm this with my colleagues, that that second wave, that

1   reproduction, if you will, electronically of documents

2   previously produced in hard copy is now complete and that

3   those documents are in a database.

4           THE COURT:  Well, and what about the -- by the way,

5   I'm sure the system didn't crash.  When people use a term

6   like "crash," it was simply down.  "Crash" is different than

7   "down."  So it was down for a while.  Has that been resolved?

8           MR. MC LAUGHLIN:  I don't know whether or not

9   they've still encountered difficulties.  I haven't heard that

10  the system is down, Your Honor, but I did not go into it this

11  morning, so I --

12          THE COURT:  "Crash" means you don't have a database;

13  "down" just simply means it's gone down for upgrades or

14  whatever.

15          Tell me what's going on with it.

16          MR. GORDON:  Yeah, well it's back.

17          THE COURT:  Please stand when you address the Court.

18          MR. GORDON:  It's back up.  It's available now.

19          THE COURT:  Please stand when you address the Court.

20          It's back up and available?

21          MR. GORDON:  Yes, it is available.

22          THE COURT:  Slowness, nobody can do much about.

23  That's just realities of life, on particularly a database

24  that PDFed.

25          So tell me your perspective of what's going on.

1        MR. GORDON:  Well, first of all, we had, Your Honor,

2   an initial concern about how the diligence search was going

3   to be conducted, and those -- we aired some of those concerns

4   during our last teleconference.  And our initial concern --

5   there's sort of a big picture problem with this -- is that we

6   don't believe that the database, either the Merrill database

7   or the new separate database is -- well, let's just start

8   with the Merrill database.

9        There's no meaningful index system or foldering

10  system.  As Your Honor will recall, most of the purported

11  index is a series of Bates numbers.  And in discussions with

12  Mr. McLaughlin, we have come to learn that the Amechi portion

13  (phonetic) of the database, which is approximately three-

14  quarters of it or 3 million documents, was assembled in

15  connection to government subpoenas with no real organization

16  to it, so --

17        THE COURT:  Okay.  We understood that.  We knew

18  that.

19        MR. GORDON:  Well --

20        THE COURT:  But you've got it now in front of you,

21  right?  And somebody can thumb through every page and look at

22  it, right?

23        MR. GORDON:  Well, through -- I'm sorry.  Through

24  the new database?

25        THE COURT:  Right.

1          MR. GORDON:  Well, our concern is that it's not

2    complete and that there was not a diligent search.

3          The representation that we understood to be made was

4    that there were going to be manual searches of all of the

5    folders where responsive documents were likely to be found,

6    and there would be backup entry of search terms, electronic

7    searching, to make sure that the folder was complete.  And it

8    was very important to us that the representation that there

9    were going to be manual searches of all folders where

10   documents were likely to be found was important to us because

11   we don't think that a fulsome production could be assembled

12   just through the entry of search terms, and I can reiterate

13   the reasons why.

14         THE COURT:  Okay.  So we're not dealing with the

15   database now; we've jumped over to something else.  You tell

16   me about the database first, and then we'll jump to the next

17   thing.

18         MR. GORDON:  Okay.  All right.  The database that

19   has been produced, we've managed to determine that it's

20   incomplete.  Now --

21         THE COURT:  How have you managed to determine it's

22   incomplete?

23         MR. GORDON:  Well, we've managed to do that by

24   checking whether documents we know should be there are in it.

25   For example, the documents that we referred to in our motion

1  to compel, we went -- we did a test to see whether all those

2  documents were in the database, and a number of the documents

3  were not in the database.

4        THE COURT:  So you actually did a test, and you knew

5  that this was a particular document, and you could not find

6  it.

7        MR. GORDON:  Correct, Your Honor.

8        THE COURT:  Did you pick up the phone and call and

9  say, we can't find this document, can the people that put

10 this database together find this document and show us where

11 it is?

12       MR. GORDON:  We did not do that, Your Honor.

13       THE COURT:  Okay.  I want you to do that.

14       MR. GORDON:  Okay.

15       THE COURT:  And then I want you all to do that

16 because I think that's a valid test.  If there's a document

17 that you have that doesn't come up in there, then let's find

18 out about it and then we can --

19       MR. GORDON:  Very good.

20       THE COURT:  -- renew there, but, you know ... okay.

21       MR. GORDON:  And there was a representation made

22 about uploading hard copy documents from third-party

23 productions, and we used -- we understand -- we have those

24 documents, we understand that they're third-party

25 productions, and that we don't have them we're going to have

1  them.  But again, we used that as a test to see whether a

2  diligent search had been conducted.

3           THE COURT:  Okay.  Let me ask you a question.

4           When you used -- what document did you use for that

5  first test?

6           MR. GORDON:  For the first one?  Well, there were

7  interview memoranda from -- that were prepared, you know, by

8  Covington & Burling in connection with its investigation that

9  we had --

10          THE COURT:  But do you think that that -- is that

11 what you're producing separately or later?

12          MR. MC LAUGHLIN:  No --

13          THE COURT:  Wait a minute.  We may be talking over

14 each other --

15          MR. GORDON:  Well, yeah.  No, I don't --

16          THE COURT:  -- and I want to make sure we're not.

17          MR. MC LAUGHLIN:  I think we're talking about two

18 different things.

19          THE COURT:  Okay.  All right.  Thank you.

20          MR. GORDON:  Your Honor, these are documents that we

21 previously demanded and were produced in response to our

22 demand.  So in order for us to know whether -- we don't know

23 the universe of documents, so it's extremely difficult for us

24 to try to figure out whether the production is complete.  The

25 only way we could do it is by taking some documents we know

1  should be in there and testing them.  What we --

2      THE COURT:  I think everybody agrees that that's a

3  proper test.

4      MR. GORDON:  Okay.

5      THE COURT:  And I think the second stage to that is

6  -- and one of the things that I am going to caution you about

7  today on the record is Rule 26, so ... and Rule 26 is meet

8  and confer.  Meet and confer.  That's not just pick up the

9  phone, but you need to tell them that you've looked at the

10  database, that you have this particular one document that you

11  can't find or these four documents; you know, test it.

12      MR. GORDON:  Okay.

13      THE COURT:  Test it legitimately.  Have five

14  documents, have something, and say, I can find Document No.

15  4, or I can't, I can find Document 6, I can't.  And then give

16  them an opportunity to find those documents.  And then if

17  they don't, then we're all going to come back here and find

18  out what's the matter with the database.

19      MR. GORDON:  Okay.  Shall I mention one other area

20  where we think it's incomplete?

21      THE COURT:  Sure.

22      MR. GORDON:  Mr. McLaughlin represented that he

23  produced responsive handwritten notes from the Buchanan

24  Ingersoll file in the Merrill database.  There hasn't been

25  any representation made as to handwritten notes, responsive

1  handwritten notes that were not in the Buchanan Ingersoll

2  folder, so we don't know the status of those, and we'll

3  confer about that, but that's an issue.

4      THE COURT: Okay. Because "meet and confer" means

5  cooperate. Try to get the things accomplished in the most

6  convenient way. Fighting in front of me is not the most

7  convenient way, so ...

8      All right. So what else do we have to deal with on

9  the electronic database?

10     MR. GORDON: I think --

11     THE COURT: I mean, I think it's legitimate that

12 we're going to run some tests to try to find out that what

13 you know is there or isn't there. You're going to talk,

14 you're going to give them the opportunity to respond to that.

15 And the indexing, I don't think anybody wants to pay for an

16 index. But is it at a page now that you can start thumbing

17 through it? I mean that's a whole lot better than a hard

18 copy.

19     MR. GORDON: Well, we still have a strong concern

20 that there has not been a diligent search and that there's

21 not going to be a full production. The only way we can

22 really know that there's been a full production is if the

23 plaintiffs represent that they've done a diligent search and

24 they explain how they did the diligent search to the

25 satisfaction of the Court. So far, I don't believe we have

13

1   that.

2           THE COURT:  Okay.  I'm going to let you respond.

3           MR. MC LAUGHLIN:  Your Honor, two things, but let me

4   just hit that issue first.

5           We have done -- I'm not sure how to answer this,

6   other than to say if you want me to raise my hand and swear

7   that what I've done is what I've done, I --

8           THE COURT:  You're an officer of the Court.  You're

9   speaking to the Court on the record.

10          MR. MC LAUGHLIN:  Exactly, Your Honor.  And we have

11  done everything that I know how to do, to do.  I haven't

12  tried to throw obstacles in these guys' faces.  I'm trying

13  very hard to get them the documents that they're asking for.

14  I've been doing that for a long time.  I, myself, personally,

15  manually searched for handwritten documents; it took me many

16  hours to do it.  I was very happy when I found the things I

17  was looking for, and I produced them.  I caused a team of

18  temporary attorneys under my direction to review additional

19  handwritten notes that I might have missed, and we found

20  additional documents and conferred about those and how they

21  wanted me to deal with those.  We utilized -- as I said we

22  would, we utilized search terms throughout other areas of the

23  database.  I also personally inspected portions of the

24  database, the folders that contained the due diligence

25  materials from the sale process; that's a very large portion

1  of the database because the bidders asked for a large amount

2  of due diligence.  It took me a while to go through all of

3  that to satisfy myself that it was complete, to understand

4  what was in those folders, to be sure that they were

5  responsive; and those, now, have been included into the

6  database.

7        I don't know what more it is that I haven't done

8  that the defendants are asking me to do.  If there's

9  something specific that somebody thinks I haven't done, I'd

10  be happy to do it.

11        THE COURT:  Well, I think doing a test on it and

12  talking to each other before you come in front of me is a

13  wise thing to do.  I think that's a test.  We'll see if it's

14  there and, if it's not there, why isn't it there, and follow

15  up with it.

16        MR. MC LAUGHLIN:  That's fine, Your Honor.

17        In one instance, there's a reason, but we don't have

18  to do it in front of you; we can confer about it.

19        THE COURT:  Thank you.

20        Because I think -- let me tell you what's happening.

21  This letter briefing is getting a little too convenient.  And

22  I can see right now that the plaintiffs are now, at least

23  from what I see in here, trying to produce these documents in

24  good faith, including some of the handwritten documents, and

25  that was the gist of your motion to compel.

1    So I am ruling today that the motion to compel is

2  now resolved, and we're marking it off.

3    Now, if you practiced in front of me in

4  Poughkeepsie, New York, you'd know that I don't tolerate

5  letter briefs.  It's been a little too easy to submit one

6  without attempting to resolve the issue.

7    And by "meet and confer," I mean face-to-face, sit

8  down, talk about it, figure it out.  You're attorneys.  You

9  know what you're entitled to and not.

10    And this is the reason I'm making this pretty much

11  final here:

12    As you accuse each other, you may or may not be

13  aware that it seems to me an attempt to bias the Court, or

14  any Court, for that matter.  So from now on, if the issue

15  warrants it, you bring it forward as a formal motion -- and I

16  want you to think twice before you do it -- and make sure

17  that you have first fulfilled your obligation under Rule 26

18  to meet and confer in good faith.

19    I also want you to think twice because the Court

20  will contemplate ordering a mediator for the discovery phase

21  if it appears that the parties are not able to reasonably

22  confer with one another on their own; or, in such a case,

23  mediation is always useful because it could be particularly

24  appropriate where the parties are unable to cooperate and

25  risk bias to the Court.

1    And the one thing I don't want and I don't think you

2  really do want is that we do something at this stage that

3  ends up getting us overturned on appeal.  If we're going to

4  get overturned, all of us, let's get overturned on a real

5  meaty matter that law schools will quote and we look good for

6  history.  Don't get us overturned because we did something

7  stupid that biased the Court.  So that's that.

8        Now let's move to the next stage.

9        But I expect a motion if things aren't done in a way

10 -- but it seems to me he's trying.  You all just meet and

11 confer.  Make it happen.

12       Now then, we're into the next part of this and that

13 is the privilege log.

14       I'm sorry I wasn't a little bit clearer.  And I will

15 tell you, candidly, I had wanted it where -- you know, when I

16 look at this, it's like turn back over here and look at the

17 privilege log.  I wanted it put out in categories.  When you

18 say -- and we'll try to get through it, but it's going to be

19 a little bit more complicated.

20       For instance, when you say 145, 176, 327 and 330, I

21 wanted 145, 175, 327 and 330 right there, instead of me

22 having to go, okay, 147, did I check that off, oh, no, did I

23 check that one off, so that we had a log that we could all

24 work together that we could say, check, that's been resolved,

25 check, that's been resolved.  We don't have that today, but

1  we're going to still try to go through it and see if we can't

2  get some of it resolved.

3        Because, for instance, in the Kasowitz brief you use

4  one as an example.  You don't put all of them in there.  So I

5  mean, I know they're back here and we have to turn, but that

6  means we've got to -- how do we check it off to say that we

7  got it resolved.  So we're going to try.

8        So the first one that you all both came up with is

9  communications with Adelphia's lawyers, attorneys.

10        Are there really two Gary Walkers?  I want to know

11  that, right off the bat.

12        MR. WINSBERG:  Yes, Your Honor.

13        THE COURT:  There are two Gary Walkers?

14        MR. WINSBERG:  There is a Gary Walker who was a

15  former Prestige employee.

16        THE COURT:  Okay.  And they don't have middle

17  initials.  So we don't get to differentiate them?

18        MR. WINSBERG:  And what we did, Your Honor, we

19  looked at the documents -- and if, like we said in our letter

20  brief, if we couldn't establish that it was the Gary Walker

21  of Prestige, we just gave it to them since it was our burden

22  of proof.

23        THE COURT:  Okay.  So if it was a Gary Walker of

24  Prestige or you couldn't distinguish, it's been given.

25        MR. WINSBERG:  We just gave it to them.

1    THE COURT:  Okay.  So how much of the Gary Walkers

2  are left?

3    MR. GERSHMAN:  Your Honor, I believe my

4  understanding is there were four Gary Walkers at issue.

5    THE COURT:  145, 175, 327 and 330.

6    MR. GERSHMAN:  Yes.

7    THE COURT:  Okay.

8    MR. GERSHMAN:  My understanding is that 176, that

9  nothing on 176 has been produced at all.

10    THE COURT:  So 145 has been taken care of, 327 has

11  been taken care of, and 330 has been taken care of.

12    MR. GERSHMAN:  Well, those three, my understanding

13  is, they have produced redacted notes.  It's unclear to me

14  whether that is all of the conversations on these handwritten

15  notes that Mr. Walker was a party to or not.  So I believe

16  that -- I believe those three, some redacted notes had been

17  provided.

18    THE COURT:  Yes, sir?

19    MR. GERSHMAN:  I'm sorry.  Go ahead.

20    MR. WINSBERG:  I'm sorry.

21    THE COURT:  Yes, go ahead.

22    MR. WINSBERG:  Your Honor, we did prepare Exhibit 8

23  to our letter brief.

24    THE COURT:  Yeah, I know.

25    MR. WINSBERG:  We tried to outline by each category

1  and to correspond to the letter under each entry and explain

2  -- list the entry description, and then list the privilege

3  asserted, and then list additional information that we shared

4  either orally with Kasowitz, during the conferrals, that we

5  were able discern and --

6        THE COURT:  Okay.  On that one, I've got 313 and

7  341, which doesn't match with 145, 176, 327 and 330.

8        MR. WINSBERG:  I'm sorry.  Which?

9        THE COURT:  Well, communication with Adelphia

10  attorneys.

11        MR. WINSBERG:  Are you looking at Exhibit --

12        THE COURT:  I'm trying to match the exhibit with

13  your letter brief.  That's what I'm trying to do.  But your

14  exhibit is the Kasowitz exhibit.

15        MR. WINSBERG:  No, I'm sorry, it's not, Your Honor.

16  If you look at our letter brief, Exhibit 8 --

17        THE COURT:  I'm looking at your letter brief.  In

18  fact, I was going through your letter brief.    Okay.

19        MR. WINSBERG:  On Page 4 of our letter brief is

20  Subpart (a) --

21        THE COURT:  Yeah, right.

22        MR. WINSBERG:  -- "Communications with Adelphia

23  Attorneys."  And if you go to Exhibit 8 to our letter brief I

24  think we've listed --

25        THE COURT:  Thank you.  See, the exhibit I have is -

1    - oh, I have Exhibit 1, not Exhibit A.   Okay.

2         MR. WINSBERG:  Exhibit 8.

3         THE COURT:  Okay.  Thank you.

4     (Court reviews documents.)

5         THE COURT:  So then I have to turn to 145?

6         MR. WINSBERG:  No, Your Honor.  On Exhibit 8 -- if

7    you look at the letter brief, at the categories that are in

8    dispute --

9         THE COURT:  Okay.  Help me.  Help me.  Help me.

10        MR. WINSBERG:  Exhibit -- that's not --

11        THE COURT:  Okay.  That's not it.

12        MR. WINSBERG:  That's not ours, Your Honor.

13        THE COURT:  Okay.  And I'm looking -- I have your

14   letter right here, Troutman Sanders, Troutman Sanders,

15   Troutman Sanders, Troutman Sanders -- which by the way,

16   Willkie Farr doesn't have a letterhead on theirs.

17        I have Exhibit 1, which is Kasowitz.  And you're

18   saying that, if I go on over, I'm going to end up with

19   Exhibit A?

20        MR. WINSBERG:  Eight.  The letter -- the number

21   eight, Your Honor.

22        THE COURT:  Oh, excuse me.

23        MR. WINSBERG:  I'm sorry, Your Honor.  And I can

24   give you my copy.

25        THE COURT:  No, I've got it.  I've got it.  I've

1    just got to get to it.  I've got Exhibit 9.

2        (Court reviews documents.)

3            THE COURT:  That's why I came out and told you all

4    that this was not so straightforward as you all must have

5    thought it was.

6            MR. WINSBERG:  Your Honor, may I approach?

7            THE COURT:  I've got it right here.  Exhibit 8,

8    right?  Exhibit 8.

9            MR. WINSBERG:  That looks different from --

10           THE COURT:  This is what you filed.

11           MR. WINSBERG:  Your Honor, unless I'm --

12           THE COURT:  What page are you on?

13           MR. WINSBERG:  In Exhibit 8 --

14           THE COURT:  Page what of Exhibit 8?

15           MR. WINSBERG:  The first page.  It looks --

16           THE COURT:  It does, it looks exactly like that,

17   I've just got it in smaller print.

18           MR. WINSBERG:  Oh, okay, Your Honor.  Sorry, Your

19   Honor.

20       (Laughter.)

21           MR. WINSBERG:  But that first page --

22           THE COURT:  Instead of having to carry a ream of

23   paper.

24           MR. WINSBERG:  Your Honor, what we tried to do was

25   we matched up to the letter brief, we put the entries on

1  Exhibit 8, and we've listed them by category and matched them

2  to what was in the letter brief.  So the letter brief

3  mentions that, under Topics A it's entries 145, 176, 327, and

4  330.  And then we discussed --

5          THE COURT:  Okay, okay.  I've got you there.  145,

6  176, 327 and 330.  Okay.

7          MR. WINSBERG:  Yes.

8          THE COURT:  And that's, "(a)  Communications with

9  the attorney."

10          MR. WINSBERG:  Yes, Your Honor.

11          THE COURT:  That's exactly what I want.  All right.

12          MR. WINSBERG:  Yes, Your Honor.

13          THE COURT:  And now then, you're saying --

14          MR. WINSBERG:  What we did, Your Honor, is that, for

15  some of these, we looked back at these notes and they were

16  clearly -- what we could discern from them, they were clearly

17  attorney notes of -- some of which were communications with

18  Gary Walker, which we had discerned.  We can't prove

19  otherwise; we just assumed it was Gary Walker, Buchanan, and

20  just recitation of those communications we've produced.

21          THE COURT:  Okay.  So let's go with 145.  You've

22  produced 145?

23          MR. WINSBERG:  We've produced most of 145.  If you

24  look to the column to the right, we redacted the top of that

25  page, as there was more than just recitation of

1    communications with Gary Walker, their attorney.  There were

2    lawyers' notes for giving advice to the client.  So that part

3    we redacted off.

4        THE COURT:  So it was giving advice about a pending

5    litigation or a litigation?

6        MR. WINSBERG:  It was giving advice as to -- in this

7    situation, Your Honor, this is giving advice as to how to

8    structure the transaction after communications with Gary

9    Walker, which we assume was the Buchanan attorney.  It wasn't

10   -- and to the extent we could discern it was just reciting,

11   Mr. Walker says X, Y or Z, then we gave it to them.  If it

12   said, for example, situations where this is a hot point for

13   Adelphia, this is how we should draft around this, that part

14   of it we would redact and not produce.

15       Now if Your Honor believes that we need to produce

16   the whole thing --

17       THE COURT:  Well, we're going to ask on 145.  And if

18   you all want me to, we're going to go through every one of

19   them.

20       MR. GERSHMAN:  Your Honor, I mean, you know, we just

21   don't know -- we have been given redacted versions of these

22   three items.  We have no idea whether, in fact, all of the

23   notes -- you know, we had been given portions of it -- if

24   Gary Walker was a party to that conversation and Harold

25   Abrams was taking notes of that conversation.  It seems to us

1  we should be getting all those notes.

2          THE COURT:  Even though it may be about privileged

3  communication and litigation?

4          MR. GERSHMAN:  Well, if they can --

5          THE COURT:  If the shoe was on the other foot, would

6  you give it?

7          MR. GERSHMAN:  If they can clearly tell whether --

8          THE COURT:  Answer my question.  If the shoe was on

9  the other foot, would you give it?

10         MR. GERSHMAN:  Well, I don't think it's -- if he's

11 taking notes of a conversation with Gary Walker, I don't

12 think it's a privileged communication.

13         THE COURT:  Because Gary Walker is not an attorney?

14         MR. GERSHMAN:  Gary Walker was -- well, he was

15 Adelphia's attorney.

16         All four of these documents that we're talking about

17 are notes of conversations that the defendants' lead lawyer

18 on the transaction, Harold Abrams, notes that he took in

19 conversations in which Gary Walker, Adelphia's lead lawyer,

20 was talking to him, and so --

21         THE COURT:  But even if it's Adelphia's lead lawyer

22 talking to him and he's been making notes, that would be

23 litigation stance.

24         MR. GERSHMAN:  If they can tell from the notes that

25 it is clearly --

Motion                                                              25

1          THE COURT:  So do you want me to look at this in

2    camera?

3          MR. GERSHMAN:  Yes, Your Honor.

4          THE COURT:  All right.  So we've got -- well, let's

5    go through each one.

6          145.  Is there something redacted from 145?

7          MR. WINSBERG:  Yes, we redacted the top, as we note

8    on the right-hand column of that --

9          THE COURT:  And so I need to look at that, right?

10         MR. WINSBERG:  Yes.  We're happy to submit it in

11   camera, Your Honor.

12         THE COURT:  176.

13         MR. GERSHMAN:  176 has not been produced at all,

14   Your Honor.

15         THE COURT:  Okay.  Now what's the -- well, then

16   let's go to 127.  Is that the same issue as 145, has

17   something been redacted?

18         MR. GERSHMAN:  It's 327, Your Honor.

19         MR. WINSBERG:  327, yes.

20         THE COURT:  Excuse me.  Thank you.

21         MR. WINSBERG:  327.  Yes, Your Honor, it's the same

22   issue as 145.

23         THE COURT:  So you're going to give that to me.

24         MR. WINSBERG:  Yes, Your Honor.

25         THE COURT:  What about 330?

1          MR. GERSHMAN:  I believe it's the same issue.

2          MR. WINSBERG:  The same issue, Your Honor.

3          THE COURT:  Okay.  So those three are coming to me

4   in camera with an unredacted -- send me a redacted and an

5   unredacted, so I can see what you gave and what you didn't.

6          Okay.  What's the issue on 176?  Seventy -- yeah,

7   176.

8          MR. GERSHMAN:  Our understanding was that these were

9   handwritten notes of Harold Abrams and Gary Walker, and that

10  they should have been produced, and nothing has been

11  produced.

12         THE COURT:  What's your issue on 176?  You're

13  reading it.  Tell me.

14         MR. WINSBERG:  Yes, Your Honor, I'm just refreshing

15  -- because we --

16         THE COURT:  Do you all really want me to go through

17  all of this, and do you really want me to be biased or not

18  biased?  I mean, this may go to either one of you.  You don't

19  know.

20         What do you all want me to do?

21         MR. WINSBERG:  And, Your Honor, to that extent we

22  gave numerous documents off the log to try to avoid this

23  today.  I mean, there was -- just to ease the Court's burden.

24  But at some point, the client wishes to preserve privilege,

25  and we've tried every -- I think we have produced numerous

Motion                                        27

1    notes that have been in this case and drafts of documents

2    that we can't establish from communications we've produced.

3    We don't certainly wish to have Your Honor review all of

4    these documents.

5            MR. GERSHMAN:  And, Your Honor, we don't either, and

6    I did appreciate your comment.

7            You know, we had some difficulty during the meet-

8    and-confer process in doing this.  With rare exceptions, when

9    the defendants were questioned, you know, all right, the

10   description in the log appears to be a description that is

11   not privileged, can you explain why it is privileged, we

12   wouldn't get any explanation; it would just be, we've looked

13   at, we think it's privileged, but there would be no -- there

14   was no real -- with rare exceptions, there really wasn't any

15   explanation as to why they were keeping it or what there was

16   that was factual.

17           THE COURT:  Well, I just had a thought, and that is

18   a joint submission.  Instead of me going back and forth, then

19   you sit down and you go through each one of them, and you

20   give your reasons, you give your objections.  But if you all

21   are -- because what we're doing right now is just basically

22   having me sort of mediate what you all could do on your own.

23   Unless there's one or something in here that you want to turn

24   -- and we're talking about 330, right?  330?  How many of

25   these entries do we have?

1        MR. GERSHMAN:  I believe that it was approximately

2   150 entries that were challenged.

3        THE COURT:  Oh, that's right, 150 exactly.

4        MR. WINSBERG:  We removed a substantial number, Your

5   Honor, to try to avoid --

6        MR. GERSHMAN:  I mean, I think that makes sense.  I

7   think that -- I suspect, Your Honor, that with further

8   discussions we may be able to narrow this down to things that

9   are really at issue.

10       THE COURT:  And I think there's another side to this

11  then, too.  And then, once you've done it, then I will take a

12  joint letter from both of you, and then on a separate cover

13  anything that needs to be sent to me for in camera, after

14  that.  Am I using everybody's time more wisely in doing it

15  this way?

16       MR. GERSHMAN:  I believe so, Your Honor.  I think

17  the only question that may -- maybe you want to defer on it.

18  But I think that the only sort of legal disagreements that

19  has arisen amongst the parties is an interpretation about

20  work product.

21       THE COURT:  I have interpreted that in another case.

22       MR. GERSHMAN:  Okay.

23       THE COURT:  And I wish I could recall it exactly off

24  the top of my head because I can't, but work product is

25  trickier than most people think.

1    MR. GERSHMAN:  We don't disagree --

2    MR. WINSBERG:  And, Your Honor --

3    MR. GERSHMAN:  On Page 11 of our letter, Your Honor,

4  we lay out some of their entries where the defendants are

5  withholding on the grounds of work product.  And you know,

6  the crux of our motion here is just that the burden is the

7  defendants, and in their log or otherwise the defendants

8  haven't provided facts which suggest that this stuff should

9  be withheld.  And if you take a look, for example, on Page 11

10  of our letter, Entry No. 184, handwritten notes of Harold

11  Abrams regarding tax implications.  You know, the hallmark,

12  really, of work product is, was it created in anticipation of

13  litigation or in anticipation of either ongoing or future

14  litigation.  And there's no information in these entries at

15  all which suggest that it is.

16    And you know, the defendants seem to have sort of

17  taken the position that, if a tax analysis or an analysis of

18  an environmental regulatory issue is done, that, necessarily,

19  you know, you could contemplate that litigation might arise

20  out of it; and, therefore, it's automatically protected by

21  work product.  We don't believe that's the case.  We've cited

22  to a number of cases where tax-analysis-related documents,

23  environmental-related documents have been ordered produced.

24    And so I mean that is one area where there has been

25  -- I think there was a legal disagreement between us.

1    THE COURT:  And I think that's a legitimate legal

2    disagreement.  Chime in and tell me what you're saying on it,

3    too, because I honestly have ruled in another case on this,

4    on every single individual one.

5    MR. WINSBERG:  And, Your Honor, there are two

6    categories here.  In Exhibit 8, it's (d), and it starts on

7    Page 9.

8    THE COURT:  Okay.  Exhibit 8(d).  Okay.

9    MR. WINSBERG:  Page 9, at the bottom; it's Page 9 of

10   43.  And there's only a couple of pages' worth of entries on

11   that.  They're really in two categories, Your Honor:  They're

12   tax advice and environmental advice.  And we do believe we

13   have submitted a lot of information on our log, and to why

14   we're holding those few documents back on the basis of work

15   product.

16   THE COURT:  Okay.  On these, we're talking about

17   184, 188, 190, 302, 304, 307.  Is that all we're talking

18   about?

19   MR. WINSBERG:  No, there are --

20   MR. GERSHMAN:  No, there's more.  They're all listed

21   under our Line 11.  It's 302, 304, 311, 314, 319, 321, 334,

22   347, 409, 445.

23   THE COURT:  Okay.

24   MR. WINSBERG:  But there are very few, Your Honor,

25   that are just work product designations.  Most of the ones he

Motion                                           31

1   just read -- most of the ones -- and we list them in our

2   chart -- most of them have attorney/client and work product,

3   and ones that only have -- there's very few that are just

4   solely work product.

5          THE COURT:  Okay.  I want those separated out.

6   Separate the attorney -- separate the sole work product from

7   the attorney/client.  I want you all to meet and confer on

8   those two, and then those also will come to me in camera.

9          MR. WINSBERG:  Yes, Your Honor.

10         And we also, just so Your Honor is aware, we did

11  submit Hal Abrams' deposition, who was the Kilpatrick --

12         THE COURT:  I saw that.  I saw that.

13         MR. WINSBERG:  And he does discuss -- give some

14  factual background as to why these documents, we believe, it

15  is a proper assertion of work product.

16         THE COURT:  Okay.  Then I want the same thing then.

17  I want asterisked to that -- and again, I want this part of

18  meet-and-confer, I want it to be a joint submission.  And

19  then I do know the standard, but I will let you give me, each

20  one of you -- in the joint submission, I want you all to

21  agree on what the standard is on work product.

22         MR. WINSBERG:  Okay.

23         THE COURT:  I mean it's pretty simple, and it's

24  pretty straightforward.  It's got to be in anticipation.  So

25  I want you to agree on the legal standard.

1        MR. WINSBERG:  There's a Second Circuit case.

2        THE COURT:  There's a Second Circuit case right on

3   point, so you all agree on this legal standard.  And then I

4   do understand that it may be that you interpret it a little

5   different than I will interpret, but you -- because once you

6   all are agreed on the standard, then you all can go through

7   each one of those and you can say, okay, this is it or I've

8   got to have the Judge look at it in camera and decide it.

9        MR. WINSBERG:  That's fine, Your Honor.

10       THE COURT:  Okay.

11       MR. GERSHMAN:  Could I raise one other issue, Your

12   Honor?

13       THE COURT:  Sure.  Sure.

14       MR. GERSHMAN:  Your Honor, one of the defendants is

15   being deposed next Wednesday.  There is one item that has

16   been outstanding in discovery, which is the billing records

17   for the transaction from Kilpatrick Stockton.

18       The defendants have indicated that they have a copy

19   of the records.  They're reviewing them --

20       THE COURT:  This is legal fees you're talking about?

21       MR. GERSHMAN:  Well, the two items that are listed

22   in this log apparently were just the cover sheet itself, not

23   the billing records.  Separate and apart from that, because

24   the law is clear that billing records are not privileged,

25   sometimes there may be small amounts of information in them

1    that are.  The defendants have procured a copy of the billing

2    records from Kilpatrick Stockton and have indicated that they

3    are going to produce them in redacted form.  We would like to

4    get that prior to Mr. Buckfleder's deposition, which is next

5    Wednesday, and have asked the defendants if we could get a

6    copy of that by Friday, and we haven't heard back from them

7    as to whether they're willing to do that.

8         THE COURT:  I think that's when you meet and confer,

9    you talk to each other.

10        MR. WINSBERG:  That's not -- we've told them in

11   writing that we're going to get it to them on Friday.

12        THE COURT:  That's fine.

13        MR. WINSBERG:  End of story.

14        THE COURT:  Simply black it out.  It's client

15   matter, so ... thank you.  I expect that.

16        All right.  So what's our time frame and what are we

17   doing?

18        I'm talking about a joint a submission.  That means

19   I want you all spending time with each other.  I can do the

20   same thing on this one.  I can put somebody in to help you

21   all look at it if that's what you need, but I really don't

22   think you need that.

23        I want the defendants to explain why the document is

24   a work product privilege when they give it, but after you all

25   have talked.

34

1           What are the time frames?  When do you want to be

2    doing this?  Meet and confer.

3           MR. WINSBERG:  We'll talk.

4           THE COURT:  Well, you can talk right now.

5        (Counsel confer.)

6           THE COURT:  I'll watch you talk.

7           MR. GERSHMAN:  Your Honor, are you in town for a

8    January lunch?

9           THE COURT:  No.

10          MR. GERSHMAN:  And you're taking most of January

11   off?

12          THE COURT:  I am taking the month of January off.

13   I'm not taking the month of January off, but I'm pretending

14   to take the month of January off, so I'm not planning to be

15   here.

16          Actually, for the record, I'm getting sworn in at

17   the Supreme Court that week, so I'm not going to be here for

18   the January lunch.

19          MR. MC LAUGHLIN:  Congratulations, Your Honor.

20          THE COURT:  Thank you.  Isn't that fun?  I can't

21   practice law, so I don't even know -- but it just sounded

22   like a fun thing to do.

23          I will be here on February -- oh, wait, wrong year.

24   Anybody got '07 anywhere?

25       (Court and court personnel confer.)

1      THE COURT:  Has anybody got a Blackberry and pull up

2   2007?

3      MR. GERSHMAN:  Your Honor, maybe what I would

4   suggest is we will -- to the extent there are issues that

5   need to be submitted to you, we will shoot to have a joint

6   submission to you in the second week in January?

7      THE COURT:  All right.  And I will be back here on

8   February 21st, and I'll probably want to confer with you

9   anyway, so I won't --

10      MR. GERSHMAN:  I just found February.  Is it too

11  late?

12      THE COURT:  Yeah, we just found it.

13      MR. WINSBERG:  Your Honor, with the joint

14  submission, would you want us to get that time also to submit

15  in camera the documents in dispute?

16      THE COURT:  Only the ones in dispute.

17      MR. WINSBERG:  Only the ones in dispute, Your Honor.

18      THE COURT:  Right.  Only the ones in dispute, and do

19  those under separate cover.

20      MR. GERSHMAN:  And, Your Honor, in light of the fact

21  that you're not going to be back until February 21st, is it

22  all right with you if we get that joint submission to you

23  some time in January?

24      THE COURT:  Yes.  In fact, that's why I've got the

25  calendar here because I -- well, think about what we've got.

36

1  Hanukkah is Friday, which doesn't really affect them too much

2  because it falls on a weekend.  And then we have Christmas,

3  which is -- basically, that week is going to probably be

4  pretty quiet for everybody because it falls on a Monday.  And

5  then with New Year's falling on a Monday, I'm sure many of

6  you will be out, and so will your staff, because that will

7  just -- obviously, that's just going to be slow, down time.

8          If you got it to us, to me by January 19th, is that

9  enough time?

10         MR. GERSHMAN:  I think so, Your Honor.

11         MR. WINSBERG:  That's fine, Your Honor.

12         THE COURT:  Now what's our time schedule?  What have

13 we got in our joint case conference?  What do we --

14         MR. GERSHMAN:  Currently, I believe the schedule

15 calls for fact discovery to end around the end of February.

16         THE COURT:  Okay.

17         MR. GERSHMAN:  And I would suspect that, sort of in

18 light of the issues that are going on with discovery here, I

19 wouldn't be surprised -- the defendants have indicated

20 earlier to us with the uncertainty over the production that

21 they may need some additional time to work through those

22 issues, and we certainly have no objection to that.

23         THE COURT:  Well, we definitely will talk on the

24 21st of February about what's happening, so I do want to --

25 I'd also like to continue to have scheduled meetings, where

1   we talk about where the case is going and what's our time

2   frame and what we're looking for.  So you can tell me then if

3   you think that you're going to need a little bit more

4   flexibility on it.  But I will want a joint order from you or

5   a stip. to extend the time, but you can tell me then.

6           MR. GERSHMAN:  So we'll prepare something in advance

7   of the February 21st conference for you.

8           THE COURT:  Okay.  By the way, that's Ash Wednesday.

9   I just looked at this calendar.  '07 is already going fast.

10          When do you think we'll be looking at trial, when do

11  you think --

12          MR. WINSBERG:  Well, on that point, Your Honor, as I

13  had mentioned at one of the conferences, we are probably

14  going to ask Your Honor again, the fact discovery, for

15  permission to set a schedule --

16          THE COURT:  Okay.

17          MR. WINSBERG:  -- for summary judgment submissions.

18          THE COURT:  Sure.  Sure.

19          MR. WINSBERG:  And subject to Your Honor's ruling on

20  that --

21          THE COURT:  Any dispositive motions.

22          MR. WINSBERG:  And that obviously would stay any

23  pending trial if Your Honor allows us --

24          THE COURT:  Well, would you do one other thing about

25  that?  Since you're meeting and conferring, why don't you

1   also talk about that.  Because in a summary judgment I would

2   really appreciate it if you could at least stipulate to the

3   facts.  Now that may not be -- because I might have to infer

4   things which can be done, but I would like for you all to

5   stipulate to whatever facts you can stipulate to.  Because

6   then that would help everybody:  You in preparing a summary

7   judgment motion, Adelphia in defending it, and me in deciding

8   it.  So if we can at least think about that in the times you

9   meet and confer, so that when we get here on the 21st, we can

10  talk about the possibility of summary judgment and where we

11  may be headed with it, based on the facts that have been

12  discovered.

13         MR. GERSHMAN:  And we have had some preliminary

14  discussions.  I think it's the Creditors' Committee's view

15  that they think that it is highly unlikely that summary

16  judgment would be able to dispose of all of the claims in the

17  case.  We'll talk with the defendants more about that and,

18  you know, I'm sure we'll discuss it on the 21st, as to

19  whether it makes sense.

20         THE COURT:  And what facts.  Because if it's just,

21  facts because there are certain facts that -- you know, that

22  I do get to infer things and do stuff with at summary

23  judgment.  But I really would like to have at least the facts

24  agreed to, so that we're not having a question of fact.  Of

25  course, that's what would defeat a summary judgment anyway.

1    But I have to tell you, I, in particular, do like

2 summary judgment motions.  Because one thing that will happen

3 on a summary judgment is that issues may get narrowed, mainly

4 because you do have to come up and say, these are the facts,

5 these are not disputed, this is what they are, and that

6 starts narrowing the issues that have to be decided at trial,

7 which helps all of us.  It makes it a cleaner trial.

8    MR. GERSHMAN:  I think we -- I think that the

9 plaintiffs have some concern about setting a -- the

10 defendants have indicated that they want to, perhaps, do

11 summary judgment before expert discovery.  I think we have

12 some concern about doing a whole round of briefing prior to

13 expert discovery, concluding that there are issues of fact,

14 and then having to do another whole round of summary judgment

15 briefing after expert discovery.  But we can discuss all that

16 with you at the end of February.

17    THE COURT:  Right.  And you've got your local rule

18 here that requires you each, anyway, to have a stipulation of

19 the undisputed facts, so you've got a local rule, it's 70.56-

20 1, so ...

21    MR. WINSBERG:  Your Honor, in connection with going

22 forward, there was one issue of particular concern to us that

23 has not been addressed today, and that was the assertion of

24 PWC work product that we --

25    THE COURT:  Yes, I saw that one.  Okay.  Let's pull

1    that one up then.  That was in the other one that I'm saying

2    that these letters are getting a little too easy to file with

3    me?

4              MR. WINSBERG:  Yes, Your Honor.

5        (Court reviews documents.)

6              THE COURT:  Okay.  How is PriceWaterhouseCoopers

7    privileged?

8              MR. MC LAUGHLIN:  Your Honor, Terence McLaughlin

9    from Willkie Farr.  I'm going to give you a little bit of

10   background that I think answers that question.

11             PriceWaterhouseCoopers has been involved in the

12   Adelphia case twice, two different teams.  One team we're not

13   contending is privileged.  That's the team that assisted

14   Adelphia restate its financial statements.

15             THE COURT:  And that's been produced, all that

16   information has been produced?

17             MR. MC LAUGHLIN:  Correct.  There's a voluminous set

18   of restatement files that -- or issue statements that have

19   been used in depositions.  That's all been produced.  And

20   again, just for the record, nothing from our files has been

21   withheld.  The issue is PriceWaterhouse has received a

22   subpoena, and the team of PriceWaterhouse forensic

23   accountants who were retained by Covington & Burling -- let

24   me back up.

25             The fraud broke in, I guess May of 2002.  The

1   special committee of the board of directors immediately

2   retained counsel to figure out, what's this all about.

3   Counsel needed forensic accounting expertise and they hired

4   PriceWaterhouseCoopers forensics to help them provide legal

5   advice to the special committee of the board of directors, to

6   help them understand the accounting; the very complicated

7   fraud that was perpetrated here.

8          So Covington & Burling retains, itself, the law firm

9   retains PriceWaterhouseCoopers.  Price Waterhouse then

10  assists Covington & Burling to investigate together facts to

11  ferret out the fraud.  Covington & Burling then prepares a

12  report.

13         We have taken the position that because the report

14  was intended to be disseminated, the report itself is not

15  privileged.  That's the reason why we produced the report to

16  the defendants, together with the exhibits to the report.

17  But the underlying work that goes behind it was always

18  intended to be confidential and privileged, and we've --

19  they've known that for at least a year, that we've taken the

20  position that the special investigatory work was privileged.

21         So what's happened is, in -- just about a month ago

22  the defendants propounded a subpoena on PriceWaterhouse.

23  PriceWaterhouse, as I just said, has these two files that are

24  potentially responsive, called us and said, we've received a

25  subpoena, they're asking for all of our files.  That would

1  include not just the restatement team's files, but also the

2  forensic team's files.  They know from prior situations where

3  subpoenas have been served by other parties that Adelphia

4  asserts a privilege, so they said, you know, are you

5  authorizing us to waive the privilege and produce this

6  material.  I said, no, Adelphia is preserving the privilege.

7  And then Price Waterhouse interposed its objection to the

8  subpoena saying, well, you know, we've been told that we

9  can't produce the forensics files.

10       That then triggered a call from Mr. Gordon along the

11  meet-and-confer lines doing what we would expect to do, he

12  called and he said, hey, I've gotten this response from

13  PriceWaterhouseCoopers, and you tell me what this is, why is

14  there a privilege being asserted.  I explained to him what

15  I've just told the Court, reminded him that, you remember, we

16  raised this issue when we produced the Covington & Burling

17  report.  I don't think he remembered that at the time, but I

18  believe that they have since realized that that was a subject

19  of discussion.  And he inquired, well, is somebody going to

20  do a privilege log.  And I certainly understood that he was

21  asking me is anybody going to do a privilege log with respect

22  to the documents in PriceWaterhouseCoopers' files, to which I

23  said, we can do it -- if there's an insistence that we do it,

24  we can do a privilege log.

25       My suggestion was all of these documents are either

1  privileged or not for the same reason:  Either

2  PriceWaterhouse's work, as retained by Covington & Burling,

3  is privileged or it isn't privileged.

4          THE COURT:  You're going to have to brief me.

5          MR. MC LAUGHLIN:  Yeah.

6          THE COURT:  Both of you.

7          MR. MC LAUGHLIN:  And that's my thought, was that we

8  would maybe brief this.

9          THE COURT:  All right.

10         MR. WINSBERG:  Your Honor, that's fine.  I mean

11 certainly our concern is that the law is fairly clear the

12 accountants' files are in the possession, custody, and

13 control of Adelphia.  They've represented to us in letters

14 they're not withholding anything that was not responsive on

15 the basis of privilege.  They did assert work product under

16 Covington, but then went on to say, we're holding nothing

17 back responsive.  And that was their defense to us moving to

18 compel on why they had never given us a log.

19         So now, for the first time, we hear that there are

20 documents that are responsive that are being withheld on the

21 basis of privilege, and there's never been a log been

22 produced.

23         THE COURT:  I admit that does raise a red flag.  And

24 I'm the one that's being biased.  But I hear what you have to

25 say.  You're going to have to brief me on it.

1    MR. MC LAUGHLIN:  We will, Your Honor, I --

2    THE COURT:  But it doesn't make me happy.  It should

3 have been brought up at the very beginning.

4    MR. MC LAUGHLIN:  I understand, Your Honor.  But

5 again, our position is that these documents are in the

6 possession of third parties.  I don't have any access to

7 those files.  They have their own counsel.  I don't have the

8 right to go in and review those files, certainly don't have

9 the right to produce them.  I can produce the documents that

10 are in my files.

11    I also don't have control over Covington & Burling's

12 files.

13    THE COURT:  But it is Adelphia's privilege to waive.

14    MR. MC LAUGHLIN:  It is, Your Honor.  But again,

15 it's documents in possession of a third party that's just

16 recently --

17    THE COURT:  It still belongs to you.  So once it

18 belongs to you, you're the one that either can say, I'm going

19 to give it or I'm not going to give it.

20    MR. MC LAUGHLIN:  Correct.  The privilege belongs to

21 us, but the documents are not our documents, but the

22 privilege attaches to those documents.  That's our privilege,

23 but it's not our documents.  In other words, when I received

24 the document request I would not have thought to go look in a

25 third party's files.  I looked in Adelphia's files, and I

1  produced from Adelphia's files.  I wouldn't have thought to

2  go looking in third parties' files to figure out whether

3  there are documents in those third party's files.

4      THE COURT:  Even though you had discussions about

5  what PriceWaterhouse did?

6      MR. MC LAUGHLIN:  Yeah.  Exactly, Your Honor.  I

7  mean, I don't think there's any -- there's no surprise here.

8  If they took the position that I was supposed to be searching

9  in PriceWaterhouseCoopers' files, they never said so.

10     MR. WINSBERG:  Your Honor, just I'll be brief.  We

11 can put submissions in on it.  But we understand that this

12 was litigated in Adelphia v. Deloitte.  They had to produce a

13 log on all Covington materials.  This is not the first time

14 it's been brought to Adelphia's attention.

15     On top of that, Your Honor, the very nature of work

16 product, it is the lawyer.  So if it's not in Willkie's files

17 -- it's hard to believe, it defies common sense it wouldn't

18 be in the lawyer's files at Covington --

19     THE COURT:  It seems the issue here is whether this

20 privilege has been waived, so we'll find out, but let's do

21 that ASAP.

22     MR. MC LAUGHLIN:  Yes, I think we're briefing the

23 issue now, orally, it seems.

24     THE COURT:  Yeah.

25     MR. WINSBERG:  We'll brief the issue.  It's our

Motion

46

1   position in our papers:  No log, there's a waiver.

2          THE COURT:  Good.  Put that out there and tell me

3   how you got to that position, and let me know.

4          What's our time frame on that?

5       (Counsel confer.)

6          MR. WINSBERG:  We could put out the briefing by the

7   end of the year, Your Honor.

8          THE COURT:  Okay.  Put it in as a joint submission,

9   too, though.

10          You all have got to talk to each other.  I'm tired

11  of you not talking to each other.  So you've got to do

12  everything jointly.  Make me happier.

13          So I'm going to be hearing from you by the end of

14  the year on that.  And then, by January 19th, was that it, on

15  the other issue.

16          MR. WINSBERG:  Yes, Your Honor.

17          THE COURT:  And I'm going to see you February 22nd.

18          Yes, sir.

19          February 21st.

20          MR. GERSHMAN:  Just so that we do not give you

21  something that's what you're not looking for --

22          THE COURT:  Thank you.

23          MR. GERSHMAN:  -- I take it with a joint submission

24  you're looking for a single letter, where basically we say

25  these are the things that we haven't been able to resolve.

Motion

1    THE COURT:  Absolutely.

2    MR. GERSHMAN:  Do you also want in there discussion

3    about why the plaintiffs think it should be produced, and why

4    the defendants think it shouldn't?

5    THE COURT:  In categories.

6    MR. GERSHMAN:  Okay.

7    THE COURT:  Lined out in categories.  You know, 1

8    through 150 doesn't work for me.  147, 85, 303.

9    MR. GERSHMAN:  We will reformulate a chart if we

10   have that many --

11   THE COURT:  Well, I think it's already been done by

12   Troutman Sanders, so ...

13   MR. WINSBERG:  We're happy to work off -- we'll

14   share our chart with them.  We're happy to work off that.

15   THE COURT:  Yes.  That's how I want it done and

16   shared with that, so -- and no string of numbers, you know,

17   by the following -- well, you might put them there, so that

18   we can just mark them off, so we can get it done.

19   MR. WINSBERG:  And, Your Honor, we would tender them

20   in camera.  We'd put them in a binder by category --

21   THE COURT:  Please.  Exactly.  Right.

22   MR. WINSBERG:  -- and put each tag number on it, so

23   you'll know exactly what we were talking about.

24   THE COURT:  Right.  Exactly.

25   And then you're also going to begin on, and talk

1  seriously about undisputed facts here?

2       MR. WINSBERG:  Yes, Your Honor.  There are still

3  substantial depositions left to be taken.

4       THE COURT:  You know, and the interesting part about

5  that is there's another side to undisputed facts, there's the

6  disputed facts.  If you all could also agree on what facts

7  are disputed, that would go a long way for all of us on these

8  kinds of motions that might also, again, begin -- you all are

9  all fine lawyers, you'll start narrowing the issues.  Let's

10  narrow them.  Let's make it much more comfortable for all of

11  us.

12       Again, it's all well and good and all wonderful if

13  we get to have an area of law that goes up on appeal that we

14  all can look with pride at and say, I argued that side, I

15  argued this side, I judged it this way.  But if it goes up on

16  appeal that we were just snipping over -- of course, the big

17  comma in Canada.

18       Have you heard that case?  They signed contracts in

19  two languages, English and French.  In one, they put in, in

20  the English version, they either left out a comma or they had

21  a comma in a different position.  The judge interpreted the

22  English version, and it was a two-million-dollar difference

23  between for want of a comma.  So I don't want that kind of

24  notoriety, either.  I don't want to have to make that

25  decision, either.  Okay.

1      Why don't we make everything due on January 21st?

2  Why rush you all?

3      MR. WINSBERG:  January 21st or February 21st, Your

4  Honor?

5      MR. GERSHMAN:  January 19th.

6      THE COURT:  I mean January 19th, and see you on

7  February 21st.

8      MR. WINSBERG:  Okay.

9      THE COURT:  Instead of just rushing everything in

10  this late in the year.  That gives you all some time.

11      MR. WINSBERG:  Thank you.

12      THE COURT:  It gives me -- like I say, my normal

13  time down in Manhattan, I'm going to go south for a minute --

14  not as far south as I wanted to go.

15      Don't I already have a hearing at 10:30 on the 21st?

16      (Court and court personnel confer.)

17      THE COURT:  So why don't we see you at 11:30 on the

18  21st.  You might want to be here a little earlier because, if

19  I stop early and you all are here, we can all get out a

20  little sooner, so ...

21      Anything else that you need to talk with me about?

22      MR. WINSBERG:  No, Your Honor.

23      MR. GERSHMAN:  No, Your Honor.

24      MR. MC LAUGHLIN:  No, Your Honor.

25      THE COURT:  If I don't see you again, have a happy

1  holiday, be safe, and enjoy your season.

2          COUNSEL:  Thank you.  Thank you.

3          THE COURT:  Court is in recess.

4      (Proceedings concluded at 12:14 p.m.)

5                    CERTIFICATION

6  I certify that the foregoing is a correct transcript from the

7  electronic sound recording of the proceedings in the above-

8  entitled matter.

9

10  *Coleen Rand*

11  _____          December 18, 2006
    Coleen Rand, AAERT Cert. No. 341
12  Certified Court Transcriptionist
    Rand Transcript Service, Inc.
13

14

15

16

17

18

19

20

21

22

23

24

25

1

2   UNITED STATES BANKRUPTCY COURT
    SOUTHERN DISTRICT OF NEW YORK
    ------------------------------------x   Case No.
3   In re                                   02-41729 (REG)

4   ADELPHIA COMMUNICATIONS CORPORATION,

5                    Debtor.
    ------------------------------------x
6   ADELPHIA COMMUNICATIONS CORPORATION,
    et al.,                                 (04-03293)(CGM)
7                    Plaintiffs,
    vs.                                     New York, New York
8
    PRESTIGE COMMUNICATIONS OF NC, INC.,    February 21, 2007
9   et al.,                                 11:14 a.m.
                     Defendants.
10  ------------------------------------x
                       DIGITALLY RECORDED PROCEEDINGS
11                        (Proceedings -- Prestige)

12  Motion for Leave to Amend the Complaint filed by Official
    Committee of Unsecured Creditors.
13

14  B E F O R E:

15      THE HONORABLE CECELIA G. MORRIS
        United States Bankruptcy Judge
16

17  A P P E A R A N C E S:

18      WILLKIE FARR & GALLAGHER LLP
        Attorneys for Reorganized Debtor Adelphia Communications
19          787 Seventh Avenue
            New York, New York    10019
20
        BY:  TERENCE K. McLAUGHLIN, ESQ.
21

22  (appearances continued on page 2)

23

                    DEBORAH HUNTSMAN, Court Reporter
24      (212) 608-9053    (718) 774-2551    (917) 723-9898
          Proceedings Recorded by Electronic Sound Recording,
25            Transcript Produced by Court Reporter

1    A P P E A R A N C E S:   (continued)

2        KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
         Attorneys for the Adelphia Recovery Trust
3            1633 Broadway
             New York, New York    10019
4
         BY:  DAVID FRIEDMAN, ESQ.
5             JOSEPH A. GERSHMAN, ESQ.
                    -and-
6             PAUL G. WILLIAMS, ESQ.

7        TROUTMAN SANDERS LLP
         Attorneys for Prestige Communications of NC, Inc.
8            Bank of America Plaza
             Suite 5200
9            600 Peachtree Street, # E
             Atlanta, Georgia    03038
10

11       BY:  HARRIS B. WINSBERG, ESQ.
                    -and-
12            ROBERT GORDON, ESQ.

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1          JUDGE MORRIS:  We are on the next one.  We are still

2    on case number 02-41729, Adelphia Communications.  This one is

3    in the matter of Prestige Communication.

4          Good morning.  How are you?  Welcome, welcome.

5          This Adelphia Communications and Adelphia Cablevision,

6    LLC, Official Committee of Unsecured Creditors v. Prestige

7    Communications of North Carolina, Inc., Jonathan J. Oscher,

8    Lorraine Oscher McClain, Robert Buckfelder, Buckfelder

9    Investment Trust, and Anverse.  The adversary proceeding is

10   04-3293.

11         State your name and affiliation.

12         MR. WINSBERG:  Good morning, Your Honor.  Harris

13   Winsberg and Robert Gordon from Troutman Sanders on behalf of

14   the Defendants.

15         MR. FRIEDMAN:  Good morning, Your Honor.  David

16   Friedman and Joseph Gershman from Kasowitz, Benson, Torres &

17   Friedman appearing for the very first time on behalf of the

18   Adelphia Recovery Trust, which was, as Your Honor knows, the

19   contingent value vehicle established pursuant to the

20   consummated Plan.

21         JUDGE MORRIS:  Right.  And the Plan did consummate?

22         MR. FRIEDMAN:  Yes, it did.

23         JUDGE MORRIS:  Very good.

24         MR. McLaughlin:  Good morning, Your Honor.  Terence

25   McLaughlin from Willkie Farr & Gallagher on behalf of the

4

1   Reorganized Debtor Adelphia Communications.

2         MR. WILLIAMS:  Your Honor, I am Paul Williams from

3   Kasowitz, Benson, Torres & Friedman as well.

4         JUDGE MORRIS:  Very good.  Now, then I understand we

5   have two or three matters.  The first matter, I believe, is a

6   ruling on the joint submissions of the parties regarding the

7   Plaintiffs' objections to Defendants' privilege log.

8         I have an oral ruling on that.  Let me go through what

9   else I have to deal with.  Then I have a letter from

10  Mr. McLaughlin concerning some other considerations I need to

11  talk about with you, and then a possibility of a one-week

12  adjournment or we need to talk about the motion for leave to

13  amend the complaint.

14        Those are the only issues which I have in front of me

15  today.

16        MR. McLAUGHLIN:  Yes, Your Honor.  I believe so.

17        JUDGE MORRIS:  We are 15 minutes early.  I didn't

18  realize we were to start at 11:30.  If you all don't mind, I

19  don't mind.  I like being early.

20        I am ready to make a ruling on this joint submission

21  of the parties regarding the Plaintiffs' objection to

22  Defendants' privilege log.  Is there anything you wish to add

23  that is not in your papers?

24        MR. McLAUGHLIN:  Your Honor, Terry McLaughlin from

25  Willkie Farr.  The only thing I would wish to point out, you

1    did refer to the letter.  There was just that one document

2    that we weren't able to include in the joint submission.

3        JUDGE MORRIS:  I am going to talk about that after we

4    finish here.

5        MR. McLAUGHLIN:  That is the only thing I wish to add,

6    Your Honor.

7        MR. WINSBERG:  I am sorry.  You are going on this

8    joint submission on the Defendants' privilege log or on the

9    Plaintiffs'?

10        JUDGE MORRIS:  Plaintiffs' objection to Defendants'

11    privilege log, isn't that what we are dealing with?

12        MR. WINSBERG:  There are two joint submissions, Your

13    Honor.  There is the joint submission on the Plaintiffs'

14    objection to the Defendants' privilege log, and then there is

15    a joint submission on Defendants' request that a waiver has

16    been found.

17        JUDGE MORRIS:  I tell you what, I will rule, and then

18    you decide if I have hit everything.  Because I have a 15-page

19    ruling for you.  How is that?  And if I have missed anything,

20    you can tell me I have missed something.  Actually we had to

21    go back through a lot of stuff to come up with this.  I do

22    have an overview of the ruling.

23        First, let me just begin with there are 35 documents

24    that have been submitted in camera in an effort to resolve

25    Adelphia's motion to compel production of certain documents,

1  and that is found on the electronic case filing docket number

2  29.  Then Prestige's opposition, which is found on electronic

3  docket numbers 41, 42, and 43.

4      I want to thank you for your help and your joint

5  submissions categorizing.  The basis is excellent and it has

6  helped me in working through this.  Organizing it under these

7  tabs, with each party articulating their position, has made it

8  a lot simpler for me to comb through it.

9      I reviewed the joint submissions and in camera and I

10  am not prepared to make that ruling.  All the references in

11  this ruling are in the joint submission of the parties dated

12  January 19th.  That is not currently an electronic case

13  filing.  If you all remind me, we will talk about that after I

14  have made my ruling.

15      Before I begin, let me just recite the general legal

16  standards that I believe apply to this motion and which I used

17  in thinking about each one of these documents as I looked at

18  them.

19      The work product privilege.  In United States v.

20  Adlman, which is a Second Circuit 1998 decision, the circuit

21  addressed the proper interpretation of the work product

22  privilege in this circuit.  You should note, when I read that,

23  I basically put in my mind that I had to crawl into the mind

24  of the scrivener of the document.

25      A document created because of anticipated litigation,

1  which tends to reveal mental impressions, conclusions,

2  opinions, or theories concerning the litigation does not lose

3  work product protection merely because it is intended to

4  assist in the making of a business decision influenced by the

5  likely outcome of the anticipated litigation where a document

6  was recreated because of anticipated litigation and would not

7  have been prepared in substantially similar form, but for the

8  prospect of litigation, it falls within the 26(b)(3) rubric.

9        In reaching that holding the Court adopted the

10  "because of" -- and I put that in quotes -- formation of the

11  work product privilege.  The Court stated, Federal Rule of

12  Civil Procedure 26(b)(3) states that documents prepared in

13  anticipation of litigation or for trial are discoverable only

14  upon a showing of substantial need of the materials and

15  inability without undue hardship to obtain their substantial

16  equivalence elsewhere.  Documents should be deemed prepared in

17  anticipation of litigation and thus within the scope of the

18  rule, if in light of the nature of the document and the

19  factual situation in the particular case, the document can

20  fairly be said to have been prepared or obtained because of

21  the prospect of litigation.

22        Where a document is created because of the prospect of

23  litigation, analyzing the likely outcome of that litigation,

24  it does not lose protection under this formulation merely

25  because it is created in order to assist with a business

1  decision.  The "because of" formation that we adopt here --

2  and, again, I am quoting the Second Circuit -- withholds

3  protections from documents that are prepared in the ordinary

4  course of business or that would have been created in

5  essentially similar form irrespective of the litigation.  It

6  is well established that work product privilege does not apply

7  to such documents.

8      Attorney/client privilege for the standard there.  To

9  invoke the attorney/client privilege, a party must demonstrate

10  that there was -- and this is key to a lot of things that I

11  look at -- a communication between client and counsel, which

12  was intended to be and was, in fact, kept confidential and

13  made for the purpose of obtaining or providing legal advice.

14  Again, that is a Second Circuit decision.  United States v.

15  Construction Products Research, 73 F.3d 464.

16      Standards governing the challenge of documents entered

17  on a privilege log.  Federal Rule of Civil Procedure 26(b)(5)

18  requires that if a party withholds documents by claiming that

19  they are subject to the protection as trial preparation

20  materials are as privileged attorney/client communications,

21  that party must describe the nature of the documents,

22  communications, and things not produced or disclosed in a

23  manner that without revealing information itself, privileged

24  or protective, will enable other parties to assess the

25  applicability of the privilege or protection.  That is just a

1    quote from the rule.

2         It is axiomatic that the burden is on a party claiming

3    the protection of a privilege to establish those facts that

4    are essential elements of the privilege relationship, a burden

5    not discharged by mere conclusory or ipse dixit assertions.

6    That is a Second Circuit decision in In re Grand Jury

7    Subpoena, (1984 decision).

8         The standard for testing the adequacy of a privilege

9    log is whether as to each document it sets forth facts that,

10   if credited, would suffice to establish each element of the

11   privilege or immunity that is the claim.  I will tell you,

12   that was my constant thought as I looked at these documents.

13        If the log does not meet the standard, the privilege

14   should be rejected.  There are a whole list of cases on that.

15   The withholding party's initial obligation is to prepare an

16   index of withheld documents providing the specific information

17   required by Federal Rule of Civil Procedure 26(b)(5) and Local

18   Civil Rule 26.2.  "If the assertions of a privilege are not

19   challenged and the withholding party has no further obligation

20   with respect to its assertions of privilege, if the assertions

21   of privilege are challenged and the dispute cannot be resolved

22   informally, the withholding party then has to submit evidence

23   by way of affidavit, deposition testimony, or otherwise

24   establishing only the challenged elements of the application

25   privilege or protection with the ultimate burden of proof

1    resting with the party asserting the privilege or protection."

2    I had no affidavit testimony on these.

3         The foregoing procedure properly allocates the burden

4    of proof and saves the Court and the parties from having to

5    address any element of privilege or protection that are not in

6    dispute.   In addition, the foregoing accurately reflects the

7    manner in which disputes concerning the documents withheld on

8    the ground privilege are currently resolved in this district.

9         After a privilege has been challenged, the party

10   seeking to assert it must demonstrate the factual premise for

11   any and all challenged elements.

12        Now, then let's go to the first one, which is tab A.

13   That is:  communications with Adelphia's attorneys.  This is

14   document 145, document 176, document 327, and document 330.

15   In this category there are four documents that, according to

16   the privilege log, directly relate to communications with Gary

17   Walker, Adelphia's lead attorney for the Prestige

18   transactions.  Although the privilege log indicates that Gary

19   Walker is a representative of Prestige, it is my understanding

20   the parties now agree the Gary Walker referred to in the

21   privilege log on these entries is an Adelphia attorney.

22        The documents consist of handwritten notes of

23   conversations with different people on different days.

24   Prestige has turned over the pages of those documents relating

25   to communications with Gary Walker.  For example, Prestige has

1  produced the bottom three quarters of Bates stamped page

2  14001, which is one of the eight pages that make up

3  document 145.

4      The conversation with Mr. Walker in Bates stamp 1401

5  is part of an entry for November 21, 1999.  The redacted

6  portion of that page consists of notes from November 19, 1999,

7  a different conversation.  The other pages comprising

8  document 145 refer to other conversations with other people on

9  other dates.  Thus, as to document 145, Prestige has produced

10  the portion for which the attorney/client privilege was

11  waived, so no further production is required on document 145.

12      The same is true of document 327.  Two of the three

13  pages comprising this document were disclosed because they

14  reflected a conversation with Gary Walker.  The remaining

15  pages of 327, Bates number 21014, is an eight-word fragment of

16  a conversation with Rob Buckfelder with no date given.  As the

17  page reflects conversation between a Prestige attorney and a

18  Prestige representative, it is a privileged communication.  So

19  that is 145 and 327.

20      As to document 176, which consists of 12 pages of

21  handwritten notes of Harold E. Abrams, a Prestige attorney,

22  Prestige claims these are handwritten notes of Harold E.

23  Abrams memoralizing a conference call with Gary Walker re real

24  estate appraisal issues and Adelphia Prestige transactions for

25  the purpose of providing legal advice or legal services, and

1   are also notes of a telephone conversation between Hal Abrams,

2   Lorri McClain, and Rob Buckfelder re stock transfer issues,

3   setting up private charitable foundations, opinions on

4   interactions with Gary Walker, notes re Gary Walker, not mere

5   recitations of communications, but legal opinions and strategy

6   based on understanding of client's confidences and requests

7   for legal advice.

8        It is not clear, either from reviewing the privilege

9   log or reviewing the notes in camera, which notes reflect

10  conversations with Prestige representatives Lorri McClain or

11  Rob Buckfelder, and which reflects conversations with Gary

12  Walker, an Adelphia attorney.  The notes reflecting

13  conversations with Prestige representatives are records of

14  privilege communications that do not need to be disclosed.

15  Whether or not notes on interactions with Gary Walker or

16  re Gary Walker, not mere recitations of communications, but

17  legal opinions and strategies based on the Court's

18  understanding of the requirements for privilege to attach to

19  these notes must be communicated confidentially by the author

20  to a recipient for the purposes of obtaining or providing

21  legal advice.

22       It is not clear whether the notes reflect conversation

23  with Prestige representatives or Gary Walker.  If to Gary

24  Walker, Prestige should identify whether the notes were then

25  communicated to a Prestige representative or an attorney for

1    the purposes of obtaining or providing legal advice.  To the

2    extent the notes reflect conversations with Gary Walker and

3    were not communicated to anyone, they should be produced.

4         So as to document 176, you need to amend the privilege

5    log to identify page by page whether the notes reflect

6    conversations with Prestige representatives or Gary Walker.

7    If to Walker, they must be produced, unless the notes were

8    communicated to a Prestige representative or attorney for the

9    purposes of obtaining legal advice.

10        As to document 330, document 330 consists of nine

11   pages of handwritten notes of Alex Bransford, an attorney for

12   Prestige.  The privilege log now reflects that the notes of

13   memorialized conversation with Prestige representatives and

14   attorneys, except for the two pages Prestige already produced

15   with redactions, that is Bates stamped numbers 21037 and

16   21039, regarding conversations with Adelphia representatives.

17        The balance of document 330 does not have to be

18   produced, except for Bates stamped pages 21035.  For that

19   page, Prestige asserts the work product privilege.  However,

20   the notes on that page merely relate a conversation with

21   Michelle Hunt at CIBC.  The notes are not work product,

22   because they do not reveal mental impressions, conclusions,

23   opinions or theories concerning litigation.

24        So as to document 330, produce Bates stamped pages

25   PRES 31036 and 21035 only.

1      MR. WINSBERG:  Your Honor, if I may, just real

2  briefly?  I understand Your Honor's ruling, but I would make

3  the Court aware that the bottom part of the page is what was

4  concerning us, which was "type - discussing a class action,

5  fee litigation."  We will stand by Your Honor's ruling.

6      JUDGE MORRIS:  I think I meant it was not clear to me

7  too.  We are 330.  Give me a second.

8      We are at Bates stamp 21035.  As you can see, we went

9  through these pretty carefully and I have a yellow sticky on

10  this one.

11      MR. WINSBERG:  It was the bottom part of the page,

12  which says "telephone with Hal Abrams."  On May 22, 2000,

13  there was a discussion of a class action and late fees.

14      JUDGE MORRIS:  You have that redacted on the next

15  page, which is Bates stamped 31036?

16      MR. GERSHMAN:  No, Your Honor.

17      MR. WINSBERG:  We have no objection to giving them the

18  top part of that page.  It was the bottom part.

19      JUDGE MORRIS:  Very good.  I am going to let you give

20  the redacted.  I am changing that.  I will change that you

21  only give the redacted.  That is pretty clear litigation.  I

22  don't know how I missed that.

23      The waiver issue.  Prestige also asserts the work

24  product privilege as to one document -- I think I have gone

25  over this, but I want to be clear -- and document 176, Bates

1    number 14693.  The notes on that page fit the definition of

2    "work product" in that they appear to have been prepared in

3    anticipation of litigation.  Adelphia urges the Court to hold

4    that Prestige has waived the right to assert the work product

5    privilege, which was not claimed for this document in the

6    first iteration of the privilege log.

7        The cases cited by Adelphia indicate that this Court

8    has the power in appropriate circumstances either to assess

9    monetary sanctions or to hold that the privilege is waived

10    when not asserted in a timely manner.  The Court agrees with

11    Adelphia that such a time may come.  As things currently

12    stand, Prestige's recent assertion of work product privilege

13    will apply to only one case in the one document.  The Court

14    will not penalize Prestige for its conduct at this time, but

15    such conduct in the future may merit a waiver for monetary

16    sanctions.

17        As to the Robert Buckfelder issue, Adelphia has

18    asserted while providing very little background explanation

19    that the privilege has been waived as to document 176, which

20    relates to the estate planning of Jonathan Oscher and the

21    creation of Anverse, because Robert Buckfelder was present and

22    Buckfelder later testified that he was not involved in these

23    matters.  Adelphia does not contend that Buckfelder's presence

24    evidenced an intention that the communication would not remain

25    confidential.

1     Adelphia does not contend that Mr. Buckfelder was not

2     a representative for Prestige that was otherwise involved in

3     the Adelphia/Prestige transaction.  It appears that the estate

4     planning issues were related to the Adelphia/Prestige

5     transaction.

6          Adelphia has not cited and the Court is not aware of

7     any case holding that a communication between an attorney and

8     the representative of the client is waived if the

9     communication is made in the presence of another

10    representative of the same client who is not involved in the

11    precise subject matter of the communication.

12         According to Adelphia's complaint at paragraph 15,

13    Buckfelder was at all relevant times Prestige's North Carolina

14    Vice President of Finance and Chief Financial Officer and

15    owned 21 shares of Prestige North Carolina stock, which

16    constitutes 2.1 percent of Prestige NC -- I don't know if that

17    means North Carolina -- stock at the time of the asset

18    purchase.

19         As the privilege log reveals, Mr. Buckfelder was

20    certainly involved in other aspects of the Adelphia/Prestige

21    transaction, even if he was not involved in this particular

22    issue.  It is unreasonable to expect that every employee will

23    be involved in every issue or, if they are not, that they will

24    be excluded from discussions whenever a confidential

25    communication is about to be made as to some aspect over which

1   they are not directly involved.  Adelphia's argument on this

2   point is overruled.

3       I hope I have made everything else clear.  Is there

4   anything I need to clarify on tab A, documents 145, 176, 327,

5   and 330?

6       (Whereupon, no response was heard.)

7       JUDGE MORRIS:  As to tab B.1, communications that

8   appear to merely recite communications with Adelphia's

9   attorneys.  This category consists of six documents that

10   Adelphia says appear to be communications between Prestige

11   representatives that reflect the substance of communications

12   between Prestige's counsel and Adelphia's attorney.  If the

13   document simply recites the discussion, Adelphia argues that

14   they should not be privileged.  Defendants note that the six

15   entries above are copies of the same inter-attorney

16   memorandum, except that document entries 196, 200 and 295, in

17   addition to the memorandum, also contain facsimile cover pages

18   which transmitted the memorandum from counsel to client.  The

19   facsimile cover pages contain substantive communications

20   between counsel concerning opinions about the Prestige

21   transaction and is therefore privileged.

22       Regarding the memorandum, although it refers to

23   non-privileged communication with Heather Wyman, an attorney

24   for Adelphia, Prestige argues that it embodies Defendants'

25   counsels' legal analysis and legal strategy concerning

1  Adelphia's position on aspects of the Prestige transaction, as

2  learned from the communications with Ms. Wyman.  Prestige

3  argues, "Without the benefit of an intimate understanding of

4  Defendants' confidential information and the nature of the

5  legal advice and services being sought by the Defendants,

6  Defendants' counsel would not be able to formulate an opinion

7  or strategy concerning the information learned from Adelphia's

8  attorney and ultimately convey that opinion to co-counsel or

9  the client."

10      "Thus, in essence the memorandum at issue here is not

11  merely a recitation of the communication between Defendants'

12  counsel and Adelphia's attorney, it is the communication of

13  legal advice to co-counsel based on an understanding of the

14  Defendants' needs and Adelphia's proposal.  Undeniably such a

15  communication is privileged," and I quote that.

16      The Court agrees that where the memoranda constitute

17  the communication of legal advice based on an understanding of

18  the client's needs and the adversary's proposals, such

19  communication would be privileged.  After reviewing the

20  memorandum and the fax cover sheets, in the Court's view,

21  these documents do not meet that standard.

22      The memo appears to relay the substance of

23  conversation with Ms. Wyman and nothing more.  The fax cover

24  sheet states that the sender thought that the proposal made by

25  Rick Horder, Prestige's senior environmental attorney to

1  Heather Wyman, was a generous proposal because of the very

2  favorable language from our standpoint in the contract.

3      There is nothing about this comment that constitutes a

4  communication made for the purpose of obtaining or providing

5  legal advice.  Thus, documents 196, 198, 199, 200, 201 and 295

6  must be produced.  So that tab B.1.

7      Communications that appear to relay business

8  communications or appear to be unprivileged drafts.  Adelphia

9  raises two objections to the documents in this category.

10     Business communications.  The first objection is that

11 communications, as described in the privilege log, would

12 appear to do nothing more than relay business communications.

13 These objections are certainly valid with regard to four of

14 the documents.

15     Document 119, for certain schedules that corrected

16 mislabeled headings, there appears to be nothing privileged

17 and document 119 should be disclosed.

18     The same is true of Document 162.  The handwritten

19 note described in the privilege logs does nothing more than

20 say, "Alex, sample for your review.  Derek," and attaches a

21 sample letter to be distributed to third parties.  The note is

22 not a privileged communication and, therefore, document 162

23 must be disclosed.

24     For the same reason, document 255 must be disclosed.

25 The letter does nothing more than state that an agreement is

1   attached and request the recipient review and sign it.

2         As to document 163, the unredacted version of the

3   cover letter discloses an important fact listing the value of

4   all of the stock of the company as taken from the Houlihan

5   Valuation Advisor's appraisal.  Of course, facts are not

6   privileged and there is nothing else about the communication

7   that suggests it was made for the purpose of providing or

8   obtaining legal advice.  Thus, document 176 must be disclosed

9   without redaction.

10         MR. GERSHMAN:  Your Honor, I am sorry.  Is that 176 or

11   163?

12         JUDGE MORRIS:  I have a little dyslexia.  It is 163.

13   I am trying to get all of these numbers straight, and I have

14   had to correct myself six times already.

15         Like document 163, document 164 is a cover letter that

16   purports to forward the same appraisal to a different person,

17   but document 164 provides additional lines of analysis, making

18   it more like a communication for the purpose of legal advice,

19   rather than merely relaying unprivileged information.  The

20   attorney/client privilege therefore applies to 164.

21         Document 206 appears to be a handwritten letter from

22   Harold Abrams to Donna Paul, both of Prestige's law firm

23   Kilpatrick Stockton, regarding the cover letters labeled here

24   as documents 163 and 164.  Document 206 is a privileged

25   communication for the purposes of providing legal advice.

1    Status of drafts.  As for the remaining documents,
2    Adelphia contends that drafts of agreements, schedules and
3    other documents pertaining to the transaction being negotiated
4    between the parties are not privileged, even if they contain
5    handwritten notes of counsel.  Prestige answers that, although
6    final versions of the documents may have been disclosed to
7    third parties, this fact does not strip the drafts of the
8    attorney/client privilege where the client intends that
9    communications prior to the final version should remain
10   confidential.  The key word is "remain."

11   Both parties discussed the case of U.S. Postal Service
12   v. Phelps Dodge Refining Corporation, which is an Eastern
13   District of New York case found at 852 F.Supp. 156 (1994)
14   where Magistrate Judge Go ruled that the drafts at issue in
15   that case would be considered privileged if they were prepared
16   with the assistance of an attorney for the purpose of
17   obtaining legal advice and/or contained information a client
18   considered but decided not to include in the final version.

19   Prestige cites the McCario v. Pratt & Whitney, an
20   Eastern District of Pennsylvania case from 1991.  Unless the
21   party asserting the privilege intends that the draft would be
22   disclosed to a third party in that particular form, the draft
23   remains subject to attorney/client privilege.  The party
24   asserting that the draft is privileged bears the burden of
25   proof.

1    Document 214 is a fax cover letter which attaches an

2    environmental agreement and draft cover letter intended to

3    accompany the transmittal of the environmental agreement to

4    Adelphia.  Thus, document 214 appears to be in a form that

5    Prestige expects would be disclosed to Adelphia very soon

6    thereafter.  Accordingly, document 214 must be disclosed.

7    Document 292 is a redline of changes that were made to

8    the environmental agreement in document 214 two days later.

9    The draft is of the type Prestige expects would be disclosed

10   to Adelphia, and, therefore, 292 must be produced or

11   disclosed.

12   Document 303 has two parts.  Bates stamped pages 20581

13   through 20586 is the copy of an environmental agreement after

14   certain handwritten changes have been made to the draft.  The

15   handwritten changes that were apparently incorporated, along

16   with a privileged inter-attorney communication regarding the

17   changes, makes up the rest of the document, Bates stamped

18   pages 20587 through 20596.

19   The first part of the document 303 was intended to be

20   transmitted to Adelphia, and Prestige must disclose only Bates

21   stamped pages 20581 through 20586 of document 303.

22   Document 314 contains the draft letter from Chintan

23   Amin, a Prestige attorney, to a duty officer at the

24   Underground Storage Tank Management Program.  The draft letter

25   at Bates stamped pages 20882 and 20883 was in a form that

1    Prestige expected would be a communication to third parties,

2    and thus Bates stamped pages 20882 and 20883 of document 314

3    must be disclosed.  The other two pages in document 341, Bates

4    stamped pages 20880 and 20881, contain privileged

5    inter-attorney communications.

6         Document 348 contains handwritten notes regarding the

7    revisions of the schedules and also includes handwritten edits

8    to the schedules to the Asset Purchase Agreement.  The

9    information contained in this document is not of the sort that

10   would be intended for incorporation into a final draft.

11   Document 348 is therefore a protected attorney/client

12   communication.

13        I will go over tab B.2.  Document 119 produce;

14   document 162 produce; document 363 produce without redaction;

15   document 164 is privileged; document 206 is privileged;

16   document 214 produce; document 255 produce; document 292

17   produce; document 302 produce only Bates stamped 0581 through

18   0586; document 314 produce only Bates stamped pages 20882 and

19   20883; document 348 privileged.

20        I understand as to tab C, you all have resolved those

21   objections.

22        Tab D, for the five documents in this category,

23   documents 184, 188, 190, 314, 319 and 321.  Prestige asserts

24   work product privilege.  Adelphia objects that the privilege

25   log does not sufficiently refer to actual or threatened

1  litigation.  Implicit in Adelphia's objection is that the

2  documents are properly subject to the work product privilege,

3  if they do refer to an actual or threatened litigation.

4      (There are more than five documents.  There are six

5  documents.  188, and it has a different standard.)

6      First, the privilege log refers merely to tax

7  implications.

8      Second, reference is made to environmental regulatory

9  action, but in detail insufficient to indicate whether the

10  document refers to potential or actual litigation or some

11  other regulatory action.  Prestige responds that all but one

12  of the documents being objected to on this basis were prepared

13  by Defendants' outside counsel because of the prospect of

14  litigation arising due to certain tax and environmental

15  regulatory matters threatening the prestige transaction.

16      On the tax issue, Prestige also provided the Court

17  with the Second Circuit case that I have quoted before,

18  United States v. Adlman for the proposition that legal

19  analysis regarding the structure of a transaction to minimize

20  a party's tax liability when the possibility of an IRS

21  challenge looms has been considered by the Second Circuit to

22  fall within the work product protection.  In that case

23  litigation was virtually certain to result and the

24  restructuring there was based on an interpretation of the Tax

25  Code without a case or IRS ruling directly on point.

1    The case held that a document created because of

2  anticipated litigation which tends to reveal mental

3  impressions, conclusions, opinions or theories concerning the

4  litigation does not lose work product production merely

5  because it is intended to assist in the making of a business

6  decision influenced by the outcome of the anticipated

7  litigation.

8    On the environmental issue, Prestige cites Garrett v.

9  Metropolitan Life Insurance (S.D.N.Y. 1996) found at Westlaw,

10  which observes that regulatory investigations by outside

11  agencies present more than a mere possibility of future

12  litigation and provide reasonable grounds for anticipating

13  litigation.

14    JUDGE MORRIS:  I reviewed these documents in camera.

15  Documents 190, 314, 319 and 321 refer to pending actions and

16  investigation.  The Court is satisfied that the work product

17  privilege applied to protect these documents from disclosure,

18  because they relate to ongoing regulatory actions, and under

19  the circumstances Prestige reasonably anticipated that

20  litigation could arise.  So 190, 314, 319 and 321 are

21  privileged.

22    Document 184, that document suggests that it was legal

23  analysis regarding the structuring of a traction to minimize

24  tax liability, and upon review, it appears that this document

25  was prepared with an eye towards possible government scrutiny.

1  Thus, Prestige will not be required to produce 184.

2  The sixth document in this category is document 188.

3  Document 188 was reclassified by Prestige as subject to the

4  attorney/client privilege, rather than the work product

5  privilege.  Document 188 consists of one page of notes from

6  Bill Veatch, an attorney for Prestige, memorializing a

7  conversation with Rob Buckfelder, a Prestige representative.

8  It is impossible to tell from a review of the document whether

9  the purpose of the communication was for providing legal

10  advice as opposed to business advice.  As the parties agree,

11  Prestige bears the burden of demonstrating that

12  attorney/client privilege applies.  Prestige must produce this

13  document.

14  So as to tab D, 184 is privileged; 188 must be

15  produced; 190 privileged; 314 privileged; 319 privileged; 321

16  privileged.

17  It is my understanding that the parties have resolved

18  tab E.

19  Tab F.  Entries for which the attorney/client

20  privilege has been asserted as to notes with no indication as

21  to how or whether the communication was actually transmitted.

22  Adelphia challenges the claim of privilege as to five

23  documents, because Adelphia claims the privilege log is

24  unclear as to how or whether the documents were actually

25  communicated between Prestige's representatives and attorneys.

27

1    The Court has reviewed these five documents in camera.

2    Document 22 is a questionnaire completed by a Prestige

3    representative.  The questionnaire contains printed

4    instructions that it is to be returned to Julie Gordy, a legal

5    assistant at Cole, Raywid & Braverman LLP, attorneys for

6    Prestige, and contains a mailing address, phone number, fax

7    number, and e-mail address for Ms. Gordy.  There is no reason

8    to doubt -- and Adelphia has not provided any -- that the

9    questionnaire was, in fact, returned and thus communicated as

10   instructed.  Therefore, it is privileged.

11        More problematic is document 182.  Although the

12   handwritten information contained in document 182 appears to

13   be legal, the description in the privilege log states only

14   these are handwritten notes of Harold E. Abrams memorializing

15   confidential information of Prestige Communication of NC,

16   Inc., for purposes of providing legal advice.  The description

17   does not indicate that the notes memorialized a conversation,

18   i.e., a communication that would be privileged, between

19   Mr. Abrams and anyone else.  Moreover, the document does not

20   appear to indicate this either.  The description also does not

21   indicate that the notes were later communicated by Mr. Abrams

22   to anyone.

23        As Prestige has failed meet its burden, document 182

24   must be produced, except for the three lines at the top of

25   Bates stamped page 14746.  The Court has reviewed the

1  documents in camera and it appears that these three lines are

2  protected by the work product privilege and may be redacted.

3      It is also not clear from document 325 consisting of

4  handwritten notes of Chintan Amin were ever communicated to

5  anyone.  As to this entire document though, Prestige asserts

6  the work product privilege, because it contemplates litigation

7  over a transaction.  The Court has reviewed the document in

8  camera and agrees with Prestige's characterization of the

9  privilege log.  Document 325 is protected as work product.

10      The Court has reviewed in camera document 328, which

11  Prestige claims are handwritten notes of Derek Richman, a

12  Prestige attorney, memorializing a conference call with

13  Mr. Abrams.  The notes indicated at the top "CONF HEA."  Thus

14  it appears that Document 328 reflects a protected

15  attorney/client communication.

16      As to the last one in tab F, upon examination of

17  document 348, the document was obviously communicated as

18  described in the privilege log.  As the Court earlier ruled,

19  document 348 is protected attorney/client privilege.  So as to

20  tab F, document 22 is privileged; Document 182 is to be

21  produced, except the three lines at Bates stamped page 14746;

22  document 325 is privileged; document 328 is privileged;

23  document 348 is earlier ruled on and protected under

24  attorney/client privilege, so it is privileged.

25      Tab G.  Entries with inadequate descriptions.  The

1    Court has already ruled on 5 of these documents, 182, 184,

2    321, 325, and 328.  Based on the in camera review and the

3    ruling is moot, it is Adelphia's contention that the privilege

4    log entry is inadequate.

5         As to 336, the Court has reviewed this document in

6    camera and finds that Prestige has properly redacted the

7    document.  The description is sufficient and 336 is privileged

8    as redacted.

9         As noted in the discussion under tab I, which will

10   come forward, documents 352 and 356 must be produced, and I

11   will talk about those.  So the issue of whether they are

12   adequately described is moot.  I will talk about those in a

13   minute.

14        Tab H.  The parties have resolved those objections.

15        Tab I.  Documents for which non-privileged portions

16   need to be produced.

17        JUDGE MORRIS:  The Court has previously ruled that

18   document 292 must be disclosed in its entirety mooting

19   Adelphia's objection under this category.  As for

20   document 303, the Court previously ruled that only Bates

21   stamped pages 20581 through 20586 of document 303 must be

22   disclosed.  The remaining pages of document 303 are

23   privileged.

24        Documents 352 and 356 must be produced, because they

25   are drafts that do not appear to contain information that was

1   not intended to appear in the final version shared with third

2   parties.  As such they are not protected by the attorney/

3   client privilege.

4          I am not going to review tab I, if you didn't mind.

5   Well, I will.  292, I ruled on that in tab B.2.  303, I ruled

6   on that in tab B.2.  352 must be produced.  356 must be

7   produced.

8          Tab J.  Interest regarding legal fees.  These are

9   documents 205 and 450.  Adelphia seeks discovery, because

10  information regarding fees for legal services are only

11  privileged to the extent they would reveal client confidences.

12  Prestige responds that disclosure would reveal confidential

13  information concerning the client and the type of legal

14  services it sought.  The Court has reviewed these documents in

15  camera and believes that Prestige is correct.  The documents

16  may reveal client confidences and would provide inside as to

17  Prestige's legal strategy.  Accordingly, those documents 205

18  and 450 are privileged.

19         Adelphia has also asked the Court to direct Prestige

20  to produce a revised privilege log which accurately reflects

21  what documents or portions of documents they continue to

22  withhold from production.  On the other hand, Prestige asks

23  the Court to rule on all issues concerning the disputed

24  documents at issue here, as well as Defendants' privilege log

25  in whole, and the documents listed thereon are settled and

1  will not be revisited by the Court due to the enormous amount

2  of time and effort expended by the Defendants to address and

3  where possible satisfy Plaintiffs' concern over Defendants'

4  log.

5      In the course of today's ruling, I have made findings

6  in favor of both of the parties.  In general, I found that the

7  privilege log was sufficient, but I am not prepared to say

8  that the privilege log is sufficient in whole.  On the other

9  hand, I find no basis to order Prestige to revise the

10  privilege log.  The Court presumes that Adelphia raised all of

11  its privilege log issues in the current motion, and the Court

12  shares Prestige's concern about the time and effort expended

13  on these discovery issues.  So I consider that these issues

14  are resolved as of today's ruling.

15      Counsel for Adelphia shall submit an order requiring

16  Prestige to do the following:  produce documents 119, 162,

17  188, 196, 198, 199, 200, 201, 214, 255, 292, 295, 352, 356,

18  and the redacted version of Bates pages 21035 of document 330,

19  and amend the privilege log to identify page by page whether

20  the notes in document 176 reflect conversation with Prestige

21  representative or Gary Walker.  If to Walker, they must be

22  produced unless the notes were communicated to a Prestige

23  representative or attorney for the purposes of obtaining legal

24  advice.

25      Produce document 163 without redaction.  Produce

1  document 182, except for three lines at the top of Bates

2  stamped pages 14746.  Produce Bates stamped pages 20581

3  through 20586 of document 303.  Produce Bates stamped pages

4  20882 and 20883 of document 314.

5      The order should provide that it will direct Prestige

6  to comply within 10 days of the date of the order, and should

7  provide that Adelphia's motion is in all other respects

8  denied.  I will confirm to you that copies of the documents

9  submitted to the Court in camera for inspection will be

10  destroyed.

11      Now, then, yes.  You are standing to rise.

12      MR. GERSHMAN:  Your Honor, there were just a couple of

13  things that I wanted to raise with you.  One was your comment

14  with respect to the notes of the Gary Walker conversation.

15  You had indicated that the Defendants were to analyze them,

16  and indicate, if any, portions concern conversations with Gary

17  Walker and, if so, to produce them, unless those conversations

18  were then communicated to the Defendants.  I would just want

19  to point out that if there are notes of conversations with

20  Gary Walker, those conversations are not privileged.  The mere

21  fact that they may have been communicated to the Defendants

22  does not render those privileged.

23      To the extent that there is a record there of a

24  conversation between Mr. Abrams and Adelphia's attorneys, that

25  wasn't privileged and it doesn't become privileged by

1    conveying it to the Defendants.  It is no different than

2    reciting a fact.

3         JUDGE MORRIS:  I say, if to Walker, they must be

4    produced, unless the notes were communicated to a Prestige

5    representative.  I have addressed that.  They can be

6    privileged under some circumstances.

7         MR. GERSHMAN:  Maybe I misunderstood, Your Honor.  I

8    thought you were saying that if there were notes of a

9    conversation with Mr. Walker, but then they were communicated

10   to the Defendants, then they were privileged.

11        JUDGE MORRIS:  What I said was, and I will be clear as

12   to what I said, and let me go back to my original notes, not

13   my summary notes.  We are talking about 176?

14        MR. GERSHMAN:  That is correct, Your Honor.

15        JUDGE MORRIS:  176 is 12 pages of handwritten notes of

16   Harold S. Abrams, a Prestige attorney.  It is not clear either

17   from reviewing the privilege log or from reviewing the notes,

18   which reflects conversations with Prestige representatives

19   Lorri McClain or Rob Buckfelder and which reflects

20   conversations with Gary Walker, an Adelphia attorney.  The

21   notes reflecting conversation with Prestige representatives

22   are records of privileged communications and do not need to be

23   disclosed.

24        So whether or not those are not the notes on

25   interactions with Gary Walker or re Gary Walker are not mere

 1    recitations of communications, but legal opinions and strategy

 2    based on the Court's understanding of the requirements of

 3    privilege to the attached, these notes must have been

 4    communicated confidentially by the author to a recipient for

 5    the purposes of obtaining or providing legal advice.  It is

 6    not clear that they were.  Thus, Prestige should amend the

 7    privilege log to identify page by page whether the notes

 8    reflect conversations with Prestige representatives or Gary

 9    Walker; and, if to Gary Walker, Prestige should identify

10    whether the notes were then communicated to a Prestige

11    representative or an attorney for the purposes of obtaining or

12    providing legal advice.

13          So to the extent those notes reflect conversations

14    with Gary Walker and were not communicated to anyone, they

15    should be produced.  Did I miss something?

16          MR. GERSHMAN:  No, Your Honor.  Perhaps we disagree as

17    to the application of the privilege.  It is my understanding,

18    if there was a communication with Gary Walker, that

19    communication is not privileged and the fact that Kilpatrick

20    would turn around and repeat that information, whether it was

21    part of providing legal advice or not, it doesn't turn an

22    unprivileged communication into something that is privileged.

23    Just as if, if they learned a particular fact from Mr. Walker,

24    the fact that they then passed that fact along to their

25    client, and that wouldn't make that privileged either.  So I

1  was just trying to clarify that point.

2      MR. WINSBERG:  I would just respond that he is not

3  clarifying.  He is trying to reconsider.

4      JUDGE MORRIS:  You are muddying the water.  I think I

5  am pretty clear on what I said.

6      MR. WINSBERG:  The Court has ruled.  It is improper

7  attempt to reconsider the ruling.

8      JUDGE MORRIS:  After reviewing it in camera, I am

9  sticking by what I said.  I went through every one of these,

10  so I don't agree with you on that.

11      All right.  We are now down to your letter.  It is the

12  same formality as the other one.  I am not going to do it

13  without -- when did this come in?  This came in on the 16th in

14  the middle of a snowstorm.

15      MR. McLAUGHLIN:  Your Honor, may I just be heard

16  briefly?  It is not apparent to me whether you know that that

17  relates to another submission which you haven't yet talked

18  about I think also submitted on January 19th.

19      JUDGE MORRIS:  Are you talking about the Amended

20  Complaint?

21      MR. McLAUGHLIN:  No, Your Honor.  There was a second

22  joint submission submitted by the parties.  This time.  It was

23  Willkie Farr and the Troutman firm.  The issue in that joint

24  submission was the Defendants' assertion that Willkie Farr's

25  failure to log PricewaterhouseCoopers forensic documents on a

1  privilege log operates as a waiver, this letter is just a

2  supplement.

3         JUDGE MORRIS:  I want it on the same formality.  I am

4  not going to rule on it today.  I have got them both in front

5  of me.  You all haven't responded yet, have you?  I know I am

6  looking at it.

7         Go ahead.

8         MR. WINSBERG:  Your Honor, just to avoid some

9  confusion, there were two joint submissions that were sent

10  into Court on the same day in January.

11        JUDGE MORRIS:  In January or February?

12        MR. WINSBERG:  In January, Your Honor.  One was on

13  what you just ruled upon and the other was on, as you may

14  recall, the Defendants' filed a motion to compel.  One of the

15  arguments we made was they never gave us a log and they moved

16  to compel on any documents that they never logged, and their

17  response was "there is nothing to put on the log."  It came to

18  our attention that there are documents that are responsive

19  that are being held back on privilege that were not put on the

20  log.

21        There was a joint submission and the parties made

22  various arguments about that, and Mr. McLaughlin's letter that

23  he tendered last week addresses that joint submission.

24        JUDGE MORRIS:  And I haven't addressed it yet?

25        MR. WINSBERG:  No, Your Honor.  I do have a copy of

1    the joint submission, if you would like?

2           JUDGE MORRIS:  I have it too.  I have it right here,

3    but that is February 16th one.  This is the January one?

4           MR. WINSBERG:  Yes, Your Honor.

5           JUDGE MORRIS:  Hand me a copy for me to see, because I

6    have dealt with this one.  By the way, would you all do us a

7    favor, when you send anything to the Court would you mark it

8    very clearly "for chambers."  We are not necessarily getting

9    everything, and we have a remarkable staff.

10          Somehow this has not come to my attention, so it could

11   just be that it got lost in the mail.  So this is it?

12          MR. WINSBERG:  Yes, Your Honor.

13          JUDGE MORRIS:  And then this submission goes with it.

14   Then you all are going to have to give me a chance to take a

15   look at this, and we will meet back.

16          May I hand this to you?  I have taken your copy.  Do

17   you have another copy?

18          MR. WINSBERG:  That is okay, Your Honor.

19          JUDGE MORRIS:  I apologize.  We will keep it and we

20   will take a look at it, but I have to tell you, when I saw the

21   letter it didn't totally make sense to me, so something was

22   missing there.  But I have the letter.  It has February the

23   16th on that.

24          MR. McLAUGHLIN:  That is the date of my letter; right,

25   Your Honor.

1    JUDGE MORRIS:  May I have that back for just a moment,

2    please, because I just want to be clear on what I am looking

3    at.  I have your letter dated February 16th, but then I have a

4    letter dated February 16th also because these documents were

5    not included in the original joint submission.

6    MR. McLAUGHLIN:    I am going to try to help on it.

7    The submission that Mr. Winsberg has just handed up to you

8    had, I don't remember, 8 or 9 exhibits attached to it, that

9    speak to the issue that is addressed in that submission, which

10   Your Honor will have an opportunity to look at in due course.

11   My letter is simply to add Exhibit 9.  I don't know

12   whether it is Exhibit 9, but whatever the next exhibit would

13   be.  My letter is simply saying that I didn't have this letter

14   in my hands at the time that the joint submission went in.  I

15   am requesting the opportunity to have that included as part of

16   the joint submission.  That is all.

17   JUDGE MORRIS:  I will need you to respond to his

18   letter.

19   MR. WINSBERG:  The engagement letter is what it is.

20   JUDGE MORRIS:  I have to tell you all that somehow

21   this was overlooked.  It didn't get to chambers.  Please, if

22   you would just note "chambers" on everything, so that we can

23   get it.  I apologize for that.  They are normally pretty good.

24   Now, then we are at the motion to amend the complaint.

25   I now have a redline copy.

1    MR. FRIEDMAN:  You should have had it earlier.  It is

2  true.

3    JUDGE MORRIS:  Just so you know, I have got it.  The

4  answer, as you all know, it has been in the middle of a

5  snowstorm.  We had a holiday and we had a heavy calendar.

6    Mr. Friedman, there are many points in the answer that

7  I think ask many questions and bring out many points that do

8  need an answer, so we do need to have a response to the answer

9  before I make a decision on it.  How does this affect the

10  scheduling order?

11    MR. FRIEDMAN:  We have submitted a proposed scheduling

12  order to Your Honor, which would push fact discovery out until

13  the end of May.

14    JUDGE MORRIS:  How would this affect it if we get back

15  here?  I am in town on March the 21st and 22nd.

16    MR. FRIEDMAN:  Your Honor, part of me just wants to

17  respond formally to what you received, but part of me just

18  wants to say that none of this is going to affect anything.

19  This I think is classically the case of no good deed going

20  unpunished.  The reason why this ought to be good for

21  discovery and good for the schedule and at worse mutual for

22  it, is because we haven't added any parties and we haven't

23  added any claims.  All we have done is prior to the deadline

24  in the prior scheduling order, to amend the complaint, we

25  asked ourselves, "Can we make this complaint any more precise,

1    because discovery is beginning against our side?"  So could we

2    make this anymore precise or should we take the chance of not

3    amending the complaint and being accused of not putting the

4    best possible, most precise factual recitation into the

5    complaint before depositions begin.

6         The only deposition that has been taken of our side

7    has been of Mark Spiecker.  It was about a two-hour

8    deposition, and it was just a guy who, while available to

9    Adelphia's enterprise, did not have any personal knowledge

10   and, frankly, was deposed on the state of the records and the

11   state of the documents.

12        JUDGE MORRIS:  You think that your changes have made

13   it clearer?

14        MR. FRIEDMAN:  I think they have, yes.  I think the

15   changes are really, if you will, just three categories.  The

16   first category -- and you will see stricken language, and with

17   the implication that we have deleted allegations -- some of

18   the stricken language is just reorganized and put into a

19   different paragraph later on.  But basically, Your Honor, what

20   we have done is we have provided greater precision to the

21   issue of how the purchase price was allocated, which was

22   derived in part from the discovery that we have taken since

23   the case began.  In other words, not just to say that the

24   Rigases decided on their own to manipulate the purchase price.

25   We think to some extent unanswered what would have been the

1  motive of the Defendants to participate in this scam?  So we

2  have basically added a very short factual recitation about

3  incremental benefits that the Defendants had that would have

4  added to their motive to participate.  That is the first

5  session.  It is a couple of sentences.  Again, part of me

6  wants to just have you read our response, because they went in

7  so many different directions.

8        JUDGE MORRIS:  Because when I read your notice of

9  motion for leave to amend and didn't have a redline copy, I

10  have all the same questions.  But I don't know what we are

11  doing here.  So then I read their response, and I had some

12  questions.  For instance, in your notice to motion, attached

13  here as Exhibit A of the original complaint, and then attached

14  here is the proposed amend.  There is no explanation for the

15  differences, so I just went, okay.

16        MR. FRIEDMAN:  Well, Your Honor, I think that the

17  reason for that was, again, just to put this in context,

18  normally people would get excited about an amended complaint

19  if they added claims or if they added parties or if they

20  altered the theory of the case or if they changed the quantum

21  of damages.  All they did was take those issues and made them

22  more precise.  The original complaint, for example, said "we

23  are asking for damages to be determined at trial."  With the

24  amended complaint, again, there was a deadline to amend and we

25  had greater information than we had at the beginning, so we

1    provided greater clarity on that.

2         The allocation of the purchase price.  Having known

3    now more about how the allocation was derived, we gave I think

4    a couple of extra paragraphs about how the parties agreed to

5    the allocation.  We made greater reference to the contract

6    itself, which permitted the Rigases to become owners of these

7    assets rather than Adelphia.  Again, I don't think that the

8    complaint, frankly, needed to be amended.  We were looking at

9    this from the perspective again -- and maybe we did this

10   foolishly -- just trying to be better and more precise in our

11   complaint.  Because when you have a deadline to amend, you ask

12   yourself, "Well, there is a deadline coming up.  Should we do

13   anything in advance of that deadline to improve the complaint

14   and provide greater notice to the other side as to what we are

15   doing?"  That is all we did.

16        If the amendment were stricken, we would still try the

17   same case with the same facts with the same claims against the

18   same parties.  We are happy to respond and explain.  I think

19   we needed to, because Your Honor clearly has questions about

20   it, and we will.

21        We think that what has happened here -- and I don't

22   blame the Defendants -- when you see a motion to amend, you

23   have a free shot at attacking a pleading, you are going to

24   attack the pleading.  But I think if Your Honor will read our

25   response and see that there really isn't anything meaningful

1  to the amendments other than from our perspective.

2          JUDGE MORRIS:  I think you have cleared it up for me.

3          MR. FRIEDMAN:  We are happy to do it, Your Honor.

4          JUDGE MORRIS:  Because, as I read it, there are some

5  conclusionary statements.  My big question is, you say no new

6  discovery; am I correct?

7          MR. FRIEDMAN:  No.  I can't imagine how this would

8  have provided any incremental discovery.  We recognized when

9  we did this, this would create an opportunity for mischief.

10  That somebody would come up and say, "Your Honor, this is

11  crazy.  This is opening up a can of worms," and it really

12  isn't.  It really isn't in any way, and I think we would like

13  you to read our submission.

14          JUDGE MORRIS:  Because I am concerned about the

15  proposed amendment would convert what Plaintiffs previously

16  stated -- and these are statements that bother me -- from a

17  $100 million claim to a $400 million claim, are we going to

18  have discovery over there?

19          MR. FRIEDMAN:  Your Honor, there hasn't been any

20  discovery of damages from our side at all yet.  This is part

21  of the reason why we felt it was appropriate to amend the

22  complaint.  If you look at the complaint itself, which asks

23  for damages in an amount to be determined at trial, if you

24  look at the interrogatory responses, which similarly do not

25  quantify the damages, and defer to a later day than to expert

1  discovery, we thought it made more sense to get this out there

2  now, so that as they begin taking discovery of our side, they

3  have something to shoot at.

4      JUDGE MORRIS:  I don't disagree with you on that.  It

5  just opens a lot of questions on it, because does it change

6  the theory of recovery?  That was one of my questions as I

7  read it.

8      MR. FRIEDMAN:  We don't see how, but, Your Honor, I

9  would prefer rather than having --

10      JUDGE MORRIS:  I think you have got to answer it, yes.

11  Who wants to see me again on the 21st of March?

12      MR. FRIEDMAN:  That would be fine.  In what city would

13  you like to meet?

14      MR. WINSBERG:  If I may respond, Your Honor?

15      JUDGE MORRIS:  You can briefly?

16      MR. WINSBERG:  On this issue.

17      JUDGE MORRIS:  Because you respond nicely.

18      MR. WINSBERG:  There are witnesses, particularly

19  Adelphia's lawyers, that we deposed.  If we had known this was

20  a new allegation, we would have to go back and ask those

21  lawyers such questions as:  did you ever give Adelphia legal

22  advice on whether the tax allocation complied with federal tax

23  laws?

24      JUDGE MORRIS:  Let's get a response to that.

25      MR. WINSBERG:  We disagree with them on that and we

1  disagree that it is more precise.  The complaint speaks for

2  itself.  There are twenty-two upon information and beliefs,

3  and a complaint this late in this stage of the case.  If Your

4  Honor wants it to wait until March, that is fine.  We are

5  concerned we have put off our 30(b)(6).

6       JUDGE MORRIS:  Why can we not wait until March?  I

7  will look at my calendar.  What does you alls calendar look

8  like?  It has to wait until March anyway.  February is over.

9  I am going to give you at least a couple of weeks to get that

10 in, I would think.  What day is today?  Today is the 21st.

11 March 2nd is a Friday.  Texas Independence Day.

12      MR. McLAUGHLIN:  How did you know we celebrated that?

13      JUDGE MORRIS:  It is a good one to celebrate.  I am

14 going to be here on the 21st.  March 8th I have to be in Long

15 Island.  The 6th and 13th I have very, very heavy calendars in

16 Poughkeepsie, so the 21st?

17      MR. WINSBERG:  The 21st is fine, Your Honor.  We just

18 want to get on with our 30(b)(6).

19      JUDGE MORRIS:  I am sure I have trials that aren't on

20 here on those days on Wednesday in Poughkeepsie, on Wednesday,

21 Thursday, and Friday.  So I know I have to be in on the 14th

22 in Manhattan, but that is a jam-packed day.  So let's do it

23 the 21st here.  I have two trials the last week in March.

24      MR. McLAUGHLIN:  Your Honor, should we expect to

25 address the other joint submission?

1    JUDGE MORRIS:  Yes, please.  It is fully submitted.  I

2 am just going to have to do the same thing I did today.

3    MR. McLAUGHLIN:  You are not expecting any oral

4 argument?

5    JUDGE MORRIS:  Yes.  We must not have gotten a hard

6 copy of that.  So if you all will just please mark -- I am

7 about to put Jeff Narmore on the spot here -- "attention Jeff

8 Narmore."  So it comes directly to him.  It could easily be up

9 there.  What happens sometimes when it has a Manhattan number

10 on it, it gets a little confused.  So I will have a ruling by

11 then on that, and Jeff is N-a-r-m-o-r-e.  Is there anything

12 else you all need of me?

13    Yes, sir?

14    MR. McLAUGHLIN:  Your Honor, you had mentioned at the

15 beginning and you had pointed out that the joint submission

16 was not filed electronically.  Would you like us to do that?

17    JUDGE MORRIS:  Please.  I would appreciate it.

18    MR. FRIEDMAN:  When would you like the papers on the

19 amended complaint?

20    JUDGE MORRIS:  Let me give you two weeks.  Is that

21 good?

22    MR. FRIEDMAN:  That is perfect.

23    JUDGE MORRIS:  Then that gives me time to take a look

24 at it.  So if you will get it in by Wednesday the 7th.

25    MR. FRIEDMAN:  No problem.

1        JUDGE MORRIS:  Very good.  Thank you.

2     MR. FRIEDMAN:  Thank you, Your Honor.

3        JUDGE MORRIS:  Have a good day.

4     (Time noted:  12:35 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                       C E R T I F I C A T E

2   STATE OF NEW YORK      )
                                    : SS:
3   COUNTY OF NEW YORK     )

4

5              I, DEBORAH HUNTSMAN, a Shorthand Reporter and

6   Notary Public within and for the State of New York, do hereby

7   certify:

8              That the within is a true and accurate

9   transcript from the official electronic sound recording of the

10  proceedings held on the 21st day of February, 2007.

11             I further certify that I am not related by blood

12  or marriage to any of the parties and that I am not interested

13  in the outcome of this matter.

14             IN WITNESS WHEREOF, I have hereunto set my hand

15  this 6th day of March, 2007.

16

17

18                              DEBORAH HUNTSMAN
                                _____
19                              DEBORAH HUNTSMAN

20  PROOFREAD BY HALLIE CANTOR

21  ROUGH DRAFT 1 DELIVERED VIA E-MAIL 2/28/2007
    ROUGH DRAFT 2 DELIVERED VIA E-MAIL 3/1/2007
22

23

24

25

**$**

**$100** [1] - 43:17
**$400** [1] - 43:17

**0**

**02-41729** [2] - 1:3, 3:2
**03038** [1] - 2:9
**04-03293)(CGM** [1] - 1:6
**04-3293** [1] - 3:10
**0581** [1] - 23:17
**0586** [1] - 23:18

**1**

**1** [1] - 48:21
**10** [1] - 32:6
**10019** [2] - 1:19, 2:3
**119** [4] - 19:15, 19:17, 23:13, 31:16
**11:14** [1] - 1:9
**11:30** [1] - 4:18
**12** [2] - 11:20, 33:15
**12:35** [1] - 47:4
**13th** [1] - 45:15
**14001** [1] - 11:2
**1401** [1] - 11:4
**145** [7] - 10:14, 11:3, 11:8, 11:9, 11:11, 11:19, 17:4
**14693** [1] - 15:1
**14746** [3] - 27:25, 28:21, 32:2
**14th** [1] - 45:21
**15** [2] - 4:17, 16:12
**15-page** [1] - 5:18
**156** [1] - 21:13
**162** [4] - 19:18, 19:22, 23:14, 31:16
**163** [6] - 20:2, 20:11, 20:12, 20:15, 20:24, 31:25
**1633** [1] - 2:3
**164** [5] - 20:15, 20:17, 20:20, 20:24, 23:15
**16th** [5] - 35:13, 37:3, 37:23, 38:3, 38:4
**176** [11] - 10:14, 11:20, 13:4, 14:25, 15:19, 17:4, 20:8, 20:10, 31:20, 33:13, 33:15

**182** [6] - 27:11, 27:12, 27:23, 28:20, 29:1, 32:1
**184** [5] - 23:23, 25:22, 26:1, 26:14, 29:1
**188** [7] - 23:23, 24:5, 26:2, 26:3, 26:5, 26:14, 31:17
**19** [1] - 11:6
**190** [4] - 23:23, 25:15, 25:20, 26:15
**196** [3] - 17:16, 19:5, 31:17
**198** [2] - 19:5, 31:17
**1984** [1] - 9:7
**199** [2] - 19:5, 31:17
**1991** [1] - 21:20
**1994** [1] - 21:13
**1996** [1] - 25:9
**1998** [1] - 6:20
**1999** [2] - 11:5, 11:6
**19th** [2] - 6:12, 35:18

**2**

**2** [2] - 1:21, 48:21
**2.1** [1] - 16:16
**2/28/2007** [1] - 48:21
**200** [3] - 17:16, 19:5, 31:17
**2000** [1] - 14:12
**2007** [3] - 1:8, 48:10, 48:15
**201** [2] - 19:5, 31:17
**205** [2] - 30:9, 30:17
**20581** [4] - 22:12, 22:21, 29:21, 32:2
**20586** [4] - 22:13, 22:21, 29:21, 32:3
**20587** [1] - 22:18
**20596** [1] - 22:18
**206** [3] - 20:21, 20:24, 23:15
**20880** [1] - 23:4
**20881** [1] - 23:4
**20882** [4] - 22:25, 23:2, 23:18, 32:4
**20883** [4] - 22:25, 23:2, 23:19, 32:4
**21** [3] - 1:8, 11:5, 16:15
**21014** [1] - 11:15
**21035** [4] - 13:18, 13:25, 14:8, 31:18
**21037** [1] - 13:15
**21039** [1] - 13:16
**212** [1] - 1:24
**214** [6] - 22:1, 22:4,

**3**

**3/1/2007** [1] - 48:21
**30(b)(6)** [2] - 45:5, 45:18
**302** [1] - 23:17
**303** [8] - 22:12, 22:19, 22:21, 29:20, 29:21, 29:22, 30:5, 32:3
**31036** [2] - 13:25, 14:15
**314** [8] - 22:22, 23:2, 23:18, 23:23, 25:15, 25:20, 26:15, 32:4
**319** [4] - 23:23, 25:15, 25:20, 26:15
**321** [5] - 23:23, 25:15, 25:20, 26:15, 29:2
**325** [4] - 28:3, 28:9, 28:22, 29:2
**327** [5] - 10:14, 11:12, 11:15, 11:19, 17:4
**328** [4] - 28:10, 28:14, 28:22, 29:2
**330** [8] - 10:14, 13:10, 13:17, 13:24, 14:7, 17:5, 31:18
**336** [2] - 29:5, 29:7
**341** [1] - 23:3
**348** [8] - 23:6, 23:11, 23:19, 28:17, 28:19, 28:23
**35** [1] - 5:23

**352** [4] - 29:10, 29:24, 30:6, 31:17
**356** [4] - 29:10, 29:24, 30:6, 31:17
**363** [1] - 23:14

**4**

**41** [1] - 6:3
**42** [1] - 6:3
**43** [1] - 6:3
**450** [2] - 30:9, 30:18
**464** [1] - 8:15

**5**

**5** [1] - 29:1
**5200** [1] - 2:8

**6**

**600** [1] - 2:9
**608-9053** [1] - 1:24
**6th** [2] - 45:15, 48:15

**7**

**718** [1] - 1:24
**723-9898** [1] - 1:24
**73** [1] - 8:15
**774-2551** [1] - 1:24
**787** [1] - 1:19
**7th** [1] - 46:24

**8**

**8** [1] - 38:8
**852** [1] - 21:13
**8th** [1] - 45:14

**9**

**9** [3] - 38:8, 38:11, 38:12
**917** [1] - 1:24

**A**

**a.m** [1] - 1:9
**able** [2] - 5:2, 18:6
**Abrams** [7] - 11:21, 11:23, 12:1, 14:12, 20:22, 27:14, 27:19,

**27:21**, 28:13, 32:24, 33:16
**accompany** [1] - 22:3
**According** [1] - 16:12
**according** [1] - 10:15
**Accordingly** [2] - 22:6, 30:17
**accurate** [1] - 48:8
**accurately** [2] - 10:6, 30:20
**accused** [1] - 40:3
**action** [4] - 14:4, 14:13, 24:9, 24:11
**actions** [2] - 25:15, 25:18
**actual** [3] - 23:25, 24:3, 24:10
**add** [3] - 4:22, 5:5, 38:11
**added** [6] - 39:22, 39:23, 41:2, 41:4, 41:19
**addition** [2] - 10:6, 17:17
**additional** [1] - 20:17
**address** [5] - 10:5, 27:6, 27:7, 31:2, 45:25
**addressed** [4] - 6:21, 33:5, 36:24, 38:9
**addresses** [1] - 36:23
**ADELPHIA** [2] - 1:4, 1:6
**Adelphia** [38] - 1:18, 2:2, 3:2, 3:5, 3:18, 4:1, 10:21, 11:24, 12:12, 13:16, 15:3, 15:7, 15:11, 15:17, 15:23, 16:1, 16:6, 17:10, 17:13, 17:24, 19:8, 21:2, 22:4, 22:5, 22:10, 22:20, 23:24, 26:22, 26:23, 27:8, 30:9, 30:19, 31:10, 31:15, 33:20, 42:7, 44:21
**Adelphia's** [16] - 5:25, 10:13, 10:17, 16:12, 17:1, 17:8, 17:12, 18:1, 18:7, 18:12, 18:14, 24:1, 29:3, 29:19, 32:7, 32:24, 40:9, 44:19
**Adelphia/Prestige** [3] - 16:3, 16:4, 16:20
**adequacy** [1] - 9:8
**adequately** [1] -

29:12
  adjournment [1] -
4:12
  Adlman [2] - 6:20,
24:18
  adopt [1] - 8:1
  adopted [1] - 7:9
  advance [1] - 42:13
  adversary [1] - 3:9
  adversary's [1] -
18:18
  advice [3] - 8:13,
11:25, 12:7, 12:21,
13:1, 13:9, 18:5,
18:13, 18:17, 19:5,
20:8, 20:18, 20:25,
21:17, 26:10, 27:16,
31:24, 34:5, 34:12,
34:21, 44:22
  Advisor's [1] - 20:5
  affect [3] - 39:9,
39:14, 39:18
  affidavit [2] - 9:23,
10:2
  affiliation [1] - 3:11
  agencies [1] - 25:11
  agree [3] - 10:20,
26:10, 35:10
  agreed [1] - 42:4
  Agreement [1] - 23:8
  agreement [5] -
19:25, 22:2, 22:3,
22:8, 22:13
  agreements [1] -
21:2
  agrees [3] - 15:10,
18:16, 28:8
  ahead [1] - 36:7
  al [2] - 1:6, 1:9
  Alex [2] - 13:11,
19:20
  allegation [1] - 44:20
  allegations [1] -
40:17
  allocated [1] - 40:21
  allocates [1] - 10:3
  allocation [4] - 42:2,
42:3, 42:5, 44:22
  alls [1] - 45:7
  altered [1] - 41:20
  Amend [1] - 1:12
  amend [12] - 4:13,
13:4, 31:19, 34:6,
38:24, 39:24, 41:9,
41:14, 41:24, 42:11,
42:22, 43:21
  amended [4] - 41:18,
41:24, 42:8, 46:19
  Amended [1] - 35:19
  amending [1] - 40:3

  amendment [2] -
42:16, 43:15
  amendments [1] -
43:1
  America [1] - 2:8
  Amin [2] - 22:23,
28:4
  amount [2] - 31:1,
43:23
  analysis [4] - 17:25,
20:17, 24:19, 25:23
  analyze [1] - 32:15
  analyzing [1] - 7:23
  answer [5] - 39:4,
39:6, 39:8, 44:10
  answers [1] - 21:5
  anticipated [6] -
6:25, 7:5, 7:6, 25:2,
25:6, 25:19
  anticipating [1] -
25:12
  anticipation [3] -
7:13, 7:17, 15:3
  Anverse [2] - 3:9,
15:21
  anyway [1] - 45:8
  apologize [2] -
37:19, 38:23
  apparent [1] - 35:16
  appear [9] - 15:2,
17:8, 17:10, 19:7,
19:8, 19:12, 27:20,
29:25, 30:1
  appearances [1] -
1:21
  appearing [1] - 3:17
  applicability [1] -
8:25
  application [2] -
9:24, 34:17
  applied [1] - 25:17
  applies [2] - 20:20,
26:12
  apply [3] - 6:16, 8:6,
15:13
  appraisal [3] - 11:24,
20:5, 20:16
  appreciate [1] -
46:17
  appropriate [2] -
15:8, 43:21
  argues [3] - 17:13,
17:24, 18:3
  argument [2] - 17:1,
46:4
  arguments [2] -
36:15, 36:22
  arise [1] - 25:20
  arising [1] - 24:14
  articulating [1] - 6:7

  aspect [1] - 16:25
  aspects [2] - 16:20,
18:1
  assert [2] - 10:10,
15:4
  asserted [3] - 15:10,
15:18, 26:20
  asserting [3] - 10:1,
21:21, 21:24
  assertion [2] - 15:12,
35:24
  assertions [4] - 9:5,
9:18, 9:20
  asserts [4] - 13:19,
14:23, 23:23, 28:5
  assess [2] - 8:24,
15:8
  Asset [1] - 23:8
  asset [1] - 16:17
  assets [1] - 42:7
  assist [3] - 7:4, 7:25,
25:5
  assistance [1] -
21:16
  assistant [1] - 27:5
  Atlanta [1] - 2:9
  attach [1] - 12:18
  attached [5] - 20:1,
34:3, 38:8, 41:12,
41:13
  attaches [1] - 19:20,
22:1
  attack [1] - 42:24
  attacking [1] - 42:23
  attempt [1] - 35:7
  attention [3] - 36:18,
37:10, 46:7
  attorney [5] - 10:17,
10:21, 11:17, 11:21,
12:12, 12:25, 13:8,
13:11, 16:7, 17:12,
17:15, 17:23, 18:8,
18:12, 18:25, 21:16,
22:16, 22:23, 23:5,
26:6, 28:12, 30:2,
31:23, 33:16, 33:20,
34:11
  Attorney/client [1] -
8:8
  attorney/client [13] -
8:9, 8:20, 11:10,
20:20, 21:8, 21:23,
23:11, 26:4, 26:12,
26:19, 28:15, 28:19,
28:24
  Attorneys [3] - 1:18,
2:2, 2:7
  attorneys [6] - 10:13,
13:14, 17:9, 26:25,
27:5, 32:24

  author [2] - 12:19,
34:4
  available [1] - 40:8
  Avenue [1] - 1:19
  avoid [1] - 36:8
  aware [2] - 14:3, 16:6
  axiomatic [1] - 9:2

B

  B.1 [2] - 17:7, 19:6
  B.2 [3] - 23:13, 30:5,
30:6
  background [1] -
15:18
  balance [1] - 13:17
  Bank [1] - 2:8
  BANKRUPTCY [1] -
1:1
  Bankruptcy [1] -
1:15
  Based [1] - 29:2
  based [6] - 12:6,
12:17, 18:13, 18:17,
24:24, 34:2
  basis [3] - 6:5, 24:12,
31:9
  Bates [24] - 11:1,
11:4, 11:15, 13:15,
13:18, 13:24, 14:8,
14:15, 14:25, 22:12,
22:17, 22:20, 22:25,
23:2, 23:3, 23:17,
23:18, 27:25, 28:21,
29:20, 31:18, 32:1,
32:2, 32:3
  bears [2] - 21:24,
26:11
  become [2] - 32:25,
42:6
  began [1] - 40:23
  begin [4] - 5:23,
6:15, 40:5, 44:2
  beginning [3] - 40:1,
41:25, 46:15
  behalf [3] - 3:13,
3:17, 3:25
  beliefs [1] - 45:2
  believes [1] - 30:15
  benefit [1] - 18:3
  benefits [1] - 41:3
  Benson [2] - 3:16,
4:3
  BENSON [1] - 2:2
  best [1] - 40:4
  better [1] - 42:10
  between [12] - 8:11,
11:17, 12:1, 16:7,
17:10, 17:12, 17:20,

18:11, 21:4, 26:25,
27:18, 32:24
  big [1] - 43:5
  Bill [1] - 26:6
  blame [1] - 42:22
  blood [1] - 48:11
  bother [1] - 43:16
  bottom [4] - 11:1,
14:3, 14:11, 14:18
  Bransford [1] - 13:11
  Braverman [1] - 27:5
  briefly [3] - 14:2,
35:16, 44:15
  bring [1] - 39:7
  Broadway [1] - 2:3
  Buckfelder [13] - 3:8,
11:16, 12:2, 12:11,
15:17, 15:21, 15:22,
16:1, 16:13, 16:19,
26:7, 33:19
  Buckfelder's [1] -
15:23
  burden [7] - 9:2, 9:4,
9:25, 10:3, 21:24,
26:11, 27:23
  business [7] - 7:4,
7:25, 8:4, 19:7, 19:12,
25:5, 26:10
  Business [1] - 19:10
  BY [4] - 1:20, 2:4,
2:11, 48:20

C

  Cablevision [1] - 3:5
  calendar [3] - 39:5,
45:7
  calendars [1] - 45:15
  camera [13] - 5:24,
6:9, 12:9, 25:14, 27:1,
28:1, 28:8, 28:10,
29:2, 29:6, 30:15,
32:9, 35:8
  cannot [1] - 9:21
  CANTOR [1] - 48:20
  carefully [1] - 14:9
  Carolina [4] - 3:7,
16:13, 16:15, 16:17
  case [19] - 3:2, 6:1,
6:12, 7:19, 15:13,
16:7, 21:11, 21:13,
21:15, 21:20, 24:17,
24:22, 24:25, 25:1,
39:19, 40:23, 41:20,
42:17, 45:3
  Case [1] - 1:2
  cases [2] - 9:14, 15:7
  categories [1] -
40:15

**categorizing** [1] - 6:5
**category** [7] - 10:15, 17:9, 19:9, 23:22, 26:2, 29:19, 40:16
**CECELIA** [1] - 1:15
**celebrate** [1] - 45:13
**celebrated** [1] - 45:12
**certain** [5] - 5:25, 19:15, 22:14, 24:14, 24:23
**certainly** [1] - 16:20, 19:13
**certify** [2] - 48:7, 48:11
**challenge** [2] - 8:16, 24:21
**challenged** [5] - 9:19, 9:21, 9:24, 10:9, 10:11
**challenges** [1] - 26:22
**chambers** [3] - 37:8, 38:21, 38:22
**chance** [2] - 37:14, 40:2
**change** [2] - 14:20, 44:5
**changed** [1] - 41:20
**changes** [6] - 22:7, 22:14, 22:15, 22:17, 40:12, 40:15
**changing** [1] - 14:20
**characterization** [1] - 28:8
**charitable** [1] - 12:3
**Chief** [1] - 16:14
**Chintan** [2] - 22:22, 28:4
**CIBC** [1] - 13:21
**Circuit** [6] - 6:20, 8:2, 8:14, 9:6, 24:17, 24:21
**circuit** [2] - 6:20, 6:22
**circumstances** [3] - 15:8, 25:19, 33:6
**cited** [2] - 15:7, 16:6
**cites** [2] - 21:19, 25:8
**city** [1] - 44:12
**Civil** [4] - 7:12, 8:17, 9:17, 9:18
**claim** [4] - 9:11, 26:22, 43:17
**claimed** [1] - 15:5
**claiming** [2] - 8:18, 9:2
**claims** [6] - 11:22, 26:23, 28:11, 39:23, 41:19, 42:17

**clarify** [2] - 17:4, 35:1
**clarifying** [1] - 35:3
**clarity** [1] - 42:1
**class** [2] - 14:4, 14:13
**classically** [1] - 39:19
**clear** [12] - 12:8, 12:22, 14:6, 14:21, 14:25, 17:3, 28:3, 33:11, 33:16, 34:6, 35:5, 38:2
**cleared** [1] - 43:2
**clearer** [1] - 40:13
**clearly** [2] - 37:8, 42:19
**client** [12] - 8:11, 16:8, 16:10, 17:18, 18:9, 21:8, 21:17, 30:3, 30:11, 30:13, 30:16, 34:25
**client's** [2] - 12:6, 18:18
**co** [2] - 18:8, 18:13
**co-counsel** [2] - 18:8, 18:13
**Code** [1] - 24:25
**Cole** [1] - 27:5
**comb** [1] - 6:8
**coming** [1] - 42:12
**comment** [2] - 19:3, 32:13
**Committee** [2] - 1:12, 3:6
**communicated** [17] - 12:19, 12:25, 13:3, 13:8, 26:25, 27:9, 27:21, 28:4, 28:17, 31:22, 32:18, 32:21, 33:4, 33:9, 34:4, 34:10, 34:14
**Communication** [2] - 3:3, 27:15
**communication** [28] - 8:11, 11:18, 15:24, 16:7, 16:9, 16:11, 16:25, 17:23, 18:11, 18:12, 18:15, 18:17, 18:19, 19:4, 19:22, 20:6, 20:18, 20:25, 22:16, 23:1, 23:12, 26:9, 26:21, 27:18, 28:15, 34:18, 34:19, 34:22
**COMMUNICATION S** [3] - 1:4, 1:6, 1:8
**communications** [22] - 8:20, 8:22, 10:13, 10:16, 10:25,

12:5, 12:14, 12:16, 17:7, 17:8, 17:10, 17:11, 17:19, 18:2, 19:8, 19:10, 19:11, 19:12, 21:9, 23:5, 33:22, 34:1
**Communications** [7] - 1:18, 2:7, 3:2, 3:5, 3:7, 4:1, 19:7
**company** [1] - 20:4
**compel** [3] - 5:25, 36:14, 36:16
**Complaint** [2] - 1:12, 35:20
**complaint** [19] - 4:13, 16:12, 38:24, 39:24, 39:25, 40:3, 40:5, 41:13, 41:18, 41:22, 41:24, 42:8, 42:11, 42:13, 43:22, 45:1, 45:3, 46:19
**completed** [1] - 27:2
**complied** [1] - 44:22
**comply** [1] - 32:6
**comprising** [2] - 11:7, 11:13
**concern** [3] - 31:3, 31:12, 32:16
**concerned** [2] - 43:14, 45:5
**concerning** [11] - 4:10, 7:2, 10:7, 13:23, 14:4, 17:20, 17:25, 18:7, 25:3, 30:13, 30:23
**conclusionary** [1] - 43:5
**conclusions** [3] - 7:1, 13:22, 25:3
**conclusory** [1] - 9:5
**conduct** [2] - 15:14, 15:15
**CONF** [1] - 28:13
**conference** [2] - 11:23, 28:12
**confidences** [3] - 12:6, 30:11, 30:16
**confidential** [7] - 8:12, 15:25, 16:24, 18:4, 21:10, 27:15, 30:12
**confidentially** [2] - 12:19, 34:4
**confirm** [1] - 32:8
**confused** [1] - 46:10
**confusion** [1] - 36:9
**consider** [1] - 31:13
**considerations** [1] - 4:10
**considered** [3] -

21:15, 21:18, 24:21
**consist** [1] - 10:22
**consisting** [1] - 28:3
**consists** [5] - 11:6, 11:20, 13:10, 17:9, 26:5
**constant** [1] - 9:12
**constitute** [1] - 18:16
**constitutes** [2] - 16:16, 19:3
**Construction** [1] - 8:15
**consummate** [1] - 3:21
**consummated** [1] - 3:20
**contain** [5] - 17:17, 17:19, 21:4, 23:4, 29:25
**contained** [3] - 21:17, 23:9, 27:12
**contains** [4] - 22:22, 23:6, 27:3, 27:6
**contemplates** [1] - 28:6
**contend** [2] - 15:23, 16:1
**contends** [1] - 21:2
**contention** [1] - 29:3
**context** [1] - 41:17
**contingent** [1] - 3:19
**continue** [1] - 30:21
**continued** [2] - 1:21, 2:1
**contract** [2] - 19:2, 42:5
**conversation** [17] - 11:4, 11:7, 11:14, 11:16, 11:17, 12:1, 12:22, 13:13, 13:20, 18:23, 26:7, 27:17, 31:20, 32:14, 32:24, 33:9, 33:21
**conversations** [16] - 10:23, 11:8, 12:10, 12:11, 12:13, 13:2, 13:6, 13:16, 32:16, 32:17, 32:19, 32:20, 33:18, 33:20, 34:8, 34:13
**convert** [1] - 43:15
**convey** [1] - 18:8
**conveying** [1] - 33:1
**copies** [2] - 17:15, 32:8
**copy** [8] - 22:13, 36:25, 37:5, 37:16, 37:17, 38:25, 41:9, 46:6
**CORPORATION** [2] -

1:4, 1:6
**Corporation** [1] - 21:12
**correct** [4] - 20:14, 30:15, 33:14, 43:6
**corrected** [1] - 19:15
**counsel** [10] - 8:11, 17:12, 17:18, 17:20, 18:6, 18:8, 18:12, 18:13, 21:5, 24:13
**Counsel** [1] - 31:15
**counsels'** [1] - 17:25
**COUNTY** [1] - 48:3
**couple** [4] - 32:12, 41:5, 42:4, 45:9
**course** [4] - 8:4, 20:5, 31:5, 38:10
**COURT** [1] - 1:1
**Court** [33] - 1:23, 1:25, 7:9, 7:11, 10:4, 14:3, 15:3, 15:7, 15:10, 15:13, 16:6, 18:16, 24:16, 25:16, 27:1, 27:25, 28:7, 28:10, 28:18, 29:1, 29:5, 29:17, 29:20, 30:14, 30:19, 30:23, 31:1, 31:10, 31:11, 32:9, 35:6, 36:10, 37:7
**Court's** [3] - 12:17, 18:20, 34:2
**cover** [9] - 17:17, 17:19, 18:20, 18:23, 20:3, 20:15, 20:23, 22:1, 22:2
**crawl** [1] - 6:23
**crazy** [1] - 43:11
**create** [1] - 43:9
**created** [5] - 6:25, 7:22, 7:25, 8:4, 25:1
**creation** [1] - 15:21
**credited** [1] - 9:10
**Creditors** [2] - 1:12, 3:6
**current** [1] - 31:11

**D**

**damages** [5] - 41:21, 41:23, 43:20, 43:23, 43:25
**date** [3] - 11:16, 32:6, 37:24
**dated** [3] - 6:11, 38:3, 38:4
**dates** [1] - 11:9
**David** [1] - 3:15
**DAVID** [1] - 2:4

**days** [4] - 10:23, 22:8, 32:6, 45:20
**deadline** [5] - 39:23, 41:24, 42:11, 42:12, 42:13
**deal** [1] - 4:9
**dealing** [1] - 5:11
**dealt** [1] - 37:6
**DEBORAH** [4] - 1:23, 48:5, 48:18, 48:19
**Debtor** [3] - 1:5, 1:18, 4:1
**decide** [1] - 5:18
**decided** [2] - 21:18, 40:24
**decision** [7] - 6:20, 7:4, 8:1, 8:14, 9:6, 25:6, 39:9
**decision)** [1] - 9:7
**deed** [1] - 39:19
**deemed** [1] - 7:16
**Defendants** [13] - 1:9, 3:14, 17:14, 18:5, 31:2, 32:15, 32:18, 32:21, 33:1, 33:10, 41:1, 41:3, 42:22
**Defendants'** [16] - 4:7, 4:22, 5:8, 5:10, 5:14, 5:15, 17:24, 18:4, 18:6, 18:11, 18:14, 24:13, 30:24, 31:3, 35:24, 36:14
**defer** [1] - 43:25
**definition** [1] - 15:1
**deleted** [1] - 40:17
**DELIVERED** [2] - 48:21, 48:21
**demonstrate** [2] - 8:9, 10:10
**demonstrating** [1] - 26:11
**denied** [1] - 32:8
**deposed** [2] - 40:10, 44:19
**deposition** [3] - 9:23, 40:6, 40:8
**depositions** [1] - 40:5
**Derek** [2] - 19:20, 28:11
**derived** [2] - 40:22, 42:3
**describe** [1] - 8:21
**described** [4] - 19:11, 19:19, 28:18, 29:12
**description** [4] - 27:13, 27:16, 27:20, 29:7
**descriptions** [1] -

28:25
**destroyed** [1] - 32:10
**detail** [1] - 24:9
**determined** [2] - 41:23, 43:23
**differences** [1] - 41:15
**different** [8] - 10:23, 11:7, 20:16, 24:5, 33:1, 40:19, 41:7
**DIGITALLY** [1] - 1:10
**direct** [2] - 30:19, 32:5
**directions** [1] - 41:7
**directly** [4] - 10:16, 17:1, 24:25, 46:8
**disagree** [4] - 34:16, 44:4, 44:25, 45:1
**discharged** [1] - 9:5
**disclose** [1] - 22:20
**disclosed** [17] - 8:22, 11:13, 12:14, 19:17, 19:23, 19:24, 20:8, 21:6, 21:22, 22:5, 22:6, 22:9, 22:11, 23:3, 29:18, 29:22, 33:23
**discloses** [1] - 20:3
**disclosure** [2] - 25:17, 30:12
**discoverable** [1] - 7:13
**discovery** [12] - 30:9, 31:13, 39:12, 39:21, 40:1, 40:22, 43:6, 43:8, 43:18, 43:20, 44:1, 44:2
**discussed** [1] - 21:11
**discussing** [1] - 14:4
**discussion** [3] - 14:13, 17:13, 29:9
**discussions** [1] - 16:24
**dispute** [2] - 9:21, 10:6
**disputed** [1] - 30:23
**disputes** [1] - 10:7
**distributed** [1] - 19:21
**DISTRICT** [1] - 1:2
**District** [2] - 21:13, 21:20
**district** [1] - 10:8
**dixit** [1] - 9:5
**docket** [2] - 6:1, 6:3
**Document** [18] - 19:15, 19:18, 20:21, 20:24, 22:1, 22:7, 22:12, 22:22, 23:6,

23:11, 23:13, 25:22, 26:3, 26:5, 27:2, 28:9, 28:14, 28:20
**document** [93] - 5:1, 6:24, 6:25, 7:5, 7:18, 7:19, 7:22, 9:9, 10:14, 11:3, 11:8, 11:9, 11:11, 11:12, 11:13, 11:20, 13:4, 13:10, 13:17, 13:24, 14:24, 14:25, 15:5, 15:13, 15:19, 17:13, 17:16, 19:17, 19:22, 19:24, 20:2, 20:8, 20:15, 20:17, 22:4, 22:6, 22:8, 22:17, 22:19, 22:21, 23:2, 23:3, 23:9, 23:14, 23:15, 23:16, 23:17, 23:18, 23:19, 24:10, 25:1, 25:22, 25:24, 26:2, 26:8, 26:13, 27:11, 27:12, 27:19, 27:23, 28:3, 28:5, 28:7, 28:10, 28:17, 28:19, 28:20, 28:22, 28:23, 29:5, 29:7, 29:18, 29:20, 29:21, 29:22, 31:18, 31:20, 31:25, 32:1, 32:3, 32:4
**Documents** [4] - 7:16, 25:15, 29:15, 29:24
**documents** [54] - 5:23, 5:25, 6:17, 7:12, 8:3, 8:7, 8:16, 8:18, 8:21, 9:12, 9:16, 10:7, 10:15, 10:22, 10:24, 17:4, 17:9, 18:21, 19:5, 19:9, 19:14, 20:24, 21:1, 21:3, 21:6, 23:22, 23:23, 24:2, 24:4, 24:5, 24:12, 25:14, 25:17, 26:23, 26:24, 27:1, 28:1, 29:1, 29:10, 30:9, 30:14, 30:15, 30:17, 30:21, 30:24, 30:25, 31:16, 32:8, 35:25, 36:16, 36:18, 38:4, 40:11
**Dodge** [1] - 21:12
**done** [2] - 39:23, 40:20
**Donna** [1] - 20:22
**doubt** [1] - 27:8
**down** [1] - 35:11
**draft** [13] - 21:21, 21:22, 21:24, 22:2, 22:9, 22:14, 22:22,

22:24, 23:10
**DRAFT** [2] - 48:21, 48:21
**drafts** [6] - 19:8, 21:1, 21:2, 21:7, 21:14, 29:25
**due** [3] - 24:14, 31:1, 38:10
**duty** [1] - 22:23
**dyslexia** [1] - 20:12

**E**

**e-mail** [1] - 27:7
**E-MAIL** [2] - 48:21, 48:21
**early** [2] - 4:17, 4:19
**easily** [1] - 46:8
**Eastern** [2] - 21:12, 21:20
**edits** [1] - 23:7
**effort** [3] - 5:24, 31:2, 31:12
**eight** [2] - 11:2, 11:15
**eight-word** [1] - 11:15
**either** [5] - 12:8, 15:8, 17:20, 33:16, 34:25
**electronic** [4] - 6:1, 6:2, 6:12, 48:9
**Electronic** [1] - 1:24
**electronically** [1] - 46:16
**element** [2] - 9:10, 10:5
**elements** [3] - 9:4, 9:24, 10:11
**elsewhere** [1] - 7:16
**embodies** [1] - 17:24
**employee** [1] - 16:22
**enable** [1] - 8:24
**end** [1] - 39:13
**engagement** [1] - 38:19
**enormous** [1] - 31:1
**entered** [1] - 8:16
**enterprise** [1] - 40:9
**entire** [1] - 28:5
**entirety** [1] - 29:18
**entries** [3] - 10:21, 17:15, 17:16
**Entries** [2] - 26:19, 28:25
**entry** [2] - 11:5, 29:4
**environmental** [8] - 18:25, 22:2, 22:3, 22:8, 22:13, 24:8,

24:14, 25:8
**equivalence** [1] - 7:16
**ESQ** [6] - 1:20, 2:4, 2:5, 2:6, 2:11, 2:12
**essence** [1] - 18:10
**essential** [1] - 9:4
**essentially** [1] - 8:5
**establish** [2] - 9:3, 9:10
**established** [2] - 3:19, 8:6
**establishing** [1] - 9:24
**estate** [3] - 11:24, 15:20, 16:3
**et** [2] - 1:6, 1:9
**evidence** [1] - 9:22
**evidenced** [1] - 15:24
**examination** [1] - 28:16
**example** [2] - 10:25, 41:22
**excellent** [1] - 6:5
**except** [6] - 13:14, 13:18, 17:16, 27:24, 28:21, 32:1
**excited** [1] - 41:18
**excluded** [1] - 16:24
**Exhibit** [3] - 38:11, 38:12, 41:13
**exhibit** [1] - 38:12
**exhibits** [1] - 38:8
**expect** [2] - 16:22, 45:24
**expected** [1] - 23:1
**expecting** [1] - 46:3
**expects** [2] - 22:5, 22:9
**expended** [2] - 31:2, 31:12
**expert** [1] - 43:25
**explain** [1] - 42:18
**explanation** [2] - 15:18, 41:14
**extent** [5] - 13:2, 30:11, 32:23, 34:13, 40:25
**extra** [1] - 42:4
**eye** [1] - 25:25

**F**

**F.3d** [1] - 8:15
**F.Supp** [1] - 21:13
**facsimile** [2] - 17:17, 17:19
**fact** [11] - 8:12, 20:3,

21:7, 27:9, 32:21, 33:2, 34:19, 34:23, 34:24, 39:12
**facts** [4] - 9:3, 9:9, 20:5, 42:17
**factual** [4] - 7:19, 10:10, 40:4, 41:2
**failed** [1] - 27:23
**failure** [1] - 35:25
**fairly** [1] - 7:20
**fall** [1] - 24:22
**falls** [1] - 7:8
**FARR** [1] - 1:18
**Farr** [3] - 3:25, 4:25, 35:23
**Farr's** [1] - 35:24
**favor** [2] - 31:6, 37:7
**favorable** [1] - 19:2
**fax** [4] - 18:20, 18:23, 22:1, 27:6
**February** [8] - 1:8, 36:11, 37:3, 37:22, 38:3, 38:4, 45:8, 48:10
**Federal** [3] - 7:11, 8:17, 9:17
**federal** [1] - 44:22
**fee** [1] - 14:5
**fees** [3] - 14:13, 30:8, 30:10
**felt** [1] - 43:21
**filed** [3] - 1:12, 36:14, 46:16
**filing** [2] - 6:1, 6:13
**final** [5] - 21:6, 21:9, 21:18, 23:10, 30:1
**Finance** [1] - 16:14
**Financial** [1] - 16:14
**findings** [1] - 31:5
**fine** [3] - 44:12, 45:4, 45:17
**finish** [1] - 5:4
**firm** [2] - 20:22, 35:23
**first** [8] - 3:17, 4:5, 10:12, 15:6, 19:10, 22:19, 40:16, 41:4
**First** [2] - 5:23, 24:6
**fit** [1] - 15:1
**five** [4] - 23:22, 24:4, 26:22, 27:1
**following** [1] - 31:16
**foolishly** [1] - 42:10
**foregoing** [2] - 10:3, 10:6
**forensic** [1] - 35:25
**form** [5] - 7:7, 8:5, 21:22, 22:4, 22:25
**formality** [2] - 35:12, 36:3

**formally** [1] - 39:17
**formation** [2] - 7:10, 8:1
**formulate** [1] - 18:6
**formulation** [1] - 7:24
**forth** [1] - 9:9
**forward** [2] - 20:16, 29:10
**foundations** [1] - 12:3
**four** [2] - 10:15, 19:13
**fragment** [1] - 11:15
**frankly** [2] - 40:10, 42:8
**free** [1] - 42:23
**Friday** [2] - 45:11, 45:21
**FRIEDMAN** [18] - 2:2, 2:4, 3:15, 3:22, 39:1, 39:11, 39:16, 40:14, 41:16, 43:3, 43:7, 43:19, 44:8, 44:12, 46:18, 46:22, 46:25, 47:2
**Friedman** [4] - 3:16, 3:17, 4:3, 39:6
**front** [2] - 4:14, 36:4
**fully** [1] - 46:1
**future** [2] - 15:15, 25:11

## G

**GALLAGHER** [1] - 1:18
**Gallagher** [1] - 3:25
**Garrett** [1] - 25:8
**Gary** [26] - 10:16, 10:18, 10:20, 10:25, 11:14, 11:23, 12:4, 12:11, 12:15, 12:16, 12:23, 13:2, 13:6, 31:21, 32:14, 32:16, 32:20, 33:20, 33:25, 34:8, 34:9, 34:14, 34:18
**general** [2] - 6:15, 31:6
**generous** [1] - 19:1
**Georgia** [1] - 2:9
**Gershman** [1] - 3:16
**GERSHMAN** [7] - 2:5, 14:16, 20:10, 32:12, 33:7, 33:14, 34:16
**given** [1] - 11:16
**GORDON** [1] - 2:12

**Gordon** [1] - 3:13
**Gordy** [2] - 27:4, 27:7
**governing** [1] - 8:16
**government** [1] - 25:25
**Grand** [1] - 9:6
**greater** [5] - 40:20, 41:25, 42:1, 42:5, 42:14
**ground** [1] - 10:8
**grounds** [1] - 25:12
**guy** [1] - 40:8

## H

**Hal** [2] - 12:1, 14:12
**HALLIE** [1] - 48:20
**Hand** [1] - 37:5
**hand** [4] - 30:22, 31:9, 37:16, 48:14
**handed** [1] - 38:7
**hands** [1] - 38:14
**handwritten** [16] - 10:22, 11:21, 11:22, 13:11, 19:18, 20:21, 21:5, 22:14, 22:15, 23:6, 23:7, 27:12, 27:14, 28:4, 28:11, 33:15
**happy** [2] - 42:18, 43:3
**hard** [1] - 46:5
**hardship** [1] - 7:15
**Harold** [5] - 11:21, 11:22, 20:22, 27:14, 33:16
**Harris** [1] - 3:12
**HARRIS** [1] - 2:11
**HEA** [1] - 28:13
**headings** [1] - 19:16
**heard** [2] - 17:6, 35:15
**Heather** [1] - 17:23, 19:1
**heavy** [1] - 39:5, 45:15
**held** [3] - 25:1, 36:19, 48:10
**help** [2] - 6:4, 38:6
**helped** [1] - 6:6
**hereby** [1] - 48:6
**hereunto** [1] - 48:14
**hit** [1] - 5:18
**hold** [2] - 15:3, 15:9
**holding** [2] - 7:9, 16:7
**holiday** [1] - 39:5
**Honor** [42] - 3:12,

3:15, 3:18, 3:24, 4:2, 4:16, 4:24, 5:6, 5:13, 14:1, 14:16, 20:10, 32:12, 33:7, 33:14, 34:16, 35:15, 35:21, 36:8, 36:12, 36:25, 37:4, 37:12, 37:18, 37:25, 38:10, 39:12, 39:16, 40:19, 41:16, 42:19, 42:24, 43:3, 43:10, 43:19, 44:8, 44:14, 45:4, 45:17, 45:24, 46:14, 47:2
**Honor's** [2] - 14:2, 14:5
**HONORABLE** [1] - 1:15
**hope** [1] - 17:3
**Horder** [1] - 18:25
**Houlihan** [1] - 20:4
**hour** [1] - 40:7
**Hunt** [1] - 13:21
**HUNTSMAN** [4] - 1:23, 48:5, 48:18, 48:19

## I

**i.e** [1] - 27:18
**identify** [5] - 12:24, 13:5, 31:19, 34:7, 34:9
**imagine** [1] - 43:7
**immunity** [1] - 9:11
**implication** [1] - 40:17
**implications** [1] - 24:7
**implicit** [1] - 24:1
**important** [1] - 20:3
**impossible** [1] - 26:8
**impressions** [3] - 7:1, 13:22, 25:3
**improper** [1] - 35:6
**improve** [1] - 42:13
**IN** [1] - 48:14
**inability** [1] - 7:15
**inadequate** [2] - 28:25, 29:4
**Inc** [3] - 2:7, 3:7, 27:16
**INC** [1] - 1:8
**include** [2] - 5:2, 21:18
**included** [2] - 38:5, 38:15
**includes** [1] - 23:7
**incorporated** [1] - 22:15

**incorporation** [1] - 23:10
**incremental** [2] - 41:3, 43:8
**Independence** [1] - 45:11
**index** [1] - 9:16
**indicate** [6] - 15:7, 24:9, 27:17, 27:20, 27:21, 32:16
**indicated** [2] - 28:13, 32:15
**indicates** [1] - 10:18
**indication** [1] - 26:20
**influenced** [2] - 7:4, 25:6
**informally** [1] - 9:22
**information** [15] - 8:23, 9:16, 18:4, 18:7, 20:19, 21:17, 23:9, 27:12, 27:15, 29:25, 30:10, 30:13, 34:20, 41:25, 45:2
**initial** [1] - 9:15
**inside** [1] - 30:16
**inspection** [1] - 32:9
**instance** [1] - 41:12
**instructed** [1] - 27:10
**instructions** [1] - 27:4
**insufficient** [1] - 24:9
**Insurance** [1] - 25:9
**intended** [7] - 7:3, 8:12, 22:2, 22:19, 23:10, 25:5, 30:1
**intends** [2] - 21:8, 21:21
**intention** [1] - 15:24
**inter** [3] - 17:15, 22:16, 23:5
**inter-attorney** [3] - 17:15, 22:16, 23:5
**interactions** [3] - 12:4, 12:15, 33:25
**Interest** [1] - 30:8
**interested** [1] - 48:12
**interpretation** [2] - 6:21, 24:24
**interrogatory** [1] - 43:24
**intimate** [1] - 18:3
**investigation** [1] - 25:16
**investigations** [1] - 25:10
**Investment** [1] - 3:9
**invoke** [1] - 8:9
**involved** [7] - 15:22, 16:2, 16:10, 16:20,

16:21, 16:23, 17:1
ipse [1] - 9:5
irrespective [1] - 8:5
IRS [2] - 24:20, 24:25
Island [1] - 45:15
issue [14] - 14:23,
15:17, 16:22, 16:23,
18:10, 21:14, 24:16,
25:8, 29:11, 30:24,
35:23, 38:9, 40:21,
44:16
issues [9] - 4:14,
11:24, 12:2, 16:4,
30:23, 31:11, 31:13,
41:21
iteration [1] - 15:6
itself [4] - 8:23, 42:6,
43:22, 45:2

**J**

jam [1] - 45:22
jam-packed [1] -
45:22
January [6] - 6:12,
35:18, 36:10, 36:11,
36:12, 37:3
Jeff [3] - 46:7, 46:11
joint [21] - 4:6, 4:20,
5:2, 5:8, 5:12, 5:13,
5:15, 6:4, 6:9, 6:11,
35:22, 35:23, 36:9,
36:21, 36:23, 37:1,
38:5, 38:14, 38:16,
45:25, 46:15
Jonathan [2] - 3:7,
15:20
JOSEPH [1] - 2:5
Joseph [1] - 3:16
Judge [2] - 1:15,
21:14
JUDGE [53] - 3:1,
3:21, 3:23, 4:4, 4:17,
5:3, 5:10, 5:17, 14:6,
14:14, 14:19, 17:7,
20:12, 25:14, 29:17,
33:3, 33:11, 33:15,
35:4, 35:8, 35:19,
36:3, 36:11, 36:24,
37:2, 37:5, 37:13,
37:19, 38:1, 38:17,
38:20, 39:3, 39:14,
40:12, 41:8, 43:2,
43:4, 43:14, 44:4,
44:10, 44:15, 44:17,
44:24, 45:6, 45:13,
45:19, 46:1, 46:5,
46:17, 46:20, 46:23,
47:1, 47:3

Julie [1] - 27:4
Jury [1] - 9:6

**K**

Kasowitz [2] - 3:16,
4:3
KASOWITZ [1] - 2:2
keep [1] - 37:19
kept [1] - 8:12
key [2] - 8:10, 21:10
Kilpatrick [1] -
20:23, 34:19
knowledge [1] - 40:9
known [2] - 42:2,
44:19
knows [1] - 3:18

**L**

labeled [1] - 20:23
language [3] - 19:2,
40:16, 40:18
last [3] - 28:16,
36:23, 45:23
late [2] - 14:13, 45:3
law [1] - 20:22
laws [1] - 44:23
lawyers [2] - 44:19,
44:21
lead [1] - 10:17
learned [3] - 18:2,
18:7, 34:23
least [1] - 45:9
leave [2] - 4:12, 41:9
Leave [1] - 1:12
legal [36] - 6:15,
8:13, 11:25, 12:5,
12:7, 12:17, 12:21,
13:1, 13:9, 17:25,
18:5, 18:13, 18:17,
19:5, 20:8, 20:18,
20:25, 21:17, 24:18,
25:22, 26:9, 27:4,
27:13, 27:16, 30:8,
30:10, 30:13, 30:17,
31:23, 34:1, 34:5,
34:12, 34:21, 44:21
letter [24] - 4:9, 5:1,
19:21, 19:25, 20:3,
20:15, 20:21, 22:1,
22:2, 22:22, 22:24,
35:11, 36:1, 36:22,
37:21, 37:22, 37:24,
38:3, 38:4, 38:11,
38:13, 38:18, 38:19
letters [1] - 20:23
liability [2] - 24:20,

25:24
Life [1] - 25:9
light [1] - 7:18
likely [2] - 7:5, 7:23
lines [5] - 20:17,
27:24, 28:1, 28:21,
32:1
list [1] - 9:14
listed [1] - 30:25
listing [1] - 20:3
litigation [27] - 6:25,
7:2, 7:5, 7:6, 7:8,
7:13, 7:17, 7:21, 7:23,
8:5, 13:23, 14:5,
14:21, 15:3, 24:1,
24:3, 24:10, 24:14,
24:23, 25:2, 25:4,
25:7, 25:12, 25:13,
25:20, 28:6
LLC [1] - 3:6
LLP [4] - 1:18, 2:2,
2:7, 27:5
Local [1] - 9:17
log [39] - 4:7, 4:22,
5:8, 5:11, 5:14, 8:17,
9:9, 9:13, 10:16,
10:18, 10:21, 12:9,
13:5, 13:12, 15:6,
16:19, 19:11, 23:25,
24:6, 26:23, 27:13,
28:9, 28:18, 29:4,
30:20, 30:24, 31:4,
31:7, 31:8, 31:10,
31:11, 31:19, 33:17,
34:7, 35:25, 36:1,
36:15, 36:17, 36:20
logged [1] - 36:16
logs [1] - 19:19
look [9] - 8:11,
37:15, 37:20, 38:10,
43:22, 43:24, 45:7,
46:23
looked [2] - 6:17,
9:12
looking [3] - 36:6,
38:2, 42:8
looms [1] - 24:21
Lorraine [1] - 3:8
Lorri [3] - 12:2,
12:10, 33:19
lose [1] - 7:2, 7:24,
25:4
lost [1] - 37:11

**M**

Magistrate [1] -
21:14
MAIL [2] - 48:21,

48:21
mail [2] - 27:7, 37:11
mailing [1] - 27:6
Management [1] -
22:24
Manhattan [2] -
45:22, 46:9
manipulate [1] -
40:24
manner [3] - 8:23,
10:7, 15:10
March [9] - 39:15,
44:11, 45:4, 45:6,
45:8, 45:11, 45:14,
45:23, 48:15
mark [2] - 37:7, 46:6
Mark [1] - 40:7
marriage [1] - 48:12
materials [2] - 7:14,
8:20
matter [4] - 3:3, 4:5,
16:11, 48:13
matters [4] - 4:5,
15:23, 24:15
McCario [1] - 21:19
McClain [4] - 3:8,
12:2, 12:10, 33:19
McLaughlin [16] -
1:20, 3:24, 3:25, 4:10,
4:16, 4:24, 5:5, 35:15,
35:21, 37:24, 38:6,
45:12, 45:24, 46:3,
46:14
McLaughlin's [1] -
36:22
meaningful [1] -
42:25
means [1] - 16:17
meant [1] - 14:6
meet [5] - 9:13,
18:21, 27:23, 37:15,
44:13
memo [1] - 18:22
memorializing [1] -
11:23
memoranda [1] -
18:16
memorandum [6] -
17:16, 17:17, 17:18,
17:22, 18:10, 18:20
memorialized [2] -
13:13, 27:17
memorializing [3] -
26:6, 27:14, 28:12
mental [3] - 7:1,
13:22, 25:2
mentioned [1] -
46:14
mere [6] - 9:5, 12:4,
12:16, 25:11, 32:20,

33:25
merely [8] - 7:3,
7:24, 13:20, 17:8,
18:11, 20:19, 24:6,
25:4
merit [1] - 15:15
Metropolitan [1] -
25:9
Michelle [1] - 13:21
middle [2] - 35:14,
39:4
million [2] - 43:17
mind [5] - 4:18, 4:19,
6:23, 30:4
minimize [2] - 24:19,
25:23
minute [1] - 29:13
minutes [1] - 4:17
mischief [1] - 43:9
mislabeled [1] -
19:16
miss [1] - 34:15
missed [3] - 5:19,
5:20, 14:22
missing [1] - 37:22
misunderstood [1] -
33:7
moment [1] - 38:1
monetary [2] - 15:9,
15:15
moot [2] - 29:3,
29:12
mooting [1] - 29:18
Moreover [1] - 27:19
morning [4] - 3:4,
3:12, 3:15, 3:24
MORRIS [54] - 1:15,
3:1, 3:21, 3:23, 4:4,
4:17, 5:3, 5:10, 5:17,
14:6, 14:14, 14:19,
17:7, 20:12, 25:14,
29:17, 33:3, 33:11,
33:15, 35:4, 35:8,
35:19, 36:3, 36:11,
36:24, 37:2, 37:5,
37:13, 37:19, 38:1,
38:17, 38:20, 39:3,
39:14, 40:12, 41:8,
43:2, 43:4, 43:14,
44:4, 44:10, 44:15,
44:17, 44:24, 45:6,
45:13, 45:19, 46:1,
46:5, 46:17, 46:20,
46:23, 47:1, 47:3
most [1] - 40:4
motion [10] - 4:12,
5:25, 6:16, 31:11,
32:7, 36:14, 38:24,
41:9, 41:12, 42:22
Motion [1] - 1:12

**motive** [2] - 41:1, 41:4
**moved** [1] - 36:15
**MR** [55] - 3:12, 3:15, 3:22, 3:24, 4:2, 4:16, 4:24, 5:5, 5:7, 5:12, 14:1, 14:11, 14:16, 14:17, 20:10, 32:12, 33:7, 33:14, 34:16, 35:2, 35:6, 35:15, 35:21, 36:8, 36:12, 36:25, 37:4, 37:12, 37:18, 37:24, 38:6, 38:19, 39:1, 39:11, 39:16, 40:14, 41:16, 43:3, 43:7, 43:19, 44:8, 44:12, 44:14, 44:16, 44:18, 44:25, 45:12, 45:17, 45:24, 46:3, 46:14, 46:18, 46:22, 46:25, 47:2
**muddying** [1] - 35:4
**must** [26] - 8:9, 8:21, 10:10, 12:19, 13:7, 19:6, 19:23, 19:24, 20:8, 22:6, 22:10, 22:20, 23:3, 26:12, 26:14, 27:24, 29:10, 29:18, 29:21, 29:24, 30:6, 31:21, 33:3, 34:3, 46:5
**mutual** [1] - 39:21

**N**

**N-a-r-m-o-r-e** [1] - 46:11
**name** [1] - 3:11
**Narmore** [2] - 46:7, 46:8
**nature** [3] - 7:18, 8:21, 18:4
**NC** [4] - 1:8, 2:7, 16:16, 27:15
**necessarily** [1] - 37:8
**need** [12] - 4:10, 4:12, 7:14, 12:14, 13:4, 17:4, 29:16, 33:22, 38:17, 39:8, 46:12
**needed** [2] - 42:8, 42:19
**needs** [2] - 18:14, 18:18
**negotiated** [1] - 21:3
**never** [2] - 36:15, 36:16
**new** [2] - 43:5, 44:20

**NEW** [3] - 1:2, 48:2, 48:3
**New** [8] - 1:7, 1:19, 2:3, 21:13, 48:6
**next** [3] - 3:1, 14:14, 38:12
**nicely** [1] - 44:17
**nine** [1] - 13:10
**non** [2] - 17:23, 29:15
**non-privileged** [2] - 17:23, 29:15
**none** [1] - 39:18
**normally** [2] - 38:23, 41:18
**North** [4] - 3:7, 16:13, 16:15, 16:17
**Notary** [1] - 48:6
**note** [5] - 6:22, 17:14, 19:19, 19:21, 38:22
**noted** [2] - 29:9, 47:4
**notes** [47] - 10:22, 11:6, 11:21, 11:22, 12:1, 12:4, 12:9, 12:12, 12:15, 12:19, 12:22, 12:24, 13:2, 13:5, 13:7, 13:11, 13:12, 13:20, 13:21, 15:1, 21:5, 23:6, 26:5, 26:20, 27:14, 27:17, 27:21, 28:4, 28:11, 28:13, 31:20, 31:22, 32:14, 32:19, 33:4, 33:8, 33:12, 33:13, 33:15, 33:17, 33:21, 33:24, 34:3, 34:7, 34:10, 34:13
**nothing** [8] - 18:23, 19:3, 19:12, 19:16, 19:19, 19:25, 20:6, 36:17
**notice** [3] - 41:8, 41:12, 42:14
**November** [2] - 11:5, 11:6
**number** [7] - 3:2, 6:1, 11:15, 15:1, 27:6, 27:7, 46:9
**numbers** [2] - 6:3, 13:15, 20:13

**O**

**objected** [1] - 24:12
**objection** [7] - 4:21, 5:10, 5:14, 14:17, 19:10, 24:1, 29:19
**objections** [5] - 4:7,

19:9, 19:13, 23:21, 29:14
**objects** [1] - 23:24
**obligation** [2] - 9:15, 9:19
**observes** [1] - 25:10
**obtain** [1] - 7:15
**obtained** [1] - 7:20
**obtaining** [10] - 8:13, 12:20, 13:1, 13:9, 19:4, 20:8, 21:17, 31:23, 34:5, 34:11
**obviously** [1] - 28:17
**OF** [4] - 1:2, 1:8, 48:2, 48:3
**Officer** [1] - 16:14
**officer** [1] - 22:23
**official** [1] - 48:9
**Official** [2] - 1:12, 3:6
**One** [3] - 32:13, 36:12, 36:14
**one** [21] - 3:1, 3:2, 4:11, 5:1, 6:17, 10:12, 11:2, 14:10, 14:24, 15:13, 24:11, 26:5, 28:16, 35:9, 35:12, 37:3, 37:6, 44:6, 45:13
**one-week** [1] - 4:11
**ongoing** [1] - 25:18
**opening** [1] - 43:11
**opens** [1] - 44:5
**operates** [1] - 36:1
**opinion** [2] - 18:6, 18:8
**opinions** [8] - 7:2, 12:3, 12:5, 12:17, 13:23, 17:20, 25:3, 34:1
**opportunity** [2] - 38:10, 38:15, 43:9
**opposed** [1] - 26:10
**opposition** [1] - 6:2
**oral** [2] - 4:8, 46:3
**order** [8] - 7:25, 31:9, 31:15, 32:5, 32:6, 39:10, 39:12, 39:24
**ordinary** [1] - 8:3
**Organizing** [1] - 6:6
**original** [4] - 33:12, 38:5, 41:13, 41:22
**Oscher** [3] - 3:7, 3:8, 15:20
**otherwise** [2] - 9:23, 16:2
**ought** [1] - 39:20
**ourselves** [1] - 39:25
**outcome** [4] - 7:5, 7:23, 25:6, 48:13
**outside** [2] - 24:13,

25:10
**overlooked** [1] - 38:21
**overruled** [1] - 17:2
**overview** [1] - 5:22
**own** [1] - 40:24
**owned** [1] - 16:15
**owners** [1] - 42:6

**P**

**p.m** [1] - 47:4
**packed** [1] - 45:22
**page** [20] - 1:21, 11:1, 11:6, 11:17, 13:5, 13:19, 13:20, 14:3, 14:11, 14:15, 14:18, 15:1, 26:5, 27:25, 28:21, 31:19, 34:7
**pages** [27] - 10:24, 11:2, 11:7, 11:13, 11:15, 11:20, 13:11, 13:14, 13:18, 13:24, 17:17, 17:19, 22:12, 22:18, 22:21, 22:25, 23:2, 23:3, 23:4, 23:18, 29:21, 29:22, 31:18, 32:2, 32:3, 33:15
**papers** [2] - 4:23, 46:18
**paragraph** [2] - 16:12, 40:19
**paragraphs** [1] - 42:4
**part** [13] - 11:5, 14:3, 14:11, 14:18, 22:19, 34:21, 38:15, 39:16, 39:17, 40:22, 41:5, 43:20
**participate** [2] - 41:1, 41:4
**particular** [4] - 7:19, 16:21, 21:22, 34:23
**particularly** [1] - 44:18
**parties** [23] - 4:6, 4:21, 6:11, 8:24, 10:4, 10:20, 19:21, 21:4, 21:7, 21:11, 23:1, 26:10, 26:17, 29:14, 30:2, 31:6, 35:22, 36:21, 39:22, 41:19, 42:4, 42:18, 48:12
**parts** [1] - 22:12
**party** [12] - 6:7, 8:9, 8:18, 8:21, 9:2, 9:19, 9:22, 10:1, 10:9,

21:21, 21:22, 21:23
**party's** [2] - 9:15, 24:20
**passed** [1] - 34:24
**PAUL** [1] - 2:6
**Paul** [2] - 4:2, 20:22
**Peachtree** [1] - 2:9
**penalize** [1] - 15:14
**pending** [1] - 25:15
**Pennsylvania** [1] - 21:20
**people** [3] - 10:23, 11:8, 41:18
**percent** [1] - 16:16
**perfect** [1] - 46:22
**Perhaps** [1] - 34:16
**permitted** [1] - 42:6
**person** [1] - 20:16
**personal** [1] - 40:9
**perspective** [2] - 42:9, 43:1
**pertaining** [1] - 21:3
**Phelps** [1] - 21:12
**phone** [1] - 27:6
**Plaintiffs** [2] - 1:7, 43:15
**Plaintiffs'** [6] - 4:7, 4:21, 5:9, 5:10, 5:13, 31:3
**Plan** [2] - 3:20, 3:21
**planning** [2] - 15:20, 16:4
**Plaza** [1] - 2:8
**pleading** [2] - 42:23, 42:24
**point** [5] - 4:25, 17:2, 24:25, 32:19, 35:1
**pointed** [1] - 46:15
**points** [2] - 39:6, 39:7
**portion** [2] - 11:6, 11:10
**portions** [3] - 29:15, 30:21, 32:16
**position** [2] - 6:7, 18:1
**possibility** [3] - 4:11, 24:20, 25:11
**possible** [3] - 25:25, 31:3, 40:4
**Postal** [1] - 21:11
**potential** [1] - 24:10
**Poughkeepsie** [1] - 45:16, 45:20
**power** [1] - 15:8
**Pratt** [1] - 21:19
**precise** [5] - 16:11, 39:25, 40:2, 40:4, 41:22, 42:10, 45:1
**precision** [1] - 40:20

prefer [1] - 44:9
premise [1] - 10:10
preparation [1] -
8:19
prepare [1] - 9:15
prepared [11] - 6:10,
7:7, 7:12, 7:16, 7:20,
8:3, 15:2, 21:15,
24:12, 25:25, 31:7
PRES [1] - 13:25
presence [2] - 15:23,
16:9
present [2] - 15:21,
25:11
President [1] - 16:14
PRESTIGE [1] - 1:8
prestige [1] - 24:15
Prestige [79] - 1:11,
2:7, 3:3, 3:6, 10:17,
10:19, 10:24, 10:25,
11:9, 11:17, 11:18,
11:21, 11:22, 11:24,
12:10, 12:13, 12:23,
12:24, 12:25, 13:6,
13:8, 13:12, 13:13,
13:14, 13:19, 14:23,
15:4, 15:14, 16:2,
16:15, 16:16, 17:10,
17:20, 17:24, 18:1,
18:2, 21:5, 21:19,
22:5, 22:9, 22:20,
22:23, 23:1, 23:23,
24:11, 24:16, 25:8,
25:19, 26:1, 26:3,
26:6, 26:7, 26:11,
26:12, 27:2, 27:6,
27:15, 27:23, 28:5,
28:11, 28:12, 29:6,
30:12, 30:15, 30:19,
30:22, 31:9, 31:16,
31:20, 31:22, 32:5,
33:4, 33:16, 33:18,
33:21, 34:6, 34:8,
34:9, 34:10
Prestige's [10] - 6:2,
15:12, 16:13, 17:12,
18:25, 20:22, 26:25,
28:8, 30:17, 31:12
presumes [1] - 31:10
pretty [4] - 14:9,
14:21, 35:5, 38:23
previously [3] -
29:17, 29:20, 43:15
price [3] - 40:21,
40:24, 42:2
PricewaterhouseC
oopers [1] - 35:25
printed [1] - 27:3
private [1] - 12:3
privilege [82] - 4:7,

4:22, 5:8, 5:11, 5:14,
6:19, 6:22, 7:11, 8:6,
8:8, 8:9, 8:17, 8:25,
9:3, 9:4, 9:8, 9:11,
9:13, 9:18, 9:20, 9:21,
9:25, 10:1, 10:5, 10:8,
10:9, 10:16, 10:18,
10:21, 11:10, 12:8,
12:14, 12:18, 13:4,
13:12, 13:19, 14:24,
15:5, 15:6, 15:9,
15:12, 15:19, 16:19,
19:11, 19:19, 20:20,
21:8, 21:21, 21:23,
23:24, 24:2, 24:6,
25:17, 26:4, 26:5,
26:12, 26:20, 26:22,
26:23, 27:13, 28:2,
28:6, 28:9, 28:18,
28:19, 28:24, 29:3,
30:3, 30:20, 30:24,
31:7, 31:8, 31:10,
31:11, 31:19, 33:17,
34:3, 34:7, 34:17,
36:1, 36:19
privileged [47] -
8:20, 8:23, 11:18,
17:14, 17:21, 17:23,
18:15, 18:19, 19:16,
19:22, 20:6, 20:24,
21:4, 21:15, 21:24,
22:16, 23:4, 23:15,
23:19, 25:21, 26:14,
26:15, 26:16, 27:10,
27:18, 28:20, 28:22,
28:24, 29:7, 29:15,
29:23, 30:11, 30:18,
32:20, 32:22, 32:25,
34:19, 34:22, 34:25
problem [1] - 46:25
problematic [1] -
27:11
procedure [1] - 10:3
Procedure [3] - 7:12,
8:17, 9:17
proceeding [1] - 3:9
PROCEEDINGS [1] -
1:10
proceedings [1] -
48:10
Proceedings [2] -
1:11, 1:24
Produce [4] - 31:25,
32:2, 32:3
produce [1] - 13:24,
23:13, 23:14, 23:16,
23:17, 23:18, 26:1,
26:12, 30:20, 31:16,
32:17

produced [20] - 8:22,
11:1, 11:9, 13:3, 13:7,
13:14, 13:18, 19:6,
22:10, 26:15, 27:24,
28:21, 29:10, 29:16,
29:24, 30:6, 30:7,
31:22, 33:4, 34:15
Produced [1] - 1:25
product [20] - 6:19,
6:21, 7:3, 7:11, 8:6,
13:19, 13:21, 14:24,
15:2, 15:4, 15:12,
23:24, 24:2, 24:22,
25:4, 25:16, 26:4,
28:2, 28:6, 28:9
production [4] -
5:25, 11:11, 25:4,
30:22
Products [1] - 8:15
Program [1] - 22:24
proof [3] - 9:25, 10:4,
21:25
PROOFREAD [1] -
48:20
proper [1] - 6:21
properly [1] - 10:3,
24:2, 29:6
proposal [3] - 18:14,
18:24, 19:1
proposals [1] - 18:18
proposed [3] -
39:11, 41:14, 43:15
proposition [1] -
24:18
prospect [4] - 7:8,
7:21, 7:22, 24:13
protect [1] - 25:17
protected [7] -
23:11, 28:2, 28:9,
28:14, 28:19, 28:23,
30:2
protection [9] - 7:3,
7:24, 8:19, 8:25, 9:3,
9:25, 10:1, 10:5,
24:22
protections [1] - 8:3
protective [1] - 8:24
provide [5] - 25:12,
30:16, 32:5, 32:7,
42:14
provided [5] - 24:16,
27:8, 40:20, 42:1,
43:8
provides [1] - 20:17
providing [14] - 8:13,
9:16, 11:25, 12:20,
13:1, 15:18, 19:4,
20:7, 20:25, 26:9,
27:16, 34:5, 34:12,
34:21

Public [1] - 48:6
Purchase [1] - 23:8
purchase [4] - 16:18,
40:21, 40:24, 42:2
purports [1] - 20:16
purpose [7] - 8:13,
11:25, 19:4, 20:7,
20:18, 21:16, 26:9
purposes [8] - 12:20,
13:1, 13:9, 20:25,
27:16, 31:23, 34:5,
34:11
pursuant [1] - 3:19
push [1] - 39:12
put [6] - 6:23, 7:10,
36:17, 36:19, 40:18,
41:17, 45:5, 46:7
putting [1] - 40:3

Q

quantify [1] - 43:25
quantum [1] - 41:20
quarters [1] - 11:1
questionnaire [3] -
27:2, 27:3, 27:9
questions [7] - 39:7,
41:10, 41:12, 42:19,
44:5, 44:6, 44:21
quote [2] - 9:1, 18:15
quoted [1] - 24:17
quotes [1] - 7:10
quoting [1] - 8:2

R

raise [1] - 32:13
raised [1] - 31:10
raises [1] - 19:9
rather [4] - 20:19,
26:4, 42:7, 44:9
Raywid [1] - 27:5
re [7] - 1:3, 9:6,
11:23, 12:2, 12:4,
12:16, 33:25
reaching [1] - 7:9
read [8] - 6:22, 41:6,
41:8, 41:11, 42:24,
43:4, 43:13, 44:7
ready [1] - 4:20
real [2] - 11:23, 14:1
realize [1] - 4:18
really [4] - 40:15,
42:25, 43:11, 43:12
reason [5] - 19:24,
27:7, 39:20, 41:17,
43:21
reasonable [1] -

25:12
reasonably [1] -
25:19
received [1] - 39:17
recent [1] - 15:12
recipient [3] - 12:20,
20:1, 34:4
recitation [3] - 18:11,
40:4, 41:2
recitations [1] - 12:5,
12:16, 34:1
recite [2] - 6:15, 17:8
recites [1] - 17:13
reciting [1] - 33:2
reclassified [1] -
26:3
recognized [1] - 43:8
reconsider [2] -
35:3, 35:7
record [1] - 32:23
RECORDED [1] -
1:10
Recorded [1] - 1:24
recording [1] - 48:9
Recording [1] - 1:24
records [2] - 12:13,
33:22, 40:10
recovery [1] - 44:6
Recovery [2] - 2:2,
3:18
recreated [1] - 7:6
redacted [8] - 11:5,
14:14, 14:20, 14:21,
28:2, 29:6, 29:8,
31:18
redaction [3] - 20:9,
23:14, 31:25
redactions [1] -
13:15
redline [3] - 22:7,
38:25, 41:9
refer [5] - 5:1, 11:8,
23:25, 24:3, 25:15
reference [2] - 24:8,
42:5
references [1] - 6:10
referred [1] - 10:20
refers [3] - 17:22,
24:6, 24:10
Refining [1] - 21:12
reflect [8] - 12:9,
12:22, 13:2, 13:5,
17:11, 31:20, 34:8,
34:13
reflected [1] - 11:14
reflecting [2] - 12:12,
33:21
reflects [8] - 10:6,
11:17, 12:11, 13:12,
28:14, 30:20, 33:18,

33:19
**REG** [1] - 1:3
**regard** [1] - 19:13
**Regarding** [1] -
17:22
**regarding** [10] - 4:6,
4:21, 13:16, 20:23,
22:16, 23:6, 24:19,
25:23, 30:8, 30:10
**regulatory** [5] - 24:8,
24:11, 24:15, 25:10,
25:18
**rejected** [1] - 9:14
**relate** [3] - 10:16,
13:20, 25:18
**related** [2] - 16:4,
48:11
**relates** [2] - 15:20,
35:17
**relating** [1] - 10:24
**relationship** [1] - 9:4
**relay** [3] - 18:22,
19:7, 19:12
**relaying** [1] - 20:19
**relevant** [1] - 16:13
**remain** [3] - 15:24,
21:9, 21:10
**remaining** [3] -
11:14, 21:1, 29:22
**remains** [1] - 21:23
**remarkable** [1] - 37:9
**remember** [1] - 38:8
**remind** [1] - 6:13
**render** [1] - 32:22
**Reorganized** [2] -
1:18, 4:1
**reorganized** [1] -
40:18
**repeat** [1] - 34:20
**Reporter** [3] - 1:23,
1:25, 48:5
**representative** [13] -
10:19, 11:18, 12:25,
13:8, 16:2, 16:8,
16:10, 26:7, 27:3,
31:21, 31:23, 33:5,
34:11
**representatives** [11]
- 12:10, 12:13, 12:23,
13:6, 13:13, 13:16,
17:11, 26:25, 33:18,
33:21, 34:8
**request** [2] - 5:15,
20:1
**requesting** [1] -
38:15
**requests** [1] - 12:6
**required** [3] - 9:17,
11:11, 26:1
**requirements** [2] -

12:18, 34:2
**requires** [1] - 8:18
**requiring** [1] - 31:15
**Research** [1] - 8:15
**resolve** [1] - 5:24
**resolved** [6] - 9:21,
10:8, 23:20, 26:17,
29:14, 31:14
**respect** [2] - 9:20,
32:14
**respects** [1] - 32:7
**respond** [6] - 35:2,
38:17, 39:17, 42:18,
44:14, 44:17
**responded** [1] - 36:5
**responds** [2] - 24:11,
30:12
**response** [7] - 17:6,
36:17, 39:8, 41:6,
41:11, 42:25, 44:24
**responses** [1] -
43:24
**responsive** [1] -
36:18
**rest** [1] - 22:17
**resting** [1] - 10:1
**restructuring** [1] -
24:24
**result** [1] - 24:23
**returned** [2] - 27:4,
27:9
**reveal** [6] - 7:1,
13:22, 25:2, 30:11,
30:12, 30:16
**revealing** [1] - 8:23
**reveals** [1] - 16:19
**review** [6] - 19:20,
20:1, 25:24, 26:8,
29:2, 30:4
**reviewed** [8] - 6:9,
25:14, 27:1, 27:25,
28:7, 28:10, 29:5,
30:14
**reviewing** [6] - 12:8,
12:9, 18:19, 33:17,
35:8
**revise** [1] - 31:9
**revised** [1] - 30:20
**revisions** [1] - 23:7
**revisited** [1] - 31:1
**Richman** [1] - 28:11
**Rick** [1] - 18:25
**Rigases** [2] - 40:24,
42:6
**rise** [1] - 32:11
**Rob** [5] - 11:16, 12:2,
12:11, 26:7, 33:19
**Robert** [4] - 3:8,
3:13, 15:17, 15:21
**ROBERT** [1] - 2:12

**ROUGH** [2] - 48:21,
48:21
**rubric** [1] - 7:8
**rule** [5] - 5:17, 7:18,
9:1, 30:23, 36:4
**Rule** [4] - 7:11, 8:17,
9:17, 9:18
**ruled** [10] - 21:14,
28:18, 28:23, 29:1,
29:17, 29:20, 30:5,
35:6, 36:13
**ruling** [16] - 4:6, 4:8,
4:20, 5:19, 5:22, 6:10,
6:11, 6:14, 14:2, 14:5,
24:25, 29:3, 31:5,
31:14, 35:7, 46:10

## S

**S.D.N.Y** [1] - 25:9
**sample** [2] - 19:20,
19:21
**sanctions** [2] - 15:9,
15:16
**Sanders** [1] - 3:13
**SANDERS** [1] - 2:7
**satisfied** [1] - 25:16
**satisfy** [1] - 31:3
**saves** [1] - 10:4
**saw** [1] - 37:20
**scam** [1] - 41:1
**schedule** [1] - 39:21
**schedules** [4] -
19:15, 21:2, 23:7,
23:8
**scheduling** [3] -
39:10, 39:11, 39:24
**scope** [1] - 7:17
**scrivener** [1] - 6:24
**scrutiny** [1] - 25:25
**Second** [7] - 6:20,
8:2, 8:14, 9:6, 24:8,
24:17, 24:21
**second** [2] - 14:7,
35:21
**see** [7] - 14:8, 37:5,
40:16, 42:22, 42:25,
44:8, 44:11
**seeking** [1] - 10:10
**seeks** [1] - 30:9
**send** [1] - 37:7
**sender** [1] - 18:24
**senior** [1] - 18:25
**sense** [2] - 37:21,
44:1
**sent** [1] - 36:9
**sentences** [1] - 41:5
**Service** [1] - 21:11
**services** [4] - 11:25,

18:5, 30:10, 30:14
**session** [1] - 41:5
**set** [1] - 48:14
**sets** [1] - 9:9
**setting** [1] - 12:3
**settled** [1] - 30:25
**Seventh** [1] - 1:19
**shall** [1] - 31:15
**shared** [1] - 30:1
**shares** [2] - 16:15,
31:12
**sheet** [1] - 18:24
**sheets** [1] - 18:20
**shoot** [1] - 44:3
**short** [1] - 41:2
**Shorthand** [1] - 48:5
**shot** [1] - 42:23
**showing** [1] - 7:14
**side** [5] - 40:1, 40:6,
42:14, 43:20, 44:2
**sign** [1] - 20:1
**similar** [2] - 7:7, 8:5
**similarly** [1] - 43:24
**simpler** [1] - 6:8
**simply** [3] - 17:13,
38:11, 38:13
**situation** [1] - 7:19
**six** [4] - 17:9, 17:14,
20:14, 24:4
**sixth** [1] - 26:2
**snowstorm** [2] -
35:14, 39:5
**sometimes** [1] - 46:9
**soon** [1] - 22:5
**sorry** [2] - 5:7, 20:10
**sort** [1] - 23:9
**sought** [2] - 18:5,
30:14
**Sound** [1] - 1:24
**sound** [1] - 48:9
**SOUTHERN** [1] - 1:2
**speaks** [1] - 45:1
**specific** [1] - 9:16
**Spiecker** [1] - 40:7
**spot** [1] - 46:7
**SS** [1] - 48:2
**staff** [1] - 37:9
**stage** [1] - 45:3
**stamp** [2] - 11:4,
14:8
**stamped** [19] - 11:1,
13:15, 13:18, 13:24,
14:15, 22:12, 22:17,
22:21, 22:25, 23:2,
23:4, 23:17, 23:18,
27:25, 28:21, 29:21,
32:2, 32:3
**stand** [2] - 14:5,
15:12

**standard** [5] - 8:8,
9:8, 9:13, 18:21, 24:5
**standards** [1] - 6:16
**Standards** [1] - 8:16
**standing** [1] - 32:11
**standpoint** [1] - 19:2
**start** [1] - 4:18
**State** [3] - 3:11, 48:6
**STATE** [1] - 48:2
**state** [3] - 19:25,
40:10, 40:11
**statements** [2] -
43:5, 43:16
**states** [3] - 7:12,
18:24, 27:13
**STATES** [1] - 1:1
**States** [4] - 1:15,
6:19, 8:14, 24:18
**Status** [1] - 21:1
**sticking** [1] - 35:9
**sticky** [1] - 14:9
**still** [2] - 3:1, 42:16
**stock** [4] - 12:2,
16:15, 16:17, 20:4
**Stockton** [1] - 20:23
**Storage** [1] - 22:24
**straight** [1] - 20:13
**strategies** [1] - 12:17
**strategy** [5] - 12:5,
17:25, 18:7, 30:17,
34:1
**Street** [1] - 2:9
**stricken** [3] - 40:16,
40:18, 42:16
**strip** [1] - 21:7
**structure** [1] - 24:19
**structuring** [1] -
25:23
**stuff** [1] - 5:21
**subject** [5] - 8:19,
16:11, 21:23, 24:2,
26:3
**submission** [21] -
4:20, 5:2, 5:8, 5:13,
5:15, 6:11, 35:17,
35:22, 35:24, 36:21,
36:23, 37:1, 37:13,
38:5, 38:7, 38:9,
38:14, 38:16, 43:13,
45:25, 46:15
**submissions** [5] -
4:6, 5:12, 6:5, 6:9,
36:9
**submit** [2] - 9:22,
31:15
**submitted** [6] - 5:24,
32:9, 35:18, 35:22,
39:11, 46:1
**Subpoena** [1] - 9:7
**substance** [2] -

17:11, 18:22
  substantial [2] - 7:14, 7:15
  substantially [1] - 7:7
  substantive [1] - 17:19
  suffice [1] - 9:10
  sufficient [3] - 29:7, 31:7, 31:8
  sufficiently [1] - 23:25
  suggests [2] - 20:7, 25:22
  Suite [1] - 2:8
  summary [1] - 33:13
  supplement [1] - 36:2

**T**

  Tab [6] - 23:22, 26:19, 28:25, 29:14, 29:15, 30:8
  tab [14] - 10:12, 17:4, 17:7, 19:6, 23:13, 23:20, 26:14, 26:18, 28:16, 28:20, 29:9, 30:4, 30:5, 30:6
  tabs [1] - 6:7
  Tank [1] - 22:24
  tax [7] - 24:6, 24:14, 24:16, 24:20, 25:24, 44:22
  Tax [1] - 24:24
  telephone [2] - 12:1, 14:12
  tendered [1] - 36:23
  tends [2] - 7:1, 25:2
  TERENCE [1] - 1:20
  Terence [1] - 3:24
  Terry [1] - 4:24
  testified [1] - 15:22
  testimony [2] - 9:23, 10:2
  testing [1] - 9:8
  Texas [1] - 45:11
  THE [1] - 1:15
  theories [3] - 7:2, 13:23, 25:3
  theory [2] - 41:20, 44:6
  thereafter [1] - 22:6
  therefore [5] - 17:21, 19:22, 20:20, 22:10, 23:11
  Therefore [1] - 27:10
  thereon [1] - 30:25
  thinking [1] - 6:17

  third [5] - 19:21, 21:7, 21:22, 23:1, 30:1
  threatened [2] - 23:25, 24:3
  threatening [1] - 24:15
  three [8] - 4:5, 11:1, 11:12, 27:24, 28:1, 28:21, 32:1, 40:15
  Thursday [1] - 45:21
  timely [1] - 15:10
  today [4] - 4:15, 36:4, 45:10, 46:2
  Today [1] - 45:10
  today's [2] - 31:5, 31:14
  top [4] - 14:18, 27:24, 28:13, 32:1
  Torres [2] - 3:16, 4:3
  TORRES [1] - 2:2
  totally [1] - 37:21
  towards [1] - 25:25
  town [1] - 39:15
  traction [1] - 25:23
  transaction [9] - 16:3, 16:5, 16:21, 17:21, 18:1, 21:3, 24:15, 24:19, 28:7
  transactions [2] - 10:18, 11:24
  Transcript [1] - 1:25
  transcript [1] - 48:9
  transfer [1] - 12:2
  transmittal [1] - 22:3
  transmitted [3] - 17:18, 22:20, 26:21
  trial [4] - 7:13, 8:19, 41:23, 43:23
  trials [2] - 45:19, 45:23
  Troutman [2] - 3:13, 35:23
  TROUTMAN [1] - 2:7
  true [4] - 11:12, 19:18, 39:2, 48:8
  Trust [3] - 2:2, 3:9, 3:18
  try [2] - 38:6, 42:16
  trying [4] - 20:13, 35:1, 35:3, 42:10
  turn [2] - 34:20, 34:21
  turned [1] - 10:24
  twenty [1] - 45:2
  twenty-two [1] - 45:2
  two [12] - 4:5, 5:12, 13:14, 19:9, 22:8, 22:12, 23:3, 36:9, 40:7, 45:2, 45:23,

46:20
  Two [1] - 11:12
  two-hour [1] - 40:7
  type [3] - 14:4, 22:9, 30:13

**U**

  U.S [1] - 21:11
  ultimate [1] - 9:25
  ultimately [1] - 18:8
  unanswered [1] - 40:25
  unclear [1] - 26:24
  Undeniably [1] - 18:14
  under [7] - 6:6, 7:24, 25:18, 28:23, 29:9, 29:19, 33:6
  Underground [1] - 22:24
  undue [1] - 7:15
  UNITED [1] - 1:1
  United [4] - 1:15, 6:19, 8:14, 24:18
  Unless [1] - 21:20
  unless [4] - 13:7, 31:22, 32:17, 33:4
  unprivileged [3] - 19:8, 20:19, 34:22
  unpunished [1] - 39:20
  unreasonable [1] - 16:22
  unredacted [1] - 20:2
  Unsecured [2] - 1:12, 3:6
  up [10] - 5:21, 11:2, 12:3, 22:17, 38:7, 42:12, 43:2, 43:10, 43:11, 46:8
  urges [1] - 15:3

**V**

  valid [1] - 19:13
  Valuation [1] - 20:5
  value [2] - 3:19, 20:3
  various [1] - 36:22
  Veatch [1] - 26:6
  vehicle [1] - 3:19
  version [5] - 20:2, 21:9, 21:18, 30:1, 31:18
  versions [1] - 21:6
  VIA [1] - 48:21, 48:21
  Vice [1] - 16:14

  view [1] - 18:20
  virtually [1] - 24:23
  vs [1] - 1:7

**W**

  wait [3] - 45:4, 45:6, 45:8
  waived [5] - 11:11, 15:4, 15:9, 15:19, 16:8
  waiver [4] - 5:15, 14:23, 15:15, 36:1
  Walker [32] - 10:17, 10:19, 10:20, 10:25, 11:4, 11:14, 11:23, 12:4, 12:12, 12:15, 12:16, 12:23, 12:24, 13:2, 13:6, 13:7, 31:21, 32:14, 32:17, 32:20, 33:3, 33:9, 33:20, 33:25, 34:9, 34:14, 34:18, 34:23
  wants [5] - 39:16, 39:18, 41:6, 44:11, 45:4
  water [1] - 35:4
  Wednesday [3] - 45:20, 46:24
  week [3] - 4:11, 36:23, 45:23
  weeks [2] - 45:9, 46:20
  Welcome [1] - 3:4
  welcome [1] - 3:4
  Westlaw [1] - 25:9
  WHEREOF [1] - 48:14
  Whitney [1] - 21:19
  whole [3] - 9:14, 30:25, 31:8
  WILLIAMS [2] - 2:6, 4:2
  Williams [1] - 4:2
  WILLKIE [1] - 1:18
  Willkie [4] - 3:25, 4:25, 35:23, 35:24
  WINSBERG [21] - 2:11, 3:12, 5:7, 5:12, 14:1, 14:11, 14:17, 35:2, 35:6, 36:8, 36:12, 36:25, 37:4, 37:12, 37:18, 38:19, 44:14, 44:16, 44:18, 44:25, 45:17
  Winsberg [2] - 3:13, 38:7
  wish [3] - 4:22, 4:25, 5:5

  withheld [2] - 9:16, 10:7
  withhold [1] - 30:22
  withholding [3] - 9:15, 9:19, 9:22
  withholds [2] - 8:2, 8:18
  WITNESS [1] - 48:14
  witnesses [1] - 44:18
  word [2] - 11:15, 21:10
  words [1] - 40:23
  worms [1] - 43:11
  worse [1] - 39:21
  Wyman [4] - 17:23, 18:2, 18:23, 19:1

**Y**

  yellow [1] - 14:9
  YORK [3] - 1:2, 48:2, 48:3
  York [8] - 1:7, 1:19, 2:3, 21:13, 48:6
  yourself [1] - 42:12

```
 1                    UNITED STATES BANKRUPTCY COURT
                       SOUTHERN DISTRICT OF NEW YORK
 2                                      .
      IN RE:                            . Case No. 02-41729 (REG)
 3                                      .
                                        . (Jointly Administered)
 4    ADELPHIA COMMUNICATIONS           .
      CORPORATION, et al.,              . Poughkeepsie, New York
 5                                      . Wednesday, March 21, 2007
                            Debtors.    . 11:38 a.m.
 6                                      .
      . . . . . . . . . . . . . . . .   .
 7    ADELPHIA COMMUNICATIONS           . Adv. Proc. No. 04-03293(CGM)
      CORPORATION, et al.,              .
 8                                      .
                          Plaintiffs,  .
 9           vs.                        .
                                        .
10    PRESTIGE COMMUNICATIONS OF        .
      NC, INC., et al.,                 .
11                                      .
                          Defendants.  .
12    . . . . . . . . . . . . . . . .   .

13              TRANSCRIPT OF MOTION TO AMEND COMPLAINT
                            COURT DECISION
14            BEFORE THE HONORABLE CECELIA G. MORRIS
                    UNITED STATES BANKRUPTCY JUDGE
15
      APPEARANCES: (Via Telephone)
16
      For the Plaintiffs:            David M. Friedman, Esq.
17                                   Joseph A. Gershman, Esq.
                                     KASOWITZ, BENSON, TORRES &
18                                    FRIEDMAN, LLP
                                     1633 Broadway
19                                   New York, New York 10019
      (Appearances continued)
20
      Audio Operator:               Electronically Recorded
21                                  by Court Personnel

22    Transcription Company:        Rand Transcript Service
                                    80 Broad Street, Fifth Floor
23                                  New York, New York 10004
                                    (212) 504-2919
24                                  www.randtranscript.com

25    Proceedings recorded by electronic sound recording, transcript
      produced by transcription service.
```

1  A P P E A R A N C E S:  (Continued)

2  For the Reorganized Debtor:    Terence McLaughlin, Esq.
                                   WILLKIE, FARR & GALLAGHER, LLP
3                                  787 Seventh Avenue
                                   New York, New York 10019
4
   For Prestige Communications
5  of NC, Inc.:                    Harris B. Winsberg, Esq.
                                   TROUTMAN SANDERS, LLP
6                                  600 Peachtree Street, N.E.
                                   Suite 5200
7                                  Atlanta, Georgia 30308

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1      (Proceedings commence at 11:38 a.m.)

2          THE COURT:  Very good.  You're going to have to speak

3   up for me.  This is Adversary Proceeding 04-3293, <u>Adelphia</u>

4   <u>Communications v. Prestige Communications</u>.

5          State your name and affiliation for me, please.

6          MR. FRIEDMAN:  Your Honor, it's David Friedman and

7   Joseph Gershman, Kasowitz, Benson, Torres & Friedman, for the

8   plaintiffs.

9          MR. MC LAUGHLIN:  Good morning, Your Honor.  Terence

10  McLaughlin of Willkie, Farr & Gallagher on behalf of the

11  reorganized debtor Adelphia Communications Corporation.

12         MR. WINSBERG:  Good morning, Your Honor.  Harris

13  Winsberg, Troutman Sanders, on behalf of Prestige

14  Communications.

15         THE COURT:  Very good.

16         Is that everyone?  It's going to be a litle difficult

17  on the telephone for you to give me any information because I'm

18  having a bit of a diffiuclty hearing you.  Can you hear me?

19         MR. FRIEDMAN:  Yes, Your Honor.

20         MR. GLUCK:  Yes, Your Honor.

21         THE COURT:  The first thing I would like to do is on

22  the motion to amend the complaint, does anyone wish to add

23  anything that's not in their papers?

24         Having heard nothing, I am ready to rule on that.

25         The proposed ruling -- not proposed.  The motion to

4

1    amend the complaint is granted.

2           First, the second amended scheduling order in this

3    case, which was agreed upon by both parties and signed by this

4    Court on September the 27th, 2006, specifically contemplates

5    all motions which seek to add additional parties or to amend

6    the pleadings must be filed and served no later than January

7    the 2nd, 2007, and the plaintiffs made this motion on January

8    the 1st, 2007.

9           Before I go farther, can everyone hear me clearly?

10          MR. FRIEDMAN:  Yes, Your Honor.

11          THE COURT:  If you cannot at any time, when I take a

12   breath speak up and I will try to speak more clearly.

13          Second, Federal Rule of Civil Procedure 15(a) made

14   applicable in the Bankruptcy Rule by 7015 states that leave to

15   amend shall be freely given when justice so requires.  The

16   Second Circuit has observed that it is rare that such leave

17   should be denied, especially when there has been no prior

18   amendment.  And that is Ricciuti v. New York Transit Authority,

19   941 F.2d, 119 Second Circuit, citing a Supreme Court case,

20   Foman v. Davis, 371 U.S. 178, and that's a 1962 case.

21          A Court should not deny leave to file a proposed

22   amended complaint unless it appears beyond doubt that the

23   plaintiff can prove no set of facts in support of his claim

24   which would entitle him to relief.

25          Judge Sweet, District Court Judge, Southern District,

1  permitted an amended complaint in ResQNet.com, Inc. v. Lansa in

2  2005, found at 382 F. Supp. 2d 424, where the defendant sought

3  to amend its affirmative defenses and add a counterclaim.  The

4  plaintiff objected on the grounds that the amendment at this

5  stage of the litigation would be prejudicial and that

6  allegations upon which a new defense would be based had been

7  fully known to the defendant over three years.

8         Even in view of Rule 15(a)'s requirement that leave to

9  amend should be freely granted, amend to leave must be denied

10  where there is undue delay, bad faith, or dilatory motives on

11  the part of the movant, repeated failure to cure deficiencies

12  by amendments previously allowed, undue prejudice to the

13  opposing party by virtue of an allowance of an amendment, and

14  futility of the amendment or similar conduct.

15         Judge Sweet held to determine where there would be

16  undue prejudice from a proposed amendment, a Court must

17  consider whether the new aspects of the proposed pleading would

18  require the opponent to expend significant additional resources

19  to conduct discovery and prepare for trial, significantly delay

20  the resolution of the dispute, or prevent the plaintiff from

21  bringing a timely action in another jurisdiction.  Delay alone

22  in the absence of showing of undue prejudice or bad faith

23  typically provides an insufficient basis for denying a motion

24  to amend.  The party opposing the motion for leave to amend has

25  the burden of establishing that amendment would be prejudicial.

1    The Second Circuit has rejected the argument that

2  prejudice solely because of the time, effort and money expended

3  in litigation justifies denial of a motion to amend a

4  complaint.   That's Block v. First Blood Associates, 988 F.2d

5  344.

6    Such allegations do not arise to the level of

7  substantial prejudice contemplated in other cases.   An example

8  of substantial prejudice is found in Evans v. Syracuse City

9  School District, 704 F.2d 44, a 1983 case, where a motion to

10 amend a pleading was denied where the plaintiff was clearly

11 dilatory and delay unduly in requesting the amendment only six

12 days before the scheduled trial date, and two years and nine

13 months after the defense could properly have been asserted.

14 Under those circumstances, the moving party had the burden to

15 show a compelling reason for the delay and could not do so.

16    Parties have been permitted to amend their pleadings

17 to assert new claims long after they acquired the facts

18 necessary to support those claims.   Again, a Second Circuit

19 case, Richardson Greenshields Securities, Inc. v. Lau, L-a-u.

20 The Richardson Greenshields case reversed the lower Court's

21 denial of a motion to amend, finding that the District Court

22 asserted power by preventing defendants from filing a motion

23 for leave to amend their answer, and noted that absent

24 extraordinary circumstances, such as a demonstrated history of

25 frivolous and vexation litigation or a failure to comply with

1  sanctions imposed for such conduct, a Court has no power to

2  prevent a party from filing pleadings, motions or appeals

3  authorized by the Federal Rules of Civil Procedure.

4      In Richardson Greenshields, the Second Circuit pointed

5  out that the interval in that case between the filings of the

6  original answer and the attempt to amend is no greater in the

7  present case than in many cases in which amendments to the

8  pleadings have been allowed.

9      In ResQNet.com v. Lansa, Judge Sweet made several

10 observations that apply in the case before us.  Mere delay

11 provides an insufficient basis to deny a motion to amend absent

12 a showing of bad faith or undue prejudice.  As to the

13 possibility of undue prejudice, allegations that an amendment

14 will require the expenditure of additional time, effort, or

15 money do not constitute undue prejudice.  Even the need to

16 reopen discovery in and of itself is not sufficient

17 justification to refute a 15(a) motion.

18     The Court is aware that permitting amendment of the

19 complaint will result in a certain amount of delay and expense

20 to the defendants.  The delay and expense is not, in this

21 Court's judgment, undue, and does not appear to be caused by

22 bad faith or dilatory conduct.

23     In so doing, this Court has had to balance the

24 potential prejudice to the defendants against the liberal

25 standard for allowing an amended complaint.  Defendants will be

1  given the time they need to re-depose witnesses and they will

2  be permitted to propose new 30(b)(6) topics if necessary.

3        The parties have agreed among themselves, pursuant to

4  a proposed third amending scheduling order dated January the

5  31st, 2007, to extend the period for completion of factual

6  discovery to May the 31st, 2007.  The Court will consider a

7  request from the defendants for additional time to be added to

8  that period, if necessary and needed.  That scheduling order

9  was dated January the 31st, and factual discovery was extended

10 to May the 31st, if I did not make that clear.

11       In ResQNet.com, Inc., Judge Sweet indicated that the

12 adversary would be permitted additional discovery.  The party

13 opposing amendment in ResQNet, like the defendants in this

14 case, offered little more than conclusory assertions concerning

15 the purportedly broad scope of any such discovery, the specter

16 of potential third-party discovery disputes in other

17 jurisdictions, and the cost of retaining a technical expert.

18 Such dire predictions of cost and effort without more are

19 insufficient to establish undue prejudice.

20       Defendants contend in their surreply that the

21 fraudulent conveyance in aiding and abetting breach of

22 fiduciary duty causes of actions are futile.  The parties

23 opposing a motion to amend bears the burden of establishing

24 that an amendment would be futile.

25       As the Court has already stated, leave to amend should

1    not be denied unless it appears beyond doubt that the plaintiff

2    can prove no set of facts in support of his claim which would

3    entitle him to relief.   Conley v. Gibson, a Supreme Court

4    decision, 355 U.S. at 45.

5            This Court has reviewed the proposed amended complaint

6    and cannot deny the motion to amend on this basis.   Although

7    defendants argue that constructive knowledge will not support a

8    claim for aiding and abetting breach of fiduciary duty, both

9    constructive and actual knowledge are pled.   See the

10   defendant's notes at Page 7 of their surreply, that the

11   Pennsylvania Supreme Court, and I want to emphasize this, has

12   yet to determine whether it will recognize a claim of aiding

13   and abetting a fiduciary duty.   "Yet to be determined" is quite

14   different from futile.

15           The same is true for the contention on Page 8 of

16   defendant's surreply, that the Georgia Supreme Court, and I

17   emphasize again, has not addressed such a claim.   Also, though

18   the amended complaint suggests that it is possible that the

19   Rigases did not even decide to cause Adelphia to sell the stock

20   of Prestige Communication to the Rigas family until after the

21   purchase price allocation was established, the amended

22   complaint makes other allegation that would constitute a prima

23   facie claim for fraudulent conveyance.

24           The defendants' objection and surreply list many other

25   grievances.   Some may be valid, but they do not justify denial

1  of a motion to amend the complaint under the liberal standard

2  set forth by the Bankruptcy Rules, Supreme Court, and the

3  Second Circuit Court of Appeals.

4        Most of the defendants' arguments must be addressed at

5  a later stage in the trial.  On this note, it is important to

6  emphasize nothing in this ruling constitutes a factual finding

7  in the case, except that the amended complaint should be

8  permitted and is sufficient to state a prima facie cause of

9  action, or causes of action.

10        The Court may agree with the defendants when they

11  suggest that perhaps the amended complaint is less forceful

12  than the original.  Perhaps, also, the material appearing in

13  the amended complaint was not obtained in discovery, and where

14  a reasonable person could disagree as to whether or not the

15  amended complaint puts a finer point on things.  None of these

16  facts, even if true, would be decisive on the question of

17  whether or not the Court should permit the complaint to be

18  amended.

19        Since these arguments do not go to the heart of the

20  standard that must be met on this motion, they will not be

21  argued today or decided by the Court on this motion.  The most

22  significant effect of permitting the amended complaint will be

23  the additional three-hundred-million-dollar damage component.

24  The magnitude of the new damage request, without more, does not

25  require a different ruling, and for the reasons the Court has

1    explained, the amended complaint must be granted under the Rule

2    15(a) standard.

3        Upon the foregoing, plaintiffs are requested to submit

4    an order granting the motion to amend and requiring an amended

5    answer within thirty day of the date of the order.  The parties

6    should also confer and submit an amended scheduling order

7    providing new discovery deadlines based upon this ruling.

8        I would now like to go off the record.

9     (Proceedings concluded at 11:54 a.m.)

10                    *****

11                CERTIFICATION

12        I certify that the foregoing is a correct transcript

13    from the electronic sound recording of the proceedings in the

14    above-entitled matter to the best of my knowledge and ability.

15

16

17

18    _____        April 5, 2007
      Cathryn Lynch, N.J. Cert. No. 565
19    Certified Court Transcriptionist
      For Rand Transcript Service, Inc.

20

21

22

23

24

25

1     UNITED STATES BANKRUPTCY COURT
      SOUTHERN DISTRICT OF NEW YORK

2
 IN RE:     .  Case No. 02-41729 (REG)

3
       .  New York, New York

4 ADELPHIA COMMUNICATIONS .  Wednesday, May 16, 2007
 CORPORATION, et al.,  .  11:22 a.m.

5
      Debtors. .

6 . . . . . . . . . . . . .
 ADELPHIA COMMUNICATIONS .  Adv. Proc. No. 04-03293 (CGM)

7 CORPORATION, et al.,  .

8     Plaintiffs, .

9   vs.     .

10 PRESTIGE COMMUNICATIONS OF .
 N.C,, INC., et al.,   .

11     Defendants. .

12 . . . . . . . . . . . . .

13    TRANSCRIPT OF A JOINT SUBMISSION
   BEFORE THE HONORABLE CECELIA G. MORRIS

14    UNITED STATES BANKRUPTCY JUDGE

15 APPEARANCES:

16
 For the Plaintiffs:   Joseph A. Gershman, Esq.

17       Jennifer B. Schwarz, Esq.
       KASOWITZ, BENSON, TORRES &

18        FRIEDMAN, LLP
       1633 Broadway

19       New York, New York  10019

20 Audio Operator:    Electronically Recorded
       by Court Personnel

21
 Transcription Company:  Rand Transcript Service, Inc.

22       80 Broad Street, Fifth Floor
       New York, New York 10004

23       (212) 504-2919
       www.randtranscript.com

24
 Proceedings recorded by electronic sound recording, transcript

25 produced by transcription service.

```
 1    APPEARANCES:   (Continued)

 2    For the Reorganized Debtor:    Shalini K. Rajoo, Esq.
                                     WILLKIE, FARR & GALLAGHER, LLP
 3                                   787 Seventh Avenue
                                     New York, New York 10019
 4

 5    for Prestige Communications
      of NC, Inc.:                   Harris B. Winsberg, Esq.
 6                                   Douglas E. Ernst, Esq.
                                     TROUTMAN SANDERS, LLP
 7                                   600 Peachtree Street, N.E.
                                     Suite 5200
 8                                   Atlanta, Georgia 30308

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1        (Proceedings commence at 11:22 a.m.)

2              THE COURT:  Good morning.  You may be seated.

3              State your name and affiliation, please.

4              MR. WINSBERG:  Good morning, Your Honor.  Harris

5    Winsberg, from Troutman Sanders, on behalf of the defendants.

6    With me today is Mr. Doug Ernst, who had filed pro hac papers.

7    I don't know if an order has been entered yet on that, but he's

8    also with Troutman Sanders.

9              THE COURT:  Did he pay his $25?

10             MR. WINSBERG:  Yes, Your Honor.

11             THE COURT:  We'll assign him, then.

12             MR. WINSBERG:  Thank you, Your Honor.

13             MR. GERSHMAN:  Good morning, Your Honor.  Joseph

14   Gershman from Kasowitz, Benson, Torres & Friedman; also, my

15   associate, Jennifer Schwarz from the Kasowitz firm, on behalf

16   of plaintiff, Adelphia Recovery Trust.

17             THE COURT:  Very good.

18             MS. RAJOO:  Shalini Rajoo, from Willkie, Farr &

19   Gallagher, representing reorganized Adelphia, debtors.

20             THE COURT:  Someone didn't introduce --

21             MR. GERSHMAN:  Oh, I'm sorry.  We have a summer

22   associate, Sandra Pullman (phonetic), also from the Kasowitz

23   firm.

24             THE COURT:  Good.  Good morning.  Welcome.  And what

25   law firm are you going to -- I mean what law school?

4

1          MS. PULLMAN:  Oh, Harvard Law.

2          THE COURT:  Oh, congratulations.  Welcome.  You'll

3     enjoy your summer.  You're going to learn all about discovery

4     now.

5          A couple of things.  First, let's go through some

6     pretrial stuff, and then we'll get down to the nitty gritty.

7          The Court had granted the plaintiffs' motions to amend

8     and so that complaint, amended complaint and answer have been

9     filed.  In that, it was the scheduling order was signed by the

10    parties and filed on electronic filing, but you didn't send it

11    to me for a signature, so it's not an order of the Court.  Did

12    you want it to be an order of the Court?

13         MR. WINSBERG:  Your Honor, we have had discussions

14    with the Kasowitz firm, with Mr. Gershman -- I've had about the

15    scheduling order, and one of the things we're going to talk

16    about today is that we have orally agreed that we would extend

17    fact discovery through August 31.  There's been a production, a

18    very voluminous production that's been made by the plaintiffs

19    to us at the beginning of May.  It's over seven million pages

20    of un-Bates production that we're going to look at to determine

21    whether we're going to need more time.  It essentially puts us

22    back to --

23         THE COURT:  So that final pretrial that you set for

24    January the 29th, 2008, is going to be --

25         MR. WINSBERG:  Is likely going to be moved, Your

5

1  Honor.

2       THE COURT:  Okay.  Well then I haven't signed this, so

3  it's not an order, but I do want a stipulation -- I want a

4  scheduling order, and I want it to be an order, so get it to me

5  e-filed and let's -- so you've just got seven -- does anything

6  of that seven million have to do with what we're talking about

7  today, on the PwC forensic?

8       MR. WINSBERG:  It does not, Your Honor.  I had

9  discussions with Mr. Gershman on Monday or Tuesday?

10       MR. GERSHMAN:  Monday.

11       MR. WINSBERG:  Monday.  And we had discussions about

12  the production.  It was in a hard drive they gave to us, and

13  basically, and they can correct me if I'm wrong, but it was

14  basically pulling everything off Adelphia servers.  We've asked

15  whether it's duplicative or not, and they believe part of it or

16  maybe a lot of it is duplicative.  They can't tell us for sure.

17       There's also an additional production they're going to

18  be making to us, and I don't know when that is, but it

19  certainly, in light of the damages that Your Honor is very

20  aware are being alleged in this case, the size and the scope of

21  the damages, we need time to look through these documents, to

22  make sure that they're not all duplicative, anything new that

23  we're looking for.

24       And it does raise, in our minds, some issues about the

25  discovery process, in general, about getting such a large

1   production, you know, in a two-and-a-half-year-old case.

2           But to answer your question, this --

3           THE COURT:  Well, you may be getting a little more,

4   too, today.  We'll see.  So --

5           MR. WINSBERG:  But to answer your question, Your

6   Honor, the new production, as I understand, what's been

7   represented to me, is completely unrelated to the PwC forensic

8   accounting documents that is under advisement in front of Your

9   Honor.

10          THE COURT:  So what has just been produced?

11          MR. GERSHMAN:  Maybe it's easier for me to respond to

12  that, Your Honor.

13          In the fall -- last fall, after Adelphia had sold off

14  its assets and, in the process of sort of winding operations

15  down, it was the technology folks discovered there were several

16  hundred back-up tapes of indeterminate year, which they had not

17  been aware of, and so we took those back-up tapes and hired

18  someone to find out what gates those back-up tapes covered.  I

19  believe approximately sixty tapes were found to be in the 2000

20  and 2001 time period, which was the closest to the transaction,

21  and those -- we then -- Adelphia then paid for those tapes to

22  be restored and the same search terms that had been used in the

23  creation of the Prestige database were run through those tapes,

24  and then an attempt was made to compare that information to

25  what is currently on the Prestige database, and you're not able

1    to do a complete comparison because the existing Prestige

2    database, some of those documents are in electronic form, so

3    that you actually could compare and eliminate any duplicates,

4    but a lot of those documents were scanned in and there's no way

5    to tell for sure whether it's duplicative.

6         At the end of that process, the documents, which were

7    very large in size, over a megabyte, were produced in native

8    format, on a hard drive, the belief being that these documents

9    were very unlikely to be responsive.  And in looking at these

10   things, the documents were very large, tended to be large

11   spreadsheets which really weren't -- really had nothing to do

12   with the transaction, but some of the search terms showed up in

13   it.  The documents which were smaller, which would be things

14   more like e-mails or letters or correspondence, that

15   information is being loaded into the Merrill database, so that

16   it can -- it's fully word searchable.  It's there with

17   everything else that's in the database.  And Merrill has that

18   information.  Some of it has been loaded on, and I believe that

19   they think, within the next week or so, that stuff will be up

20   and fully searchable.

21        So that is the bulk of what has been produced to the

22   other side.

23        THE COURT:  But it's going to be electronic, so it's

24   not as if you're going to have to go through it page by page.

25   You might have to go through it screen by screen.

8

1       MR. WINSBERG:  Your Honor, I'm not the technology

2   person.  There is -- I understand there's going to be a phone

3   call with our IT department in the Kasowitz firm.

4       THE COURT:  And it also should be word searchable,

5   even though the PDF documents will probably not be word

6   searchable, but will they be -- they're indexed?

7       MR. GERSHMAN:  The documents that were sent on the

8   hard drive are all word searchable, and that phone call

9   actually was held yesterday.  Troutman's IT department had a

10  phone call with our IT department to discuss ways to search it,

11  and what we're doing to search it on our end, but the documents

12  are all word searchable.

13      THE COURT:  You took off the -- do you have any PDF

14  documents, because you said you had to scan documents?

15      MR. GERSHMAN:  The scanned documents is what's already

16  in the existing database.  I was just suggesting that we made

17  an effort to try to eliminate anything in this new production,

18  to the extent we could, we tried to run a comparison between

19  the two, and all I was saying about the documents that were

20  scanned in, that's stuff that was in the original database.  In

21  the original database, a lot of that production had been

22  scanned in.  And so, for documents that are scanned in, you

23  can't really -- there isn't an electronic -- the metadata is

24  not there to compare.

25      THE COURT:  Okay.

1          MR. GERSHMAN:  So all of the stuff was in --

2          THE COURT:  I'm sure I will hear from you if it

3     doesn't turn out to be what you expect to be.

4          MR. WINSBERG:  Yes, Your Honor.  The major point that

5     I just wanted to make was that obviously, it's a voluminous

6     production coming to us late in the case, and that's why we're

7     -- that's why we don't have an agreed-upon scheduling order.

8          THE COURT:  Well, you all had an agreed-upon

9     scheduling order.  It just wasn't ordered of the Court.

10         MR. WINSBERG:  Prior to us knowing that this new

11     production was -- substantial production was being made.

12         THE COURT:  Okay.  Well then, why don't we go to the

13     PwC forensic documents.  Now I've gotten all of your documents

14     on it.  I've got your memos.  I've got what ya'll -- is there

15     anything you wish to add?  Anybody?  Very good.  Having heard

16     nothing, I'm ready to rule.

17              This is the discovery dispute in PwC, and it's the PwC

18     forensic documents.  The parties made a joint submission to the

19     Court addressing the issue of whether or not Adelphia should be

20     required to produce certain documents created by

21     PricewaterhouseCoopers Forensic Accounting Services.  And

22     that's forensic, the PwC forensic documents.

23              The PwC forensic documents were produced at the

24     request of the special committee of independent directors of

25     Adelphia Communications Corp.  The special committee function,

1  both pre and post-petition, the special committee retained

2  counsel at Fried Frank and Covington & Burling to perform legal

3  services for the special committee in connection with this

4  investigation.  During this period, PwC Forensics created

5  documents, including work papers, that are responsive to

6  Prestige discovery requests in this adversary proceeding.

7        Prestige claims that it has good reason to believe

8  that PwC forensic documents go to the heart of its case, but

9  Adelphia has not produced any PwC forensic documents that would

10  be responsive to Prestige's discovery request, and has not

11  produced any privilege log asserting work product or

12  attorney/client privilege over any of the PwC forensic

13  documents.

14        Adelphia has previously stated in pleadings filed in

15  this adversary proceeding that it would not assert the

16  attorney/client privilege or work-product privilege, except in

17  very limited circumstances, not applicable here.  In Adelphia's

18  October 2006 objection to Prestige's motion to compel, Adelphia

19  stated:

20        "Defendants complain that plaintiffs have refused to

21        produce a privilege log, and argue that because they

22        have not produced a privilege log, there's been a

23        waiver of privilege.  But to draft a privilege log,

24        one must have privileged documents to enter on it.  As

25        plaintiffs have told defendants numerous times, in

1    open court and in chambers conferences, and made it

2    clear in correspondence,"

3    Plaintiff added that:

4    "Plaintiffs have not withheld responsive documents

5    based on privilege, with the exception of work product

6    and privilege documents created in connection with

7    this litigation."

8    Also, in December of 2006, Adelphia basically hedged

9  by stating that they're not withholding any responsive

10  documents from their files.  That's sort of a big hedge.  It

11  didn't include the PwC, but it's from their files.  Adelphia

12  does not dispute that the PwC Forensics was retained to assist

13  special counsel performing an internal investigation of the

14  Rigases' wrongdoing, and was not retained to conduct an

15  invitation of the Prestige transaction.

16    Prestige claims they first learned that PwC documents

17  were being withheld as a result of a third-party subpoena to

18  PwC.  PwC claimed the privilege at the direction of Adelphia.

19  That's in the joint submissions.  It's found, in the joint

20  submissions, Exhibit B, Page 3, where PwC states that:

21    "It has been advised by counsel for the debtor that

22    Adelphia does not consent to the production of such

23    documents on the grounds that they are protected by

24    Adelphia's work -- attorney/client work product and

25    other applicable privileges.  Accordingly, PwC, in its

1    capacity as a stakeholder, objects to the production

2    of these documents, and respectfully refers counsel to

3    counsel for the debtor for such further information,

4    if any, as may be required."

5    Adelphia now claims that the documents fall within the

6  work-product protection provided by Federal Rules of Civil

7  Procedure 26(b)(3), which is, of course, applicable to

8  Bankruptcy Federal Rule 7026.  Prestige claims that Adelphia

9  has waived any work-product protection because they have not

10  produced a privilege log.  Adelphia replies that PwC forensics

11  documents have not been in their possession, custody, or

12  control.  This is sort of sword-and-a-shield defense here.

13    Federal Rule of Civil Procedure 26(b)(5), which is

14  applicable to this adversary proceeding pursuant to Federal

15  Bankruptcy Procedure 7026, states in the relevant part:

16    "Claims of privilege or protection of trial

17    preparation materials, 5(a), information withheld:

18    When a party withholds information otherwise

19    discoverable under these rules by claiming that it is

20    privileged or subject to protection as trial

21    preparation material, the parties shall make the claim

22    expressly and shall describe the nature of the

23    documents, communications, or things not produced or

24    disclosed in a manner that, without revealing

25    information itself, privileged or protected, will

13

1    enable other parties to assess the applicability of

2    the privilege or protection."

3    The party claiming the privilege bears the burden of

4    showing its applicability.  There's a whole list of cases.

5    Adelphia has failed to produce any responsive PwC

6    forensic documents, or to produce a privilege log identifying

7    responsive PwC forensic documents that are subject to

8    attorney/client or work-product privilege.  Adelphia claims

9    that one, no such log is required in the Federal Rules of Civil

10   Procedure because they were and are not in debtors' custody,

11   possession or control, and that Adelphia is in a position -- is

12   not in a position to direct PwC to produce responsive documents

13   from work papers.  Adelphia claims that no privilege log is

14   necessary because a log would not have told them anything they

15   did not know already, and responsive documents are either all

16   privileged, as debtor contends, because every document was

17   created in connection with PwC Forensic Service, as forensic

18   accountants to special committee counsel, or they're not

19   privileged at all.

20   Elsewhere, Adelphia threatens that a privilege log

21   would not, and presumably will not, have been informative to

22   the defendants because every item in the log will have the same

23   information, work product prepared at the direction of counsel

24   to assist counsel in rendering legal advice in connection with

25   litigation.  Adelphia argues that it would be highly

1  inequitable to require the plan administrator to go through

2  with a futile, yet costly exercise of reviewing the voluminous

3  PwC forensic work papers in order to log those documents

4  containing therein, that are responsive to defendants' request.

5          Prestige summarizes its case for waiver as follows:

6      "Defendants have been demanding a privilege log since

7      June of 2005.  Defendants were finally forced to file

8      a motion to compel.  Plaintiffs have made repeated

9      reckless or negligent misrepresentations to the

10     defendants and to the Court concerning the non-

11     existence of responsive privileged documents.

12     Meanwhile, PwC forensic documents have been the

13     subject of contention and a privilege log in other

14     Adelphia litigation.  The existence of the withheld

15     responsive documents was ascertained only through

16     independent actions of the defendant.  Even after

17     defendants learned of the existence of the documents,

18     plaintiffs made an impermissible blanket assertion of

19     privilege, and refused to provide a privilege log.

20     All the while, plaintiffs have been attacking

21     defendants' timely produced privilege log on every

22     conceivable technicality."

23     Adelphia's response, in joint submissions, leaves many

24  unanswered questions.  First, as Prestige puts it on Page 14 of

25  the joint submissions:

1    "How can Adelphia concede that they control PwC

2    restatement team work papers, while contending that

3    they have no such control over similarly situated work

4    papers of PwC forensics?"

5    Adelphia claims, on Page 22, that the debtors do not

6 assert any privilege with respect to PwC restatement team work

7 papers and, in fact, the parties have been engaged in

8 productive discussions to arrange for production of responsive

9 PwC restatement documents to Prestige.  But Adelphia does not

10 explain how it cannot make a similar arrangement for the

11 forensics documents.

12    Can you give me a distinction, based on the fact that

13 the restatement papers were originally given by Adelphia to

14 Prestige and PwC forensic papers are not?

15    MS. RAJOO:  Your Honor, I don't think we can give you

16 any information on that point right now, unfortunately.

17    THE COURT:  Adelphia never affirmatively states this,

18 but argues at Page 27 of the joint submissions:

19    "We are not dealing here with documents that debtors

20    gave to PwC Forensics.  The debtors are not asserting

21    a privilege with respect to responsive, underlying

22    debtor documents that were provided to PwC."

23    Adelphia claims that PwC forensic documents were

24 created by PwC Forensics in connection with its work on the

25 special committee investigation, which refers to Adelphia,

16

1  PwC's client.  Adelphia argues that the documents were and are

2  owned and maintained by PwC, and the terms and conditions on

3  which they were produced are entirely up to PwC and its

4  counsel.  Adelphia emphasizes over and over again that it has

5  no control over what PwC does with the forensic papers that it

6  created, but never explains why PwC forensic work-product

7  papers are different from any other claim of work product in

8  any other case, where the existence of the documents would have

9  to be identified and privilege would have to be timely claimed

10  and logged, or else waiver.

11        Adelphia relies on an extremely narrow view of

12  possession and control.  Federal Rule of Bankruptcy Procedure

13  35(a), again, applicable to Federal Rule of Bankruptcy

14  Procedure 7034, is captioned, production of documents,

15  electronic stored information and things and entry upon LAN for

16  inspection and other purposes.  34(a) says, the scope:

17        "Any party may serve on any other party a request to

18        produce and permit the party making the request and on

19        someone acting on the requestor's behalf to inspect,

20        copy, test or sample any designated documents or

21        electronically stored information, including writings,

22        drawings, graphs, charts, photographs, sound

23        recordings, images, and other data or data compilation

24        stored in any medium from which information can be

25        obtained."

1    Translated, if necessary by the respondent into any

2    reasonably usable form or to inspect, copy, test or sample any

3    designated tangible thing which constitute or contains matters

4    within the scope of Rule 26(b), and, and I emphasize this,

5    which are in the possession, custody or control of the party

6    upon whom the request is served, and are to permit entry upon

7    designated LAN.  We don't need to go into that.

8        Under Rule 34, control does not require that the party

9    have legal ownership or actual physical possession of the

10   documents at issue.  Rather, documents are considered to be

11   under a party's control when the party has the right, authority

12   or practical ability to obtain the documents from a non-party

13   to the action.  And I have a cite for you on that, <u>Bank of New</u>

14   <u>York v. Meridien BIAO Bank, Tanzania Limited</u>, 171 F.R.D. 131

15   (S.D.N.Y. 1997).

16       Courts have also interpreted Rule 34 to require

17   production if the party has the practical ability to obtain the

18   documents from another, irrespective of his legal entitlement.

19   Again, a Southern District of New York case, 1996, <u>Nasdaq</u>

20   <u>Market Makers Anti-Trust Litigation</u>, Judge Sweet, who quoted

21   <u>Golden Trade SRL v. Lee Apparel</u>, a 1992 Southern District case,

22   143 F.R.D. 514:

23       "Control includes the legal right of the producing

24        party to obtain documents from another source upon

25        demand.  A party may be ordered to produce documents

1    where the party the legal right to obtain the

2    documents, even though the party retains no copy and

3    regardless of whether the documents are beyond the

4    jurisdiction of the Court."

5        In this case, Adelphia has never argued that PwC would

6    not produce the documents in question if directed by Adelphia.

7    The lack of physical possession does not mean the documents are

8    not in Adelphia's control.  Adelphia does not contend, again,

9    that PwC would refuse to produce the forensic documents.

10        According to Adelphia, it is entirely up to PwC what

11    to do with its own work papers.  This is having it both ways.

12    PwC is admittedly asserting the privilege at the direction of

13    Adelphia, and then Adelphia argues the fact that PwC gave the

14    debtors notice of the subpoena and the fact that the debtors

15    instructed PwC that the debtors were not waiving their

16    privilege with respect to the PwC forensic work papers, does

17    not establish the debtor had control over PwC's files.

18        Adelphia objects that Prestige has known since at

19    least October '05 that Adelphia asserted a privilege over the

20    special committee investigation.  However, Adelphia later,

21    unequivocally, said that it was not asserting any privilege,

22    and made similar statements to this Court.  Nevertheless,

23    Adelphia still had to timely and formally claim the privilege,

24    and Adelphia did not do so.

25        Adelphia argues, in the joint submission, that it

1    repeatedly and unequivocally asserted that the special

2    committee's investigation is privileged and the debtors do not

3    intend to waive that privilege.  Yet, Adelphia provides no

4    proof of this with one exception:  An understanding between the

5    parties dated back to October 2005.  In an e-mail from Prestige

6    counsel dated October the 4th, 2005, Mr. Gordon stated the

7    following understanding:

8           "Adelphia will produce the Covington report and

9           exhibits to Prestige.  Once we agree not to take issue

10          with Adelphia's position that although the report and

11          exhibits are not themselves privileged, the documents

12          created in connection with their preparation fall

13          within the work-product privilege.  You will send us a

14          proposed form of agreement to review and upon our

15          signing the agreement, you will promptly send us the

16          Covington report and exhibits.  You will provide us

17          with a log listing the materials relating to the

18          Covington report in which you claim work-product

19          production."

20          On October the 20th -- that was Exhibit 5 to

21   defendants' motion to compel.  On October the 20th, 2005,

22   Adelphia provided Prestige with two boxes of documents,

23   consisting of the reports and exhibits, a letter from

24   Adelphia's counsel that accompanied these documents, and

25   reflected the parties' understanding that these documents are

1  being provided to you pursuant to your representation that you

2  will not contend that the production of such materials

3  constitutes a waiver of the attorney/client privilege, and the

4  attorney work product protection or any other evidentiary

5  privilege with respect to the investigation conducted by

6  Covington & Burling, including, without limitation, interview

7  notes, memoranda and analysis.

8         At Exhibit 1 to the joint submission, in that letter,

9  Adelphia's counsel went on to acknowledge that in making that

10  representation, you, meaning Prestige, are not waiving your

11  right to contend that no such privilege or protection applies,

12  or that it has been waived through conduct other than our

13  production of the materials enclosed within.

14         At that time, more than a year-and-a-half ago,

15  Prestige expected Adelphia to provide a log listing the

16  materials relating to the Covington report, for which Adelphia

17  claims work-product protection.  But Adelphia never did so.

18  Such conduct would constitute conduct other than Adelphia's

19  production of the Covington report, and Prestige specifically

20  retained its right to argue that such conduct would result in

21  waiver of privilege.  Moreover, Adelphia has stated in

22  pleadings and in its representations to the Court that

23  plaintiffs are not withholding responsive documents based on

24  privilege, with the exception of work product and privileged

25  documents created in connection with this litigation.

1    Key to Adelphia's argument is the claim that Adelphia

2 has no access or control over PwC forensic documents, yet it

3 appears that it is not the case.  Adelphia makes the following

4 argument:  The debtors argue the fact that the debtors' counsel

5 in the Deloitte litigation has sufficient access to provide

6 certain of PwC forensics work to the Adelphia expert, and

7 sufficient access to log those documents on a privilege log,

8 proves that the debtors do indeed have possession, custody and

9 control over the PwC forensic work papers.  The only reason the

10 debtors came to have access to those materials in the Deloitte

11 litigation is because Deloitte's counsel issued a subpoena to

12 PwC.  Deloitte's counsel recognized that without such a

13 subpoena, Deloitte could not expect to receive production of

14 documents from PwC's files, merely by propounding discovery

15 requests on the debtor.

16    The reference to the Adelphia expert apparently refers

17 to a witness who testified on Adelphia's behalf in the Deloitte

18 litigation, and reviewed certain of the PwC forensic documents.

19 In the joint submission, Adelphia states that they are not

20 prepared to consent, without concession, to production of all

21 responsive documents contained in the PwC forensic work papers

22 that were made available to the Adelphia expert, excluding only

23 those responsive documents that constitute core work product,

24 which the debtor will log on a privilege log.

25    Adelphia's offer seems to weigh against its argument

1  that it did not have access to PwC forensic documents.  If

2  Adelphia had access to those documents, the claim of privilege

3  was previously waived, so Adelphia could not now claim to

4  withhold whole core work product that it has apparently had

5  under its possession or control.

6        The Court has a question.  Did Adelphia's counsel have

7  access to the PwC forensic documents in connection with the

8  Deloitte litigation, and produce a 220-page privilege log?

9        Yes, ma'am?

10       MS. RAJOO:  Thank you, Your Honor.

11       Your Honor, Dechert represents Adelphia in the

12 Deloitte & Touche litigation, and as we said before, they have

13 had access to certain documents.  Willie, Farr & Gallagher has

14 not been involved in that litigation.  We certainly haven't had

15 limited, or any sort of access to these documents.  Dechert had

16 limited access, but right now, that's really all the

17 information I have as to our access to any of these documents.

18       THE COURT:  So you didn't -- so Willkie did not

19 prepare the privilege log in that litigation for PwC forensic

20 documents?

21       MS. RAJOO:  No, we did not, Your Honor.  That was

22 prepared by Dechert.

23       THE COURT:  It still implies access by Adelphia to the

24 underlying documents.

25       MS. RAJOO:  I understand, Your Honor.  I think there

23

1  was the distinction, though, that Dechert was handling these

2  issues with PwC directly, just in the course of the <u>Deloitte &</u>

3  <u>Touche</u> litigation.

4       THE COURT:  But Adelphia has never explained how this

5  does not constitute access or control, and does not explain the

6  related question of why Adelphia believes that although a

7  privilege log was produced in the <u>Deloitte</u> adversary, the same

8  is not required in this case.

9       And why was no one working from the privilege log in

10 the <u>Deloitte</u> matter in this case?

11      MS. RAJOO:  I'm sorry, Your Honor.  I wish I had more

12 information for you on these issues, but as I said, because of

13 the fact that Dechert was involved in the <u>Deloitte & Touche</u>

14 litigation, and Willkie, Farr & Gallagher was not, it would be

15 remiss on my part to try and guess or speculate how, exactly,

16 access came to be in that case.

17      THE COURT:  Okay.  Well, then that means the Court

18 would have to speculate, too, and I won't, either.  I'll just

19 know that they had it, so --

20      Adelphia, in the paper, has responded that it does not

21 deny that there may be documents contained in the PwC forensic

22 work papers that may discuss the Prestige transaction, or that

23 may be responsive in some other way to the defendants' request.

24 However, Adelphia contends that the focus of the special

25 committee investigation has nothing to do with the analysis of

1   the Prestige transaction, per se, so that it is likely that

2   most of the documents in the PwC forensics work papers are not

3   responsive at all to defendants' discovery request.

4         Thus, Adelphia concludes it would be burdensome for

5   the Court to sift through PwC's forensic work papers to find

6   those responsive documents.  Once again, Adelphia, who

7   commenced this litigation, has argued that it would now be too

8   expensive or inconvenient to comply with its disclosure

9   obligations.  If Adelphia believes that compliance with the

10   discovery obligations in the adversary proceeding is

11   overburdensome, I might want to withdraw the complaint.

12         This argument, however, is insufficient to excuse

13   Adelphia's compliance with the Federal Rules of Civil

14   Procedure.  If Adelphia has cited any argument for

15   inconvenience or expense exception to the production of the

16   privilege log, that Court has not seen it.

17         Adelphia submits that even if the Court were to

18   conclude that the failure to produce a privilege log

19   constitutes a waiver, the scope of such a waiver would have to

20   be limited to those documents in the PwC forensic files that

21   are responsive to the discovery request.

22         Which would bring us to Local Bankruptcy Rule 7034-1,

23   states in relevant part:

24         "Objections to and requests for relief with respect to

25         productions of documents.

1(b).  If an objection or request for relief is made with respect to any document request or portion thereof, the objection or request for relief shall state all the grounds with specificity.  Any grounds not stated in the objection or request for relief within the time provided by the Bankruptcy Rule or any extension thereof shall be deemed waived.

(c)  If a claim of privilege is asserted in an objection or a request for relief with respect to any document request or portion thereof, and an answer is not provided on the basis of assertion, the objection or request for relief shall identify:

(1)  the nature of the privilege being claimed.  And if the privilege is being asserted in connection with a claim or defense governed by state law, the state's privilege rule being invoked, and;

(2)  unless divulgence of such information would cause disclosure of the allegedly privileged information to the type of document, the subject matter -- the general subject matter of the document, the date of the document, and such other information as is sufficient to identify the document for a subpoena duces tecum, including, where appropriate, the author of the document, the addressee of the document, and where not apparent, the relationship of the author to

1      the addressee, and the names of all entities that

2      receive a copy of the document."

3      Failure to timely provide a privilege log may cause --

4  may result in a waiver of privilege.

5      Once the party claiming privilege has met its initial

6  burden, the party seeking production of the documents may still

7  prevail by demonstrating either than an exception to the

8  privilege applies and that privilege has been waived.  A

9  privilege log must be received either within thirty days of the

10  request for the document, or by the date that is either agreed

11  upon by the parties or set by the Court.

12      That is, again, a Judge Sweet decision, <u>Strougo v. BEA</u>

13  <u>Associates</u>, 199 F.R.D. 515.  In <u>Hearst v. Woolworth Company</u>, a

14  1997 Westlaw 61051, (S.D.N.Y., Feb. 1997), Judge Haight ruled

15  that the defendant there had waived any claim of privilege that

16  might exist as a result of its unjustified failure to comply

17  with Federal Rules of Civil Procedure, and the local District

18  Court rules, which are interesting because, of course, those

19  might apply to the Bankruptcy Court, too.  But I think they're

20  subsumed in 7031-1.

21      By failing to timely provide a privilege log, Judge

22  Haight noted:

23      "Although waiver may be a serious sanction for such a

24      violation, the importance of local rules shall not be

25      diminished by skirting their application when results

1  prove harsh to the party."

2      In <u>PK Finance International Corp. v. IBJ Schroeder</u>

3  <u>Leasing Company</u> (phonetic) (1996) Westlaw 252862, a Southern

4  District of New York case, Magistrate Judge Pitman waived the

5  protection of privilege by not producing the privilege log

6  required by local civil rule.  Despite plaintiff's repeated

7  requests, defendant produced neither the documents, nor a

8  privilege log.  On these facts, the Court concluded that a

9  finding of waiver is clearly justified, and set the following

10 reasons:

11      "The Court is aware that some places have held that

12      the remedy for a violation of the local rule is a

13      court order directing the preparation of a privilege

14      log.  The Court does not, however, find those cases

15      persuasive.  Limiting the remedy to the belated

16      preparation of a privilege log effectively tells

17      practitioners they can flout the Court's order --

18      rules, and incur no sanctions, other than an order

19      directing compliance with the rules.  Such a result

20      would not only encourage disregard of the Court's

21      rules and encourage motion practice to compel

22      compliance with those rules."

23      Magistrate Judge Katz also has observed that whether

24 failure to comply with the federal rules and local rules

25 pertaining to a claim of privilege would result in waiver of

28

1 the privilege turns upon the nature of the violations, it's

2 willingness or cavalier disregard for the rules requirement and

3 the harm which results to others.

4      In re: Scheck (phonetic), Judge Bernstein, (S.D.N.Y.

5 1997), Westlaw 465271, held that a Chapter 11 trustee's claim

6 of privilege was waived when the trustee and her counsel failed

7 to offer any justification for her failure to provide a

8 privilege log initially, or in the face of repeated requests,

9 or for her counsel's representation, which specifically asked

10 that all responsive documents had been produced, and that no

11 witness interview notes existed.  Judge Bernstein concluded

12 that the parties did not have the documents -- did not give the

13 document request the serious attention it merited, and ignored

14 the requirements imposed on the producing party under Rule 34.

15      In this case, Adelphia has waived the right to prevent

16 the production to Prestige of the PwC forensic documents, based

17 upon a claim of work product privilege.

18      I do reject Prestige's argument in the joint

19 submission that the privilege was waived by sharing the

20 documents with other individuals because it appears that those

21 individuals were not third party, and that could cause a waiver

22 of the privilege.  Submit an order.

23      Now, when are you all going to get me a scheduling

24 order?

25      MR. WINSBERG:  Your Honor, when I talked I Mr.

29

1    Gershman about is trying to get a handle on how long it's going

2    to take for us to look and to still deal with the seven million

3    pages of documents.  My goal was to get an order to the Court

4    by the end of the month, and I'll have a better understanding

5    then how long it's going to take me to just go through these

6    documents, and how much more time we'll need on fact discovery.

7        Obviously, in light of the Court's ruling, we're also

8    going to be getting a new production of documents with forensic

9    accounting documents.

10       THE COURT:  When am I going to be back in Manhattan?

11       (Court and court personnel confer.)

12       THE COURT:  There's a Judge's meeting on June 20th.  I

13   can set that -- I'll set that for a morning conference here, if

14   we need it.  But let's set it.  Y'all mark it on your

15   calendars.  If we don't need it, if we've got everything put

16   together, then we may not need it, but be in touch with -- Jeff

17   Narmore will still be the law clerk handling thing.

18       MR. WINSBERG:  All right.  Your Honor, there are --

19       THE COURT:  I do have a hearing that morning?  Not in

20   this Adelphia, the other Adelphia?  Okay.  I will be here.

21       MR. WINSBERG:  Your Honor, there are some various

22   discovery issues.  The parties are conferring, and we

23   suspect --

24       THE COURT:  It would be nice if you did confer.

25       MR. WINSBERG:  Yeah.  And we have been conferring,

30

1  Your Honor.

2          One of the things that I had thought about, given --

3  in light that the discovery in this case has been expensive and

4  difficult, is maybe the concept of a special master.  You know,

5  at this point in the case, it seems like everything we try to

6  get --

7          THE COURT:  I cannot give you a special master.  It's

8  precluded.  I believe it's 9019, precludes a Bankruptcy Court

9  from appointing a special master.

10         MR. WINSBERG:  I was thinking of ways to avoid the

11  Court -- wasting the Court's time with some of the issues that

12  we've had to fight over.

13         THE COURT:  I didn't think the Court's time was wasted

14  on that one.

15         MR. WINSBERG:  I didn't think so, either.

16         THE COURT:  Adelphia might have thought so.

17         MR. WINSBERG:  The point, Your Honor, is that there's

18  been a lot of court time being used to, what we would view as

19  things that we should have been able to work out, without

20  having to involve the Court.

21         THE COURT:  That's always nice.  I've given ya'll that

22  lecture before.  I would prefer that you do work them out, but

23  I'm available.

24         Anything else?

25     (No verbal response.)

1    THE COURT:  Very good.  I will probably see you June

2  20th.  The Court is in recess.

3    (Proceedings concluded at 12:04 p.m.)

4                       CERTIFICATION

5    I certify that the foregoing is a correct transcript

6  from the electronic sound recording of the proceedings in the

7  above-entitled matter.

8

9  *Jennifer Linnartz*

10

11  _____          May 20, 2007

12  Jennifer Linnartz  AAERT Cert. No. 339
    Certified Court Transcriptionist
    For Rand Transcript Service, Inc.

13

14

15

16

17

18

19

20

21

22

23

24

25

1
2

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

3    IN RE:                          .    Case No. 02-41729 (REG)

4    ADELPHIA COMMUNICATIONS         .    New York, New York
     CORPORATION, et al.,            .    Wednesday, October 17, 2007
5                                     .    11:34 a.m.
                    Debtors.         .
6    . . . . . . . . . . . . . . . .
     ADELPHIA COMMUNICATIONS         .    Adv. Proc. No. 04-03293 (CGM)
7    CORPORATION, et al.,            .

8                    Plaintiffs, .

9          vs.                       .

10   PRESTIGE COMMUNICATIONS OF      .
     NC, INC., et al.,               .
11                                    .
                    Defendants. .
12   . . . . . . . . . . . . . . . .

13          TRANSCRIPT OF DEFENDANTS' MOTION FOR SANCTIONS
                BEFORE THE HONORABLE CECELIA G. MORRIS
14                UNITED STATES BANKRUPTCY JUDGE

15   APPEARANCES:

16   For the Plaintiffs:        Joseph A. Gershman, Esq.
                                Jennifer B. Schwarz, Esq.
17                              KASOWITZ, BENSON, TORRES &
                                 FRIEDMAN, LLP
18                              1633 Broadway
                                New York, New York  10019
19
     Audio Operator:            Electronically Recorded
20                              by Court Personnel

21   Transcription Company:     Rand Reporting & Transcription, LLC
                                80 Broad Street, Fifth Floor
22                              New York, New York 10004
                                (212) 504-2919
23                              www.randreporting.com

24
     Proceedings recorded by electronic sound recording, transcript
25   produced by transcription service.

1   APPEARANCES:   (Continued)

2   For the Defendants:        Harris B. Winsberg, Esq.
                               Douglas E. Ernst, Esq.
3                              TROUTMAN SANDERS, LLP
                               600 Peachtree Street, N.E.
4                              Suite 5200
                               Atlanta, Georgia   30308

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1    (Proceedings commence at 11:34 a.m.)

2         THE COURT:  Good morning.  You may be seated.

3    (Pause.)

4         THE COURT:  Just one minute.

5         Good morning.  This is Case Number 04-03293, <u>Adelphia</u>

6    <u>Communications versus Prestige Communication</u>, and the lead case

7    is 02-41729, <u>Adelphia Communication</u>.

8         Your name and affiliation, please.

9         Go ahead.

10        MR. WINSBERG:  Good morning, Your Honor.  Harris

11   Winsberg from Troutman Sanders on behalf of the defendants.

12   Also with me is Mr. Doug Ernst, also from Troutman Sanders on

13   behalf of the defendants.  And with me today is Miss Irlene

14   Holmes (phonetic), who works with Mr. Osher (phonetic), who's

15   one of the defendants in the case.

16        THE COURT:  And Ms. Holmes is --

17        MR. WINSBERG:  The one that works for Mr. Osher who's

18   a defendant --

19        THE COURT:  Okay, so --

20        MR. WINSBERG:  -- in this --

21        THE COURT:  -- her role today is as?

22        MR. WINSBERG:  She's just here as a representative of

23   the defendants.

24        THE COURT:  Very good.

25        MR. GERSHMAN:  Good morning, Your Honor.  Joseph

4

1    Gershman from Kasowitz, Benson, Torres & Friedman on behalf of

2    plaintiff, Adelphia Recovery Trust, joined today by my

3    associate Jennifer Schwarz.

4              THE COURT:  Welcome.  It's your motion.

5              MR. WINSBERG:  Yes, Your Honor.  Prefer the podium

6    or --

7              THE COURT:  Whatever you're comfortable with.  I'm new

8    to this courtroom, so I have -- I actually designed this

9    courtroom, but it's the first time I've ever been in it.

10             MR. WINSBERG:  I'll stand here then --

11             THE COURT:  Okay.

12             MR. WINSBERG:  -- Your Honor.

13             First, Your Honor, I would apologize.  I looked at the

14   docket this week and it has an 11:30 date a.m. appearance, so

15   we were late because of that, and I certainly apologize to the

16   Court for --

17             THE COURT:  Well, we took a walk and had a cup of

18   coffee, so -- and worked on other cases, so we took -- we made

19   use of the time.

20             MR. WINSBERG:  Your Honor, we are here today on

21   defendants' motion to compel.  There were three primary things

22   that we sought in this motion to compel.  One were the

23   unredacted transcripts of the four independent directors of

24   Adelphia that were taken in the <u>Adelphia v. Deloitte</u> case.  The

25   second thing we're seeking are complete corporate minute books

5

1  with respect to Highland Prestige Georgia and Prestige

2  Communications, Inc.  And the third thing we're seeking are

3  documents relating to acquisitions that Adelphia made in the

4  1999, 2000 time frame.  Those are the primary three sources of

5  documents we're looking for.

6      If I could turn to just the transcript, I could

7  explain -- what I'd like to do is explain why we believe each

8  one of the three things we're seeking are relevant and should

9  be produced in the case --

10      THE COURT:  Okay.

11      MR. WINSBERG:  With respect to the independent

12  director transcripts in Deloitte, Your Honor, there is

13  substantial overlap between this litigation and the Adelphia v.

14  Deloitte case.

15      In the Deloitte case, Your Honor, witnesses discussed

16  the Prestige transaction.  There were numerous issues litigated

17  in the Adelphia v. Deloitte case, such as whether the 1999 and

18  2000 financials were done in accordance with generally accepted

19  accounting principles and such things as how much, if any, of

20  the co-borrowing debt should have been reported.  All those

21  issues are relevant to the litigation in this case as

22  Adelphia's alleged that it was insolvent at the time of this

23  transaction.

24      By bringing this fraudulent conveyance case, the Court

25  not only is -- Adelphia's not only put its financial condition

6

1  at issue, but really Adelphia itself is at issue in this case

2  by alleging that it was setting itself up to fail by entering

3  into these transactions.

4       Your Honor, the full transcripts allow us to review

5  their testimony and put the redacted testimony they give us --

6  given us in the proper context.  Our other concern, Your Honor,

7  is that there -- we have no understanding of what they

8  redacted, and we believe that what they may think is relevant

9  to the claims and defenses and what we may think is relevant to

10 the claims and defenses are probably two separate things.  And

11 I can give some examples if Your Honor would like --

12      THE COURT:  Please, I would like to have them for the

13 record.

14      MR. WINSBERG:  Sure, Your Honor.  For example, one of

15 the things that we believe is that there are no damages in this

16 case.  Adelphia had a centralized cash management system.  That

17 cash management system, all of the cash, even from the Rigas

18 entities, would flow through Adelphia centralized cash

19 management system and became -- become Adelphia's property.

20      So we would believe testimony regarding a centralized

21 cash management system would be relevant.  I would take it Mr.

22 Gershman would think otherwise.  We just can't tell.

23      There are other things that the directors were talking

24 about, such things as other acquisitions that Adelphia made and

25 what they looked at.  Again, when you look at inadequate

7

1  capitalization, Your Honor, you look at whether Adelphia was

2  making -- was entering into acquisitions, and I'll get to that

3  later why those other documents are relevant also.  You look at

4  whether when they were approving these transactions were -- was

5  it reasonable or should they have known that by entering into

6  these transactions Adelphia was setting itself up to fail.

7       So there's a lot of things these directors talked

8  about.  They also probably got deposed on corporate governance

9  matters.  One of the things Adelphia's alleged is there was a

10  failure of corporate governance matters in this litigation, so

11  how they -- what process they went through in approving

12  transactions, did they look at the Prestige transaction any

13  differently they looked at any of the other acquisitions they

14  looked at.

15       All those things that Deloitte may have -- they may

16  have covered in the Deloitte litigation would bear on this

17  case.  I can't imagine anything that they said that wouldn't

18  have some bearing or at least give us some context of what's

19  going on in this case and remind Your Honor they've had these

20  depositions sitting in their offices or have had access to them

21  for over a year and we haven't seen them and, you know, we're

22  trying to get up to speed on what was Adelphia.  You know, how

23  was it created and -- and as I'll get to later, 60 percent of

24  Adelphia was created in 1999 and 2000, so the bulk of Adelphia.

25  So we're trying to get up to speed and whatever they're talking

8

1    about, it gives us the proper context for understanding what

2    went on in this period of time.

3         The -- there are also allegations in the complaint

4    about what the independent directors knew or didn't know with

5    respect to Prestige, and again, how they looked at this

6    transaction versus any others would also be relevant in this

7    case.

8         And I point out, Your Honor, we attached the exhibits

9    if Your Honor would like, but our understanding in this case

10   and the -- particularly Exhibit 5 reflects that -- was the

11   redactions were done at the insistence of Deloitte.  And rather

12   than get into a fight about getting complete transcripts right

13   before we were going to take depositions of Buchanan Ingersoll

14   lawyers, we went ahead and took redacted transcripts based upon

15   that it was Deloitte that was the one insisting on the

16   redactions.  And we didn't want to make an issue of it, but

17   when we contacted Deloitte, they may have changed their mind.

18   I don't know.  I don't have those documents between the

19   communications between -- and I don't really --

20        THE COURT:  Let the record reflect that I recall this

21   on and off the record of exactly the same way you recall it.

22        MR. WINSBERG:  Thank you, Your Honor.

23        THE COURT:  Okay.  I have a couple of questions on --

24   and I'll go with them.  Why are the minute books of Highland

25   Prestige of Georgia and Prestige Communications relevant to

1  this action?

2      MR. WINSBERG:  Sure, Your Honor.  The minute books, as

3  Your Honor is aware, are the primary source of corporate

4  governance matters of those two legal entities.  And in the

5  complaint -- in particular, I would direct the Court to the

6  amended complaint at Paragraph 25, the last sentence --

7  Adelphia alleged that it -- there's no debate in this case,

8  Your Honor, that my client gave the stock of Prestige

9  Communications to Adelphia.  There's no debate about that.  The

10  30(b)(6) witness has acknowledged that.

11      They alleged in their complaint that Adelphia

12  transferred that stock to Highland Prestige.  However, at the

13  30(b)(6) deposition, the Adelphia witness said it never was

14  transferred, which raises questions such as how was Adelphia

15  damaged in this case if Highland never got the stock of

16  Prestige Communications, and how did Highland allegedly

17  exercise control over Prestige Communications, Inc. when it

18  never actually acquired the stock from Adelphia.  Were

19  corporate formalities followed with respect to these two legal

20  entities.

21      The minute books in full, Your Honor, are the primary

22  source of corporate governance matters of these two entities

23  and a lot of the allegations they made that the stock was

24  transferred, even though now they admit in 30(b)(6) it wasn't,

25  we'd like --

1        THE COURT:  And you don't have these minute books?

2        MR. WINSBERG:  We do not have full set minute books.

3    No, Your Honor.

4        THE COURT:  But Adelphia does?

5        MR. WINSBERG:  That's -- my understanding is they do,

6    and, Your Honor, we -- Prestige Communications, Inc. and

7    Highland Prestige of Georgia were what they would refer to as

8    Rigas managed entities.  We looked at the bankruptcy schedule.

9    Those entities filed bankruptcy, as I understand and they can

10   correct me if I'm wrong, as part of the government settlement.

11        And so when they put them into bankruptcy, we looked

12   at their bankruptcy schedules and said, oh, the minute books

13   are located in Denver, Colorado.  So it's in our exhibits we

14   asked Willkie, Farr & Gallagher, hey, the minute books look

15   like they're in Denver, Colorado, can you give them to us.  And

16   it looks like they were, and of course they didn't, and there's

17   no point about going through that correspondence.

18        The bottom --

19        THE COURT:  But you do not have them and you have

20   asked for them?

21        MR. WINSBERG:  Yes, Your Honor.

22        THE COURT:  Okay.

23        MR. WINSBERG:  I do not have the complete set minute

24   books and I have asked for them.  So I could go on, but that's

25   the basic argument on why we believe the minute books --

1      THE COURT:  And then the other one is you are asking

2   for transactions binders for Adelphia's acquisitions between

3   1999 and 2001, and you've referred to that already in your

4   opening arguments.  Why is this relevant?

5      MR. WINSBERG:  Yes, Your Honor, and just to dovetail

6   itself, Adelphia created itself through these acquisitions.

7   Sixty percent of it.  We have to value that aspect of the

8   balance sheet.  And I was reading from Adelphia's restated 10-K

9   that they did after they did the restatement in the bankruptcy,

10  and according to that restated 10-K, just to give you some

11  magnitude of the numbers, in 1999, Adelphia had 1.5 million

12  subscribers and had about 3.7 billion in debt.

13      And then you flip to 2001.  Adelphia has 5.2, five

14  million subscribers and 17.4 billion in debt.  It's a different

15  company, and it was through these major acquisitions it made in

16  1999 and 2000.  There were some in 2001, but the bulk of them

17  were done in '99 and 2000.

18      And so the parties have to value that large piece of

19  the balance sheet that was created by these acquisitions.  And

20  Adelphia's contended that it was inadequately capitalized as

21  far back as the Fall of 1999.  At least that's what Adelphia's

22  corporate representative said in the deposition.  And so what

23  -- as I understand the law, and I read the Iridium decision,

24  which I thought was a fantastic decision on a summary of the

25  solvency law and fraudulent conveyance, you look at what the

12

1   intent of the parties were at the time of the transaction.

2   What did the board consider with each one of these

3   acquisitions.  Were those -- they made assumptions, obviously,

4   when they made those acquisitions.  Were those assumptions

5   reasonable at the time.  If they were, then Adelphia was not

6   inadequately capitalized.  If they weren't reasonable, then

7   Adelphia -- the Court could rule that it was inadequately

8   capitalized.  That's how I understand the law, so how they

9   viewed each of these acquisitions is relevant to the

10  allegations they made about inadequate capitalization and

11  solvency.

12          Now, Your Honor, we do recognize it's a large volume

13  of documents that we're looking for.

14          THE COURT:  Thirty binders, I understand, correct?

15          MR. WINSBERG:  Those are the closing acquisitions.

16          THE COURT:  Okay.

17          MR. WINSBERG:  Which they have given us the closing

18  binders, Your Honor.  We -- so we did offer if they told us

19  where they were located, we go collect them.  I'm aware of Your

20  Honor's decision that Your Honor -- that there's a warehouse

21  that exists.  I'm also aware that Big Merrill -- they may be

22  floating around somewhere in Big Merrill, so we offered tell us

23  where they are and we'll go get them ourselves.  And what --

24  instead of doing that, and I -- and you can look at Exhibits 17

25  and 19 of our brief, they told us to go fish in Big Merrill

1   without giving us any direction, which I believe was contrary

2   to this Court's prior ruling on that Merrill was not a

3   production.

4        The last argument they make, Your Honor, on that point

5   was that the numbers were fraudulent, and nobody's debating

6   that in the restatement Adelphia adjusted the numbers to the

7   public.  The issue I'm looking at is not, Your Honor, what was

8   reported to the public, but what were the numbers that were

9   being represented by sellers to Adelphia in making those

10  acquisitions.  That's a separate issue, and I've heard no

11  allegation that sellers were misrepresenting to Adelphia the

12  nature and extent of the assets that Adelphia was acquiring

13  from them.

14       So it's two separate issues.  One issue would be what

15  they reported to the public, which is not really relevant to

16  the analysis we're looking at when it comes to inadequate

17  capitalization, versus what sellers were telling Adelphia the

18  stuff was what they were getting; how many subscribers, what

19  was the growth rates.

20       So all those things, Your Honor, we believe are

21  relevant in the case and we respectfully ask that the motion to

22  compel be granted.

23       THE COURT:  Very good.

24       MR. WINSBERG:  Thank you, Your Honor.

25       THE COURT:  And you've asked for expenses, but that's

1    something we'll deal with later.

2         Mr. Hershman, before --

3         MR. GERSHMAN:  Gershman, actually, Your Honor.

4         THE COURT:  Excuse me, Hersh -- I'm sorry.

5         MR. GERSHMAN:  Gershman.  Gershman with a G.

6         THE COURT:  Oh.  Let me, before I begin, recollect

7    something to you; an in-chambers conference and an out-of-

8    chambers conference where you yourself said to me -- said to

9    this Court, said to everybody go find those Deloitte.  If you

10   get them, you got them.  Seems you're retreating from that.

11        MR. GERSHMAN:  Not at all, Your Honor.

12        THE COURT:  So then tell me where you are.

13        MR. GERSHMAN:  Sure.  With respect to the acquisition

14   documents, first of all, Your Honor, just so it's clear --

15        THE COURT:  Why don't you answer my question first

16   before you go to the --

17        MR. GERSHMAN:  Are we retreating?  We are --

18        THE COURT:  Yeah.

19        MR. GERSHMAN:  -- not retreating at all, Your Honor.

20   What -- we objected to Mr. Winsberg's entire request.  I don't

21   know whether you have seen it.  It goes on for --

22        THE COURT:  No, no, no, no, no, no, no, no.  Don't go

23   there.  You tell me what you told me on the record and off the

24   record in this litigation in -- when I was in court with you

25   about that Prestige litigation and the Deloitte information.

1   That's my question to you.  Don't go to something else yet.  I

2   want to know what you said to this Court before, and you are

3   changing what you said to this Court before, and I want to know

4   why.

5           MR. GERSHMAN:  Your Honor, I'm not sure what you're --

6   what point you're --

7           THE COURT:  You have -- you said from the very

8   beginning -- basically, you told Troutman Sanders go to the --

9   go to Deloitte.  If you can get it, you can have it.  That's

10  basically what you said.

11          MR. GERSHMAN:  I don't believe that's correct, Your

12  Honor.

13          THE COURT:  Well, that's what I remembered.  So tell

14  me what I remembered wrong.

15          MR. GERSHMAN:  Sure.  With respect to Deloitte, Your

16  Honor, at the -- when the -- the defendants at one point had

17  asked for deposition transcripts and it came to light that

18  there were -- there may have been particular transcripts in the

19  Deloitte case which were relevant.  There were issues of

20  confidentiality because there had been confidentiality

21  designations made in the Deloitte case.

22          Cravath, who represented Deloitte, was particularly

23  adamant that they were not going to agree to the production of

24  those transcripts and were going to move to quash a subpoena

25  which would have sought the production of those transcripts.

16

1    Now, that subpoena had been served on Buchanan Ingersoll and

2    was seeking transcripts from them directly.

3          Then I had a number of conversations with Mr. Gordon,

4    at which point Mr Gordon said all -- that I said, look, Cravath

5    is objecting, they are going to move to quash, and if -- unless

6    we can come up with some kind of a resolution and Cravath had

7    indicated that they would not object if only the portions of

8    the transcripts relating to the Prestige transaction were

9    produced.  If the transcripts were redacted in that form, they

10   would not move to quash and they would agree to their

11   production.

12         We conveyed that to Troutman.  Mr. Gordon said all

13   that we need from these and all that we want is the stuff that

14   relates the Prestige transaction.  So if you're willing to give

15   that to us, that is fine.

16         And so that is how the transcripts from the <u>Deloitte</u>

17   case have been produced.  Thirty-eight transcripts over the

18   last --

19         THE COURT:  And redacted.

20         MR. GERSHMAN:  Redacted.

21         THE COURT:  But you're making the decision on the

22   redaction, not me, and you haven't produced a privilege log.

23   This is discovery.

24         MR. GERSHMAN:  Your Honor, it was done with the

25   agreement of the defendants.  The defendants agreed --

1          THE COURT:  Is that correct?

2          MR. GERSHMAN:  -- to take them that way.

3          MR. WINSBERG:  No, Your Honor.

4          THE COURT:  It's not what I remember on and off the

5   record.  Now, you might remember it one way, but I'm

6   remembering it another and I think opposing counsel may be

7   remembering it another way, too.  So that means two of us

8   remember it one way and you remember it one way.

9          How many of the director -- independent director

10  transcripts exist?  First, have you produced a privilege log at

11  all?

12         MR. GERSHMAN:  I don't believe we have, Your Honor.

13         THE COURT:  How many independent director transcripts

14  exist?

15         MR. GERSHMAN:  From the Deloitte case, I believe there

16  are 11; six of which have been produced in their entirety.

17         Also, let me just clarify for Your Honor just so that

18  -- so the independent director transcripts were originally

19  produced pursuant to our agreement in redacted form.  In the --

20  earlier this year, Mr. Gordon approached Cravath about getting

21  unredacted copies of the independent director transcripts and

22  Cravath at that point said, we do not object where your getting

23  the -- to your getting those transcripts if it is all right --

24  if there is no objection from the plaintiff.  So they withdrew

25  their objection at that time to unredacted transcripts of the

1   plaintiff.

2         We have since that time produced unredacted copies of

3   all of the transcripts which have any testimony relating to the

4   Prestige transaction, the financial status of Adelphia in the

5   1999, 2000 period --

6         THE COURT:  Is that true?

7         MR. WINSBERG:  I can't tell, Your Honor.  He has

8   produced us some transcripts, Your Honor, that -- in unredacted

9   forms before the motion to compel right before we filed it.  He

10  did not produce all volumes of all the transcripts.  Mr.

11  Gelber's deposition transcripts, we can't find any redacted or

12  unredacted copies in our files.  We asked him about that.  His

13  opposition papers, he says they produced Gelber's transcripts.

14  We haven't seen any of those, so I have no way -- without

15  seeing all the transcripts, I have no way of knowing whether

16  that's true or not.

17        MR. GERSHMAN:  In total, there were 11 transcripts,

18  Your Honor.  Six of them have been produced in total.  Because

19  those -- and contrary --

20        THE COURT:  And whose transcript that you can't find

21  at all?

22        MR. WINSBERG:  Mr. Gelber's.

23        MR. GERSHMAN:  There are transcripts of Mr. Gelber in

24  there.

25        THE COURT:  Okay, well we need to -- all you have to

1   do is talk to each other.  You say you don't have them.  You

2   say you do.  Produce them.

3          MR. GERSHMAN:  We'll make sure he has them.  We

4   believe he already does.

5          THE COURT:  And then we're going to talk about

6   redacted and unredacted.  There's no privilege log though, I'm

7   hearing.

8          MR. GERSHMAN:  There is no privilege log, Your Honor.

9          THE COURT:  And I have a question to ask.  Why is it

10  that you asked that they agree not to ask questions in the

11  Deloitte transcripts of the independent directors without

12  having -- how can you demand that Prestige agree not to ask

13  some same questions in the Deloitte transcripts at the

14  depositions of the independent directors in the Prestige

15  litigation without first having access to unredacted

16  transcripts?

17         MR. GERSHMAN:  It was merely a proposal that we made,

18  Your Honor, to avoid the -- these directors from having to do

19  the same exact deposition twice.  We said, all right, if you

20  want to have these transcripts so that we don't have exactly

21  the same deposition all over again, we'll produce them to you.

22  Let's just agree that they were a deposition in this case --

23         THE COURT:  No.

24         MR. GERSHMAN:  -- and you're free to ask --

25         THE COURT:  I won't --

1    MR. GERSHMAN:  -- them anything else you want.

2    THE COURT:  I won't agree to that.  Is there -- if

3  there's no privilege log, why weren't unredacted copies turned

4  over to defendants when they were first requested in November

5  of '04?

6    MR. GERSHMAN:  It was not --

7    THE COURT:  When you went running to Judge Gerber and

8  said, stop -- it's your case.  You're not giving me a case.  I

9  have to tell you I've been so frustrated from the very

10  beginning.  It's been your case.  You're the one that has said

11  that this didn't happen, and yet you then -- you're the one

12  that keeps putting the brakes on when we're trying to move to

13  find out what's going on this case.

14    MR. GERSHMAN:  Well, it was not a privilege issue,

15  Your Honor, it was a confidentiality agreement issue and

16  therefore not something that we're required a privilege log.

17  And because there were confidentiality issues arising from the

18  confidentiality agreement in the <u>Deloitte</u> case, an agreement

19  was struck --

20    THE COURT:  And if the transcripts are irrelevant to

21  the current matter, why wouldn't you agree that advacy (sic)

22  process would take care of how the defendants are able to

23  utilize this and produce them?

24    MR. GERSHMAN:  Well, we did, Your Honor --

25    THE COURT:  No, you gave them redacted ones.

1    MR. GERSHMAN:  No, no, no.  We -- initially we gave

2  them redacted ones and then at the -- once Deloitte said that

3  they were not going to object to the production of unredacted

4  independent director transcripts, we gave them unredacted ones

5  for all transcripts that had any testimony relating to issues

6  in this case.

7    THE COURT:  You may --

8    MR. GERSHMAN:  Anything --

9    THE COURT:  You may answer that.

10    MR. WINSBERG:  Your Honor, we -- let's just let the

11  record be clear.  We know there are volumes of independent

12  director transcripts that have not been produced to us in

13  redacted --

14    THE COURT:  Do you know the name of the directors?

15    MR. WINSBERG:  Then I think all four, or three.  I

16  think -- if you give me a minute, Your Honor --

17    THE COURT:  Do you know the names?

18    MR. GERSHMAN:  It's --

19    MR. WINSBERG:  Yeah -- yes.

20    MR. GERSHMAN:  It's set out in our papers, Your Honor.

21  In our papers, we --

22    THE COURT:  You're hedging.  I -- and I'm really tired

23  of Adelphia's hedging.  So I -- and I've had it.  I looked at

24  this case from the very beginning.  It's your case.  Then once

25  when it comes down to getting to the meat of it, you just keep

1   putting brakes up, and I'm not going to put up with it.

2       MR. GERSHMAN:  Your Honor, there are 11 transcripts;

3   six of which have been produced in their entirety.  Five of

4   them have not because they did not have testimony that was

5   related --

6       THE COURT:  That's your decision --

7       MR. GERSHMAN:  Yes.

8       THE COURT:  -- not mine.  Produce them.

9       MR. GERSHMAN:  Okay.

10      THE COURT:  End of story on that, but I want to know

11  that every one of them are produced.

12      And, Mr. Winsberg, did you have an agreement with

13  Cravath about making a deal to turn over those transcripts?

14      MR. WINSBERG:  No, Your Honor.  What we have, Your

15  Honor, is set forth in Mr. Gordon's e-mail.  Mr. Gordon had the

16  communication with Cravath and asked them, you know, we want to

17  find out -- he -- we decided we wanted to find out from the

18  source who was really the one that was making the decision on

19  these transcripts --

20      THE COURT:  Okay.

21      MR. WINSBERG:  -- and so he called Cravath and my -- I

22  did not have that communication, but Mr. Gordon did, and my

23  understanding is he called them, they said, as long as you're

24  under the confidentiality agreement that you -- that we have

25  now signed up with you, you can have unredacted transcripts.

1          THE COURT:  Okay.

2          So we're giving all the unredacted transcripts.  Name

3    the six that you have given and the five that you're going to

4    give by next week.

5          MR. GERSHMAN:  Okay.

6          THE COURT:  Name them.

7          MR. GERSHMAN:  Shall I continue, Your Honor?

8          THE COURT:  Yeah, give me the --

9          MR. GERSHMAN:  Okay.

10          THE COURT:  Give me the six that you've --

11          MR. GERSHMAN:  Oh.

12          THE COURT:  -- given and the five that you're going to

13    give so that we're clear about what you're going to do between

14    now and next week.

15          MR. GERSHMAN:  I can't tell you what volume it is,

16    Your Honor.  I can just tell you that --

17          THE COURT:  The name of the independent directors.

18          MR. GERSHMAN:  Do you want me to tell you that now --

19          THE COURT:  Uh-huh.

20          MR. GERSHMAN:  -- or you just --

21          THE COURT:  Uh-huh.

22          MR. GERSHMAN:  -- want it within the week or --

23          THE COURT:  Now.

24          MR. GERSHMAN:  I'll have to -- hang on, Your Honor.

25    I'll have to --

24

1        THE COURT:  Sure, I'm here.

2        MR. GERSHMAN:  -- look in my papers.

3    (Pause.)

4        THE COURT:  Confidentiality agreements don't mean you

5    don't produce.

6    (Pause.)

7        THE COURT:  While you're looking, can you --

8        MR. GERSHMAN:  Here -- I've got it --

9        THE COURT:  Okay, go ahead.

10        MR. GERSHMAN:  -- Your Honor.

11        THE COURT:  All right, go ahead.

12        MR. GERSHMAN:  So on Page 28 of our papers, we

13    indicate that there were three transcripts for Mr. Gelber,

14    three for Mr. Kailbourne, two for Mr. Coyle, and three for Mr.

15    Metros in the Deloitte litigation total.

16        THE COURT:  And those were produced?

17        MR. GERSHMAN:  No, no, no.  Of those -- and which I

18    believe adds up to 11.  Of those 11, two for Gelber, two for

19    Coyle, one for Kailbourne, and one for Metros have been

20    produced.

21        THE COURT:  And, Mr. Winsberg, you say you don't have

22    any for Gelber?

23        MR. WINSBERG:  That's our understanding, yes, Your

24    Honor.  We've looked hard and we couldn't find it --

25        THE COURT:  Okay.  I want you two to confer and then I

1  want you to re-produce and find out why they weren't produced.

2      MR. GERSHMAN:  Yeah, so there are five, Your Honor,

3  that were not produced, which -- you know, which you're

4  directing us to produce.  Whatever the difference is between

5  the 11 and the six, of course we will produce them.

6      THE COURT:  But of those people.  Okay.  Very good.

7  Saying we're over the confidentiality.  Deloitte says there's

8  no problem and then Adelphia took it on themselves not to

9  produce five based on confidentiality.  That's not the standard

10  in discovery.  The discovery is privileged and if you have

11  something you need to do would be a privilege log.  You didn't

12  produce a privilege log, produce.

13      MR. GERSHMAN:  Actually, Your Honor, there -- the five

14  that Adelphia did not produce it didn't produce them because

15  they were not relevant to any issue in this case.

16      THE COURT:  That's not your decision to make.

17      MR. GERSHMAN:  Okay.

18      THE COURT:  Produce them.  Discovery if it goes to

19  possibility of any financial condition, produce.

20      MR. GERSHMAN:  Okay, Your Honor.

21      THE COURT:  Whether it's relevant at trial or not is a

22  total nother (sic) issue.  We're at discovery.  Okay.  So we

23  know that about that -- discovery rules are broadly and

24  liberally construed in order to fulfill discovery's purpose --

25  let me tell you this before you continue your arguments:

1    "For providing all parties with information essential

2    to the proper litigation of all relevant facts to

3    eliminate surprise and promote settlement.  As long as

4    a party's request for information or documents are

5    relevant to the claims at issue in case and such

6    discovery are tendered in good faith and not unduly

7    burdensome, discovery shall proceed."

8    And that's -- you're making a decision that I disagree

9 with.

10    "The parties resisting a production bears the burden

11    of establishing lack of relevancy or undue burden or

12    demonstrate to the court that the requested documents

13    either do not come withing the broad scope of

14    relevancy defined in Federal Rule of Civil Procedure

15    26(b)(1), of course applicable to bankruptcy rules, or

16    that the request are of such marginal relevance that

17    the potential harm occasioned by discovery would

18    outweigh the ordinary presumption in favor of broad

19    disclosure."

20    That would be a decision for me to make.  You didn't

21 bring it to me.  You did it on your own.  It's discoverable.

22 You get it.

23    "Further, the statement by a party that a request for

24    production is overly broad, burdensome, oppressive or

25    irrelevant is not adequate to voice a successful

1    objection.  A party objecting to discovery request

2    must substantiate the objection by specifying how each

3    request for production or interrogatory is deficient

4    and articulate the particular harm."

5    So we have now dealt with the independent directors of

6    the -- in the <u>Deloitte</u> litigation.  Now please argue the

7    Highland Prestige of Georgia and Prestige Communications

8    minutes books.

9    MR. GERSHMAN:  Yes, Your Honor.  The --

10    THE COURT:  And you said you'd give them to him,

11    right?

12    MR. GERSHMAN:  No, no.  We have already given -- I'm

13    sorry.  You're talking about the minute books, Your Honor,

14    or --

15    THE COURT:  Yes.

16    MR. GERSHMAN:  Yeah.

17    THE COURT:  The minute books.

18    MR. GERSHMAN:  The minute books, Your Honor -- the

19    minute books for these two entities were produced in their

20    entirety up through 2001.

21    THE COURT:  Tell him where to get them and they'll go

22    get them.

23    MR. GERSHMAN:  The --

24    THE COURT:  Tell him exactly where to get them.

25    MR. GERSHMAN:  I don't think he has a problem finding

1   that, Your Honor.  What Mr. Winsberg is asking for is he wants

2   all of the minute books, not just for the relevant time period,

3   which is '99, 2000.  And we gave an additional year 2001.  He

4   wants all of the minute books all the way up through 2007.

5         THE COURT:  Is that correct?

6         MR. WINSBERG:  Yes, Your Honor.

7         MR. GERSHMAN:  And --

8         THE COURT:  Okay, and why do you want them up through

9   2007?

10        MR. WINSBERG:  Because, Your Honor, again, what I said

11  in my initial presentation, the stock was never transferred

12  from Adelphia to Highland Prestige, so we'd like to see what

13  exactly Adelphia was doing in these minute -- how were these

14  entities being governed when Highland Prestige, which was the

15  Rigas managed entity, was allegedly exercising control over the

16  entity that's the source of the litigation in this case.

17        THE COURT:  And you're saying that it wasn't

18  transferred at all and you think the minute books haven't

19  reflected that there -- up to that point they haven't?

20        MR. WINSBERG:  The not --

21        THE COURT:  So let me ask you something.  At trial, if

22  they weren't transferred before that, then why would they even

23  win based on what you've said?

24        MR. WINSBERG:  I don't think they would, Your Honor,

25  but I think the standard for relevancy is broader than that.  I

1  think we have a right to see what they did in the bankruptcy

2  case because our view is there's no damages, but we have a

3  right to see what those minute books would say --

4      THE COURT:  And the -- well, the damages are only up

5  to '01, right?

6      MR. WINSBERG:  Our --

7      THE COURT:  The damages are not past '01?

8      MR. WINSBERG:  Our view, Your Honor, is there is no

9  damages at all because the stock was never transferred from

10 Adelphia to Highland.  And not only that, Your Honor, but

11 during the government settlement, Prestige Communications, Inc.

12 went back to Adelphia and then got sold to Comcast and Time

13 Warner.

14      THE COURT:  And you think that was after the fact?

15     MR. WINSBERG:  I think those certainly happened in

16 2005 and '6 is my understanding and Mr. Gershman can correct me

17 if I'm wrong.

18     THE COURT:  Sign a confidentiality agreement and I'll

19 let you have them, too.

20     MR. WINSBERG:  We already have, Your Honor.

21     THE COURT:  I don't see why not.  I'll let you argue.

22     MR. GERSHMAN:  Okay.

23     THE COURT:  Tell me what I missed.

24     MR. GERSHMAN:  Sure.

25     THE COURT:  I'm sorry.

1    MR. GERSHMAN:  Your Honor, the -- we believe again

2 that everything that is relevant has been produced, that the --

3 whatever corporate governance was -- let me back up.  Two

4 things.

5    THE COURT:  Go directly to what he argued.  Because

6 what he argued is very compelling.  So go back to that.

7    MR. GERSHMAN:  Okay.  The -- these entities were Rigas

8 -- they were Rigas family entities.  The Rigas family entities

9 were always managed day-to-day by Adelphia.  Always were.  The

10 Rigases had economic interest in them.  The economic interest

11 that the Rigas family had we -- Mr. Winsberg said, we want to

12 see documents that relate to the -- you know, the control and

13 whether the stock was transferred.  We said, okay, fine, we

14 will produce you the documents where --

15    THE COURT:  Well, you gave all the minute books.  All

16 of them.

17    MR. GERSHMAN:  We gave him all of the minute books

18 through '01.

19    THE COURT:  Is that correct?

20    MR. GERSHMAN:  We also --

21    THE COURT:  I want to make sure I understand.  Is that

22 correct?

23    MR. WINSBERG:  To the best of our understanding, Your

24 Honor, we believe that to be the case.  We don't know -- we

25 have no way to prove a negative, but we -- I have no reason to

1   disbelieve his --

2           THE COURT:  Okay.

3           MR. WINSBERG:  -- representation to the Court.

4           THE COURT:  All right.

5           All right.  Thank you.  I just wanted to make sure.

6           MR. GERSHMAN:  Okay.  All of the minute books through

7   '01 we produced the document whereby the Rigases reconveyed

8   their ownership in the stock of these entities to Adelphia in

9   2006 pursuant to the government settlement.

10          The issue that Mr. Winsberg has raised is that in the

11  stock ledger book, and they have all of the relevant portions

12  for this, there is no entry back in 2000.  And they have all of

13  this stuff, indicating that Adelphia had signed the stock over

14  to the Rigas family entity.  They have all --

15          THE COURT:  So then -- let me ask you then.  So then

16  it becomes a moot issue when you start arguing that the control

17  of the stock is one of the reasons for the fraudulent

18  conveyance?

19          MR. GERSHMAN:  No, Your Honor, it's merely -- we

20  believe that there's no question that the Rigases owned this

21  entity.  It was recorded as such in the accounting records.

22  The government was told and believed that they owned it.  It

23  was addressed in the government settlement to something that

24  the Rigases owned.  The Rigases reconveyed their stake.  The

25  only issue is that it appears that no one ever got around to

1  recording in the ledger book that this transfer had happened,

2  but otherwise, all other indications are that the transfer did

3  happen.

4           THE COURT:  Okay.  I hear you.  And given the

5  complexities of this case, I think Mr. Winsberg's explanation

6  are sufficient to beat your relevancy objection.  So there's a

7  reasonable basis for requesting it and they -- it must be

8  produced.  If they're not relevant, hopefully you won't even

9  bring them up at trial, because let's just not make this more

10 complicated than it is, but you can object to it at that time.

11          MR. GERSHMAN:  Okay.

12          THE COURT:  All right.  So then that's the minute

13 books.  Now then we're relating to closing documents, right?

14          MR. GERSHMAN:  No, Your Honor.  It's -- we're not --

15          THE COURT:  Oh, it's not the closing documents, right.

16          MR. GERSHMAN:  The closing documents were produced two

17 years ago.

18          THE COURT:  Okay.

19          MR. GERSHMAN:  All right.

20          THE COURT:  All right.

21          MR. GERSHMAN:  We've been through this.  This is the

22 third time.  The defendants in their --

23          THE COURT:  Trust me.

24          MR. GERSHMAN:  -- initial document request --

25          THE COURT:  I know that.

33

1    MR. GERSHMAN:  In 2005, the defendants made the same

2  exact request.  They made the same request that is now before

3  you, which is --

4    Is this their exhibit?

5    -- which is their Exhibit 32.  Document Request Number

6  1, which goes on for two and a half pages and has 16 sub parts,

7  they basically are requesting almost every document -- not just

8  the closing sets, almost every document having to do with every

9  acquisition that Adelphia engaged in, in addition to the

10  Prestige acquisition, during 1999 and 2000.

11    That same request was made in 2005.  We met and

12  conferred with them on it and it was agreed that those requests

13  would be resolved by the production of the closing sets which

14  would show the -- it would show the signed purchase agreements,

15  it would show what Adelphia paid for them --

16    THE COURT:  Okay, did you ask Mr. Winsberg in looking

17  at the closing documents that there came up other questions and

18  that's why they want these?

19    MR. GERSHMAN:  Well, we did.  We asked them -- we

20  asked a number of times to --

21    THE COURT:  I will now ask you, Mr. Winsberg.  You got

22  the closing documents.  So what about all of these and why

23  could you not -- do you have to have them all, and what is it

24  about just the closing documents that you think you need more

25  than that?

1    MR. WINSBERG:  We had numerous conferrals with him,

2  Mr. Gershman, on why we think --

3    THE COURT:  Now, he has a name.

4    MR. WINSBERG:  With Mr. Gershman on these issues, Your

5  Honor.  To answer your question, Your Honor, the closing

6  binders tell us -- and my recollection incidently was we got

7  the closing binders to resolve a 30(b)(6) topic issue.  We

8  needed more than the -- closing binders deal, Your -- dealt

9  with gave us the purchase price, number of subscribers, who the

10  seller and buyer were.

11    THE COURT:  Right.  Right.

12    MR. WINSBERG:  What they did not give us, Your Honor,

13  and what is apparent from the case law is they did not give us

14  the board minutes, what the board looked at in approving these

15  acquisitions --

16    THE COURT:  But do you need them all?

17    MR. WINSBERG:  We need --

18    THE COURT:  I mean how many do you have?  I mean how

19  many are there?

20    MR. WINSBERG:  There are -- the '99, 2000 time frame,

21  there are approximately 20 or so acquisitions, I believe, in

22  that time frame.  There were some in '01 that he gave us

23  closing binders on which we did not ask for in this request.

24  We didn't ask for any acquisitions documents for 2001.  We only

25  asked for '99 and 2000 --

1    THE COURT:  So in other words, instead of having the

2 income tax return, my analogy, you want the documents behind

3 putting the income tax return together.

4    MR. WINSBERG:  Yes.

5    THE COURT:  Yes, sir?

6    MR. GERSHMAN:  Your Honor, I don't -- that's not quite

7 -- well --

8    THE COURT:  Okay.

9    MR. GERSHMAN:  -- it's much broader than that.

10    THE COURT:  Okay.

11    MR. GERSHMAN:  I mean, and I encourage you strongly to

12 take a look at this request and some of the things that are in

13 there as to how they could be possibly relevant.  You know, due

14 diligence checklist for every one of these transaction,

15 engagement letters for every one of these transaction, and

16 there are several reasons why this stuff is, we believe, so far

17 afield that it should not be ordered to be produced.  And --

18    THE COURT:  Okay.

19    MR. GERSHMAN:  -- let me touch a couple of them --

20    THE COURT:  Sure.

21    MR. GERSHMAN:  -- and it's a little bit complicated.

22 I mean basically, Mr. Winsberg is contending that to sort of

23 analyze Adelphia's allegations of solvency, it needs to get all

24 of the documents relating to all of the acquisitions that

25 Adelphia did in 1999 and 2000 to analyze those allegations.

1    And these are all documents -- and he indicates that what he

2    wants to see is, you know, sort of the what were the financial

3    analysis, what were the projections and things that people were

4    looking at, at that point in time, and there are a couple

5    problems with his argument.

6        First, all of that stuff was done in the middle of the

7    fraud, it is not reliable, and it's not going to be useful in

8    any analysis here as to whether Adelphia was solvent or had

9    unreasonable capital.  We're going to have to look at the real

10   numbers which came out of the restatement.

11       Let me -- and let me also add in, Your Honor, the --

12   Mr. Winsberg cites to one case and there are cases who say in

13   situations where you don't have widespread company fraud such

14   that the numbers being looked at prior to the transfer are not

15   useful or reliable, there are cases that say, well, if we're

16   looking at a particular transfer and the transfer we're looking

17   at here is the Prestige transaction, you know, it may be fair

18   to look at what other -- what -- you know, what was the

19   analysis people were doing.  Did they think they were going to

20   have insufficient capital after this transaction.

21       But we have given him everything having to do with the

22   Prestige transaction and he is asking for everything having to

23   do with 32 transfers that we are not challenging.

24       THE COURT:  I heard.  You're not challenging it?

25       MR. GERSHMAN:  He's not challenging the payments --

1    we're not -- we are not challenging the payments that were made

2    in connection with all those transactions.

3        THE COURT: Again, you're making the relevancy

4    determination on behalf of Prestige. Prestige has to make

5    their own. But I will tell you I want you meeting and

6    conferring on this, and I am at the stage that I'm coming to

7    sanctions, and I'm about ready to give them. So when I say

8    meet and confer, I mean meet and confer, and I mean to get it

9    resolved or you're going to start paying. And I can't be more

10   clear than that. Because it seems to me that this is the kind

11   of stuff you can talk about.

12       While my analogy might be simple about the IRS and the

13   background for it, I think it's still a good analogy. And I

14   think that you can find ones that you can look at and give and

15   let them see because I think it is relevant and figure it out.

16   And it doesn't have to be you have to give this desk full of

17   papers. You can figure it out and do it together.

18       I'm getting ready for trial. So you're making a

19   relevancy determination without giving me anything except broad

20   relevancy determination, and I won't do that. I think the -- I

21   think they met the relevance standard. Whether it's admissible

22   at trial or not, I don't have a clue, and I won't know until we

23   get there. I hope if it's not relevant, you're not going to

24   bring it in.

25       All right. Have I decided on everything? Except I am

1    holding expenses and attorneys fees.  I want to see you again

2    next week.

3         MR. GERSHMAN:  Your Honor, it's a little unclear to me

4    I guess on -- on that last one, are you saying you want us to

5    sit, meet, and confer and try to work it out with --

6         THE COURT:  Absolutely.

7         MR. GERSHMAN:  All right.

8         THE COURT:  Within a week.  I'm not willing to --

9    relevancy is my determination, not a broad sweep that just

10   comes in and says we've decided it's not relevant.  I think

11   these may be relevant and I think the standard has been met by

12   Prestige that in the determination under the Rule 26 they are

13   relevant enough.  Now then, you could meet and confer and not

14   have to produce everything, but produce enough that they can

15   see what's going on.

16        MR. GERSHMAN:  The only thing I would say, Your Honor,

17   is the -- in their papers, the defendants do not identify a

18   single case where any court said you need to analyze all of the

19   acquisitions that this company has done in the preceding two

20   years with respect to solvency or insufficiency of capital.

21   They have no cases where that --

22        THE COURT:  That's why you're --

23        MR. GERSHMAN:  -- has ever been done --

24        THE COURT:  -- meeting and conferring because I might

25   be the first court that decides that.  Maybe I won't, but maybe

39

1    I will.

2            MR. GERSHMAN:  Fair enough, Your Honor.

3            THE COURT:  So on -- so I have all depositions you're

4    giving -- you're -- I'm ordering that all depositions be given

5    from the <u>Deloitte</u> litigation in unredacted format within the

6    week.  I am compelling the corporate minute books and I'm

7    having you meet and confer on the cable systems acquisions

8    between 1999 and 2000.  Is that understood?

9            MR. GERSHMAN:  Understood, Your Honor.

10           THE COURT:  I need an order.

11           Now I have one other housekeeping matter that I need

12   to discuss.

13           You may sit down.

14           My chambers have been inundated with a phone -- with

15   phone calls and messages from a representative of Judge

16   Weinstein; Judge Weinstein that I do not know.  He seems to be

17   a California -- a former California state judge that is a

18   mediator in several of the Adelphia matters.  Are you familiar

19   with him at all?

20           MR. GERSHMAN:  I'm not familiar with the individual.

21   I do know that there is a Judge Weinstein who has been

22   mediating various Adelphia litigations.

23           THE COURT:  And aren't they in district court or -- or

24   do you know?

25           MR. GERSHMAN:  I believe he may have been involved in

40

1  mediating the Deloitte case, which was not in district court.

2  I believe he may be involved in some of the cases that Judge

3  McKenna has.

4        THE COURT:  I think it's Judge McKenna; the cases.  I

5  can only tell you all -- and we don't -- first you need to know

6  that I am a mediator.  I think mediation's a wonderful thing.

7  I strongly believe in it, and I would entertain a request for

8  appointment of a mediation from anybody.  It doesn't even have

9  to be that both parties agree.

10        If somebody really wants -- by the way, you just need

11  to know I never spoke to the representative.  He tried every

12  way in the world to the point of telling my law clerks that

13  they didn't understand.  Both of them.  You don't understand.

14  But anyway, that's beside the point.

15        If anybody wants mediation though, you just need to

16  get it in front of the Court in a way that the Court can deal

17  with it.  I don't take ex parte communications.  I'm strictly

18  prohibited.  I let the law clerks talk to him.  They don't talk

19  to him about the meat of it, but -- and never would I think

20  that I would advocate a mediation with a specific mediator.  I

21  might change my mind on that, but I wouldn't think so.

22        Usually, the Court only appoints mediators that are on

23  the Southern District of New York's mediation panel.  There

24  might be a very rare exception for that, but that's rare.  But

25  I wanted you all to know because we have been inundated with an

1    ex parte communication.  So I wanted it on the record that I

2    have not spoken to him and just let you all know what's going

3    on.

4            All right, am I going to see you again next week?  Or

5    do you think you need me?

6            MR. GERSHMAN:  I think our motion --

7            THE COURT:  I like seeing you.

8            MR. GERSHMAN:  Our motion is -- we have a motion on --

9            THE COURT:  That's right.

10           MR. GERSHMAN:  -- seeking production of the

11   defendants' tax documents, Your Honor.

12           THE COURT:  Okay, when you meet and confer, would you

13   please confer over that, too?

14           MR. WINSBERG:  Yes, Your Honor, we can --

15           MR. GERSHMAN:  Sure, Your Honor.

16           MR. WINSBERG:  -- talk again about that.

17           THE COURT:  Thank you.  And you know my -- and you

18   sort of know my feelings now.  So what -- are we set up for

19   anything next week?  You --

20           MR. GERSHMAN:  Yes, Your Honor, I believe it's 10:30

21   on the 24th, a week from today.

22           THE COURT:  Very good.  Very good.  Just to let you

23   know, documents that come in late the night before, we travel

24   back to Manhattan.  There's no way we could even get them.

25   They're -- because they're on ECF.  We don't sit down to

42

1   computers.  We do know that some came in from you last night.

2   There's no way we could have had then.  That -- it just can't

3   happen.

4           We have a rule up in our court and it -- and I don't

5   -- it's a sort of unwritten rule, but if you -- you need to

6   give us -- well, more than 24 hours.  Usually it's three days

7   up there, but you need to give us at least -- because we do

8   travel, you need to give us at least two days because we can't

9   get it.

10          Yesterday was also a brutal day.  We -- I don't think

11  we ever set at a computer yesterday.  We were in trial all day

12  long, so -- anyway.

13          MR. WINSBERG:  Your Honor, if I --

14          THE COURT:  Anything else?

15          MR. WINSBERG:  Yes, Your Honor, if I could just be

16  real brief on the tax return issue which we'll deal with next

17  week, we'll certainly -- at Your Honor's instruction, we will

18  meet and confer again on that.

19          I would note we were on an expedited time frame to put

20  a response in to that motion, and I know last night -- I hadn't

21  studied it, but I know last night Mr. Gershman did file a reply

22  and I --

23          THE COURT:  I knew something was filed, but I --

24          MR. WINSBERG:  I was wondering if I get the Court's

25  permission, if I'd so choose, if I could put an additional

43

1  paper in on that.

2  THE COURT:  Certainly, but I think you've got -- just

3  so you know, I think you got a feel for me today on what I

4  think, so -- on relevancy, but I think you're also both

5  beginning to get a feel that I'm getting at my wits end, so

6  somebody's going to start paying.  And trust me it's not going

7  to be me.  So --

8  Court's in recess.

9  MR. WINSBERG:  Thank you, Your Honor.

10  THE CLERK:  All rise.

11  THE COURT:  Unless you have questions.

12  MR. WINSBERG:  No, Your Honor.

13  THE COURT:  You'll submit an order.

14  MR. WINSBERG:  Yes, Your Honor.

15  (Proceedings concluded at 12:22 p.m.)

16  *****

17

18

19

20

21

22

23

24

25

44

1                           CERTIFICATION

2          I certify that the foregoing is a correct transcript

3   from the electronic sound recording of the proceedings in the

4   above-entitled matter.

5

6          *Tracy A. Gegenheimer*

7   _____          October 18, 2007

8   Tracy A. Gegenheimer   AAERT Cert. No. 282
    Certified Court Transcriptionist
9   For Rand Reporting & Transcription, LLC

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       UNITED STATES BANKRUPTCY COURT
        SOUTHERN DISTRICT OF NEW YORK

2
              .

3 IN RE:          . Case No. 02-41729 (REG)
             .

4 ADELPHIA COMMUNICATIONS  . New York, New York
 CORPORATION, et al.,   . Wednesday, October 24, 2007

5            . 10:37 a.m.
        Debtors.  .

6 . . . . . . . . . . . . . . .
 ADELPHIA COMMUNICATIONS  . Adv. Proc. No. 04-03293 (CGM)

7 CORPORATION, et al.,   .

8       Plaintiffs, .
             .

9    vs.       .

10 PRESTIGE COMMUNICATIONS OF .
 NC, INC., et al.,    .

11       Defendants. .

12 . . . . . . . . . . . . . . .

13    TRANSCRIPT OF DISCOVERY CONFERENCE AND MOTIONS
     BEFORE THE HONORABLE CECELIA G. MORRIS

14      UNITED STATES BANKRUPTCY JUDGE

15 APPEARANCES:

16 For the Plaintiffs:   Joseph A. Gershman, Esq.
             Jennifer B. Schwarz, Esq.

17             KASOWITZ, BENSON, TORRES &
              FRIEDMAN, LLP

18             1633 Broadway
             New York, New York  10019

19
 Audio Operator:     Electronically Recorded

20             by Court Personnel

21 Transcription Company:  Rand Reporting & Transcription, LLC
             80 Broad Street, Fifth Floor

22             New York, New York 10004
             (212) 504-2919

23             www.randreporting.com

24
 Proceedings recorded by electronic sound recording, transcript

25 produced by transcription service.

1    APPEARANCES:   (Continued)

2    For the Defendants:           Harris B. Winsberg, Esq.
                                   TROUTMAN SANDERS, LLP
3                                  600 Peachtree Street, N.E.
                                   Suite 5200
4                                  Atlanta, Georgia   30308

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1    (Proceedings commence at 10:37 a.m.)

2         THE COURT:  Good morning.

3         COUNSEL:  Good morning, Your Honor.

4         THE COURT:  How are you this morning?

5         COUNSEL:  Fine.  Fine, Judge.

6         THE COURT:  You may be seated.

7         This is Case No. 04-03293, <u>Adelphia Communications v.</u>

8    <u>Prestige</u>.

9         State your name and affiliation.

10        MR. WINSBERG:  Good morning, Your Honor.  Harris

11   Winsberg from Troutman Sanders on behalf of the defendants.

12        MR. GERSHMAN:  Good morning, Your Honor.  Joe Gershman

13   from Kasowitz, Benson, Torres & Friedman on behalf of

14   plaintiff, and with me today is my associate Jennifer Schwarz,

15   also from Kasowitz.

16        THE COURT:  I have a couple of things before we begin.

17        We're out of time on the scheduling order, everybody;

18   and since that is an order, I sort of have expectations that

19   you will get me another one.

20        For instance, the deadline for completion of fact

21   discovery was February the 12th.  So everything could die,

22   because it's not been met.  2007.

23        MR. WINSBERG:  Your Honor, there was an old scheduling

24   order entering fact discovery to continue through November

25   30th.

4

1      THE COURT:  Okay.  So it's to November 30th.

2      MR. WINSBERG:  Yes, Your Honor.  In fact, that --

3      THE COURT:  That's another order, and I don't --

4      MR. WINSBERG:  Yes, that Your Honor signed, I believe

5  three or four months ago; I can find it on the docket.

6      THE COURT:  Okay.

7      MR. WINSBERG:  We also discussed with Mr. Gershman,

8  we're going to -- one of the things I wanted to present to Your

9  Honor was we're going to present a new, agreed-upon scheduling

10  order.

11      THE COURT:  Okay.  That was mine.  I want the third

12  amended scheduling order within ten days of today's date.

13      MR. WINSBERG:  I think we're on the fifth.

14      THE COURT:  Oh, you're on the fifth.

15      MR. WINSBERG:  We're on the fifth.

16      THE COURT:  Well, I've missed two or three.  Okay.

17  We're on the fifth.  Let's make that the final one, if y'all

18  don't mind.

19      So what about dispositive motions; what are you

20  looking at?  Are we going to have any?  I want to know that.

21      MR. WINSBERG:  Yes, Your Honor, we --

22      THE COURT:  What's the projected date of that?

23      MR. WINSBERG:  Your Honor, the current scheduling

24  order that we've agreed upon, I don't have it right in front of

25  me, but it has fact discovery in -- proposed mid-March.  We

1  have mentioned to Your Honor before that, at that time, we

2  believe on the record, that we'd like the Court to stay expert

3  discovery and just move for summary judgment.

4          THE COURT:  Okay.

5          MR. WINSBERG:  So, Your Honor, if I was going to look

6  to block it out to the future, I would say it would be fine, if

7  Your Honor would allow us -- we have to get the Court's --

8          THE COURT:  Well, once you put it together, I'll take

9  a look at it.  But I have to work on my schedule, too, that's

10  why I'm curious about this -- not "curious," I want an order.

11  And I had the third, not the fifth.  But we need -- so we're

12  looking at between the middle of -- since I have '08 right here

13  at a glance, and since I'm already booked in December of '08 --

14  that's pretty brutal.

15          So you're thinking about we'll probably have

16  dispositive-type motions some time in May?

17          MR. WINSBERG:  That's what the defendants would be

18  asking for.  I understand that plaintiffs may have a different

19  view?

20          THE COURT:  What are you thinking about?

21          MR. GERSHMAN:  Your Honor, we won't know until we

22  complete the depositions of the defendants whether we would be

23  making any dispositive motions, so we're not sure now, but ...

24          THE COURT:  I understand that.  But if you're finished

25  with fact discovery in the middle --

6

1      MR. GERSHMAN:  Yeah, that's fine with us if --

2      THE COURT:  Okay.  No, I'm not setting down dates.

3   I'm trying to look at my calendar, because it's, as I say --

4   look, there's May, it's already got stuff on it.

5      MR. GERSHMAN:  If, in fact, discovery ends in the

6   middle of March, we would anticipate that --

7      THE COURT:  Something in May.

8      MR. GERSHMAN:  -- we'd be prepared to put in --

9   respond to dispositive motions in the spring.

10     THE COURT:  All right.  And then looking at trial,

11  when?  We'll probably try it in Poughkeepsie if -- the

12  dispositive motions.  Because Poughkeepsie is much simpler.  If

13  you're in the middle of trial, you're staying in a hotel

14  anyway, and you will -- we have the whole courthouse, so it's

15  not -- we don't have to be reliant on one courtroom and another

16  courtroom and another courtroom; and we can also -- what I

17  usually do is, for a trial such as this, I will shut down the

18  Poughkeepsie, except for emergencies, so there won't be

19  anything, so you have a full, solid week of trial.  If we go

20  past a week, then of course I can't shut down Poughkeepsie, but

21  then we'll work around it.  So it just makes it simpler to do

22  it in Poughkeepsie.

23     Actually, and your save your clients money.  You're

24  not staying in New York City hotels; you're staying in country

25  hotels, and you get to talk a walk down, at that time of year,

7

1  on the Hudson River and -- only at certain times of the day,

2  though, I'll be sure.

3       All right.  So y'all are going to get that to me

4  within ten days, right?

5       MR. WINSBERG:  Yes, Your Honor.

6       MR. GERSHMAN:  And, you know, Your Honor, I guess --

7  it's not clear to the plaintiffs that it would make sense to

8  brief dispositive motions at that point.  It may be that we

9  think that it may make sense, rather than briefing dispositive

10 motions then, if they're not granted, then having expert

11 discovery and the possibility of another summary judgment

12 motion after that, we may take the position, and Your Honor may

13 want to hear from all of us before we decide whether to proceed

14 with expert discovery or go with dispositive motions first.

15      THE COURT:  Obviously, you're going to be talking to

16 me along the way, every part of the way.  One of the things

17 that dispositive -- whatever that word is -- dispositive

18 motions do for the Court is it often narrows the issue.  But I

19 thought your expert discovery was already in process.  Not at

20 all.  Okay.

21      So how long is this case going to go?  When am I going

22 to have it to try?  When are you setting down trial?

23      MR. GERSHMAN:  If expert discovery moves forward as --

24 if the --

25      THE COURT:  It will.  Let's not say "if."  We're going

8

1    to put it in a fifth amended, and we're going to use it, and

2    we're going to obey that order.

3            MR. GERSHMAN:  The reason I'm saying that is that the

4    defendants have indicated that they're going to ask Your Honor

5    to forego expert discovery and move for summary judgment.

6            THE COURT:  Okay.  That's fine.

7            MR. GERSHMAN:  And I'm saying, if we don't do that, we

8    move forward with expert discovery in the normal course, then

9    do summary judgment motions, then do the pretrial filings, I

10   think -- and correct me if I'm wrong, Harris -- that I think

11   the way it's laid out is that a trial date would be

12   approximately twelve months from the end of fact discovery; I

13   think that that's how --

14           THE COURT:  We can be faster than that.  You do not

15   want to be in Poughkeepsie in the middle of winter.  So just

16   set it up sooner than that.

17           MR. GERSHMAN:  Actually, if we set it up sooner, we

18   will be there in winter, and if we finish fact discovery in the

19   middle of March, if we do it less than a year, then --

20           THE COURT:  Why don't we -- why the middle of March?

21   Why can't we get fact discovery sooner than that?  I didn't

22   hear -- I heard the middle of March, didn't I?

23           MR. WINSBERG:  Your Honor, I think there's -- because

24   of the discovery disputes we have, and they're actually --

25           THE COURT:  I know.  I'm so tired of them, trust me.

1    MR. WINSBERG:  It has slowed the process down.

2    We have taken, Your Honor -- we have taken depositions

3 without all of the documents, we've done it; we've tried our

4 best to move it.  And some of them, we're just unwilling to

5 take until we get all of the documents, but we've tried, Your

6 Honor.  We have taken as many depositions as we can find

7 without the documents.  We took the 30(b)(6) without.

8    THE COURT:  Maybe I should have y'all try it in the

9 winter in Poughkeepsie.  That's a thought.  We can start in the

10 dark and end in the dark, and you can trudge to the courthouse

11 in the snow.  Not this year, though.

12    All right.  I'll see what you say when you bring it to

13 me, but we will meet again to talk about it.

14    Now then, report to me about what I told y'all to meet

15 and confer on last week.

16    MR. WINSBERG:  Sure, Your Honor.  I can tick through -

17 - I've got some good news.  I can tick through on respect to

18 the defendants' second motion to compel, Your Honor asked us to

19 meet and confer; and in fact, that was in the order that Your

20 Honor had entered, that we prepared for Your Honor's signature.

21    THE COURT:  I believe I signed it, and it's docketed,

22 right?

23    MR. WINSBERG:  Yes, Your Honor.

24    THE COURT:  Okay.

25    MR. WINSBERG:  We sent a letter to the plaintiffs, and

1    I can just read exactly what the compromise is into the record.

2         THE COURT:  Perfect.

3         MR. WINSBERG:  We, the defendants, were limiting

4    Request No. 1 to the defendants' fourth document request to ten

5    cable transactions that occurred in '99 and 2000, which were as

6    follows:  Verto, Century/Citizens, Harron, FrontierVision,

7    Olympus, Benchmark, Cablevision, Prestige, Cablevision Midwest,

8    and Century-TCI.

9         We also -- that request had some subparts, Your Honor,

10   and we also deleted Subparts (d), (e), (f), (i), (j), and (l).

11        And finally, Your Honor, with respect to Subpart (o),

12   we limited it just to the presentations to or materials

13   provided to banks, equity analysts, or shareholders concerning

14   the ten acquisitions that I just described to Your Honor.

15        THE COURT:  Okay.

16        MR. WINSBERG:  And plaintiff orally told me that was

17   acceptable to them.  I assume they're going to produce that in

18   a reasonable time frame to us.  But that resolves the scope of

19   what we're going to get.

20        THE COURT:  Okay.  So we're going to make that an

21   order of the Court on the record today?

22        MR. WINSBERG:  I would like to.

23        THE COURT:  Please, that's an order of the Court, and

24   I will so order the record.

25        MR. GERSHMAN:  And, Your Honor, just -- we did agree

1  to that under the -- with the understanding that our agreeing

2  to that would resolve their motion and those requests.  And Mr.

3  Winsberg indicated to me that he was fine with that.

4          THE COURT:  Okay.  I'm going to carry the motion,

5  though, until such times as you do produce.

6          MR. GERSHMAN:  For that request, Your Honor, that's

7  fine.  That's --

8          THE COURT:  That's all I'm going to do is carry the

9  motion until such time it is produced; that way, I can keep the

10  motion open.  But I'm going to so order the record for that

11  with the caveat that the motion is not closed until such time

12  as it is produced.  So I would expect a letter from you when it

13  is produced, so that we can close the motion.

14          MR. GERSHMAN:  Okay.

15          MR. WINSBERG:  Your Honor, on the plaintiff's second

16  request for documents, which were the -- primarily the

17  individual tax returns.

18          THE COURT:  That's why we're today, right?

19          MR. WINSBERG:  Yes, Your Honor.  We have a settlement

20  on that, Your Honor.

21          THE COURT:  Oh, thank you.

22          MR. WINSBERG:  Your Honor --

23          THE COURT:  I have worked hard on this.

24          MR. WINSBERG:  Your Honor, the defendants, to this

25  day, view that they are not relevant, and that we have -- a

1   compelling need has not been met, and that we've given them

2   ample information to determine what, if anything, they want to

3   explore on any alleged tax benefits.

4          We heard Your Honor on Wednesday.  Your Honor

5   indicated its view on relevancy, and I have no interest in

6   pursuing something that Your Honor had indicated to us your

7   views on the point.  So I took it from a different perspective,

8   Your Honor; I took it from a protective order perspective.

9          We have negotiated the material terms.  That's not

10  been drafted.  There's been e-mailed shared and we've had

11  conferrals on a protective order that would limit essentially

12  access to these documents, which would remain at Kasowitz, to

13  approximately a total of about fifteen people.  It's more than

14  I would --

15         THE COURT:  So it's very limited.

16         MR. WINSBERG:  It's very limited, who can have access

17  to it.  You know, I would have liked it to be less, but

18  plaintiff said they --

19         THE COURT:  That's what you negotiated, though.

20         MR. WINSBERG:  Yes, Your Honor.

21         THE COURT:  Okay.

22         MR. WINSBERG:  And --

23         THE COURT:  And plus, I notice there's a

24  confidentiality agreement, so it's even --

25         MR. WINSBERG:  It's going to be much more restrictive

1    than the confidentiality agreement.

2            THE COURT:  Okay.  Okay.

3            MR. WINSBERG:  So we propose tendering an order to the

4    Court for a protective order, which would resolve their motion.

5    Again, this was the defendants' view that we want to move the

6    case; this is not a reflection of how we feel about the merits,

7    or certainly the relevancy of the documents.

8            THE COURT:  It's discovery; it's not merits.  This is

9    just discovery.  Okay.

10           MR. WINSBERG:  There was one -- there were two

11   requests that were not limited in time.  There were some tax

12   returns they asked for, for Mr. Buckfelder and Buckfelder

13   Investment Trust.  I asked them to confirm whether that was

14   also '99 and 2000.  Mr. Gershman told me on the phone that it

15   was.  He may have something -- I just want to make sure I'm

16   giving them everything that they expect to be given to them.

17           THE COURT:  Well, we're limiting the time, right?

18           MR. GERSHMAN:  The agreement between us, Your Honor,

19   is that they will produce what has been requested in Requests 5

20   through 9 from plaintiff's second request.

21           THE COURT:  Give me the years; don't hedge on us.

22           MR. GERSHMAN:  Well --

23           THE COURT:  We're on the record, I don't want you

24   hedged.

25           MR. GERSHMAN:  I'll explain why we hedge.  We asked

1    for defendant -- we asked for Mr. Buckfelder and the Buckfelder

2    Investment Trust returns --

3         THE COURT:  You bring another motion after '99 and

4    2000.

5         MR. GERSHMAN:  Well, that -- what we asked for, Your

6    Honor, is, because we don't know when Mr. Buckfelder donated

7    his stock in Prestige North Carolina, we made a request that

8    just said whatever year that is; and it may be '99 and 2000,

9    and there's no issue, but it's possible that he donated it in

10   '98 or '97.  Whatever year it was, we asked that they produce

11   those returns.  And maybe it's all in 1999 and 2000, and

12   there's no issue.

13        THE COURT:  I'm not leaving it open-handed.  Y'all can

14   talk if you want to, but I'm not leaving it open.  Y'all

15   decide; tell me right now what you want.

16        MR. WINSBERG:  Your Honor, I mean, my understanding is

17   that what he's looking for is what the tax situation was that

18   the defendants, at the time, entered into the purchase

19   agreements, which was in December of '99 --

20        THE COURT:  Exactly.  So ...

21        MR. WINSBERG:  -- and then the closing in July of

22   2000.

23        I just don't want to be in a "gotcha" situation, where

24   I give him '99 and 2000, and he's like, there's a court order

25   saying --

1    THE COURT:  I'm not going to allow that to happen.  So

2  y'all make -- you either make your deal, or we'll go forward

3  with the hearing.  But I'm not going to allow an open-ended.

4  You tell us what year you want the tax returns, and you get

5  them, because that's what y'all agreed on.

6    MR. GERSHMAN:  Okay.  I mean, not -- you know, again,

7  we're at a bit of a disadvantage, Your Honor, because we don't

8  know what year these donations were made.  So yes, we want '99

9  and 2000.  If Mr. Winsberg wants me to state right now what

10  year we want, it may well be that we don't need any other

11  years, which is why we made the request the way we did.  But if

12  we need to give him a year, we can either -- I can either try

13  to work this out with him, if he wants, or I can name other

14  years --

15    THE COURT:  Or we can have a hearing right now.  I'm

16  ready for a hearing.  I'm totally prepared, I'm absolutely

17  totally prepared.

18    MR. GERSHMAN:  If they're -- Harris, if they're -- if

19  the contributions were made in '99 and 2000, then that's fine.

20    THE COURT:  I will direct the defendant to review the

21  tax returns.  I'm only giving you '99 and 2000.  If you want

22  more than that, you're going to come back to me.

23    MR. GERSHMAN:  Okay, Your Honor.

24    MR. WINSBERG:  That's fine with us, Your Honor.  We

25  just want to -- we wanted to move past this issue and get this

1    case through fact discovery.

2            THE COURT:  And it may be that you might want to --

3    okay.  You might want to come back to me and not give '99 or

4    2000; you may want to give '97.  You let me know.

5            MR. WINSBERG:  Yes, Your Honor.

6            THE COURT:  I don't want to be out of loop on this

7    one.

8            MR. WINSBERG:  Yes, Your Honor.

9            THE COURT:  I will tell y'all -- okay.  Are we

10   finished?  Is that it?  What else do we got?

11           MR. WINSBERG:  Your Honor, there is also -- those were

12   -- I believe, were the good news for the -- there is also some

13   not so good news that I can share with Your Honor, the Court.

14           THE COURT:  Okay.

15           MR. WINSBERG:  We received yesterday the corporate

16   minute books and the transcripts, and what a surprise, there

17   are voluminous redactions in the corporate minute books on

18   privilege, there are redactions in the --

19           THE COURT:  Where's the privilege log?

20           MR. WINSBERG:  Your Honor, he said he was going to

21   give us privilege --

22           THE COURT:  No.  You had a chance to give the

23   privilege log a long time ago, and you didn't give it; that's

24   what I ruled last week.  If you don't give it, you give it;

25   give it all, unredacted.  I said that last week, and I didn't

1  stutter.

2        MR. GERSHMAN:  No, you did not, Your Honor.

3        THE COURT:  You did not produce a privilege log before

4  that time.  We had to come here and make it -- I want it over

5  there, and I do not want it redacted.

6        MR. GERSHMAN:  Okay, Your Honor.

7        THE COURT:  And if you need another order to that

8  effect, let's have it.  And besides that, it's not bad news to

9  me.  I'm really willing to rule; that's one thing you get out

10  of me.  Maybe you don't like it, but I rule.  Unredacted

11  minutes, ASAP.

12        MR. GERSHMAN:  Okay, Your Honor.

13        MR. WINSBERG:  That's what we understood Your Honor to

14  mean.  I just --

15        THE COURT:  That's what I said last week.  I didn't

16  stutter.  You were too late to do the privilege log, I said

17  that.  I'm sorry if I did stutter.  I am now at the point of

18  considering sanctions.  It wasn't given when it was said it was

19  to be given.  I'm at that point.  Actually, that's made me

20  angry.  So I said what to do.  Do it.

21        But where are we now?

22        MR. WINSBERG:  Your Honor, where we are is we're going

23  to propose to you a scheduling order that we talked about.

24  We're going to -- I have asked for some additional transcripts

25  of witnesses.  I'm moving this case.  I mean, I need to get the

1    transcripts from him for some other witnesses, we're going to

2    notice up the depositions, we're going to move it through fact

3    discovery.

4              Your Honor, we can talk about it more; we can talk

5    about it now or talk about it later, but we believe this case

6    is wholly without merit on the facts.  And we're going to come

7    in front of Your Honor and ask for summary judgment at the end

8    of fact discovery.  We're going to ask Your Honor at that

9    point, Your Honor, if it has some indication of how it would

10   view [sic], but we're going to ask Your Honor to stay expert

11   discovery because we don't want to waste anymore time and money

12   fighting over a case that we believe is wholly without merit.

13             THE COURT:  We'll get there when we get there.  I just

14   want you to get every -- I just want everybody to get what they

15   need in discovery.  Okay.

16             So the minute books are obviously there.  They were

17   redacted.  I want them by Friday.

18             MR. GERSHMAN:  They'll have them before Friday, Your

19   Honor.

20             THE COURT:  Very good.

21             MR. WINSBERG:  And the Deloitte transcripts were

22   redacted, too.

23             THE COURT:  They were?  I want those unredacted --

24             MR. GERSHMAN:  They're --

25             THE COURT:  And I want the defendant to file an

1  affidavit outlining the time and expense for bringing the

2  minute book motion.  So I want that to me.

3          Now what am I missing?  When am I going to see y'all

4  again?  I don't mind seeing you once a week, but I don't think

5  y'all want to come to New York once a week.

6          MR. WINSBERG:  Your Honor, I do think it would make

7  sense to have -- I know Your Honor said your schedule is very

8  busy, but it would make sense to have a status conference in

9  thirty to forty-five days to see where we are.

10          THE COURT:  I am busy, but I'm never too busy for you.

11  We will find time.  Thirty to forty-five days; that's still

12  this year.  We're not in November yet, are we?

13          MR. WINSBERG:  No, Your Honor.

14      (Pause in proceedings.)

15          THE COURT:  Okay.  I'm in Manhattan next week, but

16  that's not thirty to forty-five days.  And thirty days, it's

17  Thanksgiving; I'm in Washington, D.C.  That's a thought.

18      (Pause in proceedings.)

19          THE COURT:  December the 12th.

20      (Pause in proceedings.)

21          THE COURT:  Okay.

22          MR. WINSBERG:  That day, Your Honor, I did have a

23  status conference in front of Judge Mullins in the Allied case,

24  but I can get someone else to attend that, so that's fine.

25          THE COURT:  Ray Mullins?

1    MR. WINSBERG:  Yes, Your Honor.  That's fine, Your

2  Honor.

3    THE COURT:  If it's just a status conference, I'd

4  prefer you to be here --

5    MR. WINSBERG:  That's fine.

6    THE COURT:  -- even though I would not preempt Judge

7  Mullins.

8    MR. WINSBERG:  That's fine, Your Honor.  I can be

9  here; I'll get someone else to attend.

10    MR. GERSHMAN:  Your Honor, if we have -- in the

11  unlikely situation, but it could happen -- if we have discovery

12  issues that we might need Your Honor's guidance on in the

13  interim, should we contact you?

14    THE COURT:  Yes, some way.  Actually, let's change it

15  from the 12th to the 19th.

16    MR. GERSHMAN:  The 19th of December?

17    THE COURT:  19th of December, at again, 10:30.  And we

18  have to -- again, we have to leave the courtroom open because

19  we don't know who's available.  So just leave -- but 10:30, and

20  we'll find a courtroom or we'll find a conference room.

21    MR. WINSBERG:  Your Honor, one of the things on the

22  discovery disputes that I found helpful was listening to Your

23  Honor giving us an indication of how Your Honor views some of

24  the issues that have come up, and I took to heart what you said

25  last week and took a different tact because of it.

1      There are a couple of issues that I believe are going

2 to probably -- we may not be able to resolve consensually; and

3 rather than briefing it and putting all these, you know,

4 motions together, I mean, at some point I would just frankly

5 like to -- if we could have a status conference to just discuss

6 them, and Your Honor could tell us yea or nay, and we'll move

7 on, and --

8      THE COURT:  Okay.  That's sort of hard for the Court

9 because I don't like to -- but if it's based on what you've

10 already filed with me, and if it's on relevance -- I'll tell

11 you candidly, since we've now resolved it, I was -- today's

12 discovery dispute was definitely going to win or lose on the

13 argument, because I've read both of your briefs, I've reread

14 both of your briefs, I've reread both of your briefs, so --

15 because the tax returns are a little bit different than simply

16 everything else.  And you know it, you've pointed it out to me.

17 You slanted it your way; you slanted it your way.  But if it's

18 based on what you've given before and it's relevance, I really

19 think y'all can figure that out.

20      But what you could do for me and what would make it

21 simpler is if you did it sort of summary judgment style;

22 meaning a joint statement.  So I would prefer that.  If you've

23 got an issue -- I don't like to come in cold, I don't like to

24 just give you -- I know in a trial I've got to think on my

25 feet.  But on this, it's so much simpler if you do it together,

22

1    and if you did it sort of summary judgment style.  We've got

2    this discovery dispute.

3         The other thing that happens with me when you do it

4    that way is that, in my heart, I know you've met and conferred.

5    Now y'all can set up here and say you did, but until y'all put

6    it on paper and you've had to go through that exercise, I don't

7    know that you have really met and conferred in a way that I

8    think is meaningful.

9         MR. GERSHMAN:  And by that, Your Honor, you mean a

10   submission laying out, this is the dispute, this is what we

11   think the law is, and then each side argues its part.

12        THE COURT:  Right.  Right.

13        MR. GERSHMAN:  Okay.

14        THE COURT:  And you do it jointly, because that means

15   the facts are not -- we're not looking at two different sets of

16   facts, we're not looking -- and the truth be known, for

17   instance, on today's issue, the law was the law.  I mean, the

18   case law was the same case law.  There wasn't a difference in

19   the case law.

20        But I would like it to be, like today, in that there

21   was a possible close call.  If it's not a close call, do not

22   waste my time; I will do sanctions on it.  That's crazy.  Y'all

23   are gentlemen and ladies.  This is your professional

24   reputation.  Use your professional reputation.  Do it right.  I

25   teach ethics, too, so ...

1          Anything else you need from me?

2          MR. GERSHMAN:  Not at this point, Your Honor.

3          THE COURT:  Always good to see y'all.

4      (Court and court personnel confer.)

5          THE COURT:  Motion to seal.

6          MR. WINSBERG:  Oh, yes, Your Honor.  We did file

7   approximately ten exhibits.  Obviously, they were sensitive tax

8   information of --

9          THE COURT:  Absolutely.  You can put those under seal.

10         MR. WINSBERG:  And we --

11         MR. GERSHMAN:  We have no objection.

12         THE COURT:  Right.  Okay.

13         MR. WINSBERG:  And so I'll prepare a proposed order.

14         THE COURT:  Absolutely.  Just prepare that order.

15  Yeah.  There's no way I'm going to let the tax returns,

16  particularly -- and just so you know, I do want one thing

17  redacted from them completely before they're filed, and that is

18  any Social Security numbers or any tax ID numbers.  That needs

19  to be redacted.

20         MR. WINSBERG:  Yes, Your Honor.

21         THE COURT:  So that's an important thing.

22         Anything else?

23         MR. GERSHMAN:  That's it, Your Honor.

24         THE COURT:  Well, I'll see you when I see you.

25         MR. WINSBERG:  Thank you, Your Honor.

24

1    MR. GERSHMAN:  Thank you, Your Honor.

2    THE COURT:  Have a great day.

3    THE COURT OFFICER:  All rise.

4    THE COURT:  Okay.  Thank you very much.

5    (Proceedings concluded at 11:02 a.m.)

6    * * * * *

7    <u>CERTIFICATION</u>

8    I certify that the foregoing is a correct transcript

9 from the electronic sound recording of the proceedings in the

10 above-entitled matter.

11

12

13                                          October 25, 2007

14 Coleen Rand, AAERT Cert. No. 341
   Certified Court Transcriptionist
15 Rand Reporting & Transcription, LLC

16

17

18

19

20

21

22

23

24

25

1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

2

3   IN RE:                          .   Case No. 02-41729 (REG)

4   ADELPHIA COMMUNICATIONS         .   New York, New York
    CORPORATION, et al.,            .   Thursday, November 1, 2007
5                                   .   10:27 a.m.
                     Debtors.       .
6   . . . . . . . . . . . . . . . .
    ADELPHIA COMMUNICATIONS         .   Adv. Proc. No. 04-03293 (CGM)
7   CORPORATION, et al.,            .

8                    Plaintiffs, .

9          vs.                      .

10  PRESTIGE COMMUNICATIONS OF      .
    NC, INC., et al.,               .

11                   Defendants. .

12  . . . . . . . . . . .

13              TRANSCRIPT OF CONFERENCE
       BEFORE THE HONORABLE CECELIA G. MORRIS
14          UNITED STATES BANKRUPTCY JUDGE

15  APPEARANCES:

16  For the Plaintiffs:        David M. Friedman, Esq.
                               KASOWITZ, BENSON, TORRES &
17                              FRIEDMAN, LLP
                               1633 Broadway
18                             New York, New York  10019

19  Audio Operator:            Electronically Recorded
                               by Tenille Brown, ECRO
20
    Transcription Company:     Rand Reporting & Transcription, LLC
21                             80 Broad Street, Fifth Floor
                               New York, New York 10004
22                             (212) 504-2919
                               www.randreporting.com
23

24
    Proceedings recorded by electronic sound recording, transcript
25  produced by transcription service.

1    APPEARANCES:    (Continued)

2    For the Defendants:          Harris B. Winsberg, Esq.
     (Via Telephone)              Douglas E. Ernst, Esq.
3                                 TROUTMAN SANDERS, LLP
                                  600 Peachtree Street, N.E.
4                                 Suite 5200
                                  Atlanta, Georgia   30308

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Proceedings commence at 10:27 a.m.)

2          THE COURT:  Good morning.  You may be seated.

3          MR. WINSBERG:  (Via telephone) Good morning, Your

4    Honor.  It's Harris Winsberg and Doug Ernst from Troutman

5    Sanders on behalf of the defendants.

6          THE COURT:  Mr. Friedman, I'll call the case after you

7    -- go ahead.

8          MR. FRIEDMAN:  Yes, Your Honor.  David Friedman for

9    the plaintiff.

10         THE COURT:  This is 04-03293, <u>Adelphia Communications</u>

11   <u>v. Prestige</u>.

12         And on the phone, we're having a bit of difficulty,

13   just because there's a little static.  Now it's better.  Are

14   you there?

15         MR. WINSBERG:  I am, Your Honor.  I hear the same

16   static.

17         THE COURT:  Okay.  Mr. Winsberg, before we begin, I

18   want to ask you a question.

19         MR. WINSBERG:  Yes, Your Honor.

20         THE COURT:  At any point, have you asked for any

21   documents from after '01?

22         MR. WINSBERG:  Yes, Your Honor.  And in fact, Your

23   Honor, in our original motion to compel, we moved on that very

24   point.  But we discovered that there were numerous documents

25   after 2001 that were relevant to the litigation, such as

1  deposition transcripts, such as documents created during

2  Adelphia's restatement, such as the Covington report, as Your

3  Honor recalls, such as the PWC forensic documents that Your

4  Honor ruled upon.  They asserted an objection saying that the

5  relevant time period was '99 through 2001.  We actually moved

6  to compel on that point, and they withdrew that objection to

7  the relevant time frame.

8        And to answer the question shortly, Your Honor, yes,

9  there are numerous documents we've requested and have been

10  produced after 2001.

11       THE COURT:  How about after 2005?

12       MR. WINSBERG:  After 2005, there are documents that we

13  have looked at.  Certainly, off the top of my head, documents

14  in 2005, again with the deposition transcripts.  There were

15  documents -- for example, this week we've been asking for -- we

16  discovered during Ms. Savage's* deposition that Adelphia

17  created an issue summary on accounting for the Government

18  settlement; that is a 2005 document that was produced to us

19  finally this week.

20       We also -- there are deposition transcripts, again, of

21  Deloitte individuals, including the independent directors,

22  which I believe were deposed in 2006; so there are numerous

23  examples of documents after 2005.

24       THE COURT:  Okay.  Mr. Friedman, let me ask you

25  something about the four documents in question.  Are they part

5

1  of a transcript?

2       MR. FRIEDMAN:  No, Your Honor.  The four documents are

3  documents -- and they appear in each case two times, which is

4  why you see multiple base numbers for each of them in the log,

5  but the --

6       THE COURT:  But they are not part of a transcript.

7       MR. FRIEDMAN:  No, Your Honor.

8       THE COURT:  And they're not part of exhibits to a

9  transcript.

10       MR. FRIEDMAN:  No, Your Honor.  They're parts of --

11  they're exhibits within the minute books of --

12       THE COURT:  Oh, they are exhibits within the minute

13  books?

14       MR. FRIEDMAN:  Yes, within four director meetings.

15       And, Your Honor, we did have a -- we did offer, during

16  the course of -- we did have a dispute with the defendants as

17  to the scope of discovery of the minute books.  They had asked

18  for 2007; we had offered through 2002.  They had said that's

19  not adequate.  We had a hearing.  Your Honor said, produce all

20  of the minute books; that was provided in Your Honor's order of

21  October 19th.

22       THE COURT:  Right.

23       MR. FRIEDMAN:  And then, after that order was entered,

24  we asked Your Honor to allow us to withhold from the production

25  of those minute books these four memoranda.  Everything else

6

1   has been produced, just these four memos from Willkie Farr are,

2   at this point, the subject of this hearing.

3        THE COURT:  Okay.  I can tell you, I've looked at them

4   and looked at what they've produced, and I find them

5   irrelevant, so ...

6        But I want to ask some questions.  Did y'all meet and

7   confer about this before we went through all of this?  Mr.

8   Winsberg.

9        MR. WINSBERG:  We've met and conferred on the minute

10  books themselves on numerous occasions.  As far as the

11  privilege assertion, I wasn't aware of the privilege assertion;

12  it wasn't in any of their papers or any of the meet-and-confers

13  we had, which were voluminous, until they actually produced to

14  us more minute books in response to Your Honor's order.

15       And if Your Honor is asking, since last Tuesday, did

16  we meet and confer on the privilege that they had asserted for

17  the first time on the minute books, the answer to that is no.

18  But our view is that you have to have -- if there's a

19  privilege, you've got to assert it timely, which they're very

20  aware of as --

21       THE COURT:  I'm not ruling on privilege; I'm ruling on

22  relevance.

23       I will tell you, Mr. Gershman isn't here, but he did

24  not mention that the minute books contained memos directed by

25  attorneys for the purpose of advising clients at all.  There

7

1   was no privilege asserted.  So, Mr. Friedman, this is new for

2   the Court.

3        So I'm disappointed on the meet-and-confer.  I said

4   very point blank, meet and confer.  That's the purpose of the

5   Rules of Civil Procedure.  It says pointedly in there you're to

6   meet and confer.

7        I'm not going to allow these to be produced, but I'm

8   not going to allow them to be produced on the grounds of

9   relevance.

10        Mr. Friedman is rising.

11        MR. FRIEDMAN:  Your Honor, that's obviously acceptable

12   to us.  I just wanted to make sure that Your Honor is not

13   ruling one way or the other on the issue of waiver.  As Your

14   Honor might guess, because these documents are irrelevant --

15        THE COURT:  You meet and confer, Mr. Friedman.

16        MR. FRIEDMAN:  Your Honor, that's fine.  I just need

17   to know -- what I can't -- there is an order out there from

18   October 19th that compels the production.  I understand Your

19   Honor is now modifying that order with respect to these four

20   documents, and that's fine.

21        THE COURT:  I don't know that these four documents are

22   even in there.  I don't even know that they are in that bunch.

23        MR. FRIEDMAN:  Your Honor, they were part of the

24   minute books, and the order refers to producing the minute

25   books.

8

1        I just want there to be -- I just want to walk out of

2   here today in a neutral environment on the issue of the

3   attorney/client privilege.  I'm --

4        THE COURT:  I'm not doing that to you -- I'm not doing

5   that for you, Mr. Friedman.  It wasn't produced to me that way,

6   it wasn't set up to me that way, and I'm not going to do it

7   that way.  It wasn't set up.  I've said to you off the record,

8   and I'm saying to you on the record:  We were reassured off the

9   record that there was no privilege going to be asserted; we

10  were assured on the record that there was no privilege going to

11  be asserted.  And now then, we're this far down the line, and

12  somebody starts yelling privilege.  That's not right, and

13  that's not fair to the defendants in this case, it's not fair

14  to the Court.

15       MR. FRIEDMAN:  Your Honor, again, I --

16       THE COURT:  And I'm not giving you guidance.  I've got

17  four documents.  Those four documents are irrelevant.

18       MR. FRIEDMAN:  Okay.  Your Honor, I just want you to

19  understand that -- and I went through this, and I've reviewed

20  all of the transcripts, and I've spent much more time than I

21  would like with Mr. Gershman, trying to understand exactly what

22  has happened at this case because, obviously, I have not been

23  at every hearing.  And I am assured that every time Mr.

24  Gershman spoke to the issue of privilege, in his mind, what he

25  was speaking about was the fact that, with respect to the

9

1   period of time that we viewed to be -- and I understand the

2   Court may not view this to be the case -- but within the period

3   of time that we view to be the appropriate scope of discovery,

4   which ended --

5        (Audio interference.)

6        THE COURT:  Mr. Winsberg, can you hear this?

7        MR. WINSBERG:  I cannot hear -- I --

8        THE COURT:  There is construction going on --

9   construction going on in the courtroom below us, so ...

10       MR. FRIEDMAN:  Anyway, the period of time that ended

11  with the announcement of Rigas fraud, which was in the spring

12  of 2002.  We have not, we will not, and we never have asserted

13  a privilege.  All of the documents of Adelphia through the

14  announcement of that fraud have been made available to

15  countless parties, including the United States Government.  All

16  the documents of Adelphia's counsel during the time of the

17  restatement are available.

18       THE COURT:  Mr. Friedman, I'm going to interrupt you

19  because you haven't been at every hearing, and you haven't

20  heard some of the allegations about that.  You haven't heard it

21  being said on the other side that it was basically, here's the

22  warehouse, go find out what the Government had, you go find it,

23  and no guidance or help there.  You haven't heard that

24  colloquy.

25       Now I have said right now, and I've said it before,

1    meet and confer.  But I am not giving you a privilege comfort.

2    On these four documents, it's irrelevant, and that's as far as

3    I'm going today.

4         MR. FRIEDMAN:  That's fine, Your Honor.  And I'm sorry

5    to press you on this.  I understand -- I'm not asking for a

6    privilege comfort.  But is Your Honor ruling that, but for the

7    irrelevance of these documents, the privilege has been waived?

8         THE COURT:  I have not ruled anything except they're

9    irrelevant.

10         MR. FRIEDMAN:  Okay.

11         THE COURT:  That's all I'm doing.

12         MR. FRIEDMAN:  That's fine, Your Honor.  Thank you.

13         THE COURT:  And that's all that's in front of me.

14         MR. FRIEDMAN:  Your Honor, thank you.

15         THE COURT:  The Court is in recess.

16      (Proceedings concluded at 10:37 a.m.)

17                          *****

18

19

20

21

22

23

24

25

11

1                          <u>CERTIFICATION</u>

2          I certify that the foregoing is a correct transcript

3   from the electronic sound recording of the proceedings in the

4   above-entitled matter.

5

6   *[signature: Coleen Rand]*

7   _____        November 2, 2007

8   Coleen Rand, AAERT Cert. No. 341
    Certified Court Transcriptionist
9   Rand Reporting & Transcription, LLC

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25