UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ADELPHIA RECOVERY TRUST,

                    Plaintiff,

v.

PRESTIGE COMMUNICATIONS OF NC, INC.
*et al.*,

                    Defendants.

Case No. 1:07 Civ. 11152 (LMM)

**AFFIRMATION OF DOUGLAS E. ERNST IN SUPPORT OF DEFENDANTS' THIRD MOTION TO COMPEL THE PRODUCTION OF DISCOVERY**

DOUGLAS E. ERNST, an attorney admitted *pro hac vice* to this Court hereby affirms, pursuant to Rule 37 of the Federal Rules of Civil Procedure, that the following statements are true and correct under penalties of perjury:

1.      I am a partner in the law firm Troutman Sanders LLP and I represent Prestige Communications of NC, Inc., Jonathan J. Oscher, Lorraine Oscher McClain, Robert F. Buckfelder, the Robert F. Buckfelder Trust, and Anverse, Inc. (collectively, the "Defendants") in the above-captioned matter.

2.      I submit this affirmation in support of Defendants' Third Motion to Compel the Production of Discovery ("Motion to Compel").

3.      I am fully familiar with the facts set forth in this affirmation, either from personal knowledge or on the basis of documents that have been provided to me.

4.      Attached as Exhibit "A" is a true and correct copy of Plaintiff's Amended Complaint against Defendants, which was filed in the action styled *Adelphia Recovery Trust v. Prestige Comm'ns of NC, Inc. et al.*, Adv. Pro. No. 04-03293 (Bankr. S.D.N.Y.) (CGM) on or about March 26, 2007.

5.    Attached as Exhibit "B" is a true and correct copy of Adelphia Communications Corporation's ("Adelphia") Civil Action Complaint against Deloitte & Touch, LLP ("Deloitte"), which was filed in the action styled *Adelphia Comm'ns Corp. v. Deloitte & Touche, LLP*, No. 000598 (Pa. Commw. Ct., Phil. Co., November Term 2002) (the "Deloitte Litigation") on or about November 6, 2002.

6.    Attached as Exhibit "C" is a true and correct excerpted copy of the transcript of the FRCP 30(b)(6) deposition of Connie Campbell, dated August 1, 2007.

7.    Attached as Exhibit "D" is a true and correct excerpted copy of Adelphia's Form 10-K filed with the Securities & Exchange Commission on or about December 23, 2004 for the period ending December 31, 2003.

8.    Attached as Exhibit "E" is a true and correct copy of that certain Confidentiality Agreement by and among Deloitte, Adelphia and John, Timothy, Michael and James Rigas (the "Rigas Family"), dated as of September 20, 2004.

9.    Attached as Exhibit "F" is a true and correct copy of that certain Confidentiality Agreement by and between Plaintiff and Defendants, dated as of March 8, 2005.

10.    Attached as Exhibit "G" is a true and correct copy of that certain Agreement by Parties to the Prestige Action to Maintain Confidentiality of Material Designated by Deloitte as "Confidential" or "Highly Confidential" in the Adelphia Action by and among Deloitte, Plaintiff and Defendants, dated as of March 17, 2006.

11.    Attached as Exhibit "H" is a true and correct copy of Defendants' Fourth Request for Production of Documents to Plaintiff, dated as of June 19, 2007.

12.     Attached as Exhibit "I" is a true and correct copy of Plaintiff's Objections and Responses to Defendants' Fourth Request for Production of Documents to Plaintiff, dated as of July 23, 2007.

13.     Attached as Exhibit "J" is a true and correct copy of Defendants' Sixth Request for Production of Documents to Plaintiff, dated as of June 19, 2007.

14.     Attached as Exhibit "K" is a true and correct copy of Plaintiff's Objections and Responses to Defendants' Sixth Request for Production of Documents to Plaintiff, dated as of December 10, 2007.

15.     Attached as Exhibit "L" is a true and correct copy of Defendants' Seventh Request for Production of Documents to Plaintiff, dated as of November 29, 2007.

16.     Attached as Exhibit "M" is a true and correct copy of Plaintiff's Objections and Responses to Defendants' Seventh Request for Production of Documents to Plaintiff, dated as of December 31, 2007.

17.     As of the date of this Affirmation, Plaintiff has failed to produce a privilege log relating to any of the Deloitte Materials.

18.     Attached as Exhibit "N" is a true and correct copy of the Rule 45 Subpoena *duces tecum* Defendants served on Deloitte on November 28, 2007 (the "Deloitte Subpoena").

19.     Attached as Exhibit "O" is a true and correct copy of the Objections and Responses of Deloitte Pursuant to FRCP 45(c)(2)(B) to the Deloitte Subpoena, dated December 17, 2007.

20.     Attached as Exhibit "P" is a true and correct copy of the Rule 45 Subpoena *duces tecum* Defendants served on the Rigas Family, care of the Rigas Family's attorney, John Higson, on March 24, 2008 (the "Rigas Family Subpoena").

21.     Although the Rigas Family objected to certain of the requests contained in the Rigas Family Subpoena, they did not object to Request Nos. 1 and 2, which requested all expert reports prepared on behalf of the Rigas Family, as well as unredacted deposition transcripts of the Rigas Family's experts.

22.     The Rigas Family produced an expert report of Kenneth McGraw who analyzed the value of certain cable systems, including some of the cable systems at issue in this litigation.

23.     Attached as Exhibit "Q" is a true and correct copy of that certain letter agreement by and between Deloitte and Defendants, dated February 20, 2008, regarding the production of documents pursuant to the Deloitte Subpoena.

24.     Attached as Exhibit "R" is a true and correct copy of the Transcript of Defendants' Motion For Sanctions Before The Honorable Cecelia G. Morris, United States Bankruptcy Judge, from October 17, 2007.

25.     Attached as Exhibit "S" is a true and correct copy of an email from Plaintiff's counsel (Joseph Gershman) to Deloitte's counsel (James Canning), dated February 14, 2008, regarding the production of documents pursuant to the Deloitte Subpoena.

26.     Attached as Exhibit "T" is a true and correct copy of a letter from me to Plaintiff's counsel, dated March 27, 2008, regarding various outstanding discovery issues.

27.     Attached as Exhibit "U" is a true and correct copy of a letter from me to Plaintiff's counsel, dated February 13, 2008, regarding various outstanding discovery issues.

28.     Attached as Exhibit "V" is a true and correct copy of a letter from Plaintiff's counsel (Jonathan Minsker) to Deloitte's counsel (James Canning) without enclosures, dated March 28, 2007, regarding the production of certain materials from the Deloitte Litigation.

I declare under penalty of perjury that the forgoing is true and correct.

This 14th day of July 2008.

_____/s/ Douglas E. Ernst_____
Douglas E. Ernst (*Pro Hac Vice*)
(Ga. Bar No. 249956)

1938148_1.DOC

KASOWITZ, BENSON, TORRES
& FRIEDMAN LLP
David M. Friedman (DF-4278)
Joseph A. Gershman (JG-8275)
1633 Broadway
New York, NY 10019
Tel: (212) 506-1700
Fax: (212) 506-1800

*Counsel to Official Committee
of Unsecured Creditors*

WILLKIE FARR & GALLAGHER
LLP
Terence McLaughlin (TM-0287)
787 Seventh Avenue
New York, New York 10019
Tel: (212) 728-8000
Fax: (212) 728-8111

*Counsel to the Debtors*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re<br>ADELPHIA COMMUNICATIONS CORP., *et al.*,<br>a Delaware corporation,<br><br>Debtors.<br><br>ADELPHIA COMMUNICATIONS CORP.,<br>ADELPHIA CABLEVISION, L.L.C., and the<br>OFFICIAL COMMITTEE OF UNSECURED<br>CREDITORS OF ADELPHIA<br>COMMUNICATIONS CORP., *et al.*,<br><br>Plaintiffs,<br><br>vs.<br><br>PRESTIGE COMMUNICATIONS OF NC, INC.,<br>JONATHAN J. OSCHER,<br>LORRAINE OSCHER McCLAIN,<br>ROBERT F. BUCKFELDER,<br>BUCKFELDER INVESTMENT TRUST, and<br>ANVERSE, INC.,<br><br>Defendants. | Chapter 11 Case<br><br>Case No. 02-41729 (REG)<br><br><br><br><br><br><br>Adv. Pro. No. 04-03293<br>(CGM)<br><br><br><br><br>**AMENDED COMPLAINT** |

Plaintiffs Adelphia Communications Corporation ("ACC"), Adelphia Cablevision, L.L.C.

("Cablevision," and together with ACC, "Adelphia"), and the Official Committee of Unsecured

Creditors of Adelphia Communications Corporation, *et al.* (the "Committee"), for their complaint against Defendants, allege as follows:

## SUMMARY OF ACTION

1.       This action seeks to recover a fraudulent conveyance arising out of Adelphia's July 5, 2000 purchase of certain cable systems from Prestige Communications of NC, Inc. ("Prestige NC") in exchange for approximately $800 million in cash (the "Asset Purchase") -- which was far more than those assets were worth -- while Adelphia was insolvent.

2.       Adelphia entered into and overpaid in the Asset Purchase as part of a transaction in which members of the Rigas Family (defined *infra*), who were Adelphia directors and senior officers, simultaneously bought Prestige NC's sister company, Prestige Communications, Inc. ("Prestige Georgia") for themselves at a significantly lower price.  In addition, this action also seeks to recover damages from the Defendants for aiding and abetting the Rigas Family's breaches of fiduciary duty, as upon information and belief Defendants knew that the Rigas Family was breaching its fiduciary duties by entering into and consummating the Asset Purchase, and Defendants substantially assisted the Rigas Family in doing so by agreeing to, and then consummating, the transaction.

## JURISDICTION AND VENUE

3.       This Court's jurisdiction is founded upon sections 157 and 1334 of title 28 of the United States Code, in that this proceeding arises under title 11 of the United States Code (the "Bankruptcy Code"), or arises in or is related to the above-captioned chapter 11 case under the Bankruptcy Code, which is pending in the United States Bankruptcy Court for the Southern District of New York.

4.       This civil proceeding is a core proceeding under sections 157(b)(2)(A), (B), (C), (D), (H), (K) and (O) of title 28 of the United States Code.

5.      Venue in this Court is appropriate under section 1409(a) of title 28 of the United States Code.

6.      Adelphia and the Committee have filed this action jointly. Adelphia and the Committee filed a motion seeking court approval for the Committee to prosecute this action on behalf of the estates, and on July 14, 2004 that motion was granted by The Honorable Robert E. Gerber.

## THE PARTIES AND OTHER KEY PARTICIPANTS

7.      The Committee is the statutory committee of unsecured creditors duly appointed on July 11, 2002 in the chapter 11 cases of ACC and its affiliated debtors by the Office of the United States Trustee for the Southern District of New York.

8.      ACC and Cablevision are debtors in the jointly administered chapter 11 case, *In re Adelphia Communications Corporation, et al.*, Case No. 02-41729 (REG), which commenced on June 25, 2002 (the "Petition Date"). ACC, which at one time was one of the leading cable companies in the United States, is a corporation organized under the laws of the State of Delaware, and its principal place of business on the Petition Date was located in Coudersport, Pennsylvania. Cablevision, an indirect subsidiary of ACC, is a Pennsylvania corporation, and its principal place of business on the Petition Date was located in Coudersport, Pennsylvania. Cablevision paid Defendants $1.1 billion on behalf of ACC at the closing of the transaction.

9.      At all relevant times herein, members of the Rigas Family, principally John Rigas and his three sons, Timothy, Michael and James Rigas (collectively, the "Rigas Family), held all of the most senior positions at Adelphia. John Rigas was Adelphia's President and Chief Executive Officer; Timothy Rigas was Adelphia's Executive Vice President, Chief Financial Officer, Chief Accounting Officer and Treasurer; Michael Rigas was Adelphia's Executive Vice-President in Charge of Operations; and James Rigas was Adelphia's Executive Vice President in

Charge of Strategic Planning.  In addition, the Rigas Family owned a substantial percentage of Adelphia stock with voting rights that enabled the Rigas Family to exercise voting control over the Debtors.  In addition to their holdings in Adelphia, the Rigas Family also owned a number of cable systems themselves through corporations that were wholly-owned, directly or indirectly, by members of the Rigas Family.

10.    Highland Prestige Georgia, Inc. ("Highland Prestige") is a corporation organized under the laws of the State of Delaware, with its principal place of business located in the Commonwealth of Pennsylvania.  At all relevant times herein Highland Prestige was owned and controlled by the Rigas Family, and was the entity that the Rigas Family used to purchase Prestige Georgia in July 2000.

11.    Upon information and belief, at all relevant times herein Prestige NC was a closely-held corporation with its principal place of business in Cartersville, Georgia that owned and operated cable systems in Virginia, Maryland, and North Carolina.  In July 2000, Prestige NC sold these cable systems (the "Prestige Cable Systems") to Adelphia for approximately $800 million in cash.  Prestige NC was dissolved in December 2000.  Upon information and belief, defendants Jonathan J. Oscher, Lorraine Oscher McClain, Robert Buckfelder and the Buckfelder Investment Trust constituted the entirety of Prestige NC's shareholders, and, prior to its dissolution, the company was controlled by defendant Jonathan J. Oscher ("Oscher").

12.    Upon information and belief, at all relevant times herein, defendant Oscher served as President and Treasurer of Prestige NC, and was Prestige NC's primary shareholder, owning 940 shares of Prestige NC stock, or 94% of Prestige NC's outstanding stock at the time of the Asset Purchase.

13.    Upon information and belief, at all relevant times herein, defendant Lorraine Oscher McClain ("McClain") was Vice President of Prestige NC, and owned 30 shares of Prestige NC stock, which constituted 3% of Prestige NC's outstanding stock at the time of the Asset Purchase.

14.    Upon information and belief, at all relevant times herein, defendant Robert F. Buckfelder ("Buckfelder") was Prestige NC's Vice President of Finance and Chief Financial Officer, and owned 21 shares of Prestige NC stock, which constituted 2.1% of Prestige NC's stock at the time of the Asset Purchase.

15.    Upon information and belief, at all relevant times herein, defendant Buckfelder Investment Trust ("Buckfelder Trust") owned 9 shares of Prestige NC Stock, which constituted 0.9% of Prestige NC's outstanding stock at the time of the Asset Purchase.

16.    Upon information and belief, at all relevant times herein, Prestige Georgia was a closely-held corporation with its principal place of business in Cartersville, Georgia that provided cable service in the State of Georgia.  In July 2000, Prestige Georgia ultimately was acquired by the Rigas Family through a series of transactions.  At the time of the acquisition, Prestige Georgia's largest shareholder was Anverse, Inc. ("Anverse"), a non-profit corporation, which owned approximately 89% of Prestige Georgia's outstanding stock.  Upon information and belief, the remaining 11% of Prestige Georgia's stock was split between defendant Oscher and three McClain family trusts, including a trust in the name of defendant McClain.

17.    Upon information and belief, defendant Anverse, whose principal place of business is in Cartersville, Georgia, is a non-profit charitable corporation organized under the laws of the State of Georgia.  Upon information and belief, Anverse was one of the ultimate transferees of the cash Adelphia paid in the Asset Purchase.  When Prestige Georgia was sold to

5

the Rigas Family, Anverse was Prestige Georgia's largest shareholder. Upon information and

belief, at all relevant times herein Anverse was controlled by defendant Oscher, who served as

Anverse's Chief Executive Officer. Upon information and belief, at all relevant times herein

defendant McClain was Anverse's Secretary.

18.     Prior to the Asset Purchase, Defendants owned (directly or indirectly) and

controlled two closely-held cable companies: Prestige NC, which provided cable service to

approximately 118,250 subscribers in three states, Maryland, Virginia and North Carolina; and

Prestige Georgia, which provided cable service to approximately 59,000 subscribers in Georgia.

## FACTS

19.     In the fall of 1999, Adelphia entered into negotiations with the Defendants and

their representatives in hopes of acquiring the Prestige Cable Systems and Prestige Georgia's

cable systems.

20.     These negotiations were ultimately successful, and on December 6, 1999, ACC

entered into two agreements with the Defendants: (i) an Asset Purchase Agreement between

ACC and Prestige NC that required Adelphia to purchase the Prestige Cable Systems; and (ii) a

Stock Purchase Agreement between Adelphia and the shareholders of Prestige Georgia that

required Adelphia to purchase all of the stock of Prestige Georgia. Collectively, these two

agreements called for Adelphia to pay the Defendants $1.1 billion for both the Prestige Cable

Systems and Prestige Georgia.

21.     In the course of the negotiations, the Defendants and the Rigas Family had to

agree to an allocation of the total purchase price between the two purchase agreements. As

directors and senior executives who had voting control over Adelphia's stock, the Rigas Family,

subject to the proper exercise of its fiduciary duties to Adelphia and to approval by independent

members of Adelphia's Board of Directors (the "Board"), had the power to determine what

percentage of the purchase price would be allocated to the Prestige Cable Systems (for which Adelphia would ultimately pay), and what percentage of the purchase price would be allocated to Prestige Georgia (for which the Rigas Family was ultimately supposed to pay). While the federal tax laws require that such a price allocation be done in a manner that reflects the fair market value of the underlying assets, upon information and belief the Defendants and the Rigas Family ultimately agreed to an allocation of the $1.1 billion purchase price that did not reflect the fair market value of the underlying assets. Rather, the Defendants and the Rigas Family ultimately agreed to allocate $800 million in cash in exchange for the Prestige Cable Systems under the Asset Purchase Agreement, and approximately $300 million in cash in exchange for the stock of Prestige Georgia under the Stock Purchase Agreement. In other words, at the behest of the Rigas Family and without the Rigas Family having made the appropriate disclosures to Adelphia's independent directors (the "Independent Directors"), Adelphia agreed to a price allocation that called for it to pay approximately $7,000 per subscriber for the Prestige Cable Systems in the Asset Purchase, an amount dramatically higher than comparable transactions. By contrast, the allocation for the Stock Purchase Agreement called for Adelphia to pay approximately $5,300 per subscriber for the cable systems owned by Prestige Georgia, approximately $1,700 less per subscriber than what Adelphia agreed to pay for the assets of Prestige Georgia's sister company.

22.     Upon information and belief, the large price disparity between the price per subscriber being paid in the Asset Purchase Agreement and the Stock Purchase Agreement was not a reflection of differences in the fair market value of these assets. Moreover, upon information and belief both the Rigas Family and the Defendants knew that the price allocation that they agreed to between the Asset Purchase Agreement and the Stock Purchase Agreement did not correspond to the fair market value of the assets and the stock being purchased.

However, the Rigas Family concealed this information from the Independent Directors who would have prevented this injury to Adelphia had they been informed of its occurrence. Upon information and belief, both the Rigas Family and the Prestige Defendants knew that the $800 million price allocated to the Asset Purchase Agreement was substantially more than the fair market value of the assets being purchased, and the $300 million price allocated to the Stock Purchase Agreement was substantially less than the fair market value of the Prestige Georgia stock being purchased.

23.    In addition to negotiating and agreeing to a skewed purchase price allocation between the two purchase agreements that did not reflect the fair market value of the underlying assets, the Defendants also agreed to a proposal from the Rigas Family that each purchase agreement include an assignment clause that permitted Adelphia to assign all of its rights and obligations under either agreement to a subsidiary or affiliate of Adelphia. An affiliate, in turn, was defined to include, among other things, any entity owned or controlled by the Rigas Family. In sum, the Rigas Family engineered a deal structure that allowed them to misappropriate assets contracted for by Adelphia and to assign those assets to themselves. The Defendants, certain of whom were long-time friends of the Rigas Family, knowingly agreed to a deal structure that permitted the Rigas Family to cause Adelphia to pay substantially in excess of fair market value for the assets that it would ultimately receive, so that the Rigas Family could assign to itself the Prestige Georgia stock that was priced at substantially less than its fair market value. Upon information and belief, the Defendants agreed to this deal structure because it purportedly provided certain of the Defendants with certain tax benefits.

24.    Either prior to or shortly after the Rigas Family and the Defendants agreed to an allocation that did not reflect the fair market value of the underlying assets, the Rigas Family

decided to cause Adelphia to sell Prestige Georgia — the undervalued asset — to the Rigas Family at Adelphia's cost. As directors and senior executives who had voting control over Adelphia's stock, the Rigas Family, subject to approval of the Independent Directors, had the power to determine how much it would pay Adelphia for the stock of Prestige Georgia. This "agreement" between Adelphia and the Rigas Family was ultimately memorialized in a June 2000 letter agreement obligating Adelphia to transfer Prestige Georgia's common stock to Highland Prestige, a company wholly-owned by the Rigas Family, in exchange for $300 million in cash. Prior to the closing of the transaction, the Defendants were informed that Highland Prestige Georgia, Inc. was to be purchasing the Prestige Georgia stock, and the "agreement" between Adelphia and the Rigas Family that called for the Rigas Family to purchase this stock at Adelphia's cost was shared with certain of the Defendants' agents. In spite of this knowledge, Defendants did nothing to halt or amend the transaction, but instead took all steps necessary to ensure that the transaction was consummated.

25.    Adelphia's purchase of the Prestige Cable Systems and Prestige Georgia was consummated on July 5, 2000. Adelphia paid Prestige NC approximately $800 million for the Prestige Cable Systems. Adelphia also paid the shareholders of Prestige Georgia approximately $300 million for their stock. The same day, Adelphia transferred Prestige Georgia's stock to Highland Prestige in exchange for the assumption of $300 million in debt for which Highland Prestige was already liable.

26.    Upon information and belief, the Prestige Cable Systems were not reasonably equivalent in value to the cash that Adelphia paid for them. Indeed, the Rigas Family was motivated to agree to an allocation that intentionally inflated their price -- with Defendants' knowledge and consent -- so that the purchase price of the Prestige Georgia systems allocated to

the Rigas Family would be substantially discounted from the amount Adelphia paid.  At the same time, the Individual Defendants were motivated to agree to an inflated allocation of the Prestige NC purchase because the Individual Defendants owned all of the stock in Prestige NC, but only a small percentage of the stock in Prestige Georgia, 89% of which was owned by defendant Anverse.  Thus, money paid to acquire Prestige Georgia would provide little benefit to the Individual Defendants, as it would go primarily to Anverse, while money paid to acquire Prestige NC would go entirely to the Individual Defendants.  In addition, upon information and belief the price allocation agreed to by the Defendants and the Rigas family purportedly provided certain of the Defendants with tax benefits.

27.     In the end, at the behest of the Rigas Family Adelphia agreed to and ultimately paid approximately $7,000 per subscriber for the Prestige Cable Systems in the Asset Purchase, an amount dramatically higher than comparable transactions.  By contrast, the Rigas Family paid approximately $5,300 per subscriber for the cable system owned by Prestige Georgia, approximately $1,700 less per subscriber than what Adelphia paid for the assets of Prestige Georgia's sister company.

### FIRST CLAIM FOR RELIEF

#### (Avoidance and Recovery of Constructively Fraudulent Transfer Under 11 U.S.C. §§ 544(b) and 550)

28.     Plaintiffs reallege paragraphs 1 through 27 as if fully set forth herein.

29.     The Asset Purchase was a transfer of interest in Adelphia's property.

30.     At the time of the Asset Purchase, Adelphia: (i) was insolvent or was rendered insolvent and/or (ii) was engaged or was about to engage in business or a transaction for which any property remaining with them was an unreasonably small capital.  Adelphia did not receive reasonably equivalent value for the assets it acquired in the Asset Purchase.

31.     The Defendants and Prestige NC were initial and/or immediate or mediate transferees of the cash received in the Asset Purchase.

32.     At all times relevant hereto, there were actual creditors of Adelphia holding unsecured claims allowable against Adelphia's estates within the meaning of Sections 502(d) and 544(b) of the Bankruptcy Code with the right to void the Asset Purchase under applicable law, including, but not limited to, the laws of the Commonwealth of Pennsylvania and the State of Georgia.

33.     By virtue of the foregoing, pursuant to sections 544(b) and 550, of the Bankruptcy Code, Adelphia seeks to recover for the benefit of Adelphia's estate the difference in value between what it paid in cash in connection with the Asset Purchase Agreement, and the value of the cable systems that it received, together with all interest paid in respect of the obligations avoided hereunder.

### SECOND CLAIM FOR RELIEF

**(Avoidance and Recovery of Intentionally
Fraudulent Transfer Under 11 U.S.C. §§ 544(b) and 550)**

34.     Plaintiffs reallege paragraphs 1 through 33 as if fully set forth herein.

35.     The Asset Purchase constituted a transfer of interest in Adelphia's property.

36.     Adelphia -- through the actions of the Rigas Family described herein -- purchased the Prestige Cable Systems with the actual intent to delay, hinder and defraud any entity to which Adelphia was or became indebted to, on or after the date that such obligations were incurred. Upon information and belief, the Rigas Family knew that the cost Adelphia paid per subscriber for the Prestige Cable Systems was far in excess of fair market value. The Rigas Family also caused Adelphia to pay a disproportionately higher amount of the total purchase price for the Prestige Cable Systems, which effectively subsidized the Rigas Family's cost of acquiring

11

Prestige Georgia. The Rigas Family caused Adelphia to conceal from the Independent Directors and creditors the true structure of the transactions relating to the Asset Purchase and the actual price that the Rigas Family intended to pay.

37.   The Defendants were initial and/or immediate or mediate transferees of the Asset Purchase.

38.   At all times relevant hereto, there were actual creditors of Adelphia holding unsecured claims allowable against Adelphia's estates within the meaning of Sections 502(d) and 544(b) of the Bankruptcy Code with the right to void the Asset Purchase under applicable law, including, but not limited to, the laws of the Commonwealth of Pennsylvania and the State of Georgia.

39.   By virtue of the foregoing, pursuant to sections 544(b) and 550 of the Bankruptcy Code, Adelphia seeks to recover for the benefit of Adelphia's estate the difference in value between what it paid in cash in connection with the Asset Purchase Agreement, and the value of the cable systems that it received, together with all interest paid in respect of the obligations avoided hereunder.

## THIRD CLAIM FOR RELIEF

### (Aiding and Abetting Breach of Fiduciary Duty)

40.   Plaintiff ACC realleges paragraphs 1 through 39 as if fully set forth herein.

41.   Each member of the Rigas Family, as an officer and director of ACC, owed fiduciary duties to ACC. In addition, each member of the Rigas Family owed fiduciary duties to ACC's creditors by virtue of ACC's insolvency.

42.   Each member of the Rigas Family breached his fiduciary duties to ACC by causing ACC to overpay for the Prestige Cable Systems for the benefit of the Rigas Family. In

so doing, each of these members of the Rigas Family acted in a manner that was adverse to the interests of ACC.

43.    Defendants knew that the members of the Rigas Family, as officers and directors of ACC, owed fiduciary duties to ACC. In addition, Defendants knew that the Rigas Family's acquisition of Prestige Georgia was a self-interested transaction for the Rigas Family, and the usurpation of a corporate opportunity from Adelphia.

44.    Upon information and belief, Defendants knew or were willfully blind to the fact that by engineering and agreeing to a transaction structure that allowed the Rigas Family to shift some of the cost of Prestige Georgia onto Adelphia, the Rigas Family was breaching its fiduciary duties to ACC. Despite this knowledge, the Defendants substantially assisted the Rigas Family's breaches of fiduciary duties by agreeing to and consummating the sale of the Prestige Cable Systems and Prestige Georgia on the terms and conditions described in the Asset Purchase Agreement and Stock Purchase Agreement.

45.    The members of the Rigas Family were not the "sole actors" with respect to ACC. Rather, there were independent directors at ACC who would not have allowed ACC to enter into the Asset Purchase Agreement and the Stock Purchase Agreement had they been fully informed that: (i) the Rigas Family intended to saddle Adelphia with the bill for a disproportionately large amount of the total cost of the purchases from the Prestige NC and Prestige Georgia companies and (ii) the cost of acquiring the assets in the Asset Purchase was significantly in excess of their fair market value.

46.    By reason of the foregoing, ACC has been damaged in an amount to be determined at trial, including: (i) the amount that ACC's payment in acquiring assets in the Asset

Purchase Agreement exceeded their fair market value, and (ii) the amount of money that ACC incurred in additional debt in connection with the purchase of Prestige Georgia.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in favor of Plaintiffs pursuant to Sections 544(b) and 550 of the Bankruptcy Code, avoiding, preserving and recovering for the benefit of Adelphia's estate the difference between what Adelphia paid for the Prestige Cable Systems and the value of what it received, together with all interest and in respect of the obligations avoided hereunder; (ii) awarding compensatory damages to ACC for Defendants' aiding and abetting of the Rigas Family's breaches of fiduciary duty, together with interest; and (iii) such other and further relief as the Court deems just and proper.

Dated: New York, New York
         March 26, 2007

                               Respectfully submitted,

                               KASOWITZ, BENSON, TORRES
                               & FRIEDMAN LLP

                               By:    /s/ David M. Friedman
                                      David M. Friedman (DF-4278)
                                      Joseph A. Gershman (JG-8275)
                               1633 Broadway
                               New York, New York 10019
                               Tel: (212) 506-1700
                               Fax: (212) 506-1800

                               *Counsel to the Official Committee of Unsecured Creditors*

                               WILLKIE FARR & GALLAGHER LLP

                               By:    /s/ Terence K. McLaughlin
                                      Terence K. McLaughlin (TM-0287)
                               787 Seventh Avenue
                               New York, New York 10019
                               Tel: (212) 728-8000
                               Fax: (212) 728-8111

                               *Counsel to the Debtors*

# EXHIBIT B

Robert C. Heim
Identification No. 15758
Michael E. Baughman
Identification No. 78690
DECHERT PRICE & RHOADS
4000 Bell Atlantic Tower
1717 Arch Street
Philadelphia, Pennsylvania 19103-2793
(215) 994-4000



ATTEST

NOV 0 6 2002

L PAONE
PRO. PROTHY

This Case is Subject to the Commerce
Program.

This is Not an Arbitration Case. An
Assessment of Damages Hearing is
Required

---

ADELPHIA COMMUNICATIONS CORP., a
Delaware Corporation
One North Main Street
Coudersport, Pennsylvania 16915-1141

                Plaintiff,

v.

DELOITTE & TOUCHE, LLP, a Delaware limited
liability partnership,
1700 Market Street, 22nd Floor
Philadelphia, PA 19103

              and

2500 One PPG Place
Pittsburgh, PA 15222

              Defendant.

COURT OF COMMON PLEAS
PHILADELPHIA COUNTY

NOVEMBER TERM 2002
NO. _____ 000598

JURY TRIAL DEMANDED

JURY FEE PAID

---

## COMPLAINT AND JURY TRIAL DEMAND

## NOTICE

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

Lawyer Reference Service
One Reading Center
Philadelphia, Pennsylvania 19107
Telephone: 238-1701

## AVISO

Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas en las paginas siguentes, usted tiene veinte (20) dias de plazo al partir de la fecha de la de manda y la notificacion. Hace falta a sentar una comparencia escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea a visado que si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificacion. Ademas, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades o otros de rechos importantes para usted.

LLEVE ESTA DEMANDA A UNA BOGADO INMEDIAIAMENTE SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICIO, VAYA EN PERSONA O LLAME POR TELEFONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGA.

Servicio de Referencia Legal
Uno Reading Centro
Filadelfia, PA 19107
Telefono: 238-1701



Robert C. Heim
Identification No. 15758
Michael E. Baughman
Identification No. 78690
DECHERT PRICE & RHOADS
4000 Bell Atlantic Tower
1717 Arch Street
Philadelphia, Pennsylvania 19103-2793
(215) 994-4000

This Case is Subject to the Commerce Program.

This is Not an Arbitration Case. An Assessment of Damages Hearing is Required

| | |
|---|---|
| ADELPHIA COMMUNICATIONS CORP., a Delaware Corporation One North Main Street Coudersport, Pennsylvania 16915-1141 : : : : : Plaintiff, : v. : DELOITTE & TOUCHE, LLP, a Delaware limited liability partnership, 1700 Market Street, 22nd Floor Philadelphia, PA 19103 and 2500 One PPG Place Pittsburgh, Pennsylvania 15222-5401 : : : : : : : : : : Defendants. | COURT OF COMMON PLEAS PHILADELPHIA COUNTY NOVEMBER TERM 2002 NO. _____ 000598 JURY TRIAL DEMANDED |

## CIVIL ACTION COMPLAINT
### (PROFESSIONAL NEGLIGENCE 4y, CONTRACT 1c, FRAUD 4f, AND OTHER)

Plaintiff, Adelphia Communications Corporation ("Adelphia" or the "Company"),

by its attorneys, Boies, Schiller & Flexner LLP and Dechert Price & Rhoads, as and for

its Complaint against Deloitte & Touche LLP ("Deloitte"), upon knowledge as to matters

in which it was directly involved and upon information and belief as to all other matters,

alleges as follows:

## Nature of the Action

1.  This is an action against Deloitte for professional negligence, breach of contract, fraud, and other wrongful conduct arising out of Deloitte's role in one of the most egregious instances of corporate self-dealing and financial chicanery in United States corporate history.

2.  Deloitte has been one of the largest and most highly regarded accounting firms in the world. The firm holds itself out, and advertises itself, as providing auditing services of the highest quality. Clients and prospective clients of the firm are induced by Deloitte to believe that hiring Deloitte will assure the client of a reliable audit of the highest quality.

3.  Deloitte in fact has many auditors of the highest competence and integrity and regularly provides clients with auditing services which fully meet the clients' expectations. The case of Adelphia, however, is one of a number of instances where Deloitte's promises and assurances were untrue and where the Company, and the independent directors on Adelphia's Board of Directors, failed to receive the honest, competent audit which had been promised to them, to which they were entitled, and without which the Company could not survive as a solvent going concern. The misconduct of Deloitte personnel in connection with Adelphia has embarrassed Deloitte and caused great harm to Adelphia. Unfortunately, instead of forthrightly admitting its breaches of duty and acting, as it was obligated to act, to mitigate the damage those breaches caused Adelphia, Deloitte has acted to deny and attempt to cover-up its misconduct – thereby increasing the harm to its client.

2

4. Adelphia is the sixth-largest cable company in the United States and was founded by John Rigas more than fifty years ago. Until May 2002, John Rigas along with his sons Timothy Rigas, Michael Rigas, and James Rigas, (collectively, together with John Rigas's son-in-law Peter Venetis, the "Rigas Family"), held all of the senior executive positions of the Company.

5. In a series of shocking revelations beginning in the Spring of 2002, it was revealed that the Rigas Family used their positions at Adelphia to enrich themselves at the expense of Adelphia, including by engaging in multiple acts of self-dealing and, to cover-up their larceny, caused the Company to file false and misleading financial statements. The Rigas Family operated Adelphia to benefit the Rigas Family to the detriment of the Company, and concealed their self-dealing and the false and misleading statements from actual and potential investors and from the independent members of the Adelphia Board of Directors (the "Board") and the Audit Committee of the Board (the "Audit Committee"). If the Board and the Audit Committee had been informed of the misconduct of the Rigas Family they could have, and would have, acted to stop and remedy the misconduct. That is in fact what they did in May of 2002 when they discovered the Rigas Family's misconduct, but by that time it was too late to avoid the billions of dollars of losses that had occurred.

6. On July 24, 2002, John Rigas, Timothy Rigas, and Michael Rigas, along with two other high ranking executives placed by the Rigases in the accounting function of the Company, were arrested in connection with a criminal complaint filed by the United States Attorney for the Southern District of New York charging them with nine counts of bank, securities and wire fraud. Each of them was indicted on September 23, 2002. The

3

criminal complaint against the Rigases alleges, among other wrongful conduct, that the Rigas Family "looted Adelphia on a massive scale, using the company as the Rigas Family's personal piggy bank, at the expense of public investors and creditors" and that John Rigas, Timothy Rigas, and Michael Rigas, together with their co-conspirators, "fraudulently concealed the Rigas Family's self-dealing from the public".

7.  The Rigas Family's self-dealing was not, however, concealed from Deloitte. Deloitte was the Company's long-time outside auditors.  Deloitte also provided audit services for private Rigas Family entities.  As discussed below, some of the Rigas Family's acts of self-dealing and looting were certainly known to Deloitte; other acts of self-dealing and looting were readily apparent to Deloitte on the books and records which Deloitte reviewed and to which it had access in connection with its audits, and, Deloitte knew or should have known of such acts.  Deloitte, however, never disclosed these wrongful acts to the independent members of the Board or the Audit Committee who did not themselves have access to the information available to Deloitte in its audit but who were in a position to prevent or put a stop to the Rigas Family's wrongful acts.  These wrongful acts resulted in billions of dollars in damages to the Company, which damages were preventable if Deloitte had acted consistently with its professional responsibilities as it had promised when it agreed to be Adelphia's outside auditors.

8.  The Rigas Family never could have accomplished their acts of self-dealing had Deloitte fulfilled its professional responsibilities to Adelphia by, among other things, disclosing the corporate abuses that it knew and should have known were taking place. Had Deloitte properly planned and performed its audit functions, exercised the level of professional skepticism required by like professionals, appropriately evaluated the

4

thousands of related party transactions openly reflected in Adelphia's books and records, and otherwise performed its auditing services for the Company in accordance with Generally Accepted Auditing Standards ("GAAS") and Generally Accepted Accounting Principles ("GAAP"), Deloitte would have readily discovered the Rigas Family's self-dealing and the misleading nature of the financial statements filed by the Company and could have disclosed (as it was obligated to disclose) this conduct to the Audit Committee and to the independent directors on the Board. Each of these independent directors, including those on the Audit Committee, was in a position to prevent or stop the wrongdoing by the Rigas Family well before the billions of dollars of damages occurred to Adelphia.

9.    Moreover, despite the years of massive looting and other wrongdoing taking place for the Rigas Family's benefit and to the detriment of Adelphia, Deloitte performed its audits and certified Adelphia's financial statements without ever qualifying its audit reports and always rendered a favorable opinion on Adelphia's ability to continue as a going concern. Deloitte recognized that Adelphia's was a "high risk" audit because of a variety of factors including the Rigas Family's close relationship with the Company, their significant stock holdings and voting control, and the regular presence of related party transactions. However, Deloitte did not even send a letter to Adelphia's management (customarily sent in connection with an audit and referred to as a "management letter") suggesting any changes in its practices that could help ensure the accuracy and appropriateness of Adelphia's financial reporting and business practices.

10. Instead, in each year that the Rigas Family was looting Adelphia, Deloitte acted as if nothing was wrong, blessing Adelphia's financial reporting by systematically



issuing unqualified audit opinions that certified (i) that Deloitte had audited Adelphia's financial statements in accordance with GAAS; (ii) that Deloitte had planned and performed those audits "to obtain reasonable assurance about whether the financial statements are free of material misstatement"; (iii) that in Deloitte's opinion, Adelphia's financial statements "present fairly, in all material respects, the financial position" of the Company "in conformity" with GAAP; and (iv) that its audits provided a "reasonable basis" for its opinions. Each of these statements were false. Each of these statements were relied on by the Company, the independent directors of the Board, and Adelphia's shareholders and investors, to their detriment.

11. Indeed, just a few weeks before the Rigas Family's acts of self-dealing and other misconduct began to become public, Deloitte advised the Audit Committee that all was well. In its briefing to the Audit Committee on February 28, 2002, Deloitte gave assurances that notwithstanding the "issues surrounding recent events with Enron and the lessons learned," Deloitte was "comfortable with Adelphia's accounting and proposed disclosures" in connection with the proposed Form 10-K for 2001, *i.e.*, the 10-K that the Company was planning to issue at the end of March 2002. Deloitte also indicated that except for some routine, audit adjustments, it was "not aware of any other significant points as it related to the audit or the Company's financial statements." Thereafter, on March 26, 2002, Deloitte told the Chairman of the Audit Committee that its audit for the year ended December 31, 2001 was one of the best audits they had ever had. And, the next day, Deloitte told the Company that the list of open items on the Adelphia 10-K were limited to four minor issues.



12. Deloitte violated its professional responsibilities and contractual obligations as Adelphia's independent auditor in light of (i) what Deloitte certainly knew (and, at a minimum, should have known) about the Rigas Family's misconduct and the clear violations of GAAP in the Company's financial statements; (ii) Deloitte's studious indifference to wrongdoing, and (iii) Deloitte's continued willingness to provide the unqualified audit reports that enabled the Rigas Family to continue their acts of self-dealing and corporate looting. Among other breaches of duty, Deloitte failed to perform its audits in conformity with GAAS and certified Adelphia financial statements that Deloitte knew, and should have known, systematically violated GAAP, all while Deloitte failed to give any indication of the Rigas Family's wrongdoing to the independent members of the Board, the Audit Committee, or others, to enable them to act to stop the Rigas Family's misconduct."

13. Deloitte's audit failures render Deloitte liable for breach of its duty to exercise due professional care in connection with the audits of the Company, as well as for breach of its contractual obligations pursuant to its engagement letters with the Company. See First Claim for Relief (Professional Negligence) and Second Claim for Relief (Breach of Contract). Deloitte's conduct also aided and abetted the breaches of fiduciary duty committed by the Rigas Family. See Third Claim for Relief (Aiding and Abetting Breach of Fiduciary Duty). Deloitte's misrepresentations in connection with its audits and audit reports also constitute a fraud committed on the Company and its Audit Committee and independent directors or, to the extent such misrepresentations were not knowing or reckless, constitute negligent misrepresentation. See Fourth Claim for Relief (Fraud) and Fifth Claim for Relief (Negligent Misrepresentation).



14. This is not a case where a company fails for business reasons and its auditing firm is sued as a convenient deep-pocket. Nor is this a case where an auditing firm is itself a victim of fraud of which it was unaware and of which it had no reasonable notice. Here, as a direct and proximate result of Deloitte's own wrongful conduct, Adelphia has suffered substantial damages and, on June 26, 2002, was ultimately forced to file for bankruptcy protection. By this action, Adelphia seeks compensation for all injury suffered as a result of Deloitte's wrongful conduct as well as punitive damages.

### Jurisdiction and Venue

15. This Court has jurisdiction over this dispute and the parties pursuant to 42 Pa. C.S.A. § 5301.

16. Venue is proper in this Court pursuant to Pa. R. Civ. P. 2130(a) as Deloitte regularly conducts business in Philadelphia County, including maintaining a major office here.

### Parties

17. Plaintiff Adelphia is a Delaware corporation with its principal place of business in Coudersport, Pennsylvania. Adelphia maintains executive offices at One North Main Street, Coudersport, Pennsylvania 16915-1141. The Company provides a variety of cable and telecommunications services to consumers throughout the United States and abroad, including digital television, high-speed internet access, long distance telephone services and two-way paging. Until June of 2002, the Company was a listed security trading on NASDAQ. On June 25, 2002, Adelphia and 227 of its subsidiaries (the "Debtors") filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). The Debtors continue in the possession of

8

their respective properties and the management of their respective businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. On July 11, 2002, the United States Trustee for the Southern District of New York appointed an official committee of the Debtors' unsecured creditors. On July 31, 2002, the United States Trustee for the Southern District of New York appointed an official committee of holders of the Debtors' equity.

18. Defendant Deloitte is a limited liability partnership organized under the laws of the State of Delaware. Deloitte is, and has been for decades, one of the largest and most highly regarded accounting firms in the world. Deloitte has an international presence and maintains offices throughout the United States of America, including in this state and county. Deloitte served as Adelphia's independent auditors throughout the period relevant to this Complaint. In connection therewith, Deloitte reviewed the Company's quarterly and year end financial statements and its associated reports and forms filed with the SEC, designed, planned and implemented the procedures to be used in connection with its independent auditing services, reported to the Audit Committee, had full access to and reviewed the Company's financial and related documentation and systems of internal control, and otherwise advised Adelphia on an ongoing basis on a variety of different financial, tax and accounting issues. Deloitte also performed audit functions for private entities owned by the Rigas Family.

## Factual Background

### I.    The Rigas Family's Founding of Adelphia

19. At the beginning when John Rigas and his brother Gus started Adelphia in the small town of Coudersport in rural Northwestern Pennsylvania a half century ago, the

Company was a small cable company with relatively few cable subscribers. Over the next fifty years, and particularly starting in the late 1990s, the Company grew to become one of the largest cable providers in the United States, now serving well over 5 million subscribers.

20. Until 1986, Adelphia remained a closely held company owned and operated by the Rigas family. Throughout this time period, John Rigas continued in the position as head of the Company. Upon information and belief, when John Rigas's sons, Timothy, Michael and James, reached their teens, they began working at Adelphia. And, after each of his sons returned home from college or graduate school, they rejoined their father and were given executive positions at, and joined the Board of, the Company.

21. In 1986, Adelphia issued stock through an initial public offering and became a publicly traded company. After its IPO, as with all publicly-traded companies, Adelphia was subject to the disclosure and related requirements imposed by the United States Securities and Exchange Commission ("SEC"), including those related to financial filings. Adelphia also became subject to the corporate governance requirements of a public company.

22. In the fall of 1999, the character of the company changed significantly when, through a series of transactions, Adelphia acquired three separate cable companies with significant cable assets: Century Communication Corporation, FrontierVision Partners, L.P., and Harron Communications Corp. As a result of these transactions, the number of Adelphia's subscribers grew substantially, as did its revenues. Given these significant acquisitions, the Company's stature in the burgeoning cable and high-speed internet industry also increased significantly, attracting the attention of the investment and

financial communities. In connection with its expansion activities, the Company further

changed its corporate governance structure increasing the number of independent

members of its board. One of the driving forces behind expanding the number of

independent board members was the push from the owners of cable assets as they were

acquired by Adelphia to have increased independent board oversight of the Rigas

Family's management of the Company.

23. Through a special series of Class B voting stock (that had ten times the voting

power of the publicly issued Class A shares), the Rigas Family retained a majority of the

vote, despite the fact that they held a minority of the Class A common stock and a

minority of the economic ownership of the Company. The Rigas Family were

themselves directors. The Board also had at least four independent members from 1999

through May of 2002.

24. Until the independent directors of the Board forced the Rigases to relinquish

their positions as officers and directors of the Company in May of 2002, the Rigas Family

held the top executive positions at the Company: John Rigas was the Chairman,

President and Chief Executive Officer of Adelphia; Timothy Rigas was Executive Vice

President, Chief Financial Officer, Chief Accounting Officer and Treasurer of Adelphia;

Michael Rigas was Executive Vice President in Charge of Operations of the Company

and Vice President; and, James Rigas was Executive Vice President of the Company,

whose primary responsibility was strategic planning.

II.     **The Rigas Family's Self-Dealing
        and Other Wrongful Conduct**

25. In the relative isolation of the small 3,000 person town of Coudersport in rural

Northwestern Pennsylvania where Adelphia is headquartered, the Rigas Family misused

11

their positions with Adelphia to engage in one of the largest instances of corporate self-dealing and financial wrongdoing in American corporate history.

26. The Rigas Family engaged in multiple acts of self-dealing and theft of corporate monies and assets that caused serious damages and financial hardship to the Company, including billions of dollars in damages, a tremendous loss of goodwill, and, ultimately, bankruptcy. Indeed, the price per share of Adelphia's stock fell from over $20 before the Rigas Family's wrongdoing began to be revealed to mere pennies today.

27. The wrongful conduct by the Rigas Family resulted in the arrest on July 24, 2002 of John Rigas, Timothy Rigas, and Michael Rigas, as well as two former senior employees placed by the Rigas Family in Adelphia's accounting function – James R. Brown, Vice President of Finance, and Michael Mulcahey, Director of Internal Reporting – and the filing of a criminal complaint, charging them with nine counts of bank, securities and wire fraud alleging that they "looted Adelphia on a massive scale, using the company as the Rigas Family's personal piggy bank, at the expense of public investors and creditors."

28. Also on July 24, 2002, the SEC filed a civil complaint (the "SEC Complaint") against John Rigas, Timothy Rigas, Michael Rigas, and James Rigas, among others, alleging violations of the federal securities laws and accusing the Rigas Family of "blatant" and "rampant self-dealing." A copy of the SEC Complaint is annexed hereto as Exhibit 1.

29. On September 22, 2002, John Rigas, Timothy Rigas, Michael Rigas, James Brown, and Michael Mulcahey were indicted. Each is charged with one count of conspiracy, 16 counts of securities fraud, five counts of wire fraud, and two counts of

12



bank fraud. The total maximum sentence of imprisonment for each of the charged

individuals is 255 years. A copy of the indictment is annexed hereto as Exhibit 2.

30. Among the most egregious of the Rigas Family's acts of self-dealing and

wrongdoing (based on Adelphia's current knowledge) are (i) the Rigas Family's use of

over three billion dollars of borrowed funds for their own benefit, even though Adelphia

remained liable to repay these borrowings; (ii) the Rigas Family's commingling of

Adelphia funds with funds of entities controlled by the Rigas Family (the "Rigas Family

Entities")[1] and the use of such commingled Adelphia funds to pay personal obligations of

members of the Rigas Family; (iii) the Rigas Family's acquisition of over $772 million of

Adelphia equity securities and more than $563 million in Adelphia notes without

providing adequate consideration to Adelphia and without appropriate collateral for the

loans from Adelphia that they secretly caused to be made to pay for these securities; and

(iv) the Rigas Family's manipulation of Adelphia's books and records and false

statements and other misleading conduct, in order to conceal their wrongdoing, maintain

voting control of Adelphia, and otherwise further their self-dealing.

III.    **Deloitte's Obligation To Use "Professional Skepticism"
        To Insure the Fairness and Accuracy of Adelphia's Financial
        Statements And To Detect and Report Self-Dealing, Irregularities,
        Errors, and Fraud.**

31. Deloitte had a professional responsibility and a contractual duty to the

Company to audit, detect, and disclose to the independent directors and others the Rigas

---

[1] The "Rigas Family Entities" include Coudersport Television Cable Company,
Coudersport Theatre, Dobaire Designs, Dorellenic, Doris Holdings, L.P., NCAA
Holdings, Inc., Illiad Holdings, Inc., Eleni Interiors, Inc., ErgoArts, Inc., Highland 2000,
L.P., Highland Holdings, Highland Prestige Georgia, Inc., Highland Video Associates,
L.P., Hilton Head Communications L.P., Niagara Frontier Hockey, L.P., SongCatcher



Family's "rampant self-dealing" and looting "on a massive scale, using the company as

the Rigas Family's personal piggy bank, at the expense of public investors and creditors,"

as described by the SEC and the Department of Justice, and as further described below.

.  A.    Deloitte's Obligations Pursuant to GAAS.

32. The professional responsibilities of an auditor, including Deloitte here, are set

forth, among other places, in GAAS, which codifies certain professional standards

applicable to accountants in auditing financial statements.  The Auditing Standards Board

of the American Institute of Certified Public Accountants established GAAS.  Its

standards must be complied with by certified public accountants auditing financial

statements.  These pronouncements form the ground rules for every audit, including the

audits of Adelphia performed by Deloitte.  GAAS has additional requirements that

certified public accountants must fulfill in reviewing quarterly financial information.

33. There are ten auditing standards.  They are categorized as general standards,

standards of field work and standards of reporting.  The three general GAAS standards

require auditors to have "adequate technical training and proficiency"; to maintain an

"independent" state of mind in "all matters relating to the assignment"; and, to exercise

"[d]ue professional care . . . in the performance of the audit and the preparation of the

report".  The three standards of field work require that audit work "be adequately

planned"; that "the nature, timing, and extent of tests to be performed" be determined

based on a "sufficient understanding of internal control"; and that "[s]ufficient competent

evidential matter be obtained through inspection, observation, inquiries and

---

Films, L.L.C., Wending Creek 3656, L.L.C., Wending Creek Farms, Inc.


confirmations to afford a reasonable basis for an opinion regarding the financial

statements under audit."

34. In the four standards of reporting, GAAS requires that an auditor's final

product – the audit report – state whether the financial statements are presented in

accordance with GAAP; "identify those circumstances in which such principles have not

been consistently observed in the current period in relation to the preceding period;" must

contain informative disclosures that are "reasonably adequate;" and contain a statement

of opinion by the auditor regarding the accuracy of the financial statements or explain

why no opinion can be given.

35. In addition to the above basic auditing standards, GAAS includes many other

requirements affecting all aspects of the professional services rendered by auditors.

36. In keeping with the duty to exercise independent judgment, Codification,

AU § 333(a) provides that an auditor must not take client representations at face value

and expressly warns that client representations cannot "substitute for the auditing

procedures necessary to afford a reasonable basis for" the auditor's "opinion on the

financial statements." Similarly, Codification, AU § 342 holds the auditor responsible

for evaluating the reasonableness of accounting estimates made by management.

37. GAAS also requires that in "all audits, the auditor should obtain an

understanding of internal control sufficient to plan the audit by performing procedures to

understand the design of controls relevant to an audit of financial statements and

determining whether they have been placed in operation." See Codification,

AU § 319.02. Auditors must likewise assess the control risk of a client by "evaluating

the effectiveness of an entity's internal control in preventing or detecting material

misstatements in financial statements." <u>See</u> Codification, AU § 319.64.  In assessing the same, GAAS acknowledges that an "entity's control consciousness is influenced significantly by the entity's board of directors or audit committee.  Attributes include the board or audit committee's independence from management, the experience and stature of its members, the extent of its involvement and scrutiny of activities, the appropriateness of its actions, the degree to which difficult questions are raised and pursued with management, and its interaction with internal and external auditors."

38. Importantly, GAAS requires the auditor to be aware of the possibility of intentional wrongdoing by management.  Indeed, an auditor has "a responsibility to plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud," <u>see</u> Codification AU § 110, and to assess the risk of fraudulent financial reporting and accounting irregularities and to respond appropriately. <u>See</u> Codification, AU §316.

39. GAAS also requires an auditor to exercise "professional skepticism" in conducting an audit, to plan for the possibility of fraud, to report potential wrongdoing to appropriate levels of authority, and to avoid the reliance upon client representations with respect to important audit issues.

40. The importance of "professional skepticism" is a theme emphasized throughout the authoritative interpretations of GAAS, and the phrase is defined in Codification, AU § 230 as:  "an attitude that includes a questioning method and critical assessment of audit evidence.  The auditor uses the knowledge, skill, and ability called for by the profession of public accounting to diligently perform, in good faith and with integrity, the gathering and objective evaluation of evidence." Codification, AU § 230

16

makes it clear that "professional skepticism should be exercised throughout the audit process," and that "the auditor should not be satisfied with less than persuasive evidence because of a belief that management is honest."

41. Upon detection, GAAS imposes an affirmative obligation on the auditor to bring illegal and improper conduct, as well as so-called "reportable conditions," to the attention of the audit committee.

42. The purpose of an audit committee is to provide oversight of the financial reporting process, the business risk process and adequacy of internal controls, relationships with external and internal auditors, and financial compliance issues.

43. Audit committees, including the Adelphia Audit Committee, necessarily work closely with the outside auditors, who they depend heavily on to provide them with the meaningful information that will allow them to perform their oversight function. Indeed, in order to enable audit committees to work effectively, the auditing literature requires certain communications between external auditors and audit committee members. Statement on Auditing Standards No. 61, Communications with Audit Committees, lists nine matters to be discussed, including significant accounting policies and significant audit adjustments, disagreements with management, and auditors' awareness of management consultation with other accountants. These auditing standards require that an outside auditor discuss with the audit committee their judgments about the quality, and not just the acceptability, of a Company's accounting principles. In all, the requirements for auditor communications with audit committees are intended to foster a candid dialogue with external auditors in order to increase the likelihood that all audit committee members will be informed of matters required to be discussed.



44. For example, Codification, AU § 325 requires auditors to communicate to the audit committee of the board of directors regarding (i) significant deficiencies in internal controls; and, (ii) the method to be used to account for significant unusual transactions, matters involving particularly sensitive accounting estimates, and/or significant audit adjustments. Likewise, Codification, AU § 317.17 mandates that the "auditor should assure himself that the audit committee, or others with equivalent authority and responsibility, is adequately informed with respect to illegal acts that come to the auditor's attention."

45. Even where the auditor has not identified fraud, GAAS imposes on auditors an obligation to inform the Audit Committee about the methods used to account for significant transactions and significant accounting policies and their application. The rule itself cites to three examples: (1) significant accounting issues that may exist in areas such as revenue recognition; (2) off-balance sheet financing; and (3) accounting for equity investments.

46. GAAS also expressly recognizes the possibility that management might engage in improper conduct and that "business structure and operating style are occasionally deliberately designed to obscure related party transactions." Codification, AU § 334.05. In light of this potential for abuse, GAAS requires an auditor to "be aware of the possible existence of material related party transactions that could affect the financial statements and of common ownership or management control relations for which" GAAP "requires disclosure." See Codification, AU § 334.04. To that end, in evaluating any related party transactions, Codification, AU § 334 dictates that: "The auditor should place emphasis on testing material transactions with parties he knows are

18



related to the reporting entity," including by evaluating "the company's procedures for identifying and properly accounting for related party transactions" and employing procedures to "obtain satisfaction concerning the purpose, nature, and extent" of the related party transactions "and their effect on the financial statements." In so doing, an auditor must:

    a.    "Obtain an understanding of the business purpose of the transaction."

    b.    "Examine invoices, executed copies of agreements, contracts, and other pertinent documents, such as receiving reports and shipping documents."

    c.    "determine whether the transaction has been approved by the board of directors or other appropriate officials."

    d.    "Test for reasonableness the compilation of amounts to be disclosed, or considered for disclosure, in the financial statements."

    e.    "Arrange for audits of intercompany account balances . . . and for the examination of specified, important, and representative related party transactions by the auditors for each of the parties, with appropriate exchange of relevant information."

    f.    "Inspect or confirm and obtain satisfaction concerning the transferability and value of collateral."

    g.    "With respect to material uncollected balances, guarantees, and other obligations, obtain information about the financial capability of the other party or parties to the transaction."

47. Further, GAAS requires that:

"For each material related party transaction, . . . for which" GAAP "requires disclosure, the auditor should consider whether he has obtained sufficient competent evidential matter to understand the relationship of the parties and, for related party transactions, the effects of the transaction on the financial statements. He should then evaluate all the information available to him concerning the related party transaction or control relationship and satisfy himself on



the basis of his professional judgment that it is adequately
disclosed in the financial statements."

48. Deloitte was obligated to fulfill and comply with the requirements of GAAS
when it acted as Adelphia's independent auditor.   Deloitte's audit engagement letters
with the Company expressly stated that Deloitte's audits would "be conducted in
accordance with auditing standards generally accepted in the United States of America".

B.      Deloitte's Obligations Pursuant to Its Engagement Letters.

49. In its most recent audit engagement letter with Adelphia dated November 5,
2001 (a copy of which is annexed as Exhibit 3 hereto), as in each of its prior engagements
with the Company, Deloitte agreed to "plan and perform our audit to obtain reasonable
assurance about whether the financial statements are free of material misstatement,
whether caused by error or fraud" and confirmed that its audit would include "obtaining
an understanding of internal control sufficient to plan the audit and to determine the
nature, timing, and extent of audit procedures to be performed."  Further, Deloitte
recognized that its responsibilities during its audit included "examining, on a test basis,
evidence supporting the amounts and disclosures in the financial statements" and
"assessing the accounting principles used and significant estimates made by management,
as well as evaluating the overall financial statement presentation."

50. The engagement letter itself imposes on Deloitte an affirmative obligation to
communicate to the Audit Committee of Adelphia regarding a number of potentially
significant issues.  Specifically, in the section entitled "OTHER COMMUNICATIONS
ARISING FROM THE AUDIT," Deloitte agreed to:

> "In connection with the planning and the performance of
> our audits, generally accepted auditing standards require
> that certain matters be communicated to the Audit

20



Committees. We will report directly to the Audit Committees any fraud of which we become aware that involves senior management, and any fraud (whether caused by senior management or other employees) of which we become aware that causes a material misstatement of the financial statements. We will report to senior management any fraud perpetrated by lower level employees of which we become aware that does not cause a material misstatement of the financial statements; however, we will not report such matters directly to the Audit Committees, unless otherwise directed by the Audit Committees.

We will inform the appropriate level of management of the Companies and determine that the Audit Committees are adequately informed with respect to illegal acts that have been detected or have otherwise come to our attention in the course of our audits, unless the illegal act is clearly inconsequential.

We will also report directly to management of the Companies and the Audit Committees matters coming to our attention during the course of our audits that we believe are reportable conditions. <u>Reportable conditions are significant deficiencies in the design or operation of internal control that could adversely affect the Companies' ability to record, process, summarize, and report financial data consistent with the assertions of management in the financial statements.</u>

"In addition, we will communicate to the Audit Committees, or determine that the Audit Committees are informed, about certain other matters related to the conduct of our audits, including, when applicable:

"Our responsibility as auditors under generally accepted auditing standards

"Significant accounting policies

"Management judgments and accounting estimates

"Audit Adjustments



"Our judgments about the quality of the Companies' accounting principles as applied in their financial reporting

"Other information in documents contained in audited financial statements

"Disagreements with management

"Consultation by management with other accountants on significant matters

"Difficulties encountered in performing the audit

"Major issues discussed with management prior to our retention as auditors

"We may also have other comments for management on matters we have observed and possible ways to improve the efficiency of the Companies' operations or other recommendations concerning internal control." (Emphasis added.)

Throughout the period of the Rigas Family's misconduct, Deloitte had both a professional responsibility and a contractual obligation to follow professional standards and, among other standards, use "professional skepticism" to insure the fairness and accuracy of Adelphia's financial statements and to reasonably detect and report self-dealing, irregularities, material weaknesses in internal control, errors, and fraud.

C.    Deloitte's Heightened Obligations as a Result of Its Determination that Adelphia Was a "High Risk" Audit.

51. The above duties and responsibilities are constant, but, depending upon the level of risk associated with a particular audit, the planning, testing and procedures employed by the auditor should be even more stringent. Here, Deloitte knew (and, in fact, so stated on more than one occasion) that Adelphia was a "high risk" client



necessitating heightened skepticism in planning and performing an audit if that audit were to conform with prevailing professional standards.

52. Among the examples of risk factors an auditor must assess in evaluating the possibility of misstatements arising from fraudulent financial reporting are:

a.    "An excessive interest by management in maintaining or increasing the entity's stock price or earnings trend through the use of unusually aggressive accounting practices."

b.    "Significant pressure to obtain additional capital necessary to stay competitive considering the financial position of the entity—including the need for funds to finance major research and development or capital expenditures."

c.    "Significant related-party transactions not in the ordinary course of business or with related entities not audited or audited by another firm."

d.    "Overly complex organization structure involving numerous or unusual legal entities, managerial lines of authority, or contractual arrangements without apparent business purpose."

e.    "Unusually high dependence on debt or marginal ability to meet debt repayment requirements; debt covenants that are difficult to maintain."

53. After considering these as well as other risk factors, Deloitte concluded that Adelphia was a "high risk" audit. Such a conclusion is obvious since many of these indicia were prevalent at Adelphia.

54. Under these circumstances and considering the relative risk of the Adelphia audit, Deloitte had an obligation, among other obligations, to increase its vigilance during its audit of the Company, to follow up any possible red flags, to focus particular scrutiny on areas where internal controls might be weak and abuses might be possible, and, in

general, to tailor the scope of its audit to the heightened risk it identified, including the

risk associated with numerous related party transactions.

55. As Codification, AU § 317.27 states:

a. "Some examples demonstrating the application of professional skepticism in response to the auditor's assessment of the risk of material misstatement due to fraud include (a) increased sensitivity in the selection of the nature and extent of documentation to be examined in support of material transactions, and (b) increased recognition of the need to corroborate management explanations or representations concerning material matters – such as further analytical procedures, examination of documentation, or discussion with others within or outside the entity."

b. "The knowledge, skill, and ability of personnel assigned significant engagement responsibilities should be commensurate with the auditor's assessment of the level of risk of the engagement."

c. "The auditor may decide to consider further management's selection and application of significant accounting policies . . . . In this respect, the auditor may have a greater concern about whether the accounting principles selected and policies adopted are being applied in an inappropriate manner to create a material misstatement of the financial statements."

d. "When a risk of material misstatement due to fraud relates to risk factors that have control implications, the auditor's ability to assess control risk below the maximum may be reduced. However, this does not eliminate the need for the auditor to obtain an understanding of the components of the entity's internal control sufficient to plan the audit. In fact, such an understanding may be of particular importance in further understanding and considering any controls (or lack thereof) the entity has in place to address the identified fraud risk factors. However, this consideration would need to include an added sensitivity to management's ability to override such controls."

56. Deloitte acknowledged the risky nature of the Adelphia audits in its

presentations to the Audit Committee. For example, in an "Audit Overview" regarding

its audit for fiscal year 2000, Deloitte described the special measures that it said it would

employ as its "Audit Response" given the risk associated with "related party

24

transactions." This "Audit Response" included: "Work with management to understand and evaluate such arrangements in order to identify impact on other accounts and entities and evaluate the sufficiency of disclosure"; and, "While performing audit procedures in all areas, have staff and seniors identify possible related party transactions not previously identified."

57. Deloitte's "Audit Overview" regarding the year 2000 audit also identified "Debt Compliance" as a "risk area." Deloitte noted that "Adelphia is highly leveraged" and "most" of Adelphia's financing agreements "contain numerous complex financial loan covenants." Deloitte also noted that "In the past, compliance with certain of these covenants has been marginal" and "Deloitte & Touche is associated with these covenants through the issuance of debt compliance letters." As its "Audit Response," Deloitte told Adelphia that, among other steps, it would review "loan agreements and financial loan covenant calculations." Deloitte also said that it would:

- "Review new and existing debt agreements for financial loan covenants and any requirements for debt compliance letters to be issued."

- "Obtain copies of debt compliance calculations prepared by Adelphia personnel as of the appropriate periods."

- "Agree information used in the debt compliance calculations to the respective financial statements for the reporting entity."

- "Recalculate compliance with the respective covenants on a test basis."

58. Deloitte's "Audit Overview" regarding the year 2000 audit also noted as a "risk area" that Adelphia "records numerous post-closing adjusting journal entries" and identified as an Audit Response: "Deloitte & Touche engagement to review post-closing

entries recorded and review with appropriate personnel. Conclude as to reasonableness of entries posted."

59. Deloitte's regarding the year 2000 audit also noted as a risk area "Significant Non-routine Transactions" and identified the following Audit Response: "Discuss with management to obtain an understanding of the nature and terms of any such transaction taking place during the year"; "Review contracts and related correspondence"; and, "Assess the accounting treatment based on the nature and terms and complete audit procedures appropriate for the unique transactions."

60. As a result of the public standards and obligations applicable to Deloitte's work, and the custom and usage of audit professionals, the board of directors of Adelphia, including in particular the independent members of the Board, reasonably relied on Deloitte to properly plan and conduct its work in accordance with what is required for a high risk audit and to detect and to disclose to the Board, including to the Audit Committee and to the independent members of the Board, any wrongdoing generally by the Rigases or issues involving potential disagreements between Deloitte and management over disclosures or other issues in the audit and reporting process, including the wrongdoing engaged in by the Rigas Family described herein.

IV.  **Deloitte's Complicity in the Rigas Family's Wrongdoing and Its Abdication of Its Responsibilities As Adelphia's Independent Auditors.**

A.  <u>Deloitte's Certification of Financial Statements that Did Not Properly Reflect the Rigas Family's Co-Borrowing Loans.</u>

61. Certain of Adelphia's subsidiaries entered into co-borrowing credit agreements (the "Co-Borrowing Credit Facilities") that permitted various entities controlled by the Rigas Family (the "Rigas Co-Borrowing Entities") as well as certain subsidiaries of the Company to borrow billions of dollars. The Co-Borrowing Credit Facilities allowed either borrower (the Rigas co-borrowers or the Adelphia subsidiary co-borrowers) to borrow up to the entire amount of the facility. A key feature of the Co-Borrowing Credit Facilities was that a borrower that is a part of a publicly-held entity (i.e., Adelphia) is subject to joint and several liability for all amounts borrowed by the Rigas Family Entities, even if the amounts borrowed were used to benefit only the Rigas Family Entities. Thus, the Co-Borrowing Credit Facilities gave the Rigas Family access to billions of dollars of credit, the economic responsibility for which was ultimately borne by the Company.

62. The three key Co-Borrowing Credit Facilities were:

a. <u>Co-Borrowing Facility One</u>: This facility was entered into on May 6, 1999 on behalf of UCA Corp., UCA LLC, National Cable Acquisition Associates, L.P., Grand Island Cable, Inc., SVHH Cable Acquisition, L.P. and Tele-Media Company of Hopewell-Prince George, each of which is a subsidiary of Adelphia, and Hilton Head Communications, L.P. ("HHC"), which is a Rigas Family Entity. This facility afforded any of the "co-borrowers" the ability to borrow up to $850 million;

b. <u>Co-borrowing Facility Two:</u> In April and September of 2000, Century Cable Holdings, Ft. Myers Cablevision, LLC, both of which were subsidiaries of the Company, and HPGI (defined above) entered into a series of co-borrowing facilities that allowed any of these parties to borrow up to $2.75 billion; and,

c. <u>Co-borrowing Facility Three:</u> On September 28, 2001, each of Olympus Cables Holdings, LLC, Adelphia Company of Western Connecticut and Adelphia Holdings 2001, LLC, each subsidiaries of the Company, and two Rigas Family Entities–Highland Video Associates, L.P. ("HVA") and Coudersport Television Cable Company ("CTCC"), entered into a like transaction that allowed any of these entities to borrow up to just over $2 billion.

63. The Rigas Co-Borrowing Entities eventually borrowed billions of dollars under these three credit facilities. As of December 31, 1999, the amount of their co-borrowings approximated $250 million. As of December 31, 2000, the amount of these borrowings had increased to approximately $1.45 billion. And, by December 31, 2001, the amount of their borrowings under the Co-Borrowing Credit Facilities had increased to approximately $2.55 billion. By April 30, 2002, the amount of these borrowings had increased to a staggering $3.1 billion. Of this $3.1 billion in debt incurred by the Rigas Co-Borrowing Entities, Adelphia subsidiaries remained jointly and severally liable for the entire amount of the debt (even though Adelphia received no benefit from the same) because under the joint and several provisions of the relevant financing agreements, the lenders could look exclusively to Adelphia's subsidiaries for repayment of all amounts. The unauthorized borrowings by the Rigas Family thus benefited and enriched the Rigas Family and the Rigas Family Entities to the detriment of the Company.

28

64. Deloitte knew that the Rigas Co-Borrowing Entities had borrowed these amounts and that Adelphia (through its subsidiaries) remained jointly and severally liable for the full amount of the debt. Deloitte was aware that Adelphia's consolidated financial statements did not disclose the amounts borrowed by the Rigas Co-Borrowing Entities or Adelphia's potential liability for these borrowings.

65. In these circumstances, Deloitte's unqualified audit opinions with respect to Adelphia's 1999 and 2000 consolidated financial statements, and its review of Adelphia's quarterly financial statements since the second quarter of 1999, violated GAAS.

66. As described above, under the joint and several provisions of the relevant financing agreements, the co-borrowing lenders could look exclusively to Adelphia's subsidiaries for repayment of the billions of dollars borrowed by the Rigas Family Entities, notwithstanding the fact that the money had gone to benefit only the Rigas Family.

67. Moreover, once lenders sought repayment from Adelphia subsidiaries for amounts borrowed by the Rigas Family, there was no contractual obligation of the Rigas Co-Borrowing Entities to reimburse the Adelphia subsidiaries for any repayments they might be forced to make. In reviewing the agreements and making due inquiry of other evidence, as Deloitte was required to do and represented that it would do, Deloitte would have known, and should have known, that there was no written agreement between Adelphia and the Rigas Co-Borrowing Entities requiring indemnification for any amounts paid. Deloitte also would have known, and should have known, that there was no collateral or other security pledged by the Rigas Family to ensure that Adelphia was protected in the event of its being called on the debt.

29

68. Even if the Rigas Family or the Rigas Co-Borrowing Entities had claimed an intent to repay the Company in the event the lenders called the loans, their ability to do so was limited by their financial condition, which, given the extraordinary sums of money involved, further reinforced the conclusion that regardless of the entity using the Co-Borrowing Credit Facility, it was Adelphia that would ultimately be responsible for repayment. As a result, the exclusion of most, or (as the SEC has alleged) all, of the co-borrowing debt (created for the sole benefit of the Rigas Family) from Adelphia's consolidated balance sheet violated GAAP.

69. Indeed, even if there were a basis under GAAP on which to exclude some of the co-borrowing debt from the Adelphia consolidated balance sheet, GAAP would still require some public disclosure of the total amount of the Rigas Co-Borrowing Entities' debt under the Co-Borrowing Credit Facilities, including because Adelphia was jointly and severally liable for such debt.

70. In particular, Statement of Financial Accounting Standards No. 5, "Accounting for Contingencies," ("FAS 5") provides guidance on how to properly record and disclose so-called "loss contingencies," like "Guarantees of indebtedness of others." Paragraph 8 of FAS 5 provides:

> "An estimated loss from a loss contingency ... shall be accrued by a charge to income if both the following conditions are met: (a) Information available prior to issuance of the financial statements indicate that it is probable that . . . a liability had been incurred at the date of the financial statements. It is implicit in this that it must be probable that one or more future events will occur confirming the fact of the loss. (b) The amount of loss can be reasonably estimable."

71. Paragraph 10 of FAS 5 provides:

> "If no accrual is made for a loss contingency because one
> or both of conditions in paragraph 8 are not met . . .
> disclosure of the contingency shall be made when there is
> at least a reasonable possibility that a loss or an additional
> loss may have been incurred . . . Disclosure is not required
> of a loss contingency involving an unasserted claim or
> assessment when there has been no manifestation by a
> potential claimant of an awareness of a possible claim or
> assessment unless it is considered probable that a claim will
> be asserted and there is a reasonable possibility that the
> outcome will be unfavorable."

72. Under these principles, even if a guarantee of indebtedness does not meet the

thresholds under FAS 5 for inclusion in a company's financial statements, disclosure of

the guarantee is still required where there is a reasonable *possibility* of having to incur a

liability under the guarantee regardless of whether the liability is reasonably estimable.

As Deloitte knew both from the information available to it in conducting audits of

Adelphia and the special purpose audits that Deloitte conducted of many of the Rigas

Family Entities – including precisely those entities that were parties to the co-borrowing

agreements and that had cable assets of their own – there was a significant possibility, if

not a probability, that lenders would have to look to Adelphia to repay the massive co-

borrowing loans to the Rigas Family Entities.

73. As a result, there was, at a minimum, a reasonable possibility that Adelphia

would be called upon to repay some or all of the amounts borrowed by the Rigas Co-

Borrowing Entities under the Co-Borrowing Credit Facilities; as such, Deloitte had no

reasonable basis for concluding otherwise or acquiescing to the debt being excluded from

the Company's financial statements.  Disclosure of the co-borrowings of the Rigas Co-

Borrowing Entities should have at least appeared in a footnote to Adelphia's financial statements.

74. Even if the probability that Adelphia would have to assume responsibility for the Rigas Co-Borrowing Entities' borrowings could somehow be characterized as "remote," disclosure of the nature and the amount of Adelphia's potential liability was still necessary.

75. Specifically, paragraph 12 of FAS 5 states:

"Certain loss contingencies are presently being disclosed in financial statements even though the possibility of loss may be remote. The common characteristic of those contingencies is a guarantee, normally with a right to proceed against an outside party in the event that the guarantor is called upon to satisfy the guarantee. . . . The Board concludes that disclosure of those loss contingencies, and others that in substance have the same characteristic, shall be continued. The disclosure includes the nature and the amount of the guarantee."

76. This principle requires that all of the co-borrowings be included on the Company's financial statements, including the portion of the debt attributed to the Rigas Co-Borrowing Entities, regardless of whether Adelphia will be called upon to repay some or all of the debt.

77. FAS 57 provides an independent basis for disclosure of the co-borrowing debts. In particular, paragraph 2 of FAS 57 requires disclosure of transactions with related parties sufficient to permit the reviewer of the report to have an understanding of the effects of the transactions on the financial statements. FAS 57 would require, then, the inclusion of the actual amounts allocated to the Rigas Co-Borrowing Entities outstanding under the Co-Borrowing Credit Facilities, the fact that Adelphia had not recorded any liability in connection with these amounts, the conditions under which the Company

32



would have to repay the lenders, the absence of any agreement by the Rigas Co-Borrowing Entities to repay Adelphia, the degree of likelihood that Adelphia would have to re-pay any amounts borrowed by the Rigas Co-Borrowing Entities, the actual use of proceeds of the borrowings by the Rigas Co-Borrowing Entities, and the repayment terms of principal and interest.

78. Accordingly, under GAAP, Deloitte should have either: (i) caused Adelphia to correct its consolidated financial statements to include the debt borrowed by the Rigas Co-Borrowing Entities under the Co-Borrowing Credit Facilities; (ii) caused Adelphia to disclose in narrative form the material information regarding such debt and Adelphia's potential liability for these amounts; or, (iii) refused to issue an unqualified audit report. Deloitte should also have raised each of these issues with the Audit Committee since they plainly implicate, among other issues, the type of "Significant accounting policies" that Deloitte had promised in its engagement letter it would "communicate to the Audit Committee."

79. During the relevant time period, Deloitte did none of these things. Instead, Deloitte simply acquiesced in the Rigas Family's desire to hide the extent of Adelphia's liabilities under the Co-Borrowing Credit Facilities from the public and the independent members of the Audit Committee and the Board.

80. Deloitte actually had express conversations during its audit regarding what disclosures, if any, should be included in Adelphia's financial statements about the amounts the Rigas Co-Borrowing Entities had borrowed under the Co-Borrowing Credit Facilities. Remarkably, during these conversations, Deloitte facilitated the Rigas Family's self-dealing by agreeing with the Rigas Family's position that none of the Rigas

Co-Borrowing Entities debt needed to be disclosed on the Company's financial statements. For example, beginning in at least the year 2000 audit, Deloitte told the Rigas Family and its accomplices within the accounting function of the Company that Adelphia should include in a footnote the total amount of credit available under the co-borrowings, as well as the total amount that had been borrowed by the Rigas Entities. However, when the Rigas Family objected, Deloitte acquiesced, without ever disclosing this issue or any disagreements to the Audit Committee or any of the independent members of the Adelphia Board of Directors.

81. Based on Deloitte's acquiescence and as a result of Deloitte's breach of its professional responsibilities, Note 4 to Adelphia's Form 10-K for Fiscal Year 2000, stated only:

> "Certain subsidiaries of Adelphia are co-borrowers with Managed Entities under credit facilities for borrowings of up to $3,751,250[,000]. Each of the co-borrowers is liable for all borrowings under the credit agreements, and may borrow up to the entire amount of the available credit under the facility. The lenders have no recourse against Adelphia other than against Adelphia's interest in such subsidiaries."

82. Similarly, Adelphia's Form 10-K for Fiscal Year 1999, merely made the following disclosure:

> "Certain subsidiaries of Adelphia are co-borrowers with Managed Entities under credit facilities for borrowings of up to $1,025,000[,000]. Each of the co-borrowers is liable for all borrowings under the credit agreements, and may borrow up to the entire amount of the available credit under the facility. The lenders have no recourse against Adelphia other than against Adelphia's interest in such subsidiaries."

83. These disclosures do no more than describe certain terms and conditions of the Co-Borrowing Credit Facilities and the total amount that either party could borrow

under these facilities. These disclosures fail to comport with GAAP. Even if one were to

assume that GAAP did not require balance sheet disclosure of the full amount borrowed

by the Rigas Co-Borrowing Entities, any adequate narrative disclosure of the Co-

Borrowing Credit Facilities in a footnote to the financial statements should necessarily

have identified, at a minimum, the amount that had been borrowed for which Adelphia

remained jointly and severally liable. But, with Deloitte's blessing, this critical piece of

information – which would have shown the true nature and extent of Adelphia's financial

condition as well as how the Rigas Co-Borrowing Entities were using the Company's

credit for their own benefit – remained hidden from the independent members of the

Board, investors and the SEC. Had Deloitte taken appropriate steps to ensure that this

information was properly disclosed to the Audit Committee, the independent directors,

and the investing public, much if not of all of the Rigas Family's wrongdoing could have

and would have been prevented and much if not all of the damages caused to Adelphia

could have and would have been avoided.

84. Deloitte, however, did not take these steps. On the contrary, Deloitte aided,

abetted, and participated in the preparation and submission by the Rigas Family of

materially false and misleading financial statements that suggested that Adelphia was

including on its balance sheet all of the draw downs under the Co-Borrowing Credit

Facilities (including those that the Company had attributed to Rigas Co-Borrowing

Entities), where that was not the case. Deloitte knew or should have known that the

financial statements were materially misstated in this regard.

85. Even after it ultimately signed off on what it knew were inadequate and

misleading disclosures regarding the co-borrowings, Deloitte failed to even advise the

35

Audit Committee, or any independent member of the Board, of the issues relating to the disclosure of the Co-Borrowing Credit Facilities or its initial disagreement with management about the characterization relating to the same – or its subsequent acquiescence – about such disclosure. To the contrary, Deloitte, during the course of its audits for both fiscal years 2000 and 2001, misrepresented to the Audit Committee that it had not had any disagreements with management related to matters that are material to the Company's financial statements. Had Deloitte made the disclosures it should have made, reasonable steps could have and would have been taken to prevent the improper conduct by the Rigases and their accomplices and to prevent the massive damage to Adelphia.

      B.      <u>Deloitte's Certification of Financial Statements that Improperly Reflected the Rigas Family Securities Purchases.</u>

86. In the period from August 18, 1998 to January 22, 2002, the Rigas Family engaged in eleven transactions for the purchase of Company securities, all but three of which were made in connection with public offerings of the same or similar securities. These securities purchases entailed a total aggregate purchase price of approximately $1.9 billion.

87. On March 27, 2002, the Rigas Family for the first time publicly disclosed that the Rigas Entities which had purchased these securities on behalf of the Rigas Family had used funds from the Co-Borrowing Credit Facilities to finance the majority of their purchases. These borrowings were for the benefit of the Rigases and the Rigas Family Entities and to the detriment of Adelphia.

88. While this was shocking news to the public and to the independent members of the Board, Deloitte knew or should have known this fact. Contrary to its obligations as

an independent auditor, Deloitte enabled the Rigas Family to hide this information from the public and the independent members of the Audit Committee, either by concealing what it actually knew or closing its eyes to what it had good reason to know.

89. There was good reason for Deloitte to carefully scrutinize the Rigas Family's use of proceeds from the Co-Borrowing Credit Facilities. As noted above, Deloitte identified Adelphia as a high risk audit and the Co-Borrowing Credit Facilities were plainly high risk transactions. As Deloitte knew, these facilities were established using the credit worthiness of Adelphia and its subsidiaries, not the Rigas Family or the Rigas Co-Borrowing Entities, as it is clear that the Rigas Co-Borrowing Entities did not have the financial wherewithal to obtain over $4 billion of financing on their own. Nor did the Rigas Co-Borrowing Entities have the ability to repay all, indeed perhaps any, of the borrowings, to the extent that these facilities were drawn upon. For example, by 2001, Rigas Entities contributed only 61,335 (approximately 4%) of the total collateral of 1,566,847 cable subscribers under the Co-Borrowing Credit Facilities.

90. Given that Adelphia would be liable for any monies borrowed under these facilities, even for monies borrowed that provided no benefit to Adelphia, and the related party nature of the transactions, there was an obvious potential for abuse of the Co-Borrowing Credit Facilities by the Rigas Family and the Rigas Co-Borrowing Entities.

91. Deloitte had a duty to recognize these red flags and employ appropriate audit procedures and make and ensure that others made proper disclosures. If Deloitte had done so by merely reviewing the relevant entries in the books and records of the Company, the Rigas Family's self-dealing would have been clear, including the advancement of co-borrowed funds to Rigas Family Entities that were using these funds

37

to purchase Adelphia securities to Adelphia's detriment for the secret benefit of the Rigas Family.

92. Moreover, Deloitte's methodology for accounting for the Co-Borrowing Credit Facility Debt necessarily included an analysis of how the proceeds from the Co-Borrowing Credit Facilities were used. As a result, Deloitte should have known that the Co-Borrowing Credit Facilities funded Rigas Family securities purchases. Deloitte's apparent view of the co-borrowings was that, even though Adelphia was jointly and severally liable for amounts borrowed that benefited Rigas Co-Borrowing Entities, Adelphia should only be treated as a "guarantor" of such amounts. Even if this interpretation was correct, however, FAS 5 still required Deloitte to reach an independent judgment regarding the probability that Adelphia would be called upon to fulfill its guarantee and incur a future liability if the Rigas Co-borrowing Entities did not themselves repay the Co-Borrowing Credit Facility Debt.

93. Thus, under FAS 5, Deloitte was required to evaluate the ability of the Rigas Co-Borrowing Entities – the supposed "primary obligor" – to pay and evaluate whether the risk of non-payment by these entities was "probable," "possible" or "remote." This inquiry, had it been made, would have revealed that the Co-Borrowing Credit Facilities were funding securities purchases by the Rigas Family through various entities they controlled. Deloitte should have reviewed the assets purchased with the Co-Borrowing Credit Facility Debt to assess whether they provided sufficient collateral to insure satisfaction of the total co-borrowing debt attributed to the Rigas Family. And, since some of the primary assets purchased with these funds were the Adelphia securities, Deloitte, under FAS 5, would have discovered – assuming it did not already know – that

over $1 billion of co-borrowed proceeds were being transferred to Rigas Family Entities to purchase Adelphia securities.

94. Further evidence that Deloitte must have known about the Rigas Family's use of co-borrowing proceeds for securities purchases is the fact that Deloitte audited not only the financial statements of the Company and its subsidiaries, but also audited the special purpose financial statements given to the co-borrowing lenders, which statements consolidated the financial information of the Adelphia subsidiaries who were parties to the Co-Borrowing Credit Facility with those of the Rigas Co-Borrowing Entities.

95. Given this dual role, Deloitte knew the total amount of the co-borrowing debt attributed to the Rigas Co-Borrowing Entities. It also knew the value of cable systems held by the Rigas Co-Borrowing Entities and that certain of the co-borrowing draw downs by the Rigas Family Entities were not being used to fund the acquisition of these cable systems. And, given that Deloitte knew the amount of securities purchased by the Rigas Family Entities, Deloitte could easily determine that co-borrowing proceeds were being used to fund these purchases.

96. Indeed, Deloitte had to have known that the amount of Co-Borrowing Credit Facility Debt attributed to the Rigas Co-Borrowing Entities was well beyond the capital used to acquire cable systems and, in fact, corresponded with the capital needed by the Rigas Family to purchase Adelphia securities pursuant to written agreements that were also known to Deloitte. These facts demonstrate that Deloitte knew and should have known that over $1 billion of co-borrowing debt was being transferred to entities controlled by the Rigas Family to purchase Adelphia securities.

97. Given that the Rigas Family's massive security purchases were funded by draw downs on the Co-Borrowing Credit Facilities for which Adelphia itself was liable (as Deloitte either knew or should have known) substantial portions of Adelphia's shareholder's equity was illusory.  In these circumstances, GAAP is clear that Adelphia should not have recorded an increase in shareholder equity as a result of the sale of equity securities to the Rigas Family where, as here, the only consideration received by the Company for the equity securities was co-borrowed funds for which Adelphia was itself jointly and severally liable.

98. In particular, Emerging Issues Task Force No.85-1, "Classifying Notes Received for Capital Stock," which is based upon SEC Staff Accounting Bulletin No. 40, Topic 4-E, "Receivables from Sale of Stock," provides that a company that records a notes receivable as payment for its stock should record the note as a reduction to shareholder's equity, not as an asset.

99. Deloitte issued an unqualified audit report for Adelphia's consolidated financial statements for 2000, which reflected more than $500 million in shareholder equity attributable only to purchases of Adelphia stock by the Rigas Family using co-borrowed funds for which Adelphia received, at most, a receivable.  This violated Deloitte's duty to comply with GAAS.  Deloitte also failed to inform the Audit Committee of any issue existing with respect to these co-borrowings, let alone that such funds were being used for purchases of Adelphia stock.  This was in further violation of GAAS. And, Deloitte violated GAAS in connection with its review of Adelphia's quarterly financial statements beginning the first quarter of 2000, which also misstated Adelphia's shareholder's equity by hundreds of millions of dollars.

40

100.    Again, there can be no doubt that these issues raise precisely the type of "Significant accounting policies" that Deloitte promised it would "communicate to the Audit Committee," but did not. Had it done so, and had it communicated these issues to the Audit Committee and the independent directors of the Board, they could have and would have been able to reduce, if not eliminate, the damages suffered by the Company as a result of the misconduct of the Rigases and their accomplices.

C.    Deloitte's Failure to Identify and Report Rampant Self-Dealing and Its Certification of Financial Statements that Hid Such Self-Dealing.

101.    A central tool for much of the Rigas Family's self-dealing was the Adelphia Cash Management System ("CMS") which permitted the commingling of Adelphia funds with funds from Rigas Family Entities. In essence, the CMS was the centralized "piggy bank" that allowed the Rigas Family to loot the Company.

102.    The operation of the CMS resulted in continuous commingling of funds among the participants in the CMS, which included both Adelphia and its subsidiaries and the Rigas Entities and the Rigas Family. With certain limited exceptions, all receivables of the company and of many of its public and private affiliates were ultimately deposited into a central account of the Company and held at First Union Bank. Similarly, the Company had a central controlled disbursement account from which payables of the Company and its public and private affiliates were paid. In addition, affiliates of the Company held their own related accounts at First Union, and, less frequently, at other banking institutions. Monies were deposited from the Company's controlled disbursement account into these other accounts, giving the authorized signatories on those accounts more or less unrestricted access to use the funds deposited therein.

41



103.    The CMS was utilized by the Rigas Family to commit egregious

wrongdoing.  By way of example only:

a.    The CMS permitted the Rigas Family Entities to cause Adelphia to fund
      their expenditures on an immediate basis without any cash outlay required
      by the Rigas Family themselves.  Among other things, the Rigas Family
      used the Adelphia CMS to purchase cable and other assets outright and to
      lend funds to Rigas Family Entities for the purpose of acquiring real
      estate, an NHL hockey team and a golf course, each of which was
      acquired on behalf of entities owned and controlled by them, not
      Adelphia.  In essence, the CMS was a personal checkbook that permitted
      the Rigas Family to use an Adelphia bank account for any purpose
      whatsoever to the Rigas Family's benefit based on nothing more than
      undocumented promise to pay.

b.    The CMS was not only a personal checkbook for the Rigas Family and the
      Rigas Family Entities but it also had the added benefit for the Rigas
      Family that, to the extent they were ever required to reimburse the
      Company at all, they, and the entities they controlled, did not have to do
      so on any scheduled basis.  During the time funds were advanced, all that
      Adelphia received in return from the Rigas Family and the Rigas Family
      was an implicit IOU that they would make good on their debts to the
      Company at some unspecified later date.  This *de facto* borrowing by the
      Rigas Family occurred without Board approval, in clear contravention of
      the Company's Bylaws and Delaware law, without proper documentation,
      and to the detriment of the Company.

c.    The CMS permitted the Rigas Family Entities to "settle" their debts to
      Adelphia through illusory journal entries that, on a quarterly basis
      beginning in September 2000, purported to "reclassify" debt from the
      books of an Adelphia subsidiary to the books of one of the Rigas Family
      Entities even though the Adelphia subsidiary in fact remained jointly and
      severally liable for this debt even after "reclassification."  Thus, even
      though the Rigas Family Entities were released of certain obligations to
      Adelphia pursuant to this so-called quarterly reclassification process,
      Adelphia did not receive equivalent value (if any value) in return.  In the
      third quarter of 2000 alone, approximately $200 million of Rigas Family
      Entity receivables to Adelphia were "settled" in this way.  From
      September 30, 2000 through December 31, 2001, the Rigas Family
      Entities purported to settle approximately $478 million of its obligations to
      Adelphia through these reclassification transactions.

d.    The CMS permitted entities controlled by the Rigas Family to purchase
      securities from Adelphia without paying any cash whatsoever.
      Specifically, the Rigas Family caused Adelphia to issue stock and notes to

42



entities they controlled and the only "consideration" that Adelphia received in return was a journal entry in the Adelphia general ledger that showed that certain debt equal to the price of the securities at issue which had been previously attributed to an Adelphia subsidiary was henceforth "reclassified" on Adelphia's books and records as the debt of a Rigas Family Entity. Notwithstanding this reclassification, Adelphia remained jointly and severally liable for all the debt, including the amounts that had been "reclassified" to the Rigas Family Entities as purported consideration for these security transactions. In all, over $800 million worth of Adelphia securities were issued to the Rigas Family or their designated Rigas Family Entities in these cash-less transactions.

e.    The CMS permitted the Rigas Family to avoid having to make good on certain obligations to Adelphia by permitting the Rigas Family and the entities they controlled to offset amounts due and owing to Adelphia or its subsidiaries with amounts that Adelphia or its subsidiaries might owe to the Rigas Family (and the entities they controlled) themselves. Thus, if one Rigas entity owed $100 million to Adelphia and another Rigas entity was owed $50 million by Adelphia, the Adelphia CMS would net these amounts and characterize the total amount owed by the Rigas Family Entities as only $50 million even when different legal entities with different ownership structures were involved.

f.    The CMS was used by the Rigas Family to contract with service providers owned and controlled by the Rigas Family and then paid such service provider fees in excess of those which would be paid if the services were negotiated in an arms-length transaction. For example, the Rigas Family caused Adelphia to contract with Rigas-owned vendors for the purchase of, for example, furniture (through Dobaire Designs and Eleni Interiors, Inc.) and vehicles (through Preston Motors). All of the furniture and some of the lighting fixtures and railings for the Company's Operations Center were to be provided by Eleni and Doris Rigas was to handle design issues for the boardroom. In fact, regional vice presidents were told directly by Doris Rigas that they had to purchase their furniture from Eleni. The monies paid by Adelphia to such Rigas Family-controlled entities are in the tens of millions of dollars.

g.    The CMS provided millions of dollars of "funding" to John Rigas on an annual basis, including by permitting the Rigas Family to cause millions of dollars to be wired to entities they controlled which then, often on the exact same day, wired the exact same funds to John Rigas himself. For example, Highland Holdings – a Rigas Family Entity – routinely drew down on the CMS and then distributed the funds to John Rigas and other Rigases in amounts totaling over $50 million.



104.    These aspects of the Adelphia CMS were not hidden from Deloitte. To the contrary, while the CMS was not disclosed to the Audit Committee or to the independent directors, Deloitte not only was aware of the CMS but also had access to the information contained in the CMS which made clear much of the improper transactions engaged in by the Rigas Family. Indeed, the CMS was at the very heart of Adelphia's treasury system, and journal entries and cost centers in Adelphia's general ledger system tracked openly and systematically, the transactions with related parties discussed above. In short, the CMS was a road map for Deloitte that would have directed it to most, if not all, of the self-dealing committed by the Rigas Family. (A detailed description of many of these related party transactions involving the Rigas Family is set forth in the Current Reports on Form 8-K filed by Adelphia with the SEC on May 24, 2002, on June 10, 2002, and on June 14, 2002, which are annexed hereto as Exhibit 4, 5, and 6, respectively.)

105.    Deloitte had no excuse for just ignoring this roadmap, particularly given Deloitte's recognition that Adelphia was a "high risk" audit, which required Deloitte to expand the scope and independent verification procedures of its audit to focus on areas of particular sensitivity and to demand more complete access to (and gain a heightened understanding of) the Company's books and records. Moreover, the CMS was rife with multiple related party transactions that, pursuant to GAAS, Deloitte was required to scrutinize with particularity. Indeed, in its "Audit Overview" regarding the 2000 audit, for example, Deloitte had itself identified "related party transactions" (which were rampant throughout the CMS) as an audit "Risk Area" and promised to focus particular attention on such issues.

106.     In these circumstances, the CMS should have been a focal point of Deloitte's audit scrutiny, and Deloitte should have thoroughly analyzed and understood this unorthodox cash system. The structure of the CMS was in and of itself highly unusual given that it co-mingled revenues and expenses from companies that were not included within the consolidated financial statements of Adelphia and that had separate ownership. The unique and complex nature of the CMS, coupled with the sheer number of related party transactions, would have put any reasonable auditor on notice of the need to construct specific audit plans and tests to ensure that there were adequate controls in place to protect against the risk of self-dealing or abuse. Had Deloitte properly audited this facet of the Company and brought to the attention of the Audit Committee and the independent directors the multiple issues readily apparent from the existence of the CMS and from the information contained in the CMS, the Rigas Family's use of the CMS as their personal piggy bank and their massive self-dealing could have been and would have been prevented saving Adelphia hundreds of millions, if not billions, of dollars in damages.

107.     Nevertheless, Deloitte issued unqualified audit reports for Adelphia's consolidated financial statements notwithstanding the multitude of issues raised by the CMS. This violated Deloitte's duty to comply with GAAS. Deloitte also failed to inform the Audit Committee of any issue, with respect to thee CMS. This was in further violation of GAAS.

D.     Deloitte's Certification of Financial Statements that Improperly Extinguished Adelphia Debt.

108.     As discussed above, the Rigas Family used the CMS to "reclassify" certain debt from an Adelphia subsidiary to one of the Rigas Family Entities. This

45

process was used to eliminate over $400 million in IOU's from the Rigas Family to Adelphia, and to provide "consideration" for over $800 million of securities purchases by the Rigas Family. Critically, once this debt was "reclassified" in the Adelphia CMS, Adelphia no longer reported the debt on its consolidated balance sheet, treating the general ledger entries that recorded these transactions as the equivalent to a formal assumption of the debt by the Rigas Family Entities. Although this system of debt classification gave the appearance of eliminating intercompany balances owed by the Rigas Entities for financial reporting purposes, the system never entailed the quarterly repayment of amounts owed. Moreover, the elimination of recorded payables to Adelphia allowed the Rigas Family to obscure the true value of activity between Adelphia and Rigas Entities that had taken place over the course of the quarter by reporting only outstanding balances.

109.    This process was a clear violation of GAAP, which includes strict guidelines governing the extinguishment of debt. In particular, Financial Accounting Standard ("FAS") No. 125 (recently superseded by FAS 140 which includes the same language) provides that debt is extinguished from a balance sheet only when (a) the debtor pays its creditor and is relieved of its obligation for the liability; or, (b) the debtor is legally released from being the primary obligor under the liability either by the obligor or creditor.

110.    Here, neither condition was satisfied in connection with the internal reclassification of debt between Adelphia and the Rigas Family Entities. Notwithstanding the journal entries that recorded these reclassifications in the CMS, Adelphia's position *vis-à-vis* its lenders remained the same, both before and after the

reclassification; Adelphia and its subsidiaries continued to be liable to the banks for precisely the same amounts as before the reclassification. Thus, the reclassification process did not cause any Adelphia obligations to be legally released, and, Adelphia's consolidated balance sheet should have (but did not) remained precisely the same. Deloitte, however, never raised these GAAP violations with Audit Committee or the independent directors. Given the enormous sums of money involved (more than $1 billion) and the open and notorious documentation of these transactions in the CMS, Deloitte could not have reasonably remained ignorant of these transactions, and its failure to report such clear violations of GAAP to the Audit Committee, and its willingness to issue unqualified audit reports, was a clear violation of its responsibilities as an independent auditor.

E.   Deloitte's Certification of Financial Statements that Improperly Set-Off Receivables and Payables with Different Legal Entities.

111.   Similarly, the netting of related party receivables in the Adelphia CMS discussed above was another clear violation of GAAP that Deloitte must have known about but ignored. The Company's general ledger system in more recent years reflected rapidly growing balances between the Company and the Rigas Family and the Rigas Family Entities. The Company's detailed accounting records show hundreds of millions of dollars of balances due and owing between the company and the Rigas Family and Entities. However, the Company externally reported only the net position of the company with respect to the amounts due and owing to the Rigas Family and Rigas Entities.

112.   Accounting Principles Board Opinion No. 10 and FAS 39 govern this issue APB 10 provides: "It is a general principle of accounting that the offsetting of

assets and liabilities in the balance sheet is improper except where a right of setoff exists."

113.    Here, however, there was no legal right of set off with respect to any of the receivables and payables owed to and from Adelphia and the Rigas Family or the Rigas Family Entities. APB 10 and FAS 39 thus do not permit the netting of the payables and receivables from the different Rigas entities. This notwithstanding, the CMS treated these related party receivables and payables on a net basis, and Adelphia's consolidated balance sheet only reflected the net receivable owed by the Rigases to Adelphia.[2] In this way, the Rigas Family was able to hide the full magnitude of the related party obligations flowing back and forth between Adelphia and the Rigas Family and the entities they controlled. Deloitte must have known about this practice, which was readily apparent from the face of Adelphia's general ledger and balance sheet and which involved huge sums of money. Deloitte did not advise the Audit Committee or the independent directors of this improper practice or of any concern related to this practice. Indeed, rather than reporting it, or seeking to have the practice discontinued, Deloitte, in clear violation of GAAS, continued to issue unqualified audit reports on consolidated financial statements that did not comport with GAAP.

F.    Deloitte's Certification of Financial Statements that Improperly Characterized Debt as Long Term Even When Adelphia Was in Violation of Debt Covenants.

114.    The Rigas Family's access to Adelphia's credit through the Co-Borrowing Credit Facilities and through the CMS was the linchpin of their self-dealing. Without this

---

[2] On a net basis, the Rigas Family and the entities they controlled always owed money to Adelphia and not vice versa. Thus, the netting process always showed a



flow of funds into the Company, the Rigas Family would not have been able to extract

millions, if not billions of dollars out of the Company.

115.    Adelphia's credit facilities included debt covenants that set forth a formula

for the calculation of the amount that could be borrowed at any point in time.  These

covenants restricted the Company's ability to borrow unless the total borrowings were

less than a set ratio in relation to the Company's earnings before interest, taxes,

depreciation, and amortization ("EBITDA"), which is a measure of the Company's cash

flow.  In this way, the Company's lenders sought to insure that its borrowings were

limited to amounts that the Company could reasonably be expected to pay based on its

cash flow.  The Company was required to provide certificates of compliance with these

debt covenants on a quarterly basis.  Failure to certify compliance could limit or cut off

altogether the Company's access to further credit, and could accelerate Adelphia's

obligation to repay amounts already borrowed.

116.    Deloitte had a professional responsibility to plan its audit to test these type

of covenant calculations.  Even in normal circumstances, GAAS makes absolutely clear

that an auditor must not let untested client representations "substitute for the auditing

procedures necessary to afford a reasonable basis for" the auditor's "opinion on the

financial statements."  Given the "high risk" audit nature of the Adelphia audit, Deloitte

was required to test and understand the basis of any debt calculations.

117.    Indeed, the reliability of Adelphia's debt covenant calculations was central

to Deloitte's certification of the fairness and accuracy of the Company's consolidated

financial statements.  This is because, as noted above, Adelphia's failure to comply with

receivable from the Rigas Family and the entities it controlled to Adelphia.

 

these covenants could result in the acceleration of what was otherwise long-term debt, requiring immediate repayment by the Company, and/or the cutoff of available financing that was necessary for Adelphia to remain a going concern. And, Deloitte plainly understood the importance of a careful audit of covenant compliance issues since, for example, its "Audit Overview" for the 2000 audit expressly identified "Debt Compliance" as a "Risk Area". Deloitte even represented that it would "recalculate compliance with the respective covenants on a test basis" during its audit.

118.    In fact, Adelphia was consistently out of compliance with the debt covenants in certain of its central loan agreements. As set forth in greater detail below, the calculations were manipulated at the direction of the Rigas Family to keep the flow of funds coming, thereby permitting Adelphia and its subsidiaries to both borrow more than they were contractually entitled to borrow, and to borrow at a rate lower than the rate at which they were contractually permitted to borrow. These manipulations were done to benefit the Rigases and their scheme of insuring a continuation of their ability to draw on co-borrowing agreements for their personal benefit and to the detriment of Adelphia. In addition, Adelphia's compliance certificates were inadequate on a variety of other levels, including that they were not timely filed, not properly authorized and failed to include supporting financial calculations where required.

119.    A review of Adelphia's compliance certificates, liquidity calculations and other source documentation would have readily revealed this wrongdoing. But Deloitte, in its audit, either never discovered the clear misconduct, or simply ignored it. Either way, Deloitte violated GAAS.



120.    Deloitte never informed the Audit Committee or the independent directors that the debt covenants were not being complied with or that the calculations were being manipulated to make the Company appear to be in compliance.  Upon information and belief, Deloitte likewise never informed the lending banks that the Company was not in compliance with its debt covenants.  Each of these persons and entities, had they been informed, was in a position to have stopped the manipulations and improper reporting of compliance well before all of the damage that has occurred to Adelphia took place. Indeed, the Company had publicly announced a policy of reducing, instead of increasing, its leverage, further showing the concern with which the independent directors would have reacted had they been informed of the manipulation of calculations that concealed the increased leverage of Adelphia by the Rigases.

121.    Deloitte could not reasonably certify the fairness and accuracy of Adelphia's consolidated financial statements unless it had confidence that Adelphia had complied with the debt covenants.   Moreover, if Deloitte had recognized (as was in fact the case) that Adelphia was not in compliance with certain covenants such that certain debt needed to be re-characterized as short-term debt, Deloitte was required to do further analysis and testing to insure Adelphia was a "going concern."  Deloitte, however, issued unqualified audit opinions without performing any such analysis or testing of the solvency of Adelphia.

122.    That Deloitte willingly issued unqualified audit opinions even in the face of clear and easily detectable non-compliance with certain critical debt covenants only further reveals Deloitte's systematic failure to meet its professional responsibilities and contractual obligations as Adelphia's independent auditor.

51



G.   Deloitte's Failure to Identify and Report Intentional Misstatements in the Adelphia Financial Statements.

123.   In addition to falsifying Adelphia's debt covenant calculations, the Rigas Family and the Rigas Management[3] also engaged in outright fraud in order to misstate Adelphia's reported financial results, including the EBITDA numbers that were critical to the Rigas Family's ability to continue to access the co-borrowing credit facilities. Indeed, these manipulations of EBITDA effectively permitted the Rigas Family to continue their scheme of utilizing Adelphia's credit to access the CMS for their own personal benefit and to the detriment of Adelphia, including by allowing them to maintain their voting control of Adelphia, keeping open their ability to draw on the co-borrowing facilities, and preventing further market scrutiny that would have occurred had Adelphia not just met expectations and that could have revealed and put a stop to the Rigas Family scheme.

124.   Examples of certain of these false and misleading statements include:

a.   Manufactured Marketing Support Charges. Under the direction of the Rigas Family, beginning in 2000, Adelphia entered into two separate agreements with providers of digital converter boxes. The existence of those agreements and their terms were publicly disseminated through a series of press releases issued in May and June of 2000. Through these two relationships, the Company agreed to increase the price paid per "set-top" by approximately $35 million in 2000 and $54 million in 2001 and, at the same time, would receive approximately the same amount back from the vendors in the form of "marketing support." Upon information and belief, in exchange for agreeing to engage in this sophistry, these vendors demanded that the Company purchase extra converter boxes, which the Company agreed to do. The Company back-dated the agreements in order to claim the "marketing support" kickbacks in the fourth quarter of 2000. Adelphia did not

---

[3]   The term "Rigas Management" is used to refer to John Rigas, Tim Rigas, Michael Rigas, James Rigas, James Brown, and Michael Mulcahey.



provide any services in exchange for such payments, which equaled approximately $90 million over 2000 and 2001. The "marketing support" component (or kick-back) was improperly treated as a reduction of the Company's operating expenses and the payments for the converter boxes were capitalized as inventory.

b.    Overstatement of EBITDA. The Rigas Management or others acting under their direction and control caused further misrepresentations to be made in the Company's financial statements, filings, and other publicly available materials by manipulating the Company's EBITDA so that it would satisfy the expectations and estimates of the investment and financial communities:

i.      In an effort to show continued growth, beginning in or about 2000, the Rigas Management caused the Company to charge the Rigas Entities so-called "management fees" that were above the 5% regular management fee that the Company was already receiving. To offset the "payments" from the Rigas Entities, the Company decreased the Rigas entities' interest expense under the Co-Borrowing Credit Facilities. The net result of these transactions was to artificially inflate the Company's EBITDA, thereby misrepresenting the Company's true financial situation.

ii.     The Rigas Management recorded "fees" other than management fees in order to inflate the Company's quarter-end EBITDA. The Rigas Management made entries into the Company's books and records to record the payment of "placement fees" from Rigas Entities. Ostensibly, the placement fees were intended to compensate Adelphia for the assistance it provided in connection with various asset acquisitions and in the respective Rigas Entities obtaining funds from the Co-Borrowing Credit Facilities. No cash, however, actually flowed from the Rigas Entities to Adelphia and the Rigas Entities did not as a result of the fee transaction incur any further debt. Rather,



these fees were recorded simply by journal entries and the only effect thereof was to inflate the Company's EBITDA.

iii.     In reporting results during 2001 and prior periods, the Company capitalized certain labor expenses, such as those associated with reconnecting disconnected subscribers and operating customer service centers and other overhead items. These labor expenses should have been expensed rather than capitalized.   As a result of capitalizing these expenses, the Company's EBITDA for 2000 and 2001 was inflated.

iv.     During 2000 and 2001, the Rigas Management caused the Company to enter into transactions with Adelphia Business Solutions Inc. ("ABIZ"), various Rigas Entities, and/or other parties, which had the effect of increasing the Company's reported EBITDA.  These transactions included increasing the management fees charged by the Company to the Rigas Entities, transferring expenses from the Company to a joint venture controlled by ABIZ, and entering into arrangements with third parties under which the Company was allowed to accrue additional fee income, which had the effect of inflating EBITDA in 2001 and 2000.

v.     Certain interactive cable providers, whose services were carried on the Company's cable television systems, paid the Company with their financial instruments, the value of which may have become impaired over time. In their disclosure of operating results for 2001, however, the Rigas Management caused the Company not to report the impairment of the value of these financial instruments, and instead to report payments from these interactive cable service providers in revenue. As a result, revenue and EBITDA were inflated in 2000 and 2001.

vi.  Adelphia had contracts with providers of
cable television programming under which
Adelphia made fixed payments over a
number of years. The Rigas Management
calculated the amount of that payment per
subscriber to be charged as an expense in
any year by estimating the number of
subscribers who would receive the service
over the life of a contract and dividing that
figure into the total amount paid by the
Company over the life of the contract. This
method resulted in a lower expense during
the early years of a contract than if the
Company had simply reflected the contract
payments due in such years as an expense.
The Rigas Management's practice with
respect to these programming charges had
the effect of increasing EBITDA by
approximately tens of millions of dollars in
2001 and 2000, compared to amounts
reflected in previously announced results.
Not only did the Rigas Management report
inflated subscriber numbers, they also
reported revenue from actual subscribers
during time periods in which the subscriber
was receiving free service in connection
with a new or enhanced service
arrangement. This practice also inflated the
Company's EBITDA by million of dollars in
2001 and 2000.

vii. The Rigas Management or others acting
under their direction and control artificially
adjusted the Company's bad debt expense in
order to further manipulate EBITDA.

d.  <u>Manufacturing Reduced Costs</u>. The Rigas
Management used ABIZ and other joint ventures to
absorb significant Company costs. At the end of
each quarter, the Company and ABIZ were
supposed to net out their respective share of costs.
Beginning in or about 2001, however, one or more
of the Rigas Management began allocating to ABIZ
costs that were attributable to and should have been
recorded on the books and records of Adelphia.



The Rigas Management concealed their actions by distributing these costs to certain ABIZ cost centers, thereby minimizing the risk that any one cost center would show an unwarranted "spike." In addition, Adelphia was in a joint venture with PECO. PECO consistently performed better than Adelphia so Adelphia attributed to PECO costs that should have rightfully been incurred by Adelphia.

e.   <u>Artificially Inflated Rebuild Percentages</u>.  One metric by which the investment and financial communities measure the success and growth potential of cable and telecommunications companies is by analyzing the company's "rebuild percentage," which by industry convention is a measure of the percentage of a company's infrastructure that is broadband and two-way capable.  Because the rebuild percentage is inversely related to capital expenditures, reporting higher rebuild percentage serves the dual purpose of making the company appear more attractive to analysts and investors and also reducing its capital expenditures.  This became a particularly problematic issue for the Company because the assets that the Company acquired during the 1999 acquisitions were dated cable systems that required substantial capital to remain competitive as a function of rebuild percentage.  In an effort to meet or exceed Wall Street expectations, the Rigas Management developed and implemented a plan to manipulate the Company's EBITDA and other financials, in part, to keep the Company's capital expenditures within acceptable bounds.  As part of their plan, the Rigas Management reported artificially inflated rebuild percentages to analysts during conference calls and to the public through various disclosures.

f.   <u>Inflated Subscriber Numbers</u>.  In or about the first or second fiscal quarters of 2000, the Rigas Management began inflating the subscriber numbers that the Company reported.  Subscriber numbers are used by the lending, investment, and regulatory (calculation of franchise fees) communities to assess the market potential and risks associated with cable and telecommunications

companies such as Adelphia. The Rigas
Management inflated Adelphia's subscriber
numbers by including subscribers from the
following: (i) one or both of Adelphia's Brazilian
joint ventures; (ii) cable systems owned by or
affiliated with Adelphia in Venezuela; (iii)
subscribers of the high speed data service
(Powerlink), who are not cable subscribers; (iv)
home security subscribers; (v) cable acquisitions,
such as the Cleveland acquisition; (vi) subscribers
of cable systems owned and operated by the Rigas
Family Entities; (vii) double counting subscribers
who subscribe to both basic cable and premium
channel service; and, (viii) digital subscribers,
which the Rigas Management reported by the
number of digital boxes in a household even if the
household had more than one box. Rigas
Management used the Company's S-Base computer
system to carry out their plan to inflate the
subscriber numbers by setting up a separate account
in the system that recorded and supplied the
adjusted subscriber numbers. Indeed, Rigas
Management and others at Adelphia under their
direction and control had one set of pre-adjustment
subscriber numbers that was kept internally and a
second set of post-adjustment subscriber numbers
that Rigas Management disclosed in press releases
and official filings.

g.  <u>Inconsistent Accounting for a Brazilian Transaction</u>.
The Rigas Management caused the Company to
invest in two Brazilian ventures, Brazil S.A. and
S.T.V. At first, neither entity was consolidated on
Adelphia's balance sheet. Though the Company
advanced equal funds to the two ventures, it
eventually consolidated only S.T.V. because S.T.V.
is more established and has some revenue. Brazil
S.A., however, is a new endeavor, and therefore,
has high capital expenditures and little revenue.

h.  <u>Manipulating Debt Compliance</u>. In addition to
inflating EBITDA to satisfy Wall Street, the Rigas
Management also caused Adelphia to make false
reports to the Co-Borrowing Credit Facility lenders
concerning the Company's debt compliance. Upon
information and belief, the Rigas Management did

57



so by:

i.    accruing expenses over long periods of time based on what debt compliance and EBITDA required, rather than the facts as analyzed under GAAP allowed;

ii.    manipulating affiliate interest. The CMS allowed for the possibility of discretionary interest on positive net receivables by a particular entity. The affiliate interest payment would not affect Adelphia's consolidated balance sheet, only the balance sheet for the other affiliated entity. Under credit facilities, the participating entities could record affiliate interest up to 10% as revenue for purposes of calculating earnings for the debt covenant compliance ratios. When it appeared that the Company would be out of compliance, the Rigas Management would order that journal entries be made recording affiliate interest payments at certain rates. Because the interest payment was recorded as revenue for the participating entity, it raised the earnings of all entities participating in the particular credit facility. The interest payments, on the other hand, were made by the Company, which was not a participant in any of the credit facilities;

iii.    reversing management fees. In order to increase the earnings of entities participating in a particular credit facility, the Rigas Management would arrange for management fee entries to be reversed. The effect of the entry, therefore, was to increase the earnings of the entity that was a party to Co-Borrowing Credit Facility; and,

iv.    Distributing regional expenses. Regional managers were responsible for reporting to the Company expenses from their respective region so that those expenses could be gathered in the Company's system and reported on the Company's disclosures. If it



appeared that the Company was at risk of
failing to satisfy the debt compliance test,
however, the Rigas Management would
direct others not to enter the expenses and to
instead leave the expenses in the regional
corporate cost center.

125.    As noted above, auditors have an express responsibility "to plan and
perform their audit to obtain reasonable assurance about whether the financial statements
are free of material misstatement, whether caused by error or fraud," Codification AU §
110. This is particularly true in a high risk audit like Adelphia.

126.    Had Deloitte properly performed its audit in conformance with GAAS,
this litany of misconduct by the Rigas Management could have and should have been
detected. Certainly, during a properly performed audit, at least some of the acts or
transactions described herein would have been identified by competent auditors.

127.    For example, the manufactured marketing support charges should have
been readily detectable to Deloitte had it merely compared the marketing expenses of
Adelphia with those of other large cable operators in the industry; this would have
provided evidence of the disproportionate amounts received by Adelphia in kick-backs.
Furthermore, Deloitte could have analyzed the cost of cable boxes with those acquired by
Adelphia in prior years or with those acquired by other large cable operators in the
industry during the same period; had it done so, Deloitte again would have seen that the
prices putatively agreed upon were inflated. Or, Deloitte merely had to look at the
Company's own records to see what it had received in the past. In any case, Deloitte
would have discovered the patent wrongdoing perpetrated by the Rigas Family.
Nonetheless, Deloitte never questioned these charges, never reported any concern to the
Audit Committee, and continued to issue unqualified audit reports on Adelphia's

consolidated financial statements. Deloitte's conduct is particularly glaring given that

Deloitte had itself identified "Significant Non-routine Transactions" as a "Risk Area"

warranting special attention.

128.    Similarly, the type of quarter-end adjustments that occurred at Adelphia

for debt compliance and other purposes are a known trouble spot in audits and, as

Deloitte acknowledged in presentations it made to the Audit Committee were a "risk

area" that required an "audit response." Here, had Deloitte's "audit response" conformed

with GAAS and had Deloitte properly reviewed these quarter-end adjustments, Deloitte

would have seen, among other things, (i) a specific general ledger account used to make

quarter ending adjustments; (ii) adjustments for "affiliate fees" and other suspicious

revenues that were made well after the quarter-end; and, (iii) adjustments, including post-

closing adjustments, that, on aggregate, were able to bring Adelphia into compliance with

debt covenants that would otherwise have been violated. All these items, as well as

others, were telling red flags to Deloitte that something was very wrong. These kind of

EBITDA adjustments fed directly into Adelphia's borrowing base and every $1 million

increase in EBITDA could have a $7 - $8 million dollar effect on Adelphia's increasingly

spent credit limits (as a result of the debt covenant multipliers). Nonetheless, Deloitte

never questioned what was happening, never reported a concern to the Audit Committee,

and continued to issue unqualified audit reports on Adelphia's consolidated financial

statements.

129.    Taken together, the type of intentional misstatements directed by the Rigas

Family discussed above, and others, caused Adelphia to announce in its June 10, 2002,

Form 8-K that it had determined that it would make certain adjustments to its results of

operations for 2000 and 2001, including adjusting 2000 EBITDA of $1.202 billion, as previously reported, to $1.042 billion, and adjusting 2001 EBITDA from $1.409 billion, as previously reported, to $1.199 billion. A complete list of the adjustments reflected in these revised operating results, as well as other revisions to previous public statements that had been made at the direction of the Rigas Family, are identified in this Form 8-K, a copy of which is attached as Exhibit 5 hereto.

130. Consistent with its professional responsibilities and contractual obligations as Adelphia's auditor, Deloitte should have identified and reported to the Audit Committee and the independent directors each of the items discussed in the June 10 Form 8-K, but it did not. Had Deloitte made such disclosures, the Audit Committee and the independent directors could have and would have prevented the reporting of the fraudulent financial results that the Rigas Family used to effect their self-dealing.

H.    Deloitte's Failure to Report Internal Control Deficiencies

131. Deloitte violated GAAS through its failure to bring known egregious internal control deficiencies to the attention of the Audit Committee, or to even document such deficiencies in the kind of "management letter" that auditors routinely provide to their client to report areas where improvement of internal controls should occur.

132. Almost every aspect of Adelphia's business that Deloitte audited presented glaring internal control deficiencies, from the systematic commingling of Adelphia and the Rigas Family Entities funds, to the thousands of unreviewed and undocumented related party transactions in the CMS, to the journal entries that purported to transfer hundreds of millions, if not billions of dollars of debt, without any meaningful documentation whatsoever.

61



133.    Clearly, under applicable standards and principles and under its engagement letter, Deloitte had both an affirmative obligation to make known to the Audit Committee and the independent directors the kind of illegal and improper conduct that was rife at Adelphia, as well as an affirmative obligation to inform the Audit Committee of the significant deficiencies in the design or operation of internal control that could adversely affect the Company's ability to record, process, summarize, and report financial data consistent with the assertions of management in financial statements.

134.    During the relevant time period, Deloitte never disclosed to the Audit Committee or the independent directors any concern regarding the related party transactions, the CMS, compliance with debt covenants, the manner in which Adelphia's assets were used or reported or any other fact that would have caused them to take corrective action on behalf of the Company.

135.    Indeed, during the relevant time period, Deloitte never issued a management letter or otherwise disclosed any material weaknesses in the internal controls, the reporting of co-borrowing debt or any other material issue regarding the financial statements of Adelphia.

136.    For example, Deloitte was inactive in the face of an egregious related party transaction that involved the construction of a championship quality golf course in Coudersport, at least three hours away from any major population center.  In connection with this golf course, the Rigas Family acquired approximately 980 acres of land, only 169 acres of which were titled to entities owned by Adelphia.  The remaining acres were deeded to entities owned by the Rigas Family.  The Rigas Family then caused Adelphia to expend millions of dollars in developing a golf course on this land, which, even now,

and millions of dollars of expenses later, remains unfinished. Indeed, it is projected that tens of millions of dollars would be necessary to complete the project. Given that Coudersport already has one golf course and only approximately 3,000 residents, Deloitte should have, at a minimum, had serious questions about the rationale for the golf course project. These questions should only have been magnified by the self-dealing manner in which the property for the course was acquired and deeded, and by the fact that the clear intended beneficiary of this project was Timothy Rigas, who was known to be an avid golfer. In fact, he would frequently use Company planes to fly across the country to play golf on various courses, and several memberships were purchased by Adelphia for Tim Rigas's personal use.

137.    Deloitte was similarly indifferent upon discovering that the Rigas Family caused Adelphia to falsify documents to memorialize transactions that never happened. These documents were created in connection with the purchase of $423 million of Adelphia securities on October 20, 2001. According to the cross-receipt signed by Timothy Rigas and one of his staff that was supposed to memorialize this transaction for Adelphia's files, the Rigas Family paid cash for these securities. According to draw-down and pay-down notices that were also created to memorialize this transaction, the source of funds for this purchase was a draw-down on a Co-Borrowing Credit Facility administered by the Bank of Montreal and Adelphia used the proceeds from this transaction to pay-down the same Co-Borrowing Credit Facility. Taken together, these documents simulate a transaction where cash was transferred from the Bank of Montreal facility to Adelphia and then back to the Bank of Montreal.

138.   No cash, however, was actually involved in these securities purchases. The cross-receipt stating that Adelphia received cash was false.  And, the pay-down and draw-down notices placed in Adelphia's files were never sent.

139.   This false documentation was discovered during the Company's investigation into the Rigas Family's wrongdoing, and Deloitte was promptly informed on May 9, 2002.  At that time, Deloitte stated that it knew that these documents were false and learned of the same in connection with its fieldwork relating to the audit.

140.   Remarkably, even despite this admitted knowledge, Deloitte had never brought this fraudulent, and potentially criminal conduct, to the attention of anyone on Adelphia's Audit Committee or the independent members Board.

141.   And, as noted above, Deloitte's presentation to the Audit Committee on February 28, 2002 is probative of Deloitte's failure to inform the Audit Committee or the independent directors of the blatant self-dealing and other misconduct by the Rigas Family.  This meeting had been initiated by Erland Kailbourne who took over as chairman of Adelphia's Audit Committee in August of 2001 and, since that time, had requested that Deloitte increase the quality of its communications to the members of the Audit Committee.

142.   One of the purposes of this meeting was for Deloitte to give a full and frank assessment of its audit process.  In making its presentation, Deloitte touched on issues regarding related party transactions, the Co-Borrowing Credit Facilities, non-standard journal entries, and significant non-routine transactions.  Deloitte understood that information regarding these types of issues was important to the Audit Committee and advised that it had considered them in the planning of its audit.



143.    Even at this late date, and despite the fact that the Audit Committee did not include a single Rigas Family member, and even despite the fact that related party matters were expressly on the table as a discussion point about which the Audit Committee wanted to be briefed, Deloitte's business as usual attitude carried the day. Except for a recommendation (two years too late and still inadequate) to increase the level of disclosure regarding the Co-Borrowing Credit Facilities, Deloitte did not report to the Audit Committee with respect to any of the misconduct described in this Complaint.

144.    Indeed, nothing in Deloitte's presentation reflected any sense of alarm by Deloitte that anything was materially wrong with the financials of the Company or its internal controls. The minutes of the February 28, 2002 meeting show that after discussion of "issues surrounding recent events with Enron and the lessons learned," Deloitte "indicated that" it "was comfortable with Adelphia's accounting and proposed disclosures." Moreover, after identifying its "summary of proposed audit adjustments" – all of which were not material – Deloitte readily assured the Audit Committee "they were not aware of any other significant points as it related to the audit or the Company's financial statements." And, finally, when Mr. Kailbourne asked Deloitte if they had a management letter for the current year, the lead Deloitte partner told the Audit Committee that "there was no formal management letter" but that Deloitte "did have a couple of points for management discussion," which Deloitte said it would "share with the committee" at some unspecified "future meeting."

### V.    The 2001 Form 10-K

145.    After the February 28, 2002 meeting, Deloitte continued to finalize its 2001 audit, and as of March 27, 2002, the date when Adelphia issued its earning release for fourth quarter and full year 2001, Deloitte informed Adelphia that it was prepared to issue an unqualified report that, like its prior audit reports, certified that: (a) Deloitte had audited Adelphia's financial statements in accordance with GAAS; (b) Deloitte had planned and performed those audits "to obtain reasonable assurance about whether the financial statements are free of material misstatement"; (c) in Deloitte's opinion, Adelphia's financial statements "present fairly, in all material respects, the financial position" of Adelphia "in conformity" with GAAP; and, (d) its audits provided a "reasonable basis" for its opinions.

146.    Then, in a March 27, 2002 earnings release, Adelphia announced for the first time that $2.3 billion of debt borrowed by the Rigas Co-Borrowing Entities under the Co-Borrowing Credit Facilities was not reflected as debt on the Company's balance sheet. On this day, Adelphia also for the first time announced that a portion of that debt had been advanced to members of the Rigas Family to finance insider equity purchases.

147.    As evidenced above, this information had long been known to Deloitte and it never once failed to issue an unqualified audit report despite the fact that the consolidated financial statements hid this off balance sheet debt, and the financing of the insider stock purchases. Indeed, Deloitte, together with the Rigas Family, always agreed on language in Adelphia's Form 10-K for 1999 and 2000 that discussed the overall terms of the Co-Borrowing Credit Facilities while still avoiding any mention of the kind of off-balance sheet debt that was finally disclosed on March 27, 2002, or the use of a



substantial portion of that debt to enable the Rigas Family to purchase Adelphia securities.

148.   But investors, and the independent members of Adelphia's Board of Directors, who looked to Adelphia's consolidated financial statements to provide a fair and accurate picture of the Company's financial condition, reacted to disclosure of this new, previously undisclosed information about the Co-Borrowing Credit Facilities with anger and shock and Adelphia's stock price fell dramatically.  This shock only increased as evidence of the Rigas Family's self-dealing and other misconduct emerged in the weeks after the Rigas Family stepped down from their officer and director positions and the independent members of the Board were able to commence an internal investigation.

149.   Facing clear evidence that they had been asleep at the switch and that their judgments about how to account for the co-borrowing debt (among other things) had been grossly incorrect, Deloitte immediately embarked on a strategy of trying to avoid blame.

150.   Deloitte, on May 14, 2002, presented Adelphia with a list of issues that it now claimed "needed" to be resolved prior to the issuance of the Company's Annual Report on Form 10-K.  It did so despite its previous statements to the Company that the 10-K was essentially done and that Deloitte was proud of its work.  Many of the "issues" identified by Deloitte related to aspects of Adelphia's accounting that Deloitte had long known about, but that, following the public outcry, Deloitte was now claiming a need to analyze.  Deloitte's pretextual posturing was too little, too late.

151.   Ultimately, it became clear that, once the Rigas Family had been pushed out, Adelphia's new management was fully committed to absolute financial transparency.



Nonetheless, Deloitte simply had no interest in working with Adelphia's new management in good faith to complete its audit for 2001. Indeed, Deloitte's concerns about the investigation of its conduct by new management apparently played a significant role in Deloitte's decisions to withdraw from the audit of Adelphia's 2001 financials.

152.    In particular, on May 14, 2002, the independent members of the Adelphia Board forced John Rigas to resign as Chairman and CEO of Adelphia. Erkie Kailbourne, one of the independent members of the Board and the chair of the Audit Committee, then assumed the position of interim CEO and Chairman. Immediately after assuming these positions, Mr. Kailbourne and counsel for Adelphia informed Deloitte of the change in management. Approximately, one hour later, Deloitte informed Adelphia that it was suspending its audits for the year ending December 31, 2001. In other words, when John Rigas was removed and non-Rigas management was in a position to investigate what had occurred, Deloitte immediately took action to separate itself from the situation.

153.    On May 14, 2002, Deloitte advised Adelphia that it had suspended its audit for the year ended December 31, 2001. Deloitte never agreed to resume the audit. It always came up with one excuse or another as part of its single-minded effort to create the false impression of distance between itself and the obvious wrongdoing that had occurred on its watch.

154.    For example, on June 9, 2002, the Company received a letter from Deloitte in which Deloitte stated that it was still not prepared to resume its audit. In that letter, Deloitte claimed that the Company continued to employ executives who might have been involved in inappropriate conduct related to the Company's financial reporting and stated: "To the extent that any of those persons have been involved in illegal

activities, there is no way that we would be willing to rely on their representations, and indeed the mere fact that they remain in their positions raises additional concerns."

155.   But, the "concerns" raised in this letter were wholly pretextual.  As Adelphia noted in a letter dated June 13, 2002 responding to Deloitte, since May 25, 2002 the Company's accounting and finance staff had been headed by Christopher Dunstan, Chief Financial Officer and Treasurer, and Steven B. Teuscher, Chief Accounting Officer. In addition, the Company retained the Conway Del Genio firm for restructuring advice. Neither Messrs. Dunstan and Teuscher, nor the Conway Delgenio firm, had any connection with the Company during the time that any potentially improper activities occurred.

156.   Moreover, the members of the Company's accounting, finance, bank and investor relations staff, referred to in Deloitte's letter, who may have known or been directly implicated in inappropriate conduct, were being transferred to other duties pending completion of the Special Committee's investigation. Thus, as the Company noted, and as Deloitte could not reasonably deny, the management representations required in connection with Deloitte's audit of the Company's financial statements would be provided by Adelphia officers who had no involvement in prior management's improper activities and who would be adequately informed about the issues relating to the Company's financial statements by the findings of counsel to Special Committee. Nevertheless, Deloitte still claimed it could not resume its audit.

157.   In the end, Deloitte's improper actions and inactions had dramatic consequences.  In the absence of a complete audit by Deloitte, Adelphia could not file its Form 10-K for 2001. Adelphia's inability to file timely this Form 10-K – which was

directly attributable to Deloitte's earlier failure to comply with required auditing

standards and its unwillingness to work in good faith to resume its audit – resulted in

Adelphia defaulting on billions of dollars of debt, and causing NASDAQ to delist the

Company's stock. Thus, Deloitte's wrongful conduct, which helped put Adelphia on the

brink of bankruptcy in the first place, then contributed to Adelphia being forced to file for

bankruptcy on June 25, 2002.

158. Deloitte was dismissed as Adelphia's independent auditors on June 9,

2002, and was replaced by PricewaterhouseCoopers on June 13, 2002. Upon being hired,

PricewaterhouseCoopers promptly commenced work on preparing for and auditing the

Company's consolidated financial statements for 2001. PricewaterhouseCooper's

willingness to take on this task further reinforces that Deloitte's repeated refusal to finish

its audit was pretextual.

**VI.     The Harm Caused by
         Deloitte's Wrongful Conduct**

159. If Deloitte had competently fulfilled its duties as independent auditor and

fulfilled its professional responsibilities and contractual obligations to conduct its audit

with professional skepticism, the Rigas Family's wrongful conduct would have been

revealed long ago, the wrongful use of company funds and credit would never have

occurred, and much of the huge damages suffered by Adelphia, and Adelphia's

bankruptcy, would have been avoided.

160. In particular, at all times relevant to this action, the Audit Committee

included at least one independent director who was not involved in the Rigas Family

wrongdoing. Pete Metros, an independent Adelphia director was a member of the

70

Adelphia Audit Committee beginning in 1997. Dennis Coyle and Erland Kailbourne became members of the Adelphia Audit Committee on April 1, 2001.

161. In addition, at all relevant times, independent directors existed on the board of Adelphia who were readily accessible to Deloitte, including Mr. Metros, who joined the Board in 1986, Mr. Coyle who joined the board in 1995, Mr. Kailbourne, who joined the board in 1999, and Mr. Gelber who joined the board in 1999.

162. In addition to the independent directors, after Adelphia became a public company, large shareholders of the Company emerged besides the Rigas Family, like Leonard Tow who during the relevant time period owned approximately 12% of the issued and outstanding shares of Adelphia and held certain rights to appoint directors to the Adelphia Board.

163. Messrs. Coyle, Gelber, Kailbourne, and Metros were not involved in the self-dealing and other wrongful conduct by the Rigas Family. Mr. Tow was likewise not involved in the Rigas Family's wrongdoing.

164. Messrs. Coyle, Gelber, Kailbourne, and Metros, either individually or together, as well as large shareholders like Mr. Tow (who had the right to appoint directors to the Adelphia board), could have and would have prevented the self-dealing and other wrongful conduct by the Rigas Family had Deloitte informed them of this conduct as it was required to do.

165. For example, the Rigas Family's massive self-dealing was criminal, as evidenced by the recent arrest and indictment of John, Timothy, and Michael Rigas. Had Messrs. Coyle, Kailbourne and Metros been appropriately informed of the criminal looting of the Company (among other misconduct described above), they could have and

would have prevented this wrongdoing by confronting the Rigas Family or, to the extent this was by itself ineffective, reporting the criminal misconduct to appropriate authorities. Indeed, the readily apparent nature of the wrongdoing is emphasized by the government's ability to arrest and charge the Rigases after reviewing and analyzing Adelphia's documents for just a matter of months – documents that Deloitte had reviewed, analyzed and/or had access to for years.

166.    Similarly, had Deloitte appropriately informed Messrs. Coyle, Kailbourne, and Metros of the systematic violations of GAAP in Adelphia's financial statements or of the rampant lack of internal controls at the Company, they – as members of the audit committee who were specifically charged with oversight responsibility for Adelphia's financial statements – could have and would have taken action to address the issues immediately and appropriately.

167.    Indeed, clear evidence of the willingness and ability of Messrs. Coyle, Gelber, Kailbourne, and Metros to address and prevent the Rigas Family's wrongdoing is their conduct once they learned of the Rigas Family's wrongdoing in the Spring of 2002 and thereafter.

168.    Among other things, in May 2002, a Special Committee of the Board composed of independent directors including Messrs. Gelber (chairman), Coyle and Kailbourne (the "Special Committee"):

    a.   commenced a formal investigation into transactions occurring when the Rigas Family controlled the Company;

    b.   forced John Rigas, Timothy Rigas, Michael Rigas, and James Rigas to relinquish control of the Company and to resign both their Board and their respective senior executive positions;

c.  publicly disclosed previously undisclosed information about the Rigas Family's co-borrowing activities, related party transactions, and involvement in accounting irregularities in Current Reports on Form 8-K filed by Adelphia with the Securities and Exchange Commission ("SEC") on May 24, 2002 (the "May 24 Form 8-K"), on June 10, 2002 (the "June 10 Form 8-K"), and on June 14, 2002 (the "June 14 Form 8-K") (copies of these Forms 8-K are being provided herewith);

d.  cooperated fully with ongoing investigations by the SEC and the U.S. Attorneys for the Southern District of New York and the Middle District of Pennsylvania; and,

e.  terminated Deloitte as the Company's independent auditors and replaced them with PricewaterhouseCoopers, LLP.

169.  Thus, by its action, the Special Committee took decisive action to stop the Rigas Family's wrongdoing.  This is precisely what would have occurred much earlier had Deloitte not breached its professional and contractual obligations to the Company.

170.  As a direct and proximate result of Deloitte's acts and omissions, Adelphia has incurred and will continue to incur substantial injury, including, but not limited to, the following:

a.  the Rigas Family and the entities they control have wrongfully made use of billions of dollars of the Company's cash and credit;

b.  Adelphia expended millions of dollars in audit fees to Deloitte, which did not deliver the services for which it contracted;

c.  the perception of Adelphia's financial integrity among Wall Street analysts, the general public, and Adelphia's investors, suppliers, lenders, employees and customers has been damaged, including through its significant loss of goodwill and its vastly reduced ability to access the capital markets;

d.  Adelphia has been forced to spend and will be forced to continue to spend substantial and unanticipated amounts of time, money and effort dealing with the effects of the Rigas Family's and Deloitte's wrongdoing, and has had to pay and will continue to pay for unforeseeable legal, accounting, and public relations services in connection with investigations by the United States Department of

73



Justice and the SEC, the Special Committee, and its defense of investor and other related lawsuits;

e.    Adelphia's cost of doing business has increased and will continue to increase;

f.    Adelphia has been forced to withdraw from transactions, or accept uneconomic terms with respect to transactions, that it had negotiated or entered into before it knew of the Rigas Family's and Deloitte's wrongdoing;

g.    Adelphia has been forced to declare bankruptcy;

h.    Adelphia may have to sell some of its profitable business operations at distressed prices to raise cash;

i.    Adelphia's ability to retain, and procure new, municipal cable franchises has been adversely affected;

j.    Adelphia's acquisition plans have been adversely affected; and, Adelphia has been exposed to potential liability in a civil action by the SEC, investor lawsuits and other related lawsuits.

171.    All conditions precedent to the filing of this action have been discharged, performed or otherwise have been waived.

## FIRST CLAIM FOR RELIEF

### Professional Negligence

172.    Adelphia repeats and realleges each of the allegations contained in paragraphs 1 through 171 as though fully set forth herein.

173.    Deloitte owed a duty of care to Adelphia for the audits and reviews Deloitte conducted on Adelphia's consolidated financial statements for all appropriate periods including the fiscal years 1999 through 2001.

174.    The auditing and review services rendered by Deloitte in connection with these financial statements were performed negligently and carelessly because as set forth above: (i) they were not performed with the degree of skill and care commonly applied

in the community by the major accounting firms; (ii) they were not performed with the degree of expert skill and care that Deloitte held itself out as possessing; and, (iii) they were not performed with the degree of skill and care called for in Deloitte's own internal standards.

175.    Deloitte's negligence includes, but is not limited to:  (i) the negligent manner in which it conducted its audits and its reviews of the consolidated financial statements and information of Adelphia; (ii) its negligent failure to discover the Rigas Family's self-dealing and the accounting irregularities and errors regarding the consolidated financial statements and information of Adelphia; (iii) its negligent failure to disclose such self-dealing, such accounting irregularities and errors, and the weaknesses in internal controls and procedures to the appropriate level of management or, if necessary, to the independent members of the Audit Committee or Board of Adelphia; and, (iv) its negligent misrepresentations that it had conducted its audits of Adelphia in accordance with GAAS and that Adelphia's financial statements were fairly presented in all material respects with GAAP.

176.    Deloitte's negligence has directly and proximately caused the injuries Adelphia suffered, as described previously.  Accordingly, Deloitte is liable to Adelphia for its damages in an amount to be proven at trial.

### SECOND CLAIM FOR RELIEF

#### Breach of Contract

177.    Adelphia repeats and realleges each of the allegations contained in paragraphs 1 through 176 as though fully set forth herein.

178. For each relevant year through 2001, Deloitte entered into annual agreements with Adelphia to render professional services on behalf of the Company and its subsidiaries including, without limitation, to audit the Company's consolidated financial statements.

179. Pursuant to those agreements, Deloitte specifically promised to, among other obligations,

    a.  conduct its audit in accordance with GAAS;

    b.  plan and perform its audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud;

    c.  obtain an understanding of internal control sufficient to plan the audit and to determine the nature, timing, and extent of audit procedures to be performed;

    d.  examine on a test basis evidence supporting the amounts and disclosures in the financial statements;

    e.  report directly to the Audit Committee any fraud of which Deloitte become aware that involved senior management, and any fraud (whether caused by senior management or other employees) of which Deloitte became aware that caused a material misstatement of the financial statements;

    f.  report to senior management any fraud perpetrated by lower level employees of which Deloitte became aware that does not cause a material misstatement of financial statements;

    g.  inform the appropriate level of management and determine that the Audit Committees adequately informed with respect to illegal acts that have been detected or have otherwise come to



Deloitte's attention in the course of its audits, unless the illegal act is clearly inconsequential;

h.  report directly to management and the Audit Committee matters coming to Deloitte's attention during the course of its audits that were believed to be significant deficiencies in the design or operation of internal control that could adversely affect Adelphia's ability to record, process, summarize, and report financial data consistent with the assertions of management in the financial statements; and,

i.  communicate to the Audit Committee, or determine that the Audit Committees is informed, about certain other matters related to the conduct of its audits, including, when applicable: (a) Deloitte's responsibility as auditors under generally accepted auditing standards; (b) significant accounting policies; (c) management judgments and accounting estimates; (d) audit adjustments; (e) Deloitte's judgments about the quality of the Companies' accounting principles as applied in their financial reporting; (f) other information in documents contained in audited financial statements; (g) disagreements with management; (h) consultation by management with other accountants on significant matters; (i) difficulties encountered in performing the audit; (j) major issues discussed with management prior to Deloitte's retention as auditors.

180.    Deloitte consistently breached its agreements with Adelphia by failing to perform its professional services for Adelphia in the agreed upon manner.

181.    Between 1999 and 2001 Deloitte also entered into annual agreements with Adelphia to review the quarterly consolidated financial statements of Adelphia for the first three quarters of each fiscal year.

182.    Pursuant to these agreements, Deloitte specifically promised to:
(i) conduct its review of those financial statements in accordance with professional

standards; and, (ii) render a report as to whether it was aware of any material modification that should be made in the quarterly consolidated financial statements for them to be in conformity with GAAP.

183.   Starting at least as early as 1999, Deloitte breached its agreements with Adelphia by failing to conduct its review of Adelphia's quarterly consolidated financial statements in accordance with GAAS.  Deloitte breached its agreements with Adelphia by failing to provide an appropriate report as to whether material modifications should be made to Adelphia's quarterly consolidated financial statements for them to be presented in conformity with GAAP.

184.   As a direct consequence of Deloitte's breach of its agreement with respect to its audit of the annual consolidated financial statements of Adelphia for fiscal years 1999, 2000, and 2001, and its agreements with respect to the reviews of Adelphia's quarterly consolidated financial statements for the first three quarters of fiscal years 1999, 2000, and 2001, Adelphia has suffered the injuries described previously.

185.   Accordingly, Deloitte is liable to Adelphia for damages in an amount to be proven at trial.

### THIRD CLAIM FOR RELIEF

#### Aiding And Abetting Breach Of Fiduciary Duty

186.   Adelphia repeats and realleges each of the allegations contained in paragraphs 1 through 185 as though fully set forth herein.

187.   John Rigas, Timothy Rigas, Michael Rigas, James Rigas, and Peter Venetis were officers and/or directors of Adelphia who owed fiduciary duties to the Company.

188.    As set forth above, these fiduciary duties were breached as a result of the Rigas Family's self-dealing and other wrongful conduct.

189.    Given its relationship to the Company, its subsidiaries, as well as the Rigas Family Entities, Deloitte knew or should have known that the Rigas Family was engaged in the significant self-dealing, fraud and other wrongful conduct more fully described above.

190.    By its reckless failure to properly audit the Company as well as its abdication of its duties to properly detect and disclose the fraud of the Rigas Family, Deloitte aided and abetted the breach of fiduciary duty committed by the Rigas Family and provided substantial assistance to the Rigas Family in their tortious conduct by inaction and failure to disclose the wrongdoing perpetrated by them.

191.    Deloitte's aiding and abetting of the Rigas Family's breaches of fiduciary duty was the direct and proximate cause of injury to Adelphia as described previously.

192.    Accordingly, Deloitte is liable to Adelphia in an amount to be proven at trial.

## FOURTH CLAIM FOR RELIEF

### Fraud

193.    Adelphia repeats and realleges each of the allegations contained in paragraphs 1 through 192 as though fully set forth herein.

194.    For fiscal years 1999 and 2000, Deloitte issued an audit report to Adelphia's board of directors, Audit Committee, and shareholders concerning its audit of Adelphia's consolidated financial statements.  In each fiscal year, Deloitte issued an unqualified audit report on Adelphia's financial statements in which Deloitte certified:

(a) that it had audited Adelphia's financial statements in accordance with GAAS; (b) that it had planned and performed those audits "to obtain reasonable assurance about whether the financial statements are free of material misstatement"; (c) that, in its opinion, Adelphia's financial statements "present fairly, in all material respects, the financial position" of Adelphia "in conformity" with GAAP; and, (d) that its audits provided a "reasonable basis" for its opinions.

195.   In each year, Adelphia filed Deloitte's unqualified audit report for the fiscal year as part of its Form 10-K with the SEC.  At the time it prepared and issued these unqualified reports, Deloitte expected that they would be included in Adelphia's Form 10-K for that year.

196.   In addition, for fiscal years 1999, 2000, and 2001, Deloitte conducted quarterly reviews of Adelphia's consolidated financial results.  In connection with these reviews, Deloitte represented that it was not aware of any material modifications that should be made to the quarterly consolidated financial results for them to be in conformity with GAAP.

197.   At the time that Deloitte issued these audit reports and conducted its quarterly reviews, Deloitte knew that material representations in these audit reports and in connection with these quarterly reviews were false, or Deloitte recklessly disregarded whether these representations were true or not.  Deloitte nevertheless issued these audit reports and made these representations with the knowledge and intention that Adelphia and its board of directors would rely on and use them.

80

198.    In addition, for fiscal years 1999, 2000, and 2001, Deloitte represented to the Audit Committee that it had not had any disagreements with management related to matters that are material to the Company's financial statements for those years.

199.    At the time that Deloitte made these statements, Deloitte knew it had had disagreements with management related to matters that were material to the Company's financial statements, including with respect to how to disclose the co-borrowing debt.

200.    At all times relevant to this action, the Audit Committee included at least one independent director who was not involved in the Rigas Family wrongdoing. Pete Metros, an independent Adelphia director, was a member of the Audit Committee for all relevant time periods. In addition, Dennis Coyle and Erland Kailbourne became members of the Adelphia Audit Committee on April 1, 2001.

201.    The independent members of the Adelphia Board of Directors, and the independent members of the Adelphia Audit Committee, reasonably relied on the Deloitte audit reports and Deloitte's representations in connection with Deloitte's quarterly reviews. Among other actions, the independent members of the Adelphia Board, and the independent members of the Adelphia Audit Committee, caused Adelphia to publicly disclose the information contained in the financial statements that Deloitte audited or reviewed and filed Deloitte's audit reports and the financial statements with the SEC. Adelphia would not have made these public disclosures absent the misrepresentations by Deloitte to the independent members of the Adelphia Board, and the independent members of the Adelphia Audit Committee. In addition, because the independent members of the Adelphia Board, and the independent members of the Adelphia Audit Committee, reasonably relied on the Deloitte audit reports and Deloitte's

representations in connection with Deloitte's quarterly reviews, they were left unaware of the Rigas Family's wrongful conduct and were therefore unable to take action to stop that conduct.

202.    The reliance by the independent members of the Adelphia Board, and the independent members of the Audit Committee, on the representations of Deloitte was justified given Deloitte's professional expertise, and the relationship of trust between the parties and the fiduciary position Deloitte occupied to the Company.

203.    Deloitte's fraud directly and substantially injured Adelphia, as described previously.

204.    Accordingly, Deloitte is liable to Adelphia in an amount to be proven at trial

### FIFTH CLAIM FOR RELIEF
### Negligent Misrepresentation

205.    Adelphia repeats and realleges each of the allegations contained in paragraphs 1 through 204 as though fully set forth herein.

206.    For fiscal years 1999 and 2000, Deloitte issued an audit report to Adelphia's Board, Audit Committee, and shareholders concerning its audit of Adelphia's consolidated financial statements.  In each fiscal year, Deloitte issued an unqualified audit report on Adelphia's financial statements in which Deloitte certified:  (a) that it had audited Adelphia's financial statements in accordance with GAAS; (b) that it had planned and performed those audits "to obtain reasonable assurance about whether the financial statements are free of material misstatement"; (c) that, in its opinion, Adelphia's financial statements "present fairly, in all material respects, the financial position" of Adelphia "in

82

conformity" with GAAP; and, (d) that its audits provided a "reasonable basis" for its opinions.

207.    In each year, Adelphia filed Deloitte's unqualified audit report for the fiscal year as part of its Form 10-K with the SEC. At the time it prepared and issued these unqualified reports, Deloitte expected that they would be included in Adelphia's Form 10-K for that year.

208.    In addition, for fiscal years 1999, 2000, and 2001, Deloitte conducted quarterly reviews of Adelphia's consolidated financial results. In connection with these reviews, Deloitte represented that it was not aware of any material modifications that should be made to the quarterly consolidated financial results to be in conformity with GAAP.

209.    At the time that Deloitte issued these audit reports and conducted its quarterly reviews, Deloitte knew or should have known that material representations in these audit reports and in connection with these quarterly reviews were false, or Deloitte negligently disregarded whether these representations were true or not. Deloitte nevertheless issued these audit reports and made these negligent misrepresentations with the knowledge and intention that Adelphia and its Board would rely on and use them.

210.    In addition, for fiscal years 1999, 2000, and 2001, Deloitte negligently misrepresented to the Audit Committee that it did not have any disagreements with management related to matters that are material to the Company's financial statements for those years.

211.    At the time that Deloitte made these statements, it knew or should have known it had had disagreements with management related to matters that were material to

the Company's financial statements, including with respect to how to disclose the co-borrowing debt.

212.    At all times relevant to this action, the Audit Committee included at least one independent director who was not involved in the Rigas Family wrongdoing. Pete Metros, an independent Adelphia director was a member of the Audit Committee beginning in 1997. In addition, Dennis Coyle and Erland Kailbourne became members of the Adelphia Audit Committee on April 1, 2001.

213.    The independent members of the Adelphia Board, and the independent members of the Adelphia Audit Committee, reasonably relied on the Deloitte audit reports and the representations in connection with Deloitte's quarterly reviews. Among other actions, the independent members of the Adelphia Board, and the independent members of the Adelphia Audit Committee, caused Adelphia to publicly disclose the information contained in the financial statements that Deloitte audited or reviewed and filed Deloitte's audit reports and the financial statements with the SEC. Adelphia would not have made these public disclosures absent the negligent misrepresentations by Deloitte to the independent members of the Adelphia Board, and the independent members of the Adelphia Audit Committee. In addition, because the independent members of the Adelphia Board, and the independent members of the Adelphia Audit Committee, reasonably relied on the Deloitte audit reports and Deloitte's representations in connection with Deloitte's quarterly reviews, they were left unaware of the Rigas Family's wrongful conduct and were therefore unable to take action to stop that conduct.

214.    The reliance by the independent members of the Adelphia Board and the Audit Committee on the representations of Deloitte was justified given Deloitte's



professional expertise, the relationship of trust between the parties and the fiduciary

position Deloitte occupied to the Company.

215.    Deloitte's negligent misrepresentations directly and substantially injured

Adelphia, as described previously. Accordingly, Deloitte is liable to Adelphia in an

amount to be proven at trial

### SIXTH CLAIM FOR RELIEF

### Contribution

216.    Adelphia repeats and realleges each of the allegations contained in

paragraphs 1 through 215 as though fully set forth herein.

217.    The Company has been sued in a variety of different lawsuits across the

country in connection with the material misstatements contained in its financial

statements and other improper disclosures in Adelphia's audited financial statements.

218.    Deloitte is responsible in substantial part for the injuries or damages

alleged in these lawsuits because, among other things, Deloitte intentionally

misrepresented and concealed, or at a minimum failed to discover or recklessly or

negligently disregarded, the Rigas Family's self-dealing and the accounting errors and

irregularities that occurred for years in the financial statements of Adelphia.

219.    Because of the aforesaid self-dealing and accounting errors and

irregularities, Adelphia may incur substantial liability, which liability would not have

arisen had Deloitte properly audited the aforesaid financial statements of Adelphia.

Adelphia therefore seeks contribution from Deloitte, to the extent permitted by law, for

Deloitte's share of the responsibility for the injuries or damages that Adelphia may be

obliged to pay in respect of any liability determined against the Company.



WHEREFORE, Adelphia demands judgment against Deloitte as follows:

a.    For compensatory, consequential, and punitive damages and interest thereon in an amount to be proven at trial;

b.    For contribution, to the extent permitted by law, with respect to Adelphia's liabilities to third parties occasioned by Deloitte's wrongful conduct;

c.    Granting Adelphia the costs and disbursements of this action, including reasonable attorneys' fees; and,

d.    Awarding Adelphia such other relief as this Court deems just and proper.

Dated:  November 6, 2002

Respectfully Submitted,

Robert C. Heim (ID# 15758)
Michael E. Baughman (ID# 78690)
Dechert Price & Rhoads
4000 Bell Atlantic Tower
1717 Arch Street
Philadelphia, PA  19103-2793

Of Counsel:

BOIES, SCHILLER & FLEXNER LLP

Philip C. Korologos
Eric Brenner
333 Main Street
Armonk, NY 10504
(914) 749-8200

Stephen N. Zack
Jennifer G. Altman
100 S.E. Second Street, Suite 2800
Miami, FL 33131
(305) 539-8400

*Attorneys for Plaintiff Adelphia Communications Corp.*

86

## VERIFICATION

I, Randall D. Fisher, do hereby verify that I am the Vice President, General Counsel and Assistant Corporate Secretary of Plaintiff Adelphia Communications Corp, that I am authorized to make this verification on behalf of Adelphia Communications Corp., and that the facts set forth in the foregoing Complaint are true and correct to the best of my knowledge, information and/or belief. I understand that this verification is made subject to the penalties of 18 Pa. C.S.A. § 4904 relating to unsworn falsifications to authorities.

Dated: November 5, 2002

# EXHIBIT C

1                UNITED STATES BANKRUPTCY COURT

2                SOUTHERN DISTRICT Of NEW YORK

3

    IN RE:
4
    ADELPHIA COMMUNICATIONS CORP.,
5   et al., a Delaware corporation,

6

7              Debtors.
   ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
8   ADELPHIA COMMUNICATIONS CORP., et al.,

9

10             Plaintiff,

    vs.
11
    PRESTIGE COMMUNICATIONS of NC,
12  INC., et al.,

13

14             Defendants.
   ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
15           VIDEOTAPED DEPOSITION OF

16            CONSTANCE CAMPBELL

17

18             July 31, 2007

19              9:06 a.m.

20

21       Offices of Troutman Sanders

22         405 Lexington Avenue

23         New York, New York

24

25    ROBERT BLOOM, a Shorthand Reporter

1                          C. Campbell

2    announces their -- I think it's pretty clear

3    they didn't just decide on March 8th, they got

4    a facility set up for CCH, they've been at

5    work.

6              I don't think we can say this.    I

7    think they may have made that decision in

8    November, they may have made that decision in

9    February.   We don't know.

10             But I question this statement.

11       Q.  Do you know why Scott McDonald, Paul

12   Quinn and Carol Savage signed off on a

13   document with that sentence in here?

14       A.  They say appeared to have been made.

15             First of all, there were 253

16   accounting issues, so this is one of -- excuse

17   me, 100 --

18       Q.  130?

19       A.  Excuse me, 130, actually, yes, sorry,

20   253 legal entity, 130 accounting issues.

21   There were a lot of issues, a lot of work.   I

22   think the statement is indicative of the fact

23   that they -- the first demonstration that we

24   can make is in March.   I think it's possible

25   it could have been earlier.

1              UNITED STATES DISTRICT COURT

2              SOUTHERN DISTRICT OF NEW YORK

3

      In re:
4     ADELPHIA COMMUNICATIONS CORP.,

5     et al., a Delaware corporation

6

7              Debtors,

8

9     ADELPHIA COMMUNICATIONS CORP.,

10    et al.,

11

12             Plaintiffs,

13        vs.

14

15    PRESTIGE COMMUNICATIONS OF

16    NC. INC., et al.,

17             Defendants.

18    ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

19             VIDEOTAPED DEPOSITION OF

20             CONNIE CAMPBELL

21             VOLUME II

22             August 1, 2007
               10:15 a.m.

23

               Troutman & Sanders
24             405 Lexington Avenue
               New York, New York

24

25    William Byrne a Notary Public of the State of New York

1    current paying, part of the reason for

2    that is that the true state of the

3    operating cash flow stream was not known

4    by the Street.  The amount of debt that

5    was on the books of Adelphia was not known

6    by the Street, and so the Street was

7    continuing to loan money into the company.

8            I think, at this point in

9    time, you are on an increasing amount of

10   debt every month during that '00, '01,

11   into '02 time frame, because the company

12   is cash flow negative certainly during

13   those time periods and you are increasing

14   the debt.

15           Had the Street known the fact

16   that the company was leveraged at 14, 15 X

17   to operating cash flow, or that there was

18   another three billion dollars worth of

19   debt, the lending would not have been done

20   and the company would not have been able

21   to borrow the kind of money it was

22   continuing to borrow on an increasing

23   amount on an ongoing basis.

24           But after the bankruptcy

25   filing, during that year-long period, the

1    company was paying its current bills.  But

2    it was getting none of the upgrade done,

3    which was a dramatic issue to the company

4    from a value standpoint.  And it was only

5    able to pay its current bills because it

6    was not paying debt on half of its debt --

7    current interest on half of its debt.

8        Q.      You mentioned that people on

9    the Street did not know about Adelphia's

10    debt.  The secured lenders knew about

11    Adelphia's co-borrowing debt, did they

12    not?

13        A.      I think that is something to

14    be adjudicated by the -- you know, within

15    the co-borrowing debt.  Certainly, some of

16    them may have and there may be some places

17    -- but I think the banks would say that

18    there was no place that it was added up.

19                But certainly you have bonds

20    loaning in here.  You have three silos of

21    bank debt, 900 million dollars of which

22    were used for this transaction.  Those

23    people knew nothing about the amount of

24    this debt.  The bonds certainly do not.

25                And they also think that the

1    company is at a 45-percent margin and

2    throwing off cash that, even without that

3    -- take that and leave that debt, the 3

4    billion dollar debt issue aside.  It is

5    not that big in 2000 but it grows to be

6    that big.

7                Leave that aside.  You are

8    talking about -- you know, they think they

9    are at 8X kind of OCF numbers.  So they

10   are in an investment-grade level on their

11   bonds, albeit kind of at the low end of

12   that.  But the real state of their

13   operating cash flow would not in any way

14   allow them access to the investment-grade

15   credit market that they had during this

16   time on the bond side -- let alone the

17   bank situation.

18        Q.     But, certainly, it is

19   Adelphia's position in its litigation with

20   the pre-petition banks they were aware of

21   co-borrowing debt?

22        A.     With the co-borrowing banks,

23   that is definitely Adelphia's position.

24                But, again, you have a

25   tremendous amount of debt having been

1    granted to the company -- and debt in that

2    '00, '01 timeframe that is not

3    co-borrowing debt.

4              And, again, I point you to

5    just this transaction.  This whole

6    transaction almost was financed on

7    non-co-borrowing debt.

8         Q.    From December of '99 through

9    March of 2002, did Adelphia have any

10   collection actions filed against it?

11        A.    I don't believe so.  But,

12   again, that's because the true state of

13   its debt situation was not known to the

14   Street, and it was able to access

15   investment-grade credit facilities.

16        Q.    In the December of '99 through

17   July 2000 timeframe, did any of Adelphia's

18   projections show that it was going to run

19   out of cash?

20        A.    There is one item in a board

21   meeting.  It happens in -- I think it is

22   in November of '00, so it may be beyond

23   your timeframe.

24              Did you ask me just through

25   July?

August 1, 2007

Connie Campbell - Volume II

Page 423

1      Q.      December of 1999 through July

2    of 2000?

3      A.      I have never seen anything in

4    that time period.  But, again, I would say

5    had the Street known the true numbers,

6    they would not have loaned -- the CCH

7    facility would certainly have not had a

8    covenant of 8.75 if it knew that, in fact,

9    the actual numbers were 2 X.

10      Q.      You mentioned sometime in

11    November -- you mentioned something about

12    board minutes in November of 2000?

13      A.      I recall seeing something --

14    and I reserve the right to check that

15    date.  But, in the course of an ABIZ

16    document, there is a document about they

17    are going to need to access the credit

18    markets, and they need to look at --

19    there's a comment in there that Prestige

20    has closed, and then there's some work

21    around how they -- what additional

22    requirements they have coming up and what

23    their potential sources of cash are.

24          My recollection is that is

25    somewhere in the later 2000 timeframe, but

Connie Campbell - Volume II

1    as I review this document perhaps I can

2    make sure that date is accurate.

3         Q.      Do you know if that document

4    has been produced in this case?

5              MR. GERSHMAN:   Objection.

6         Ms. Campbell is not a witness on

7         document production issues.

8              MR. WINSBERG:   I will follow

9         it up with Mr. Gershman.

10   BY MR. WINSBERG:

11        Q.      From December of 1999 through

12   March of 2002, did Adelphia ever run out

13   of cash?

14        A.      Again --

15              MR. GERSHMAN:   Objection to

16        form.

17        A.      Again, if the definition of

18   that is did it need to borrow money, yes.

19   I think it was borrowing money on a very

20   regular basis throughout that time period.

21              If the issue is did they have

22   to not pay checks on a given date or not

23   pay payroll, no.

24              But, again, that's because

25   they were not providing accurate views to

Connie Campbell - Volume II

1    the credit markets that were, in fact,

2    supporting them.

3         Q.     Do you know what Adelphia's

4    common stock trading price was as of

5    December 6 of 1999?

6         A.     No.

7         Q.     Do you know what its common

8    stock was trading at as of July 5, 2000?

9         A.     No.

10              I presume those are numbers

11   that can be obtained, but nothing that --

12   and, again, this was a time in the equity

13   markets when cable was very hot.  It was

14   very much in favor.

15              These folks were adhering to

16   the strategy which was, at that point in

17   time, in favor -- and has proved

18   successful for Time Warner and Comcast and

19   other entities -- which is to cluster and

20   get bigger.  Take advantage of the

21   strategy of high-speed data and so forth.

22              The company was walking down

23   that line very effectively, but the equity

24   markets didn't know about 3 billion

25   dollars worth of debt.  And they thought

1    there was a 45-percent margin coming off

2    this business.

3                    And if they had known that, in

4    fact, there was a lot more debt and that

5    the margins were, in fact, in the low 20s,

6    they would not have had the same view.

7                    In addition to that, the

8    company was not accurately providing to

9    the outside market views about its

10    subscribers.  And it was not accurately

11    reflecting its upgrade status.  And those

12    were two very key statistical reference

13    points that the Street was very focused

14    on.

15                    And, even in this transaction,

16    we have the evidence that they are not

17    open and accurate with the Street.  They

18    only say they are buying a 700 million

19    dollar transaction from Prestige -- yet we

20    know that, in fact, the company is paying

21    1.1 billion, 100 million more for the

22    North Carolina Inc. properties, and 300

23    for the Georgia property.  That they

24    certainly don't disclose to the street.

25        Q.        From December of 1999 through

1    March of 2002, had any of Adelphia's

2    lenders declared Adelphia or subsidiaries

3    to be in default?

4          A.        Somewhere in the March or

5    early April time frame, ABIZ filed

6    bankruptcy.  I don't remember what that

7    date is.

8                    If I set that aside, no,

9    lenders have not declared a default.

10   However, that's because they don't know

11   the true state of affairs.

12         Q.        From December 1 of 1999

13   through March of 2002, did Adelphia or its

14   subsidiaries ever miss a payment to its

15   secured lenders?

16         A.        I don't have any evidence of

17   that.  Again, the payments that were only

18   -- that were made during that time frame

19   were only interest, at least in net.

20                   They may have paid down a

21   borrowing, but they probably borrowed it

22   the same day from somewhere else.  So on

23   net they were never reducing debt on a

24   principal basis.

25                   I believe they made all their

August 1, 2007

Connie Campbell - Volume II

Page 428

1    interest payments but, again, that's

2    because the true state of affairs was not

3    known.

4        Q.    How about after March of 2002,

5    until the bankruptcy filing, did Adelphia

6    and its subsidaries ever miss payments to

7    its lenders?

8        A.    Yes.

9        Q.    When did that occur?

10        A.    In both May and June it missed

11    payments on bond debt.  And in June it

12    missed its bank debt payment.

13        Q.    And in the December of 1999

14    time frame, do you know how much

15    availability Adelphia or its subsidiaries

16    had under their credit facilities?

17        A.    No, that document -- not off

18    the top of my head, but you showed me a

19    document yesterday that had that number on

20    it.

21        Q.    And how about as of July of

22    2000?

23            MR. GERSHMAN:   Objection to

24        form.

25        A.    I don't remember.  I don't

1   think that document had that on it.  And I

2   will again preface my -- or I will add in

3   the addendum, that's because the banks and

4   lenders did not know the true state of

5   affairs.

6                I believe at the end of '99

7   there was 1.5 billion dollars left on its

8   credit facilities, and in June of 2000,

9   there was 2.9.

10               But, again, I add my standard

11  addendum.  I think it would have been zero

12  -- or I know it would have been -- if the

13  true state had been known.

14       Q.      2.9 billion in July of 2000,

15  that was the number you referred to?

16       A.      Yes, that's because the CCH

17  facility had been set up.

18       Q.      How about in July of 2001?

19       A.      I don't have that number.

20       Q.      How about as of March of 2002?

21       A.      Well, as of March of 2002 it

22  was zero.  No banks were letting any draws

23  take place.

24               When you make a draw somebody

25  has to certify they are in covenant

August 1, 2007

Connie Campbell - Volume II

Page 430

1   compliance, and even if the Rigases were

2   willing to sign that statement, the bank

3   would not have accepted it.  So there

4   weren't any draws taking place in March,

5   after the March conference call.

6        Q.       Who would be most knowledgable

7   to determine in the July 2001 time frame

8   how much availability Adelphia and its

9   subsidiaries had under its credit

10  facilities.

11       A.       I think Paul Hemann, who is

12  the author and creator of those documents

13  that you just showed me, and D53 could do

14  that again for whatever, what the time

15  period was in '01.

16               But, again, I think it is

17  somewhat moot in that that credit capacity

18  is only there because the lenders do not

19  understand the situation.

20       Q.       Paul Hemann works for

21  Adelphia?

22       A.       He does, yes.   H-E-M-A-N-N.

23       Q.       And I can contact him through

24  Mr. Gershman?

25       A.       You could.

August 1, 2007

Connie Campbell - Volume II

Page 431

1        Q.        From December 1, 1999 through

2    March 20, 2002, did Adelphia ever miss a

3    payment to its bondholders?

4        A.        I don't believe so,

5            Again, they were -- to the

6    extent there were any principal payments

7    to bondholders, they would have been again

8    reshuffled into a new credit facility.

9    They were on a net increase.

10            I make the same statement I

11    have made multiple times here.

12        Q.        Has there been any valuation

13    work done by Adelphia or on behalf of

14    Adelphia of its assets and liabilities in

15    the December`1999 through July 2000

16    timeframe?

17            MR. GERSHMAN:    Objection to

18        form.

19        A.        Well, certainly there's an

20    impairment process in accounting that

21    looks at the -- you know, looks at the

22    ongoing value of those.  And I think we

23    discussed that yesterday.

24            It revalues on an annual, and

25    then pushes that back into quarters basis

1    -- the value of the assets.

2              The value of the liabilities,

3    I think, is completely stated in the

4    restated financials and so are the

5    assets -- so, again, with that being the

6    process that they are revalued in an

7    impairment process.

8              So I would point you to the

9    restatement.  Again, that's book, that's

10   GAPP book.  It is not what you could

11   generate on those assets if you were

12   actually selling them in '99 or '00, and

13   in the public markets -- but on a book

14   accounting basis.  That valuation has been

15   done on a annual basis through the

16   restatement

17       Q.      In the 1999/2000 time frame,

18   did Adelphia prepare or cause to be

19   prepared financial projections for

20   Adelphia's assets?

21       A.      I have no -- I presume that

22   the financial staff at Adelphia was doing

23   some projections.

24              We have never seen any of the

25   total company.  And I think there were

1   some, or there are some -- and I presume

2   these have been provided in discovery.

3                   There are some documents that

4   are part of the context of some credit

5   facilities that talked to projections

6   about those credit facilities.  There are

7   some financial-- the financial conference

8   that is done in Cancun every year, in one

9   of the years has some projections.

10                  Again, I'm sorry, the

11  reference point of yours you are asking me

12  for is '99 and '00.  I'm not sure if they

13  were in that time period, but I think all

14  of those projections are not worth the

15  paper that they are printed on -- because

16  they are based upon incorrect underlying

17  accounting and they are based on

18  fraudulent representation of what the

19  company looks like.

20                  So I think whatever those

21  projections are, are again part of the

22  concealment of the true state of affairs

23  with the creditors.

24       Q.       If I wanted to come up with a

25  set of reliable Adelphia projections in

Connie Campbell - Volume II

1    the 1999/2000 time frame, how would I go

2    about doing that?

3              MR. GERSHMAN:  Objection to

4         form.

5         A.     First of all, it would be a

6    speculative kind of exercise, but you

7    would -- I think you would take the ACC

8    financials that are available from the

9    restatement that we gave you, and you

10   would put a typical cable kind of growth

11   situation on top of that -- which would be

12   a very intensive exercise.

13              But you would have to start

14   with the restated financials.

15        Q.     If I wanted to go through that

16   exercise, who would I talk to?

17              MR. GERSHMAN:   Objection to

18        form.

19              This is a question, again,

20        which goes beyond the topics here.

21              MR. WINSBERG:   Disagree.

22        There is a topic on projections.

23        Proceed you can answer.

24              MR. GERSHMAN:   There is, as

25        to projections that Adelphia did for

Connie Campbell - Volume II

1    1999 and 2000.  To the extent that

2    you are talking about some other

3    exercise, this is not a topic that

4    was not noticed -- and Ms. Campbell

5    is not designated as the 30B6

6    witness on this topic.  However, if

7    she has a view, she's free to state

8    it.

9        A.        I presume you would hire a

10   financial expert who could create that.  I

11   think they would -- my expectation, for

12   what it is worth to you, is they will find

13   that the company will rapidly become

14   book-insolvent because of the fact that it

15   will not be able to borrow money, and the

16   fact that it will not be able to generate

17   any kind of revenue growth, and it's way

18   too debt-heavy.

19            But that exercise could be

20   done in a theoretical manner by a

21   financial valuation expert.

22       Q.        Is there anybody at Adelphia

23   we could talk to who would be helpful in

24   that excercise?

25            MR. GERSHMAN:   Objection to

```
1         form.

2         A.        No.  I don't think we have a

3    financial valuation expert inside the

4    company.  We have 30 employees left as of

5    today.

6              MR. WINSBERG:   Why don't we

7         take a quick break?

8              THE VIDEOGRAPHER:  We're off

9         the record at 11:59 a.m.

10             (Off the record).

11             THE VIDEOGRAPHER:  This is

12        Videotape Number Three.  We're back

13        on the record and 12:07 p.m.

14   BY MR. WINSBERG:

15        Q.        Ms. Campbell, do you have

16   anything you would like to add?

17        A.        I don't.

18        Q.        I wanted to make sure.

19             You mentioned in the last hour

20   that the report operating margins of

21   Adelphia were around 45 percent, but the

22   true operating margins were somewhere in

23   the 20s.

24             Do you recall that testimony?

25        A.        Yes.
```

Connie Campbell - Volume II

1       Q.      If you could just explain for

2   me how you reconcile that?

3       A.      Well, the bulk of it has to do

4   with the fact that the capitalization of

5   expenses was very erroneous, and there

6   were significant sham transactions that

7   boosted revenue that had no expense

8   flow-through so they helped the margin as

9   well -- or had no expense at all

10  associated with them so they boosted the

11  margin.

12              But the bulk of it has to do

13  with capitalization of expenses, and they

14  capitalized items that were clearly not

15  appropriate under GAPP to be capitalized.

16  It was, I think, in our restatement

17  somewhere in the 12 to 15 margin points

18  across the time period.

19      Q.      When you are referring to

20  capital and expenses you are referring to

21  the fixed-asset issues in the issue

22  summaries?  Whether an expense should be

23  capitalized or booked as an expense, is

24  that what you're referring to?

25      A.      Yes.  And it has to do with,

1  for instance, if you install a customer at

2  a home where you are making -- you're

3  bringing the plant into the home for the

4  first time.  That is a capitalizable

5  event.

6            If you go to that home and fix

7  something inside their home, and you roll

8  the truck, that's $75 or $100 it costs you

9  to roll the truck that is not

10  capitalizable.  But you will find in the

11  Rigas accounting era that it was certainly

12  capitalized.

13       Q.    And anything else that you can

14  think of that would reconcile the margins?

15            MR. GERSHMAN: Objection to

16       form.

17       A.    Well, I think that you've got

18  sham transactions.  You've got revenue

19  that is not appropriate.  You've got that

20  capitalization issue.

21            The other, which fits into the

22  sham transactions a bit -- there is an

23  overlap there -- is the inner company and

24  allocation of management fees down to the

25  various cost centers was not always done

# EXHIBIT D

# ADELPHIA COMMUNICATIONS CORP

### FORM 10-K
(Annual Report)

## Filed 12/23/2004 For Period Ending 12/31/2003



| | |
|---|---|
| Address | 5619 DTC PARKWAY |
| | GREENWOOD VILLAGE, Colorado 3111 |
| Telephone | (303) 268-6300 |
| CIK | 0000796486 |
| Industry | Broadcasting & Cable TV |
| Sector | Services |
| Fiscal Year | 12/31 |



EXHIBIT

D 86

8/1/07 BB

| Generated by EDGAR Online Pro<br>http://pro.edgar-online.com | **EDGAR** Online | Contact EDGAR Online<br>Customer Service: 203-852-5666<br>Corporate Sales: 212-457-8200 |
|---|---|---|

ADELPHIA COMMUNICATIONS CORPORATION AND SUBSIDIARIES

(Debtors-In-Possession)

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - Continued

reflect a number of related adjustments that have been aggregated for disclosure purposes. The restatement adjustments are discussed in the paragraphs following the tables (amounts in thousands):

| | Balance January 1, 2001 (December 31, 2000) |
|---|---|
| ████████████████████████████████ | |
| Restatement adjustments, net:* | |
| ████████████████████████ | |
| Debt issues | (43,091) |
| ████████████████████████ | |
| Purchase accounting | (96,606) |
| ████████████████████████████████ | |
| Balance sheet reconciliations | (127,850) |
| ████████████████████████ | |
| Programming contracts and related issues | (9,096) |
| ████████████████████████ | |
| Revenue and income recognition | (47,760) |
| ████████████████████████ | |
| Investments in nonconsolidated entities | (16,275) |
| ████████████ | |
| Provision for income taxes | 283,173 |
| ████████████████████ | |
| Share of losses of equity affiliates, net | (98,524) |
| ████████████████████ | |
| As restated | $ (4,172,877) |

---

\*    All restatement adjustments are reflected pre-tax except for minority's interest in losses of subsidiaries, net and share of losses of equity affiliates, net.

*Impact on January 1, 2001 (December 31, 2000) Balance Sheet*

In addition to the effects on the Company's opening accumulated deficit as of January 1, 2001 discussed below, the restatement affected the Company's opening consolidated balance sheet as of January 1, 2001 (December 31, 2000). The following tables set forth the effects of the Company's restatement adjustments on the Company's condensed consolidated balance sheet as of January 1, 2001 (December 31, 2000). In order to provide a more meaningful basis of comparison with the "Previously

132

ADELPHIA COMMUNICATIONS CORPORATION AND SUBSIDIARIES

(Debtors-In-Possession)

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - Continued

"reported" amounts, the current and noncurrent portions of assets and liabilities have not been separately presented in the following condensed consolidated balance sheets (amounts in thousands):

| | January 1, 2001 (December 31, 2000) | | |
|---|---|---|---|
| | Previously reported (unaudited) | Increase (decrease) | As restated |
| Assets | | | |
| Cash, receivables and other assets | $ 1,283,258 | $ (123,013) | $ 1,160,245 |
| Goodwill and other intangible assets, net | 14,091,402 | (765,137) | 13,326,265 |
| | | | |
| Liabilities and Stockholders' Equity | | | |
| | | | |
| Debt | 12,603,413 | 1,638,680 | 14,242,093 |
| Total liabilities | 16,287,376 | 483,515 | 16,770,891 |
| | | | |
| Stockholders' equity: | | | |
| Common stock | 1,530 | — | 1,530 |
| Accumulated other comprehensive income (loss) | (16,362) | 14,360 | (2,002) |
| Treasury stock, at cost | (149,401) | 116,057 | (33,344) |
| | | | |
| Amounts due from the Rigas Family and Rigas Family Entities, net | — | (1,401,760) | (1,401,760) |
| | | | |
| Total liabilities and stockholders' equity | $ 21,499,480 | $ (2,350,253) | $ 19,149,227 |

*Changes in Reporting Entity*

*Change to Equity Method.*    On October 1, 1999, the Company acquired Century and its 50% equity interests in Century/ML Cable Venture ("Century/ML Cable") and Century Venture Corp. ("CVC"), and in 1995, the Company acquired a 50% equity interest in St. Marys Television Inc. ("St. Marys"). In previously issued consolidated financial statements, the Company had consolidated Century/ML Cable, CVC and St. Marys effective with their respective acquisition dates despite the fact that the Company did not own a controlling financial interest in any of these entities. Accordingly, the Company has restated its consolidated financial statements to account for its interests in Century/ML Cable, CVC and St. Marys using the equity method of accounting during the periods that such interests were owned by the Company. In May 2001, the Company exercised its rights under the CVC shareholders' agreement to withdraw from CVC and reacquire the cable systems originally contributed by the Company to CVC. The above-described restatement adjustments by themselves did not have an impact on the Company's accumulated deficit at January 1, 2001. However, restatement adjustments

133

# EXHIBIT E

| | |
|---|---|
| ADELPHIA COMMUNICATIONS CORP., | : COURT OF COMMON PLEAS |
| | : PHILADELPHIA COUNTY |
| Plaintiff, | : PENNSYLVANIA |
| | : |
| v. | : |
| | : |
| DELOITTE & TOUCHE LLP, | : |
| | : |
| Defendant, | : NOVEMBER TERM 2002 |
| | : NO. 000598 |
| v. | : |
| | : ASSIGNED TO COMMERCE |
| JOHN RIGAS, TIMOTHY RIGAS, | : PROGRAM |
| MICHAEL RIGAS AND JAMES RIGAS. | : |
| | : |
| Additional Defendants. | : |

## CONFIDENTIALITY AGREEMENT

IT IS HEREBY STIPULATED AND AGREED by and between the parties that:

1. **DEFINITIONS**

   1. The terms in this paragraph 1 shall have throughout this Confidentiality Agreement the meanings provided. Defined terms may be used in the singular or plural.

      1.1. The term "Confidential Information" means discovery material within the scope of the Pennsylvania Rules of Civil Procedure designated as confidential by a Designating Party. The designation of information as "Confidential Information" by any party or other person means that such party or other person in good faith believes that the information is confidential and/or competitively sensitive information whose disclosure could impair the interests of the Designating Person. "Confidential

Information" collectively refers to information designated as "Confidential" or "Highly Confidential", pursuant to Paragraphs 11 and 12 herein. Any summary compilation, copy or extract of such Confidential Information shall also constitute Confidential Information.

    1.2.    "Designating Party" means the party or non-party designating any discovery material which has been produced or which will be produced as Confidential Information.

    1.3.    "Receiving Party" means the party receiving or requesting production of Confidential Information.

    1.4.    "Termination" means settlement of or entry of final judgment in this action, as to which no timely appeal or request for reconsideration, rehearing or reargument has been filed and as to which the time to appeal, or to request reconsideration, rehearing or reargument has passed.

    1.5.    The term "document" shall have the full meaning ascribed to it in Pennsylvania Rule of Civil Procedure 4009.1, and shall include, without limitation, writings, drawings, graphs, charts, photographs, video or audio recordings, and other data compilations from which information can be obtained or translated, and any copies thereof, whether in hard copy or electronic format.

**II.**     **SCOPE AND INTERPRETATION OF THIS CONFIDENTIALITY AGREEMENT**

    2.    This Confidentiality Agreement shall be applicable to, and shall govern, all discovery material produced and disclosed in this action, including all information contained in writings and documents, deposition testimony, deposition exhibits, interrogatory responses, responses to requests for admission, responses to

2

production requests, responses to deposition on written question and other written, recorded, electronic or graphic materials produced in discovery.

3.      In the event that non-parties produce documents or information in connection with this action, the parties and all other persons subject to this Confidentiality Agreement agree that such production may, at the producing non-party's request, be subject to the provisions of this Confidentiality Agreement.

4.      The designation of information as "Confidential Information" pursuant to this Confidentiality Agreement shall not preclude any party from disclosing that information to any person who, in the case of a document, appears as the author or as a recipient thereof on the face of the document, or from disclosing that information to any person who has been identified by the Designating Party as having previously been provided with, or having had access to, the document or the information therein.

5.      In the event a Designating Party elects to produce documents for inspection and the Receiving Party desires to inspect them before designating them for copying, the Designating Party need not mark the documents in advance of any such inspection.  For purposes of the inspection, and any subsequent inspection of the original documents, all documents produced for inspection shall be deemed to be designated as Confidential Information.  Thereafter, upon selection of specified documents for copying by the Receiving Party, the Designating Party may make the appropriate confidentiality designation at the time the copies are produced to the Receiving Party.

6.      This Confidentiality Agreement shall not be construed:  (a) to limit any party's ability to disclose or use Confidential Information produced by that party; (b) to apply to information which is or becomes publicly known through no fault of the

3

Receiving Party; or (c) to apply to information which the Receiving Party or its counsel

has, prior or subsequent to the date of receipt of the information from the Designating

Party, lawfully, without violating the terms of this Confidentiality Agreement or the

Supplemental Confidentiality Agreement entered into on September 20, 2004, obtained

from a non-party or independently developed without the use of information derived from

Confidential Information; provided, however, that notwithstanding the foregoing,

Adelphia agrees to treat as "Confidential Information" those Deloitte documents it

received from any other sources, including the Securities and Exchange Commission.

Any documents or information developed from Confidential Information shall not be

considered independently developed.  Nothing herein shall eliminate any party's duties or

obligations to maintain confidential treatment of documents or information of an

opposing party that is in that party's possession.

   7.  All Confidential Information and all information derived from

Confidential Information shall be used solely for preparation and trial of this action,

including motions, appeals and retrials therein, and preparation and trial of the following

actions in which the Receiving Party is or would be a party, including motions, appeals

and retrials therein:

    (a) Contested Matters in In re Adelphia Communications Corp., et
    al., No. 02-41729, United States Bankruptcy Court, Southern
    District of New York, including without limitation, Adelphia v.
    John J. Rigas, et al., Adv. Pro. No. 02-08051, U.S. Bankruptcy
    Court, Southern District of New York [See list at Exhibit B];

    (b) Securities & Exchange Commission v. Adelphia
    Communications Corp., et al., No. 02 CV 5776, U.S. District
    Court, Southern District of New York;

    (c) To the extent not subject to the automatic stay pursuant to Section
    362 of the Bankruptcy Code, any securities actions that have been

brought or might be brought against Adelphia, including without limitation In re Adelphia Communications Corp. Securities & Derivative Litig., 03 MD 1529, U.S. District Court, Southern District of New York;

(d)    To the extent not subject to the automatic stay pursuant to Section 362 of the Bankruptcy Code, any litigation relating to Adelphia's Director's and Officer's liability insurance policies, including without limitation Associated Electric & Gas Ins. Servs., Ltd., et al. v. Rigas, et al., Civ. A. No. 02 CV 7444, U.S. District Court, Eastern District of Pennsylvania;

(e)    Any potential litigation between Adelphia and Buchanan Ingersoll P.C.;

(f)    Any potential litigation of forfeiture or other claims, causes of actions or charges by the United States Government;

(g)    Any litigation, including In re Adelphia Communications Corp. Securities & Derivative Litig., 03 MD 1529, U.S. District Court, Southern District of New York, or potential litigation in which Deloitte & Touche is a party, relating to Adelphia;

7.1    Use of Confidential Information in the actions described in paragraphs 7(a) - 7(g) shall be governed by the provisions of this Confidentiality Agreement, except to the extent provisions of this Confidentiality Agreement conflict with orders duly entered by the Court in the actions described in paragraphs 7(a) - 7(g).

7.2    If a party plans to add to the list of actions in paragraph 7, the party must provide the other parties with five days' notice.

7.3    Notwithstanding the foregoing, the parties may from time to time agree in writing that certain Confidential Information shall be designated "Supplemental Confidential Information". Any such materials shall be produced with the designation "SUBJECT TO SUPPLEMENTAL CONFIDENTIALITY PROVISIONS" adjacent to the designation of "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL" pursuant to

paragraph 13. Any Supplemental Confidential Information and all information derived from Supplemental Confidential Information shall be used solely for preparation and trial of this action, including motions, appeals and retrials therein."

      7.4    Subject to the restrictions set forth in Section 7.3, above, as to the use of Supplemental Confidential Information, Confidential Information and information derived from Confidential Information, shall not be disclosed to any person other than those persons identified in paragraph 14.

      8.    In the event a Receiving Party disagrees at any stage of these proceedings with the Designating Party's designation of Confidential Information, the parties shall first try to resolve such dispute in good faith on an informal basis. If the dispute cannot be so resolved, the Receiving Party may then make an application to the Court, on ten (10) business days written notice to all parties, seeking to have the Confidential Information de-designated as such. The Designating Party shall have the burden of proving that the information is entitled to be treated as Confidential Information for the purposes of this Confidentiality Agreement. The parties shall be bound by the original confidentiality designation during the pendency of any challenge or application for de-designation.

      9.    This Confidentiality Agreement is intended solely for the purpose of facilitating the pre-trial exchange of information between or among the parties and non-parties to this action without involving the Court unnecessarily in the process. Neither this Confidentiality Agreement, nor the production of any information under its terms, nor any proceedings undertaken pursuant hereto, shall be deemed to have the effect of any admissions or waiver by any party of, or otherwise deemed to alter the confidentiality

6

or nonconfidentiality of, any information. Compliance with this Confidentiality Agreement shall not operate as an admission as to the admissibility, materiality or relevance of any information, or as an admission that any objection has or has not been validly or timely asserted. All objections with respect to admissibility, relevance, materiality or otherwise arising under the Rules of Evidence are specifically reserved.

10.    This Confidentiality Agreement is without prejudice to the right of either party or any non-party: (a) to apply to the Court for a protective order relating to any Confidential Information or relating to any discovery or privilege in this action; (b) to object to the production of documents it considers privileged or not subject to discovery; or (c) to apply to the Court for an order compelling the production of documents or for any order permitting disclosure of Confidential Information beyond the terms of this Confidentiality Agreement.

## III.  DESIGNATION OF CONFIDENTIAL INFORMATION

11.     Confidential Information may be designated by any Designating Party as "Confidential" or "Highly Confidential", as the case may be.  Moreover, non-parties may designate documents that they produce and that contain Confidential Information as "Confidential".  A party may also designate as "Confidential" documents produced by another party or non-party if those documents were created by the Designating Party.

12.     To designate Confidential Information "Highly Confidential", the Designating Party must reasonably and in good faith believe that the Confidential Information reflects:  (A) highly confidential proprietary information, trade secrets, research, development and/or commercial information; or (B) sensitive non-public information that if improperly disclosed, is likely to cause the Designating Party competitive harm.

13.     Confidential Information contained in a document or thing shall be designated specifically by marking the document or thing as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL".  Multi-paged documents shall be designated confidential by marking or stamping the first page of such documents and all pages therein containing Confidential Information.  Responses to interrogatories, requests for admission or depositions upon written question shall be designated "CONFIDENTIAL" by marking or stamping the first page of such documents and all pages therein containing "CONFIDENTIAL" information as "CONFIDENTIAL".  "HIGHLY CONFIDENTIAL" information in such documents shall be set forth on separate sheets of paper and marked or stamped as "HIGHLY CONFIDENTIAL".  Notwithstanding the foregoing, Adelphia shall not be required to specifically label as "Confidential" or "Highly Confidential" any

8

Adelphia documents that already exist in a production format without such a label; instead, Adelphia may designate such materials as "Confidential" or "Highly Confidential" by formal notice, in writing, to all parties, contemporaneous with the production of such materials in this action; provided, however, that to the extent specific labels are not applied directly to the documents, good faith, inadvertent use of such documents in a non-confidential manner by the Receiving Party shall not constitute a breach of this agreement. Failure of the Designating Party to mark a document or thing as Confidential Information in accordance with this Confidentiality Agreement shall not preclude either party from thereafter in good faith marking the document or thing so long as it does so promptly after learning of the initial failure and requests in writing that the Receiving Party treat the document or information as Confidential Information in accordance with this Confidentiality Agreement. Where a Designating Party belatedly designates documents or information as Confidential Information, counsel for the Receiving Party shall take such steps as reasonably necessary to mark and treat the document or thing in accordance with this Confidentiality Agreement. The document or thing shall thereafter be fully subject to this Confidentiality Agreement. Neither party shall incur liability for disclosures made in good faith prior to notice of confidentiality designations.

IV.    **USE AND/OR DISCLOSURE OF CONFIDENTIAL INFORMATION**

14.    The Receiving Party shall not, directly or indirectly, in whole or in part, use, disclose or make available for inspection or copying any information designated as "CONFIDENTIAL", except to qualified persons. The term "qualified person" means:

9

14.1    The Court and its personnel, any jury empanelled in this action and any other person, such as a court appointed and/or party-designated mediator, who may serve in a judicial or quasi-judicial function.

14.2    Government personnel from the following governmental entities: United States Department of Justice, United States Securities and Exchange Commission, United States Internal Revenue Service, United States General Services Administration, United States Congress, United States Air Force or other branches of the Armed Forces, United States Federal Communications Commission and various local franchise authorities where Adelphia has cable systems, in the context of investigations, inquiries or proceedings relating to Adelphia. If any such disclosure is made to any such government personnel, the disclosing party shall inform such government personnel that the Confidential Information was designated "Confidential" pursuant to a Confidentiality Agreement. If a party plans to add to the list of government entities whose personnel may receive Confidential Information, the party must provide the other parties with five days' notice.

14.3    A professional court reporter engaged to transcribe testimony in this action.

14.4    Employees of outside litigation support vendors retained for purposes of this action, including commercial copy and imaging services engaged to make copies.

14.5    In-house lawyers who are engaged in preparation for trial and trial of this litigation, including the following necessary in-house staff: lawyers, accountants, legal assistants and stenographic and clerical employees assisting these persons.

10

14.6    Any party to this action, or officers, directors, and employees of any party to this action (a) who are actively engaged in assisting counsel with the prosecution or defense of this action; or (b) who are being advised by counsel regarding these actions and the particular disclosure is reasonably necessary with regard to the legal advice being rendered.

14.7    Outside counsel engaged to represent one of the parties to this action, whether or not counsel of record, including necessary legal assistants and stenographic and clerical employees actually assisting such counsel and outside vendors engaged by such counsel to scan and/or code documents.

14.8    Outside independent experts or consultants of the parties retained in connection with this action (collectively and hereinafter, "experts").

14.9    Any person whose deposition is taken in this action and their attorney.

14.10    Members of the Official Committee of Unsecured Creditors and their counsel and members of the Official Committee of Equity Security Holders and their counsel, provided that disclosure shall be for purposes relating to this action only.

14.11    Any bonafide potential purchaser of Adelphia or some or all of its cable systems, provided that such disclosure shall be pursuant to confidentiality restrictions that limit such potential buyer's use to evaluation of such information for due diligence purposes only and not for any other business, personal or litigation purpose.

14.12    Those persons to whom disclosure is authorized under paragraph 4 hereof.

14.13  Subject to the restrictions set forth in Section 7.3, above, as to the use of Supplemental Confidential Information, references to "this action" in paragraphs 14.1 - 14.12, above, in connection with use of Confidential Information in any of the actions described in paragraphs 7(a) - 7(g), above, shall mean the particular action in which the Confidential Information is being used.

15.        The Receiving Party may disclose "HIGHLY CONFIDENTIAL" information only to qualified persons, except that such information cannot be disclosed to those persons identified in paragraphs 14.10 and 14.11.  Documents and things that have been designated "HIGHLY CONFIDENTIAL" cannot be disclosed to those persons identified in paragraph 14.6, except that counsel may use information derived from documents and things that have been designated "HIGHLY CONFIDENTIAL" to provide legal advice to persons identified in paragraph 14.6 regarding these actions, provided that the particular disclosure is reasonably necessary with regard to the legal advice being rendered.

16.        Before counsel for a party may disclose Confidential Information to persons described in paragraphs 14.6, 14.8, 14.10 and 14.11, the disclosing counsel shall obtain from such person an executed copy of the Agreement To Abide by the Confidentiality Agreement ("Agreement To Abide") attached hereto as Exhibit A. Before counsel for a party may disclose Confidential Information to a person described in paragraph 14.9, the disclosing counsel shall make a good faith effort to have the person and their attorney execute the Agreement To Abide and if the person or his attorney refuses, the disclosing counsel will not provide, and will make a good faith effort to ensure that the court reporter not provide, the person with copies of any deposition

exhibits marked "Confidential" although such documents may be made available to the person or his or her counsel at the offices of the disclosing counsel. Disclosing counsel shall retain the original executed Agreement To Abide. The names of persons who have signed the form attached as Exhibit A shall not be discoverable except upon a showing of good cause and by order of the Court. To the extent Adelphia has already obtained Deloitte documents from third parties that, pursuant to this stipulation, shall be treated as "Confidential Information," but that have already been provided to persons described in paragraphs 14.6, 14.8, 14.9, 14.10 or 14.11, Adelphia shall promptly obtain executed copies of an Agreement To Abide from each such person.

   17.  Disclosure of Highly Confidential Information may be made to experts as identified in paragraph 14.8. Prior to disclosing any Highly Confidential Information to any such expert:

      a.  Counsel for the party contemplating such disclosure shall determine that (1) disclosure to any expert of particular Highly Confidential Information is, in that counsel's good faith judgment, necessary to that party's prosecution of the case, (2) the expert is not, and is not believed to intend to become affiliated with or employed by any entity that is or intends to be in the business of providing auditing services, and (3) counsel has formed a good faith and informed belief that the individual has not previously violated any confidentiality agreement or order and is not likely to violate the terms of this Confidentiality Agreement.

      b.  Each such expert must execute the Agreement To Abide pursuant to paragraph 16. Counsel for the party obtaining an expert's signature on the Agreement To Abide shall retain the original signed agreement

13

18.     If a party, who designates information as Highly Confidential, files and serves on counsel for the disclosing party, within five (5) business days after receipt of the Agreement To Abide, an objection to disclosure of Highly Confidential Information to a particular expert and a motion for protective order preventing such disclosure, the disclosing party shall not disclose Highly Confidential Information to such expert until the Court has denied such motion.

## V.     USE OF CONFIDENTIAL INFORMATION AT DEPOSITIONS

19.     Upon the good faith assertion by counsel for the Designating Party that a question or line of questions at a deposition or hearing is likely to result in the disclosure of Confidential Information, any person not entitled under paragraph 14 to have access to Confidential Information shall leave the deposition or hearing until the question or line of questions is completed, unless otherwise ordered by the Court or agreed by the parties, and the Confidential Information disclosed at the deposition or hearing shall not, directly or indirectly, in whole or in part, be used, disclosed or made available to any person, except those persons set forth in paragraph 14.

20.     Information disclosed at a deposition may be designated as Confidential Information either (a) on the record at the deposition; or (b) by serving a written notification on the other parties to this action and any involved deponent within thirty (30) business days of receipt of the deposition transcript by counsel for the Designating Party, and by specifically designating information contained in the transcripts or exhibits as Confidential Information, whether or not previously designated as such.

14

21.        All transcripts of depositions and deposition exhibits, and all information adduced at a deposition, shall, in their entirety, be treated as Confidential Information for a period of thirty (30) business days after such transcripts and exhibits are actually received by counsel for each party. If information in the transcript or exhibits is designated as Confidential Information, each party shall attach a copy of the Designating Party's written notification of Confidential Information to the face of the transcript or exhibit and to each copy in its possession, custody or control and copies of such transcripts and exhibits may only be provided to those persons who are allowed access pursuant to paragraph 14 hereof.

15

## VI.   DESIGNATED CONFIDENTIAL INFORMATION AND COURT PROCEEDINGS OR FILINGS

22.    The parties understand that it is the practice of the Court that discovery responses are not to be filed with the Court. The parties shall make good faith efforts to avoid the unnecessary disclosure of Confidential Information in any court filings, including in court filings made in the actions described in paragraphs 7(a) - 7(g), above. All documents which are filed with the Court that have been designated as Confidential Information, or any pleading purporting to reproduce, paraphrase, discuss or otherwise reveal such information, shall be filed pursuant to a protocol agreed upon by the parties and approved by the Court for filing Confidential Information under seal. Although the parties understand that there might be other parties in the actions described in paragraphs 7(a) - 7(g), above, that will not be original signatories to the protocol as drafted, the parties undertake to make good faith efforts to make all such parties file Confidential Information under seal in accordance with relevant court rules.

23.    Except as filed with the Court in accordance with this Confidentiality Agreement, and except as otherwise may be required by law, all documents and things designated as Confidential Information shall be maintained at all times in the custody of individuals to whom access may be given in accordance with paragraph 14 hereof.

24.    Confidential Information may be offered into evidence in open court at trial or other hearing unless the Designating Party obtains an appropriate protective order from the Court. If a party to this action intends to disclose Confidential Information in open court at trial or other hearing, that party must make a good faith effort to notify the Designating Party of its intention no fewer than three (3) business days before such use. In the event of a trial or hearing, counsel for the parties shall use their best efforts to

16

ensure that Confidential Information is not disclosed to persons other than those set forth in paragraph 14 hereof. Nothing in this Confidentiality Agreement shall preclude (i) a Designating Party from seeking an appropriate order from the Court to ensure that Confidential Information is not publicly disclosed at such evidentiary hearing or trial, or (ii) require prior notice to opposing counsel of any document intended to be used at such evidentiary hearing or trial solely for the purposes of impeachment.

## VII.    TERMINATION OF THIS ACTION

25.    Termination of this action shall not terminate the limitations on use and disclosure imposed by this Confidentiality Agreement. Upon termination of this action and upon written request of the Designating Party, all Confidential Information and all copies thereof, shall be delivered to counsel of record for the Designating Party within 90 days of such written request, or else shall be destroyed. If the Confidential Information is destroyed, the Receiving Party shall provide the Designating Party with a written certification within 90 days that such destruction has occurred and that no copies (whether in hard copy or electronic format) are being retained. Notwithstanding the foregoing, counsel of record for the parties to this action may retain copies of briefs and other papers filed with the court and attorney work-product that contains or constitutes Confidential Information so long as such briefs and other papers are maintained in accordance with the provisions of this Confidentiality Agreement. The obligation to treat "Confidential Information" in accordance with the provisions of this Confidentiality Agreement shall survive termination of this action.

26.    The parties and all persons and entities subject to discovery in this action who are bound by this Confidentiality Agreement hereby consent to the

17

jurisdiction of the Court for the purposes of enforcement of this Confidentiality

Agreement.

## VIII.  MISCELLANEOUS

27.    If any party or other person or entity bound by this Confidentiality

Agreement is served with a subpoena, discovery device or order for the production of

Confidential Information that has been produced under the terms of this Confidentiality

Agreement, such party or other person or entity:  (A) shall notify the Designating Party of

the subpoena, discovery device or order within ten (10) business days of receipt of said

subpoena, discovery device or order by serving by facsimile upon counsel of record for

the Designating Party a copy of said subpoena, discovery device or order, and (B) shall

not produce the information sought by the subpoena, discovery device or order until the

Designating Party has had thirty (30) days from the date of service of the copy of said

subpoena, discovery device or order to object or take other appropriate steps to protect

the information.

28.    Inadvertent production of a document or thing that is subject to the

attorney-client privilege, attorney product doctrine, or any other applicable privilege or

protection, shall not constitute a waiver if the inadvertent production does not constitute a

waiver under Pennsylvania law.

28.1    If any party learns that it has inadvertently produced a document it

reasonably believes to be privileged, it shall promptly notify the other parties.  Upon

notification by the producing party that it believes it has inadvertently produced a

privileged document, all parties shall immediately return the document or thing in

question to the producing party.  If a party with such documents in its possession intends

18

to challenge the validity of the claimed privilege or protection, or to claim that such privilege has been waived under Pennsylvania law, it may so notify the producing party and retain, in a sealed envelope, one copy of the document or thing, and make a prompt application to the Court regarding the document or thing. If the Court upholds the privilege or protection, the moving party shall return the remaining copy to the producing party.

28.2    If any party learns that it has in its possession a document or thing produced by another party or third-party that it reasonably believes to be privileged, the party shall immediately return the document or thing in question to the producing party. If a party with such documents or things in its possession intends to challenge the validity of the claimed privilege or protection, or to claim that such privilege has been waived under Pennsylvania law, it may so notify the producing party and retain, in a sealed envelope, one copy of the document or thing, and make a prompt application to the Court regarding the document or thing. If the Court upholds the privilege or protection, the moving party shall return the remaining copy to the producing party

29.    Execution of this Confidentiality Agreement shall not prevent a party to this action from seeking, upon application to the Court on ten (10) business days notice, to modify this Confidentiality Agreement for good cause shown or from seeking such other relief upon good cause shown as may become appropriate or necessary.

19

Dated:  September 20, 2004

Max R. Shulman
Katherine B. Forrest
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY  10019-7475
(212) 474-1000

Attorneys for Deloitte & Touche LLP


Philip C. Korologos
Eric Brenner
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, NY  10504
 (914) 749-8200

Stephen N. Zack
BOIS, SCHILLER & FLEXNER LLP
100 S.E. Second Street, Suite 2800
Miami, FL  33131
(305) 539-8400

Attorneys for Adelphia Communications Corp.


Lawrence G. McMichael
Penny Conly Ellison
John J. Higson
DILWORTH PAXSON LLP
3200 Mellon Bank Center
1735 Market Street
Philadelphia, PA  19103
 (215) 575-7000

Attorneys for John, Timothy, Michael and James Rigas

## EXHIBIT A

## AGREEMENT TO ABIDE BY CONFIDENTIALITY AGREEMENT

1.    I, _____, have carefully reviewed and understand the provisions of the attached CONFIDENTIALITY AGREEMENT and have received a copy of the Confidentiality Agreement.

2.    I will comply with all of the provisions of the Confidentiality Agreement.

3.    I understand that execution of this Agreement To Abide By the Confidentiality Agreement shall constitute a binding obligation on me to be bound by the Confidentiality Agreement and shall constitute consent to the jurisdiction of the Court of Common Pleas of Philadelphia County, Pennsylvania to enforce the Confidentiality Agreement against me.

Dated: _____    By: _____

21

# EXHIBIT F

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re ) | Chapter 11 Case |
| ) | |
| ADELPHIA COMMUNICATIONS CORP., et al., ) | Case No. 02-41729 (REG) |
| a Delaware corporation, ) | |
| ) | |
| Debtors. ) · | (Jointly Administered) |
| ) | |
| ADELPHIA COMMUNICATIONS CORP., et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | |
| ) | |
| PRESTIGE COMMUNICATIONS OF NC, INC., et al, ) | Adv. Pro. No. 04-03293 (REG) |
| ) | |
| Defendants. ) | |
| ) | |

## CONFIDENTIALITY AGREEMENT

IT IS HEREBY STIPULATED AND AGREED by and between the parties that:

**I.    DEFINITIONS**

1.    The terms in this paragraph 1 shall have throughout this Confidentiality

Agreement the meanings provided.  Defined terms may be used in the singular or plural.

1.1    The term "Confidential Information" means discovery material within the

scope of the Federal Rules of Civil Procedure designated as confidential by a Designating Party.

The designation of information as "Confidential Information" by any party or other person

means that such party or other person in good faith believes that the information is confidential

or competitively sensitive information.  "Confidential Information" collectively refers to

information designated as "Confidential" or "Highly Confidential", pursuant to Paragraphs 11,

12 and 13 herein. Any summary compilation, copy or extract of such Confidential Information shall also constitute Confidential Information.

      1.2    "Designating "Party" means the party or non-party designating any discovery material which has been produced or which will be produced as Confidential Information.

      1.3    "Receiving Party" means the party receiving or requesting production of Confidential Information.

      1.4    "Termination" means settlement of or entry of final judgment in this action, as to which no timely appeal or request for reconsideration, rehearing or reargument has been filed and as to which the time to appeal, or to request reconsideration, rehearing or reargument has passed.

      1.5    The term "document" shall have the full meaning ascribed to it in Federal Rule of Civil Procedure 26, and shall include, without limitation, writings, drawings, graphs, charts, photographs, video or audio recordings, and other data compilations from which information can be obtained or translated, and any copies thereof, whether in hard copy or electronic format.

## II.    SCOPE AND INTERPRETATION OF THIS CONFIDENTIALITY AGREEMENT

      2.    This Confidentiality Agreement shall be applicable to, and shall govern, all discovery material produced and disclosed in this action, including all information contained in writings and documents, deposition testimony, deposition exhibits, interrogatory responses, responses to requests for admission, responses to production requests, responses to deposition on

2

written question and other written, recorded, electronic or graphic materials produced in discovery.

3.     In the event that non-parties produce documents or information in connection with this action, the parties and all other persons subject to this Confidentiality Agreement agree that such production may, at the producing non-party's request, be subject to the provisions of this Confidentiality Agreement.

4.     The designation of information as "Confidential Information" pursuant to this Confidentiality Agreement shall not preclude any party from disclosing that information to any person who, in the case of a document, appears as the author or as a recipient thereof on the face of the document, or from disclosing that information to any person who has been identified by the Designating Party as having previously been provided with, or having had access to, the document or the information therein.

5.     In the event a Designating Party elects to produce documents for inspection and the Receiving Party desires to inspect them before designating them for copying, the Designating Party need not mark the documents in advance of any such inspection.  For purposes of the inspection, and any subsequent inspection of the original documents, all documents produced for inspection shall be deemed to be designated as Confidential Information.  Thereafter, upon selection of specified documents for copying by the Receiving Party, the Designating Party may make the appropriate confidentiality designation at the time the copies are produced to the Receiving Party.

6.     This Confidentiality Agreement shall not be construed: (a) to limit any party's ability to disclose or use Confidential Information produced by that party; (b) to apply to

information which is or becomes publicly known through no fault of the Receiving Party; or

(c) to apply to information which the Receiving Party or its counsel has, prior or subsequent to

the date of receipt of the information from the Designating Party, lawfully, without violating the

terms of this Confidentiality Agreement or, obtained from a non-party or independently

developed without the use of information derived from Confidential Information. Any

documents or information developed from Confidential Information shall not be considered

independently developed.  Nothing herein shall eliminate any party's duties or obligations to

maintain confidential treatment of documents or information of an opposing party that is in that

party's possession.

      7.     All Confidential Information and all information derived from Confidential

Information shall be used solely for preparation and trial of this action, including motions,

appeals and retrials therein, and preparation and trial of the following actions in which the

Receiving Party is or would be a party, including motions, appeals and retrials therein:

        (a)     Contested Matters in <u>In re Adelphia Communications Corp., et al.</u>, No. 02-
               41729 (REG), United States Bankruptcy Court, Southern District of New
               York, including without limitation, <u>Adelphia v. Bank of America, N.A., et</u>
               <u>al</u>, Adv. Pro. No. 03-04942 (REG), U.S. Bankruptcy Court, Southern
               District of New York.

Confidentiality Information may only be used in other actions in which a confidentiality

agreement or order is in place.

      7.1     Use of Confidential Information in the actions described in this paragraph

shall be governed by the provisions of this Confidentiality Agreement, except to the extent

4

provisions of this Confidentiality Agreement conflict with orders duly entered by the Court in the actions described in this paragraph.

      7.2    Confidential Information and information derived from Confidential Information, shall not be disclosed to any person other than those persons identified in paragraph 14.

      8.    In the event a Receiving Party disagrees at any stage of these proceedings with the Designating Party's designation of Confidential Information, the parties shall first try to resolve such dispute in good faith on an informal basis. If the dispute cannot be so resolved, the Receiving Party may then make an application to the Court, on ten (10) days written notice to all parties, seeking to have the Confidential Information de-designated as such. The Designating Party shall have the burden of proving that the information is entitled to be treated as Confidential Information for the purposes of this Confidentiality Agreement. The parties shall be bound by the original confidentiality designation during the pendency of any challenge or application for de-designation. No party to this action shall be obligated to challenge the propriety of any designation and a failure shall not preclude a subsequent attack on the propriety of such designation.

      9.    This Confidentiality Agreement is intended solely for the purpose of facilitating the pre-trial exchange of information between or among the parties and non-parties to this action without involving the Court unnecessarily in the process. Neither this Confidentiality Agreement, nor the production of any information under its terms, nor any proceedings undertaken pursuant hereto, shall be deemed to have the effect of any admissions or waiver by any party of, or otherwise deemed to alter the confidentiality or nonconfidentiality of, any

information.  Compliance with this Confidentiality Agreement shall not operate as an admission as to the admissibility, materiality or relevance of any information, or as an admission that any objection has or has not been validly or timely asserted.  All objections with respect to admissibility, relevance, materiality or otherwise arising under the Rules of Evidence are specifically reserved.

10.    This Confidentiality Agreement is without prejudice to the right of either party or any non-party: (a) to apply to the Court for a protective order relating to any Confidential Information or relating to any discovery or privilege in this action; (b) to object to the production of documents it considers privileged or not subject to discovery; or (c) to apply to the Court for an order compelling the production of documents or for any order permitting disclosure of Confidential Information beyond the terms of this Confidentiality Agreement.  Nothing herein shall prevent disclosure beyond the terms of this Confidentiality Agreement if the person or party designating the material as Confidential Information specifically consents in advance in writing to such disclosure.  Nothing herein shall preclude any party or third party from making an application to the Court concerning the handling or treatment of material designated as Confidential Information at any trial or hearing in this action.

## III.    **DESIGNATION OF CONFIDENTIAL INFORMATION**

11.    Confidential Information may be designated by any Designating Party as "Confidential" or "Highly Confidential", as the case may be.  Moreover, non-parties may designate documents that they produce and that contain "Confidential" documents produced by another party or non-party if those documents were created by the Designating Party.

12.    To designate Confidential Information "Highly Confidential", the Designating

Party must reasonably and in good faith believe that the Confidential Information reflects: (A)

highly confidential proprietary information, trade secrets, research, development and/or

commercial information; or (B) sensitive non-public information.

13.    Confidential Information contained in a document or thing shall be designated

specifically by marking the document or thing as "CONFIDENTIAL" or "HIGHLY

CONFIDENTIAL". Multi-paged documents shall be designated Confidential or Highly

Confidential by marking or stamping the first page of such documents and all pages therein

containing Confidential Information. Responses to interrogatories, requests for admission or

depositions upon written question shall be designated "CONFIDENTIAL" or "HIGHLY

CONFIDENTIAL" by marking or stamping the first page of such documents and all pages

therein containing "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL" information as

"CONFIDENTIAL" or "HIGHLY CONFIDENTIAL." Notwithstanding the foregoing,

Adelphia shall not be required to specifically label as "Confidential" or "Highly Confidential"

any Adelphia documents that already exist in a production format without such a label; instead,

Adelphia may designate such materials as "Confidential" or "Highly Confidential" by formal

notice, in writing, to all parties, contemporaneous with the production of such materials in this

action; provided, however, that to the extent specific labels are not applied directly to the

documents, good faith, inadvertent use of such documents in a non-confidential manner by the

Receiving Party shall not constitute a breach of this agreement. Failure of the Designating Party

to mark a document or thing as Confidential Information in accordance with this Confidentiality

Agreement shall not preclude either party from thereafter in good faith marking the document or

thing so long as it does so promptly after learning of the initial failure and requests in writing that

7

the Receiving Party treat the document or information as Confidential Information in accordance

with this Confidentiality Agreement. Where a Designating Party belatedly designates documents

or information as Confidential Information, counsel for the Receiving Party shall take such steps

as reasonably necessary to mark and treat the document or thing in accordance with this

Confidentiality Agreement. The document or thing shall thereafter be fully subject to this

Confidentiality Agreement. Neither party shall incur liability for disclosures made in good faith

prior to notice of confidentiality designations.

## IV.    USE AND/OR DISCLOSURE OF CONFIDENTIAL INFORMATION

14.    The Receiving Party shall not, directly or indirectly, in whole or in part, use,

disclose or make available for inspection or copying any information designated as

"CONFIDENTIAL", except to qualified persons. The term "qualified person" means:

14.1    The Court and its personnel, any jury empanelled in this action and any

other person, such as a court appointed and/or party-designated mediator, who may serve in a

judicial or quasi-judicial function.

14.2    Government personnel from the following governmental entities: United

States Department of Justice, United States Securities and Exchange Commission, United States

Internal Revenue Service, United States General Services Administration, United States

Congress, United States Air Force or other branches of the Armed Forces, United States Federal

Communications Commission and various local franchise authorities where Adelphia has cable

systems, in the context of investigations, inquiries or proceedings relating to Adelphia. If any

such disclosure is made to any such government personnel, the disclosing party shall inform such

government personnel that the Confidential Information was designated "Confidential" pursuant

to a Confidentiality Agreement.  If a party plans to add to the list of government entities whose personnel may receive Confidential information, the party must provide the other parties with five days' written notice.

14.3    A professional court reporter engaged to transcribe testimony in this action.

14.4    Employees of outside litigation support vendors retained for purposes of this action, including commercial copy and imaging services engaged to make copies.

14.5    In-house lawyers who are engaged in preparation for trial and trial of this litigation, including the following necessary in-house staff:  lawyers, accountants, legal assistants and stenographic and clerical employees assisting these persons.

14.6    Any party to this action, or officers, directors, and employees of any party to this action (a) who are actively engaged in assisting counsel with the prosecution or defense of this action; or (b) who are being advised by counsel regarding these actions and the particular disclosure is reasonably necessary with regard to the legal advice being rendered.

14.7    Outside counsel engaged to represent one of the parties to this action, whether or not counsel of record, including necessary legal assistants and stenographic and clerical employees actually assisting such counsel and outside vendors engaged by such counsel to scan and/or code documents.

14.8    Outside independent experts or consultants of the parties retained in connection with this action (collectively and hereinafter, "experts").

14.9    Any person whose deposition is taken in this action and their attorney.

14.10   Members of the Official Committee of Unsecured Creditors and their

counsel.

14.11   Those persons to whom disclosure is authorized under paragraph 4 hereof.

14.12   References to "this action," in paragraphs 14.1 - 14.11, above, in

connection with use of Confidential Information in any of the actions described in paragraph 7,

above, shall mean the particular action in which the Confidential Information is being used.

15.    The Receiving Party may disclose "HIGHLY CONFIDENTIAL" information

only to qualified persons, except that such information cannot be disclosed to those persons

identified in paragraphs 14.2, 14.6, 14.9 (unless such person was a recipient, sender or creator of

such Highly Confidential material, or if the attorney providing such Highly Confidential material

to such person has a good faith belief that such person has specific knowledge about such Highly

Confidential material) and 14.10. Notwithstanding the foregoing, counsel may use information

derived from documents and things that have been designated "HIGHLY CONFIDENTIAL" to

provide legal advice to persons identified in paragraph 14.6 and 14.10 regarding these actions,

provided that the particular disclosure is reasonably necessary with regard to the legal advice

being rendered.

16.    Before counsel for a party may disclose Confidential Information (subject to

paragraph 15 above) to persons described in paragraphs 14.6, 14.8, and 14.10, the disclosing

counsel shall obtain from such person an executed copy of the Agreement To Abide by the

Confidentiality Agreement ("Agreement To Abide") attached hereto as Exhibit A.  Before

counsel for a party may disclose Confidential Information to a person described in paragraph 14.9, the disclosing counsel shall make a good faith effort to have the person and their attorney execute the Agreement To Abide and if the person or his attorney refuses, the disclosing counsel will not provide, and will make a good faith effort to ensure that the court reporter not provide, the person with copies of any deposition exhibits marked "Confidential" although such documents may be made available to the person or his or her counsel at the offices of the disclosing counsel. Disclosing counsel shall retain the original executed Agreement To Abide. The names of persons who have signed the form attached as Exhibit A shall not be discoverable except upon a showing of good cause and by order of the Court.

17.    Disclosure of Highly Confidential Information may be made to experts as identified in paragraph 14.8. Prior to disclosing any Highly Confidential Information to any such expert:

(a)    Counsel for the party contemplating such disclosure shall determine that (1) disclosure to any expert of particular Highly Confidential Information is, in that counsel's good faith judgment, necessary to that party's prosecution of the case, and (2) counsel has formed a good faith belief that the individual has not previously violated any confidentiality agreement or order and is not likely to violate the terms of this Confidentiality Agreement.

(b)    Each such expert must execute the Agreement To Abide pursuant to paragraph 16. Counsel for the party obtaining an expert's signature on the Agreement To Abide shall retain the original signed agreement.

11

## V.     USE OF CONFIDENTIAL INFORMATION AT DEPOSITIONS

18.     Upon the good faith assertion by counsel for the Designating Party that a question or line of questions at a deposition or hearing is likely to result in the disclosure of Confidential Information, any person not entitled under paragraph 14 to have access to Confidential Information shall leave the deposition or hearing until the question or line of questions is completed, unless otherwise ordered by the Court or agreed by the parties, and the Confidential Information disclosed at the deposition or hearing shall not, directly or indirectly, in whole or in part, be used, disclosed or made available to any person, except those persons set forth in paragraph 14.

19.     Information disclosed at a deposition may be designated as Confidential Information either (a) on the record at the deposition; or (b) by serving a written notification on the other parties to this action and any involved deponent within thirty (30) business days of receipt of the deposition transcript by counsel for the Designating Party, and by specifically designating information contained in the transcripts or exhibits as Confidential Information, whether or not previously designated as such.

20.     All transcripts of depositions and deposition exhibits, and all information adduced at a deposition, shall in their entirety, be treated as Confidential Information for a period of thirty (30) business days after such transcripts and exhibits are actually received by counsel for each party. If information in the transcript or exhibits is designated as Confidential Information, each party shall attach a copy of the Designating Party's written notification of Confidential Information to the face of the transcript or exhibit and to each copy in its possession, custody or control and copies of such transcripts and exhibits may only be provided to those persons who are allowed access pursuant to paragraph 14 hereof.

## VI.    DESIGNATED CONFIDENTIAL INFORMATION AND COURT PROCEEDINGS OR FILINGS

21.    The parties understand that it is the practice of the Court that discovery responses are not to be filed with the Court. The parties shall make good faith efforts to avoid the unnecessary disclosure of Confidential Information in any court filings, including in court filings made in the actions described in paragraph 7 above. All documents that have been designated as Confidential Information, or any pleading purporting to reproduce, paraphrase, discuss or otherwise reveal such information, shall only be filed with the Court pursuant to a protocol agreed upon by the parties and approved by the Court for filing Confidential Information under seal. Although the parties understand that there might be other parties in the actions described in paragraph 7, above, that will not be original signatories to the protocol as drafted, the parties undertake to make good faith efforts to make all such parties file Confidential Information under seal in accordance with relevant court rules.

22.    Except as filed with the Court in accordance with Confidentiality Agreement, and except as otherwise may be required by law, all documents and things designated as Confidential Information shall be maintained at all times in the custody of individuals to whom access may be given in accordance with paragraph 14 hereof.

23.    Confidential Information may be offered into evidence in open court at trial or other hearing unless the Designated Party obtains an appropriate protective order from the Court. If a party to this action intends to disclose Confidential Information in open court at trial or other hearing, that party must make a good faith effort to notify the Designated Party of its intention no fewer than three (3) business days before such use. In the event of a trial hearing, counsel for the parties shall use their best efforts to ensure that Confidential Information is not disclosed to

13

persons other than those set forth in paragraph 14 hereof. Nothing in this Confidentiality Agreement shall preclude a Designating Party from seeking an appropriate order from the court to ensure that Confidential Information is not publicly disclosed at such evidentiary hearing or trial.

## VII.   TERMINATION OF THIS ACTION

24.    Termination of this action shall not terminate the limitations on use and disclosure imposed by this Confidentiality Agreement. Upon termination of this action and upon written request of the Designating Party, all Confidential Information and all copies thereof shall be delivered to counsel of record for the Designating Party within 90 days of such written request, or else shall be destroyed. If the Confidential Information is destroyed, the Receiving Party shall provide the Designating Party with a written certification within 90 days that such destruction has occurred and that no copies (whether in hard copy or electronic format) are being retained. Notwithstanding the foregoing, counsel of record for the parties to this action may retain copies of briefs and other papers filed with the court and attorney work-product that contains or constitutes Confidential Information so long as such briefs and other papers are maintained in accordance with the provisions of this Confidentiality Agreement. The obligation to treat "Confidential Information" in accordance with the provisions of this Confidentiality Agreement shall survive termination of this action.

25.    The parties and all persons and entities subject to discovery in this action who are bound by this Confidentiality Agreement hereby consent to the jurisdiction of the Court for the purposes of enforcement of this Confidentiality Agreement.

14

## VIII.  **MISCELLANEOUS**

26.    If any party or other person or entity bound by this Confidentiality Agreement is served with a subpoena, discovery device or order for the production of Confidential Information (the "Subpoenaed Party") that has been produced under the terms of this Confidentiality Agreement, such party or other person or entity shall notify the Designating Party of subpoena, discovery device or order within 10 (10) business days of receipt of said subpoena, discovery device or order.  After the receipt of the notice specified under this paragraph, the Designating Party shall have the sole responsibility for obtaining any order it believes necessary to prevent disclosure of documents or information designed "CONFIDENTIAL" and/or "HIGHLY CONFIDENTIAL."  If the Designating Party does not move to quash the subpoena, move for a protective order, or seek another appropriate order within the time allowed for the discovery sought by the subpoena or request (or within such time as a court may direct or as may be agreed upon between the Designating Party and the subpoenaing or requesting party) or give written notice of such motion to the subpoenaing or requesting party and the Subpoenaed Party, the Subpoenaed Party may commence production in response thereto on the date designated on the subpoena or request.  In all other aspects, the Subpoenaed Party shall cooperate with the Designating Party to the extent permitted by law.  Notwithstanding the filing of a motion to quash or for protective order, nothing in this paragraph requires the Subpoenaed Party to withhold production of documents during the pendency of the motion if not permitted by law to do so.

27.    The inadvertent or unintentional production by a supplying party of any privileged or otherwise protected information shall not be deemed a waiver or an impairment of any claim of privilege or protection, including, but not limited to, the attorney-client privilege

15

and the protection afforded by the attorney work-product doctrine.  Upon receiving notice from a supplying party that privileged information, including copies or summaries thereof, has been inadvertently produced, all such privileged information shall be returned to the supplying party within five (5) business days of receipt of such notice.  A party that returns privileged information after receipt of notice may retain non-substantive information not claimed to be privileged that is sufficient to identify the document or other information that it returns.  This paragraph shall not prejudice the right of any party to challenge a supplying party's claim that information is privileged on any grounds other than the inadvertent or unintentional production of such information.

28.    Execution of this Confidentiality Agreement shall not prevent a party to this action from seeking, upon application to the Court on ten (10) business days notice, to modify this Confidentiality Agreement for good cause shown or from seeking such other relief upon good cause shown as may become appropriate or necessary.

16

Dated: March 8, 2005

_____

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, New York, 10019
(212) 506-1700

Attorneys for Plaintiffs

_____

Traub, Bonacquist & Fox LLP

655 Third Avenue, 21st Floor
New York, New York 10017-5617
Special Counsel for the Debtors

_____

SATTERLEE STEPHENS BURKE & BURKE, LLP
230 Park Avenue
New York, New York 10169-0079

Attorneys for the Defendants

_____

TROUTMAN SANDERS LLP
Bank of America Plaza, Suite 5200
600 Peachtree Street, N.E.
Atlanta, Georgia 30308
(404) 885-3000

17

Dated: ~~February~~ March 8 , 2005

*Joseph O. Gesle*

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, New York, 10019
(212) 506-1700

Attorneys for Plaintiffs

_____

Traub, Bonacquist & Fox LLP
655 Third Avenue, 21st Floor
New York, New York 10017-5617
Special Counsel for the Debtors

*C R Belmont CCB9163*

SATTERLEE STEPHENS BURKE & BURKE, LLP
230 Park Avenue
New York, New York 10169-0079

Attorneys for the Defendants

*Harris Winsberg*

TROUTMAN SANDERS LLP
Bank of America Plaza, Suite 5200
600 Peachtree Street, N.E.
Atlanta, Georgia 30308
(404) 885-3000

17

Attorneys for Defendant

KENNEDY COVINGTON
LOBDELL & HICKMAN L.L.P
Hearst Tower, 47th Floor
214 North Tryon Street
Charlotte, North Carolina 28202
(704) 331-7400


Attorneys for Defendants Robert F. Buckfelder and Buckfelder Investment Trust

Attorneys for Defendant

KENNEDY COVINGTON
LOBDELL & HICKMAN L.L.P
Hearst Tower, 47th Floor
214 North Tryon Street
Charlotte, North Carolina 28202
(704) 331-7400


Attorneys for Defendants Robert F. Buckfelder and Buckfelder Investment Trust

## EXHIBIT A

## AGREEMENT TO ABIDE BY CONFIDENTIALITY AGREEMENT

1.   I, _____, have carefully

reviewed and understand the provisions of the attached CONFIDENTIALITY AGREEMENT

and have received a copy of the Confidentiality Agreement.

2.   I will comply with all of the provisions of the Confidentiality Agreement.

3.   I understand that execution of this Agreement To Abide by the

Confidentiality Agreement shall constitute a binding obligation on me to be bound by the

Confidentiality Agreement and shall constitute consent to the jurisdiction of the United States

Bankruptcy Court, the Southern District of New York to enforce the Confidentiality Agreement

against me.

Dated:_____     By:_____

19

# EXHIBIT G

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 Cases |
| Adelphia Communications Corporation, <u>et al.</u>, | Case No. 02-41729 (REG) |
| Debtors. | (Jointly Administered) |
| Adelphia Communications Corporation, <u>et al.</u>, | |
| Plaintiffs. | |
| vs. | CGM |
| Prestige Communications of NC, Inc., <u>et al.</u>, | Adv. Pro. No. 04-03293 (REG) |
| Defendants. | |

**AGREEMENT BY PARTIES TO THE <u>PRESTIGE</u>
ACTION TO MAINTAIN CONFIDENTIALITY OF MATERIAL
DESIGNATED BY DELOITTE & TOUCHE LLP AS "CONFIDENTIAL"
OR "HIGHLY CONFIDENTIAL" IN THE <u>ADELPHIA</u> ACTION**

WHEREAS, on November 6, 2002, Adelphia Communications

Corporation ("Adelphia") commenced <u>Adelphia Communications Corp. v. Deloitte &</u>

<u>Touche LLP</u>, November Term 2002, No. 598 (the "<u>Adelphia</u> action"), against Deloitte &

Touche LLP ("Deloitte & Touche"), and Deloitte & Touche thereafter asserted in that

action counterclaims against Adelphia, as well as third party claims against additional

defendants John, Michael, Timothy and James Rigas (the "Rigases");

WHEREAS, following the service of various discovery requests in the Adelphia action, the parties to that action, on or about September 20, 2004, entered into a confidentiality agreement (the "Deloitte & Touche Confidentiality Agreement");[1]

WHEREAS, Deloitte & Touche thereafter designated certain documents as Confidential and Highly Confidential pursuant to the Deloitte & Touche Confidentiality Agreement;

WHEREAS, on June 24, 2004, Adelphia, as well as other plaintiffs, commenced the above-captioned adversary proceeding, Adv. Pro. No. 04-03293 (REG) CGM (the "Prestige action");

WHEREAS, on March 8, 2005, the parties to the Prestige action entered into a confidentiality agreement (the "Prestige Confidentiality Agreement");[2]

WHEREAS, the Prestige defendants have propounded document requests upon Adelphia that purport to require the production of documents and things that may have been designated Confidential or Highly Confidential by Deloitte & Touche pursuant to the Deloitte & Touche Confidentiality Agreement;

NOW THEREFORE, be it resolved, that the undersigned parties hereby agree as follows:

With regard to any material that Deloitte & Touche has designated as Confidential or Highly Confidential in the Adelphia action pursuant to the Deloitte &

---

[1] A true and correct copy of the Deloitte & Touche Confidentiality Agreement is attached hereto as Exhibit A.

[2] A true and correct copy of the Prestige Confidentiality Agreement is attached hereto as Exhibit B.

Touche Confidentiality Agreement, and that is received by the parties to the Prestige action:

      1)  The parties to the Prestige action shall use such material, and all information derived therefrom, solely for preparation and trial of the Prestige action, and for no other purpose;

      2)  The use of such material by the parties to the Prestige action shall be governed by paragraphs 1-4, 9-10 and 14-28 and Exhibit A of the Prestige Confidentiality Agreement, except that references in the Prestige Confidentiality Agreement to "this action" shall be deemed to mean the Prestige action, and no other action.

      3)  The parties to the Prestige action agree to designate as Confidential or Highly Confidential the transcripts and exhibits of any deposition taken in the Prestige action at which information or documents designated Confidential or Highly Confidential by Deloitte & Touche have been introduced or disclosed.

Although not a party to the Prestige action or a signatory to the Prestige Confidentiality Agreement, as a party to this Agreement, Deloitte & Touche shall be entitled to all rights and privileges of a "Designating Party" under the terms of the Prestige Confidentiality Agreement (including but not limited to rights of notice under

Paragraph 26 of the <u>Prestige</u> Confidentiality Agreement), and shall have the right to

enforce the provisions of the <u>Prestige</u> Confidentiality Agreement and of this Agreement

to the fullest extent permitted by law.

Dated: March 17, 2006

Stuart W. Gold
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY  10019-7475
(212) 474-1000

Attorneys for Third-Party Deloitte & Touche LLP


KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, NY 10019
(212) 506-1700

Attorneys for Plaintiffs


TROUTMAN SANDERS LLP
~~405 Lexington Avenue~~ 600 Peachtree Street, Suite 5200
~~New York, NY 10174~~ Atlanta, Georgia 30308-2216
~~(212) 704-6000~~

9/22/06

Attorneys for Defendants


SATTERLEE STEPHENS BURKE & BURKE, LLP
230 Park Avenue
New York, NY 10169-0079
(212) 818-9200

Attorneys for Defendants

4

KENNEDY COVINGTON LOBDELL & HICKMAN L.L.P.
Hearst Tower, 47th Floor
214 North Tryon Street
Charlotte, NC 28202
(704) 331-7400

Attorneys for Defendants Robert F. Buckfelder and Buckfelder Investment Trust

5

# Exhibit H

TROUTMAN SANDERS LLP
Harris B. Winsberg (Ga. Bar No. 770892)
Douglas E. Ernst (Ga. Bar No. 249956)
600 Peachtree Street, N.E.
Suite 5200
Atlanta, Georgia 30308-2216

Counsel for the Defendants

| | |
|---|---|
| In re:<br><br>ADELPHIA COMMUNICATIONS CORP., et al., a<br>Delaware corporation,<br><br>    Debtors. | Chapter 11 Case<br><br>Case No. 02-41729 (REG)<br><br>(Jointly Administered) |
| ADELPHIA COMMUNICATIONS CORP., et al.,<br><br>        Plaintiffs,<br><br>v.<br><br>PRESTIGE COMMUNICATIONS OF NC, INC., et al.,<br><br>        Defendants. | Adversary Proceeding<br>No. 04-03293 (CGM) |

## DEFENDANTS' FOURTH REQUEST FOR PRODUCTION OF DOCUMENTS

The Defendants Prestige Communications of NC, Inc., Jonathan J. Oscher, Lorraine Oscher McClain, Robert F. Buckfelder, Buckfelder Investment Trust and Anverse, Inc. (hereinafter collectively the "Defendants"), request that the Plaintiff Adelphia Recovery Trust (the "Plaintiff") produce the following documents pursuant to Rule 7034 of the Federal Rules of Bankruptcy Procedure, which incorporates by reference Rule 34 of the Federal Rules of Civil Procedure. The Plaintiff should produce the following requested documents at the offices of the undersigned counsel for the Defendants at Troutman Sanders LLP, 600 Peachtree Street, N.E., Suite 5200, Atlanta, Georgia 30308-2216 within the time permitted by law.

1811476

## DEFINITIONS

As used herein, the following terms are intended to have the meanings indicated:

A.    "Adelphia" means, for purposes of this Request only, Adelphia Communications Corporation and those of its direct and indirect subsidiaries that each filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York and are jointly administered under Case No. 02-41729, and any of their parents, subsidiaries, affiliates, partners, directors, officers, employees, representatives, advisors, agents, attorneys, consultants, associates, members or any other person acting on their behalf.

B.    "You", "your", "yourself", or "Debtors" means Adelphia and the Official Committee of Unsecured Creditors of Adelphia and/or the Plaintiff (i) your present and former agents, representatives, accountants, investigators, consultants, and attorneys, (ii) any other person or entity acting on your behalf, or (iii) any other person or entity otherwise subject to their control or which controls you.

C.    "Any" or "each" should be understood to include and encompass "all"; "or" should be understood to include and encompass "and"; and "and" should be understood to include and encompass "or".

D.    "Person" shall mean any natural person, firm, corporation, partnership, joint venture or any form of business entity or other organization.

E.    "Document" or "documents" means any tangible thing upon which any expression, communication, representation or data has been recorded by any means including, but not limited to, handwriting, typewriting, printing, photostatting, photographing, on a computer, magnetic impulse, or mechanical or electronic recording

and any non-identical copies (whether different from the original because of notes made on such copies, because of indications that said copies were sent to different individuals than were the originals, or because of any other reason), including but not limited to working papers, preliminary, intermediate or final drafts, correspondence, email, memoranda, charts, notes, records of any sort of meetings, invoices, financial statements, financial calculations, diaries, reports of telephone or other oral conversations, desk calendars, appointment books, audio or video tape recordings, microfilm, microfiche, computer tape, computer disk, computer printout, computer card, and all other writings and recordings of every kind that are in your actual or constructive possession, custody, or control.

F.     "Transaction" means any and all aspects of the acquisition by Adelphia of certain cable systems from certain of the Defendants as more particularly specified in the Asset Purchase Agreement and Stock Purchase Agreement both dated December 6, 1999.

G.     Capitalized terms not otherwise defined herein shall have the meanings attributed to them in the Complaint dated June 24, 2004 (the "Complaint").

H.     "Answer" means Defendants' Answer dated September 15, 2004.

I.     For each of the Definitions set out above, the singular form of the defined term includes the plural and the plural form also includes the singular.

## INSTRUCTIONS

1.    You are under a duty to seasonably amend a prior response if you obtain information upon the basis of which (a) you know that the response was incorrect when made, or (b) you know that the response, though correct when made, is no longer true.

2.    Documents should be produced in the manner in which they are maintained in the usual course of your business or you should organize and label the documents to correspond with the categories in this request. A request for a document shall be deemed to include a request for any and all file folders within which the document was contained, transmittal sheets, cover letters, exhibits, enclosures, or attachments to the document in addition to the document itself.

3.    If a requested document which you specify is not currently in your possession, but you are aware of the present location and/or the person who retains a copy of such document, state the location of each document, including the name, the address and title of the person who retains such document.

4.    Should you claim privilege for any document(s) about which information is requested, describe each document in the manner below indicated and, in addition, indicate that you claim privilege and state the ground on which the claim of privilege rests:

       a.   the title, heading or caption of each document, if any;

       b.   the identifying number(s), letter(s), or combination thereof, if any, and the significance or meaning of such number(s), letter(s), or combination thereof;

       c.   the date appearing on each document and if no date appears thereon, the answer shall so state and shall give the date or approximate date on which each document was prepared;

- 4 -

    d.  the general nature or description of each document (i.e., whether it is a letter, memorandum, minutes of a meeting, etc.) and the number of pages of which it consists;

    e.  the identity of the person who signed each document, and if it was not signed, the answer shall so state and shall give the identity of each person(s) who prepared it; and

    f.  the identity of each person to whom each document was addressed and the identity of each person to whom a copy thereof was sent; and the identity of each person who has custody of a copy of each such document.

5.  If any document within the scope of this Request has been destroyed, that document should be identified including identification of its author(s), intended or unintended recipient(s), addressee(s), intended or unintended recipients of blind copies, date and subject matter. The circumstances of such destruction shall be set forth, and any documents relating to such destruction should be produced.

6.  In producing documents and other materials, you should furnish all documents or things in your possession, custody or control, regardless of whether such documents or materials are possessed directly by you or your directors, officers, agents, employees, representatives, subsidiaries, managing agents, affiliates, accountants, investigators, or by your attorneys or their agents, employees representatives or investigators.

7.  If you object to any part of any request, you should state fully the nature of the objection. Notwithstanding any objections, you shall nonetheless comply fully with the other parts of the request not objected to.

8.  Documents not responsive to this Request should not be produced.

**DOCUMENT REQUESTS**

1.      Documents related to Adelphia Communications Corporation's ("ACC") cable system acquisitions that closed in 1999 and 2000, including the acquisition of Verto, Century/Citizens, Harron, FrontierVision, Olympus, Benchmark, Cablevision, Prestige and Cablevision Midwest (collectively, the "Acquisitions"), including:

      a.      Any and all documents and analyses prepared by, for, or provided to Adelphia concerning the operational and financial impact of the purchase opportunity including financial projections, cash flow analyses, expected returns, required capital expenditures, technology assessments, anticipated growth of subscriber base and product lines, regional demographics and housing starts and expected synergies;

      b.      Offering memoranda, prospectuses, solicitation packages, or similar documents prepared by or for the acquired corporations, or their brokers and/or agents, relating to the acquired corporation's efforts to market and sell its cable systems;

      c.      Any and all documents and analyses prepared by, for, or provided to Adelphia concerning the strategic plans, budgets, forecasts, projections and business plans for the post-acquisition period;

      d.      All letters of intent or expressions of interest or similar documents prepared by Adelphia or its agents;

      e.      Executed copies of the asset and/or stock purchase agreements, for each Acquisition (to the extent not already produced);

      f.      Due diligence checklists and related documents prepared or completed by Adelphia in connection with its purchase of each entity;

      g.      All fairness opinions received or prepared related to any of the Acquisitions;

h.    All competing bids made by third parties to acquire the assets ultimately acquired by Adelphia in 1999 and 2000;

i.    Engagement letters and correspondence with sellers and their representatives, sellers' brokers and Adelphia's agents or brokers for the purchase of the Acquisitions;

j.    Any and all closing documents related to the Acquisitions (to the extent not already produced);

k.    All Board Minutes discussing the prospects, forecasts, price, projections justification or authority to purchase the Acquisitions;

l.    All documents related to any subsequent disputes of value paid for the Acquisitions, including any valuations prepared in connection with PriceWaterhouseCooper's restatement of Adelphia's financials;

m.    All internally prepared 1999 monthly financial statements for Prestige Communications, Inc. and Prestige Communications of North Carolina, Inc. for the 1998, 1999 and 2000 calendar years, including but not limited to, income statements, balance sheets and statements of cash flow;

n.    All correspondence with, presentations to or materials provided to ACC's Board members concerning the Acquisitions;

o.    All correspondence with, presentations to or materials provided to banks, equity analysts or shareholders concerning the Acquisitions; and

p.    Any and all documents concerning bonus and compensation plans for any individual whose compensation was, in whole or in part, determined by the performance or results of Prestige Communications of North Carolina, Inc. ("Prestige North Carolina") and Prestige Communications, Inc. ("Prestige Georgia") (or collectively "the Prestige Acquisition")

or the Adelphia business units under which Prestige North Carolina and Prestige Georgia operated.

2.    All documents, financial statements and analyses prepared and/or produced by Adelphia, or any of its subsidiaries, for the lenders or the lender's agents relating to the Century Cable Holdings co-borrowing credit facility dated April 14, 2000 (the "CCH Credit Facility") to facilitate the lender's pre-closing due diligence and investigation, including, but not limited to:

a.    Any and all documents and analyses prepared by Adelphia to evaluate the operational and financial impact of the proposed credit facility including financial projections, cash flow analyses, expected returns and anticipated uses of the proceeds;

b.    Offering memoranda, prospectuses, solicitation packages, or similar documents prepared by Adelphia or its professionals relating to the proposed credit facility;

c.    All board minutes discussing the prospects, justification or authority to incur the debt associated with the CCH Credit Facility;

d.    All letters of intent, expressions of interest, commitment letters, or similar documents prepared by the lenders or their agents in connection with the CCH Credit Facility;

e.    All statements from the CCH Credit Facility lenders illustrating the daily activity, such as draws and paydowns, fees and interest charges, and the outstanding balance on the CCH Credit Facility from April 2000 to December 2000; and

f.    All loan covenant analyses or debtor certificates prepared by ACC or its subsidiaries in connection with the CCH Credit Facility from April 2000 through December 31, 2002.

3.     ACC's chart of accounts identifying all accounts used in ACC's general ledger system for ACC, its subsidiaries and its affiliates, including:

   a.     The mapping to ACC's consolidated financial statement line items; and

   b.     The numbering system used to identify individual corporations, cost centers, general ledger accounts and all other identifying information in ACC's accounting system in effect for the period January 1, 1999 to December 31, 2000.

4.     All journal entries and supporting work papers prepared by ACC, its subsidiaries, affiliates and professionals to record:

   a.     ACC's and/or Adelphia Prestige Cablevision, LLC's acquisition of Prestige North Carolina and Prestige Georgia.

   b.     The subsequent sale of Prestige Georgia to Highland Prestige;

   c.     All borrowings, advances, cash transfers, equity infusions, inter-company allocations, and debt assumptions, related to the Prestige Acquisition and subsequent sale of Prestige Georgia; and

   d.     All adjustments, reclassifications, allocations or restatements that affected the final balances of the assets and liabilities associated with the Prestige Acquisition through December 2004.

The journal entries requested in Request 4 include all related entries that affect the assets and liabilities of ACC, Adelphia Prestige Cablevision, LLC, Adelphia Cablevision, LLC ("the Bank of Adelphia"), Highland Holdings, Highland Prestige and any other entity that was directly or indirectly involved in the Prestige Acquisition, financing, adjustments, asset allocations, reclassifications or restatement.

5.    To the extent not provided in response to Request 4 above, copies of the following journal entries: UG 221, A 1001, MG 070, MG 087, MG 161, MG 279, MG 300, UG 269, UG 270, UG 265, UG 299 and UG 259.

6.    All journal entries related to the agreement of Highland Holdings to pay ACC for brokerage/placement services in connection with the acquisition of Prestige Communications, Inc. to include activity in account 48530000.

7.    All post trial briefs filed at the request of the Court by the ACC bondholders committee, the Arahova Bondholders committee and any other party addressing:

    a.    The inter-company claims arising from journal entries in connection with the Prestige Acquisition and the subsequent sale of Prestige Georgia (Issue 2); and

    b.    The inter-company claims arising from the entries in connection with the co-borrowing debt, including the funds used for Highland Prestige (Issue 6).

8.    All journal entries and reports providing evidence of the $1.161 billion of Century co-borrowed debt that was reclassified to the Rigas Family Entities between April 2000 and April 2002.

9.    Copies of the complaints, answers, counter-suits, responses to interrogatories and expert reports prepared on behalf of Adelphia, the Adelphia Creditors' Committee, the Rigas family

members, any regulatory body, or their opposition and any settlement agreements reached or proposed in connection with any of the following litigation matters:

   a.    *United States of America v. John J. Rigas, et al.*, 02-1236(LBS) (S.D.N.Y.). Include Government Exhibit 101.

   b.    *Adelphia Communications Corp. and its Affiliated Debtors and Debtors in Possession and Official Committee of Unsecured Creditors of Adelphia Communications Corp. v. Bank of America, N.A., et al.*, Case No. 02-41729 (REG) (Jointly Administered), Adv. Pro. No. 03-04942 (Bankr. S.D.N.Y.).

   c.    *Adelphia Communications Corp. and its Affiliated Debtors and Debtors in Possession and Official Committee of Unsecured Creditors of Adelphia Communications Corp. v John J. Rigas, et al.*, Case No. 02-41729 (REG) (Jointly Administered), Adv. Pro. No. 02-08051 (Bankr. S.D.N.Y.). Adelphia Communicatins Corp. and its Affiliated Debtors and Debtors in Possession and Official Committee of Unsecured Creditors of Adelphia Communications Corp. v. John J. Rigas et al., Case No. 02-41729 (REG) (Jointly Administered), Adv. Pro. No. 05-01101 (Bankr. S.D.N.Y.).

   d.    *Adelphia Communications Corp. v. Deloitte & Touche, LLP, et al.*, Case No. 000598 (Phila. Ct. of Common Pleas).

   e.    Thousand Oaks City v. Verizon Media, et al., Case No. 02-2553-ABC-E (CD CA); Adelphia CA Cable v. Lazz, et al., Case No. 02-02282-ABC-E (CD CA).

   f.    Devon Mobile Communications v. Adelphia Communications Corp., et al., Case No. 02-41729 (REG) (Jointly Administered), Adv. Pro. No. 04-03192 (CGM) (Bankr. S.D.N.Y.)

   g.    *Securities and Exchange Commission v. Adelphia Communications Corp. et al.*, Case No. 02-5776 (PKC) (S.D.N.Y.) and the Department of Justice Investigation.

h.    Securities and derivative litigation.

i.    Former shareholders' litigation against Adelphia Communications Corporation regarding stock and acquisition transactions.

j.    ML Media Ligitation.

k.    X Clause Litigation.

l.    *Gerald Dibbern v. Adelphia Communications Corp., et al.*, Case No. 02-41729 (REG) (Jointly Administered), Adv. Proc. No. 02-08074 (REG)(Bankr. S.D.N.Y.).

m.    EPA Self Disclosure Litigation.

n.    *Hyperion Solutions Corporation v. Hyperion Telecom, Inc.*, 99-00268-NAM-GS (N.D.N.Y.).

o.    Robert Lowinger class action against Century Communications Corporation.

p.    Adelphia litigation against Motorola and Scientific Atlanta regarding converter boxes.

q.    Tele-Media examiner motion.

r.    Equity Committee shareholder litigation.

s.    Preferred shareholder litigation.

10.    All documents, analyses, valuations or correspondence prepared by members of the ACC Official Committee of Equity Holders, its advisors, or any other party to support the contention that equity existed for shareholders as of June 2002 and that an equity committee should be formed.

11.    All analyses, exhibits and expert reports prepared by Adelphia's valuation expert regarding the valuation of the Time Warner Comcast ("TWC") stock in connection with the

proposed plan of reorganization, whose conclusion was that the TWC stock as defined in the plan would be worth between $5.5 and $6.5 billion.

12.    All analyses, valuations, reports, or correspondence that support the belief that the value of the Rigas Managed Entities ("RMEs") forfeited to the Department of Justice are worth approximately $900 million as indicated on page 135 of the Court's Bench Decision on Confirmation, and any analysis, valuation or report regarding the value of the RMEs as of 1999 and 2000.

13.    An electronic copy of Lazard's Waterfall model/analysis used by Daniel Aronson to support his testimony regarding the impact of inter-company claims on creditor returns.

14.    All capital expenditures budgets and related variance analyses prepared by ACC or any of its subsidiaries for the period from 1998 through 2001 to include budgets for maintenance, upgrade, expansion and acquisition expenditures.

15.    All valuation analyses prepared by ACC, its subsidiaries, or its advisors of all non-cable assets owned by ACC or its subsidiaries including, but not limited to, @ Home and Powerlink.

16.    Documents providing evidence of ACC's minority interest investments in public or private companies of December 1999 including Hyperion, Citizens Utility and UIH, including all ACC documents or analyses regarding the value of these investments as of December 1999.

17.    Documents showing discount rates received by Adelphia from programmers from December 1999 through July 2000.


Dated: June 19, 2007
Atlanta, Georgia

*Harris Winsberg*
Harris B. Winsberg (Ga. Bar No. 770892)
Douglas E. Ernst (Ga. Bar No. 249956)
TROUTMAN SANDERS LLP
600 Peachtree Street, N.E.
Suite 5200
Atlanta, Georgia 30308-2216

Counsel for the Defendants

John H. Culver III
KENNEDY COVINGTON LOBDELL
  & HICKMAN, L.L.P.
Hearst Tower, 47th Floor
214 North Tryon Street
Charlotte, North Carolina 28202

Counsel for Robert F. Buckfelder and Buckfelder Investment Trust

## CERTIFICATE OF SERVICE

I hereby certify that I have this date served the foregoing **DEFENDANTS'**

**FOURTH REQUEST FOR PRODUCTION OF DOCUMENTS** upon the parties named

herein via e-mail and by placing a copy of same in the United States Mail, postage prepaid,

addressed to counsel of record as follows:

Andrew K. Glenn, Esq. (aglenn@kasowitz.com)
Joseph A. Gershman, Esq. (jgershman@kasowitz.com)
Jennifer B. Schwarz, Esq. (jschwarz@kasowitz.com)
Kasowitz, Benson, Torres & Friedman LLP
1633 Broadway
New York, New York 10019
(Counsel for the Official Committee of Unsecured Creditors)

Terence K. McLaughlin, Esq. (tmclaughlin@willkie.com)
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, N.Y. 10019-6099

(Counsel to the Debtors)

This 19th day of June 2007.

Harris B. Winsberg (Ga. State Bar No. 770892)

# EXHIBIT I

KASOWITZ, BENSON, TORRES
& FRIEDMAN LLP
David M. Friedman (DF-4278)
Joseph A. Gershman (JG-8275)
Jennifer B. Schwarz (JS-1144)
1633 Broadway
New York, New York 10019
Tel: (212) 506-1700
Fax: (212) 506-1800

*Counsel to the Adelphia Recovery Trust*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re | ) Chapter 11 Case |
| ADELPHIA COMMUNICATIONS CORP., et al., a Delaware corporation, | ) Case No. 02-41729 (REG) |
| Debtors. | ) (Jointly Administered) |
| ADELPHIA RECOVERY TRUST, | ) |
| Plaintiff, | ) Adv. Pro. No. 04-03293 (CGM) |
| vs. | ) |
| PRESTIGE COMMUNICATIONS OF NC, INC., et al., | ) |
| Defendants. | ) |

**PLAINTIFF'S OBJECTIONS AND RESPONSES TO
DEFENDANTS' FOURTH REQUEST FOR PRODUCTION OF DOCUMENTS**

Adelphia Recovery Trust, by its counsel, hereby submits the following objections and
responses to Defendants' Fourth Request for the Production of Documents ("the Requests").

## GENERAL OBJECTIONS

1.    Plaintiff objects to and declines to disclose information insofar as the Requests seek to impose upon the Plaintiff any obligations beyond those imposed upon them by the Federal Rules of Bankruptcy Procedure, the Federal Rules of Civil Procedure, and the Local Rules of the Bankruptcy Court for the Southern District of New York (the "Local Bankruptcy Rules").

2.    Plaintiff objects to the Requests to the extent that they seek production of documents protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, the common interest privilege, or any other applicable privilege.  Plaintiff will not produce documents that are protected by the attorney-client privilege, the work-product doctrine, the common interest privilege or any other applicable privilege.  Plaintiff's production of any privileged or protected materials or information is inadvertent and shall not constitute a waiver of any privilege or protection that applies to the materials or information.  Plaintiff requests that the Defendants notify Plaintiff of the production of any such documents promptly upon discovery of any such documents.

3.    Plaintiff objects to the Requests to the extent they seek information that is not relevant to the claim or defense of any party.

4.    Plaintiff objects to the Requests to the extent they seek information not in Plaintiff's possession, custody or control.

5.    By answering any Request or producing any information in response thereto, Plaintiff does not thereby concede the relevance, materiality or admissibility of such answer or

information. Plaintiff reserves all objections as to the relevance, authenticity, materiality or admissibility of any information.

6.    By responding to a Request by stating that documents or information will be produced, Plaintiff does not represent, state or suggest that any such information or answers exist.

7.    All General Objections, Objections to Definitions, and Objections to Instructions (referred to collectively herein as the "General Objections") apply to each specific Request.

8.    Plaintiff objects to the Requests to the extent they are vague and ambiguous.

9.    Plaintiff objects to the Requests to the extent they are overly broad and unduly burdensome.

10.    Plaintiff objects to the Requests to the extent that the documents requested are protected by a Confidentiality Agreement or by a Confidentiality Order entered in another matter.

11.    Plaintiff objects to the Requests to the extent they are unintelligible, incomprehensible and not susceptible to a reasoned interpretation.

12.    Plaintiff objects to the Definitions to the extent they conflict with Local Rule 7026-1.

13.    Plaintiff objects to Instruction No. 1 on the grounds that it conflicts with Federal Rule of Civil Procedure 26(e).

14.     Plaintiff objects to Instruction No. 2 to the extent that there is no obligation to provide this information under either the Federal Rules of Civil Procedure or the Federal Rules of Bankruptcy Procedure.

15.     Plaintiff objects to Instruction No. 3 on the grounds that it is unintelligible, and on the grounds that there is no obligation to provide this information under either the Federal Rules of Civil Procedure or the Federal Rules of Bankruptcy Procedure.

16.     Plaintiff objects to Instruction No. 4 on the grounds that it conflicts with Local Rule 7034-1(c).

## SPECIFIC OBJECTIONS AND RESPONSES

### Request No. 1

Documents related to Adelphia Communications Corporation's ("ACC") cable system acquisitions that closed in 1999 and 2000, including the acquisition of Verto, Century/Citizens, Harron, FrontierVision, Olympus, Benchmark, Cablevision, Prestige and Cablevision Midwest (collectively, the "Acquisitions"), including:

a. Any and all documents and analyses prepared by, for, or provided to Adelphia concerning the operational and financial impact of the purchase opportunity including financial projections, cash flow analyses, expected returns, required capital expenditures, technology assessments, anticipated growth of subscriber base and product lines, regional demographics and housing starts and expected synergies;

b. Offering memoranda, prospectuses, solicitation packages, or similar documents prepared by or for the acquired corporations, or their brokers and/or agents, relating to the acquired corporation's efforts to market and sell its cable systems;

c. Any and all documents and analyses prepared by, for, or provided to Adelphia concerning the strategic plans, budgets, forecasts, projections and business plans for the post-acquisition period;

d. All letters of intent or expressions of interest or similar documents prepared by Adelphia or its agents;

e. Executed copies of the asset and/or stock purchase agreements, for each Acquisition (to the extent not already produced) ;

4

f.  Due diligence checklists and related documents prepared or completed by Adelphia in connection with its purchase of each entity;

g.  All fairness opinions received or prepared related to any of the Acquisitions;

h.  All competing bids made by third parties to acquire the assets ultimately acquired by Adelphia in 1999 and 2000;

i.  Engagement letters and correspondence with sellers and their representatives, sellers' brokers and Adelphia's agents or brokers for the purchase of the Acquisitions;

j.  Any and all closing documents related to the Acquisitions (to the extent not already produced);

k.  All Board Minutes discussing the prospects, forecasts, price, projections [sic] justification or authority to purchase the Acquisitions;

l.  All documents related to any subsequent disputes of value paid for the Acquisitions, including any valuations prepared in connection with PriceWaterhouseCooper's restatement of Adelphia's financials;

m.  All internally prepared 1999 monthly financial statements for Prestige Communications, Inc. and Prestige Communications of North Carolina, Inc. for the 1998, 1999 and 2000 calendar years, including but not limited to, income statements, balance sheets and statements of cash flow;

n.  All correspondence with, presentations to or materials provided to ACC's Board members concerning the Acquisitions;

o.  All correspondence with, presentations to or materials provided to banks, equity analysts or shareholders concerning the Acquisitions; and

p.  Any and all documents concerning bonus and compensation plans for any individual whose compensation was, in whole or in part, determined by the performance or results of Prestige Communications of North Carolina, Inc. ("Prestige North Carolina") and Prestige Communications, Inc. ("Prestige Georgia") (or collectively "the Prestige Acquisition") or the Adelphia business units under which Prestige North Carolina and Prestige Georgia operated.

**Response to Request No. 1**

As to transactions other than the Prestige Transaction, Plaintiff objects to this Request on the grounds that it calls for the production of documents not relevant to the claims or defenses of any party to the extent it seeks documents other than the closing documents, which have already

5

been produced. Plaintiff further objects to this Request on the grounds that Plaintiff objected to 30(b)(6) deposition topic 9 which requested similar information to this Request - and the Court subsequently struck this deposition topic for lack of relevance. Plaintiff also objects to this Request on the grounds that that it is overly broad and unduly burdensome. Plaintiff further objects to this Request as duplicative of Request Nos. 46, 47 and 48 of the Defendants' First Request for the Production of Documents. Plaintiff also objects to this Request to the extent it calls for the production of documents to the extent it seeks documents protected by a confidentiality agreement. Plaintiff objects to subsection (p) for the additional reason that it seeks documents not relevant to the claims or defenses of any party, and because it lacks a specified time-frame. Plaintiff also objects to subsection (m) on the grounds that it is nonsensical, and on the grounds that it is abusive and harassing in light of the numerous requests for financial statements that Defendants have made, and have been responded to. Notwithstanding the foregoing General and Specific Objections, a substantial number of documents responsive to this Request have already been produced to the Defendants, including closing sets relating to acquisitions other than the Prestige acquisition, and documents relating to the Prestige transaction.

### Request No. 2

All documents, financial statements and analyses prepared and/or produced by Adelphia, or any of its subsidiaries, for the lenders or the lender's agents relating to the Century Cable Holdings co-borrowing credit facility dated April 14, 2000 (the "CCH Credit Facility") to facilitate the lender's pre-closing due diligence and investigation, including, but not limited to:

    a. Any and all documents and analyses prepared by Adelphia to evaluate the operational and financial impact of the proposed credit facility including financial projections, cash flow analyses, expected returns and anticipated uses of the proceeds;

    b. Offering memoranda, prospectuses, solicitation packages, or similar documents prepared by Adelphia or its professionals relating to the proposed credit facility;

c. All board minutes discussing the prospects, justification or authority to incur the debt associated with the CCH Credit Facility;

d. All letters of intent, expressions of interest, commitment letters, or similar documents prepared by the lenders or their agents in connection with the CCH Credit Facility;

e. All statements from the CCH Credit Facility lenders illustrating the daily activity, such as draws and paydowns, fees and interest charges, and the outstanding balance on the CCH Credit Facility from April 2000 to December 2000; and

f. All loan covenant analyses or debtor certificates prepared by ACC or its subsidiaries in connection with the CCH Credit Facility from April 2000 through December 31, 2002.

**Response to Request No. 2**

Plaintiff objects to this Request on the grounds that it is overly broad, unduly burdensome, abusive and duplicative, as many of these documents have already been requested and produced. Plaintiff further objects to this Request on the grounds that it seeks documents protected by confidentiality agreements, such as documents produced by the Defendants in the Bank Litigation. Plaintiff also objects to this Request on the grounds that it seeks documents that are not relevant to the claims or defenses of any party to the extent it seeks documents post-July 31, 2000. Notwithstanding the foregoing General and Specific Objections, Plaintiff will produce additional documents responsive to this Request, if any, that relate to the period prior to July 31, 2000.

**Request No. 3**

ACC's chart of accounts identifying all accounts used in ACC's general ledger system for ACC, its subsidiaries and its affiliates, including:

a. The mapping to ACC's consolidated financial statement line items; and

b. The numbering system used to identify individual corporations, cost centers, general ledger accounts and all other identifying information in ACC's accounting system in effect for the period January 1, 1999 to December 31, 2000.

## Response to Request No. 3

Plaintiff objects to this Request on the grounds that it is overly broad and unduly burdensome. Subject to and without waiving the foregoing General and Specific Objections, Plaintiff will produce documents responsive to this Request.

## Request No. 4

All journal entries and supporting work papers prepared by ACC, its subsidiaries, affiliates and professionals to record:

    a. ACC's and/or Adelphia Prestige Cablevision, LLC's acquisition of Prestige North Carolina and Prestige Georgia.

    b. The subsequent sale of Prestige Georgia to Highland Prestige;

    c. All borrowings, advances, cash transfers, equity infusions, inter-company allocations, and debt assumptions, related to the Prestige Acquisition and subsequent sale of Prestige Georgia; and

    d. All adjustments, reclassifications, allocations or restatements that affected the final balances of the assets and liabilities associated with the Prestige Acquisition through December 2004.

    The journal entries requested in Request 4 include all related entries that affect the assets and liabilities of ACC, Adelphia Prestige Cablevision, LLC, Adelphia Cablevision, LLC ("the Bank of Adelphia"), Highland Holdings, Highland Prestige and any other entity that was directly or indirectly involved in the Prestige Acquisition, financing, adjustments, asset allocations, reclassifications or restatement.

## Response to Request No. 4

Plaintiff objects to this Request on the grounds that there was no subsequent sale of Prestige Georgia to Highland Prestige, but rather its acquisition by Highland Prestige Georgia, Inc. was simultaneous with ACC's acquisition of Prestige Georgia from the Defendants. Plaintiff further objects to this Request on the grounds that ACC did not acquire Prestige North Carolina, but rather acquired its assets. Subject to and without waiving the foregoing General and Specific Objections, Plaintiff will produce documents responsive to this Request, to the extent they have not already produced.

**Request No. 5**

      To the extent not provided in response to Request 4 above, copies of the following journal entries: UG 221, A 1001, MG 070, MG 087, MG 161, MG 279, MG 300, UG 269, UG 270, UG 265, UG 299 and UG 259.

**Response to Request No. 5**

      Plaintiff objects to this Request on the grounds that it is duplicative of Request No. 4. Plaintiff further objects to this Request on the grounds that it is overly broad, unduly burdensome, and calls for the production of entries not relevant to the claims or defenses of any party. Subject to and without waiving the foregoing General and Specific Objections, Plaintiff will produce documents responsive to this Request, other than A 1001, MG 161, UG 265 and UG 299.

**Request No. 6**

      All journal entries related to the agreement of Highland Holdings to pay ACC for brokerage/placement services in connection with the acquisition of Prestige Communications, Inc. to include activity in account 48530000.

**Response to Request No. 6**

      Subject to and without waiving the foregoing General Objections, Plaintiff will produce documents responsive to this Request, if any.

**Request No. 7**

      All post trial briefs filed at the request of the Court by the ACC bondholders committee, the Arahova Bondholders committee and any other party addressing.

    a. The inter-company claims arising from journal entries in connection with the Prestige Acquisition and the subsequent sale of Prestige Georgia (Issue 2); and

    b. The inter-company claims arising from the entries in connection with the co-borrowing debt, including the funds used for Highland Prestige (Issue 6).

**Response to Request No. 7**

9

Plaintiff objects to this Request on the grounds that it seeks documents not relevant to the claims or defenses of any party. Plaintiff further objects to this Request, on the grounds that all briefs regarding the inter-company claims are unsealed and publicly available. Notwithstanding the foregoing General and Specific Objections, to the extent Defendants want to obtain them, documents responsive to this Request may be obtained from the docket in the Adelphia bankruptcy proceeding.

## Request No. 8

All journal entries and reports providing evidence of the $1.161 billion of Century co-borrowed debt that was reclassified to the Rigas Family Entities between April 2000 and April 2002.

## Response to Request No. 8

Plaintiff objects to this Request to the extent that it is duplicative of Request No. 18 in Defendants' Third Request for the Production of Documents. Plaintiff also objects to this Request to the extent it seeks documents relating to transactions that took place after July 31, 2000, on the grounds that such documents are not relevant to the claims or defenses of any party. Notwithstanding the foregoing General and Specific Objections, documents responsive to this Request have already been produced.

## Request No. 9

Copies of the complaints, answers, counter-suits, responses to interrogatories and expert reports prepared on behalf of Adelphia, the Adelphia Creditors' Committee, the Rigas family members, any regulatory body, or their opposition and any settlement agreements reached or proposed in connection with any of the following litigation matters:

    a. *United States of America v. John J. Rigas, et al.*, 02-1236[sic](LBS) (S.D.N.Y). Include Government Exhibit 101.

    b. *Adelphia Communications Corp. and its Affiliated Debtors and Debtors in Possession and Official Committee of Unsecured Creditors of Adelphia Communications Corp. v.*

*Bank of America, N.A., et al.,* Case No. 02-41729 (REG) (Jointly Administered), Adv. Pro. No. 03-04942 (Bankr. S.D.N.Y.).

c. *Adelphia Communications Corp. and its Affiliated Debtors and Debtors in Possession and Official Committee of Unsecured Creditors of Adelphia Communications Corp. v John J. Rigas, et al.,* Case No. 02-41729 (REG) (Jointly Administered), Adv. Pro. No. 02-08051 (Bankr. S.D.N.Y.). Adelphia Communications Corp. and its Affiliated Debtors and Debtors in Possession and Official Committee of Unsecured Creditors of Adelphia Communications Corp. v. John J. Rigas et al., Case No. 02-41729 (REG) (Jointly Administered), Adv. Pro. No. 05-01101 (Bankr. S.D.N.Y.).

d. *Adelphia Communications Corp. v. Deloitte & Touche, LLP et al.,* Case No. 000598 (Phila. Ct. of Common Pleas).

e. Thousand Oaks City v. Verizon Media, et al., Case No. 02-2553-ABC-E (CD CA); Adelphia CA Cable v. Lazz, et al., Case No. 02-02282-ABC-E (CD CA).

f. Devon Mobile Communications v. Adelphia Communications Corp., et al., Case No. 02-41729 (REG) (Jointly Administered), Adv. Pro. No. 04-03192 (CGM) (Bankr. S.D.N.Y.).[sic]

g. *Securities and Exchange Commission v. Adelphia Communications Corp. et al.,* Case No. 02-5776 (PKC) (S.D.N.Y.) and the Department of Justice Investigation.

h. Securities and derivative litigation.

i. Former shareholders' litigation against Adelphia Communications Corporation regarding stock and acquisition transaction.

j. ML Media Litigation.

k. X Clause Litigation.

l. *Gerald Dibbern v. Adelphia Communications Corp., et al.,* Case No. 02-41729 (REG) (Jointly Administered), Adv. Proc. No. 02-08074 (REG) (Bankr. S.D.N.Y.).

m. EPA Self Disclosure Litigation.

n. *Hyperion Solutions Corporation v. Hyperion Telecom, Inc.,* 99-00268-NAM-GS (N.D.N.Y.).

o. Robert Lowinger class action against Century Communications Corporation.

p. Adelphia litigation against Motorola and Scientific Atlanta regarding converter boxes.

q. Tele-Media examiner motion.

r. Equity Committee shareholder litigation.

11

s. Preferred shareholder litigation.

**Response to Request No. 9**

Plaintiff objects to this Request on the grounds that it is overly broad and unduly burdensome, because it calls for a mass of documents from at least 19 different litigations. Plaintiff further objects to this Request on the grounds that it and calls for the production of documents not relevant to the claims or defenses of any party. Plaintiff also objects on the grounds that certain requested documents are believed to be covered by confidentiality agreements. Plaintiff further objects on the grounds that any proposed settlement agreements would be part of settlement discussions, and therefore privileged. Subject to and without waiving the foregoing General and Specific Objections, Plaintiff will produce documents requested herein that relate to the Prestige transaction, to the extent they have not already been produced.

**Request No. 10**

All documents, analyses, valuations or correspondence prepared by members of the ACC Official Committee of Equity Holders, its advisors, or any other party to support the contention that equity existed for shareholders as of June 2002 and that an equity committee should be formed.

**Response to Request No. 10**

Plaintiff objects to this Request on the grounds that it calls for the production of documents not relevant to the claims or defenses of any party. Plaintiff further objects to this Request on the grounds that it is abusive and harassing in that Judge Gerber has already ruled that equity did not exist for shareholders as of June 2002. See Judge Gerber Bench Decision on Confirmation, dated January 3, 2007, ("[I]t could fairly be said that the equity is hopelessly out of the money.").

**Request No. 11**

All analyses, exhibits and expert reports prepared by Adelphia's valuation expert regarding the valuation of the Time Warner Comcast ("TWC") stock in connection with the proposed plan of reorganization, whose conclusion was that the TWC stock as defined in the plan would be worth between $5.5 and $6.5 billion.

**Response to Request No. 11**

Plaintiff objects to this Request on the grounds that it calls for the production of documents not relevant to the claims or defenses of any party. Plaintiff also objects to this Request as duplicative of Request Nos. 1-4 of Defendants' Second Request for the Production of Documents.

**Request No. 12**

All analyses, valuation, reports, or correspondence that support the belief that the value of the Rigas Managed Entities ("RMEs") forfeited to the Department of Justice are worth approximately $900 million as indicated on page 135 of the Court's Bench Decision on Confirmation, and any analysis, valuation or report regarding the value of the RMEs as of 1999 and 2000.

**Response to Request No. 12**

Plaintiff objects to this Request on the grounds that it calls for the production of documents not relevant to the claims or defenses of any party.

**Request No. 13**

An electronic copy of Lazard's Waterfall model/analysis used by Daniel Aronson to support his testimony regarding the impact of inter-company claims on creditor returns.

**Response to Request No. 13**

Plaintiff objects to this Request on the grounds that it calls for the production of documents not relevant to the claims or defenses of any party.

**Request No. 14**

All capital expenditures budgets and related variance analyses prepared by ACC or any of its subsidiaries for the period from 1998 through 2001 to include budgets for maintenance, upgrade, expansion and acquisition expenditures.

**Response to Request No. 14**

Plaintiff objects to this Request on the grounds that it calls for documents not relevant to the claims or defenses of any party. Subject to and without waiving the foregoing General and Specific Objections, Plaintiff will produce documents responsive to this Request, if any, that cover the time period January 1, 1999 through December 31, 2000. Plaintiff is unaware of any documents responsive to this Request.

**Request No. 15**

All valuation analyses prepared by ACC, its subsidiaries, or its advisors of all non-cable assets owned by ACC or its subsidiaries including, but not limited to, @ Home and Powerlink.

**Response to Request No. 15**

Plaintiff objects to this Request on the grounds that it is not relevant to the claims or defenses of any party, as it purports to seek documents for time periods other than the relevant time period. Plaintiff further objects to this Request on the grounds that @ Home is a cable asset. Subject to and without waiving the foregoing General and Specific Objections, Plaintiff will produce responsive documents prepared as of the time period January 1, 1999 through July 31, 2000, if any.

**Request No. 16**

Documents providing evidence of ACC's minority interest investments in public or private companies [sic] of December 1999 including Hyperion, Citizens Utility and UIH, including all ACC documents or analyses regarding the value of these investments as of December 1999.

**Response to Request No. 16**

Plaintiff objects to this Request on the grounds that it is not relevant to the claims or defenses of any party. Plaintiff also objects to this Request on the grounds that it is nonsensical, as documents evidencing interest investment may be provided without providing valuations (to

the extent they exist).  Subject to and without waiving the foregoing General and Specific

Objections, Plaintiff will produce documents responsive to this Request.

**Request No. 17**

      Documents showing discount rates received by Adelphia from programmers from December 1999 through July 2000.

**Response to Request No. 17**

      Plaintiff objects to this Request on the grounds that it is nonsensical, as Adelphia has  no

documents showing "discount rates received by Adelphia from programmers from December

1999 through July 2000."  Plaintiff further objects to this Request as not relevant to the claims or

defenses of any party.

Dated: New York, New York
      July 23, 2007

                              KASOWITZ, BENSON, TORRES & FRIEDMAN
                              LLP

                              By:_____
                                 Joseph A. Gershman (JG-8275)

                              David M. Friedman (DF-4278)
                              Jennifer B. Schwarz (JS-1144)
                              1633 Broadway
                              New York, New York 10019
                              Tel: (212) 506-1700
                              Fax: (212) 506-1800

                              *Counsel for Adelphia Recovery Trust*

EXHIBIT J

TROUTMAN SANDERS LLP
Harris B. Winsberg (Ga. Bar No. 770892)
Douglas E. Ernst (Ga. Bar No. 249956)
600 Peachtree Street, N.E.
Suite 5200
Atlanta, Georgia 30308-2216

Counsel for the Defendants

| | |
|---|---|
| In re: | Chapter 11 Case |
| ADELPHIA COMMUNICATIONS CORP., et al., a Delaware corporation, | Case No. 02-41729 (REG) (Jointly Administered) |
| Debtors. | |
| ADELPHIA COMMUNICATIONS CORP., et al., | |
| Plaintiffs, | Adversary Proceeding No. 04-03293 (CGM) |
| v. | |
| PRESTIGE COMMUNICATIONS OF NC, INC., et al., | |
| Defendants. | |

## DEFENDANTS' SIXTH REQUEST FOR PRODUCTION OF DOCUMENTS

The Defendants Prestige Communications of NC, Inc., Jonathan J. Oscher, Lorraine Oscher McClain, Robert F. Buckfelder, Buckfelder Investment Trust and Anverse, Inc. (hereinafter collectively the "Defendants"), request that the Plaintiff Adelphia Recovery Trust (the "Plaintiff") produce the following documents pursuant to Rule 7034 of the Federal Rules of Bankruptcy Procedure, which incorporates by reference Rule 34 of the Federal Rules of Civil Procedure. The Plaintiff should produce the following requested documents at the offices of the undersigned counsel for the Defendants at Troutman Sanders LLP, 600 Peachtree Street, N.E., Suite 5200, Atlanta, Georgia 30308-2216 within the time permitted by law.

1868367

## DEFINITIONS

As used herein, the following terms are intended to have the meanings indicated:

A.    "Adelphia" means, for purposes of this Request only, Adelphia Communications Corporation and those of its direct and indirect subsidiaries that each filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York and are jointly administered under Case No. 02-41729, and any of their parents, subsidiaries, affiliates, partners, directors, officers, employees, representatives, advisors, agents, attorneys, consultants, associates, members or any other person acting on their behalf.

B.    "You", "your", "yourself", or "Debtors" means Adelphia and the Official Committee of Unsecured Creditors of Adelphia and/or the Plaintiff (i) your present and former agents, representatives, accountants, investigators, consultants, and attorneys, (ii) any other person or entity acting on your behalf, or (iii) any other person or entity otherwise subject to their control or which controls you.

C.    "Any" or "each" should be understood to include and encompass "all", "or" should be understood to include and encompass "and", and "and" should be understood to include and encompass "or".

D.    "Person" shall mean any natural person, firm, corporation, partnership, joint venture or any form of business entity or other organization.

E.    "Document" or "documents" means any tangible thing upon which any expression, communication, representation or data has been recorded by any means including, but not limited to, handwriting, typewriting, printing, photostatting, photographing, on a

computer, magnetic impulse, or mechanical or electronic recording and any non-identical copies (whether different from the original because of notes made on such copies, because of indications that said copies were sent to different individuals than were the originals, or because of any other reason), including but not limited to working papers, preliminary, intermediate or final drafts, correspondence, email, memoranda, charts, notes, records of any sort of meetings, invoices, financial statements, financial calculations, diaries, reports of telephone or other oral conversations, desk calendars, appointment books, audio or video tape recordings, microfilm, microfiche, computer tape, computer disk, computer printout, computer card, and all other writings and recordings of every kind that are in your actual or constructive possession, custody, or control.

F.     "Transaction" means any and all aspects of the acquisition by Adelphia of certain cable systems from certain of the Defendants as more particularly specified in the Asset Purchase Agreement and Stock Purchase Agreement both dated December 6, 1999.

G.     Capitalized terms not otherwise defined herein shall have the meanings attributed to them in the Complaint dated June 24, 2004 (the "Complaint").

H.     "Answer" means Defendants' Answer dated September 15, 2004.

I.     For each of the Definitions set out above, the singular form of the defined term includes the plural and the plural form also includes the singular.

## INSTRUCTIONS

1.     You are under a duty to seasonably amend a prior response if you obtain information upon the basis of which (a) you know that the response was incorrect when made, or (b) you know that the response, though correct when made, is no longer true.

- 3 -

2.    Documents should be produced in the manner in which they are maintained in the usual course of your business or you should organize and label the documents to correspond with the categories in this request. A request for a document shall be deemed to include a request for any and all file folders within which the document was contained, transmittal sheets, cover letters, exhibits, enclosures, or attachments to the document in addition to the document itself.

3.    If a requested document which you specify is not currently in your possession, but you are aware of the present location and/or the person who retains a copy of such document, state the location of each document, including the name, the address and title of the person who retains such document.

4.    Should you claim privilege for any document(s) about which information is requested, describe each document in the manner below indicated and, in addition, indicate that you claim privilege and state the ground on which the claim of privilege rests:

    a.    the title, heading or caption of each document, if any;

    b.    the identifying number(s), letter(s), or combination thereof, if any, and the significance or meaning of such number(s), letter(s), or combination thereof;

    c.    the date appearing on each document and if no date appears thereon, the answer shall so state and shall give the date or approximate date on which each document was prepared;

    d.    the general nature or description of each document (i.e., whether it is a letter, memorandum, minutes of a meeting, etc.) and the number of pages of which it consists;

- 4 -

e.    the identity of the person who signed each document, and if it was

not signed, the answer shall so state and shall give the identity of

each person(s) who prepared it; and

f.    the identity of each person to whom each document was addressed

and the identity of each person to whom a copy thereof was sent;

and the identity of each person who has custody of a copy of each

such document.

5.    If any document within the scope of this Request has been destroyed, that document should be identified including identification of its author(s), intended or unintended recipient(s), addressee(s), intended or unintended recipients of blind copies, date and subject matter. The circumstances of such destruction shall be set forth, and any documents relating to such destruction should be produced.

6.    In producing documents and other materials, you should furnish all documents or things in your possession, custody or control, regardless of whether such documents or materials are possessed directly by you or your directors, officers, agents, employees, representatives, subsidiaries, managing agents, affiliates, accountants, investigators, or by your attorneys or their agents, employees representatives or investigators.

7.    If you object to any part of any request, you should state fully the nature of the objection. Notwithstanding any objections, you shall nonetheless comply fully with the other parts of the request not objected to.

- 5 -

## DOCUMENT REQUESTS

1.    Documents sufficient to show the names of all witnesses deposed in *Adelphia Communications Corp. v. Deloitte & Touche, LLP, et al.*, Case No. 000598 (Phila. Ct. of Common Pleas) (the "Deloitte Litigation").

2.    To the extent not already requested, copies of all expert reports, summary judgment pleadings and briefs, and all exhibits related thereto, filed on behalf of Adelphia, Deloitte & Touche, LLP and the Rigas family members in the Deloitte Litigation.

3.    All electronic documents evidencing, referring to or relating to the Adelphia Issue Summary A-2 entitled "Allocation of Value on Prestige Acquisition" in their native electronic format, including but not limited to all metadata concerning the history, tracking and management of these electronic documents.

4.    The organizational chart or chart of legal entities referenced by Constance Campbell on July 31, 2007 during her deposition in the above-referenced case.

5.    Documents sufficient to show Adelphia's assets that were encumbered and unencumbered for years 1999 and 2000.

6.    To the extent not already produced, all unredacted deposition transcripts with exhibits of the following witnesses in the Deloitte Litigation: Tom Garrett, Mark Chambers, Scott MacDonald, Carol Savage, Bob Dibella, Janet Dickenson, Terry Donnovan, Vanessa Wittman and Rodney Cornelius.

7.    All affirmations, deposition testimony and trial testimony with exhibits in connection with the Motion for Order Approving Three Related Agreements between the

Debtors and the Securities and Exchange Commission, the Debtors and the Department of Justice and the Debtors and the Rigas Family, including, but not limited to, the affirmations of Anthony T. Kronman and Alan Vinegrad.

Dated: November 6, 2007
Atlanta, Georgia

Harris B. Winsberg (Ga. Bar No. 770892)
Douglas E. Ernst (Ga. Bar No. 249956)
TROUTMAN SANDERS LLP
600 Peachtree Street, N.E.
Suite 5200
Atlanta, Georgia 30308-2216

Counsel for the Defendants

John H. Culver III
KENNEDY COVINGTON LOBDELL
& HICKMAN, L.L.P.
Hearst Tower, 47th Floor
214 North Tryon Street
Charlotte, North Carolina 28202

Counsel for Robert F. Buckfelder and Buckfelder Investment Trust

- 7 -

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this date served the foregoing **DEFENDANTS' SIXTH REQUEST FOR PRODUCTION OF DOCUMENTS** upon the parties named herein via e-mail and by placing a copy of same in the United States Mail, postage prepaid, addressed to counsel of record as follows:

Andrew K. Glenn, Esq. (aglenn@kasowitz.com)
Joseph A. Gershman, Esq. (jgershman@kasowitz.com)
Jennifer B. Schwarz, Esq. (jschwarz@kasowitz.com)
Kasowitz, Benson, Torres & Friedman LLP
1633 Broadway
New York, New York 10019

(Counsel for the Plaintiff)

This 6 day of November 2007.

Harris B. Winsberg
(Ga. State Bar No. 770892)

# EXHIBIT K

KASOWITZ, BENSON, TORRES
& FRIEDMAN LLP
David M. Friedman (DF-4278)
Joseph A. Gershman (JG-8275)
Jennifer B. Schwarz (JS-1144)
1633 Broadway
New York, New York 10019
Tel: (212) 506-1700
Fax: (212) 506-1800

*Counsel to the Adelphia Recovery Trust*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | )    Chapter 11 Case |
| ADELPHIA COMMUNICATIONS CORP., *et al.*, <br> a Delaware corporation, | )    Case No. 02-41729 (REG) |
| Debtors. | )    (Jointly Administered) |
| ADELPHIA RECOVERY TRUST, | ) |
| Plaintiff, <br> vs. | )    Adv. Pro. No. 04-03293 <br> (CGM) |
| PRESTIGE COMMUNICATIONS OF NC, INC., *et al.*, | ) |
| Defendants. | ) |

## PLAINTIFF'S OBJECTIONS AND RESPONSES TO
## DEFENDANTS' SIXTH REQUEST FOR PRODUCTION OF DOCUMENTS

Adelphia Recovery Trust, by its counsel, hereby submits the following objections and responses to Defendants' Sixth Request for the Production of Documents ("the Requests").

## GENERAL OBJECTIONS

1.     Plaintiff objects to and declines to disclose information insofar as the Requests seek to impose upon the Plaintiff any obligations beyond those imposed upon them by the Federal Rules of Bankruptcy Procedure, the Federal Rules of Civil Procedure, and the Local Rules of the Bankruptcy Court for the Southern District of New York (the "Local Bankruptcy Rules").

2.     Plaintiff objects to the Requests to the extent that they seek production of documents protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, the common interest privilege, or any other applicable privilege. Plaintiff will not produce documents that are protected by the attorney-client privilege, the work-product doctrine, the common interest privilege or any other applicable privilege. Plaintiff's production of any privileged or protected materials or information is inadvertent and shall not constitute a waiver of any privilege or protection that applies to the materials or information. Plaintiff requests that the Defendants notify Plaintiff of the production of any such documents promptly upon discovery of any such documents.

3.     Plaintiff objects to the Requests to the extent they seek information that is not relevant to the claim or defense of any party.

4.     Plaintiff objects to the Requests to the extent they seek information not in Plaintiff's possession, custody or control.

5.     By answering any Request or producing any information in response thereto, Plaintiff does not thereby concede the relevance, materiality or admissibility of such answer or

information. Plaintiff reserves all objections as to the relevance, authenticity, materiality or admissibility of any information.

6.    By responding to a Request by stating that documents or information will be produced, Plaintiff does not represent, state or suggest that any such information or answers exist.

7.    All General Objections, Objections to Definitions, and Objections to Instructions (referred to collectively herein as the "General Objections") apply to each specific Request.

8.    Plaintiff objects to the Requests to the extent they are vague and ambiguous.

9.    Plaintiff objects to the Requests to the extent they are overly broad and unduly burdensome.

10.    Plaintiff objects to the Requests to the extent that the documents requested are protected by a Confidentiality Agreement or by a Confidentiality Order entered in another matter.

11.    Plaintiff objects to the Requests to the extent they are unintelligible, incomprehensible and not susceptible to a reasoned interpretation.

12.    Plaintiff objects to the Definitions to the extent they conflict with Local Rule 7026-1.

13.    Plaintiff objects to Instruction No. 1 on the grounds that it conflicts with Federal Rule of Civil Procedure 26(e).

14.     Plaintiff objects to Instruction No. 2 to the extent that there is no obligation to provide this information under either the Federal Rules of Civil Procedure or the Federal Rules of Bankruptcy Procedure.

15.     Plaintiff objects to Instruction No. 3 on the grounds that it is unintelligible, and on the grounds that there is no obligation to provide this information under either the Federal Rules of Civil Procedure or the Federal Rules of Bankruptcy Procedure.

16.     Plaintiff objects to Instruction No. 4 on the grounds that it conflicts with Local Rule 7034-1(c).

## SPECIFIC OBJECTIONS AND RESPONSES

**Request No. 1**

Documents sufficient to show the names of all witnesses deposed in *Adelphia Communications Corp. v. Deloitte & Touche, LLP, et al.*, Case No. 000598 (Phila. Ct. of Common Pleas) (the "Deloitte Litigation").

**Response to Request No. 1**

Plaintiff objects to this Request on the grounds that it seeks documents neither relevant to the claims or defenses of any party nor reasonably calculated to lead to the discovery of admissible evidence.  Notwithstanding the foregoing General and Specific Objections, Plaintiff will produce relevant documents responsive to this Request, if any.

**Request No. 2**

To the extent not already requested, copies of all expert reports, summary judgment pleadings and briefs, and all exhibits related thereto, filed on behalf of Adelphia, Deloitte & Touche, LLP and the Rigas family members in the Deloitte Litigation.

**Response to Request No. 2**

Plaintiff objects to this Request on the grounds that it is overly broad and unduly burdensome. Plaintiff also objects to this Request as duplicative of Request No. 9, subpart (d) of Defendants' Fourth Request for the Production of Documents. Plaintiff further objects to this Request on the grounds that it seeks documents neither relevant to the claims or defenses of any party nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiff also objects on the grounds that it seeks documents that were designated confidential under a confidentiality agreement. Notwithstanding the foregoing General and Specific Objections, Plaintiff will produce relevant documents responsive to this request, if any.

## Request No. 3

All electronic documents evidencing, referring to or relating to the Adelphia Issue Summary A-2 entitled "Allocation of Value on Prestige Acquisition" in their native electronic format, including but not limited to all metadata concerning the history, tracking and management of these electronic documents.

## Response to Request No. 3

Plaintiff objects to this Request on the grounds that it is overly broad and unduly burdensome. Plaintiff further objects to this Request on the grounds that it seeks documents neither relevant to the claims or defenses of any party nor reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding the foregoing General and Specific Objections, Plaintiff will produce all copies of Issue Summary A-2 in electronic format.

## Request No. 4

The organizational chart or chart of legal entities referenced by Constance Campbell on July 31, 2007 during her deposition in the above-referenced case.

## Response to Request No. 4

Plaintiff objects to this Request as duplicative of Request No. 6 of Defendants' Third Request for the Production of Documents. Notwithstanding the foregoing General and Specific

Objections, documents responsive to this Request were already been produced at Bates numbers

ADPR 000062995 to ADPR 000063015, on June 20, 2007.

**Request No. 5**

Documents sufficient to show Adelphia's assets that were encumbered and unencumbered for years 1999 and 2000.

**Response to Request No. 5**

Plaintiff objects to this Request on the grounds that the Request is not an appropriate document request, as it is really an interrogatory. Plaintiff also objects to this Request on the grounds that it requests documents that do not exist, as no document would show assets that "were [] unencumbered." Plaintiff does not possess any documents that show which of Adelphia's assets were unencumbered for the years 1999 and 2000. Notwithstanding the foregoing General and Specific Objections, Plaintiff will produce relevant documents that show Adelphia's encumbered assets in 1999 and 2000, if any.

**Request No. 6**

To the extent not already produced, all unredacted deposition transcripts with exhibits of the following witnesses in the Deloitte Litigation: Tom Garrett, Mark Chambers, Scott MacDonald, Carol Savage, Bob Dibella [sic], Janet Dickenson, Terry Donnovan, Vanessa Wittman and Rodney Cornelius.

**Response to Request No. 6**

Plaintiff objects to this Request on the grounds that it seeks documents not relevant to the claims or defenses of any party. Plaintiff also objects to this Request as duplicative of the correspondence sent by Leslie Skiba to Joseph Gershman on October 12, 2007. Notwithstanding the foregoing General and Specific Objections, all documents responsive to this Request have already been produced.

6

**Request No. 7**

All affirmations, deposition testimony and trial testimony with exhibits in connection with the Motion for Order Approving Three Related Agreements between the Debtors and the Securities and Exchange Commission, the Debtors and the Department of Justice and the Debtors and the Rigas Family, including, but not limited to, the affirmations of Anthony T. Kronman and Alan Vinegrad.

**Response to Request No. 7**

Plaintiff objects to this Request on the grounds that it seeks documents neither relevant to the claims or defenses of any party nor reasonably calculated to lead to the discovery of admissible evidence.  Plaintiff also objects to this Request on the grounds that it seeks the production of documents sealed in Case No. 02-41729 (REG) (Bankr. S.D.N.Y.) pursuant to a Sealing Order entered by Judge Gerber on May 12, 2005, Docket Entry # 7493.  Plaintiff further objects to this Request on the grounds that it calls for the production of information protected by the attorney-client privilege.  Subject to and without waiving the foregoing General and Specific Objections, Plaintiff directs Defendants to the above-referenced Docket for documents responsive to this Request that are not sealed, and Plaintiff will produce any additional non-privileged responsive documents in its possession, custody or control that are not sealed pursuant to Judge Gerber's May 12, 2005 Sealing Order.

Dated: New York, New York
　　　　December 10, 2007

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

By _____
　　Joseph A. Gershman (JG-8275)
David M. Friedman (DF-4278)
Jennifer B. Schwarz (JS-1144)
1633 Broadway
New York, New York 10019
Tel: (212) 506-1700
Fax: (212) 506-1800

*Counsel for Adelphia Recovery Trust*

7

# Exhibit L

TROUTMAN SANDERS LLP
Harris B. Winsberg (Ga. Bar No. 770892)
Douglas E. Ernst (Ga. Bar No. 249956)
600 Peachtree Street, N.E.
Suite 5200
Atlanta, Georgia 30308-2216

Counsel for the Defendants

| | |
|---|---|
| In re:<br><br>ADELPHIA COMMUNICATIONS CORP., et al., a<br>Delaware corporation,<br><br>            Debtors. | Chapter 11 Case<br><br>Case No. 02-41729 (REG)<br><br>(Jointly Administered) |
| ADELPHIA COMMUNICATIONS CORP., et al.,<br><br>            Plaintiffs,<br><br>v.<br><br>PRESTIGE COMMUNICATIONS OF NC, INC., et al.,<br><br>            Defendants. | Adversary Proceeding<br>No. 04-03293 (CGM) |

## DEFENDANTS' SEVENTH REQUEST FOR PRODUCTION OF DOCUMENTS

The Defendants Prestige Communications of NC, Inc., Jonathan J. Oscher, Lorraine Oscher McClain, Robert F. Buckfelder, Buckfelder Investment Trust and Anverse, Inc. (hereinafter collectively the "Defendants"), request that the Plaintiff Adelphia Recovery Trust (the "Plaintiff") produce the following documents pursuant to Rule 7034 of the Federal Rules of Bankruptcy Procedure, which incorporates by reference Rule 34 of the Federal Rules of Civil Procedure. The Plaintiff should produce the following requested documents at the offices of the undersigned counsel for the Defendants at Troutman Sanders LLP, 600 Peachtree Street, N.E., Suite 5200, Atlanta, Georgia 30308-2216 within the time permitted by law.

1874336

# DEFINITIONS

As used herein, the following terms are intended to have the meanings indicated:

A. "Adelphia" means, for purposes of this Request only, Adelphia Communications Corporation and those of its direct and indirect subsidiaries that each filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York and are jointly administered under Case No. 02-41729, and any of their parents, subsidiaries, affiliates, partners, directors, officers, employees, representatives, advisors, agents, attorneys, consultants, associates, members or any other person acting on their behalf.

B. "You", "your", "yourself", or "Debtors" means Adelphia and the Official Committee of Unsecured Creditors of Adelphia and/or the Plaintiff (i) your present and former agents, representatives, accountants, investigators, consultants, and attorneys, (ii) any other person or entity acting on your behalf, or (iii) any other person or entity otherwise subject to their control or which controls you.

C. "Any" or "each" should be understood to include and encompass "all"; "or" should be understood to include and encompass "and"; and "and" should be understood to include and encompass "or".

D. "Person" shall mean any natural person, firm, corporation, partnership, joint venture or any form of business entity or other organization.

E. "Document" or "documents" means any tangible thing upon which any expression, communication, representation or data has been recorded by any means including, but not limited to, handwriting, typewriting, printing, photostatting, photographing, on a

1874336_2.DOC

computer, magnetic impulse, or mechanical or electronic recording and any non-identical copies (whether different from the original because of notes made on such copies, because of indications that said copies were sent to different individuals than were the originals, or because of any other reason), including but not limited to working papers, preliminary, intermediate or final drafts, correspondence, email, memoranda, charts, notes, records of any sort of meetings, invoices, financial statements, financial calculations, diaries, reports of telephone or other oral conversations, desk calendars, appointment books, audio or video tape recordings, microfilm, microfiche, computer tape, computer disk, computer printout, computer card, and all other writings and recordings of every kind that are in your actual or constructive possession, custody, or control.

F.    "Transaction" means any and all aspects of the acquisition by Adelphia of certain cable systems from certain of the Defendants as more particularly specified in the Asset Purchase Agreement and Stock Purchase Agreement both dated December 6, 1999.

G.    Capitalized terms not otherwise defined herein shall have the meanings attributed to them in the Complaint dated June 24, 2004 (the "Complaint").

H.    "Answer" means Defendants' Answer dated September 15, 2004.

I.    For each of the Definitions set out above, the singular form of the defined term includes the plural and the plural form also includes the singular.

## INSTRUCTIONS

1.    You are under a duty to seasonably amend a prior response if you obtain information upon the basis of which (a) you know that the response was incorrect when made, or (b) you know that the response, though correct when made, is no longer true.

1874336_2.DOC

2.    Documents should be produced in the manner in which they are maintained in the usual course of your business or you should organize and label the documents to correspond with the categories in this request. A request for a document shall be deemed to include a request for any and all file folders within which the document was contained, transmittal sheets, cover letters, exhibits, enclosures, or attachments to the document in addition to the document itself.

3.    If a requested document which you specify is not currently in your possession, but you are aware of the present location and/or the person who retains a copy of such document, state the location of each document, including the name, the address and title of the person who retains such document.

4.    Should you claim privilege for any document(s) about which information is requested, describe each document in the manner below indicated and, in addition, indicate that you claim privilege and state the ground on which the claim of privilege rests:

a.    the title, heading or caption of each document, if any;

b.    the identifying number(s), letter(s), or combination thereof, if any, and the significance or meaning of such number(s), letter(s), or combination thereof;

c.    the date appearing on each document and if no date appears thereon, the answer shall so state and shall give the date or approximate date on which each document was prepared;

d.    the general nature or description of each document (i.e., whether it is a letter, memorandum, minutes of a meeting, etc.) and the number of pages of which it consists;

e.    the identity of the person who signed each document, and if it was not signed, the answer shall so state and shall give the identity of each person(s) who prepared it; and

f.    the identity of each person to whom each document was addressed and the identity of each person to whom a copy thereof was sent; and the identity of each person who has custody of a copy of each such document.

5.    If any document within the scope of this Request has been destroyed, that document should be identified including identification of its author(s), intended or unintended recipient(s), addressee(s), intended or unintended recipients of blind copies, date and subject matter. The circumstances of such destruction shall be set forth, and any documents relating to such destruction should be produced.

6.    In producing documents and other materials, you should furnish all documents or things in your possession, custody or control, regardless of whether such documents or materials are possessed directly by you or your directors, officers, agents, employees, representatives, subsidiaries, managing agents, affiliates, accountants, investigators, or by your attorneys or their agents, employees representatives or investigators.

7.    If you object to any part of any request, you should state fully the nature of the objection. Notwithstanding any objections, you shall nonetheless comply fully with the other parts of the request not objected to.

## DOCUMENT REQUESTS

1.    Robert DiBella's work papers related to Exhibit D108 and all supplemental work schedules thereto, including but not limited to those described on page 159, line 9 of Mr. DiBella's deposition transcript in the above-referenced case, dated September 26, 2007.

2.    All work papers, supporting documents and electronic spreadsheets that refer or relate to the amounts shown on **Exhibit "A"** attached hereto, including without limitation, the general ledger activity reports for the restated fiscal year 2000 by account for each general ledger account that relates to, supports or consolidates to each of the amounts shown on **Exhibit "A."**

3.    All journal entries and all documents supporting each of the journal entries identified in the general ledger activity reports described in Request 2, above.

4.    Documents sufficient to show any and all amounts due from or due to Highland Prestige of Georgia, Inc. from (or to) the Rigas Family Entities, by entity, including, without limitation, all of the entities listed in Exhibit D108 on pages ADPR 000077170, ADPR 000077171, ADPR 000077173 and ADPR 0000771714, as of September, 30, 2000 and December 31, 2000.

5.    A general ledger activity report for the year 2000 for each of the general ledger accounts that refer, relate or consolidate to the amounts described in Request 4, above.

6.    All journal entries and all documents supporting each of the journal entries identified in the general ledger activity reports described in Request 5, above.

7.    All federal tax returns filed by Adelphia for the fiscal year 2006, including all supporting work papers, electronic spreadsheets, and subsidiary schedules which refer or relate to said tax return.

8.    All amended federal tax returns filed by Adelphia for the fiscal year 2000, including all supporting work papers, electronic spreadsheets, and subsidiary schedules which refer or relate to said tax return.

9.    Any and all work papers of Paul Quinn related to the Prestige Transaction, including all of Paul Quinn's work papers on the Adelphia Issue Summary A-2 entitled "Allocation of Value on Prestige Acquisition."

10.    The balance sheets for Adelphia's cost centers 294, 295, 296 and 297 on a quarterly basis from July 2000 until the closing of the sale with Time Warner and Comcast.

11.    Documents sufficient to show the allocation of gain on Adelphia's cost centers 294 ($260,902), 295 ($193,023), 296 ($280,537) and 297 ($168,532) and how that allocation of gain was calculated as set forth in Exhibit D146.

12.    Unredacted deposition transcripts with exhibits of the expert witnesses and Christopher Dunstan, in *Adelphia Communications Corp. v. Deloitte & Touche, LLP, et al.*, Case No. 000598 (Phila. Ct. of Common Pleas).

Dated: November 29, 2007

Atlanta, Georgia

Harris B. Winsberg (Ga. Bar No. 770892)
Douglas E. Ernst (Ga. Bar No. 249956)

[CONTINUED ON NEXT PAGE]

1874336_2.DOC

TROUTMAN SANDERS LLP
600 Peachtree Street, N.E.
Suite 5200
Atlanta, Georgia 30308-2216

Counsel for the Defendants


John H. Culver III
KENNEDY COVINGTON LOBDELL
    & HICKMAN, L.L.P.
Hearst Tower, 47th Floor
214 North Tryon Street
Charlotte, North Carolina 28202

Counsel for Robert F. Buckfelder and Buckfelder Investment Trust

1874336_2.DOC

TROUTMAN SANDERS LLP
Harris B. Winsberg (Ga. Bar No. 770892)
Douglas E. Ernst (Ga. Bar No. 249956)
600 Peachtree Street, N.E.
Suite 5200
Atlanta, Georgia 30308-2216

Counsel for the Defendants

| | |
|---|---|
| In re: | Chapter 11 Case |
| ADELPHIA COMMUNICATIONS CORP., et al., a Delaware corporation, | Case No. 02-41729 (REG) |
| Debtors. | (Jointly Administered) |
| ADELPHIA COMMUNICATIONS CORP., et al., | |
| Plaintiffs, | |
| v. | Adversary Proceeding No. 04-03293 (CGM) |
| PRESTIGE COMMUNICATIONS OF NC, INC., et al., | |
| Defendants. | |

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that I have this date served the foregoing **DEFENDANTS' SEVENTH REQUEST FOR PRODUCTION OF DOCUMENTS** upon the parties named herein via e-mail and by placing a copy of same in the United States Mail, postage prepaid, addressed to counsel of record as follows:

Andrew K. Glenn, Esq. (aglenn@kasowitz.com)
Joseph A. Gershman, Esq. (jgershman@kasowitz.com)
Jennifer B. Schwarz, Esq. (jschwarz@kasowitz.com)
Kasowitz, Benson, Torres & Friedman LLP
1633 Broadway
New York, New York 10019
(Counsel for the Plaintiff)

This 29 day of November 2007.

Douglas E. Ernst
(Ga. State Bar No. 249956)

1874336_2.DOC

# EXHIBIT M

KASOWITZ, BENSON, TORRES
& FRIEDMAN LLP
David M. Friedman (DF-4278)
Joseph A. Gershman (JG-8275)
1633 Broadway
New York, New York 10019
Tel: (212) 506-1700
Fax: (212) 506-1800

*Counsel to the Adelphia Recovery Trust*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | Chapter 11 Case |
| ADELPHIA COMMUNICATIONS CORP., et al., a Delaware corporation, | Case No. 02-41729 (REG) |
| Debtors. | (Jointly Administered) |
| ADELPHIA RECOVERY TRUST, | |
| Plaintiff, | |
| vs. | Adv. Pro. No. 04-03293 (CGM) |
| PRESTIGE COMMUNICATIONS OF NC, INC., et al., | |
| Defendants. | |

## PLAINTIFF'S OBJECTIONS AND RESPONSES TO DEFENDANTS' SEVENTH REQUEST FOR PRODUCTION OF DOCUMENTS

Adelphia Recovery Trust, by its counsel, hereby submits the following objections and responses to Defendants' Seventh Request for the Production of Documents ("the Requests").

## GENERAL OBJECTIONS

1.      Plaintiff objects to and declines to disclose information insofar as the Requests seek to impose upon the Plaintiff any obligations beyond those imposed upon them by the Federal Rules of Bankruptcy Procedure, the Federal Rules of Civil Procedure, and the Local Rules of the Bankruptcy Court for the Southern District of New York (the "Local Bankruptcy Rules").

2.      Plaintiff objects to the Requests to the extent that they seek production of documents protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, the common interest privilege, or any other applicable privilege.  Plaintiff will not produce documents that are protected by the attorney-client privilege, the work-product doctrine, the common interest privilege or any other applicable privilege.  Plaintiff's production of any privileged or protected materials or information is inadvertent and shall not constitute a waiver of any privilege or protection that applies to the materials or information.  Plaintiff requests that the Defendants notify Plaintiff of the production of any such documents promptly upon discovery of any such documents.

3.      Plaintiff objects to the Requests to the extent they seek information that is not relevant to the claim or defense of any party.

4.      Plaintiff objects to the Requests to the extent they seek information not in Plaintiff's possession, custody or control.

5.      By answering any Request or producing any information in response thereto, Plaintiff does not thereby concede the relevance, materiality or admissibility of such answer or

information. Plaintiff reserves all objections as to the relevance, authenticity, materiality or admissibility of any information.

6.     By responding to a Request by stating that documents or information will be produced, Plaintiff does not represent, state or suggest that any such information or answers exist.

7.     All General Objections, Objections to Definitions, and Objections to Instructions (referred to collectively herein as the "General Objections") apply to each specific Request.

8.     Plaintiff objects to the Requests to the extent they are vague and ambiguous.

9.     Plaintiff objects to the Requests to the extent they are overly broad and unduly burdensome.

10.    Plaintiff objects to the Requests to the extent that the documents requested are protected by a Confidentiality Agreement or by a Confidentiality Order entered in another matter.

11.    Plaintiff objects to the Requests to the extent they are unintelligible, incomprehensible and not susceptible to a reasoned interpretation.

12.    Plaintiff objects to the Definitions to the extent they conflict with Local Rule 7026-1.

13.    Plaintiff objects to Instruction No. 1 on the grounds that it conflicts with Federal Rule of Civil Procedure 26(e).

3

14.    Plaintiff objects to Instruction No. 2 to the extent that there is no obligation to provide this information under either the Federal Rules of Civil Procedure or the Federal Rules of Bankruptcy Procedure.

15.    Plaintiff objects to Instruction No. 3 on the grounds that it is unintelligible, and on the grounds that there is no obligation to provide this information under either the Federal Rules of Civil Procedure or the Federal Rules of Bankruptcy Procedure.

16.    Plaintiff objects to Instruction No. 4 on the grounds that it conflicts with Local Rule 7034-1(c).

## SPECIFIC OBJECTIONS AND RESPONSES

**Request No. 1**

Robert DiBella's work papers related to Exhibit D108 and all supplemental work schedules thereto, including but not limited to those described on page 159, line 9 of Mr. DiBella's deposition transcript in the above-referenced case, dated September 26, 2007.

**Response to Request No. 1**

Plaintiff objects to this Request on the grounds that it seeks documents not relevant to the claims or defenses of any party.  Subject to and without waiving the foregoing General and Specific Objections, Plaintiff will produce documents responsive to this Request.

**Request No. 2**

All work papers, supporting documents and electronic spreadsheets that refer or relate to the amounts shown on **Exhibit "A"** attached hereto, including without limitation, the general ledger activity reports for the restated fiscal year 2000 by account for each general ledger account that relates to, supports or consolidates to each of the amounts shown on **Exhibit "A."**

**Response to Request No. 2**

Plaintiff objects to this Request on the grounds that it seeks documents not relevant to the claims or defenses of any party.  Plaintiff also objects to this Request on the grounds that it is

4

overly broad and unduly burdensome. Plaintiff further objects to this Request on the grounds that it is vague and ambiguous. Subject to and without waiving the foregoing General and Specific Objections, Plaintiff will produce documents responsive to this Request.

### Request No. 3

All journal entries and all documents supporting each of the journal entries identified in the general ledger activity reports described in Request 2, above.

### Response to Request No. 3

Plaintiff objects to this Request on the grounds that it seeks documents not relevant to the claims or defenses of any party. Plaintiff also objects to this Request on the grounds that it is overly broad and unduly burdensome, as it calls for the production of nearly all general ledger entries and supporting work papers for the ACC consolidated entity for the year 2000, which would take at least 3 months to complete.

### Request No. 4

Documents sufficient to show any and all amounts due from or due to Highland Prestige of Georgia, Inc. from (or to) the Rigas Family Entities, by entity, including, without limitation, all of the entities listed in Exhibit D108 on pages ADPR 000077170, ADPR 000077171, ADPR 000077173 and ADPR 0000771714, as of September 30, 2000 and December 31, 2000.

### Response to Request No. 4

Plaintiff objects to this Request on the grounds that it seeks documents not relevant to the claims or defenses of any party. Plaintiff also objects to this Request on the grounds that it is overly broad and unduly burdensome. Subject to and without waiving the foregoing General and Specific Objections, Plaintiff will produce documents responsive to this Request.

### Request No. 5

A general ledger activity report for the year 2000 for each of the general ledger accounts that refer, relate or consolidate to the amounts described in Request 4, above.

**Response to Request No. 5**

Plaintiff objects to this Request on the grounds that it seeks documents not relevant to the claims or defenses of any party. Plaintiff also objects to this Request on the grounds that it is overly broad and unduly burdensome. Subject to and without waiving the foregoing General and Specific Objections, Plaintiff will produce documents responsive to this Request.

**Request No. 6**

All journal entries and all documents supporting each of the journal entries identified in the general ledger activity reports described in Request 5, above.

**Response to Request No. 6**

Plaintiff objects to this Request on the grounds that it seeks documents not relevant to the claims or defenses of any party. Plaintiff also objects to this Request on the grounds that it is overly broad and unduly burdensome.

**Request No. 7**

All federal tax returns filed by Adelphia for the fiscal year 2006, including all supporting work papers, electronic spreadsheets, and subsidiary schedules which refer or relate to said tax return.

**Response to Request No. 7**

Plaintiff objects to this Request on the grounds that it seeks documents not relevant to the claims or defenses of any party. Plaintiff also objects to this Request on the grounds that it is overly broad and unduly burdensome. Plaintiff further objects to this Request on the grounds that it is vague and ambiguous. Plaintiff also objects because Defendants have not demonstrated a compelling need for these tax returns. Plaintiff additionally objections because Defendants haven not demonstrated that they cannot get the information they seek in this Request from another source.

**Request No. 8**

    All amended federal tax returns filed by Adelphia for the fiscal year 2000, including all supporting work papers, electronic spreadsheets, and subsidiary schedules which refer or relate to said tax return.

**Response No. 8**

    Plaintiff objects to this Request on the grounds that it seeks documents not relevant to the claims or defenses of any party. Plaintiff also objects to this Request on the grounds that it is overly broad and unduly burdensome. Plaintiff further objects to this Request on the grounds that it is vague and ambiguous. Plaintiff also objects because Defendants have not demonstrated a compelling need for these tax returns. Plaintiff additionally objections because Defendants haven not demonstrated that they cannot get the information they seek in this Request from another source.

**Request No. 9**

    Any and all work papers of Paul Quinn related to the Prestige Transaction, including all of Paul Quinn's work papers on the Adelphia Issue Summary A-2 entitled "Allocation of Value on Prestige Acquisition."

**Response No. 9**

    Plaintiff objects to this Request on the grounds that it is duplicative of the Document Subpoena served on November 3, 2006, to third party Tatum CFO Partners, LLP, and of the Document Subpoena served on November 2, 2007, to third party Paul Quinn, Request No. 8. Notwithstanding the foregoing General and Specific Objections, all documents responsive to this Request have already been produced.

**Request No. 10**

The balance sheets for Adelphia's cost centers 294, 295, 296 and 297 on a quarterly basis from July 2000 until the closing of the sale with Time Warner and Comcast.

**Response No. 10**

Plaintiff objects to this Request on the grounds that it seeks documents not relevant to the claims or defenses of any party. Subject to and without waiving the foregoing General and Specific Objections, Plaintiff will produce documents responsive to this Request.

**Request No. 11**

Documents sufficient to show the allocation of gain on Adelphia's cost centers 294 ($260,902), 295 ($193,023), 296 ($280,537) and 297 ($168,532) and how that allocation of gain was calculated as set forth in Exhibit D146.

**Response No. 11**

Plaintiff objects to this Request on the grounds that it seeks documents not relevant to the claims or defenses of any party. Plaintiff also objects to this Request on the grounds that it is vague and ambiguous. Subject to and without waiving the foregoing General and Specific Objections, Plaintiff will produce documents responsive to this Request, if any.

**Request No. 12**

Unredacted deposition transcripts with exhibits of the expert witnesses and Christopher Dunstan, in *Adelphia Communications Corp. v. Deloitte & Touche, LLP, et al.*, Case No. 000598 (Phila. Ct. of Common Pleas).

**Response No. 12**

Plaintiff objects to this Request on the grounds that it seeks documents not relevant to the claims or defenses of any party. Plaintiff also objects to this Request on the grounds that it is overly broad. Plaintiff further objects to this Request on the grounds that certain of the

8

transcripts and exhibits are protected by a Confidentiality Agreement. Plaintiff also objects to this Request on the grounds that Deloitte & Touche has objected to the production of certain transcripts and exhibits which have been designated confidential under a Confidentiality Agreement. Plaintiff also objects to this request on the grounds that it seeks communications protected by the attorney-client privilege and the attorney work product doctrine.

Dated: New York, New York
      December 31, 2007

                        KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

                        By: _____
                           Joseph A. Gershman (JG-8275)

                        David M. Friedman (DF-4278)
                        1633 Broadway
                        New York, New York 10019
                        Tel: (212) 506-1700
                        Fax: (212) 506-1800

                        *Counsel for Adelphia Recovery Trust*

# EXHIBIT N

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>ADELPHIA COMMUNICATIONS CORP., et al., a<br>Delaware corporation,<br><br>Debtors.<br><br>─────────────────────────────<br><br>ADELPHIA RECOVERY TRUST<br><br>Plaintiff,<br><br>v.<br><br>PRESTIGE COMMUNICATIONS OF NC, INC., et al.,<br><br>Defendants. | Chapter 11 Case<br><br>Case No. 02-41729 (REG)<br><br>(Jointly Administered)<br><br><br>**NOTICE OF**<br>**DOCUMENT SUBPOENA**<br><br><br>Adversary Proceeding<br>No. 04-03293 (CGM) |

**PLEASE TAKE NOTICE** that, pursuant to Rule 9016 of the Federal Rules of Bankruptcy Procedure, counsel for Prestige Communications of NC, Inc., et al. is serving the attached document subpoena upon third party **Deloitte & Touche LLP**.

The subpoena seeks the production of the documents listed therein at 10:00 am on Monday, December 17, 2007 at Troutman Sanders LLP, The Chrysler Building, 405 Lexington Avenue, New York, New York 10174, attention Hollace Cohen, Esq.

Respectfully submitted this 26 day of November 2007.

TROUTMAN SANDERS LLP

HARRIS B. WINSBERG
Georgia State Bar No. 770892

[CONTINUED ON NEXT PAGE]

DOUGLAS E. ERNST
Georgia State Bar No. 249956
TROUTMAN SANDERS LLP
Bank of America Plaza
600 Peachtree Street, N.E. – Suite 5200
Atlanta, Georgia 30308-2216
(404) 885-3000

Counsel for Prestige Communications of
NC, Inc., et al.

B255 (Rev. 11/91)

# UNITED STATES BANKRUPTCY COURT

### Southern District of New York

In re:  Adelphia Communications Corporation,
                                Debtor


           Adelphia Recovery Trust

                        Plaintiff

                    v.

           Prestige Communications of NC, Inc.
           Jonathan J. Oscher, Lorraine Oscher McClain,
           Robert F. Buckfelder, Buckfelder Investment Trust,
           and Anverse, Inc.,
                                Defendants

**SUBPOENA IN
AN ADVERSARY PROCEEDING**

Case No. 02-41729(REG)
Chapter 11

Adv. Proc. No. 04-03293 (CGM)


**CASE PENDING IN THE UNITED STATES
BANKRUPTCY COURT, SOUTHERN DISTRICT OF
NEW YORK**

To:  **Deloitte & Touche LLP
c/o James H. Quigley, General Partner
1633 Broadway
New York, New York 10019**

☐   YOU ARE COMMANDED to appear in the United States Bankruptcy Court at the place, date, and time specified below to testify in the above adversary proceeding.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☐   YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above adversary proceeding.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|

☒   YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date and time specified below.     **See Exhibit A.**

| PLACE    *BY MAILING TRUE AND CORRECT COPIES TO:* | DATE AND TIME |
|---|---|
| Hollace Cohen, Esq. Troutman Sanders LLP The Chrysler Building 405 Lexington Avenue New York, New York 10174 | Monday, December 17, 2007 at 10:00 a.m. |

☐   YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

Any organization not a party to this adversary proceeding that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify, Fed. R. Civ. P. 30(b)(6) made applicable in adversary proceedings by Rule 7030, Fed. R. Bankr. P.

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE November 28, 2007 |
|---|---|

*Attorney for Defendants*

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Douglas E. Ernst, Esq.
Troutman Sanders LLP, Bank of America Plaza, Suite 5200
600 Peachtree Street, N.E., Atlanta, Georgia  30308-2216
(404) 885-3000

B255 (Rev. 11/91)(cont.)

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|

| SERVED BY (PRINT NAME) | TITLE |
|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
                    DATE

SIGNATURE OF SERVER _____

ADDRESS OF SERVER _____

_____

Rule 45, Fed.R.Civ.P., Parts © and (d) made applicable in cases under the Bankruptcy Code by Rule 9016, Fed.R.Bankr.P.

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2)(A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the materials or serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person which is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)(A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information,

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom

the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1)(A) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(B) If a subpoena does not specify the form or forms for producing electronically stored information, a person responding to a subpoena must produce the information in a form or forms in which the person ordinarily maintains it or in a form or forms that are reasonably usable.

(C) A person responding to a subpoena need not produce the same electronically stored information in more than one form.

(D) A person responding to a subpoena need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or to quash, the person from whom discovery is sought must show that the information sought is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(B)(2)(C). The court may specify conditions for the discovery.

(2)(A) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

(B) If information is produced in response to a subpoena that is subject to acclaim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has and may not use or disclose the information until the claim is resolved. A receiving party may promptly present the information to the court under seal for a determination of the claim. If the receiving party disclosed the information before being notified, it must take reasonable steps to retrieve it. The person who produced the information must preserve the information until the claim is resolved.

(e)      CONTEMPT.

Failure of any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena issued. An adequate cause for failure to obey exists when a subpoena purports to require a nonparty to attend or produce at a place not within the limits provided by clause (ii) of subparagraph (c)(3)(A).

# EXHIBIT A

## REQUEST FOR PRODUCTION OF DOCUMENTS

## DEFINITIONS

As used herein, the following terms are intended to have the meanings indicated:

A.    "Debtors" means Adelphia Communications Corporation, Adelphia Cablevision, LLC and their affiliates and subsidiaries and (i) their present and former agents, representatives, accountants, investigators, consultants, and attorneys, (ii) any other person or entity acting on the Debtors' behalf, and/or (iii) any other person or entity otherwise subject to their control or which controls the Debtors.

B.    "Plaintiffs" shall mean Adelphia Communication Corporation, Adelphia Cablevision, LLC (collectively, "Adelphia"), the Official Committee of Unsecured Creditors of Adelphia Communications Corporation and the Adelphia Recovery Trust.

C.    "Any" or "each" should be understood to include and encompass "all"; "or" should be understood to include and encompass "and"; and "and" should be understood to include and encompass "or".

D.    "Prestige Cable Systems" means the cable systems acquired by Adelphia from certain of the Defendants as more specified in the Asset Purchase Agreement and Stock Purchase Agreement both dated December 6, 1999.

E.    "Person" shall mean any natural person, firm, corporation, partnership, joint venture or any form of business entity or other organization.

F.    "Rigas Family" means John Rigas, Timothy Rigas, Michael Rigas, and James Rigas.

G.    "Document" or "documents" means any tangible thing upon which any expression, communication, representation or data has been recorded by any means including, but not limited to, handwriting, typewriting, printing, Photostatting, photographing, on a computer, magnetic impulse, or mechanical or electronic recording and any non-identical copies (whether different from the original because of notes made on such copies, because of indications that said copies were sent to different individuals than were the originals, or because of any other reason), including but not limited to working papers, preliminary, intermediate or final drafts, correspondence, email, memoranda, charts, notes, records of any sort of meetings, invoices, financial statements, financial calculations, diaries, reports of telephone or other oral conversations, desk calendars, appointment books, audio or video tape recordings, microfilm, microfiche, computer tape, computer disk, computer printout, computer card, and all other writings and recordings of every kind that are in your actual or constructive possession, custody, or control.

H.    "Defendants" shall mean Prestige Communications of NC, Inc., Jonathan J. Oscher, Lorraine Oscher McClain, Robert F. Buckfelder, Buckfelder Investment Trust and Anverse, Inc. and all persons acting on their behalf.

I.    "Transaction" means any and all aspects of the acquisition by Adelphia of certain cable systems from certain of the Defendants as more specified in the Asset Purchase Agreement and Stock Purchase Agreement both dated December 6, 1999.

J.    "You," "your," or "yourself" means Deloitte & Touche LLP and/or (i) your present and former agents, representatives, accountants, investigators, consultants,

and attorneys, (ii) any other person or entity acting on your behalf, and/or (iii) any other person or entity otherwise subject to their control or which controls you.

K.    For each of the Definitions set out above, the singular form of the defined term includes the plural and the plural form also includes the singular.

## INSTRUCTIONS

1.    If a requested document which you specify is not currently in your possession, but you are aware of the present location and/or the person who retains a copy of such document, state the location of each document, including the name, the address and title of the person who retains such document.

2.    Should you claim privilege for any document(s) about which information is requested, describe each document in the manner below indicated and, in addition, indicate that you claim privilege and state the ground on which the claim of privilege rests:

    a.    the title, heading or caption of each document, if any;

    b.    the identifying number(s), letter(s), or combination thereof, if any, and the significance or meaning of such number(s), letter(s), or combination thereof;

    c.    the date appearing on each document and if no date appears thereon, the answer shall so state and shall give the date or approximate date on which each document was prepared;

    d.    the general nature or description of each document (i.e., whether it is a letter, memorandum, minutes of a meeting, etc.) and the number of pages of which it consists;

e.  the identity of the person who signed each document, and if it was not signed, the answer shall so state and shall give the identity of each person(s) who prepared it;

f.  the identity of each person to whom each document was addressed and the identity of each person to whom a copy thereof was sent; and the identity of each person who has custody of a copy of each such document.

## DOCUMENT REQUESTS

1.  Documents sufficient to show the names of all witnesses deposed in *Adelphia Communications Corp. v. Deloitte & Touche, LLP, et al.*, Case No. 000598 (Phila. Ct. of Common Pleas) (the "Deloitte Litigation").

2.  Copies of all expert reports, draft or final, summary judgment pleadings and briefs, and all exhibits related thereto, prepared on behalf of Adelphia, Deloitte & Touche, LLP or the Rigas family members in the Deloitte Litigation.

3.  Unredacted deposition transcripts with exhibits of expert witnesses and Christopher Dunstan in the Deloitte Litigation.

4.  All Adelphia board of directors' minutes, draft or final, exhibits thereto and supplemental information provided to members of Adelphia's board of directors.

5.  All interrogatories by any party and responses thereto and any requests for admission by any party and responses thereto in the Deloitte Litigation.

6.    All materials provided to Adelphia's audit committee for the years 1999 through

2002.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>ADELPHIA COMMUNICATIONS CORP., et al., a<br>Delaware corporation,<br><br>Debtors.<br><br>ADELPHIA RECOVERY TRUST<br><br>Plaintiff,<br><br>v.<br><br>PRESTIGE COMMUNICATIONS OF NC, INC., et al.,<br><br>Defendants. | Chapter 11 Case<br><br>Case No. 02-41729 (REG)<br><br>(Jointly Administered)<br><br>**NOTICE OF<br>DOCUMENT SUBPOENA**<br><br>Adversary Proceeding<br>No. 04-03293 (CGM) |

## CERTIFICATE OF SERVICE

This is to certify that I have this day served in the foregoing matter a copy of the **Notice of Subpoena on Deloitte & Touche LLP** by depositing a copy of same in the U.S. Mail in a properly addressed envelope with adequate postage thereon as follows:

David M. Friedman, Esq.
Joseph A. Gershman, Esq.
Kasowitz, Benson, Torres & Friedman LLP
1633 Broadway
New York, New York 10019
*Counsel for the Plaintiff Adelphia Recovery Trust*

John H. Culver, III, Esq.
Kennedy Covington Lobdell & Hickman, L.L.P.
Hearst Tower, 47th Floor
215 North Tryon Street
Charlotte, NC 28202
*Counsel for Defendants Robert F. Buckfelder and Buckfelder Investment Trust*

Stuart W. Gold, Esq.
Cravath, Swaine & Moore LLP
825 Eighth Avenue
World Wide Plaza
New York, New York 10019
*Counsel for Third-Party Deloitte & Touche LLP*

This 28 day of November 2007.

HARRIS B. WINSBERG (Ga. Bar No. 770892)
DOUGLAS E. ERNST (Ga. Bar No. 249956)
TROUTMAN SANDERS LLP
Bank of America Plaza
600 Peachtree Street, N.E. – Suite 5200
Atlanta, Georgia 30308-2216

# EXHIBIT O

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re<br>ADELPHIA COMMUNICATIONS CORP.,<br>et al.,<br><br>          Debtors. | : <br> : <br> : <br> : | Chapter 11<br>Case No.  02-41729 (REG) |
| Adelphia Recovery Trust,<br><br>          Plaintiff,<br><br>- against -<br><br>PRESTIGE COMMUNICATIONS OF NC,<br>INC., JONATHAN J. OSCHER, LORRAINE<br>OSCHER MCCLAIN, ROBERT F.<br>BUCKFELDER, BUCKFELDER<br>INVESTMENT TRUST, and ANVERSE,<br>INC.,<br><br>          Defendants. | : <br> : <br> : <br> : <br> : <br> : <br> : <br> : | Adversary No. 04-03293<br>United States Bankruptcy Court<br>Southern District of New York |

## OBJECTIONS AND RESPONSES OF DELOITTE & TOUCHE LLP
## PURSUANT TO F.R.C.P. 45(C)(2)(B) TO SUBPOENA
## ISSUED BY PRESTIGE COMMUNICATIONS OF NC, INC.

Pursuant to Rule 45(c)(2)(B) of the Federal Rules of Civil Procedure made applicable by Federal Bankruptcy Rule 9016, Deloitte & Touche LLP ("Deloitte & Touche"), a non-party herein, by and through its undersigned counsel, hereby objects and responds to Prestige Communications of NC, Inc.'s subpoena served on or about November 28, 2007, and returnable on December 17, 2007 (the "Subpoena").

## GENERAL OBJECTIONS

1.    Deloitte & Touche objects to the Subpoena to the extent it seeks documents and information neither relevant to, nor reasonably calculated to lead to discovery of admissible evidence related to, the allegations set forth in the Complaint filed June 24, 2004 in the above-captioned adversary proceeding (the "Complaint").

2.    Deloitte & Touche objects to the Subpoena to the extent it seeks documents that constitute proprietary information, trade secrets and/or confidential research, development or commercial information. Such documents have been developed at great expense to, and effort by, Deloitte & Touche and are not, and could not be, at issue in this action, and their disclosure would be competitively harmful and against public policy. No confidentiality order would provide adequate protection for their production.

3.    Deloitte & Touche objects to the Subpoena to the extent it seeks documents that are protected by the attorney-client privilege, the work product doctrine, the privilege of self-critical analysis, the accountant-client privilege (including, without limitation, the accountant-client privilege statute of the State of Pennsylvania, 63 Pa. Cons. Stat. § 9.11(a) (2007)), or any other applicable privilege, rule or duty of confidentiality that precludes or limits production or disclosure of documents or information, including without limitation professional standards, legal rules, laws and regulations and any other applicable laws or doctrines of privilege, privacy or confidentiality.

4.    Deloitte & Touche objects to the Subpoena to the extent that it seeks documents and information that are available from other sources and Deloitte & Touche should not be burdened with their production.

5.    Deloitte & Touche objects to the Subpoena to the extent that it fails to allow a reasonable time for compliance.

6.    Deloitte & Touche objects to the Subpoena because it is unduly burdensome and oppressive.

7.    Deloitte & Touche objects to the Subpoena to the extent that it seeks documents not in Deloitte's possession, custody or control.

8.    Deloitte & Touche objects to the Subpoena to the extent it purports to require disclosure of confidential information. Documents consisting of or containing such confidential information will not be produced unless and until an appropriate confidentiality agreement is entered into and then only in accordance with the terms of said confidentiality agreement.

9.    Deloitte & Touche objects to the subpoena to the extent it purports to require disclosure of confidential, proprietary, and trade secret information of others where such information could not be provided absent a stipulation covering the confidentiality of the information.

10.    Deloitte & Touche objects to the definition of "Debtors" in Definition A as overly broad and purporting to encompass more than just the entities themselves and their subsidiaries, divisions and joint ventures. The purported definition is also sufficiently ambiguous and vague that it would make any search for documents impossible. For instance, references to unspecified, undefined or unnamed "present and former agents, representatives, accountants, investigators, consultants, and attorneys, [or] any other person or entity acting on the Debtors' behalf" place not merely an undue burden, but an impossible burden, upon Deloitte & Touche to know the unspecified,

3

undefined or unnamed persons or entities referred to. The requirements imposed by this definition are contrary to the Federal Rules of Civil Procedure.

11.    Deloitte & Touche objects to the definition of "Defendants" in Definition H as overly broad and purporting to encompass more than just the entities themselves and their subsidiaries, divisions and joint ventures. The purported definition is also sufficiently ambiguous and vague that it would make any search for documents impossible. For instance, references to unspecified, undefined or unnamed "persons acting on their behalf" place not merely an undue burden, but an impossible burden, upon Deloitte & Touche to know the unspecified, undefined or unnamed persons or entities referred to. The requirements imposed by this definition are contrary to the Federal Rules of Civil Procedure.

12.    Deloitte's responses and objections herein do not waive (i) any objections that Deloitte & Touche might assert as to the relevance of the subject matter of any request or to the admissibility of any response or document or category of responses or documents in any subsequent proceeding or (ii) Deloitte's right to object on any ground at any time to a demand for further response to these or other document or discovery requests in this action.

13.    Production of any document that is privileged or that was prepared in anticipation of litigation is inadvertent and not intended to and does not constitute a waiver of any privilege or of any other ground for objection to discovery of such document, the information contained therein or subject matter thereof or of Deloitte & Touche's right to object to the use of such document or the information contained therein.

4

14.    The foregoing General Objections are specifically incorporated into each of the Specific Objections and Responses set forth below.

## SPECIFIC OBJECTIONS AND RESPONSES

Request No. 1

Documents sufficient to show the names of all witnesses deposed in *Adelphia Communications Corp. v. Deloitte & Touche, LLP, et al.*, Case No. 000598 (Phila. Ct. of Common Pleas) (the "Deloitte Litigation").

Response to Request No. 1

Deloitte & Touche objects to Request No. 1 for the reasons stated in the General Objections set forth above. Deloitte & Touche further objects to this request on the ground that it is overly broad and unduly burdensome. The names of all witnesses deposed in the "Deloitte Litigation" are neither relevant to, nor reasonably calculated to lead to discovery of admissible evidence related to, the allegations set forth in the Complaint.

Request No. 2

Copies of all expert reports, draft or final, summary judgment pleadings and briefs, and all exhibits related thereto, prepared on behalf of Adelphia, Deloitte & Touche, LLP or the Rigas family members in the Deloitte Litigation.

Response to Request No. 2

Deloitte & Touche objects to Request No. 2 for the reasons stated in the General Objections set forth above. Deloitte & Touche further objects to this request on the ground that it is overly broad and unduly burdensome in seeking documents neither relevant to, nor reasonably calculated to lead to discovery of admissible evidence related to, the allegations set forth in the Complaint. Deloitte & Touche specially objects to this request because it seeks documents privileged under the attorney work product doctrine and materials filed under seal. Deloitte & Touche further objects to this request because

it seeks documents governed by a confidentiality agreement between Deloitte & Touche and Adelphia Communications Corporation ("Adelphia") that prohibits Deloitte & Touche from producing certain documents without giving Adelphia thirty days "to object or take other appropriate steps to protect the information".

Request No. 3

Unredacted deposition transcripts with exhibits of expert witnesses and Christopher Dunstan in the Deloitte Litigation.

Response to Request No. 3

Deloitte & Touche objects to Request No. 3 for the reasons stated in the General Objections set forth above. Deloitte & Touche further objects to this request on the ground that it is overly broad and unduly burdensome in seeking documents neither relevant to, nor reasonably calculated to lead to discovery of admissible evidence related to, the allegations set forth in the Complaint. Deloitte & Touche further objects to this request because it seeks documents governed by a confidentiality agreement between Deloitte & Touche and Adelphia that prohibits Deloitte & Touche from producing certain documents without giving Adelphia thirty days "to object or take other appropriate steps to protect the information".

Request No. 4

All Adelphia board of directors' minutes, draft or final, exhibits thereto and supplemental information provided to members of Adelphia's board of directors.

Response to Request No. 4

Deloitte & Touche objects to Request No. 4 for the reasons stated in the General Objections set forth above. Deloitte & Touche further objects to this request on the ground that it is overly broad and unduly burdensome in seeking documents neither relevant to, nor reasonably calculated to lead to discovery of admissible evidence related

to, the allegations set forth in the Complaint.  Deloitte & Touche further objects to the terms "supplemental information" and "provided to" as vague and ambiguous.

Request No. 5

All interrogatories by any party and responses thereto and any requests for admission by any party and responses thereto in the Deloitte Litigation.

Response to Request No. 5

Deloitte & Touche objects to Request No. 5 for the reasons stated in the General Objections set forth above.  Deloitte & Touche further objects to this request on the ground that it is overly broad and unduly burdensome in seeking documents neither relevant to, nor reasonably calculated to lead to discovery of admissible evidence related to, the allegations set forth in the Complaint.

Request No. 6

All materials provided to Adelphia's audit committee for the years 1999 through 2002.

Response to Request No. 6

Deloitte & Touche objects to Request No. 6 for the reasons stated in the General Objections set forth above.  Deloitte & Touche further objects to this request on the ground that it is overly broad and unduly burdensome in seeking documents neither relevant to, nor reasonably calculated to lead to discovery of admissible evidence related

to, the allegations set forth in the Complaint.  Deloitte & Touche further objects to the

terms "all materials" and "provided to" as vague and ambiguous.


Dated: New York, New York
       December 17, 2007

                                        Respectfully submitted,

                                        Max R. Shulman (MS-8538)
                                        CRAVATH, SWAINE & MOORE, LLP
                                        Worldwide Plaza
                                        825 Eighth Avenue
                                        New York, NY 10019-7475
                                        (212) 474-1000

# EXHIBIT P

Douglas E. Ernst (douglas.ernst@troutmansanders.com)
Harris B. Winsberg (harris.winsberg@troutmansanders.com)
Sean P. Dailey (sean.dailey@troutmansanders.com)
TROUTMAN SANDERS LLP
Bank of America Plaza – Suite 5200
600 Peachtree Street, N.E.
Atlanta, Georgia 30308-2216
(404) 885-3000 (tel.)
(404) 885-3900 (fax)

*Counsel to Defendants*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ADELPHIA RECOVERY TRUST,<br><br>      Plaintiff,<br><br>v.<br><br>PRESTIGE COMMUNICATIONS OF NC, INC.<br>*et al.*,<br><br>      Defendants. | Case No. 1:07-cv-11152-LMM<br><br>**NOTICE OF RULE 45<br>SUBPOENA** |

PLEASE TAKE NOTICE THAT, pursuant to Rule 45 of the Federal Rules of Civil Procedure, counsel to Defendants Prestige Communications of NC, Inc. *et al.* is serving the attached document subpoena upon John Rigas, Timothy Rigas, Michael Rigas and James Rigas (collectively, the "Rigas Family")

The subpoena seeks the production of documents listed therein by 10:00 a.m. on Wednesday, April 23, 2008, at Dilworth Paxson LLP, Mellon Bank Center, 1735 Market Street, Philadelphia, Pennsylvania, 19103-7595, attention John J. Higson, Esq.

This 24th day of March 2008.

*[Signature appears on the following page.]*

Respectfully submitted,

TROUTMAN SANDERS LLP


By: _____
   Douglas E. Ernst (*Pro Hac Vice*)
      (Ga. Bar No. 249956)
   Harris B. Winsberg (*Pro Hac Vice*)
      (Ga. Bar No. 770892)
   Sean P. Dailey (*Pro Hac Vice*)
      (Ga. Bar No. 441395)

   Bank of America Plaza – Suite 5200
   600 Peachtree Street, N.E.
   Atlanta, Georgia  30308-2216

   (404) 885-3000 (tel.)
   (404) 885-3900 (fax)

   *Counsel to Defendants*

AO88 (Rev 12/07) Subpoena in a Civil Case

**Issued by the**

# UNITED STATES DISTRICT COURT

EASTERN     DISTRICT OF     PENNSYLVANIA

**SUBPOENA IN A CIVIL CASE**

ADELPHIA RECOVERY TRUST

    V.

PRESTIGE COMMUNICATIONS OF NC, INC.         Case Number:[1] 1:07-cv-11152-LMM (SDNY)

TO:  The Rigas Family c/o John J. Higson, Esq., Dilworth Paxson LLP, 3200 Mellon Bank Center, 1735 Market Street, Philadelphia, Pennsylvania, 19103-7595

☐  YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☐  YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|

☒  YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):
    See Exhibit "A" (attached hereto)

| PLACE<br>Dilworth Paxson LLP, 3200 Mellon Bank Center, 1735 Market Street, Philadelphia, Pennsylvania, 19103-7595 | DATE AND TIME<br>4/23/2008 at 10:00 a.m. |
|---|---|

☐  YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

    Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT)<br>*Harris Winsberg*     (Attorney for Defendants) | DATE<br>3/24/2008 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Harris B. Winsberg, Esq. at (404) 885-3000
Troutman Sanders LLP, Bank of America Plaza, 600 Peachtree Street, N.E., Suite 5200, Atlanta, Georgia, 30308-2216

(See Rule 45, Federal Rules of Civil Procedure, Subdivision (c), (d), and (e), on next page)

---

[1] If action is pending in district other than district of issuance, state district under case number.

## PROOF OF SERVICE

| DATE | PLACE |
|------|-------|

**SERVED**

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|------------------------|-------------------|

| SERVED BY (PRINT NAME) | TITLE |
|------------------------|-------|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
                         Date

SIGNATURE OF SERVER

ADDRESS OF SERVER

Federal Rule of Civil Procedure 45 (c), (d), and (e), as amended on December 1, 2007:

(c)    PROTECTING A PERSON SUBJECT TO A SUBPOENAS.
    (1) Avoiding Undue Burden or Expense; Sanctions. A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.
    (2) Command to Produce Materials or Permit Inspection.
        (A) Appearance Not Required. A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
        (B) Objections. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
            (i) At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.
            (ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.
    (3) Quashing or Modifying a Subpoena.
        (A) When Required. On timely motion, the issuing court must quash or modify a subpoena that:
            (i) fails to allow a reasonable time to comply;
            (ii) requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;
            (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
            (iv) subjects a person to undue burden.
        (B) When Permitted. To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:
            (i) disclosing a trade secret or other confidential research, development, or commercial information;
            (ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or
            (iii) a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial
        (C) Specifying Conditions as an Alternative. In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
            (i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

            (ii) ensures that the subpoenaed person will be reasonably compensated.

(d) DUTIES IN RESPONDING TO A SUBPOENA.
    (1) Producing Documents or Electronically Stored Information. These procedures apply to producing documents or electronically stored information:
        (A) Documents. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
        (B) Form for Producing Electronically Stored Information Not Specified. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
        (C) Electronically Stored Information Produced in Only One Form. The person responding need not produce the same electronically stored information in more than one form.
        (D) Inaccessible Electronically Stored Information. The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.
    (2) Claiming Privilege or Protection.
        (A) Information Withheld. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
            (i) expressly make the claim; and
            (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
        (B) Information Produced. If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

(e) CONTEMPT.
The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii)

Exhibit A

# REQUEST FOR PRODUCTION OF DOCUMENTS

## DEFINITIONS

As used herein, the following terms are intended to have the meaning(s) indicated:

A.    "Debtors" shall mean Adelphia Communications Corporation, Adelphia Cablevision, LLC and their affiliates and subsidiaries and (i) their present and former agents, representatives, accountants, investigators, consultants, and attorneys, (ii) any other person or entity acting on the Debtors' behalf, and/or (iii) any other person or entity otherwise subject to their control or which controls the Debtors.

B.    "Plaintiffs" shall mean Adelphia Communication Corporation ("Adelphia"), Adelphia Cablevision, LLC, the Official Committee of Unsecured Creditors of Adelphia Communications Corporation, and the Adelphia Recovery Trust.

C.    "Any" or "each" should be understood to include and encompass "all"; "or" should be understood to include and encompass "and"; and "and" should be understood to include and encompass "or".

D.    "Identify":

a.    When used in reference to a person or other entity, shall be a request to state:

i.    His, her or its full name;

ii.    Present or last known business and residence address;

iii.    Present or last known telephone number; and

iv.    State of incorporation or organization, registered agent, any parent company or subsidiaries, and date of formation or incorporation; and

b.    When used in reference to a "document," shall be a request to state:

i.    A description of the type of document (*e.g.*, letter, memorandum, telegram, etc.);

ii.    The identity of the person or persons who authored, signed or prepared it; and

iii.    The date on which it was signed, executed, created or prepared.

E.    "Prestige Cable Systems" means the cable systems acquired by Adelphia from certain of the Defendants as more specified in the Asset Purchase Agreement and Stock Purchase Agreement both dated December 6, 1999.

F.    "Person" shall mean any natural person, firm, corporation, partnership, joint venture or any form of business entity or other organization.

G.    "Rigas Family" means John Rigas, Timothy Rigas, Michael Rigas, and/or James Rigas.

H.    "Document" or "documents" means any tangible thing upon which any expression, communication, representation or data has been recorded by any means including, but not limited to handwriting, typewriting, printing, Photostatting, photographing, on a computer, magnetic impulse, or mechanical or electronic recording and any non-identical copies (whether different from the original because of notes made on such copies, because of indications that said copies were sent to different individuals than were the originals, or because of any other reason), including, but not limited to working papers, preliminary, intermediate or final drafts, correspondence, email, memoranda, charts, notes, records of any sort of meetings, invoices, financial statements, financial calculations, diaries, reports of telephone or other oral conversations, desk calendars, appointment books, audio or video tape recordings, microfilm, microfiche, computer tape, computer disk, computer printout, computer card, and all other

writings and recordings of every kind that are in your actual or constructive possession, custody, or control.

     I.    "Defendants" shall mean Prestige Communications of NC, Inc., Jonathan J. Oscher, Lorraine Oscher McClain, Robert F. Buckfelder, Buckfelder Investment Trust and/or Anverse, Inc., and all persons acting on their behalf.

     J.    "Transaction" means any and all aspects of the acquisition by Adelphia of certain cable systems from certain of the Defendants as more specified in the Asset Purchase Agreement and Stock Purchase Agreement both dated December 6, 1999.

     K.    "You," "your," or "yourself" means the Rigas Family and/or (i) your present and former agents, representatives, accountants, investigators, consultants, and attorneys, (ii) any other person or entity acting on your behalf, and/or (iii) any other person or entity otherwise subject to their control or which controls you.

     L.    For each of the Definitions set out above, the singular form of the defined term includes the plural and the plural form also includes the singular.

## INSTRUCTIONS

     1.    If a requested document is not currently in your possession, but you are aware of its present location and/or the person who retains a copy of that document, state the location of each such document, including the name, address and title of the person who retains the document.

     2.    Should you claim privilege for any document(s) about which information is requested, describe each document in the manner below indicated and, in addition, indicate that you claim privilege and state the ground on which the claim of privilege rests:

          a.    the title, heading or caption of each document, if any;

b.    the identifying number(s), letter(s), or combination thereof, if any, and the significance or meaning of such number(s), letter(s), or combination thereof;

c.    the date appearing on each document and if no date appears thereon, the answer shall so state and shall give the date or approximate date on which each document was prepared;

d.    the general nature or description of each document (*i.e.* whether it is a letter, memorandum, minutes of a meeting, etc.) and the number of pages of which it consists;

e.    the identity of the person who signed each document, and if it was not signed, the answer shall so state and shall give the identity of each person(s) who prepared it; and

f.    the identity of each person to whom each document was addressed and the identity of each person to whom a copy thereof was sent; and the identity of each person who has custody of a copy of each such document.

## DOCUMENT REQUEST

1.    Copies of all expert reports, including any and all exhibits thereto, prepared on behalf of the Rigas Family in connection with the following litigation: *Adelphia Commc'ns Corp. v. Deloitte & Touche, LLP et al.*, Case No. 000598 (Phila. Ct. of Common Pleas) (the "Deloitte Litigation").

2.    Unredacted deposition transcripts with exhibits of the Rigas Family's expert witnesses in the Deloitte Litigation.

3.    The Rigas Family's responses to any interrogatories or requests for admission in the Deloitte Litigation.

4.    Unredacted deposition transcripts with exhibits of the following witnesses in the Deloitte Litigation: John Rigas, Timothy Rigas, Michael Rigas, James Rigas, Peter Venetis,

Randy Fisher, Hugh Coudriet, Jason Woolcock, Scott Johnson, Dean Marshall, Russell Solomon, and James Helms.

5.    All valuations, projections and appraisals relating to any of Adelphia's assets or the Rigas Family's assets for the years 1999 and 2000.

6.    The corporate minute books of the following entities from 1998 through 2006: Highland Prestige of Georgia, Inc.; Highland Video Associates, LP; Bucktail Broadcasting Corporation; Coudersport Television Cable Company; Highland Holdings, GP; Highland Communications, LLC; Highland Pref. Communications, LLC; Highland Pref. Communications 2001, LLC; Hilton Head Communications, LP; Ionian Communications, LP; Dorellenic Cable Partners; Highland 2000, LLC; Highland 2000, LP; Doris Holdings, LP; NCAA Holdings, Inc.; Iliad Holdings, Inc.; Highland Holdings II, GP; and Prestige Communications, Inc. (the "Entities").

7.    All federal tax returns filed by Adelphia or the Entities for the fiscal year 2000 as originally prepared that relate to the Transaction, including all supporting work papers.

8.    All state tax returns filed by Adelphia or the Entities for the fiscal year 2000 as originally prepared that relate to the Transaction, including all supporting work papers.

9.    All amended federal or state tax returns filed by Adelphia or the Entities for the fiscal year 2000 that relate to the Transaction, including all supporting work papers.

10.    Documents relating to the accounting treatment and tax treatment of the Transaction.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ADELPHIA RECOVERY TRUST,

Plaintiff,                                    Case No. 1:07-cv-11152-LMM

v.

PRESTIGE COMMUNICATIONS OF NC, INC.           **CERTIFICATE OF SERVICE**
*et al.*,

Defendants.

The undersigned hereby certifies that he has this day served a copy of the forgoing

**NOTICE OF RULE 45 SUBPOENA** upon the following attorneys of record in the above-

captioned matter by depositing a copy of same in the U.S. Mail in a properly addressed envelope

with adequate postage affixed thereto as follows:

David M. Friedman                        John H. Culver, III
Joseph A. Gershman                       KENNEDY COVINGTON LOBDELL & HICKMAN
KASOWITZ, BENSON, TORRES & FRIEDMAN LLP  Hearst Tower, 47th Floor
1633 Broadway                            214 N. Tryon Street
New York, NY  10019-6799                 Charlotte, NC  28202-1078

*Counsel to Plaintiff*                   *Counsel to Defendants Robert F. Buckfelder*
                                         *and Buckfelder Investment Trust*


John J. Higson
DILWORTH PAXSON LLP
3200 Mellon Bank Center
1735 Market Street
Philadelphia, PA  19103-7595

*Counsel to Third-Party Rigas Family*


*[Signature appears on the following page.]*

This 24th day of March 2008.

Respectfully submitted,

By: _Harris Winsberg_

Harris B. Winsberg (*Pro Hac Vice*)
(Ga. Bar No. 770892)

# EXHIBIT Q

# CRAVATH, SWAINE & MOORE LLP

WORLDWIDE PLAZA
825 EIGHTH AVENUE
NEW YORK, NY 10019-7475

TELEPHONE: (212) 474-1000
FACSIMILE: (212) 474-3700

CITYPOINT
ONE ROPEMAKER STREET
LONDON EC2Y 9HR
TELEPHONE: 44-20-7453-1000
FACSIMILE: 44-20-7860-1150

WRITER'S DIRECT DIAL NUMBER

(212) 474-1070

February 20, 2008

<u>Adelphia Recovery Trust v. Prestige Communications of NC, Inc.,
et al., Adv. Proc. No. 04-03293 (CGM)</u>

Dear Harris:

       This letter sets forth the agreement between Deloitte & Touche LLP ("Deloitte & Touche") and Prestige Communications of NC, Inc., et al. ("Prestige") regarding the production of documents pursuant to the subpoena served by Prestige upon Deloitte & Touche dated November 28, 2007, in the adversary proceeding identified above (the "Subpoena").

       Deloitte & Touche agrees to produce certain documents (as described below) related to the reports submitted on behalf of Deloitte & Touche in the matter captioned Adelphia Communications Corp. v. Deloitte & Touche LLP, et al., No. 000598, in the Philadelphia Court of Common Pleas (the "Deloitte Case"), by the following expert witnesses (collectively, "Deloitte & Touche Experts"):

1. Beaver, William H.;

2. Erickson, Donald A.;

3. Fischel, Daniel R.;

4. Kinley, David;

5. Kirby, LeGrand C. (III);

6. Temkin, Robert H.; and

7. Van Liere, Kent D.

The certain documents we agree to produce at this time include and are limited to the complete expert reports and associated exhibits thereto of the Deloitte & Touche Experts.

All documents produced under this letter agreement will be produced pursuant to and will be governed by the Agreement by Parties to the Prestige Action to Maintain Confidentiality of Material Designated by Deloitte & Touche LLP as "Confidential" or "Highly Confidential" dated March 17, 2006.

Prestige agrees to cover the reasonable costs associated with Deloitte & Touche's production of documents under this letter agreement. Deloitte & Touche agrees to produce the documents covered by this letter agreement within a reasonable amount of time.

This letter agreement resolves all disputes regarding the request for documents set forth in the Subpoena, except with regard to production of transcripts of the deposition testimony and associated exhibits thereto of the Deloitte & Touche Experts.[1] For the avoidance of doubt, Prestige reserves the right to serve additional discovery requests on Deloitte & Touche, and Deloitte & Touche reserves its rights in responding to or objecting to any additional discovery requests.

Notwithstanding anything in this letter agreement to the contrary, Prestige reserves all of its rights against the Adelphia Recovery Trust, including, but not limited to, compelling the production of Adelphia's expert reports, testimony and exhibits thereto provided in the Deloitte Case and compelling the production of the transcripts of the deposition testimony and associated exhibits thereto of the Deloitte & Touche Experts.

---

[1] On February 13, 2008, Deloitte & Touche sent an email to the Adelphia Recovery Trust, informing the Adelphia Recovery Trust that Deloitte & Touche intended to produce to Prestige Deloitte & Touche's expert reports with exhibits and transcripts of the deposition testimony and associated exhibits thereto of the Deloitte & Touche Experts and asking the Adelphia Recovery Trust to confirm that it did not object to production of these materials. On February 14, 2008, the Adelphia Recovery Trust sent an email, objecting to the production of the transcripts of the deposition testimony and associated exhibits thereto of the Deloitte & Touche Experts. If the Adelphia Recovery Trust withdraws its objection, Deloitte & Touche will agree to the production of these documents. If the Adelphia Recovery Trust does not withdraw its objection, Prestige reserves all of its rights under the Subpoena to compel the production of these documents.

3

If you are in agreement with the above terms, please sign and return a copy of this letter to me.

Very truly yours,

James E. Canning

Harris B. Winsberg
    Troutman Sanders LLP
        600 Peachtree Street, NE
        Suite 5200
            Atlanta, GA 30308-2216

BY E-MAIL

Accepted and agreed:

Troutman Sanders LLP,

by _____
        Name:  Harris B. Winsberg

# EXHIBIT R

```
 1                    UNITED STATES BANKRUPTCY COURT
                     SOUTHERN DISTRICT OF NEW YORK
 2
                                      .
 3   IN RE:                           .   Case No. 02-41729 (REG)
                                      .
 4   ADELPHIA COMMUNICATIONS          .   New York, New York
     CORPORATION, et al.,             .   Wednesday, October 17, 2007
 5                                    .   11:34 a.m.
                     Debtors.         .
 6   . . . . . . . . . . . . .        .
     ADELPHIA COMMUNICATIONS          .   Adv. Proc. No. 04-03293 (CGM)
 7   CORPORATION, et al.,             .
                                      .
 8                    Plaintiffs,     .
                                      .
 9           vs.                      .
                                      .
10   PRESTIGE COMMUNICATIONS OF       .
     NC, INC., et al.,                .
11                                    .
                     Defendants.      .
12   . . . . . . . . . . . . .        .

13            TRANSCRIPT OF DEFENDANTS' MOTION FOR SANCTIONS
                 BEFORE THE HONORABLE CECELIA G. MORRIS
14                  UNITED STATES BANKRUPTCY JUDGE

15   APPEARANCES:

16   For the Plaintiffs:          Joseph A. Gershman, Esq.
                                  Jennifer B. Schwarz, Esq.
17                                KASOWITZ, BENSON, TORRES &
                                   FRIEDMAN, LLP
18                                1633 Broadway
                                  New York, New York  10019
19
     Audio Operator:             Electronically Recorded
20                                by Court Personnel

21   Transcription Company:       Rand Reporting & Transcription, LLC
                                  80 Broad Street, Fifth Floor
22                                New York, New York 10004
                                  (212) 504-2919
23                                www.randreporting.com

24
     Proceedings recorded by electronic sound recording, transcript
25   produced by transcription service.
```

```
 1   APPEARANCES:   (Continued)

 2   For the Defendants:          Harris B. Winsberg, Esq.
                                  Douglas E. Ernst, Esq.
 3                                TROUTMAN SANDERS, LLP
                                  600 Peachtree Street, N.E.
 4                                Suite 5200
                                  Atlanta, Georgia   30308
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    (Proceedings commence at 11:34 a.m.)

2    THE COURT:  Good morning.  You may be seated.

3    (Pause.)

4    THE COURT:  Just one minute.

5    Good morning.  This is Case Number 04-03293, <u>Adelphia</u>

6    <u>Communications versus Prestige Communication</u>, and the lead case

7    is 02-41729, <u>Adelphia Communication</u>.

8    Your name and affiliation, please.

9    Go ahead.

10    MR. WINSBERG:  Good morning, Your Honor.  Harris

11    Winsberg from Troutman Sanders on behalf of the defendants.

12    Also with me is Mr. Doug Ernst, also from Troutman Sanders on

13    behalf of the defendants.  And with me today is Miss Irlene

14    Holmes (phonetic), who works with Mr. Osher (phonetic), who's

15    one of the defendants in the case.

16    THE COURT:  And Ms. Holmes is --

17    MR. WINSBERG:  The one that works for Mr. Osher who's

18    a defendant --

19    THE COURT:  Okay, so --

20    MR. WINSBERG:  -- in this --

21    THE COURT:  -- her role today is as?

22    MR. WINSBERG:  She's just here as a representative of

23    the defendants.

24    THE COURT:  Very good.

25    MR. GERSHMAN:  Good morning, Your Honor.  Joseph

4

1    Gershman from Kasowitz, Benson, Torres & Friedman on behalf of

2    plaintiff, Adelphia Recovery Trust, joined today by my

3    associate Jennifer Schwarz.

4            THE COURT:  Welcome.  It's your motion.

5            MR. WINSBERG:  Yes, Your Honor.  Prefer the podium

6    or --

7            THE COURT:  Whatever you're comfortable with.  I'm new

8    to this courtroom, so I have -- I actually designed this

9    courtroom, but it's the first time I've ever been in it.

10           MR. WINSBERG:  I'll stand here then --

11           THE COURT:  Okay.

12           MR. WINSBERG:  -- Your Honor.

13           First, Your Honor, I would apologize.  I looked at the

14   docket this week and it has an 11:30 date a.m. appearance, so

15   we were late because of that, and I certainly apologize to the

16   Court for --

17           THE COURT:  Well, we took a walk and had a cup of

18   coffee, so -- and worked on other cases, so we took -- we made

19   use of the time.

20           MR. WINSBERG:  Your Honor, we are here today on

21   defendants' motion to compel.  There were three primary things

22   that we sought in this motion to compel.  One were the

23   unredacted transcripts of the four independent directors of

24   Adelphia that were taken in the Adelphia v. Deloitte case.  The

25   second thing we're seeking are complete corporate minute books

5

1   with respect to Highland Prestige Georgia and Prestige

2   Communications, Inc.  And the third thing we're seeking are

3   documents relating to acquisitions that Adelphia made in the

4   1999, 2000 time frame.  Those are the primary three sources of

5   documents we're looking for.

6          If I could turn to just the transcript, I could

7   explain -- what I'd like to do is explain why we believe each

8   one of the three things we're seeking are relevant and should

9   be produced in the case --

10          THE COURT:  Okay.

11          MR. WINSBERG:  With respect to the independent

12   director transcripts in <u>Deloitte</u>, Your Honor, there is

13   substantial overlap between this litigation and the <u>Adelphia v.</u>

14   <u>Deloitte</u> case.

15          In the <u>Deloitte</u> case, Your Honor, witnesses discussed

16   the Prestige transaction.  There were numerous issues litigated

17   in the <u>Adelphia v. Deloitte</u> case, such as whether the 1999 and

18   2000 financials were done in accordance with generally accepted

19   accounting principles and such things as how much, if any, of

20   the co-borrowing debt should have been reported.  All those

21   issues are relevant to the litigation in this case as

22   Adelphia's alleged that it was insolvent at the time of this

23   transaction.

24          By bringing this fraudulent conveyance case, the Court

25   not only is -- Adelphia's not only put its financial condition

6

1    at issue, but really Adelphia itself is at issue in this case

2    by alleging that it was setting itself up to fail by entering

3    into these transactions.

4         Your Honor, the full transcripts allow us to review

5    their testimony and put the redacted testimony they give us --

6    given us in the proper context.  Our other concern, Your Honor,

7    is that there -- we have no understanding of what they

8    redacted, and we believe that what they may think is relevant

9    to the claims and defenses and what we may think is relevant to

10   the claims and defenses are probably two separate things.  And

11   I can give some examples if Your Honor would like --

12        THE COURT:  Please, I would like to have them for the

13   record.

14        MR. WINSBERG:  Sure, Your Honor.  For example, one of

15   the things that we believe is that there are no damages in this

16   case.  Adelphia had a centralized cash management system.  That

17   cash management system, all of the cash, even from the Rigas

18   entities, would flow through Adelphia centralized cash

19   management system and became -- become Adelphia's property.

20        So we would believe testimony regarding a centralized

21   cash management system would be relevant.  I would take it Mr.

22   Gershman would think otherwise.  We just can't tell.

23        There are other things that the directors were talking

24   about, such things as other acquisitions that Adelphia made and

25   what they looked at.  Again, when you look at inadequate

1   capitalization, Your Honor, you look at whether Adelphia was

2   making -- was entering into acquisitions, and I'll get to that

3   later why those other documents are relevant also.  You look at

4   whether when they were approving these transactions were -- was

5   it reasonable or should they have known that by entering into

6   these transactions Adelphia was setting itself up to fail.

7          So there's a lot of things these directors talked

8   about.  They also probably got deposed on corporate governance

9   matters.  One of the things Adelphia's alleged is there was a

10  failure of corporate governance matters in this litigation, so

11  how they -- what process they went through in approving

12  transactions, did they look at the Prestige transaction any

13  differently they looked at any of the other acquisitions they

14  looked at.

15         All those things that <u>Deloitte</u> may have -- they may

16  have covered in the <u>Deloitte</u> litigation would bear on this

17  case.  I can't imagine anything that they said that wouldn't

18  have some bearing or at least give us some context of what's

19  going on in this case and remind Your Honor they've had these

20  depositions sitting in their offices or have had access to them

21  for over a year and we haven't seen them and, you know, we're

22  trying to get up to speed on what was Adelphia.  You know, how

23  was it created and -- and as I'll get to later, 60 percent of

24  Adelphia was created in 1999 and 2000, so the bulk of Adelphia.

25  So we're trying to get up to speed and whatever they're talking

1    about, it gives us the proper context for understanding what

2    went on in this period of time.

3         The -- there are also allegations in the complaint

4    about what the independent directors knew or didn't know with

5    respect to Prestige, and again, how they looked at this

6    transaction versus any others would also be relevant in this

7    case.

8         And I point out, Your Honor, we attached the exhibits

9    if Your Honor would like, but our understanding in this case

10   and the -- particularly Exhibit 5 reflects that -- was the

11   redactions were done at the insistence of Deloitte.  And rather

12   than get into a fight about getting complete transcripts right

13   before we were going to take depositions of Buchanan Ingersoll

14   lawyers, we went ahead and took redacted transcripts based upon

15   that it was Deloitte that was the one insisting on the

16   redactions.  And we didn't want to make an issue of it, but

17   when we contacted Deloitte, they may have changed their mind.

18   I don't know.  I don't have those documents between the

19   communications between -- and I don't really --

20         THE COURT:  Let the record reflect that I recall this

21   on and off the record of exactly the same way you recall it.

22         MR. WINSBERG:  Thank you, Your Honor.

23         THE COURT:  Okay.  I have a couple of questions on --

24   and I'll go with them.  Why are the minute books of Highland

25   Prestige of Georgia and Prestige Communications relevant to

1   this action?

2        MR. WINSBERG:  Sure, Your Honor.  The minute books, as

3   Your Honor is aware, are the primary source of corporate

4   governance matters of those two legal entities.  And in the

5   complaint -- in particular, I would direct the Court to the

6   amended complaint at Paragraph 25, the last sentence --

7   Adelphia alleged that it -- there's no debate in this case,

8   Your Honor, that my client gave the stock of Prestige

9   Communications to Adelphia.  There's no debate about that.  The

10  30(b)(6) witness has acknowledged that.

11       They alleged in their complaint that Adelphia

12  transferred that stock to Highland Prestige.  However, at the

13  30(b)(6) deposition, the Adelphia witness said it never was

14  transferred, which raises questions such as how was Adelphia

15  damaged in this case if Highland never got the stock of

16  Prestige Communications, and how did Highland allegedly

17  exercise control over Prestige Communications, Inc. when it

18  never actually acquired the stock from Adelphia.  Were

19  corporate formalities followed with respect to these two legal

20  entities.

21       The minute books in full, Your Honor, are the primary

22  source of corporate governance matters of these two entities

23  and a lot of the allegations they made that the stock was

24  transferred, even though now they admit in 30(b)(6) it wasn't,

25  we'd like --

1        THE COURT:  And you don't have these minute books?

2        MR. WINSBERG:  We do not have full set minute books.

3  No, Your Honor.

4        THE COURT:  But Adelphia does?

5        MR. WINSBERG:  That's -- my understanding is they do,

6  and, Your Honor, we -- Prestige Communications, Inc. and

7  Highland Prestige of Georgia were what they would refer to as

8  Rigas managed entities.  We looked at the bankruptcy schedule.

9  Those entities filed bankruptcy, as I understand and they can

10 correct me if I'm wrong, as part of the government settlement.

11        And so when they put them into bankruptcy, we looked

12 at their bankruptcy schedules and said, oh, the minute books

13 are located in Denver, Colorado.  So it's in our exhibits we

14 asked Willkie, Farr & Gallagher, hey, the minute books look

15 like they're in Denver, Colorado, can you give them to us.  And

16 it looks like they were, and of course they didn't, and there's

17 no point about going through that correspondence.

18        The bottom --

19        THE COURT:  But you do not have them and you have

20 asked for them?

21        MR. WINSBERG:  Yes, Your Honor.

22        THE COURT:  Okay.

23        MR. WINSBERG:  I do not have the complete set minute

24 books and I have asked for them.  So I could go on, but that's

25 the basic argument on why we believe the minute books --

1       THE COURT:  And then the other one is you are asking

2  for transactions binders for Adelphia's acquisitions between

3  1999 and 2001, and you've referred to that already in your

4  opening arguments.  Why is this relevant?

5       MR. WINSBERG:  Yes, Your Honor, and just to dovetail

6  itself, Adelphia created itself through these acquisitions.

7  Sixty percent of it.  We have to value that aspect of the

8  balance sheet.  And I was reading from Adelphia's restated 10-K

9  that they did after they did the restatement in the bankruptcy,

10  and according to that restated 10-K, just to give you some

11  magnitude of the numbers, in 1999, Adelphia had 1.5 million

12  subscribers and had about 3.7 billion in debt.

13       And then you flip to 2001.  Adelphia has 5.2, five

14  million subscribers and 17.4 billion in debt.  It's a different

15  company, and it was through these major acquisitions it made in

16  1999 and 2000.  There were some in 2001, but the bulk of them

17  were done in '99 and 2000.

18       And so the parties have to value that large piece of

19  the balance sheet that was created by these acquisitions.  And

20  Adelphia's contended that it was inadequately capitalized as

21  far back as the Fall of 1999.  At least that's what Adelphia's

22  corporate representative said in the deposition.  And so what

23  -- as I understand the law, and I read the Iridium decision,

24  which I thought was a fantastic decision on a summary of the

25  solvency law and fraudulent conveyance, you look at what the

12

1    intent of the parties were at the time of the transaction.

2    What did the board consider with each one of these

3    acquisitions.  Were those -- they made assumptions, obviously,

4    when they made those acquisitions.  Were those assumptions

5    reasonable at the time.  If they were, then Adelphia was not

6    inadequately capitalized.  If they weren't reasonable, then

7    Adelphia -- the Court could rule that it was inadequately

8    capitalized.  That's how I understand the law, so how they

9    viewed each of these acquisitions is relevant to the

10   allegations they made about inadequate capitalization and

11   solvency.

12           Now, Your Honor, we do recognize it's a large volume

13   of documents that we're looking for.

14           THE COURT:  Thirty binders, I understand, correct?

15           MR. WINSBERG:  Those are the closing acquisitions.

16           THE COURT:  Okay.

17           MR. WINSBERG:  Which they have given us the closing

18   binders, Your Honor.  We -- so we did offer if they told us

19   where they were located, we go collect them.  I'm aware of Your

20   Honor's decision that Your Honor -- that there's a warehouse

21   that exists.  I'm also aware that Big Merrill -- they may be

22   floating around somewhere in Big Merrill, so we offered tell us

23   where they are and we'll go get them ourselves.  And what --

24   instead of doing that, and I -- and you can look at Exhibits 17

25   and 19 of our brief, they told us to go fish in Big Merrill

1    without giving us any direction, which I believe was contrary

2    to this Court's prior ruling on that Merrill was not a

3    production.

4        The last argument they make, Your Honor, on that point

5    was that the numbers were fraudulent, and nobody's debating

6    that in the restatement Adelphia adjusted the numbers to the

7    public.  The issue I'm looking at is not, Your Honor, what was

8    reported to the public, but what were the numbers that were

9    being represented by sellers to Adelphia in making those

10   acquisitions.  That's a separate issue, and I've heard no

11   allegation that sellers were misrepresenting to Adelphia the

12   nature and extent of the assets that Adelphia was acquiring

13   from them.

14       So it's two separate issues.  One issue would be what

15   they reported to the public, which is not really relevant to

16   the analysis we're looking at when it comes to inadequate

17   capitalization, versus what sellers were telling Adelphia the

18   stuff was what they were getting; how many subscribers, what

19   was the growth rates.

20       So all those things, Your Honor, we believe are

21   relevant in the case and we respectfully ask that the motion to

22   compel be granted.

23       THE COURT:  Very good.

24       MR. WINSBERG:  Thank you, Your Honor.

25       THE COURT:  And you've asked for expenses, but that's

14

1   something we'll deal with later.

2          Mr. Hershman, before --

3          MR. GERSHMAN:  Gershman, actually, Your Honor.

4          THE COURT:  Excuse me, Hersh -- I'm sorry.

5          MR. GERSHMAN:  Gershman.  Gershman with a G.

6          THE COURT:  Oh.  Let me, before I begin, recollect

7   something to you; an in-chambers conference and an out-of-

8   chambers conference where you yourself said to me -- said to

9   this Court, said to everybody go find those Deloitte.  If you

10  get them, you got them.  Seems you're retreating from that.

11         MR. GERSHMAN:  Not at all, Your Honor.

12         THE COURT:  So then tell me where you are.

13         MR. GERSHMAN:  Sure.  With respect to the acquisition

14  documents, first of all, Your Honor, just so it's clear --

15         THE COURT:  Why don't you answer my question first

16  before you go to the --

17         MR. GERSHMAN:  Are we retreating?  We are --

18         THE COURT:  Yeah.

19         MR. GERSHMAN:  -- not retreating at all, Your Honor.

20  What -- we objected to Mr. Winsberg's entire request.  I don't

21  know whether you have seen it.  It goes on for --

22         THE COURT:  No, no, no, no, no, no, no, no.  Don't go

23  there.  You tell me what you told me on the record and off the

24  record in this litigation in -- when I was in court with you

25  about that Prestige litigation and the Deloitte information.

1    That's my question to you.  Don't go to something else yet.  I

2    want to know what you said to this Court before, and you are

3    changing what you said to this Court before, and I want to know

4    why.

5            MR. GERSHMAN:  Your Honor, I'm not sure what you're --

6    what point you're --

7            THE COURT:  You have -- you said from the very

8    beginning -- basically, you told Troutman Sanders go to the --

9    go to Deloitte.  If you can get it, you can have it.  That's

10   basically what you said.

11           MR. GERSHMAN:  I don't believe that's correct, Your

12   Honor.

13           THE COURT:  Well, that's what I remembered.  So tell

14   me what I remembered wrong.

15           MR. GERSHMAN:  Sure.  With respect to Deloitte, Your

16   Honor, at the -- when the -- the defendants at one point had

17   asked for deposition transcripts and it came to light that

18   there were -- there may have been particular transcripts in the

19   Deloitte case which were relevant.  There were issues of

20   confidentiality because there had been confidentiality

21   designations made in the Deloitte case.

22           Cravath, who represented Deloitte, was particularly

23   adamant that they were not going to agree to the production of

24   those transcripts and were going to move to quash a subpoena

25   which would have sought the production of those transcripts.

1    Now, that subpoena had been served on Buchanan Ingersoll and

2    was seeking transcripts from them directly.

3        Then I had a number of conversations with Mr. Gordon,

4    at which point Mr Gordon said all -- that I said, look, Cravath

5    is objecting, they are going to move to quash, and if -- unless

6    we can come up with some kind of a resolution and Cravath had

7    indicated that they would not object if only the portions of

8    the transcripts relating to the Prestige transaction were

9    produced.  If the transcripts were redacted in that form, they

10   would not move to quash and they would agree to their

11   production.

12        We conveyed that to Troutman.  Mr. Gordon said all

13   that we need from these and all that we want is the stuff that

14   relates the Prestige transaction.  So if you're willing to give

15   that to us, that is fine.

16        And so that is how the transcripts from the <u>Deloitte</u>

17   case have been produced.  Thirty-eight transcripts over the

18   last --

19        THE COURT:  And redacted.

20        MR. GERSHMAN:  Redacted.

21        THE COURT:  But you're making the decision on the

22   redaction, not me, and you haven't produced a privilege log.

23   This is discovery.

24        MR. GERSHMAN:  Your Honor, it was done with the

25   agreement of the defendants.  The defendants agreed --

1    THE COURT:  Is that correct?

2    MR. GERSHMAN:  -- to take them that way.

3    MR. WINSBERG:  No, Your Honor.

4    THE COURT:  It's not what I remember on and off the

5    record.  Now, you might remember it one way, but I'm

6    remembering it another and I think opposing counsel may be

7    remembering it another way, too.  So that means two of us

8    remember it one way and you remember it one way.

9    How many of the director -- independent director

10   transcripts exist?  First, have you produced a privilege log at

11   all?

12   MR. GERSHMAN:  I don't believe we have, Your Honor.

13   THE COURT:  How many independent director transcripts

14   exist?

15   MR. GERSHMAN:  From the Deloitte case, I believe there

16   are 11; six of which have been produced in their entirety.

17   Also, let me just clarify for Your Honor just so that

18   -- so the independent director transcripts were originally

19   produced pursuant to our agreement in redacted form.  In the --

20   earlier this year, Mr. Gordon approached Cravath about getting

21   unredacted copies of the independent director transcripts and

22   Cravath at that point said, we do not object where your getting

23   the -- to your getting those transcripts if it is all right --

24   if there is no objection from the plaintiff.  So they withdrew

25   their objection at that time to unredacted transcripts of the

1    plaintiff.

2         We have since that time produced unredacted copies of

3    all of the transcripts which have any testimony relating to the

4    Prestige transaction, the financial status of Adelphia in the

5    1999, 2000 period --

6         THE COURT:  Is that true?

7         MR. WINSBERG:  I can't tell, Your Honor.  He has

8    produced us some transcripts, Your Honor, that -- in unredacted

9    forms before the motion to compel right before we filed it.  He

10   did not produce all volumes of all the transcripts.  Mr.

11   Gelber's deposition transcripts, we can't find any redacted or

12   unredacted copies in our files.  We asked him about that.  His

13   opposition papers, he says they produced Gelber's transcripts.

14   We haven't seen any of those, so I have no way -- without

15   seeing all the transcripts, I have no way of knowing whether

16   that's true or not.

17        MR. GERSHMAN:  In total, there were 11 transcripts,

18   Your Honor.  Six of them have been produced in total.  Because

19   those -- and contrary --

20        THE COURT:  And whose transcript that you can't find

21   at all?

22        MR. WINSBERG:  Mr. Gelber's.

23        MR. GERSHMAN:  There are transcripts of Mr. Gelber in

24   there.

25        THE COURT:  Okay, well we need to -- all you have to

1  do is talk to each other.  You say you don't have them.  You

2  say you do.  Produce them.

3  　　　　　MR. GERSHMAN:  We'll make sure he has them.  We

4  believe he already does.

5  　　　　　THE COURT:  And then we're going to talk about

6  redacted and unredacted.  There's no privilege log though, I'm

7  hearing.

8  　　　　　MR. GERSHMAN:  There is no privilege log, Your Honor.

9  　　　　　THE COURT:  And I have a question to ask.  Why is it

10  that you asked that they agree not to ask questions in the

11  Deloitte transcripts of the independent directors without

12  having -- how can you demand that Prestige agree not to ask

13  some same questions in the Deloitte transcripts at the

14  depositions of the independent directors in the Prestige

15  litigation without first having access to unredacted

16  transcripts?

17  　　　　　MR. GERSHMAN:  It was merely a proposal that we made,

18  Your Honor, to avoid the -- these directors from having to do

19  the same exact deposition twice.  We said, all right, if you

20  want to have these transcripts so that we don't have exactly

21  the same deposition all over again, we'll produce them to you.

22  Let's just agree that they were a deposition in this case --

23  　　　　　THE COURT:  No.

24  　　　　　MR. GERSHMAN:  -- and you're free to ask --

25  　　　　　THE COURT:  I won't --

1          MR. GERSHMAN:  -- them anything else you want.

2          THE COURT:  I won't agree to that.  Is there -- if

3     there's no privilege log, why weren't unredacted copies turned

4     over to defendants when they were first requested in November

5     of '04?

6          MR. GERSHMAN:  It was not --

7          THE COURT:  When you went running to Judge Gerber and

8     said, stop -- it's your case.  You're not giving me a case.  I

9     have to tell you I've been so frustrated from the very

10    beginning.  It's been your case.  You're the one that has said

11    that this didn't happen, and yet you then -- you're the one

12    that keeps putting the brakes on when we're trying to move to

13    find out what's going on this case.

14         MR. GERSHMAN:  Well, it was not a privilege issue,

15    Your Honor, it was a confidentiality agreement issue and

16    therefore not something that we're required a privilege log.

17    And because there were confidentiality issues arising from the

18    confidentiality agreement in the Deloitte case, an agreement

19    was struck --

20         THE COURT:  And if the transcripts are irrelevant to

21    the current matter, why wouldn't you agree that advacy (sic)

22    process would take care of how the defendants are able to

23    utilize this and produce them?

24         MR. GERSHMAN:  Well, we did, Your Honor --

25         THE COURT:  No, you gave them redacted ones.

1            MR. GERSHMAN:  No, no, no.  We -- initially we gave

2    them redacted ones and then at the -- once Deloitte said that

3    they were not going to object to the production of unredacted

4    independent director transcripts, we gave them unredacted ones

5    for all transcripts that had any testimony relating to issues

6    in this case.

7            THE COURT:  You may --

8            MR. GERSHMAN:  Anything --

9            THE COURT:  You may answer that.

10           MR. WINSBERG:  Your Honor, we -- let's just let the

11   record be clear.  We know there are volumes of independent

12   director transcripts that have not been produced to us in

13   redacted --

14           THE COURT:  Do you know the name of the directors?

15           MR. WINSBERG:  Then I think all four, or three.  I

16   think -- if you give me a minute, Your Honor --

17           THE COURT:  Do you know the names?

18           MR. GERSHMAN:  It's --

19           MR. WINSBERG:  Yeah -- yes.

20           MR. GERSHMAN:  It's set out in our papers, Your Honor.

21   In our papers, we --

22           THE COURT:  You're hedging.  I -- and I'm really tired

23   of Adelphia's hedging.  So I -- and I've had it.  I looked at

24   this case from the very beginning.  It's your case.  Then once

25   when it comes down to getting to the meat of it, you just keep

1    putting brakes up, and I'm not going to put up with it.

2            MR. GERSHMAN:  Your Honor, there are 11 transcripts;

3    six of which have been produced in their entirety.  Five of

4    them have not because they did not have testimony that was

5    related --

6            THE COURT:  That's your decision --

7            MR. GERSHMAN:  Yes.

8            THE COURT:  -- not mine.  Produce them.

9            MR. GERSHMAN:  Okay.

10           THE COURT:  End of story on that, but I want to know

11   that every one of them are produced.

12           And, Mr. Winsberg, did you have an agreement with

13   Cravath about making a deal to turn over those transcripts?

14           MR. WINSBERG:  No, Your Honor.  What we have, Your

15   Honor, is set forth in Mr. Gordon's e-mail.  Mr. Gordon had the

16   communication with Cravath and asked them, you know, we want to

17   find out -- he -- we decided we wanted to find out from the

18   source who was really the one that was making the decision on

19   these transcripts --

20           THE COURT:  Okay.

21           MR. WINSBERG:  -- and so he called Cravath and my -- I

22   did not have that communication, but Mr. Gordon did, and my

23   understanding is he called them, they said, as long as you're

24   under the confidentiality agreement that you -- that we have

25   now signed up with you, you can have unredacted transcripts.

23

```
 1              THE COURT:  Okay.

 2              So we're giving all the unredacted transcripts.  Name

 3    the six that you have given and the five that you're going to

 4    give by next week.

 5              MR. GERSHMAN:  Okay.

 6              THE COURT:  Name them.

 7              MR. GERSHMAN:  Shall I continue, Your Honor?

 8              THE COURT:  Yeah, give me the --

 9              MR. GERSHMAN:  Okay.

10              THE COURT:  Give me the six that you've --

11              MR. GERSHMAN:  Oh.

12              THE COURT:  -- given and the five that you're going to

13    give so that we're clear about what you're going to do between

14    now and next week.

15              MR. GERSHMAN:  I can't tell you what volume it is,

16    Your Honor.  I can just tell you that --

17              THE COURT:  The name of the independent directors.

18              MR. GERSHMAN:  Do you want me to tell you that now --

19              THE COURT:  Uh-huh.

20              MR. GERSHMAN:  -- or you just --

21              THE COURT:  Uh-huh.

22              MR. GERSHMAN:  -- want it within the week or --

23              THE COURT:  Now.

24              MR. GERSHMAN:  I'll have to -- hang on, Your Honor.

25    I'll have to --
```

1          THE COURT:  Sure, I'm here.

2          MR. GERSHMAN:  -- look in my papers.

3      (Pause.)

4          THE COURT:  Confidentiality agreements don't mean you

5  don't produce.

6      (Pause.)

7          THE COURT:  While you're looking, can you --

8          MR. GERSHMAN:  Here -- I've got it --

9          THE COURT:  Okay, go ahead.

10          MR. GERSHMAN:  -- Your Honor.

11          THE COURT:  All right, go ahead.

12          MR. GERSHMAN:  So on Page 28 of our papers, we

13  indicate that there were three transcripts for Mr. Gelber,

14  three for Mr. Kailbourne, two for Mr. Coyle, and three for Mr.

15  Metros in the Deloitte litigation total.

16          THE COURT:  And those were produced?

17          MR. GERSHMAN:  No, no, no.  Of those -- and which I

18  believe adds up to 11.  Of those 11, two for Gelber, two for

19  Coyle, one for Kailbourne, and one for Metros have been

20  produced.

21          THE COURT:  And, Mr. Winsberg, you say you don't have

22  any for Gelber?

23          MR. WINSBERG:  That's our understanding, yes, Your

24  Honor.  We've looked hard and we couldn't find it --

25          THE COURT:  Okay.  I want you two to confer and then I

25

1   want you to re-produce and find out why they weren't produced.

2          MR. GERSHMAN:  Yeah, so there are five, Your Honor,

3   that were not produced, which -- you know, which you're

4   directing us to produce.  Whatever the difference is between

5   the 11 and the six, of course we will produce them.

6          THE COURT:  But of those people.  Okay.  Very good.

7   Saying we're over the confidentiality.  Deloitte says there's

8   no problem and then Adelphia took it on themselves not to

9   produce five based on confidentiality.  That's not the standard

10  in discovery.  The discovery is privileged and if you have

11  something you need to do would be a privilege log.  You didn't

12  produce a privilege log, produce.

13         MR. GERSHMAN:  Actually, Your Honor, there -- the five

14  that Adelphia did not produce it didn't produce them because

15  they were not relevant to any issue in this case.

16         THE COURT:  That's not your decision to make.

17         MR. GERSHMAN:  Okay.

18         THE COURT:  Produce them.  Discovery if it goes to

19  possibility of any financial condition, produce.

20         MR. GERSHMAN:  Okay, Your Honor.

21         THE COURT:  Whether it's relevant at trial or not is a

22  total nother (sic) issue.  We're at discovery.  Okay.  So we

23  know that about that -- discovery rules are broadly and

24  liberally construed in order to fulfill discovery's purpose --

25  let me tell you this before you continue your arguments:

1          "For providing all parties with information essential

2          to the proper litigation of all relevant facts to

3          eliminate surprise and promote settlement.  As long as

4          a party's request for information or documents are

5          relevant to the claims at issue in case and such

6          discovery are tendered in good faith and not unduly

7          burdensome, discovery shall proceed."

8          And that's -- you're making a decision that I disagree

9   with.

10         "The parties resisting a production bears the burden

11         of establishing lack of relevancy or undue burden or

12         demonstrate to the court that the requested documents

13         either do not come withing the broad scope of

14         relevancy defined in Federal Rule of Civil Procedure

15         26(b)(1), of course applicable to bankruptcy rules, or

16         that the request are of such marginal relevance that

17         the potential harm occasioned by discovery would

18         outweigh the ordinary presumption in favor of broad

19         disclosure."

20         That would be a decision for me to make.  You didn't

21  bring it to me.  You did it on your own.  It's discoverable.

22  You get it.

23         "Further, the statement by a party that a request for

24         production is overly broad, burdensome, oppressive or

25         irrelevant is not adequate to voice a successful

27

 1            objection.  A party objecting to discovery request

 2            must substantiate the objection by specifying how each

 3            request for production or interrogatory is deficient

 4            and articulate the particular harm."

 5            So we have now dealt with the independent directors of

 6   the -- in the Deloitte litigation.  Now please argue the

 7   Highland Prestige of Georgia and Prestige Communications

 8   minutes books.

 9            MR. GERSHMAN:  Yes, Your Honor.  The --

10            THE COURT:  And you said you'd give them to him,

11   right?

12            MR. GERSHMAN:  No, no.  We have already given -- I'm

13   sorry.  You're talking about the minute books, Your Honor,

14   or --

15            THE COURT:  Yes.

16            MR. GERSHMAN:  Yeah.

17            THE COURT:  The minute books.

18            MR. GERSHMAN:  The minute books, Your Honor -- the

19   minute books for these two entities were produced in their

20   entirety up through 2001.

21            THE COURT:  Tell him where to get them and they'll go

22   get them.

23            MR. GERSHMAN:  The --

24            THE COURT:  Tell him exactly where to get them.

25            MR. GERSHMAN:  I don't think he has a problem finding

1  that, Your Honor.  What Mr. Winsberg is asking for is he wants

2  all of the minute books, not just for the relevant time period,

3  which is '99, 2000.  And we gave an additional year 2001.  He

4  wants all of the minute books all the way up through 2007.

5          THE COURT:  Is that correct?

6          MR. WINSBERG:  Yes, Your Honor.

7          MR. GERSHMAN:  And --

8          THE COURT:  Okay, and why do you want them up through

9  2007?

10          MR. WINSBERG:  Because, Your Honor, again, what I said

11  in my initial presentation, the stock was never transferred

12  from Adelphia to Highland Prestige, so we'd like to see what

13  exactly Adelphia was doing in these minute -- how were these

14  entities being governed when Highland Prestige, which was the

15  Rigas managed entity, was allegedly exercising control over the

16  entity that's the source of the litigation in this case.

17          THE COURT:  And you're saying that it wasn't

18  transferred at all and you think the minute books haven't

19  reflected that there -- up to that point they haven't?

20          MR. WINSBERG:  The not --

21          THE COURT:  So let me ask you something.  At trial, if

22  they weren't transferred before that, then why would they even

23  win based on what you've said?

24          MR. WINSBERG:  I don't think they would, Your Honor,

25  but I think the standard for relevancy is broader than that.  I

29

1    think we have a right to see what they did in the bankruptcy

2    case because our view is there's no damages, but we have a

3    right to see what those minute books would say --

4              THE COURT:  And the -- well, the damages are only up

5    to '01, right?

6              MR. WINSBERG:  Our --

7              THE COURT:  The damages are not past '01?

8              MR. WINSBERG:  Our view, Your Honor, is there is no

9    damages at all because the stock was never transferred from

10   Adelphia to Highland.  And not only that, Your Honor, but

11   during the government settlement, Prestige Communications, Inc.

12   went back to Adelphia and then got sold to Comcast and Time

13   Warner.

14             THE COURT:  And you think that was after the fact?

15             MR. WINSBERG:  I think those certainly happened in

16   2005 and '6 is my understanding and Mr. Gershman can correct me

17   if I'm wrong.

18             THE COURT:  Sign a confidentiality agreement and I'll

19   let you have them, too.

20             MR. WINSBERG:  We already have, Your Honor.

21             THE COURT:  I don't see why not.  I'll let you argue.

22             MR. GERSHMAN:  Okay.

23             THE COURT:  Tell me what I missed.

24             MR. GERSHMAN:  Sure.

25             THE COURT:  I'm sorry.

30

1          MR. GERSHMAN:  Your Honor, the -- we believe again

2    that everything that is relevant has been produced, that the --

3    whatever corporate governance was -- let me back up.  Two

4    things.

5          THE COURT:  Go directly to what he argued.  Because

6    what he argued is very compelling.  So go back to that.

7          MR. GERSHMAN:  Okay.  The -- these entities were Rigas

8    -- they were Rigas family entities.  The Rigas family entities

9    were always managed day-to-day by Adelphia.  Always were.  The

10   Rigases had economic interest in them.  The economic interest

11   that the Rigas family had we -- Mr. Winsberg said, we want to

12   see documents that relate to the -- you know, the control and

13   whether the stock was transferred.  We said, okay, fine, we

14   will produce you the documents where --

15         THE COURT:  Well, you gave all the minute books.  All

16   of them.

17         MR. GERSHMAN:  We gave him all of the minute books

18   through '01.

19         THE COURT:  Is that correct?

20         MR. GERSHMAN:  We also --

21         THE COURT:  I want to make sure I understand.  Is that

22   correct?

23         MR. WINSBERG:  To the best of our understanding, Your

24   Honor, we believe that to be the case.  We don't know -- we

25   have no way to prove a negative, but we -- I have no reason to

31

1   disbelieve his --

2           THE COURT:  Okay.

3           MR. WINSBERG:  -- representation to the Court.

4           THE COURT:  All right.

5           All right.  Thank you.  I just wanted to make sure.

6           MR. GERSHMAN:  Okay.  All of the minute books through

7   '01 we produced the document whereby the Rigases reconveyed

8   their ownership in the stock of these entities to Adelphia in

9   2006 pursuant to the government settlement.

10          The issue that Mr. Winsberg has raised is that in the

11  stock ledger book, and they have all of the relevant portions

12  for this, there is no entry back in 2000.  And they have all of

13  this stuff, indicating that Adelphia had signed the stock over

14  to the Rigas family entity.  They have all --

15          THE COURT:  So then -- let me ask you then.  So then

16  it becomes a moot issue when you start arguing that the control

17  of the stock is one of the reasons for the fraudulent

18  conveyance?

19          MR. GERSHMAN:  No, Your Honor, it's merely -- we

20  believe that there's no question that the Rigases owned this

21  entity.  It was recorded as such in the accounting records.

22  The government was told and believed that they owned it.  It

23  was addressed in the government settlement to something that

24  the Rigases owned.  The Rigases reconveyed their stake.  The

25  only issue is that it appears that no one ever got around to

32

1  recording in the ledger book that this transfer had happened,

2  but otherwise, all other indications are that the transfer did

3  happen.

4          THE COURT:  Okay.  I hear you.  And given the

5  complexities of this case, I think Mr. Winsberg's explanation

6  are sufficient to beat your relevancy objection.  So there's a

7  reasonable basis for requesting it and they -- it must be

8  produced.  If they're not relevant, hopefully you won't even

9  bring them up at trial, because let's just not make this more

10  complicated than it is, but you can object to it at that time.

11         MR. GERSHMAN:  Okay.

12         THE COURT:  All right.  So then that's the minute

13  books.  Now then we're relating to closing documents, right?

14         MR. GERSHMAN:  No, Your Honor.  It's -- we're not --

15         THE COURT:  Oh, it's not the closing documents, right.

16         MR. GERSHMAN:  The closing documents were produced two

17  years ago.

18         THE COURT:  Okay.

19         MR. GERSHMAN:  All right.

20         THE COURT:  All right.

21         MR. GERSHMAN:  We've been through this.  This is the

22  third time.  The defendants in their --

23         THE COURT:  Trust me.

24         MR. GERSHMAN:  -- initial document request --

25         THE COURT:  I know that.

33

1          MR. GERSHMAN:  In 2005, the defendants made the same

2     exact request.  They made the same request that is now before

3     you, which is --

4          Is this their exhibit?

5          -- which is their Exhibit 32.  Document Request Number

6     1, which goes on for two and a half pages and has 16 sub parts,

7     they basically are requesting almost every document -- not just

8     the closing sets, almost every document having to do with every

9     acquisition that Adelphia engaged in, in addition to the

10    Prestige acquisition, during 1999 and 2000.

11         That same request was made in 2005.  We met and

12    conferred with them on it and it was agreed that those requests

13    would be resolved by the production of the closing sets which

14    would show the -- it would show the signed purchase agreements,

15    it would show what Adelphia paid for them --

16         THE COURT:  Okay, did you ask Mr. Winsberg in looking

17    at the closing documents that there came up other questions and

18    that's why they want these?

19         MR. GERSHMAN:  Well, we did.  We asked them -- we

20    asked a number of times to --

21         THE COURT:  I will now ask you, Mr. Winsberg.  You got

22    the closing documents.  So what about all of these and why

23    could you not -- do you have to have them all, and what is it

24    about just the closing documents that you think you need more

25    than that?

1          MR. WINSBERG:  We had numerous conferrals with him,

2  Mr. Gershman, on why we think --

3          THE COURT:  Now, he has a name.

4          MR. WINSBERG:  With Mr. Gershman on these issues, Your

5  Honor.  To answer your question, Your Honor, the closing

6  binders tell us -- and my recollection incidently was we got

7  the closing binders to resolve a 30(b)(6) topic issue.  We

8  needed more than the -- closing binders deal, Your -- dealt

9  with gave us the purchase price, number of subscribers, who the

10  seller and buyer were.

11          THE COURT:  Right.  Right.

12          MR. WINSBERG:  What they did not give us, Your Honor,

13  and what is apparent from the case law is they did not give us

14  the board minutes, what the board looked at in approving these

15  acquisitions --

16          THE COURT:  But do you need them all?

17          MR. WINSBERG:  We need --

18          THE COURT:  I mean how many do you have?  I mean how

19  many are there?

20          MR. WINSBERG:  There are -- the '99, 2000 time frame,

21  there are approximately 20 or so acquisitions, I believe, in

22  that time frame.  There were some in '01 that he gave us

23  closing binders on which we did not ask for in this request.

24  We didn't ask for any acquisitions documents for 2001.  We only

25  asked for '99 and 2000 --

1          THE COURT:  So in other words, instead of having the

2    income tax return, my analogy, you want the documents behind

3    putting the income tax return together.

4          MR. WINSBERG:  Yes.

5          THE COURT:  Yes, sir?

6          MR. GERSHMAN:  Your Honor, I don't -- that's not quite

7    -- well --

8          THE COURT:  Okay.

9          MR. GERSHMAN:  -- it's much broader than that.

10         THE COURT:  Okay.

11         MR. GERSHMAN:  I mean, and I encourage you strongly to

12   take a look at this request and some of the things that are in

13   there as to how they could be possibly relevant.  You know, due

14   diligence checklist for every one of these transaction,

15   engagement letters for every one of these transaction, and

16   there are several reasons why this stuff is, we believe, so far

17   afield that it should not be ordered to be produced.  And --

18         THE COURT:  Okay.

19         MR. GERSHMAN:  -- let me touch a couple of them --

20         THE COURT:  Sure.

21         MR. GERSHMAN:  -- and it's a little bit complicated.

22   I mean basically, Mr. Winsberg is contending that to sort of

23   analyze Adelphia's allegations of solvency, it needs to get all

24   of the documents relating to all of the acquisitions that

25   Adelphia did in 1999 and 2000 to analyze those allegations.

1   And these are all documents -- and he indicates that what he

2   wants to see is, you know, sort of the what were the financial

3   analysis, what were the projections and things that people were

4   looking at, at that point in time, and there are a couple

5   problems with his argument.

6           First, all of that stuff was done in the middle of the

7   fraud, it is not reliable, and it's not going to be useful in

8   any analysis here as to whether Adelphia was solvent or had

9   unreasonable capital.  We're going to have to look at the real

10  numbers which came out of the restatement.

11          Let me -- and let me also add in, Your Honor, the --

12  Mr. Winsberg cites to one case and there are cases who say in

13  situations where you don't have widespread company fraud such

14  that the numbers being looked at prior to the transfer are not

15  useful or reliable, there are cases that say, well, if we're

16  looking at a particular transfer and the transfer we're looking

17  at here is the Prestige transaction, you know, it may be fair

18  to look at what other -- what -- you know, what was the

19  analysis people were doing.  Did they think they were going to

20  have insufficient capital after this transaction.

21          But we have given him everything having to do with the

22  Prestige transaction and he is asking for everything having to

23  do with 32 transfers that we are not challenging.

24          THE COURT:  I heard.  You're not challenging it?

25          MR. GERSHMAN:  He's not challenging the payments --

1    we're not -- we are not challenging the payments that were made

2    in connection with all those transactions.

3         THE COURT:  Again, you're making the relevancy

4    determination on behalf of Prestige.  Prestige has to make

5    their own.  But I will tell you I want you meeting and

6    conferring on this, and I am at the stage that I'm coming to

7    sanctions, and I'm about ready to give them.  So when I say

8    meet and confer, I mean meet and confer, and I mean to get it

9    resolved or you're going to start paying.  And I can't be more

10   clear than that.  Because it seems to me that this is the kind

11   of stuff you can talk about.

12         While my analogy might be simple about the IRS and the

13   background for it, I think it's still a good analogy.  And I

14   think that you can find ones that you can look at and give and

15   let them see because I think it is relevant and figure it out.

16   And it doesn't have to be you have to give this desk full of

17   papers.  You can figure it out and do it together.

18         I'm getting ready for trial.  So you're making a

19   relevancy determination without giving me anything except broad

20   relevancy determination, and I won't do that.  I think the -- I

21   think they met the relevance standard.  Whether it's admissible

22   at trial or not, I don't have a clue, and I won't know until we

23   get there.  I hope if it's not relevant, you're not going to

24   bring it in.

25         All right.  Have I decided on everything?  Except I am

1   holding expenses and attorneys fees.  I want to see you again

2   next week.

3              MR. GERSHMAN:  Your Honor, it's a little unclear to me

4   I guess on -- on that last one, are you saying you want us to

5   sit, meet, and confer and try to work it out with --

6              THE COURT:  Absolutely.

7              MR. GERSHMAN:  All right.

8              THE COURT:  Within a week.  I'm not willing to --

9   relevancy is my determination, not a broad sweep that just

10  comes in and says we've decided it's not relevant.  I think

11  these may be relevant and I think the standard has been met by

12  Prestige that in the determination under the Rule 26 they are

13  relevant enough.  Now then, you could meet and confer and not

14  have to produce everything, but produce enough that they can

15  see what's going on.

16             MR. GERSHMAN:  The only thing I would say, Your Honor,

17  is the -- in their papers, the defendants do not identify a

18  single case where any court said you need to analyze all of the

19  acquisitions that this company has done in the preceding two

20  years with respect to solvency or insufficiency of capital.

21  They have no cases where that --

22             THE COURT:  That's why you're --

23             MR. GERSHMAN:  -- has ever been done --

24             THE COURT:  -- meeting and conferring because I might

25  be the first court that decides that.  Maybe I won't, but maybe

1    I will.

2                MR. GERSHMAN:  Fair enough, Your Honor.

3                THE COURT:  So on -- so I have all depositions you're

4    giving -- you're -- I'm ordering that all depositions be given

5    from the Deloitte litigation in unredacted format within the

6    week.  I am compelling the corporate minute books and I'm

7    having you meet and confer on the cable systems acquisitions

8    between 1999 and 2000.  Is that understood?

9                MR. GERSHMAN:  Understood, Your Honor.

10               THE COURT:  I need an order.

11               Now I have one other housekeeping matter that I need

12   to discuss.

13               You may sit down.

14               My chambers have been inundated with a phone -- with

15   phone calls and messages from a representative of Judge

16   Weinstein; Judge Weinstein that I do not know.  He seems to be

17   a California -- a former California state judge that is a

18   mediator in several of the Adelphia matters.  Are you familiar

19   with him at all?

20               MR. GERSHMAN:  I'm not familiar with the individual.

21   I do know that there is a Judge Weinstein who has been

22   mediating various Adelphia litigations.

23               THE COURT:  And aren't they in district court or -- or

24   do you know?

25               MR. GERSHMAN:  I believe he may have been involved in

1    mediating the <u>Deloitte</u> case, which was not in district court.

2    I believe he may be involved in some of the cases that Judge

3    McKenna has.

4         THE COURT:  I think it's Judge McKenna; the cases.  I

5    can only tell you all -- and we don't -- first you need to know

6    that I am a mediator.  I think mediation's a wonderful thing.

7    I strongly believe in it, and I would entertain a request for

8    appointment of a mediation from anybody.  It doesn't even have

9    to be that both parties agree.

10        If somebody really wants -- by the way, you just need

11   to know I never spoke to the representative.  He tried every

12   way in the world to the point of telling my law clerks that

13   they didn't understand.  Both of them.  You don't understand.

14   But anyway, that's beside the point.

15        If anybody wants mediation though, you just need to

16   get it in front of the Court in a way that the Court can deal

17   with it.  I don't take ex parte communications.  I'm strictly

18   prohibited.  I let the law clerks talk to him.  They don't talk

19   to him about the meat of it, but -- and never would I think

20   that I would advocate a mediation with a specific mediator.  I

21   might change my mind on that, but I wouldn't think so.

22        Usually, the Court only appoints mediators that are on

23   the Southern District of New York's mediation panel.  There

24   might be a very rare exception for that, but that's rare.  But

25   I wanted you all to know because we have been inundated with an

1    ex parte communication.  So I wanted it on the record that I

2    have not spoken to him and just let you all know what's going

3    on.

4            All right, am I going to see you again next week?  Or

5    do you think you need me?

6            MR. GERSHMAN:  I think our motion --

7            THE COURT:  I like seeing you.

8            MR. GERSHMAN:  Our motion is -- we have a motion on --

9            THE COURT:  That's right.

10           MR. GERSHMAN:  -- seeking production of the

11   defendants' tax documents, Your Honor.

12           THE COURT:  Okay, when you meet and confer, would you

13   please confer over that, too?

14           MR. WINSBERG:  Yes, Your Honor, we can --

15           MR. GERSHMAN:  Sure, Your Honor.

16           MR. WINSBERG:  -- talk again about that.

17           THE COURT:  Thank you.  And you know my -- and you

18   sort of know my feelings now.  So what -- are we set up for

19   anything next week?  You --

20           MR. GERSHMAN:  Yes, Your Honor, I believe it's 10:30

21   on the 24th, a week from today.

22           THE COURT:  Very good.  Very good.  Just to let you

23   know, documents that come in late the night before, we travel

24   back to Manhattan.  There's no way we could even get them.

25   They're -- because they're on ECF.  We don't sit down to

1    computers.  We do know that some came in from you last night.

2    There's no way we could have had then.  That -- it just can't

3    happen.

4         We have a rule up in our court and it -- and I don't

5    -- it's a sort of unwritten rule, but if you -- you need to

6    give us -- well, more than 24 hours.  Usually it's three days

7    up there, but you need to give us at least -- because we do

8    travel, you need to give us at least two days because we can't

9    get it.

10        Yesterday was also a brutal day.  We -- I don't think

11   we ever set at a computer yesterday.  We were in trial all day

12   long, so -- anyway.

13        MR. WINSBERG:  Your Honor, if I --

14        THE COURT:  Anything else?

15        MR. WINSBERG:  Yes, Your Honor, if I could just be

16   real brief on the tax return issue which we'll deal with next

17   week, we'll certainly -- at Your Honor's instruction, we will

18   meet and confer again on that.

19        I would note we were on an expedited time frame to put

20   a response in to that motion, and I know last night -- I hadn't

21   studied it, but I know last night Mr. Gershman did file a reply

22   and I --

23        THE COURT:  I knew something was filed, but I --

24        MR. WINSBERG:  I was wondering if I get the Court's

25   permission, if I'd so choose, if I could put an additional

43

1    paper in on that.

2            THE COURT:  Certainly, but I think you've got -- just

3    so you know, I think you got a feel for me today on what I

4    think, so -- on relevancy, but I think you're also both

5    beginning to get a feel that I'm getting at my wits end, so

6    somebody's going to start paying.  And trust me it's not going

7    to be me.  So --

8            Court's in recess.

9            MR. WINSBERG:  Thank you, Your Honor.

10           THE CLERK:  All rise.

11           THE COURT:  Unless you have questions.

12           MR. WINSBERG:  No, Your Honor.

13           THE COURT:  You'll submit an order.

14           MR. WINSBERG:  Yes, Your Honor.

15       (Proceedings concluded at 12:22 p.m.)

16                              * * * * *

1                                  CERTIFICATION

2          I certify that the foregoing is a correct transcript

3  from the electronic sound recording of the proceedings in the

4  above-entitled matter.

5

6

7                                                 October 18, 2007

8  Tracy A. Gegenheimer    AAERT Cert. No. 282
Certified Court Transcriptionist

9  For Rand Reporting & Transcription, LLC

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT S

-----Original Message-----
**From:** Joseph Gershman [mailto:JGershman@kasowitz.com]
**Sent:** Thursday, February 14, 2008 6:28 PM
**To:** James Canning
**Cc:** Ernst, Douglas E.; David M. Friedman
**Subject:** Deloitte Production To Prestige Communications of NC, Inc., et al.

James:

In response to your e-mail, the Adelphia Recovery Trust <u>does object</u> to the production of deposition transcripts and exhibits of the Deloitte experts.  There has been no discussion or agreement between the Trust and the Prestige Defendants with respect to these documents.  The Trust will review the deposition transcripts and exhibits, and if it changes its position with respect to the deposition transcripts we will inform you accordingly.

The Trust does not object to the production of Deloitte's expert reports and exhibits (with the sole exception of any materials relating to Jonathan Macey), subject to the Prestige Defendants' agreement to the following conditions, which Mr. Ernst has represented are acceptable to the Prestige Defendants:

"With respect to the Deloitte expert reports, Adelphia does not object to your access to, or review of, the reports submitted by Deloitte's experts provided that the disclosure of Deloitte's experts' reports is without prejudice to, and does not waive, our objection to the relevance or admissibility of any expert materials from the Deloitte Action, and provided further that the Prestige Defendants do not argue that the production of these materials in any way undermines or affects our objection to the request for production of Adelphia's expert reports."

Please contact me if you have any questions.

- Joe Gershman

-----Original Message-----
**From:** James Canning [mailto:JCanning@cravath.com]
**Sent:** Wednesday, February 13, 2008 1:31 PM
**To:** Joseph Gershman
**Cc:** harris.winsberg@troutmansanders.com
**Subject:** Deloitte Production To Prestige Communications of NC, Inc., et al.

On behalf of Deloitte & Touche LLP ("Deloitte"), I write to inform you that as a result of the subpoena served upon Deloitte by Prestige Communications of NC, Inc., et al. ("Prestige"), we intend to produce to Prestige the following documents from Adelphia Communications Corporation v. Deloitte: Deloitte's expert reports with exhibits and deposition transcripts of those experts with exhibits (with the sole exception of any materials relating to Jonathan Macey).

Please confirm that the Adelphia Recovery Trust does not object to production of these materials.

Sincerely,

James E. Canning, Esq.
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
Tel 212-474-1070
Fax 212-473-3700

This e-mail is confidential and may be privileged. Use or disclosure of it by a

This e-mail and any files transmitted with it are confidential and may be subject to the attorney-client privilege. Use or disclosure of this e-mail or any such files by anyone other than a designated addressee is unauthorized. If you are not an intended recipient, please notify the sender by e-mail and delete this e-mail without making a copy.

# EXHIBIT T

# TROUTMAN SANDERS LLP

### ATTORNEYS AT LAW
A LIMITED LIABILITY PARTNERSHIP

BANK OF AMERICA PLAZA
600 PEACHTREE STREET, N.E. - SUITE 5200
ATLANTA, GEORGIA 30308-2216
www.troutmansanders.com
TELEPHONE: 404-885-3000
FACSIMILE: 404-885-3900

Douglas E. Ernst
douglas.ernst@troutmansanders.com

Direct Dial:  404-885-3334
Direct Fax:  404-962-6552

March 27, 2008

## VIA E-MAIL AND U.S. MAIL

Joseph A. Gershman, Esq.
Kasowitz, Benson, Torres & Friedman LLP
1633 Broadway
New York, New York 10019-6799

> Re:  Adelphia Recovery Trust v. Prestige Communications of NC, Inc., et al.
> Civil Action File No. 07-11152, United States District Court, Southern
> District of New York

Dear Joe:

As you know, the Parties reached a compromise with respect to Request No. 1 of the Defendants' Fourth Request for Production of Documents. At the October 24, 2007 hearing, Judge Morris ordered Plaintiff to produce, among other things, all documents responsive to Document Request No. 1, subparts (a), (b), (c), (g), (h), (k), (m), (n), and (p), with the agreed limitation that the request shall only apply to the following Adelphia acquisitions: Verto, Century/Citizens, Harron, FrontierVision, Olympus, Benchmark, Cablevision, Prestige, Cablevision Midwest, and Century-TCI (the "Acquisitions"). Additionally, with respect to Document Request No. 1, subpart (p), the Parties agreed to limit the scope of this request to documents provided to banks, equity analysts, or shareholders concerning the Acquisitions. Judge Morris made the compromise agreement an order of the Court (the "Order"), and carried Defendants' Second Motion to Compel until all responsive documents were produced.

After reviewing documents Plaintiff produced pursuant to the Order, we discovered that the Plaintiff has not fully complied with the Order. For example, Document Request No. 1, subpart (b) requested "[o]ffering memoranda, prospectuses, solicitation packages, or similar documents prepared by or for the acquired corporations, or their brokers and/or agents, relating to the acquired corporation's efforts to market and sell its cable systems." We could not locate documents responsive to the request with regard to the Harron, FrontierVision, Olympus, Cablevision, and Cablevision Midwest acquisitions. As a further example, Document Request

**TROUTMAN SANDERS LLP**
ATTORNEYS AT LAW
A LIMITED LIABILITY PARTNERSHIP

Joseph A. Gershman, Esq.
March 27, 2008
Page 2

No. 1, subpart (g) requested "[a]ll fairness opinions received or prepared related to any of the Acquisitions." We could only locate one fairness opinion, which was for the Century acquisition. Additionally, among other missing documents, we could not locate any documents responsive to Document Request No. 1, subparts (h) and (n). Similarly, we could not locate documents responsive to subpart (o) with regard to the Verto and Benchmark acquisitions. Simply put, our review of Adelphia's production indicates that Plaintiff just dumped documents into banker boxes without any organization or review for responsiveness. Please immediately produce all response documents as required by the Order and the agreement of the parties.

Please also explain why Plaintiff produced redacted documents without providing a privilege log, as required by the Local Rules for the Southern District of New York. Plaintiff's failure to timely produce a privilege log waives its right to withhold any documents on the grounds of privilege. Moreover, the production included many unreadable spreadsheets. As an example, ADPR 000100953-000160989 is undecipherable, as is ADPR 000101048-00010187. Please provide all electronic spreadsheets in native form.

We also noticed that Plaintiff failed to produce the metadata concerning the history, tracking, and management of Issue Summary A-2 as requested in Request No. 3 in Defendants' Sixth Request for Documents. Please produce this information immediately.

Moreover, please explain the basis for Plaintiff's objection in its email dated February 14, 2008, to Deloitte producing the depositions the transcripts and associated exhibits thereto of Deloitte's own expert witnesses in the Deloitte Litigation.

Finally, please produce to us the following additional PWC external binders in connection with the restatement: PWC 967284, PWC 968342, PWC 967384, PWC 1438431, PWC 1111806, PWC 1111883, PWC 1111886, PWC 958276, PWC 1420638, PWC 1446372, PWC 1446366, PWC 1446374, PWC 1446377, PWC 1369773, PWC 1424890, PWC 1136357, PWC 1380050, and PWC 1336921.

Please feel free to give me a call if you have any questions.

Sincerely,

Douglas E. Ernst

DEE:bkf
cc:    Harris B. Winsberg, Esq.
       Sean P. Dailey, Esq.

1923322_1.DOC

# EXHIBIT U

# TROUTMAN SANDERS LLP

### ATTORNEYS AT LAW
A LIMITED LIABILITY PARTNERSHIP

**BANK OF AMERICA PLAZA**
600 PEACHTREE STREET, N.E. - SUITE 5200
ATLANTA, GEORGIA 30308-2216
www.troutmansanders.com
TELEPHONE: 404-885-3000
FACSIMILE: 404-885-3900

Douglas E. Ernst
douglas.ernst@troutmansanders.com

Direct Dial: 404-885-3334
Direct Fax: 404-962-6552

February 13, 2008

**VIA EMAIL & U.S. MAIL**

Joseph A. Gershman
KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, NY 10019-6799

RE: *Adelphia Recovery Trust v. Prestige Commc'ns of NC, Inc. et al. (07-Civ-11152)*

Dear Joe:

After a cursory review of the documents Plaintiff has produced in response to Defendants' Sixth and Seventh Requests for the Production of Documents it appears that Plaintiff has yet to produce any documents in response to Request Nos. 1, 2, 5 and 7 (Sixth Request) and Request Nos. 3, 6, 7, 8 and 12 (Seventh Request). We are still in the process of reviewing Plaintiff's most recent document production, I will let you know if there are additional requests to which Plaintiff has failed to fully respond.

Defendants' requests (above) are reasonably calculated to lead to the discovery of admissible evidence and seek document that are both relevant and material to this litigation. Plaintiff indicated in its responses – at least in response to Request Nos. 1, 2, 5 and 7 (Sixth Request) – that it would produce documents responsive to these requests, yet it has failed to do so. Please let me know when we can expect to receive documents responsive to these requests.

Plaintiff's objections to Request Nos. 2 and 7 (Sixth Request) are inadequate for the following reasons:

Request No. 2: The requested documents are clearly relevant to the issue of insolvency (of Adelphia). Specifically, the requested documents address issues that directly bear on the financial condition of Adelphia, such as the accounting treatment of the co-borrowing debt, the fixed asset scrub done by Adelphia in the restatement and whether Adelphia was adequately capitalized. Furthermore, as you are well aware, Defendants are parties to the "confidentiality agreement" referred to in Plaintiff's objections (have been since September 2006, so I am unclear on how that agreement could possibly serve as a legitimate basis for objection. Please produce all responsive documents immediately.

ATLANTA · HONG KONG · LONDON · NEW YORK · NEWARK · NORFOLK · RALEIGH
RICHMOND · SHANGHAI · TYSONS CORNER · VIRGINIA BEACH · WASHINGTON, D.C.

**TROUTMAN SANDERS LLP**
ATTORNEYS AT LAW
A LIMITED LIABILITY PARTNERSHIP

Joseph A. Gershman
February 13, 2008
Page 2

Request No. 7:  The requested documents are relevant to this litigation because, among other reasons, they go directly to the issue of Adelphia's alleged damages.  Furthermore, the "Sealing Order" Plaintiff's refer to in their objections does not prohibit Defendants from discovering the requested documents, it merely limits the general public's access to the documents.  Therefore, Plaintiff is obligated to produce the requested documents without any further delay.

Plaintiff's objections to Request Nos. 3, 6, 7, 8 and 12 (Seventh Request) fail for the following reasons:

Request No. 3:  The requested documents are relevant to Plaintiff's claims.  *See, e.g., Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978) (noting that within the context of discovery, relevance "has been construed broadly to encompass any matter that bears [up]on, or that reasonably could lead to other matters that could bear on, any issue that is or may be in the case").  Among other reasons, the requested documents are directly relevant to Plaintiff's claim that Prestige GA was undervalued.  Plaintiff also claims that the sale of Prestige GA to Highland Prestige was a self-interested transaction which disadvantaged Adelphia; the requested documents are necessary to refute those claims.

Furthermore, it is inappropriate for Plaintiff to withhold the requested documents simply because it would take time to complete the production thereof.  A party resisting discovery has the burden of showing:

> specifically how, despite the broad and liberal construction afforded the federal discovery rules, each ... question is overly broad, burdensome or oppressive, [] by submitting affidavits or offering evidence revealing the nature of the burden.  In order to satisfy its burden, the resisting party must do more than simply inton[e the] familiar litany that the interrogatories are burdensome, oppressive or overly broad and must clarify and explain its objections and [] provide support therefor.")

*Arias-Zeballos v. Tan*, No. 06-Civ-268, 2007 U.S. Dist. LEXIS 40245, * at 3-5 (S.D.N.Y. June 1, 2007) (alteration in original) (internal quotation marks and citations omitted).  To that end, Defendants are willing to meet and confer (via telephone) and discuss the possibility of a rolling production of these documents.

Request No. 6:  Plaintiff's objections fail for the reasons stated above in response to Plaintiff's objections to Request No. 3.

TROUTMAN SANDERS LLP
ATTORNEYS AT LAW
A LIMITED LIABILITY PARTNERSHIP

Joseph A. Gershman
February 13, 2008
Page 3

Request No. 7:  The requested documents are directly relevant to Plaintiff's claims that
the Prestige Entities were improperly valued – there is simply no legitimate way Plaintiff
can claim that this request is "overly broad and unduly burdensome." Request No. 7
seeks one year's worth of federal tax returns. Likewise, there is nothing "vague" or
"ambiguous" about Request No. 7, it is perfectly clear.

In addition, Defendants are not obligated to demonstrate that they cannot obtain
the requested documents from another source; on the contrary, "the party resisting
disclosure should bear the burden of establishing alternative sources for the information."
*United States v. Bonanno Org. Crime Family of La Cosa Nostra*, 119 F.R.D. 625, 627
(E.D.N.Y. 1988). Adelphia has failed to do so. What is more, while there is a qualified
immunity with respect to the disclosure of tax returns, the standard for permitting
discovery of such records has been met in this case. As noted above, Adelphia's 2006
federal tax returns (and any materials in support thereof) are plainly relevant to the issue
of valuation in that they show how Adelphia accounted for any gain it realized on the sale
of the Prestige Entities (or parts thereof) to Time Warner/Comcast and whether Adelphia
has suffered any damages in this case.

Lastly, you indicated to me that you intended to circulate a protective order
regarding Adelphia's tax materials, yet I have yet to receive a draft order. Please let me
know when we can expect to receive a draft consensual protective order.

Request No. 8:  Plaintiff's objections to Request No. 8 fail for the same reasons its
objections to Request No. 7 fail. The requested documents are both relevant and material
in that they show how Adelphia treated the Prestige transaction for tax purposes. Thus,
for the reasons already stated above, Plaintiff is obligated to produce any and all
responsive documents. As an aside, you informed us in writing that you would let us
know if Adelphia ever amended its 2000 tax return. Despite your written promise, you
failed to inform us that Adelphia amended its 2000 tax return in the Fall of 2007. In fact,
we did not discover the existence of the amended return until after we served you with
this document request.

Request No. 12:  Plaintiff's objections fail for the reasons stated above in response to
Plaintiff's objections to Request No. 2 (Sixth Request).

To the extent that Plaintiff is withholding documents on privilege grounds, Plaintiff has
yet to provide Defendants with a privilege log and it has been three months since Plaintiffs
responded to Defendants' Sixth Request for the Production of Documents and over forty-five
days since Plaintiff's responded to Defendants' Seventh Request. The Local Rules are clear: the

TROUTMAN SANDERS LLP
ATTORNEYS AT LAW
A LIMITED LIABILITY PARTNERSHIP

Joseph A. Gershman
February 13, 2008
Page 4

party asserting privilege in response to discovery requests must furnish the information set forth in Rule 26.2 (*i.e.* a privilege log) "in writing *at the time of the response* to such discovery …." S.D.N.Y. R. 26.2 (emphasis added). At this point (three months after the fact), Plaintiff has waived any claim of privilege with respect to any documents that are otherwise responsive to any of Defendants' outstanding requests. (*See* Order Granting Sanctions to Defs. For Pl.'s Failure to Produc. Docs., dated May 16, 2007, at 4 n.7 (ECF Docket Entry No. [114]).) More important, Adelphia has repeatedly represented to the Court and to us that it is not withholding any documents on the basis of privilege except for attorney work product related to this litigation. Therefore, Plaintiff may not withhold any responsive documents on privilege grounds and must produce said documents forthwith.

Lastly, please provide me with possible dates and times that you are available to meet and confer (via telephone) about these and other related discovery issues. Thank you.

Sincerely,

Douglas E. Ernst

cc:    Harris B. Winsberg
        Sean P. Dailey

# EXHIBIT V

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

1633 BROADWAY

NEW YORK, NEW YORK 10019-6799

212-506-1700

FACSIMILE: 212-506-1800

JONATHAN E. MINSKER
212-506-1782

ATLANTA
HOUSTON
NEWARK
SAN FRANCISCO

March 28, 2007

<u>Via E-Mail</u>

James E. Canning, Esq.
Cravath, Swaine & Moore LLP
825 Eighth Avenue
New York, New York 10019-7475

Re:    *In re Adelphia Communications Corp.*;
       Case No. 02-41729 (REG);
       *Adelphia Communications Corp. et al. v. Bank of America, N.A., et al.*;
       <u>Case Nos. 05 Civ. 9050, 05 Civ. 9250, 05 Civ. 9285 (LMM)</u>

Dear Mr. Canning:

We represent the Adelphia Recovery Trust, plaintiff in the above-captioned litigation (the "Bank Litigation"). As you know, Bank of America, N.A. ("BofA") and other defendants in the Bank Litigation have issued formal demands to the Trust's predecessors -- the Adelphia Debtors and the Official Committee of Unsecured Creditors -- for the production of all documents produced to plaintiffs by Deloitte & Touche LLP ("Deloitte") in the action brought by the Debtors against Deloitte (the "Deloitte Litigation"), as well as all pleadings and deposition transcripts (the "Deloitte Materials"). A copy of BofA's demand and a recent letter from BofA's counsel, Rick Anigian, concerning its demand are enclosed.

We understand that Cravath recently turned down a request by Bill Russell, counsel for one of the banks, to produce or allow us to produce the Deloitte Materials. We also understand that you previously have advised counsel to plaintiffs in the Deloitte Litigation, Dechert LLP, that Deloitte believes the use and production by plaintiffs in the Bank Litigation of the Deloitte Materials is prohibited by the Confidentiality Agreement in the Deloitte Litigation, and that Deloitte will not consent to plaintiffs' use or production of those materials.

We have reviewed the relevant Confidentiality Agreement and disagree with your position concerning our ability to use the Deloitte Materials in the Bank Litigation. It is clear that the Bank Litigation is expressly covered by paragraph 7 of the Confidentiality Agreement. Indeed, paragraph 7(a) covers all "contested matters" in the Debtors' bankruptcy proceedings and

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

James E. Canning, Esq.
March 27, 2007
Page 2

refers -- expressly by way of illustration and "without limitation" -- to another adversary proceeding in the Debtors' bankruptcy. Notwithstanding the clear terms of the Confidentiality Agreement, we have to this point respected your objection and have not used the Deloitte Materials in the Bank Litigation. Although we do not believe that paragraph 7.2 of the Confidentiality Agreement -- which requires notification of a party's intent to add to the list of litigations in paragraph 7 -- requires us to notify you of our intent to use the Deloitte Materials in the Bank Litigation (because the Bank Litigation is included in paragraph 7(a)), please consider this letter as the Trust's notice under paragraph 7.2.

Moreover, we believe that you should reconsider your refusal to consent to the production of the Deloitte Materials to the banks. These materials are directly relevant to plaintiffs' claims in the Bank Litigation, and most of them do not contain any confidential or proprietary information. To the extent the materials do contain such information, we understand that the banks are willing to sign on to the Confidentiality Agreement in the Deloitte Litigation and have offered to do so. Accordingly, we believe that the banks are entitled to all of the Deloitte Materials and do not understand why you have refused to give them access to those materials. Regardless, we believe that the parties should be able to resolve this issue consensually, and we would like to do so without having to involve the Court. To that end, please advise whether you are available for a meet and confer with the Trust and the lead bank defendants to discuss this issue.

Sincerely,

Jonathan E. Minsker

Enclosures

cc:    Richard Anigian, Esq.
       William Russell, Esq.
       Nancy Ruskin, Esq.
       Terence McLaughlin, Esq.
       Robin Sumner, Esq.
       Gregory Blue, Esq.
       Edward Attanasio, Esq.
       Deirdre Connell, Esq.